UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
KATHRYN SHIBER,

                                                          **1:21-cv-03649-ER**

              *Plaintiff,*

    -against-

CENTERVIEW PARTNERS LLC,

              *Defendant.*
----------------------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF
<u>UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1</u>**

                                    **SCHWARTZ PERRY & HELLER, LLP**
                                    BRIAN HELLER
                                    3 Park Avenue, Suite 2700
                                    New York, NY 10016
                                    (212) 889-6565
                                    bheller@sphlegal.com

                                    **CLAYMAN ROSENBERG KIRSHNER
                                    & LINDER LLP**
                                    JAMES F. VALENTINO
                                    305 Madison Avenue, Suite 650
                                    New York, NY 10165
                                    (212) 922-1080
                                    valentino@clayro.com

                                *Attorneys for Plaintiff*

      Pursuant to Fed. R. Civ. Proc. 56(c)(1) and Local Rule 56.1, Plaintiff Kathryn Shiber

("Shiber") respectfully submits this response to the Statement of Undisputed Facts submitted by

Defendant Centerview Partners LLC ("Centerview") in support of its Motion for Summary

Judgment.

## I.    CENTERVIEW'S THREE YEAR ANALYST PROGRAM[1]

1.      Centerview is an investment banking advisory firm that advises companies on various corporate transactions such as mergers and acquisitions. Ex. 10 (Kim Tr.) at 11:12-16.

**Shiber's Response**: Undisputed.


2.      Centerview offers a prestigious three-year analyst program. Ex. 10 at 16:2-11; Ex. 7 ¶9. Analysts, who frequently join the program directly from college, are trained in investment banking and general business. *Id.*

**Shiber's Response**: Shiber does not dispute the first sentence. In the second sentence, Shiber disputes the use of the term "frequently" as vague, ambiguous and contradicted by the record. Over ninety-five percent of Centerview's first-year analysts are recent college graduates. (Kim 12:22-25[2]).


3.      Centerview's analysts are often assigned to multiple matters at the same time. Ex. 10 at 28:21-30:16 ("At Centerview as an analyst you are available to dozens or hundreds of people as a resource, and we have a team that is – decides what work you should be on, but you can be in a situation, as I mentioned before, where you can have two or three live projects, and then, as a result, end up working at that level for a long period of time, even days or even weeks on end."), 33:2-8; Ex. 9 (Ernst Tr.) at 41:22-24.

---

[1] For purposes of convenience and pursuant to Fed. R. of Civ Proc. 56(c)(1) and Local Rule 56.1(b), Shiber has included the headings and numbered statements exactly as they appear in Centerview's Statement.

[2] All Exhibits are attached to the Declaration of Plaintiff Kathryn Shiber and all deposition transcripts are attached to the Declaration of Brian Heller, Esq. References to Shiber's Declaration are designated as "Shiber Decl. ¶__" and references to the depositions of witnesses are indicated by the witnesses' name and page number, i.e., "Shiber __."

**Shiber's Response**: Shiber disputes this statement for the following reasons: (a) the terms "often" and "matters" are vague and ambiguous; (b) Centerview misinterprets the transcripts it cites (e.g. Ernst does not indicate the frequency that he works on live deals and testified that he only worked on approximately fifteen such deals in six years, (Ernst 41:17-42:3); and (c) the record does not indisputably support Centerview's statement. (e.g. Kim 28:21-22, "Our analysts at Centerview are *sometimes* on multiple live transactions at the same time …") (emphasis added).

4. Centerview's analysts do not have set work hours. Ex. 10 at 31:25-32:12. Rather, analysts' hours are unpredictable and vary depending on the specific phase of a deal or project or the deals or projects they are working on. Ex. 18 (Robinson Tr). at 43:14-44:11, 45:24-46:11, 50:25-51:15, 106:18-21, 107:16-108:4, 136:19-137:4, 139:21-24, 151:19-23, 158:5-159:11; Ex. 10 at 28:19-29:13, 89:10-90:15; Ex. 9 at. 63:2-7 ("Q. What do you mean by 'late nights'? A. I mean working later than you would at a typical, more standard job.").

**Shiber's Response:** Shiber disputes the first sentence because the term "set" is vague and ambiguous. Further, Centerview misinterprets the transcript it cites in that Kim did not testify about "set work hours" but stated in substance that there is not a required total number of hours per week that a Centerview employee is required to work. He also testified that a Centerview employee would "rarely, if ever" have to work in excess of 120 hours in a week. (Kim 31:24-32:25, 33:2-8). Shiber disputes the second sentence in that the terms "unpredictable" and "vary" are vague and ambiguous and, therefore, cannot be used to support Centerview's notion that Shiber could not perform the essential functions of her role as an Analyst.

5.      Given the complexity and pace of most investment banking transactions, analysts at Centerview are expected to be available all hours of the day, including, at times, overnight. Ex. 10 at 89:10-12, 94:23-95:5, 114:2-24.

**Shiber's Response:** Shiber disputes this statement for the following reasons: (a) there is not specific evidence in the record to support the nature and extent of the "investment banking transactions" to which Centerview vaguely and ambiguously refers; (b) the phrase "all hours of the day" is vague and ambiguous; (c) the guardrails accommodation, which Centerview proposed and believed would work, is an admission that its analysts were not expected to be available at all hours of the day (Shiber Decl. ¶¶24-30; Robinson 139:25-140:8); and (d) Centerview expects its analysts and other employees to sleep and not work all night (Shiber Decl. ¶¶73-75, 85-86).

6.      For this reason, Centerview endeavors during its interview process to ensure that the candidates for its analyst position are capable of working long and unpredictable hours. Ex.10 at 18:1-21:5. In fact, Centerview ███████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████ Ex. 10 at. 20:17-21:5; Ex. 2.

**Shiber's Response:** Shiber disputes this statement for the following reasons: (a) the phrase "long and unpredictable hours" is vague and ambiguous; (b) Centerview has not proffered any evidence about what is specifically discussed in these interviews; (c) during Shiber's interviews for an analyst position at Centerview, no one discussed with her the exact hours she would be expected to work (Shiber Decl. ¶85; Kim 21:15-19); (d) Centerview does not provide any formal

information to its Analyst candidates to make them aware of the expectations for work hours (Kim 18:21-19:6); and (e) as evidenced by Centerview's employment offer to Shiber, she passed this vaguely described part of her interview. (*Id*. ¶74).

7.      It is widely and publicly reported that junior analysts in the investment banking industry, including at Centerview, often have a heavy workload and work long and unpredictable hours. Ex. 22 (Vicari Tr.) at 113:11-114:24; Ex. 10 at. 17:9-21:5, 95:17-25 ("Q. The ability to work 24 hours in a row, is that based upon Centerview's culture, or do you think that is across Wall street? A. that is across Wall Street"); Ex. 18 at. 157:24-159:9; Ex. 9 at 13:2-15 (describing his understanding going into Centerview's summer program that there were no set hours requirements but that he would be very busy).

**Shiber's Response:** Shiber disputes this statement for the following reasons: (a) the statement is vague and ambiguous as to the phrases "widely and publicly reported," "heavy work load," and "long and unpredictable hours;" and (b) Shiber's research on working for Wall Street firms, including Centerview, indicated that she would be permitted to sleep and have a healthy work life balance. (Shiber Decl. ¶¶84-87; Ex. 10[3]).

8.      For example, public reviews left on the review and rankings website Vault.com reference long, unpredictable hours as a facet of employment at Centerview. Ex. 11 (reviews including: "You will face the typical investment banking hours here as well"; "sometimes all the work piles up at once, and those days are less fun…"; "[l]ike any investment bank, no way to

---

[3] All Exhibits are attached to the Declaration of Plaintiff Kathryn Shiber and all deposition transcripts are attached to the Declaration of Brian Heller, Esq.

anticipate the hours/ when tasks will come up"; "unpredictability, but I think that's pretty universal across firms").

**Shiber's Response:** Since Paragraph 8 relies on the statement in Paragraph 7, Shiber incorporates her response to Paragraph 7 herein. Shiber disputes this statement for the additional reason that it does not fairly and accurately represent the cited exhibit or the publicly available information about Centerview on Vault.com at the time Shiber was seeking employment or thereafter. For example, the Vault.com information that Centerview relies upon also touts the "work-life balance" and "flexible hours" of Centerview. (Shiber Decl. ¶¶86-87; Ex 10).

## II.     SHIBER COMMENCES EMPLOYMENT AS A FIRST YEAR ANALYST.

9.     Plaintiff Kathryn Shiber interviewed for a position in Centerview's three-year analyst program in September 2019.  As part of that process, she had at least three separate rounds of interviews, with four non-partner employees, including associates, a Principal, and a third year analyst, during which she had the opportunity to discuss the specific expectations for junior analysts at Centerview.  *Id.*; Ex. 20.

**Shiber's Response:** Shiber does not dispute the first sentence. Shiber disputes the second sentence because the materials cited in support of it do not indicate a complete list of names and titles of those who interviewed Shiber, and do not indicate in any way that during her interviews she "had the opportunity to discuss the specific expectations for junior analysts at Centerview." In fact, during Shiber's interviews for an analyst position at Centerview, no one discussed with her the exact hours she would be expected to work. (Shiber Decl. ¶85; Kim 21:15-19).

6

10.     In September 2019, Centerview extended Shiber an offer to join its three-year analyst program.  Ex. 18 at 25:10-12; Ex. 8 ¶9.  Shiber accepted that offer.  *Id.*

**Shiber's Response:** Undisputed.


11.     Shiber commenced her employment with Centerview on July 6, 2020.  E x .
7 ¶7.

**Shiber's Response:** Undisputed.


12.     During the first approximately three weeks of Shiber's employment with Centerview, she participated in group training sessions and was not assigned to any client matters. Ex. 7 ¶ 19; Ex. 9 at 48:4-25.

**Shiber's Response:** Undisputed.


13.     On or about August 24, 2020 Shiber was assigned to a "live deal" that was known internally as project "Dragon." Ex. 12. A live deal is one where Centerview is engaged on behalf of a company that is actively pursuing a sale or other transaction. Ex. 9 at. 40:20-41:5. Project Dragon involved a potential merger for a large, new client of Centerview. Ex. 10 at. 59:24-60:11; Ex. 9 at. 36:8-37:1.

**Shiber's Response:** Undisputed.


14.     When Shiber joined project Dragon, the Centerview deal team consisted of a second- or third-year analyst named Matthew Gallea, an associate named Timothy Ernst, a

principal named Matthew Baron, and several partners. Ex. 9 at 31:22-35:8.

**Shiber's Response:** This paragraph is disputed to the extent that Gallea was a second-year analyst. (Ex. 20).

15.     As the associate on the team who had already passed through Centerview's analyst program, Ernst assigned Shiber work on project Dragon. Ex. 9 at 32:3-8.

**Shiber's Response:** This paragraph is disputed to the extent that Centerview is alleging that Ernst was the only individual who assigned Shiber work on this project. Shiber was also assigned work by Gallea and reported to Ernst, Gallea and other members of the team. (Shiber Decl. ¶8; Shiber 178:14-18).

16.     During the first week she was working on project Dragon, Shiber worked until after midnight more than one night.  Ex. 18 at 41:7-22; Ex. 7 ¶22.  Tim Ernst and Matt Gaella also worked well past midnight the first week Shiber joined project Dragon.  Ex. 5 at 1.

**Shiber's Response:** This paragraph is disputed to the extent that Centerview attempts to minimize Shiber's hours worked during the first week. Shiber worked to about 2:00 am for two or three days in a row and then worked until about 1:00 am on August 27, 2020. (Shiber Decl. ¶¶9-10). Shiber disputes the second sentence on the basis that the exhibit cited in support of it is Shiber's letter of medical necessity and does not reference the hours of Ernst and Gallea. Shiber reserves the right to submit an additional response to this sentence if Centerview amends it.

17.     On the evening of August 27 or early morning of August 28, 2020, Shiber signed offline without communicating to Ernst or others on project Dragon that she was doing so.   Ex.7 ¶23.

**Shiber's Response:** This paragraph is disputed in that Shiber logged off on August 28, 2020, at approximately 1:00 am because she had finished her assignments and not been assigned any additional work. (Shiber Decl. ¶¶10-12).

18.     On Friday, August 28, 2020, at 10:08 a.m. Ernst emailed Shiber stating, in part:

> We should also talk today generally about expectations on communication and expectations for a live project like this.  Matt and I shouldn't be up alone working, we are a team and will need everyone on the same page and pulling their weight. Things may come up and you aren't able to get to / finish stuff, but I need to know that and can help out.  It's not helpful to think you are working on stuff and then realize it's not done.  Let's plan to talk in the afternoon to make sure we are aligned.

Ex. 1 at 62-63.

**Shiber's Response:** This paragraph is disputed in that this quote is not complete and omits material information. It is undisputed that Ernst's email contains the quoted language.

19.     Shiber responded that same day at 10:31 a.m. asking to "strategize how we/I can be more efficient earlier in the day."  Ex. 1 at 63.

**Shiber's Response:** Disputed in that Centerview cherry-picks from the email and omits material information, including that Shiber "asked to talk [to Ernst and Gallea] earlier in the day about the plan for the day and the big picture of what is going on" and was ignored. Shiber directs the Court to the full email for a complete depiction of accurate events. (Shiber Decl. ¶13, Ex. 4).

9

20.     In response, Ernst explained: "One part of this job (and the worst part of this job) is many times you can't 'get ahead' of things or work through things early because there will always be more for you to do.  Late nights are just part of the job, especially on a live deal like this." Ex. 9 at 62:12-25.  Ernst further explained that "in general the finish line is always going to be moving so we can't just wake up with a clear task of 3 things we need to do, it'll change by the hour.  Trust, me, we don't want to be working late either and if we don't need to be we won't but there will be many late night on this [live deal]." Ex. 1 at 62-63.

**Shiber's Response:** This paragraph is disputed in that Centerview cherry-picks from the email and omits material information, including that Ernst stated, "I know you are just starting so it'll be helpful to talk." (Ex. 4). Shiber directs the Court to the full email for a complete depiction of accurate events. Additionally, neither Ernst nor Gallea previously advised Shiber about expectations on this deal including with respect to work hours or signing off for the evening. (*Id.* Ernst 64:2-6, 65:10-14).

## III.     SHIBER REQUIRES CONSISTENT SLEEP TO AVOID EXACERBATING THE EFFECTS OF HER MEDICAL DIAGNOSES

21.     Prior to joining Centerview, Shiber had been diagnosed with "Unspecified Mood Disorder" and "Unspecified Anxiety Disorder." Ex. 7 ¶26; Ex. 6.

**Shiber's Response:** Undisputed. Shiber had also been diagnosed with post-concussive syndrome while in high school. (Shiber 27).

22.     Shiber did not advise anyone at Centerview that she had any medical conditions until after she began working on project Dragon.  Ex. 5.

**Shiber's Response:** This paragraph is undisputed but the document that Centerview cites does not support the facts asserted. Shiber also disputes any implication or potential argument that she should have disclosed her medical condition to Centerview at a previous point in time.

23.     Shiber required consistent sleep to avoid exacerbating the effects of her diagnoses. Ex. 7 ¶26; Ex. 18 at 34:11-20, 38:21-39:6, 113:18-25; Ex. 10 at 70:7-15, 72:16-21; Ex. 5; Ex. 21(Verdi Tr.) 40:24-48:7; Ex. 6 at 242, 244 (October 30, 2018 medical note stating Shiber ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████   Ex. 19 (Shiber Tr). 206:2-22, 244:4-19, 224:18-23 ("A. In order to best manage my disabilities and avoid exacerbating the effects of them, I maintain a lifestyle which includes eight to nine hours of sleep per night, on average.").

**Shiber's Response:** This paragraph is disputed in that Shiber did not "require" consistent sleep, but rather had received recommendations that she maintain consistent sleep to avoid exacerbating the symptoms of her disability. (Shiber 92:20-93:5, 94:3-12). Additionally, Kim acknowledged that Shiber told him that she did not need to have consistent sleep every night, just that she needed it frequently. (Shiber Decl. ¶¶68-69; Kim 88:7-18; Shiber 266:18-269:13).

24.     If Shiber is not able to maintain a regular sleep schedule, "the symptoms of [her] disabilities are significantly increased to even further impair [her] day-to-day life and [her] work performance, [her] relationship with others, and [her] emotional condition, and all of the other arenas that these symptoms impact [her] in." Ex. 19 at 227:20-228:12.

**Shiber's Response:** Shiber does not dispute this statement but disputes that this statement means that she required a certain number of hours of sleep every single night. (Shiber Decl. ¶¶68-69; Shiber 92:20-93:5, 94:3-12, 266:18-269:13).

## IV.     SHIBER REQUESTS AN ACCOMMODATION.

25.     Upon receiving Ernst's August 28, 2020 email discussed *infra*, Shiber was "concerned that working until 8:00 a.m. would significantly exacerbate the symptoms that [she] experienced due to [her] disabilities." Ex. 19 at 206:2-22.  Accordingly, that same morning, Shiber emailed Cheryl Robinson, Centerview's Director of Human Resources, requesting "an appointment to speak sometime today." Ex. 23; Ex. 19 at 206:2-22.  Shiber explained in that email: "I am very concerned with learning how to communicate with my team and manage expectations. I may need accommodations and do not feel comfortable advocating for myself so I would really appreciate your help on this." Ex. 23.

**Shiber's Response:** Shiber disputes the first sentence in that she had additional concerns after receiving Ernst's email, including that she was expected to stay up all night for multiple days without sleep. (Shiber Decl. ¶15). Shiber disputes the second sentence to the extent it purports to rely on the first sentence for Shiber's reason for emailing Robinson. Shiber does not dispute that the remainder of the statement accurately quotes her email.

26.     In response to that email, Robinson set up a Zoom meeting with Shiber for later that same day (the "August 28 Zoom").  Ex. 18 at 24:6-16, 32:3-33:5.

**Shiber's Response:** This paragraph is disputed to the extent that Shiber does not recall if it was a Zoom or a phone call. (Shiber 213:10-15).

27.     During the August 28 Zoom, Shiber told Robinson that she has a medical condition for which she needs consistent, eight-to-nine hours of sleep per night.  Ex. 18 at 34:11-20, 38:21-39:6, 113:18-25; Ex. 20 (Shiber's September 15, 2020 notes stating: "I told [Robinson] that I had a medical disability which, for healthy management, required eight to nine hours of sleep per night and that ideally would have a somewhat consistent sleep schedule."); Ex. 19 at. 244:4-19 ("Q. And during that initial meeting on August 28, you told Ms. Robinson you had a medical disability which, for healthy management, required eight to nine hours of sleep per night and that ideally would have a somewhat consistent sleep schedule; correct?  A.  Yes. …. Q.  Ms. Robinson got this idea that you required eight to nine hours of sleep per night from you; correct?  A.  I told her that").

**Shiber's Response:** This paragraph is disputed to the extent that Shiber does not recall if it was a Zoom or a phone call, (Shiber 213:10-15), and Shiber does not require a certain number of hours of sleep every single night. (Shiber Decl. ¶¶19, 68-69; Robinson 39:3-6; Shiber 215:10-22, 266:18-269:13).

28.     During the August 28 Zoom, Robinson told Shiber that her health was the firm's top priority.  Ex. 20; Ex. 19 at 219:16-220:6.

**Shiber's Response:** This paragraph is disputed to the extent that Shiber does not recall if it was a Zoom or a phone call. (Shiber 213:10-15).

29.     During the August 28 Zoom, which occurred on a Friday afternoon, Robinson asked Shiber whether she believed she would be able to get the necessary time off over that upcoming weekend.  Ex. 18 at 34:21-35:13.  Shiber responded that she thought the weekend would be okay.  Ex. 18 at 34:21-35:13.

**Shiber's Response:** This paragraph is disputed to the extent that Shiber does not recall if it was a Zoom or a phone call. (Shiber 213:10-15). Shiber also does not recall telling Robinson that "the weekend would be okay," but rather recalls that Robinson told her that Centerview had "put something in place for over that weekend." (Shiber 289:24-290:6, 290:17-19).

30.     Robinson told Shiber that Shiber did the right thing by contacting Robinson.  Ex. 18 at 35:14-16; Ex. 20.  Robinson also told Shiber that she did not need to disclose the specifics of her medical condition, but explained that Robinson did need to understand the scope of Shiber's needed accommodation.  Ex. 18 at 35:21-36:10.  Thus, Robinson asked Shiber to provide a note from a medical provider describing her needed accommodation.  Ex. 18 at 92:11-19.

**Shiber's Response:** Shiber does not dispute the first sentence and does not dispute that Robinson told her that she did not have to disclose the specifics of her medical condition. Shiber disputes that Robinson asked Shiber to provide a letter from her medical provider "describing her needed accommodation," but rather requested a letter supporting the guardrails accommodation that Centerview had already implemented. (Shiber Decl. ¶¶31-34).

31.     Centerview customarily asks individuals seeking a medical-based accommodation to provide a doctor's note.  Ex. 22 at 20:23-21:8, 32:14-24.

**Shiber's Response:** Shiber cannot deem undisputed what Centerview "customarily" does and Centerview has proffered no evidence to adequately support its broad statement.

32.    Centerview did not question whether Shiber in fact required eight to nine hours of sleep per night. Ex. 18 at 56:10-15, 94:6-8 ("Q. Did you think that Kate [Shiber] was being sincere in saying she needed eight to nine hours of sleep each night? A. Yes."); Ex. 10 at 73:9-12 ("Q. Did you ever question whether Kate [Shiber] actually needed to get the sleep she was saying she needed? A. No."); Ex. 22 at 35:10-12 ("Q. Were you skeptical at all about what Kate was asking for? A. Not at all.").

**Shiber's Response:** This paragraph is disputed to the extent that Shiber does not require a certain number of hours of sleep every single night. (Shiber Decl. ¶¶19, 68-69; Robinson 39:3-6; Shiber 266:18-269:13).

33.    Later in the day on August 28, after the August 28 Zoom, Robinson contacted Centerview Chief Operating Officer, Jeanne Vicari. Ex. 22 at 11:9-11; 15:19-16:17. Robinson advised Vicari that Shiber had told Robinson that she needed to have consistent sleep. Ex. 22 at 16:23-17:4.

**Shiber's Response:** This paragraph is disputed because: (a) Shiber does not recall if it was a Zoom or a phone call, (Shiber 213:10-15); (b) Shiber's representations to Robinson about her need for sleep are misstated (Shiber Decl. ¶19); and (c) Robinson's recollection of this conversation differs from Vicari's in that Robinson did not recall telling Vicari that Shiber needed "consistent sleep," but rather recalls stating to Vicari, "I mentioned the need for an

accommodation." (Robinson 84:15-85:4).

34.     Upon hearing this information, Vicari reviewed Centerview's staffing system to see which matters Shiber had been assigned to. Ex. 22 at 17:18-24. Vicari advised Robinson that Shiber was currently staffed on project Dragon, which, Vicari explained, was a very active live deal. Ex. 22 at 17:18-18:11; Ex. 18 at 84:15-85:4. Accordingly, Robinson and Vicari understood that Shiber was likely to have a busy weekend with work and therefore determined that it was important to ensure that Shiber was able to get the sleep she required over the upcoming weekend. Ex. 18 at 84:15-85:4; 48:17-49:9; Ex. 22 at 19:7-21:22 ("A. At the time, I believe we needed to do whatever we could to protect her sleep based on the very limited information we had at hand about what it all meant and everything behind it. Again, it was a Friday night. We had – I had zero visibility as to the workload that was going to happen over the weekend. A. … [S]o we were going to do what we had to do for now, and we will monitor the situation and assess it as we go forward.").

**Shiber's Response:** This paragraph is disputed because: (a) to the extent it relies upon Paragraph 33, Shiber incorporates those disputes herein; (b) it recounts conversations to which Shiber was not a party, so that Shiber cannot deem those claims to be undisputed; (c) Shiber did not make any specific requests for the upcoming weekend; (d) the cited portions of the transcripts misrepresent what Shiber actually told Centerview about her request for an accommodation and she did not, as Centerview claims, state that she requires a certain number of hours of sleep every single night. (Shiber Decl. ¶¶19, 68-69; Robinson 39:3-6; Shiber 266:18-269:13); and (e) Centerview did not implement the guardrails accommodation to Shiber as a temporary

16

accommodation. (Shiber Decl. ¶¶24-30, Robinson 139:25-140:8).

35.     Robinson and Vicari determined that they should speak with Tony Kim, a senior partner at Centerview who was working on project Dragon, to ensure that Shiber's sleep was protected over the upcoming weekend.  Ex. 18 at 61:4-13, 85:5-21; Ex. 22 at 17:24-18:24 ("A. … It was Friday night.  It was a very active situation.  I did not see how we were going to protect her sleep if we didn't advise the team.  … I told Cheryl that she needs to speak to the senior-level people on the team to assess what the workload was going to be, and if it would be possible to protect her sleep that weekend.").

**Shiber's Response:** This paragraph is disputed because: (a) it recounts conversations to which Shiber was not a party, so that Shiber cannot deem those claims to be undisputed; (b) Shiber did not make any specific requests for the upcoming weekend; and (c) Centerview did not implement the guardrails accommodation to Shiber as a temporary accommodation. (Shiber Decl. ¶¶24-30, Robinson 139:25-140:8).

36.     After the August 28 Zoom, Robinson and Shiber spoke at least two other times that day.  Ex. 18 at  36:11-37:2, 48:22-49:9.  Kim was present for at least one of those conversations. Ex. 10 at 69:5-10, 76:9-25; Ex. 13.

**Shiber's Response:** Disputed for the following reasons: (a) Shiber does not recall if it was a Zoom or a phone call, (Shiber 213:10-15); (b) Shiber may have only spoken to Robinson three times that day, (Shiber Decl. ¶¶19-30); and (c) Kim only participated in one conversation with Shiber and Robinson. (*Id.* Shiber 287:9-12).

37.     Robinson proposed a "guardrails" approach to Shiber on August 28, 2020.  Ex. 10 at 81:13-20; Ex. 18 at 48:17-49:9.  The "guardrails" approach provided that Shiber would not work between midnight and 9:00 a.m. each day.  Ex. 10 at 82:16-18.

**Shiber's Response:** Undisputed.

38.     Upon hearing about the guardrails proposal, Shiber "was worried about the fact that the guardrails would need to be communicated to [her] team" because she believed "that every team member that [she] worked with would know that there was something different about [her]" and "would treat [her] differently or look down upon [her]."  Ex. 19 at 241:15-242:23.  Robinson explained that in order for the guardrails to be respected, Shiber's team would need to be made aware of them.  Ex. 20; Ex. 19 at 285:22-286:1.

**Shiber's Response:** The first sentence is disputed to the extent that it does not accurately reflect all of the concerns that Shiber raised to Robinson upon hearing about the guardrails proposal, as Shiber also feared the stigma that would come with her coworkers knowing about her disability and did not want the team to view her differently or have her opportunities at the firm diminished. (Shiber Decl. ¶22, Ex. 20). With regards to the second sentence, Shiber does not dispute that Robinson made this statement, but disputes that this is the only thing Robinson said in response to Shiber expressing her concerns about the guardrails. (*Id.* ¶23, Ex. 20).

39.     Hearing Shiber's concerns, Robinson recommended that she and Shiber have a call with Kim.  Ex. 20; Ex. 19 at. 286:10-287:8.  Robinson, Kim, and Shiber subsequently spoke that Friday, August 28.  Ex. 10 at 87:4-88:23; Ex. 19 at 287:9-12.

18

**Shiber's Response:** Shiber cannot comment upon what Robinson "heard" and disputes the use of the term "concerns" to the extent that it refers to the incomplete recitation of her concerns with the guardrails as set forth in Paragraph 38. Shiber does not dispute the remainder of the statement.

40.     During the conversations between Robinson, Kim, and Shiber on August 28, the three discussed what different approaches might work for Shiber.  Ex. 10 at 87:4-88:23; Ex. 19 at 292:5-19.

**Shiber's Response:** This paragraph is disputed because there was only one conversation between Robinson, Kim and Shiber on August 28. (Shiber Decl. ¶64). Further, the phrase "different approaches" is vague and ambiguous. During the one conversation between Robinson, Kim and Shiber, they discussed the guardrails accommodation and Kim and Robinson made it clear to Shiber that it was an accommodation Centerview was willing and able to provide, and Kim and Robinson did not ask Shiber to provide an alternative accommodation. Kim described the guardrails internally as a "longer term solution." (Shiber Decl. ¶¶19-30; Shiber 287:9-12, Ex. 15).

41.     Kim offered to remove Shiber from the live deal she was on, but Shiber said that she did not want to be removed from that live deal and wanted to continue to be staffed on live deals.  Ex. 19 at  292:13-19 ("A.  I recall that Tony stated that he could take me off of the deal that I was currently working on.  Q.  And what was your response to Tony stating that?  A.  That I did not want Tony to do that."); Ex. 22 at 28:22-29:25 ("she was averse to leaving an active job"); Ex. 18 at 52:16-54:11, 72:9-15, 80:16-81:2, 110:7-23; Ex. 10 at 101:9-19, 130:17-131:4.

**Shiber's Response:** This paragraph is disputed because Centerview and Shiber only discussed the possibility of her being removed from Dragon. Further, Centerview never asked Shiber if she would be willing to be removed from future live deals, nor did Shiber state that she wanted to continue to be staffed on live deals. (Shiber Decl. ¶79).

42.     Regarding the guardrails approach, Shiber expressed that she did not want anyone to know about her needed accommodation. Ex. 18 at 52:16-53:6; Ex. 10 at 71:4-12. In response, Kim told Shiber that it will be difficult to manage a team with respect to Shiber's offline hours without communicating any information about her situation. Ex. 10 at 74:9-75:3. Ultimately, Shiber understood that "to put in place the specific [guardrail] accommodations that [Robinson and Kim] had proposed and have [her] team respect those boundaries, the team would need to be made aware of them." Ex. 19 at 302:7-13. Centerview strove to honor Shiber's request that the reason for her work-time limitations not be shared with the team. Ex. 10 at 74:9-75:11, 98:2-16, 100:7-101:8; Ex. 9 at 78:5-25.

**Shiber's Response:** This paragraph is disputed in that Shiber understood that her colleagues would have to be informed that the guardrails were in place, and nobody from Centerview ever asked Shiber if they could disclose her accommodations (and the reasons for it) to her colleagues. (Shiber Decl. ¶78, Shiber 293:12-25).

43.     Following his conversations with Shiber and Robinson, on August 28, Kim told Shiber's live deal team that she would be offline from midnight to 9:00 a.m. each day. Ex. 19 62:2-7, 69:22-70:2; Ex. 10 at 100:7-13; Ex. 9 at 77:11-78:4. As Shiber requested, Kim did not tell

the team why Shiber would be offline during that period.  Ex. 10 at 74:9-75:11, 98:2-16, 100:7-101:8; Ex. 9 at 78:5-25.

**Shiber's Response:** Disputed for the following reasons: (a) the portions of Shiber's transcript cited by Centerview do not corroborate Centerview's statement; (b) the supporting citations from Centerview indicate that Kim told only one member of Shiber's team (Ernst) about the guardrails; (c) the statement references conversations to which Shiber was not a party so that she cannot deem them undisputed; and (d) Shiber understood that her colleagues would have to be informed that the guardrails were in place and nobody from Centerview ever asked Shiber if they could disclose her accommodations (and the reasons for it) to her colleagues. (Shiber Decl. ¶78, Shiber 293:12-25).


44.     Upon Kim's communication of the guardrails to the project Dragon team, the "guardrails" were instituted effective immediately (going into the weekend) to ensure that Shiber would be able to sleep between midnight and 9:00 a.m.  Ex. 18 at 62:2-64:25.

**Shiber's Response:** Undisputed.


45.     At the time the guardrails were implemented, neither Robinson nor Kim had determined whether the guardrails approach was a viable long-term solution.  Ex. 10 at. 83:2-84:11; Ex. 18 at 63:6-64:25.

**Shiber's Response:** This paragraph is disputed as Kim and Robinson made it clear to Shiber that the guardrails were an accommodation Centerview was willing and able to provide and never stated it was a short-term accommodation, and Kim and Robinson also did not ask Shiber to

provide an alternative to the guardrails accommodation. Kim described the guardrails internally as a "longer term solution." (Shiber Decl. ¶¶19-30; Shiber 287:9-12, Ex. 15).


46.     Upon hearing about the guardrails proposal (as limited by her request that the underlying reason for her hours restrictions not be shared), Shiber did not propose any alternative accommodations.  Ex. 19 at 242:10-243:6, 244:20-245:6 ("Q.  And did you ever propose any other accommodation to Ms. Robinson or anyone at Centerview that was different from the guardrails approach?  A.  I didn't propose any specific accommodations at all.  Q.  Did you propose any general accommodations or any thoughts about accommodations?  A.  I did not propose any general accommodations.").

   **Shiber's Response:** This paragraph is disputed, as Centerview implemented the guardrails accommodation in spite of Shiber's concerns and without asking her for any alternatives. (Shiber Decl. ¶¶64-66).Centerview never told Shiber there was a problem with the guardrails accommodation.  (Shiber Decl. ¶¶19-30, 71; Shiber 287:9-12).


## V.     CENTERVIEW MONITORS THE GUARDRAILS ACCOMMODATION

47.     On September 1, 2020, Shiber gave Robinson a letter from Marylee Verdi, a nurse practitioner who had been Shiber's primary care provide for the prior two years. Ex. 5.  In that letter, Nurse Verdi wrote:  "Because of [Shiber's] underlying medical diagnosis, she requires consistent sleep 8-9 hours.  If she is not able to maintain a regular sleep schedule she is a[t] a significant risk for exacerbation of her illness."  Ex. 5; *see also* Ex. 19 at 224:18-23 ("A.  In order to best manage my disabilities and avoid exacerbating the effects of them, I maintain a lifestyle

which includes eight to nine hours of sleep per night, on average."); Ex. 19 at. 227:20-228:12 ("Q. So you would agree with the contents of this document that if you are not able to maintain a regular sleep schedule, you are at significant risk for exacerbation of your illness; is that correct?  A.  Yes. Q.  And what did that mean, significant risk of exacerbation of your illness?  A.  That means that the symptoms of my disabilities are significantly increased to even further impair my day-to-day life and my work performance, my relationship with others, and my emotional condition, and all of the other arenas that these symptoms impact me in.").

**Shiber's Response:** It is undisputed that Verdi's letter contains the cited language, but it is disputed that Shiber requires a certain number of hours of sleep every single night. (Shiber Decl. ¶¶19, 68-69; Robinson 39:3-6; Shiber 266:18-269:13). Additionally, Verdi confirmed at her deposition that there was flexibility in Shiber's sleep schedule. (Verdi 30).

48.     On Monday, August 31, 2020, following the August 28 discussions between Shiber, Robinson, and Kim, Kim asked Robinson to "check in with [Shiber]" to see how the guardrails approach was working for her. Ex. 14.

**Shiber's Response:** This paragraph is disputed because there was only one conversation between Robinson, Kim and Shiber on August 28. (Shiber Decl. ¶64).

49.     On September 1, 2020, Shiber emailed Robinson regarding "Logistics."  Ex. 17. Among other questions, Shiber asked Robinson what had been "relayed to the team" and how she should deal with frequently-scheduled 8:00 a.m. calls on project Dragon.  Ex. 17.

**Shiber's Response:** It is undisputed that Shiber sent the referenced email and Shiber directs the Court to the full email for a complete depiction of accurate events.

50. That same day, Robinson emailed Shiber and asked whether she was able to get the time off that she needed the weekend prior. Ex. 17.

**Shiber's Response:** This paragraph is disputed as the cited document does not adequately support Centerview's statement, since the document identified is not an email from Robinson to Shiber about the prior weekend.

51. Also on September 1, 2020, Vicari investigated whether the project Dragon team had in fact respected the guardrails over the weekend. Ex. 14. Vicari wrote to Robinson that "FYI – Seems the team did a good job giving her space over the weekend." Ex. 14.

**Shiber's Response:** Shiber cannot deem it undisputed that Vicari "investigated" anything, and the cited document does not adequately support that assertion. It is undisputed as to the fact that the quoted language is in the email referenced by Centerview.

52. On September 2, 2020, Shiber and Robinson spoke regarding the "guardrails." Robinson explained that Shiber's team was told that Shiber had a hard stop from midnight to 9:00 a.m. and that no reason was given to the team for that system. Ex. 17. Robinson also explained that there was no expectation that Shiber join 8:00 a.m. calls. Ex. 17.

**Shiber's Response:** Disputed only to the extent that this statement purports to be the exact words that Robinson used during this call.

24

53.     On September 2, 2020, Kim wrote to Timothy Ernst and Matthew Gallea, an analyst

on the Dragon deal  regarding Shiber: "Are you guys managing ok?  Do we need to get additional

staffing?  Let me know what you think."  Ex. 9 at 32:20-23; Ex. 3.  Ernst responded that the project

Dragon team "can manage through the near-term.  Our only question is whether this is a near-term

or long-term set-up.  We don't have context on the situation, and understand we aren't supposed

to, but if this set-up drags on longer than a week or so, we may need additional staffing but can

figure that out when we get there."  Ernst continued:

> I also think it is not really effective from her perspective over the long-term because
> things take a while for her (as expected) but we end up having to jump in to turn
> our own comments because she has to stop before she is able to get to it so it is
> difficult for her to own things to completion.  Since she has to jump in and out of
> workstreams, and this will keep moving so fast, I think it will get increasingly
> confusing for her as Matt and I keep building things out without her.  Then she can
> get stuck in what I would call the vicious first-year cycle of not knowing what's
> going on, so her work is wrong, we don't have time or its midnight so Matt and I
> fix it, and then it repeats and she gets discouraged.  Again, not an issue if this is a
> near-term situation but figured I'd flag as well.

*Id.*

**Shiber's Response:**  This paragraph is disputed because this statement does not

completely and accurately reflect the cited email, including that Kim referred to the guardrails

as a "longer term situation."  Shiber directs the Court to the full email for a complete depiction

of accurate events.

54.     Ernst then forwarded his email to Matt Baron, the principal working on the live

deal, Ex. 10 at 115:23-116:6, writing: "FYI – let me know if you disagree but it just won't be

helpful if this thing keeps going fast.  I think it's impossible for a first-year to become value

additive on something going this fast if they aren't fully plugged in."  Baron responded:

"Completely agree.  It's not helpful for anyone if she can't get up to speed and own things as there is too much to do and we need a full person to help with everything that needs to get done."  Ex. 10 at 116:6-9.

**Shiber's Response:** Shiber does not dispute that the cited email contains this language. Shiber does dispute the sentiments of Baron and Ernst regarding her ability to be "helpful" and "value additive" on the deal. In fact, she accomplished both of these things. (Shiber Decl. ¶¶36-38, 76).

55.    After the guardrails were implemented, Ernst observed that Shiber had difficulties whereby Shiber was not able to understand what changes had been made to her work from the night prior. Ex. 9 at 85:18-87:8.  Ernst discussed this concern with Gallea and Kim.  Ex. 9 at 87:22-88:8.

**Shiber's Response:** Shiber disputes Ernst's claimed observations or that she had "difficulties." Ernst testified that Shiber's general performance was no different prior to or after the guardrails. (Ernst 85:17-21). Further, Ernst could not provide even one specific example of his purported observations of Shiber's "difficulties." (*Id.* 86:17-87:8). After the guardrails accommodation was put in place, Shiber continued to perform her duties on the Dragon projectreceived largely positive feedback from Ernst and Gallea, and nobody working on the Dragon project expressed to Shiber that they were dissatisfied with her performance or the quality of her work. (Shiber Decl. ¶¶36-38, 76).

56.    On September 3, 2020, Ernst wrote to Kim:

I caught up with Matt B[aron] this morning and he wanted to get a sense for how we can better manage the time on this account (to the extent we can) given the really late nights.  As this pace continues to pick up, it's going to become more and more difficult to give Kate [Shiber] responsibility for different workstreams (as opposed to just individual one-off tasks) and it is already becoming very inefficient.

Ex. 15 at 74.

**Shiber's Response:** This paragraph is disputed because this statement does not completely and accurately reflect the cited email, including that Kim referred to the guardrails as a "longer term situation" and that Ernst's representations about needing another team member on Dragon are inconsistent. Shiber directs the Court to the full email for a complete depiction of accurate events. Shiber also disputes Ernst's characterizations of the efficiencies of her role on Dragon. After the guardrails accommodation was put in place, she continued to perform her duties on Dragon, worked from approximately 9:00 am to midnight each day, seven days a week, including all three days of the 2020 Labor Day weekend, and receive largely positive feedback from Ernst and Gallea. Nobody working on Dragon expressed to Shiber that they were dissatisfied with her performance or the quality of her work. (Shiber Decl. ¶¶36-38, 76). Kim did not receive any complaints that the work Shiber performed was deficient in any way. (Shiber Decl. ¶62; Kim 140).


57.     Ernst further wrote: "[w]e discussed and think it may make sense to figure out staffing alternatives sooner rather than later."  Ex. 15. On September 6, 2020, Ernst followed up to that email indicating that he and Baron "think that it makes sense to add another person as soon as possible who is around Matt G[allea]'s level and would be able to help out right away."  Ex. 15.

**Shiber's Response:** This paragraph is disputed because this statement does not completely and accurately reflect the cited email, including that Kim referred to the guardrails as a "longer

term situation" and that Ernst's representations about needing another team member on Dragon are inconsistent. Shiber directs the Court to the full email for a complete depiction of accurate events. Shiber also disputes any attempt by Centerview to argue that another team member had to be added to Dragon because of the guardrails accommodation. The person added to the deal was a second-year Analyst who had far more experience than Shiber. Ernst did not feel that the employee who was added changed how the work was completed. (Shiber Decl. ¶¶36-38, 76; Ernst 105).

58.     Following Ernst's September 3, 2020 emails to Kim regarding staffing on project Dragon, and at least in part due to the concerns Ernst raised therein with regard to the guardrails, Centerview added another analyst to Shiber's deal team. Ex. 10 at 111:16-112:2, 121:2-6; Ex. 9 at 82:5-9, 109:17-110:18; Ex. 16.

**Shiber's Response:** Shiber disputes any attempt by Centerview to argue that another team member had to be added to Dragon because of the guardrails accommodation. After the guardrails accommodation was put in place, nobody working on Dragon expressed to Shiber that they were dissatisfied with her performance or the quality of her work. Kim did not receive any complaints that the work Shiber performed was deficient in any way. (Shiber Decl. ¶62; Kim 140). The person added to the deal was a second-year Analyst who had far more experience than Shiber and Ernst did not feel that the employee who was added changed how the work was completed. (Shiber Decl. ¶¶36-38, 76; Ernst 105).

59.     After the guardrails were implemented, Kim and Robinson had further discussions regarding whether they could accommodate Shiber's request long-term. Ex. 10 at 98:17-25.

**Shiber's Response:** This paragraph is disputed because: (a) the cited deposition transcript does not support this statement; (b) Kim and Robinson made it clear to Shiber that the guardrails were an accommodation Centerview was willing and able to provide and never stated it was a short-term accommodation, (Shiber Decl. ¶¶19-30; Shiber 287:9-12); and (c) Kim described the guardrails internally as a "longer term solution." (Ex. 15).

## VI.   SHIBER IS TERMINATED

60.     Ultimately, Centerview determined that it could not maintain the guardrails accommodation for the long term given the nature and requirements of Shiber's position, as it had determined it was an unsustainable situation for the firm. Ex. 18 at 110:19-23, 112:17-19; Ex. 22 at 89:17-21, 90:13-18.

**Shiber's Response:** This paragraph is disputed and it is improper for Centerview to set forth what  it "determined" as an undisputed fact. This statement demonstrates how this case hinges on the credibility of Centerview's witnesses, which cannot be determined on this motion. The record confirms that Centerview could have maintained the guardrails accommodation for Shiber or could have explored other accommodations or engaged in an interactive process to determine if there was an alternative long-term accommodation that would be sustainable. (Shiber Decl. ¶¶19-30, 73-83; Shiber 287:9-12).

61.     Centerview terminated Shiber during a WebEx video call on September 15, 2020, which was attended by Robinson and Vicari. During that meeting, Vicari advised Shiber that she was not able to fulfill the essential functions of the job due to her need for consistent

sleep each night. Ex. 18 at 143:9-13.

**Shiber's Response:** Shiber does not dispute the first sentence. Shiber disputes the second sentence because it misquotes what Vicari said and omits material, discriminatory statements made by Vicari during the meeting. (Shiber Decl. ¶¶39-48)

62.     As the Chief Operating Officer of Centerview, Vicari had the authority to make the decision to terminate Shiber and Vicari exercised that authority. Ex. 18 at 27:6-9, 30:7-25.

**Shiber's Response:** Undisputed.

## VII.   CENTERVIEW'S ANTI-DISCRIMINATION POLICIES

63.     Centerview maintains a written policy against discrimination. Ex. 18 at 11:8-24. When Centerview's employees are hired, they are required to read Centerview's anti-discrimination policy and sign that policy. Ex. 18 at. 12:9-16; Ex. 22 at 25:21-27:22.

**Shiber's Response:** Shiber does not dispute the first sentence. Shiber cannot deem the second sentence undisputed to the extent it applies to Centerview employees other than her and contains no relevant time period.

64.     Centerview also requires its employees to attend an annual anti-discrimination training program. Ex. 18 at 12:14-18, 13:14-14:14; Ex. 10 at 117:8-17.

**Shiber's Response:** Shiber cannot deem this undisputed to the extent it applies to Centerview employees other than her and contains no relevant time period.

65.     Centerview has a history of granting requests for medical accommodations. Ex. 19 at 16:13-17:19; Ex. 10 at 128:14-129:11; Ex. 9 at 121:15-24.

**Shiber's Response:** Disputed because the cited deposition testimony in support of this statement does not support Centerview's broad statement about its "history." The record demonstrates that the few accommodations Centerview had previously granted involved employees taking time off or receiving special equipment, which was far different than the issues that Shiber presented. (Shiber Decl. ¶73; Robinson 15-17; Vicari 23-24, 30-31; Kim 128-129).

66.     Prior to Shiber's request, Centerview had not received any request from one of its investment bankers for an accommodation for consistent time-off over a prolonged period. Ex. 18 at 16:13-17:19. Prior to Shiber's request, Centerview had not received a request for an accommodation by any employee relating to that employee's sleep schedule. Ex. 18 at 103-10-12.

**Shiber's Response:** Shiber cannot deem the facts asserted, which are solely within Centerview's knowledge, as undisputed.