UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
KATHRYN SHIBER,

                                                       **1:21-cv-03649-ER**

                *Plaintiff*,

    -against-

CENTERVIEW PARTNERS LLC,

                *Defendant*.
-------------------------------------------------------------------X

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*
**3 Park Avenue, Suite 2700**
**New York, NY 10016**
**(212) 889-6565**

**CLAYMAN ROSENBERG KIRSHNER & LINDER LLP**
*Attorneys for Plaintiff*
**305 Madison Avenue, Suite 650**
**New York, NY 10165**
**(212) 922-1080**

## <u>TABLE OF CONTENTS</u>

| <u>SUBJECT</u> | <u>PAGE</u> |
|---|---|
| TABLE OF AUTHORITIES | iii |
| PRELIMINARY STATEMENT | 1 |
| STATEMENT OF FACTS | 3 |
| LEGAL STANDARD FOR SUMMARY JUDGMENT IN EMPLOYMENT DISCRIMINATION CASES | 5 |
| ARGUMENT | |
| POINT I   CENTERVIEW IS LIABLE FOR DISABILITY DISCRIMINATION UNDER THE ADA & THE NJLAD | 6 |
| A.   Shiber Was Qualified To Perform The Essential Functions Of Her Position | 6 |
| 1.   Centerview Has Not Established That Being Available At All Hours Of The Day Was An "Essential" Function | 7 |
| 2.   Permitting Shiber To Sleep Was Not An Undue Burden For Centerview | 10 |
| 3.   Centerview's General Assumptions About Shiber's Disability Are Insufficient For Summary Judgment | 14 |
| B.   The Record Demonstrates That Shiber Was Terminated Because Of Disability Discrimination | 15 |
| 1.   The Real Reason Shiber Was Terminated Was Because Of Disability Discrimination | 15 |
| a.   Shiber Was Terminated Because Of Vicari's Discriminatory Bias | 15 |
| b.   Shiber Was Fired Even After She Tried To Rescind The Accommodation | 16 |
| c.   Vicari Terminated Shiber The Same Day She Learned About Shiber's History Of Concussions | 16 |

d.  Centerview Did Not Engage
In An Interactive Process                         17

2.  Centerview's Explanation For
Terminating Shiber Is A Pretext                     19

a.  Centerview Does Not Identify An Event
That Required Shiber's Termination              19

b.  Centerview Did Not Genuinely Try
To Find A Workable Accommodation               19

POINT II    CENTERVIEW IS LIABLE FOR FAILING
TO ACCOMMODATE SHIBER'S DISABILITY
UNDER THE ADA & NJLAD                              22

POINT III   CENTERVIEW IS LIABLE UNDER
THE LAD FOR FAILING TO ENGAGE
IN THE INTERACTIVE PROCESS                         23

CONCLUSION                                              25

**TABLE OF AUTHORITIES**

<u>CASE</u>                                                                              <u>PAGE</u>

Andrews v. Blick Art Materials, LLC,
      268 F. Supp. 3d 381 (E.D.N.Y. 2017)                          11

Boyce v. Lucent Techs.,
      2007 N.J. Super. Unpub. LEXIS 1680
      (Super. Ct. App. Div. May 16, 2007)                          14

Capobianco v. City of New York,
      422 F.3d 47 (2d Cir. 2005)                                   21

Carlton v. Mystic Transp., Inc.,
      202 F.3d 129 (2d Cir. 2000)                                  15

Cayetano v. Fed. Express Corp.,
      2022 U.S. Dist. LEXIS 119102 (S.D.N.Y. July 6, 2022)        17-18

Church v. Sears Holding Corp.,
      605 Fed. Appx. 119 (3d Cir. 2015)                            18

Clark v. Coca-Cola Beverages Northeast, Inc.,
      2022 U.S. App. LEXIS 657 (2d Cir. Jan. 10, 2022)             12

Dawson v. N.Y.C. Transit Auth.,
      624 Fed. Appx. 763 (2d Cir. 2015)                            7

Devany v. UPS,
      2021 U.S. Dist. LEXIS 189367 (S.D.N.Y. Sept. 30, 2021)      13

Dicino v. Aetna U.S. Healthcare,
      2003 U.S. Dist. LEXIS 26487 (D.N.J. June 23, 2003)          13

Fincher v. Depository Trust and Clearing Corp.,
      604 F.3d 712 (2d Cir. 2010)                                  5

Fox v. Costco Wholesale Corp.,
      918 F.3d 65 (2d Cir. 2019)                                   6

Grande v. Saint Clare's Health Sys.,
      230 N.J. 1 (2017)                                            14, 22

Graves v. Finch Pruyn & Co.,
      457 F.3d 181 (2d Cir. 2006)                                  13

Graziadio v. Culinary Inst. of Am.,
    817 F.3d 415 (2d Cir. 2016)          19-20

Hunt-Watts v. Nassau Health Care Corp.,
    43 F.Supp.3d 119 (E.D.N.Y. Aug. 21, 2014)      12

Joseph v. N.J. Transit Rail Operations Inc.
    586 Fed. Appx. 890 (3d Cir. 2014)      6

Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,
    263 F.3d 208 (2d Cir. 2001)      7

Malzberg v. N.Y. Univ.,
    2022 U.S. Dist. LEXIS 54375 (S.D.N.Y. Mar. 25, 2022)      18

Mathewson v. N.Y. State, Office of Mental Health,
    2021 U.S. Dist. LEXIS 209021 (N.D.N.Y. Oct. 29, 2021)      18

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)      6

McMillan v. City of N.Y.,
    711 F.3d 120 (2d Cir. 2013)      6, 11, 22

Melton v. Resorts Intl. Hotel, Inc.,
    2014 U.S. Dist. LEXIS 148803 (D.N.J. Oct. 20, 2014)      9

Nixon-Tinkelman v. N.Y.C. Dept. of Health & Mental Hygiene,
    434 Fed. Appx. 17 (2d Cir. 2011)      22

Photis v. Sears Holding Corp.,
    2013 U.S. Dist. LEXIS 104152 (D.N.J. July 25, 2013)      13

Pryce v. Tata Consultancy Services,
    2022 U.S. Dist. LEXIS 209411 (D.N.J. Nov. 18, 2022)      24-25

Raspa v. Office of Sheriff of County of Gloucester,
    191 N.J. 323 (2007)      12

Redd v. N.Y. State Div. of Parole,
    678 F.3d 166 (2d Cir. 2012)      6

Rosenfeld v. Canon Business Solutions, Inc.
    2011 U.S. Dist. LEXIS 115415 (D.N.J. Sept. 26, 2011)      13

Schlater v. Arthritis, Rheumatic & Back Disease Assocs., P.A.,
    2020 U.S. Dist. LEXIS 179024 (D.N.J. Sep. 29, 2020)    10, 23

Schwapp v. Town of Avon,
    118 F.3d 106 (2d Cir. 1997)    5-6

Shannon v. N.Y. City Transit Authority,
    332 F.3d 95 (2d Cir. 2003)    12

Sheng v. M&TBank Corp.,
    848 F.3d 78 (2d Cir. 2017)    17

Stewart v. Cty. of Salem,
    274 F. Supp. 3d 254 (D.N.J. 2017)    11-12

Stone v. City of Mount Vernon,
    118 F.3d 92 (2d Cir. 1997)    9

Tolbert v. Smith,
    790 F.3d 427 (2d. Cir. 2015)    6

Tourtellotte v. Eli Lilly & Co.,
    636 Fed. Appx. 831 (3d Cir. 2016)    24

Turner v. Delta Airlines, Inc.,
    2023 U.S. Dist. LEXIS 34110 (E.D.N.Y. Mar. 1, 2023)    13

Valenti v. SleepMed, Inc.,
    2017 U.S. Dist. LEXIS 105615 (D. Conn. July 10, 2017)    10

Williams v. N.Y.C. Dept. of Heath & Mental Hygiene,
    299 F.Supp.3d 418 (S.D.N.Y. 2018)    13-14

**STATUTE**    **PAGE**

Americans with Disabilities Act, 42 U.S.C. §12111(8)    7

Americans with Disabilities Act, 42 U.S.C. §12112 0    3, 22

New Jersey Law Against Discrimination, N.J. Stat. §10:5-12(a)    3, 23

New Jersey Administrative Code §13:13-2.5    3

New Jersey Administrative Code §13:13-2.8(a)(3)    14

29 C.F.R. §1630.9(a)    22

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Kathryn Shiber ("Shiber") was hired to work at Defendant Centerview Partners LLC ("Centerview") in its prestigious first-year Analyst program beginning in July 2020. Soon after starting, Shiber learned from her colleagues that she was expected to work multiple 24-hour days in a row without sleeping. While Shiber expected to work long and unpredictable hours, Centerview's expectations were far beyond what she could reasonably have expected, and would have exacerbated the symptoms of her medical disability.

On August 28, 2020, Shiber spoke with Centerview's Human Resources representative about how she could manage Centerview's expectations with her medical condition. In response to Shiber's inquiry, Centerview unilaterally determined that Shiber would not work between midnight and 9:00 am, which Centerview called "guardrails." Shiber continued working without incident and received positive feedback.

On September 15, 2020, just eighteen days after the guardrails were implemented, Shiber was blindsided and shocked when Centerview's Chief Operating Officer Jeanne Vicari ("Vicari") terminated her. Vicari's explanation to Shiber for this sudden, inexplicable termination was Shiber's disability, which Vicari believed Shiber "should have known" would make her unable to work as an Analyst. According to Vicari, Shiber "made a mistake" in accepting the job, and she "took a coveted spot" from someone else.

Shiber pleaded with Vicari to let her work without the guardrail accommodation that it imposed on her. Vicari said "no", making it clear that Shiber was being fired because of her disability, not because of an accommodation, stating, "We can't ignore the evidence you've presented to us that the requirements of this job will have a negative impact on your health." Shiber had not provided such "evidence" to Centerview. Shiber had not sought a reduced workload or

special treatment. Shiber had merely requested a dialogue about expectations. Vicari then made stereotypical and biased decisions about Shiber's disability.

The law required Centerview to explore whether there was an accommodation that could permit Shiber to perform when projects required that she stay up all night for days on end. Centerview's almost immediate termination of her without any type of interactive process, and while telling her that she should never have even thought she could work as an Analyst, is textbook disability discrimination.

This case is replete with questions of fact that preclude summary judgment. For example, a jury could reasonably reject Centerview's claim that Shiber was unable to fill the "essential functions" of the Analyst role, or that permitting Shiber to sleep each night for some amount of time would be an "undue burden." The record confirms that Centerview's employees were already permitted to sleep each night and that the need to be on call at *all* hours of the day was, at most, a marginal function. Revealingly, Centerview does not present any data or job description to support its claim that the ability to work overnight was an essential function. Instead, Centerview relies solely on tropes and stereotypes of "Wall Street," which is insufficient to warrant the relief it seeks.

Every person obviously requires sleep and the only difference between Shiber and her colleagues was that Shiber's need for sleep was more pressing because of her mental disability. Shiber believed she could, which is why she requested the accommodation *that she had never asked for* be rescinded. Vicari did not give Shiber that opportunity, paternalistically claiming that even permitting Shiber to try would "have a negative impact on [her] health."

There is also a question of fact as to whether there was an accommodation that could have permitted Shiber to both fulfill the essential function of the Analyst role and sleep at night, if she

actually had to be on call 24/7. Centerview argues that Shiber did not provide any alternatives, but omits that Centerview fired her without ever informing her that it had concerns. There is a further question of fact as to whether Centerview engaged in an interactive process.

In short, a jury could reasonably find that Shiber was fired because of the existence of her disability, not because of the feasibility of the accommodation. Accordingly, Centerview's motion for summary judgment on Shiber's claims for disability discrimination and failure to accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12112(a) and the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. §10:5-12(a) & N.J. Admin. Code §13:13-2.5, as well as her claim for failure to engage in the interactive process (NJLAD only), be denied, and that this matter proceed to trial.

## STATEMENT OF FACTS

Shiber was accepted into Centerview's prestigious three-year Analyst program and began working on July 6, 2020. (Siber Decl. ¶2). Shiber was selected from tens of thousands of applicants for one of the coveted 30 openings in September 2019. (Siber Decl. ¶3).

A little more than a month after starting, Shiber was assigned to a project on August 24, 2020, known as a "live deal." (Siber Decl. ¶¶6-7). Shiber soon learned that, as part of this project, she was expected to work 24 hours a day over multiple days when she was reprimanded by an Associate on the project for having logged off at 1:00 am after she had completed all of her assignments. (Siber Decl. ¶¶9-11, Ex. 3[1]). Shiber was apologetic and made it clear that she did not want there to be any question about her commitment to Centerview. (Siber Decl. ¶¶12-13, Ex. 4).

---

[1] All Exhibits are attached to the Declaration of Plaintiff Kathryn Shiber and all deposition transcripts are attached to the Declaration of Brian Heller, Esq. References to Shiber's Declaration are designated as "Shiber Decl. ¶__" and references to the depositions of witnesses are indicated by the witnesses' name and page number, i.e., "Shiber __."

The need to work 24-hours in a row over multiple days without sleep was particularly concerning for Shiber, since she has been diagnosed with and received medical treatment for "Unspecified Anxiety Disorder" and "Unspecified Mood Disorder" and requires consistent sleep to avoid exacerbating the effects of her diagnosis. (Siber Decl. ¶¶15-17).

Shiber reached out to Cheryl Robinson ("Robinson") of Human Resources the same day that she was reprimanded and advised her that she had a medical disability that required eight to nine hours of sleep per night, ideally on a somewhat consistent schedule. (Siber Decl. ¶¶18-19, Ex. 5). Robinson told Shiber that she had done the right thing by contacting Human Resources and that she would "see what [she] could do." (Siber Decl. ¶20). Shiber said she did not want her need for an accommodation to impact her opportunities and experiences at the firm. (Siber Decl. ¶20).

Later that day, Shiber spoke with both Robinson and Partner Tony Kim ("Kim"), where Shiber reiterated that she did not want her need for an accommodation to limit her professional career. (Siber Decl. ¶¶19-20). Shiber was advised that Centerview would tell Shiber's co-workers that she had a "hard stop" each night between midnight and 9:00 am, an accommodation Centerview referred to as "guardrails." (Siber Decl. ¶¶21-30). At Centerview's request, Shiber provided a letter from her college medical provider, Marylee Verdi, FNP-C, PMHNP-BC ("Verdi"), to support the guardrails accommodation that Centerview implemented. (Siber Decl. ¶¶31-34, Ex. 7). Shiber continued to work and received positive feedback. (Siber Decl. ¶¶36-38).

Shiber was terminated on Tuesday, September 15, 2020, in a meeting with Centerview's Chief Operating Officer Jeanne Vicari ("Vicari") and Robinson. (Siber Decl. ¶¶39-42). Vicari told Shiber that her termination was directly related to her disability and accommodation, saying, "Due to these accommodations you cannot perform the essential functions of the job," "You made a

4

mistake in accepting this job knowing you couldn't complete the job" and that Shiber "should have known" she would be unable to do the job. (Siber Decl. ¶¶43; Vicari 112; Robinson 143).

Shiber was shocked by her termination. (Shiber Decl. ¶44; Vicari 109; Robinson 142-143). No one had spoken with Shiber about any concerns that Centerview had with the guardrails accommodation that it had implemented. (Shiber Decl. ¶¶64-66, 71-72).

Shiber asked to rescind the accommodation entirely, but Vicari and Robinson rejected any interactive process, telling Shiber, "Your employment at the firm is terminated and that is irrevocable" and, "We can't ignore the evidence you've presented to us that the requirements of this job will have a negative impact on your health." (Shiber Decl. ¶¶45-46).

Vicari made the decision to terminate Shiber the prior Friday, September 11, 2020, which was the same day she learned that Shiber had a history of concussions. (Shiber Decl. ¶¶50-52; Vicari 77, 83-84).

## LEGAL STANDARD FOR SUMMARY JUDGMENT
## IN EMPLOYMENT DISCRIMINATION CASES

Courts have recognized that "an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000); Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) (noting that in discrimination cases, "the defendant will rarely admit to having said or done what is alleged, and third-party witnesses are by no means always available."); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof

which, if believed, would show discrimination."). It is also settled that all of Shiber's facts must be accepted as true and all inferences drawn in her favor. See Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) ("Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit."); Tolbert v. Smith, 790 F.3d 427, 434 (2d. Cir. 2015). Shiber is not required to persuade the Court that she would win at trial. See id. ("In determining whether summary judgment is appropriate, we must resolve all ambiguities and draw all reasonable inferences against the moving party.").

## ARGUMENT

### POINT I

### CENTERVIEW IS LIABLE FOR DISABILITY DISCRIMINATION UNDER THE ADA & THE NJLAD

Shiber's claims for disability discrimination under both the ADA and the NJLAD are analyzed pursuant to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). See McMillan v. City of N.Y., 711 F.3d 120, 125 (2d Cir. 2013); Joseph v. N.J. Transit Rail Operations Inc., 586 Fed. Appx. 890, 892 (3d Cir. 2014). Shiber must first establish a prima facie case; then Centerview must articulate a legitimate, nondiscriminatory reason for its actions; then Shiber must show that Centerview's explanation "was a pretext or discriminatory in its application." Fox v. Costco Wholesale Corp., 918 F.3d 65, 71 (2d Cir. 2019).

**A.    Shiber Was Qualified To Perform The Essential Functions Of Her Position**

Centerview's only argument opposing Shiber's prima facie case of disability discrimination is that Shiber's need for sleep made her unqualified to perform the essential

6

functions of being an Analyst, with or without reasonable accommodation. The record, however, confirms that Shiber's need for sleep to manage the symptoms of her disability did not impact her ability to perform the *essential* functions of her role, and that the accommodation that Centerview imposed on Shiber, namely requiring her to log off at midnight and log back on at 9:00 am, was not an undue burden. Furthermore, Centerview has failed to demonstrate an objective standard supported by factual evidence for its assertions, which is required by the NJLAD. See also Dawson v. N.Y.C. Transit Auth., 624 Fed. Appx. 763, 766 (2d Cir. 2015) (noting that the burden on the prima facie case "has been described as 'not onerous,' and 'minimal and de minimis.'").

### 1. Centerview Has Not Established That Being Available At All Hours Of The Day Was An "Essential" Function

A genuine issue of fact exists as to whether Centerview's unsupported claim that being "available all hours of the day" is an essential function of an Analyst. (Centerview Brief pg. 10). Centerview does not cite to any job description or policy to support its claim that Analysts are required to forgo sleep. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 222 (2d Cir. 2001) (finding a question of fact as to whether an essential function of plaintiff's job required a driver's license where "[n]owhere in the three-page job description does it say that managers and assistant managers must possess a valid driver's license."); 42 U.S.C. §12111(8) ("if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."). In fact, Centerview Partner Anthony Kim ("Kim") interviewed Shiber, yet he did not speak with her about the hours she would be working, which he would have done if working without sleep was an essential function. **(**Shiber 167; Kim 21).

7

In its motion, Centerview creates the illusion that ███████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████ (Centerview Brief pg. 11, SOF ¶6). The fact that Centerview hired Shiber after such █████ demonstrates that Shiber was capable of fulfilling the essential functions of the role.

Centerview finds no support for its argument from its own witnesses. Kim specifically disagreed with the claim that anyone who is incapable of working for 24 hours straight is disqualified from being considered at Centerview. (Kim 96). Kim stated that 80 hours per week was "a lot of hours," which was far less than the 120 hours per week that Shiber was working with the guardrails. (Kim 34). Cheryl Robinson ("Robinson") of Centerview's Human Resources confirmed, "All of our analysts sleep. All of our employees sleep." (Robinson 154:18-19).

Centerview argues that Shiber would not be able to sleep while working on "live deals." However, the record shows that most employees do *not* work on live deals consistently, nor do live deals prevent employees from sleeping. For example, Associate Timothy Ernst ("Ernst") testified that in six years, he had worked on just 15 live deals, working on two deals at once at certain points. (Ernst 41-42). Even then, he never went a night without sleep. (Ernst 117). Kim noted that employees working more than 120 hours a week happens "rarely, if ever." (Kim 32).

Furthermore, Centerview's reputation for maintaining "work-life balance" refutes its claim that forgoing sleep is an essential function of the Analyst role. All of Centerview's witnesses testified that the firm encourages a work-life balance, which includes sleep. (Vicari 62, 64; Kim 21-22; Robinson 19-20, 161-162). Centerview's reviews on the website "the Vault," which Centerview produced in discovery and attaches to its motion, describe the firm's "[g]reat culture

8

and work/life balance," "flexible hours" and "the best quality of life and respect of people's free time compared to any other bank I have experienced directly or indirectly." (Ex. 10). One review specifically indicates that Centerview permits employees to sleep, writing: "On balance of workload/quality of life/compensation and especially business outlook, I do not think there is a better place to work in the Investment banking industry." (Ex. 10).

Based on this record, a jury could find that the ability for Analysts to stay awake for days at a time is not an "essential" function, but is at most a "marginal" function. In Stone v. City of Mount Vernon, 118 F.3d 92, 99 (2d Cir. 1997), the municipal employer argued that the plaintiff, a firefighter, was no longer qualified for his position because he required a wheelchair after suffering an off-duty accident and was no longer able to engage in "fire suppression" duties. The court, denying summary judgment, noted that the desk job position the plaintiff had requested did not require him to actually fight fires, and that "it would be entirely permissible for a factfinder to infer that the ability to engage in fire-suppression activities is marginal to the positions" the plaintiff sought. Id. at 100.

In Melton v. Resorts Intl. Hotel, Inc., 2014 U.S. Dist. LEXIS 148803, at *17-18 (D.N.J. Oct. 20, 2014), similarly, the plaintiff, a doorman, was terminated because he was unable to work the graveyard shift, and therefore could not work all shifts. The court denied summary judgment, finding an issue of fact as to whether "schedule flexibility" was an essential function and concluding that "while there appear to be disputed facts concerning the essential functions of the door person position, as well as Plaintiff's qualifications, Plaintiff has adduced sufficient evidence in support of his prima facie case to survive summary judgment." Id. at *18.

In this case, as in <u>Stone</u> and <u>Melton</u>, a jury could reasonably find that the ability to work without sleep for days on end is "marginal" to the responsibilities of an Analyst, rather than an essential function. <u>See also</u> <u>Schlater v. Arthritis, Rheumatic & Back Disease Assocs., P.A.</u>, 2020 U.S. Dist. LEXIS 179024, at \*23 (D.N.J. Sep. 29, 2020) (finding a question of fact as to whether it was an "essential function" for the plaintiff to be present during standard office hours where the plaintiff testified that she could perform "more than half of her job" remotely or after hours and her job description did not list her essential functions "in ways that would imply they could not be done by an individual working from home at times."); <u>Valenti v. SleepMed, Inc.</u>, 2017 U.S. Dist. LEXIS 105615, at \*20 (D. Conn. July 10, 2017) (denying summary judgment because "the totality of the circumstances indicate that there remains a genuine issue of material fact as to whether escorting and greeting patients from the lobby of the hotel is an essential function.").

2.   *Permitting Shiber To Sleep Was Not*
     *An Undue Burden For Centerview*

Centerview cannot credibly claim that the guardrails accommodation that it devised was an undue burden. Robinson assured Shiber that she had "done the right thing" by raising her concerns. (Shiber Decl. ¶20). Shiber was not even in favor of the guardrails, since she was concerned that she would be viewed differently by her colleagues. (Shiber Decl. ¶22). Robinson and Kim told Shiber that they "understood" her concerns and assured her that the guardrails would not be detrimental towards her. (Shiber Decl. ¶¶24-30).

Additionally, Centerview cannot claim that permitting Shiber to sleep each night was an undue burden since Vicari specifically acknowledged at her deposition, "Employees sleeping is

10

not an undue burden for Centerview." (Vicari 89). Sleep is essential for everyone and was only more pressing for Shiber because of her disability.

Furthermore, the work on Dragon was completed successfully notwithstanding the guardrails. Kim did not receive any complaints that the work Shiber performed was deficient in any way. (Shiber Decl. ¶62; Kim 140). Kim said the meetings the team was working towards went "perfectly" and Ernst, who worked on the deal and assigned Shiber work, testified that the Partners were pleased. (Shiber Decl. ¶¶38, 76). Centerview has not cited one instance of Shiber failing to complete an assignment during her brief tenure.

This case is like McMillan v. City of New York, 711 F.3d at 122, where the plaintiff was terminated because his mental disability prevented him from arriving to work on time. The Second Circuit, reversing summary judgment, recognized "the importance of a penetrating factual analysis" and held that, drawing all inferences in the plaintiff's favor, the court could not find as a matter of law that the plaintiff's request to arrive late was an undue burden. Id. at 126, 129. Here, as in McMillan, a penetrating factual analysis demonstrates that Shiber being permitted to sleep cannot be deemed an undue burden as a matter of law. See also Andrews v. Blick Art Materials, LLC, 268 F. Supp. 3d 381, 404 (E.D.N.Y. 2017) ("An inquiry about whether a certain modification or accommodation is overly burdensome or is a fundamental alteration is necessarily fact-specific and is an affirmative defense to a prima facie claim of disability discrimination."); Stewart v. Cty. of Salem, 274 F. Supp. 3d 254, 263 (D.N.J. 2017) ("Whether the County was incapable of accommodating Plaintiff's disability of being unable to climb stairs for more than 1/3 of a 12-hour shift is a dispute that a jury must resolve. Disputed facts remain for a jury to decide whether

Plaintiff's requested accommodations were reasonable, and if so, whether the County would have suffered undue hardship if it had provided Plaintiff with those accommodations.").

Centerview distorts Shiber's need for sleep as a request for "light duty." Shiber made no such request. She only requested a conversation on how to manager her disability and made it clear that she did not want to limit her opportunities at Centerview. (Shiber Decl. ¶22, 24). Even with the guardrails, she was working 9:00 am to midnight, seven days a week, working 105 hours out of 168-hour week, which cannot reasonably be considered "light duty."

Centerview does not present one single case where a plaintiff's normal bodily function of sleeping was deemed an undue burden. Instead, Centerview cites cases where the plaintiff's disability prevented them from performing a job that required physical exertion, unlike the Analyst position. For example, in Clark v. Coca-Cola Beverages Northeast, Inc., 2022 U.S. App. LEXIS 657, at *7 (2d Cir. Jan. 10, 2022), which Centerview cites, the court held that plaintiff was not qualified for his physically strenuous warehouse position because he was unable to return from two years of medical leave and there were no positions that did not have that physical requirement. Similarly, in Raspa v. Office of Sheriff of County of Gloucester, 191 N.J. 323, 338 (2007), the plaintiff was unqualified to fulfill the essential role of working around inmates because of his disability affecting his vision. This case is not like Shannon v. N.Y. City Transit Authority, 332 F.3d 95, 103 (2d Cir. 2003), which Centerview also cites, where the plaintiff's colorblindness precluded him from working as a bus operator for safety reasons. This case must also be distinguished from Hunt-Watts v. Nassau Health Care Corp., 43 F.Supp.3d 119, 131 (E.D.N.Y. Aug. 21, 2014), where the plaintiff's inability to perform surgeries contradicted what her job description specifically identified as an essential function of her role as a podiatrist. Here, unlike

in the cases Centerview cites, there was no physical component to being an Analyst, nor was Shiber asking for anyone else to take over her responsibilities.

Centerview also cites cases where the plaintiff asked the employer to create an entirely new position, which is not the case here. See Graves v. Finch Pruyn & Co., 457 F.3d 181, 187 (2d Cir. 2006) (the employer was not required to create a sedentary position for the plaintiff after he was no longer able to fulfill his physically strenuous duties as a laborer at a paper company); Rosenfeld v. Canon Business Solutions, Inc., 2011 U.S. Dist. LEXIS 115415, at *41-42 (D.N.J. Sept. 26, 2011) (the plaintiff was not entitled to be moved off of the overnight shift – the position he had been hired to fill – because of his insomnia); Dicino v. Aetna U.S. Healthcare, 2003 U.S. Dist. LEXIS 26487, at *48 (D.N.J. June 23, 2003) (the employer was not required to accommodate the plaintiff's request to drive no longer than 30 minutes to the employer's offices because the employer had no offices within that distance).

Centerview also cites inapplicable cases where the plaintiff asserted a disability as an excuse for misconduct. See Devany v. UPS, 2021 U.S. Dist. LEXIS 189367, at *36-37 (S.D.N.Y. Sept. 30, 2021) (finding no discrimination and plaintiff fired for violating "last chance" agreement and blamed his disability of alcoholism); Turner v. Delta Airlines, Inc., 2023 U.S. Dist. LEXIS 34110, at *15 (E.D.N.Y. Mar. 1, 2023) (plaintiff terminated for failing to timely compete paperwork while on a final corrective action notice); Photis v. Sears Holding Corp., 2013 U.S. Dist. LEXIS 104152, at *25 (D.N.J. July 25, 2013) (plaintiff fired for making false statements during an investigation and never requested an accommodation).

Centerview relies on cases where the requested accommodation was plainly unreasonable. See Williams v. N.Y.C. Dept. of Heath & Mental Hygiene, 299 F.Supp.3d 418, 426 (S.D.N.Y.

2018) (plaintiff demanded to transfer back to her prior facility when she was moved from that facility due to allegations of discrimination brought against her); Boyce v. Lucent Techs., 2007 N.J. Super. Unpub. LEXIS 1680, at *17 (Super. Ct. App. Div. May 16, 2007) (plaintiff's request for a promotion as an "accommodation" was not reasonable).

       3.    *Centerview's General Assumptions About Shiber's*
              *Disability Are Insufficient For Summary Judgment*

It is Centerview's burden under the NJLAD to "produce evidence that its decision was based on 'an objective standard supported by factual evidence' and not on general assumptions about the employee's disability." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 27 (2017) (quoting N.J. Admin. Code §13:13-2.8(a)(3)).

In this case, Centerview fails to cite any objective standard or evidence regarding its claim that Shiber's disability precluded her from working as an Analyst. Centerview does not provide any analysis of hours that Analysts actually work, nor does it provide any expert testimony about the hours that other entry-level employees work at comparable firms.

Rather, Centerview relies on tall tales and tropes about employees on "Wall Street" working without sleep. Centerview's brief is replete with assumptions such as: "it is widely known and understood both within and outside the investment banking industry that analysts across Wall Street often work long and unpredictable hours" (pg. 1); "Junior investment bankers at Centerview, like junior investment bankers across Wall Street, are known to work long and often unpredictable hours" (pg. 4); "the experience of other Centerview employees, as well as the experience of junior investment bankers across Wall Street, affirm that the ability to work long and unpredictable hours as required by any given deals or projects is an essential function of that role" (pg. 12). These

stereotypes and generalities do not meet Centerview's burden to show "an objective standard" under the NJLAD.

**B.     The Record Demonstrates That Shiber Was
         Terminated Because Of Disability Discrimination**

Even assuming that Centerview meets its burden of offering a legitimate, non-discriminatory reason for its termination of Shiber, the record permits a jury to find that the real motivation for Shiber's termination was disability discrimination, and that Centerview's explanation is a pretext for discrimination.

      *1.     The Real Reason Shiber Was Terminated
         Was Because Of Disability Discrimination*

          *a.     Shiber Was Terminated Because
         Of Vicari's Discriminatory Bias*

The record confirms that Vicari, who Centerview identifies as the sole decisionmaker, held a discriminatory animus towards Shiber's disability. Vicari's flagrant malice toward Shiber's disability was on full display at the termination meeting on September 15, 2020. The callous and biased statements that Vicari admittedly said to Shiber at the termination meeting, and those confirmed by Robinson and Shiber (Shiber Decl. ¶43), include:

- **"Due to these accommodations you cannot perform the essential functions of the job."** (Vicari 112; Robinson 143).

- **"You made a mistake in accepting this job knowing you couldn't complete the job."** (Vicari 112; Robinson 143)

- Telling Shiber she **"should have known"** she would be unable to do the job. (Vicari 113; Robinson 143-144, 145-146).

- **"You took a coveted spot in a program where you agreed to fulfill the requirements for three years and given this**

15

**accommodation you can't fulfill them."** (Vicari 117-118; Robinson 144-145).

Vicari's hostility towards Shiber's disability, based on nothing more than her own unsupported assumptions, is textbook disability discrimination. Summary judgment should not be entertained on these facts.

> ### b.   Shiber Was Fired Even After She
> ### Tried To Rescind The Accommodation

There can be no question that Shiber's disability was the reason for her termination because Shiber told Vicari and Robinson that she wanted to rescind the accommodation and would work whatever hours were needed. (Shiber Decl. ¶¶45-46; Vicari 110-111; Robinson 142, 166). Vicari rejected any discussion saying, **"We can't ignore the evidence you've presented to us that the requirements of this job will have a negative impact on your health."** (Shiber Decl. ¶46; Vicari 110-111, 120; Robinson 151-152, 165:19-166:2). This undisputed evidence permits a jury to find that it was Vicari's *perception* of Shiber's disability that caused her termination, not the burden caused by the accommodation.

> ### c.   Vicari Terminated Shiber The Same Day She
> ### Learned About Shiber's History Of Concussions

It is undisputed that Vicari made the decision to terminate Shiber the very same day she learned that Shiber had a history of concussions. On Friday, September 11, 2020, Vicari saw a website that Shiber had created in high school where she wrote about the concussions she had experienced and how she was recognizable by the black helmet she wore while sailing. (Ex. 8; Shiber 29-30, 34, 214; Vicari 76-77; Robinson 129). Vicari sent that website to Amanda Kosowsky ("Kosowsky"), the Chief Compliance Officer at Centerview. Kosowsky responded by linking to a

16

different website Shiber had created, "www.katsails.com/concussion," which also mentioned her

concussions. (Ex. 8). Both Vicari and Robinson recognized that the concussions Shiber suffered

might have caused her need to sleep consistently. (Vicari 77; Robinson 131).

Vicari admits that she made the decision to terminate Shiber the very same day she

connected Shiber's concussions to her need for consistent sleep:

> Q.    Is it your testimony that you made the decision to terminate
>       Kate on the same day as your e-mails with Amanda Kososky
>       and Cheryl Robinson about the concussions?

> A.    It is my testimony that I had come to that conclusion by the
>       end of that week. If that Friday was September 11th, and if
>       that is the same day as the e-mails, it is what it is. (Vicari
>       83:18-84:2).

The timing alone permits a jury to find that Vicari's discriminatory perception of Shiber's

disability motivated her, rather than any business justification. A jury could find that once Vicari

learned Shiber had a history of concussions, she perceived her as disabled, broken and not fit to

work at Centerview.

> d.    *Centerview Did Not Engage In An Interactive Process*

Centerview's failure to engage in an interactive process is proof of its discriminatory intent.

In Sheng v. M&TBank Corp., 848 F.3d 78, 87 (2d Cir. 2017), the Second Circuit held that "an

employer's failure to engage in a good faith interactive process can be introduced as evidence

tending to show disability discrimination and that the employer has refused to make a reasonable

accommodation." See also Cayetano v. Fed. Express Corp., 2022 U.S. Dist. LEXIS 119102, at *19

(S.D.N.Y. July 6, 2022) (finding a question of fact as to whether the employer's "actions amount

to a sufficient 'interactive process'" and noting that a failure to engage in an interactive proves

"further supports an inference of discrimination."); <u>Mathewson v. N.Y. State, Office of Mental Health</u>, 2021 U.S. Dist. LEXIS 209021, at *7 (N.D.N.Y. Oct. 29, 2021) ("If a plaintiff alleges that his employer failed to make an accommodation and failed to engage in a sufficient interactive process, the plaintiff has adequately pled out his claim of disability discrimination."); <u>see e.g.</u> <u>Malzberg v. N.Y. Univ.</u>, 2022 U.S. Dist. LEXIS 54375, at *44-45 (S.D.N.Y. Mar. 25, 2022) ("The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.").

In this case, Centerview did not engage in any interactive process with Shiber about its supposed concern that the guardrails accommodation would not work long term. (Robinson 111-112, 114). The only conversations that anyone from Centerview had with Shiber about the accommodation was when (a) she was told the guardrails would be implemented on August 28 and (b) when she was terminated on September 15. (Shiber Decl. ¶64). There was nothing "interactive" about that process.

Centerview's paternalistic claim that Shiber would suffer "consequences" if she continued working at Centerview, or that she would not have "the same experience" as other Analysts if her duties were changed (Centerview Brief pg. 14-15), does not relieve it of the need to engage in an interactive process. Centerview's belief that Shiber would be better off working somewhere else because of her disability is not compassionate, but rather is the exact type of discrimination that the human rights laws are designed to prevent. <u>See</u> <u>Church v. Sears Holding Corp.</u>, 605 Fed. Appx. 119, 121-122 (3d Cir. 2015) (denying summary judgment where the plaintiff's new supervisor's explanation for terminating her was, "we didn't want [the plaintiff] to hurt herself or the company to at be fault" for an injury).

2.  _Centerview's Explanation For Terminating Shiber Is A Pretext_

Centerview cannot provide a legitimate explanation for why it terminated Shiber on September 15, 2020, just 18 days after she requested an accommodation. The reasons that Centerview offers on its motion are a pretext for discrimination.

        a.  _Centerview Does Not Identify An Event_
            _That Required Shiber's Termination_

Vicari could not identify what caused her to make the decision to terminate Shiber on Friday, September 11, 2020, which was the same day she learned that Shiber had a history of concussions. (Vicari 87). Vicari did not speak with Ernst or Gallea, upon whom Centerview relies so heavily on this motion, or see their emails about Shiber. (Vicari 52-53). Nor did Vicari consult with Kim, who developed the guardrails accommodation for Shiber, about the decision to terminate Shiber. (Vicari 81, 104). Vicari did not compare the hours that Shiber worked in the short time between her request for an accommodation and her termination. (Vicari 69, 73; Robinson 104). Vicari acknowledged that terminating Shiber soon after her requested accommodation might create the appearance of discrimination. (Vicari 86). A jury could come to a similar conclusion.

        b.  _Centerview Did Not Genuinely Try_
            _To Find A Workable Accommodation_

Centerview terminated Shiber just 18 days after it unilaterally implemented the guardrails accommodation, without exploring any modifications or alternatives. Centerview Centerview's refusal to give Shiber a chance proves that its arguments are a pretext. See Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 431 (2d Cir. 2016) ("The weakness of the evidence supporting the defendant's explanation, considered in conjunction with the very close temporal proximity

between Graziadio's leave and her termination, would then permit the conclusion that defendants' decision to fire" the plaintiff was based on her request for medical leave).

Centerview exaggerates that Shiber's sleep caused "severe inefficiencies." (Centerview Brief pg. 16). Shiber had only been employed for a few weeks and was mostly re-formatting PowerPoint slides. (Shiber Decl. ¶62; Vicari 104-105). There was nothing essential that she could have been expected to do. While Centerview brought on another individual to work on the Dragon deal, that individual was a second-year Analyst with more experience, and Ernst did not feel that this addition changed how the work was completed. (Shiber Decl. ¶76; Ernst 105).

Ernst and Gallea's complaints about Shiber's work were also exaggerated, as she only worked with them for a handful of days before they started complaining. Their expectation that a first-year Analyst do the grunt work overnight should not have controlled how Centerview responded to Shiber's request for an accommodation. In any event, Vicari did not speak to either of them or see their emails complaining about Shiber (Vicari 52-53), so Vicari's decision to terminate Shiber could not have been based on their views.

Centerview goes so far as to blame Shiber for her own termination, twisting her statement that she did not want to be treated differently as a directive that she not be removed from "live deals." This is a disputed fact, as Centerview only asked Shiber if she wanted to be removed from Dragon, not whether she wanted to stop working on live deals altogether. (Shiber Decl. ¶79).

Centerview makes the straw man argument that it had no choice but to terminate Shiber because she did not want her co-workers to learn about her disability. This is not at all true, as Shiber understood that her co-workers would have to be told that she required an accommodation. (Shiber Decl. ¶78; Vicari 39). Kim acknowledged that even if Centerview had told Shiber's co-

workers that she had a medical issue, that still would not have resolved the problem. (Kim 119). In any event, Centerview should at least have had an interactive process with her about these points before summarily terminating her.

The letter from Shiber's college medical provider, Marylee Verdi, FNP-C, PMHNP-BC ("Verdi"), stating that Shiber needed to sleep each night, also did not compel Shiber's termination. The purpose of the letter was to justify the guardrails accommodation that Centerview had already implemented and had no impact on the guardrails accommodation that had already been put in place. (Shiber Decl. ¶34; Robinson 72, 88, 93). No one from Centerview ever asked to speak with Shiber or with Verdi about her letter. (Robinson 93).

Furthermore, Centerview was aware that Shiber could have more flexibility than Verdi proposed. Kim recalled Shiber saying that she did not need to have consistent sleep every night, just that she needed it frequently. (Kim 88). Verdi, at her deposition, confirmed that there was flexibility in Shiber's sleep schedule, noting that a "consistent routine" of sleep was important, though "it may not necessarily be hours of sleep…" (Verdi 30). Centerview's refusal to further explore Verdi's letter, but rather to use it to bolster the discriminatory result it desired, is proof of its animus.

This case is like Capobianco v. City of New York, 422 F.3d 47, 60 (2d Cir. 2005), where the plaintiff, a sanitation worker, was unable to work at night due to night blindness, but the sanitation department made the decision that the plaintiff was not able to work at *any* time and fired him. The Second Circuit reversed the lower court's grant of summary judgment, citing the defendant's refusal to "consider[] whether Capobianco's condition could be accommodated." Id.

at 61. In this case, as in <u>Capobianco</u>, Shiber's refusal to simply consider accommodating Shiber precludes summary judgment.

Centerview claims that it "routinely provides reasonable accommodations for individuals with disabilities" (Centerview Brief pgs. 18-19). However, the record shows that those "accommodations" were entirely irrelevant to Shiber's request. The prior requests for accommodation that Centerview received, of which there were only a few (Robinson 15), dealt either with employees taking time off or requiring special equipment, rather than dealing with sleep. (Vicari 23-24, 30-31; Kim 128-129; Robinson 16-17). A jury could find that since Shiber's request could not be quickly resolved with time off, Centerview felt it was easier to simply terminate Shiber rather than engage in an interactive process with her.

**POINT II**

**CENTERVIEW IS LIABLE FOR FAILING TO ACCOMMODATE
SHIBER'S DISABILITY UNDER THE ADA & NJLAD**

A jury could reasonably find Centerview liable for failing to accommodate Shiber's disability. This claim is distinct from her discrimination claim and must be viewed separately. <u>See</u> <u>McMillan</u>, 711 F.3d at 125 ("An employer may also violate the ADA by failing to provide a reasonable accommodation."); <u>Nixon-Tinkelman v. N.Y.C. Dept. of Health & Mental Hygiene</u>, 434 Fed. Appx. 17, at *18-19 (2d Cir. 2011) ("A plaintiff can base a discrimination claim on an employer's failure to make a reasonable accommodation."); 42 U.S.C. §12112(b)(5)(A); 29 C.F.R. §1630.9(a); <u>Grande</u>, 230 N.J. at 21 (recognizing that "our courts have evaluated an employer's obligation to reasonably accommodate an employee's disability under the LAD in accordance with the ADA.")

Centerview's only argument on this claim is that Shiber could not have fulfilled the essential functions of her job because of her disability. As set forth above, a jury could find that Shiber was capable of performing the essential duties of an Analyst.

## POINT III

### CENTERVIEW IS LIABLE UNDER THE LAD FOR
### FAILING TO ENGAGE IN THE INTERACTIVE PROCESS

To establish a claim for failure to engage in the interactive process under NJLAD §10:5-12(a), Shiber must show: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Schlater, 2020 U.S. Dist. LEXIS 179024, at *26.

Shiber easily meets these elements. The only time that anyone at Centerview discussed the accommodation with Shiber was when the guardrails were implemented on August 28 and when she was terminated on September 15. (Shiber Decl. ¶64). Centerview's 56.1 Statement does not identify any discussions that any of its employees had with Shiber regarding the feasibility of the guardrails accommodation. Vicari acknowledged that there was no interactive process regarding Shiber's termination. (Vicari 91).

Centerview's motion glosses over the "interactive" part of the process by noting that "[s]ome combination" of individuals discussed how to handle Shiber's request." (Centerview Brief pg. 21). Centerview does not provide any basis to reject Shiber's clear recollection.

23

Centerview argues that "Shiber never offered Centerview alternative solutions" (Centerview Brief pg. 8), but omits that Centerview never asked Shiber for alternatives to the guardrails. In fact, Shiber was initially not in favor of the guardrails and offered that she sleep a set number of hours prior to the start of the next day's morning meeting, but Robinson rejected that suggestion. (Shiber Decl. ¶66). Furthermore, Centerview never told her that the guardrails created any concerns. (Shiber Decl. ¶¶64-65). Shiber believed that everything was going smoothly right up until the moment she was terminated. (Shiber Decl. ¶44). It is improper for Centerview to blame Shiber for not offering solutions when it determined that the accommodation it implemented would not work without ever having a dialogue with her.

There were alternatives that could have permitted Shiber to continue working without the guardrails. For example, Centerview could have assigned her to deals that did not require her to stay awake for multiple nights in a row. (Shiber Decl. ¶71). Centerview could have offered her a temporary leave to explore how she could balance her work with her need for sleep. (Shiber Decl. ¶72). Centerview could have permitted Shiber to work without any accommodation whatsoever, which Shiber volunteered to do. (Shiber Decl. ¶45). Centerview foreclosed all of those possibilities by summarily terminating her, with Vicari opening the conversation by cruelly telling Shiber that "her employment was being terminated effective immediately, and that the decision was irrevocable." (Vicari 109).

This case is not like Tourtellotte v. Eli Lilly & Co., 636 Fed. Appx. 831, at *45 (3d Cir. 2016), which Centerview cites, where the plaintiff's "outright refusal to engage in the interactive process at all" precluded her claim. Centerview's reliance on Pryce v. Tata Consultancy Services, 2022 U.S. Dist. LEXIS 209411, at *19 (D.N.J. Nov. 18, 2022), is similarly misplaced, as the

plaintiff could not establish a failure to accommodate where it was undisputed "that Defendant granted Plaintiff's exact accommodation request" to work remotely.

## **CONCLUSION**

For the foregoing reasons, Shiber respectfully requests that Centerview's motion for summary judgment be denied, and for such further relief as this Court deems just and proper.

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*

By:_____
BRIAN HELLER
3 Park Avenue, Suite 2700
New York, NY 10016
(212) 889-6565
bheller@sphlegal.com

**CLAYMAN ROSENBERG KIRSHNER & LINDER LLP**
*Attorneys for Plaintiff*

By:_____
JAMES F. VALENTINO
305 Madison Avenue, Suite 650
New York, NY 10165
(212) 922-1080
valentino@clayro.com