HIGHLY CONFIDENTIAL – FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **KATHRYN SHIBER,**<br><br>            Plaintiff,<br><br>    v.<br><br>**CENTERVIEW PARTNERS LLC,**<br><br>            Defendant. | Case No: 1:21-cv-03649-ER<br>ECF Case<br><br>**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
  Jennifer Barrett
  Hope Skibitsky
  Janice Yoon
  Maheema Haque
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel. (212) 849-7000

jenniferbarrett@quinnemanuel.com
hopeskibitsky@quinnemanuel.com
janiceyoon@quinnemanuel.com
maheemahaque@quinnemanuel.com

*Attorneys for Defendant*

**TABLE OF CONTENTS**

**Page**

I.    CENTERVIEW'S THREE-YEAR ANALYST PROGRAM ...............................................1
II.    SHIBER COMMENCES EMPLOYMENT AS A FIRST-YEAR ANALYST ...................3
III.   SHIBER REQUIRES CONSISTENT SLEEP TO AVOID EXACERBATING THE EFFECTS OF HER MEDICAL DIAGNOSES ...........................................................4
IV.   SHIBER REQUESTS AN ACCOMMODATION ............................................................5
V.    CENTERVIEW MONITORS THE GUARDRAILS ACCOMMODATION ...................10
VI.   SHIBER IS TERMINATED .............................................................................................13
VII.  CENTERVIEW'S ANTI-DISCRIMINATION POLICIES ...............................................14

Pursuant to Local Civil Rule 56.1, Defendant Centerview Partners LLC ("Centerview") respectfully submits this Rule 56.1 Statement of Undisputed Material Facts as to which Centerview contends there is no genuine issue to be tried.

## I.   CENTERVIEW'S THREE-YEAR ANALYST PROGRAM

1. Centerview is an investment banking advisory firm that advises companies on various corporate transactions such as mergers and acquisitions.  Ex. 10 (Kim Tr.) at 11:12-16.[1]

2. Centerview offers a prestigious three-year analyst program.  Ex. 10 at 16:2-11; Ex. 7 ¶ 9 (characterizing Centerview's analyst program as "prestigious").  Analysts, who frequently join the program directly from college, are trained in investment banking and general business.  *Id.*

3. Centerview's analysts are often assigned to multiple matters at the same time.  Ex. 10 at 28:21-30:16 ("At Centerview as an analyst you are available to dozens or hundreds of people as a resource, and we have a team that is – decides what work you should be on, but you can be in a situation, as I mentioned before, where you can have two or three live projects, and then, as a result, end up working at that level for a long period of time, even days or even weeks on end."), 33:2-8; Ex. 9 (Ernst Tr.) at 41:22-24.

4. Centerview's analysts do not have set work hours.  Ex. 10 at 31:25-32:12.  Rather, analysts' hours are unpredictable and vary depending on the specific phase of a deal or project or the deals or projects they are working on.  Ex. 18 (Robinson Tr). at 43:14-44:11, 45:24-46:11, 50:25-51:15, 106:18-21, 107:16-108:4, 136:19-137:4, 139:21-24, 151:19-23, 158:5-159:11; Ex. 10 at 28:19-29:13, 89:10-90:15; Ex. 9 at. 63:2-7 ("Q.  What do you mean by 'late nights'?  A.  I mean working later than you would at a typical, more standard job.").

---

[1] Unless otherwise indicated, all exhibit numbers cited herein are exhibits to the Declaration of Hope D. Skibitsky ("Skibitsky Decl.") submitted herewith.

5. Given the complexity and pace of most investment banking transactions, analysts at Centerview are expected to be available all hours of the day, including, at times, overnight. Ex. 10 at 89:10-12, 94:23-95:5, 114:2-24.

6. For this reason, Centerview endeavors ███████████████████ to ensure that the candidates for its analyst position are capable of working long and unpredictable hours. Ex.10 at 18:1-21:5. In fact, Centerview "███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████" Ex. 10 at. 20:17-21:5; Ex. 2.

7. It is widely and publicly reported that junior analysts in the investment banking industry, including at Centerview, often have a heavy work load and work long and unpredictable hours. Ex. 22 (Vicari Tr.) at 113:11-114:24; Ex. 10 at. 17:9-21:5, 95:17-25 ("Q. The ability to work 24 hours in a row, is that based upon Centerview's culture, or do you think that is across Wall street? A. that is across Wall Street"); Ex. 18 at. 157:24-159:9; Ex. 9 at 13:2-15 (describing his understanding going into Centerview's summer program that there were no set hours requirements but that he would be very busy).

8. For example, public reviews left on the review and rankings website Vault.com reference long, unpredictable hours as a facet of employment at Centerview. Ex. 11 (reviews including: "You will face the typical investment banking hours here as well"; "sometimes all the work piles up at once, and those days are less fun…"; "[l]ike any investment bank, no way to anticipate the hours/ when tasks will come up"; "unpredictability, but I think that's pretty universal across firms").

2

## II.  SHIBER COMMENCES EMPLOYMENT AS A FIRST-YEAR ANALYST

9. Plaintiff Kathryn Shiber interviewed for a position in Centerview's three-year analyst program in September 2019. Ex. 2. As part of that process, she had at least three separate rounds of interviews, with four non-partner employees, including associates, a Principal, and a third year analyst, during which she had the opportunity to discuss the specific expectations for junior analysts at Centerview. *Id.*; Ex. 20.

10. In September 2019, Centerview extended Shiber an offer to join its three-year analyst program. Ex. 18 at 25:10-12; Ex. 8 ¶ 9. Shiber accepted that offer. *Id.*

11. Shiber commenced her employment with Centerview on July 6, 2020. Ex. 7 ¶ 7.

12. During the first approximately three weeks of Shiber's employment with Centerview, she participated in group training sessions and was not assigned to any client matters. Ex. 7 ¶ 19; Ex. 9 at 48:4-25.

13. On or about August 24, 2020 Shiber was assigned to a "live deal" that was known internally as project "Dragon." Ex. 12. A live deal is one where Centerview is engaged on behalf of a company that is actively pursuing a sale or other transaction. Ex. 9 at. 40:20-41:5. Project Dragon involved a potential merger for a large, new client of Centerview. Ex. 10 at. 59:24-60:11; Ex. 9 at. 36:8-37:1.

14. When Shiber joined project Dragon, the Centerview deal team consisted of a second or third year analyst named Matthew Gallea, an associate named Timothy Ernst, a principal named Matthew Baron, and several partners. Ex. 9 at 31:22-35:8.

15. As the associate on the team who had already passed through Centerview's analyst program, Ernst assigned Shiber work on project Dragon. Ex. 9 at 32:3-8.

3

16. During the first week she was working on project Dragon, Shiber worked until after midnight more than one night. Ex. 18 at 41:7-22; Ex. 7 ¶ 22. Tim Ernst and Matt Gaella also worked well past midnight the first week Shiber joined project Dragon. Ex. 1 at 1.

17. On the evening of August 27 or early morning of August 28, 2020, Shiber signed offline without communicating to Ernst or others on project Dragon that she was doing so. Ex.7 ¶ 23.

18. On Friday, August 28, 2020, at 10:08 a.m., Ernst emailed Shiber stating, in part:

> We should also talk today generally about expectations on communication and expectations for a live project like this. Matt and I shouldn't be up alone working, we are a team and will need everyone on the same page and pulling their weight. Things may come up and you aren't able to get to / finish stuff, but I need to know that and can help out. It's not helpful to think you are working on stuff and then realize it's not done. Let's plan to talk in the afternoon to make sure we are aligned.

Ex. 1 at 62-63.

19. Shiber responded that same day at 10:31 a.m. asking to "strategize how we/I can be more efficient earlier in the day." Ex. 1 at 62.

20. In response, Ernst explained: "One part of this job (and the worst part of this job) is many times you can't 'get ahead' of things or work through things early because there will always be more for you to do. Late nights are just part of the job, especially on a live deal like this." Ex. 9 at 62:12-25. Ernst further explained that "in general the finish line is always going to be moving so we can't just wake up with a clear task of 3 things we need to do, it'll change by the hour. Trust, me, we don't want to be working late either and if we don't need to be we won't but there will be many late night on this [live deal]." Ex. 1 at 62.

### III. SHIBER REQUIRES CONSISTENT SLEEP TO AVOID EXACERBATING THE EFFECTS OF HER MEDICAL DIAGNOSES

21. Prior to joining Centerview, Shiber had been diagnosed with "Unspecified Mood Disorder" and "Unspecified Anxiety Disorder." Ex. 7 ¶ 26; Ex. 6.

4

22.  Shiber did not advise anyone at Centerview that she had any medical conditions until after she began working on project Dragon.  Ex. 5.

23.  Shiber required consistent sleep to avoid exacerbating the effects of her diagnoses. Ex. 7 ¶ 26; Ex. 18 at 34:11-20, 38:21-39:6, 113:18-25; Ex. 10 at 70:7-15, 72:16-21; Ex. 5; Ex. 21(Verdi Tr.) 40:24-48:7; Ex. 6 at 242, 244 (October 30, 2018 medical note stating Shiber "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."; Ex. 19 (Shiber Tr). 206:2-22, 244:4-19, 224:18-23 ("A.  In order to best manage my disabilities and avoid exacerbating the effects of them, I maintain a lifestyle which includes eight to nine hours of sleep per night, on average.").

24.  If Shiber is not able to maintain a regular sleep schedule, "the symptoms of [her] disabilities are significantly increased to even further impair [her] day-to-day life and [her] work performance, [her] relationship with others, and [her] emotional condition, and all of the other arenas that these symptoms impact [her] in."  Ex. 19 at 227:20-228:12.

IV.  **SHIBER REQUESTS AN ACCOMMODATION**

25.  Upon receiving Ernst's August 28, 2020 email discussed *infra* __, Shiber was "concerned that working until 8:00 a.m. would significantly exacerbate the symptoms that [she] experienced due to [her] disabilities."  Ex. 19 at 206:2-22.  Accordingly, that same morning, Shiber emailed Cheryl Robinson, Centerview's Director of Human Resources, requesting "an appointment to speak sometime today."  Ex. 23; Ex. 19 at 206:2-22.  Shiber explained in that email: "I am very concerned with learning how to communicate with my team and manage expectations.  I may need accommodations and do not feel comfortable advocating for myself so I would really appreciate your help on this."  Ex. 23.

5

26.     In response to that email, Robinson set up a Zoom meeting with Shiber for later that same day (the "August 28 Zoom").  Ex. 18 at 24:6-16, 32:3-33:5.

27.     During the August 28 Zoom, Shiber told Robinson that she has a medical condition for which she needs consistent, eight-to-nine hours of sleep per night.  Ex. 18 at 34:11-20, 38:21-39:6, 113:18-25; Ex. 20 (Shiber's September 15, 2020 notes stating: "I told [Robinson] that I had a medical disability which, for healthy management, required eight to nine hours of sleep per night and that ideally would have a somewhat consistent sleep schedule."); Ex. 19 at. 244:4-19 ("Q. And during that initial meeting on August 28, you told Ms. Robinson you had a medical disability which, for healthy management, required eight to nine hours of sleep per night and that ideally would have a somewhat consistent sleep schedule; correct?  A.  Yes. …. Q. Ms. Robinson got this idea that you required eight to nine hours of sleep per night from you; correct?  A.  I told her that").

28.     During the August 28 Zoom, Robinson told Shiber that her health was the firm's top priority.  Ex. 20; Ex. 19 at 219:16-220:6.

29.     During the August 28 Zoom, which occurred on a Friday afternoon, Robinson asked Shiber whether she believed she would be able to get the necessary time off over that upcoming weekend.  Ex. 18 at 34:21-35:13.  Shiber responded that she thought the weekend would be okay.  Ex. 18 at 34:21-35:13.

30.     Robinson told Shiber that Shiber did the right thing by contacting Robinson.  Ex. 18 at 35:14-16; Ex. 20.  Robinson also told Shiber that she did not need to disclose the specifics of her medical condition, but explained that Robinson did need to understand the scope of Shiber's needed accommodation.  Ex. 18 at 35:21-36:10.  Thus, Robinson asked Shiber to provide a note from a medical provider describing her needed accommodation.  Ex. 18 at 92:11-19.

31.     Centerview customarily asks individuals seeking a medical-based accommodation to provide a doctor's note.  Ex. 22 at 20:23-21:8, 32:14-24.

32.     Centerview did not question whether Shiber in fact required eight to nine hours of sleep per night.  Ex. 18 at 56:10-15, 94:6-8 ("Q.  Did you think that Kate [Shiber] was being sincere in saying she needed eight to nine hours of sleep each night?  A.  Yes."); Ex. 10 at 73:9-12 ("Q.  Did you ever question whether Kate [Shiber] actually needed to get the sleep she was saying she needed?  A.  No."); Ex. 22 at 35:10-12 ("Q.  Were you skeptical at all about what Kate was asking for?  A.  Not at all.").

33.     Later in the day on August 28, after the August 28 Zoom, Robinson contacted Centerview Chief Operating Officer, Jeanne Vicari.  Ex. 22 at 11:9-11; 15:19-16:17.  Robinson advised Vicari that Shiber had told Robinson that she needed to have consistent sleep.  Ex. 22 at 16:23-17:4.

34.     Upon hearing this information, Vicari reviewed Centerview's staffing system to see which matters Shiber had been assigned to.  Ex. 22 at 17:18-24.  Vicari advised Robinson that Shiber was currently staffed on project Dragon, which, Vicari explained, was a very active live deal.  Ex. 22 at 17:18-18:11; Ex. 18 at 84:15-85:4.  Accordingly, Robinson and Vicari understood that Shiber was likely to have a busy weekend with work and therefore determined that it was important to ensure that Shiber was able to get the sleep she required over the upcoming weekend.  Ex. 18 at 84:15-85:4; 48:17-49:9; Ex. 22 at 19:7-21:22 ("A.  At the time, I believe we needed to do whatever we could to protect her sleep based on the very limited information we had at hand about what it all meant and everything behind it.  Again, it was a Friday night.  We had – I had zero visibility as to the workload that was going to happen over the weekend. . . . A. … [S]o we

7

were going to do what we had to do for now, and we will monitor the situation and assess it as we go forward.").

35. Robinson and Vicari determined that they should speak with Tony Kim, a senior partner at Centerview who was working on project Dragon, to ensure that Shiber's sleep was protected over the upcoming weekend. Ex. 18 at 61:4-13, 85:5-21; Ex. 22 at 17:24-18:24 ("A. … It was Friday night. It was a very active situation. I did not see how we were going to protect her sleep if we didn't advise the team. … I told Cheryl that she needs to speak to the senior-level people on the team to assess what the workload was going to be, and if it would be possible to protect her sleep that weekend.").

36. After the August 28 Zoom, Robinson and Shiber spoke at least two other times that day. Ex. 18 at 36:11-37:2, 48:22-49:9. Kim was present for at least one of those conversations. Ex. 10 at 69:5-10, 76:9-25; Ex. 13.

37. Robinson proposed a "guardrails" approach to Shiber on August 28, 2020. Ex. 10 at 81:13-20; Ex. 18 at 48:17-49:9. The "guardrails" approach provided that Shiber would not work between midnight and 9:00 a.m. each day. Ex. 10 at 82:16-18.

38. Upon hearing about the guardrails proposal, Shiber "was worried about the fact that the guardrails would need to be communicated to [her] team" because she believed "that every team member that [she] worked with would know that there was something different about [her]" and "would treat [her] differently or look down upon [her]." Ex. 19 at 241:15-242:23. Robinson explained that in order for the guardrails to be respected, Shiber's team would need to be made aware of them. Ex. 20; Ex. 19 at 285:22-286:1.

8

39. Hearing Shiber's concerns, Robinson recommended that she and Shiber have a call with Kim. Ex. 20; Ex. 19 at. 286:10-287:8. Robinson, Kim, and Shiber subsequently spoke that Friday, August 28. Ex. 10 at 87:4-88:23; Ex. 19 at 287:9-12.

40. During the conversations between Robinson, Kim, and Shiber on August 28, the three discussed what different approaches might work for Shiber. Ex. 10 at 87:4-88:23; Ex. 19 at. 292:5-19.

41. Kim offered to remove Shiber from the live deal she was on, but Shiber said that she did not want to be removed from that live deal and wanted to continue to be staffed on live deals. Ex. 19 at 292:13-19 ("A. I recall that Tony stated that he could take me off of the deal that I was currently working on. Q. And what was your response to Tony stating that? A. That I did not want Tony to do that."); Ex. 22 at 28:22-29:25 ("she was averse to leaving an active job"); Ex. 18 at 52:16-54:11, 72:9-15, 80:16-81:2, 110:7-23; Ex. 10 at 101:9-19, 130:17-131:4.

42. Regarding the guardrails approach, Shiber expressed that she did not want anyone to know about her needed accommodation. Ex. 18 at 52:16-53:6; Ex. 10 at 71:4-12. In response, Kim told Shiber that it will be difficult to manage a team with respect to Shiber's offline hours without communicating any information about her situation. Ex. 10 at 74:9-75:3. Ultimately, Shiber understood that "to put in place the specific [guardrail] accommodations that [Robinson and Kim] had proposed and have [her] team respect those boundaries, the team would need to be made aware of them." Ex. 19 at 302:7-13. Centerview strove to honor Shiber's request that the reason for her work-time limitations not be shared with the team. Ex. 10 at 74:9-75:11, 98:2-16, 100:7-101:8; Ex. 9 at 78:5-25.

43. Following his conversations with Shiber and Robinson, on August 28, Kim told Shiber's live deal team that she would be offline from midnight to 9:00 a.m. each day. Ex. 19 at

62:2-7, 69:22-70:2; Ex. 10 at 100:7-13; Ex. 9 at 77:11-78:4. As Shiber requested, Kim did not tell the team why Shiber would be offline during that period. Ex. 10 at 74:9-75:11, 98:2-16, 100:7-101:8; Ex. 9 at 78:5-25.

44. Upon Kim's communication of the guardrails to the project Dragon team, the "guardrails" were instituted effective immediately (going into the weekend) to ensure that Shiber would be able to sleep between midnight and 9:00 a.m. Ex. 18 at 62:2-64:25.

45. At the time the guardrails were implemented, neither Robinson nor Kim had determined whether the guardrails approach was a viable long-term solution. Ex. 10 at. 83:2-84:11; Ex. 18 at 63:6-64:25.

46. Upon hearing about the guardrails proposal (as limited by her request that the underlying reason for her hours restrictions not be shared), Shiber did not propose any alternative accommodations. Ex. 19 at 242:10-243:6, 244:20-245:6 ("Q. And did you ever propose any other accommodation to Ms. Robinson or anyone at Centerview that was different from the guardrails approach? A. I didn't propose any specific accommodations at all. Q. Did you propose any general accommodations or any thoughts about accommodations? A. I did not propose any general accommodations.").

## V. CENTERVIEW MONITORS THE GUARDRAILS ACCOMMODATION

47. On September 1, 2020, Shiber gave Robinson a letter from Marylee Verdi, a nurse practitioner who had been Shiber's primary care provide for the prior two years. Ex. 5. In that letter, Nurse Verdi wrote: "Because of [Shiber's] underlying medical diagnosis, she requires consistent sleep 8-9 hours. If she is not able to maintain a regular sleep schedule she is a[t] a significant risk for exacerbation of her illness." Ex. 5; *see also* Ex. 19 at 224:18-23 ("A. In order to best manage my disabilities and avoid exacerbating the effects of them, I maintain a lifestyle which includes eight to nine hours of sleep per night, on average."); Ex. 19 at. 227:20-228:12 ("Q.

10

So you would agree with the contents of this document that if you are not able to maintain a regular sleep schedule, you are at significant risk for exacerbation of your illness; is that correct?  A.  Yes.  Q.  And what did that mean, significant risk of exacerbation of your illness?  A.  That means that the symptoms of my disabilities are significantly increased to even further impair my day-to-day life and my work performance, my relationship with others, and my emotional condition, and all of the other arenas that these symptoms impact me in.").

48. On Monday, August 31, 2020, following the August 28 discussions between Shiber, Robinson, and Kim, Kim asked Robinson to "check in with [Shiber]" to see how the guardrails approach was working for her.  Ex. 14.

49. On September 1, 2020, Shiber emailed Robinson regarding "Logistics."  Ex. 17. Among other questions, Shiber asked Robinson what had been "relayed to the team" and how she should deal with frequently-scheduled 8:00 a.m. calls on project Dragon.  Ex. 17.

50. That same day, Robinson emailed Shiber and asked whether she was able to get the time off that she needed the weekend prior.  Ex. 17.

51. Also on September 1, 2020, Vicari investigated whether the project Dragon team had in fact respected the guardrails over the weekend.  Ex. 14  Vicari wrote to Robinson that "FYI – Seems the team did a good job giving her space over the weekend."  Ex. 14.

52. On September 2, 2020, Shiber and Robinson spoke regarding the "guardrails." Robinson explained that Shiber's team was told that Shiber had a hard stop from midnight to 9:00 a.m. and that no reason was given to the team for that system.  Ex. 17.  Robinson also explained that there was no expectation that Shiber join 8:00 a.m. calls.  Ex. 17.

53. On September 2, 2020, Kim wrote to Timothy Ernst and Matthew Gallea, an analyst on the Dragon deal  regarding Shiber: "Are you guys managing ok?  Do we need to get additional

11

staffing? Let me know what you think." Ex. 9 at 32:20-23; Ex. 3. Ernst responded that the project Dragon team "can manage through the near-term. Our only question is whether this is a near-term or long-term set-up. We don't have context on the situation, and understand we aren't supposed to, but if this set-up drags on longer than a week or so, we may need additional staffing but can figure that out when we get there." Ernst continued:

> I also think it is not really effective from her perspective over the long-term because things take a while for her (as expected) but we end up having to jump in to turn our own comments because she has to stop before she is able to get to it so it is difficult for her to own things to completion. Since she has to jump in and out of workstreams, and this will keep moving so fast, I think it will get increasingly confusing for her as Matt and I keep building things out without her. Then she can get stuck in what I would call the vicious first-year cycle of not knowing what's going on, so her work is wrong, we don't have time or its midnight so Matt and I fix it, and then it repeats and she gets discouraged. Again, not an issue if this is a near-term situation but figured I'd flag as well.

*Id.*

54. Ernst then forwarded his email to Matt Baron, the principal working on the live deal, Ex. 10 at 115:23-116:6, writing: "FYI – let me know if you disagree but it just won't be helpful if this thing keeps going fast. I think it's impossible for a first-year to become value additive on something going this fast if they aren't fully plugged in." Baron responded: "Completely agree. It's not helpful for anyone if she can't get up to speed and own things as there is too much to do and we need a full person to help with everything that needs to get done." Ex. 10 at 116:6-9.

55. After the guardrails were implemented, Ernst observed that Shiber had difficulties whereby Shiber was not able to understand what changes had been made to her work from the night prior. Ex. 9 at 85:18-87:8. Ernst discussed this concern with Gallea and Kim. Ex. 9 at 87:22-88:8.

56. On September 3, 2020, Ernst wrote to Kim:

12

> I caught up with Matt B[aron] this morning and he wanted to get a sense for how we can better manage the time on this account (to the extent we can) given the really late nights. As this pace continues to pick up, it's going to become more and more difficult to give Kate [Shiber] responsibility for different workstreams (as opposed to just individual one-off tasks) and it is already becoming very inefficient.

Ex. 15 at 74.

57. Ernst further wrote: "[w]e discussed and think it may make sense to figure out staffing alternatives sooner rather than later." Ex. 15. On September 3, 2020, Ernst followed up to that email indicating that he and Baron "think that it makes sense to add another person as soon as possible who is around Matt G[allea]'s level and would be able to help out right away." Ex. 15.

58. Following Ernst's September 3, 2020 emails to Kim regarding staffing on project Dragon, and at least in part due to the concerns Ernst raised therein with regard to the guardrails, Centerview added another analyst to Shiber's deal team. Ex. 10 at 111:16-112:2, 121:2-6; Ex. 9 at 82:5-9, 109:17-110:18; Ex. 16.

59. After the guardrails were implemented, Kim and Robinson had further discussions regarding whether they could accommodate Shiber's request long-term. Ex. 10 at 98:17-25.

## VI.  SHIBER IS TERMINATED

60. Ultimately, Centerview determined that it could not maintain the guardrails accommodation for the long term given the nature and requirements of Shiber's position, as it had determined it was an unsustainable situation for the firm. Ex. 18 at 110:19-23, 112:17-19; Ex. 22 at 89:17-21, 90:13-18 (explaining that Shiber's requested accommodation would mean that Shiber's experience "would not be the same experience" as all other Centerview analysts as "it's not the same job anymore"). Centerview had determined that with the requested accommodation, Shiber was unable to perform the duties of an Analyst. Ex. 18 at 101:6-17 (explaining that Centerview could not "implement [the requested accommodation] full term, long term," based on "the need for…analysts to be available at oftentimes different hours throughout the day"); Ex. 22

at 103:25-104:4 ("all that unpredictability, I decided, was unsustainable to protect her in the long run, to protect that blackout period over a long, three year period.")

61. Centerview terminated Shiber during a WebEx video call on September 15, 2020, which was attended by Robinson and Vicari. During that meeting, Vicari advised Shiber that she was not able to fulfill the essential functions of the job due to her need for consistent sleep each night. Ex. 18 at 143:9-13.

62. As the Chief Operating Officer of Centerview, Vicari had the authority to make the decision to terminate Shiber and Vicari exercised that authority. Ex. 18 at 27:6-9, 30:7-25.

## VII. CENTERVIEW'S ANTI-DISCRIMINATION POLICIES

63. Centerview maintains a written policy against discrimination. Ex. 18 at 11:8-24. When Centerview's employees are hired, they are required to read Centerview's anti-discrimination policy and sign that policy. Ex. 18 at. 12:9-16; Ex. 22 at 25:21-27:22.

64. Centerview also requires its employees to attend an annual anti-discrimination training program. Ex. 18 at 12:14-18, 13:14-14:14; Ex. 10 at 117:8-17.

65. Centerview has a history of granting requests for medical accommodations. Ex. 19 at 16:13-17:19; Ex. 10 at 128:14-129:11; Ex. 9 at 121:15-24.

66. Prior to Shiber's request, Centerview had not received any request from one of its investment bankers for an accommodation for consistent time-off over a prolonged period. Ex. 18 at 16:13-17:19. Prior to Shiber's request, Centerview had not received a request for an accommodation by any employee relating to that employee's sleep schedule. Ex. 18 at 103:10-12.

Dated: September 9, 2024
      New York, New York

                          QUINN EMANUEL URQUHART &
                         SULLIVAN, LLP

                    By:  /s/ *Jennifer Barrett*
                         Jennifer Barrett
                         Hope D. Skibitsky
                         Janice Yoon
                         Maheema Haque
                         51 Madison Avenue, 22nd Floor
                         New York, New York 10010
                         Tel. (212) 849-7000
                         Fax (212) 849-7100
                         jenniferbarrett@quinnemanuel.com
                         hopeskibitsky@quinnemanuel.com
                         janiceyoon@quinnemanuel.com
                         maheemahaque@quinnemanuel.com

                         *Attorneys for Centerview Partners, LLC*