**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

KATHRYN SHIBER,

               **Plaintiff,**

     **v.**

CENTERVIEW PARTNERS LLC,

          **Defendant.**

---

**Case No: 1:21-cv-03649-ER**
**ECF Case**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Jennifer Barrett
Hope Skibitsky
Janice Yoon
Maheema Haque
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel. (212) 849-7000

jenniferbarrett@quinnemanuel.com
hopeskibitsky@quinnemanuel.com
janiceyoon@quinnemanuel.com
maheemahaque@quinnemanuel.com

*Attorneys for Defendant*

## Table of Contents

**Page**

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................4

I.    ANALYSTS AT CENTERVIEW AND ACROSS WALL STREET WORK
UNPREDICTABLE AND OFTEN LONG HOURS ..........................................................4

II.    SHIBER COMMENCES EMPLOYMENT AS A FIRST YEAR ANALYST..................4

III.    CENTERVIEW MONITORS THE GUARDRAILS APPROACH AND
DETERMINES IT WILL NOT BE FEASIBLE .................................................................6

STANDARD OF REVIEW ...................................................................................................9

ARGUMENT .......................................................................................................................9

IV.    SUMMARY JUDGEMENT SHOULD BE GRANTED IN CENTERVIEW'S
FAVOR ON COUNTS 1, 5, 7 AND 10 BECAUSE SHIBER CANNOT
ESTABLISH DISABILITY DISCRIMINATION UNDER THE NYCHRL,
NYSHRL, NJLAD OR THE ADA .....................................................................................9

    A.    Shiber Cannot Show A *Prima Facie* Case of Disability Discrimination..............10

        (a)    Shiber Could Not Perform The Essential Functions Of the Analyst
Role .............................................................................................................11

            (i)    The Ability To Work Unpredictable Long Hours And Be
Available All Hours Of The Day Is An Essential Function
Of The Centerview Analyst Role....................................................11

            (ii)    Shiber Could Not Perform This Essential Function With Or
Without Any Reasonable Accommodation ....................................14

    B.    Centerview Has Presented a Legitimate, Non-Discriminatory Reason for
Shiber's Termination. ............................................................................................18

    C.    Shiber Cannot Show that Centerview's Offered Reason is Pretextual .................19

V.    SUMMARY JUDGMENT SHOULD BE GRANTED IN CENTERVIEW'S
FAVOR ON SHIBER'S CLAIMS FOR FAILURE TO PROVIDE A
REASONABLE ACCOMMODATION UNDER THE NY HRLS, NJLAD
OR THE ADA (COUNTS 3, 6, 8 AND 11) ........................................................................20

VI.    CENTERVIEW IS ENTITLED TO JUDGMENT ON SHIBER'S CLAIMS FOR
FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS UNDER NJLAD
§10:5-12(A) AND N.J. ADMIN. CODE §13:13-2.5 (COUNT 9) ....................................21

VII.   SUMMARY JUDGMENT SHOULD BE GRANTED IN CENTERVIEW'S
FAVOR ON SHIBER'S RETALIATION CLAIM (N.Y.C. ADMIN. CODE §8-
107(7))....................................................................................................................................23

CONCLUSION....................................................................................................................................24

## Table of Authorities

**Page**

### Cases

*Abadi v. NYU Langone Health Sys.*,
2023 WL 8461654 (S.D.N.Y. Dec. 7, 2023), *reconsideration denied,* 2024
WL 396422 (S.D.N.Y. Feb. 2, 2024) .......................................................................................20

*Adams v. Montefiore Med. Ctr.*,
2017 WL 4417695 (S.D.N.Y. Oct. 3, 2017) .............................................................................24

*Balgley v. N.Y.C. Health & Hosps. Corp.*,
2017 WL 95114 (S.D.N.Y. Jan. 10, 2017) ................................................................................9

*Berry v. Marchinkowski*,
137 F. Supp. 3d 495 (S.D.N.Y. 2015) .......................................................................................9

*Boyce v. Lucent Technologies*,
2007 WL 1774267 (Sup. Ct. N.J. App. Div. Jun. 21, 2007) ....................................................20

*Burton v. Metropolitan Transp. Authority*,
244 F.Supp.2d 252 (S.D.N.Y. 2003) .......................................................................................11

*Casseus v. Elizabeth General Med*,
287 N.J. Super. 396 (App. Div. 1996) ......................................................................................18

*Clark v. Coca-Cola Beverages Northeast, Inc.*,
2022 WL 92060 (2d Cir. 2022) ..........................................................................................16, 17

*Daley v. CableVision Sys. Corp.*,
2016 WL 880203 (S.D.N.Y. Mar. 7, 2016) ............................................................................9, 11

*Davis v. City of New York Health Hospitals Corp.*,
2011 WL 4526135 (S.D.N.Y. Sep. 29, 2011) ...........................................................................11

*DeSantis v. New Jersey Transit*,
756 Fed. Appx. 197 (3d Cir. 2019) ...........................................................................................9

*Devany v. United Parcel Serv., Inc.*,
2021 WL 4481911 (S.D.N.Y. Sept. 30, 2021) ..........................................................................19

*Dicino v. Aetna U.S. Healthcare*,
2003 WL 21501818 (D.N.J. June 23, 2003) .............................................................................17

*Dossous v. New York City Health & Hosps. Corp.*,
2023 WL 4305021 (E.D.N.Y. June 30, 2023) ..........................................................................18

*Ellis v. City of New York*,
    2024 WL 1195688 (N.Y. Sup. Ct. Mar. 20, 2024) ....................................15, 16, 17

*Est. of Zoto v. Cellco P'ship*,
    2023 WL 2670713 (N.J. Super. Ct. App. Div. Mar. 29, 2023)...............................10

*Graves v. Finch Pruyn & Co., Inc.*,
    457 F.3d 181 (2d Cir. 2006)..............................................................................20

*Hunt-Watts v. Nassau Health Care Corp.*,
    43 F.Supp.3d 119 (E.D.N.Y. 2014) .....................................................................17

*Jansen v. Food Circus Supermarkets, Inc.*,
    541 A.2d 682 (N.J. 1988)....................................................................................18

*Jones v. Aluminum Shapes, Inc.*,
    339 N.J. Super. 412, 772 A.2d 34 (App. Div. 2001) ...........................................22

*Jones v. New York City Transit Auth.*,
    838 Fed. Appx. 642 (2d Cir. 2021)............................................................10, 11, 12

*Knox v. Town of Southeast*,
    599 Fed. Appx. 411 (2d Cir. 2015).....................................................................10

*Lawrence v. Nat'l Westminster Bank New Jersey*,
    98 F.3d 61 (3d Cir. 1996) ...................................................................................19

*Lazzari v. New York City Dep't of Parks & Recreation*,
    751 F. App'x 100 (2d Cir. 2018).........................................................................15

*Mauze v. CBS Corp.*,
    340 F. Supp. 3d 186, 202 (E.D.N.Y. 2018), *adhered to on reconsideration*,
    2019 WL 8137641 (E.D.N.Y. Jan. 23, 2019) .....................................................19

*McDonnell Douglas Corp. v. Green*,
    411 US 792 (1973).................................................................................9, 10, 19

*Mi-Kyung Cho v. Young Bin Cafe*,
    42 F. Supp. 3d 495, 506 (S.D.N.Y. 2013)............................................................23

*Nieblas-Love v. New York City Hous. Auth.*,
    165 F. Supp. 3d 51 (S.D.N.Y. 2016)....................................................................19

*O'Keefe v. Niagara Mohawk Power Corp.*,
    714 F. Supp. 622 (N.D.N.Y. 1989) .....................................................................18

*Photis v. Sears Holding Corp.*,
    2013 WL 3872519 (D.N.J. Jul. 25, 2013)............................................................19

*Pryce v. Tata Consultancy Servs./Tata Consultancy Servs. Ltd.*,
   2022 WL 17080744 (D.N.J. Nov. 18, 2022) ..........................................................22

*Raspa v. Office of Sheriff of Cty. Of Gloucester*,
   924 A.2d 435 (N.J. 2007)................................................................................16, 18

*Rosenfeld v. Canon Bus. Sols., Inc.*,
   2011 WL 4527959 (D.N.J. Sept. 26, 2011) ......................................................13, 17

*Shannon v. New York City Transit Auth.*,
   332 F.3d 95 (2d Cir. 2003)....................................................................................15

*Sivio v. Vill. Care Max*,
   436 F. Supp. 3d 778 (S.D.N.Y. 2020).....................................................................25

*Smith v. County of Suffolk*,
   776 F.3d 114 (2d Cir. 2015).....................................................................................9

*Spiegel v. Schulmann*,
   604 F.3d 72 (2d Cir. 2010).....................................................................................10

*Syeed v. Bloomberg*,
   235 N.E.3d 351 (N.Y. Mar. 14, 2024) .....................................................................8

*Tardie v. Rehabilitation Hosp. of Rhode Island*,
   168 F.3d 538 (1st Cir. 1999)...................................................................................14

*Taylor v. Phoenixville Sch. Dist.*,
   184 F.3d 296 (3d Cir. 1999)...................................................................................22

*Tourtellotte v. Eli Lilly and Co.*,
   636 Fed. Appx. 831 (3d Cir. 2016).........................................................................21

*Turner v. Delta Airlines, Inc.*,
   2023 WL 2305935 (E.D.N.Y. Mar. 1, 2023), appeal withdrawn sub nom.,
   *Turner v. Delta Air Lines, Inc.*, No. 23-451, 2023 WL 4311227 (2d Cir. June
   14, 2023) ...............................................................................................................18

*Turner v. Eastconn Reg'l Educ. Serv. Ctr.*,
   588 Fed. App'x 41 (2d Cir. 2014)...........................................................................15

*Turowski v. Triarc Companies, Inc.*,
   761 F. Supp. 2d 107 (S.D.N.Y. 2011).....................................................................13

*Van de Pol v. Caesars Hotel Casino*,
   979 F. Supp. 308 (D.N.J. 1997) .......................................................................11, 16

*Victor v. State*,
    203 N.J. 383, 4 A.3d 126 (2010)......................................................................................23

*White v. Pacifica Found.*,
    973 F. Supp. 2d 363 (S.D.N.Y. 2013)..............................................................................19

*Willford v. United Airlines, Inc.,* ,
    2021 WL 4066502 (S.D.N.Y. Sept. 7, 2021).....................................................................19

*Wright v. Goord*,
    554 F.3d 255 (2d Cir. 2009)................................................................................................9

*Young v. United Parcel Serv., Inc.*,
    2011 WL 3510997 (D. Md. Aug. 9, 2011) ...............................................................18, 20

*Zaborowski v. Sealright Co.*,
    2002 WL 1585521 (N.D.N.Y. July 9, 2002) .....................................................................13

## <u>Rules/Statutes</u>

29 C.F.R. § 1630.2(n)(3)...............................................................................................................11

Fed. R. Civ. P. 56.......................................................................................................................1, 9

Local Rule 56.1...............................................................................................................................4

N.J. Admin. Code §13:13-2.5 *et seq*...............................................................................8, 16, 17, 21

N.Y. Exec. Law § 296 *et seq* .........................................................................................................8

New York City, N.Y., Code §8-107 *et seq.* ..............................................................8, 14, 23, 24

N.J. Stat. Ann. § 10:5–1 *et seq*..................................................................................................8, 21

## INTRODUCTION

Defendant Centerview Partners, LLC ("Centerview") respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment dismissing certain claims asserted by Plaintiff Kathryn Shiber ("Shiber") in the above-captioned action.

Centerview is a globally renowned investment banking advisory firm that provides financial advisory services to clients involved in some of the largest and most complex corporate transactions in the world, including advising on highly active matters such as time-sensitive mergers and acquisitions. As a consequence of this work, Centerview's most junior investment bankers, or analysts, often work demanding and unpredictable hours. Centerview is not unique in this regard; it is widely known and understood both within and outside the investment banking industry that analysts across Wall Street often work long and unpredictable hours.

In August 2020, just a few weeks into her new role as a first-year investment banking analyst in Centerview's prestigious three-year analyst program, plaintiff Kathryn Shiber ("Shiber") realized that these demanding hours "would significantly exacerbate the symptoms that [she] experience[d] due to [her] disabilities." Instead of the inconsistent and limited amount of sleep she had been getting as a result of working on a highly active deal, to maintain her health, Shiber needed eight-to-nine hours of sleep on a consistent basis. Thus, Shiber approached Centerview's Director of Human Resources, Cheryl Robinson, asking for an accommodation. Hearing Shiber's concerns, Robinson immediately worked with Centerview's Chief Operating Officer as well as a senior partner on Shiber's deal team and Shiber herself to identify potential accommodations to protect Shiber's sleep in the near-term. When Centerview offered to take Shiber off the live deal that had her working into the early morning, she refused, insisting that she

wanted to continue working on live deals.  When they offered to implement "guardrails" whereby she would not be asked to work between midnight and 9:00 a.m., she insisted that she did not want her colleagues to know that she required these limitations.  Shiber never offered Centerview alternative solutions.  So, with Shiber's blessing, and honoring her request that her colleagues not be given any information as to why she required set working hours, Centerview advised Shiber's deal team that she was to be offline between midnight and 9:00 a.m. until further notice.

For the next few weeks, Centerview monitored the guardrails approach and determined that honoring Shiber's request for predictable work hours would be unsustainable for Centerview in the long-term.  As a result of Shiber's need to sign offline at midnight each night, Shiber's colleagues were left picking up on workstreams that Shiber would have been responsible for completing, and Centerview ultimately added a new analyst to that deal team on account of these issues, uncommon in Centerview's lean staffing structure.  In short, Centerview determined that Shiber's need for an accommodation whereby she, unlike any other analyst at Centerview, would have prescribed work hours, interfered with the essential functions of the analyst role and imposed an undue burden on Centerview.  Thus, having determined that there were no accommodations that Shiber was willing to accept and that Centerview could offer that would allow for Shiber to have predictable hours yet satisfy the essential functions of the analyst role, Centerview terminated her employment.

Shiber thereafter filed this action for disability discrimination and failure to accommodate and engage in an interactive dialogue.  The evidence produced during discovery shows that Shiber cannot prove these claims.

To succeed on any claim for disability discrimination under the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL", and with the

NYSHRL, the "NY HRLs"), the New Jersey Law Against Discrimination ("NJLAD") and Americans with Disabilities Act ("ADA"), Shiber must make a *prima facie* showing of disability discrimination. And, in order to make that showing, she must prove that she was capable of performing the essential functions of the analyst role, with or without any reasonable accommodation. Shiber cannot make this showing. It is undisputed that Shiber's significant disabilities would be exacerbated if she did not consistently receive eight-to-nine hours of sleep per night. It is also undisputed that the ability to work unpredictable hours is an essential function of the role of an analyst and is wholly inconsistent with Shiber's request for set working hours. Thus, there was no reasonable accommodation available which would permit Shiber to satisfy the essential functions of the analyst role and Shiber cannot make a *prima facie* showing of disability discrimination.

Further, Centerview's decision to terminate Shiber is well supported by the record and Shiber cannot prove that that decision was a pretext for discriminatory animus against Shiber due to her disabilities. To the contrary, Centerview went to great lengths, including engaging in an interactive dialogue with Shiber, to ensure that, while she was employed by Centerview, her requests—including that she remain on the live deal, that she receive consistent sleep, and that her deal team not be advised why she would be subject to this daily blackout period—were respected and honored. Against this backdrop, Shiber's claims fail and this Court should enter partial summary judgment in Centerview's favor.

## BACKGROUND[1]

### I.    ANALYSTS AT CENTERVIEW AND ACROSS WALL STREET WORK UNPREDICTABLE AND OFTEN LONG HOURS

Centerview is an investment banking advisory firm that advises companies on various corporate transactions such as mergers and acquisitions.  SOF ¶ 1; Ex. 10 (Kim Tr.) at 11:12-16. Centerview offers a prestigious three-year analyst program whereby its analysts, who frequently join the program directly from college, are trained in investment banking and general business. SOF ¶¶ 2; 3; Ex. 10 at 16:2-11; Ex. 7 at (SAC) ¶ 9.

Junior investment bankers at Centerview, like junior investment bankers across Wall Street, are known to work long and often unpredictable hours (SOF ¶¶ 3-7), a consequence of the job of an investment banker that necessarily flows from the nature of the work itself.  For example, analysts are often working on one or more highly active matters, including involving advice on mergers and acquisitions or other time-sensitive transactions.  *Id.*

### II.    SHIBER COMMENCES EMPLOYMENT AS A FIRST YEAR ANALYST

In September 2019, upon completing Centerview's interview process, Centerview extended Shiber an offer to join its three-year analyst program.  SOF ¶ 10; Ex. 18 (Robinson Tr.) at 25:10-12; Ex. 8 ¶ 9.  Shiber commenced her employment with Centerview on July 6, 2020.  SOF ¶ 11; Ex. 7 ¶ 7.

Less than two months into her new position, on or about August 24, 2020, Shiber was assigned to a very active live deal that was known internally as project "Dragon."  SOF ¶ 13.  Due to the nature of the transaction on which they were advising, Shiber, the other analyst, and the

---

[1]    Centerview incorporates by reference its Statement of Undisputed Material Facts ("SOF") pursuant to Local Rule 56.1.  All citations to the SOF are "SOF ¶_."  And, unless otherwise indicated, all exhibit numbers cited herein are exhibits to the Declaration of Hope D. Skibitsky ("Skibitsky Decl.") submitted herewith.

associate on the team were working long nights.  SOF ¶ 16.  A few days into being assigned to project Dragon, Shiber signed offline without telling her team that she was doing so and while her colleagues were still working.  SOF ¶ 17; Ex. 7 ¶ 23.  The next morning, Timothy Ernst, an associate and Shiber's supervisor on the team, emailed her noting that they "should also talk today generally about expectations on communications and expectations for a live project like this."  SOF ¶ 18; Ex. 1 at 62-63.  Ernst explained that the other members of the team "shouldn't be up alone working, we are a team and will need everyone on the same page and pulling their weight."  *Id.*

The same morning she received Ernst's email, Shiber contacted Cheryl Robinson, Centerview's Director of Human Resources, requesting "an appointment to speak sometime today."  SOF ¶ 25; Ex. 23; Ex. 19 (Shiber Tr.) 206:2-22.  Shiber told Robinson: "I may need accommodations and do not feel comfortable advocating for myself so I would really appreciate your help on this."  SOF ¶ 25; Ex. 23.  During a video conference call that same day, Shiber "told [Robinson] that [she] had a medical disability which, for healthy management, required eight to nine hours of sleep per night and that ideally [sic] would have a somewhat consistent sleep schedule."  SOF ¶ 27; Ex. 20; Ex. 19 at 244:4-19.  Robinson assured Shiber that she did the right thing by disclosing this and asked Shiber, as Centerview customarily does in response to accommodation requests, for a note from a medical provider identifying her needed accommodation.  SOF ¶¶ 30-31.  Later that day, Robinson relayed her conversation with Shiber to Jeanne Vicari, Centerview's Chief Operating Officer, who advised Robinson that Shiber had been assigned to project Dragon, which was likely to have Shiber working demanding hours over the upcoming weekend.  SOF ¶¶ 33-34.  Accordingly, Robinson and Vicari endeavored to ensure that Shiber's sleep was protected in the near term, and Robinson contacted a senior partner on Shiber's deal team, Tony Kim, to that end.  SOF ¶ 35.  After speaking with Kim that Friday afternoon,

Robinson proposed to Shiber a "guardrails" approach whereby Shiber would not work between midnight and 9:00 a.m. each day.  SOF ¶¶ 36-37; Ex. 10 at 81:13-82:18; Ex. 18 at 48:17-49:9. Shiber insisted, however, that she did not want the guardrails to be communicated to her colleagues, who she feared would then "know that there was something different about [her]." SOF ¶ 38; Ex. 19 at 241:15-242:23.

Later that Friday, Shiber spoke with both Robinson and Kim, who discussed with her alternative approaches to the "guardrails."  SOF ¶ 39-40; Ex. 10 at 87:4-88:23; Ex. 19 at 292:5-19.  Specifically, Kim offered to remove Shiber from the live deal she was on, but Shiber insisted that she did not want to be removed from that deal and that she wanted to continue to be staffed on live deals.  SOF ¶ 41; Ex. 19 at 292:13-19; Ex. 22 (Vicari Tr.) at 28:22-29:25.  Regarding the guardrails approach, Shiber expressed again that she did not want anyone to know about her needed accommodation.  SOF ¶ 42; Ex. 18 at 52:16-53:6; Ex. 10 at 71:4-12.  Shiber ultimately agreed to the guardrails approach and to allow Kim to communicate those boundaries to the team.  SOF ¶ 42.  As such, Kim communicated Shiber's blackout period to her team but, honoring Shiber's wishes, did not tell the team why Shiber would be offline during that period.  SOF ¶ 43; Ex. 10 at 74:9-75:11, 98:2-16, 100:7-101:8; Ex. 9 (Ernst Tr.) at 78:5-25.  At no time did Shiber offer any alternative accommodations.  SOF ¶ 46; Ex. 19 at 242:10-243:6, 244:20-245:6.

## III.   CENTERVIEW MONITORS THE GUARDRAILS APPROACH AND DETERMINES IT WILL NOT BE FEASIBLE

When the guardrails were implemented, neither Robinson nor Kim had determined whether that approach was a viable long-term solution; rather, their goal was to ensure that Shiber's health was safe in the immediate term going into what would inevitably be a very busy weekend for project Dragon.  SOF ¶ 45; Ex. 10 at 83:2-84:11; Ex. 18 at 63:6-64:25.  Thus, following that

weekend, Centerview began evaluating whether the guardrails approach would be a feasible accommodation in the long-term.

Kim, Robinson, and Vicari confirmed that Shiber's colleagues had respected the guardrails over the weekend and that the guardrails were working for Shiber. SOF ¶¶ 48-51. On September 1, 2020, Shiber gave Robinson a letter from her nurse practitioner which confirmed the accommodations she requested a few days prior. Specifically, Shiber's medical provider wrote: "Because of [Shiber's] underlying medical diagnosis, she requires consistent sleep 8-9 hours. If she is not able to maintain a regular sleep schedule she is a[t] a significant risk for exacerbation of her illness." SOF ¶ 47; Ex. 5.

In addition to confirming that the guardrails were acceptable to Shiber, Kim contacted Shiber's deal team to see how the team was managing with Shiber's restricted hours. SOF ¶ 53; Ex. 3. Ernst indicated that if the guardrails "drags on longer than a week or so, we may need additional staffing[.]" *Id.* Ernst further expanded upon concerns he had with Shiber's offline hours:

> I also think it is not really effective from her perspective over the long-term because things take a while for her (as expected) but we end up having to jump in to turn our own comments because she has to stop before she is able to get to it so it is difficult for her to own things to completion. Since she has to jump in and out of workstreams, and this will keep moving so fast, I think it will get increasingly confusing for her as Matt and I keep building things out without her. Then she can get stuck in what I would call the vicious first-year cycle of not knowing what's going on, so her work is wrong, we don't have time or its midnight so Matt and I fix it, and then it repeats and she gets discouraged. Again, not an issue if this is a near-term situation but figured I'd flag as well.

*Id.* The following day, Ernst wrote to Kim inquiring about "how [the team] can better manage the time on this account (to the extent we can) given the really late nights. As this pace continues to pick up, it's going to become more and more difficult to give [Shiber] responsibility for different workstreams (as opposed to just individual one-off tasks) and it is already becoming

very inefficient." SOF ¶ 56; Ex. 15. Ernst then requested that another person be added to the deal team "as soon as possible." SOF ¶ 57. Ex. 15. In response, the project Dragon team added another analyst. SOF ¶ 58; Ex. 10 at 111:16-112:2, 121:2-6; Ex. 9 at 82:5-9, 109:17-110:18; Ex. 16.

Ultimately, Centerview determined that it could not maintain the guardrails accommodation for the long term given the nature and requirements of the analyst position. SOF ¶ 60; Ex. 18 at 110:19-23, 112:17-19. Accordingly, Centerview terminated Shiber during a video call on September 15, 2020. SOF ¶ 61. During that meeting, Vicari advised Shiber that she was not able to fulfill the essential functions of the job due to her need for consistent sleep each night. SOF ¶ 61; Ex. 18 at 143:9-13.

On April 23, 2021, Shiber filed this litigation seeking over $5 million in damages. This Court dismissed certain of Shiber's claims brought under the NY HRLs in April 2022. Following the New York Court of Appeals' decision in *Syeed v. Bloomberg*, 235 N.E.3d 351, No. 20, 2024 WL 1097279 (N.Y. Mar. 14, 2024), this Court granted Shiber's request to file an amended complaint reviving her NY HRL claims.

Shiber brings the following claims: disability discrimination under NYCHRL §8-107(1)(a) (Count 1); failure to engage in a cooperative dialogue in violation of NYCHRL §8-107(28) (Count 2); failure to provide a reasonable accommodation in violation of NYCHRL §8-107(15)(a) (Count 3); retaliation in violation of NYCHRL §8-107(7) (Count 4); disability discrimination under NYSHRL §296(1)(a) (Count 5); failure to provide a reasonable accommodation in violation of NYSHRL §296(3)(a) (Count 6); disability discrimination under the NJLAD, § 10:5-12(a) (Count 7); failure to accommodate her disability in violation of the NJLAD § 10:5-12(a) and NJ Admin. Code § 13:13-2.5 (Count 8); failure to engage in an interactive process in violation of the NJLAD § 10:5-12(a) and NJ Admin. Code § 13:13-2.5 (Count 9); disability discrimination in violation of

the ADA (Count 10); and (5) failure to grant a reasonable accommodation in violation of the ADA (Count 11).  Centerview brings this motion seeking summary judgment in its favor on Counts 1 and 3-11.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Smith v. County of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (per curiam) (citation omitted); *see also* Fed. R. Civ. P. 56(a).  "'However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015).

The party opposing summary judgment "may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted).

## ARGUMENT

## IV.   SUMMARY JUDGEMENT SHOULD BE GRANTED IN CENTERVIEW'S FAVOR ON COUNTS 1, 5, 7 AND 10 BECAUSE SHIBER CANNOT ESTABLISH DISABILITY DISCRIMINATION UNDER THE NYCHRL, NYSHRL, NJLAD OR THE ADA

Claims of disability discrimination under the NY HRLs, the NJLAD, and ADA are all subject to the *McDonnell Douglas* burden shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973); *DeSantis v. New Jersey Transit*, 756 Fed. Appx. 197, *202 (3d Cir. 2019) (applying *McDonnell Douglas* framework to ADA and NJLAD claims); *Balgley v. N.Y.C. Health & Hosps. Corp.*, 2017 WL 95114, at *4 (S.D.N.Y. Jan. 10, 2017) (applying *McDonnell Douglas* framework to ADA and NYCHRL claims); *Daley v. CableVision Sys. Corp.*, 2016 WL

9

880203, at *4 (S.D.N.Y. Mar. 7, 2016) (applying *McDonnell Douglas* framework to ADA and NYSHRL claims).  Under that framework, "a plaintiff must first establish a *prima facie* case of violation, which shifts the burden to the defendant to articulate a legitimate, non-discriminatory reason for its conduct, at which point the burden shifts back to the plaintiff to show that defendant's explanations are a pretext for impermissible discrimination."  *Knox v. Town of Southeast*, 599 Fed. Appx. 411, 413 (2d Cir. 2015) (summary order).

Here, Shiber cannot make a *prima facie* showing of discrimination to meet her burden at the first step of the *McDonnell Douglas* framework.  And, even if she could, Centerview has offered a non-discriminatory reason for its decision to terminate Shiber (step two) which Shiber cannot show is pretextual (step three).

### A.    Shiber Cannot Show A *Prima Facie* Case of Disability Discrimination

A plaintiff must show the following four elements to establish a *prima facie* case of disability discrimination under the NY HRLs, NJLAD, and ADA:  "(1) [her] employer is subject to the [statute]; (2) [s]he was disabled within the meaning of the [statute]; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability." *Jones v. New York City Transit Auth.*, 838 Fed. Appx. 642 (2d Cir. 2021) (discussing the ADA); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (same elements under NY HRLs)[2]; *Est. of Zoto v. Cellco P'ship*, 2023 WL 2670713, at *6 (N.J. Super. Ct. App. Div. Mar. 29, 2023) (same elements under NJLAD).  Here, Shiber cannot meet the third element of a *prima facie* case of disability discrimination.

---

[2]  In *Spiegel*, the Second Circuit recognized that the NY HRLs define "disability" more broadly than the ADAs.  However, for purposes of this motion Centerview does not dispute that Shiber can satisfy the first and second elements of her claim.

      (a)     Shiber Could Not Perform The Essential Functions Of the Analyst Role

            (i)     The Ability To Work Unpredictable Long Hours And Be Available All Hours Of The Day Is An Essential Function Of The Centerview Analyst Role

Courts "give considerable deference to an employer's determination as to what functions are essential" to a job position. *Daley*, 2016 WL 880203, at *5. Courts determining whether a function is essential consider such non-exhaustive factors as:

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

*Jones*, 838 Fed. Appx. at 645 (citing 29 C.F.R. § 1630.2(n)(3))); *Davis v. City of New York Health Hospitals Corp.*, 2011 WL 4526135, at *6 (S.D.N.Y. Sep. 29, 2011) (finding that the "NY [HRLs] have very similar requirements with respect to the ADA's 'essential functions' test"); *Burton v. Metropolitan Transp. Authority*, 244 F.Supp.2d 252, 258 (S.D.N.Y. 2003) (holding that the NYSHRL requires the same inquiry with respect to essential functions as the ADA, and the NYCHRL provides for "an affirmative defense roughly equivalent to the ADA and NYSHRL 'essential functions' test"); *Van de Pol v. Caesars Hotel Casino*, 979 F. Supp. 308, 312 (D.N.J. 1997) ("all conclusions reached by this court regarding plaintiff's ADA claim apply equally to plaintiff's NJLAD claim"). These factors militate in favor of finding that the ability to be available at all hours of the day and to work long, unpredictable hours is an essential function of the analyst role.

*First*, it is Centerview's judgement that the ability to meet a demanding and unpredictable schedule is an essential function of the analyst role. SOF ¶¶ 3-6; Ex. 10 at 89:10-90:15, 28:21-30:16; Ex. 18 at 43:14-44:11 ("I do know that our analysts are, as I mentioned earlier, they are on

a …unpredictable schedule, so there are often times that they need to be on call 24-7, so because of the unpredictability of it, they are available."), 45:24-46:11, 50:25-51:15, 106:18-21, 107:16-108:4 ("the role and responsibilities and duties of an analyst -- regardless of what your perception may be -- is that analysts are available at all hours of the day, and it is not -- again, it's unpredictable"), 136:19-137:4, 139:21-24, 151:19-23, 158:5-159:11.  "[A] court must give substantial deference to an employer's judgment as to whether a function is essential to the proper performance of a job."  *Jones*, 838 Fed. Appx. at 645.  So essential does Centerview deem the ability to work long and unpredictable hours as an analyst that it has ███████████████

████████████████████████████████████████████

█████████████████████████   SOF ¶ 6; Ex. 10 at 20:17-21:5; Ex. 2.

*Second*, as far as the "amount of time spent on the job performing the function," *Jones*, 838 Fed. Appx. at 645, demanding hours are common at Centerview where analysts are generalists, "are available to dozens or hundreds of people as a resource" and thus may "have two or three live projects, and then, as a result, end up working at that level for a long period of time, even days or even weeks on end."  SOF ¶ 3; Ex. 10 at 28:21-30:16.

*Third,* as discussed *infra* at 15-16, the consequences of waiving an analyst's ability to work unpredictable hours include, as in the case with Shiber: passing work off to other team members who are already facing long hours and demanding deadlines; the need to bring in additional employees to a particular deal team; an inability of the analyst to fully understand and own a task to completion, and a disruption in the training and education of a first-year analyst.  SOF ¶¶ 53-58.

*Fourth*, the experience of other Centerview employees, as well as the experience of junior investment bankers across Wall Street, affirm that the ability to work long and unpredictable hours

as required by any given deals or projects is an essential function of that role.  SOF ¶ 7.  For example, within weeks of starting at Centerview, Shiber's associate supervisor, Timothy Ernst, who himself had been through Centerview's three-year analyst program, told Shiber that "late nights are just part of the job, especially on a live deal like this."  SOF ¶ 20; Ex. 1 at 62-63.  Ernst explained that "in general the finish line is always going to be moving […] it'll change hour by hour."  *Id.*  Ernst confirmed in his deposition and based on his own experiences at Centerview that long hours on a live deal were to be expected.  SOF ¶ 7; Ex. 9 at 13:2-15, 63:2-7 ("Q.  What do you mean by 'late nights'?  A.  I mean working later than you would at a typical, more standard job."); Ex. 22 (Vicari Tr.) at 113:11-114:24; Ex. 10 at 17:9-21:5, 95:17-25 ("Q. The ability to work 24 hours in a row, is that based upon Centerview's culture, or do you think that is across Wall street?  A.  That is across Wall Street"); Ex. 18 at 157:24-159:9; *see also Zaborowski v. Sealright Co.,* 2002 WL 1585521, at *4-5 (N.D.N.Y. July 9, 2002) (relying on testimony from coworkers in the same or similar positions in concluding that working long hours is an essential function of plaintiff's role).

Against this backdrop, Centerview has demonstrated that the ability to work unpredictable and late hours, including sometimes all hours of the day, is an essential function of the Centerview analyst role.  And, the caselaw is clear that the ability to work unpredictable, indetermined hours can be an essential function of an employee's role.  *See Rosenfeld v. Canon Bus. Sols., Inc*., 2011 WL 4527959, at *20 (D.N.J. Sept. 26, 2011) (granting defendant's motion for summary judgment where plaintiff was unable to perform the "essential job function" of being available for his 11:30 p.m. to 8:00 a.m. shift); *Turowski v. Triarc Companies, Inc.*, 761 F. Supp. 2d 107, 112 (S.D.N.Y. 2011) (plaintiff could not show that "scheduling flexibility in chauffeuring former employer and his family to where they need to go at any time…is not a requirement of his employment" and "to

accommodate plaintiff by allowing him to maintain a rigid schedule would be to eliminate an essential function of his job") (reaching same conclusion under ADA, NYSHRL, and NYCHRL); *see also Tardie v. Rehabilitation Hosp. of Rhode Island*, 168 F.3d 538, 544 (1st Cir. 1999) (evaluating "essential functions" element under FMLA and finding working more than 40 hours per week was an essential function of employee's job as director of human resources).

(ii)    Shiber Could Not Perform This Essential Function With Or Without Any Reasonable Accommodation

To prove a *prima facie* case of disability discrimination under the ADA, NYSHRL, or NJLAD, Shiber must show that she could perform the above-discussed essential function of an analyst (the ability to work indeterminate hours on a daily basis) with or without a reasonable accommodation. Under the NYCHRL, Centerview must establish that Shiber could not satisfy the essential requisites of the analyst position even with a reasonable accommodation. New York City, N.Y., Code § 8–107(15)(b). Shiber cannot make her required showing; conversely, Centerview can fulfil its burden.

It is undisputed that, at the time of her Centerview employment, Shiber had been diagnosed with multiple medical conditions, including "Unspecified Mood Disorder" and "Unspecified Anxiety Disorder." SOF ¶ 21; Ex. 7 ¶ 26; Ex. 6. As Shiber's primary care provider told Centerview: "Because of [Shiber's] underlying medical diagnosis, she requires consistent sleep 8-9 hours" and "[i]f she is not able to maintain a regular sleep schedule she is a[t] a significant risk for exacerbation of her illness." SOF ¶ 47; Ex. 5; Ex. 19 at 227:20-228:12 ("Q. And what did that mean, significant risk of exacerbation of your illness? A. That means that the symptoms of my disabilities are significantly increased to even further impair my day-to-day life and my work performance, my relationship with others, and my emotional condition, and all of the other arenas that these symptoms impact me in..."); Ex. 19 at 224:18-23 ("A. In order to best manage my

14

disabilities and avoid exacerbating the effects of them, I maintain a lifestyle which includes eight to nine hours of sleep per night, on average."); SOF ¶ 23; Ex. 7 ¶ 26; Ex. 18 at 34:11-20, 38:21-39:6, 113:18-25; Ex. 10 at 70:7-15, 72:16-21; Ex. 20; Ex. 21 (Verdi Tr.) at 40:24-48:7; Ex. 6 at 242, 244.  Among other consequences, Shiber's medical provider explained that "lack of consistent sleep exacerbates migraine, depression, anxiety, inflammation in the brain, which can worsen post-concussion syndrome," all "underlying conditions" that Shiber had during her time at Centerview. Ex. 21 at 43:4-10, 45:1-14.

Because Shiber cannot perform the essential function of working unpredictable hours without an accommodation, she must demonstrate that she could have done so with a reasonable accommodation.  *Turner v. Eastconn Reg'l Educ. Serv. Ctr.*, 588 Fed. Appx. 41, 43 (2d Cir. 2014) (affirming dismissal of ADA claims where plaintiff "ha[d] not adequately established the existence of a reasonable accommodation"); *Lazzari v. New York City Dep't of Parks & Recreation*, 751 Fed. Appx. 100, 103 (2d Cir. 2018) (affirming summary judgment on NYSHRL claim where plaintiff failed to "carry his burden of showing a reasonable accommodation that would have enabled him to perform an essential function.").

Here, Shiber cannot make this showing because the record demonstrates there was no reasonable accommodation available to ensure Shiber would receive eight to nine hours of sleep per night.[3]  "Of course, [a] reasonable accommodation can never involve the elimination of an essential function of a job."  *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003); *Ellis v. City of New York*, 2024 WL 1195688, at *7 (N.Y. Sup. Ct. Mar. 20, 2024) ("According to the NYSHRL and the NYCHRL, 'an employer is not obligated to locate another

---

[3]  Conversely, Centerview has fulfilled its burden under the NYCHRL to show that Shiber could not fulfil the essential function of the analyst position even with a reasonable accommodation, as no such reasonable accommodation existed.

job for the employee, establish a new position, or create a light-duty version of the current role'"
and noting that "a reasonable accommodation can never necessitate the elimination of an essential
job function") (internal citations omitted); *Van de Pol*, 979 F. Supp. 308 at 314; N.J. Admin. Code
§13:13-2.5(b)(3)(iv) ("The extent to which an accommodation would involve waiver of an
essential requirement of a job" is a factor "[i]n determining whether an accommodation would
impose undue hardship on the operation of an employer's business.").  Here, any accommodation
would necessarily eliminate the essential function of working unpredictable, and sometimes late
hours and of being available at all hours of the day depending on the deals or projects Shiber was
staffed on, because it required Shiber to be consistently unavailable for eight to nine hours per
night.  *See supra* at 13-14.  Further, being limited to set working hours meant that Shiber's
experience "would not be the same experience" as all the other Centerview analysts and thus
continuing to implement the accommodation would mean "it's not the same job anymore."  SOF
¶ 60.  Having set working hours made it "difficult for [Shiber] to own things to completion" such
that her deal team "[kept] building things out without her[.]"  SOF ¶ 53.  In that way, Shiber would
have a more restricted ability for on-the-job training than her peers, rendering her less prepared for
the forthcoming years of the analyst role.  SOF ¶ 52; Ex. 3; Ex. 22 (Vicari Tr.) at 104:20-105:5.

Moreover, an employer is not required to create an indefinite, light-duty position for a
permanently disabled employee if that disability renders the employee otherwise unqualified for a
full-time, full-duty position.  *Clark v. Coca-Cola Beverages Northeast, Inc*., 2022 WL 92060, at
*2-3 (2d Cir. 2022); *Ellis*, 2024 WL 1195688, at *7 (N.Y. Sup. Ct. Mar. 20, 2024); *see also Raspa
v. Office of Sheriff of Cty. Of Gloucester*, 924 A.2d 435, 445 (N.J. 2007).  Accommodations that
require "reallocating [] tasks from [plaintiff] to other team members" are indicative of an employer
having to create such an "indefinite, light duty position."  *Clark*,  2022 WL 92060, at *3.  As a

result of being unavailable when her team needed her as the "pace continue[d] to pick up", Shiber's deal team experienced severe inefficiencies. SOF ¶ 56; Ex. 15. As a result, it "became more and more difficult to give [Shiber] responsibility for different workstreams (as opposed to just individual one-off tasks)." SOF ¶ 56. Shiber's teammates "end[ed] up having to jump in to turn [their] own comments because [Shiber] ha[d] to stop before she [could] to get to [them]." *Id*. Accordingly, Centerview needed to staff project Dragon with another analyst who was available at all hours. SOF ¶ 53; Ex. 3.

This shifting of work and "reallocation of [] tasks" from Shiber to her colleagues evidences that any accommodation involving set hours would amount to the creation of a "light duty" position which an employer is not required to do, *see Clark*, 2022 WL 92060, at *3, and thus would impose an undue burden on Centerview. An accommodation is not "reasonable" if it would impose an undue hardship on the employer, including by "waiving an essential requirement of a job." *Hunt-Watts v. Nassau Health Care Corp.*, 43 F.Supp.3d 119, 134 (E.D.N.Y. 2014) ("Plaintiff's proposed accommodation is also not reasonable because it amounts to having other employees do her job for her, and would result in Defendant having to employ two professionals to perform the job of one podiatrist[.]"); *Ellis*, 2024 WL 1195688, at *7 (N.Y. Sup. Ct. Mar. 20, 2024); *see also* N.J. Admin. Code §13:13-2.5(b)(3)(iv); *see also Dicino v. Aetna U.S. Healthcare*, 2003 WL 21501818, at *14 (D.N.J. June 23, 2003); *see also Rosenfeld*, 2011 WL 4527959, at *14. That Shiber's proposed accommodation resulted in a permanent, light-duty position reinforces there was no reasonable accommodation that would allow her to perform an essential function of the analyst role. As a result, she will be unable to establish a *prima facie* case of discrimination.

### B.    Centerview Has Presented a Legitimate, Non-Discriminatory Reason for Shiber's Termination.

Even if Shiber could prove a *prima facie* case of discrimination, which she cannot, Centerview easily meets its burden at step two of *McDonnell-Douglas* by providing a "legitimate, non-discriminatory reason" for its actions.  *Jansen v. Food Circus Supermarkets, Inc.*, 541 A.2d 682, 692 (N.J. 1988); *Turner v. Delta Airlines, Inc*., 2023 WL 2305935, at *8 (E.D.N.Y. Mar. 1, 2023), appeal withdrawn sub nom., *Turner v. Delta Air Lines, Inc.*, No. 23-451, 2023 WL 4311227 (2d Cir. June 14, 2023).  For an employer arguing that it had a non-discriminatory reason, rather than that it reasonably concluded the employee's handicap precluded job performance, "the burden of production—not the burden of proof or persuasion—shifts to the employer."  *Id.*

Here, Centerview has produced evidence demonstrating that it terminated Shiber for a legitimate, non-discriminatory reason; namely, she could not fulfill the essential functions of the first-year analyst position.  *See supra* at 13-14.  Failure to perform an essential function is a "legitimate, non-discriminatory reason" for termination.  *See Dossous v. New York City Health & Hosps. Corp*., 2023 WL 4305021, at *8 (E.D.N.Y. June 30, 2023); *see also Young v. United Parcel Serv., Inc.,* 2011 WL 3510997, at *3 (D. Md. Aug. 9, 2011) (employer offered non-discriminatory, legitimate reason for terminating employee where essential function of employee's role involved lifting 20 pounds, and employee's medical form restricted employee from lifting more than 20 pounds); *O'Keefe v. Niagara Mohawk Power Corp*., 714 F. Supp. 622, 628 (N.D.N.Y. 1989) ("New York courts have found [] that in Human Rights Law actions, if an employee is unable to perform a certain portion of his job, that inability provides a legitimate, non-discriminatory reason for terminating the employee"); *Casseus v. Elizabeth General Med*, 287 N.J. Super. 396, 406 (App. Div. 1996) ("Clearly, an inability to perform the job is a legitimate reason under LAD to discharge (or to fail to promote, or to demote) an employee.");  *see also Raspa*, 191 N.J. at 341 (same).

### C.    Shiber Cannot Show that Centerview's Offered Reason is Pretextual

Having demonstrated a legitimate rationale for termination, the burden then shifts to Shiber to show by a preponderance of the evidence that the rationale given for her termination was a pretext for discrimination. *Photis v. Sears Holding Corp.*, 2013 WL 3872519, at *5 (D.N.J. Jul. 25, 2013); *Devany v. United Parcel Serv., Inc.*, 2021 WL 4481911, at *15 (S.D.N.Y. Sept. 30, 2021); *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016) (same standard for NYSHRL).    At this step, Shiber must demonstrate that either "a discriminatory motive, more likely than not" motivated Centerview, or that "the reasons given by the defendant[] are not true and that discrimination is the real reason." *Willford v. United Airlines, Inc.,* 2021 WL 4066502, at *6 (S.D.N.Y. Sept. 7, 2021), *aff'd*, 2023 WL 309787 (2d Cir. Jan. 19, 2023); *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 66 (3d Cir. 1996) (same for NJLAD); *Mauze v. CBS Corp.*, 340 F. Supp. 3d 186, 202 (E.D.N.Y. 2018), *adhered to on reconsideration*, 2019 WL 8137641 (E.D.N.Y. Jan. 23, 2019) (same for NYSHRL).    Proving pretext is a "higher burden" than Shiber has in the first step of the *McDonnell Douglas* framework in establishing a *prima facie* case of discrimination for her claims brought under the ADA, NYSHRL, and NJLAD.    *Devaney*, 2021 WL 4481911 at *15.    At the third step of the *McDonnell Douglas* framework under the NYCHRL, Shiber must show that the termination was "motivated at least in part by discrimination[.]"    *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 379 (S.D.N.Y. 2013).

Shiber cannot meet this burden with respect to any claim because she has presented *no* evidence of pretext.    First, it is undisputed that working unpredictable hours, including overnight, is an essential part of the analyst role.    *See* SOF ¶ 61 and *supra* at 10-13.    The record is clear that, upon advising Centerview that she had a disability, Centerview took immediate action to ensure as best they could that Shiber's needs were met in the near term.    SOF ¶ 43-51.    There is no evidence that Shiber was treated poorly on account of her disabilities while she was employed by

Centerview; indeed, Centerview respected her wishes not to tell Shiber's deal team that she had a disability. SOF ¶ 42-43. Nor is there any evidence that Centerview treated any other individuals with disabilities with animus. SOF ¶ 63-66. To the contrary, it is undisputed that Centerview routinely provides reasonable accommodations for individuals with disabilities who request an accommodation. SOF ¶ 63-66; *Young*, 2011 WL 3510997 at *3 ("If UPS regarded [another employee] as disabled and nevertheless treated her differently than [Plaintiff], the difference in treatment would obviously not stem from a discriminatory animus towards the disabled.")

## V. SUMMARY JUDGMENT SHOULD BE GRANTED IN CENTERVIEW'S FAVOR ON SHIBER'S CLAIMS FOR FAILURE TO PROVIDE A REASONABLE ACCOMMODATION UNDER THE NY HRLS, NJLAD OR THE ADA (COUNTS 3, 6, 8 AND 11)

Shiber's claims for failure to accommodate under the NJLAD, the ADA and the NY HRLs fail because all claims require there be a reasonable accommodation in the first instance. *See, e.g.*, *Boyce v. Lucent Technologies*, 2007 WL 1774267, at *5 (Sup. Ct. N.J. App. Div. Jun. 21, 2007) (after plaintiff makes a *prima facie* showing of discrimination under the NJLAD, the burden shifts to defendant to demonstrate that there is no reasonable accommodation); *see Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183–84 (2d Cir. 2006) (failure to provide reasonable accommodation under the ADA requires a showing that with a reasonable accommodation, plaintiff could have performed the essential functions of the inspector role); *Abadi v. NYU Langone Health Sys.*, 2023 WL 8461654, at *7 (S.D.N.Y. Dec. 7, 2023), *reconsideration denied,* 2024 WL 396422 (S.D.N.Y. Feb. 2, 2024) ("the NYSHRL provides that a reasonable accommodation should be provided 'unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations' […] [i]n the NYCHRL context, a reasonable accommodation is one that does 'not cause undue hardship

in the conduct of the covered entity's business'" and assessing reasonableness of any accommodation "implicate[s] organizational interests.").

For the same reasons discussed *supra* at 13-14, the evidence plainly establishes that there was no reasonable accommodation and thus summary judgment should be entered in Centerview's favor on Counts 3,6, 8, and 11.

## VI.    CENTERVIEW IS ENTITLED TO JUDGMENT ON SHIBER'S CLAIMS FOR FAILURE TO ENGAGE IN AN INTERACTIVE PROCESS UNDER NJLAD §10:5-12(A) AND N.J. ADMIN. CODE §13:13-2.5 (COUNT 9)

To show that Centerview failed to engage in an interactive process with Shiber under the NJLAD, Shiber must show, *inter alia*, that (1) she has established a *prima facie* case of discrimination; (2) she requested an accommodation or assistance for her disability; (3) Centerview did not make a good faith effort to assist Shiber in seeking accommodations; and (4) Shiber could have been reasonably accommodated but for Centerview's lack of good faith. *Tourtellotte v. Eli Lilly and Co.*, 636 Fed. Appx. 831, 849 (3d Cir. 2016).[4]  At the outset, Shiber's NJLAD claim fails because Shiber cannot establish a *prima facie* case of discrimination or that she could have been reasonably accommodated, as discussed *supra* at 10-14.  Shiber's NJLAD claims also fail because she cannot show that Centerview failed to make a good faith effort to accommodate her.  Indeed, the record demonstrates that Centerview did just that.

When an employee requests an accommodation for a disability, the employer has a responsibility "to 'engage the employee in the interactive process of finding accommodations.'" *Pryce v. Tata Consultancy Servs./Tata Consultancy Servs. Ltd.,* 2022 WL 17080744, at *7 (D.N.J. Nov. 18, 2022).  Employers can demonstrate good faith in a number of ways, including by

> taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the

---

[4]   Centerview does not dispute that Shiber sought an accommodation.

employee has, ask the employee what he or she specifically wants, show some sign of having considered the employee's request, and offer and discuss available alternatives when the request is too burdensome.

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999); *see also Jones v. Aluminum Shapes, Inc.*, 339 N.J. Super. 412, 425, 772 A.2d 34, 42 (App. Div. 2001) (applying *Taylor* to an NJLAD).

Centerview went above and beyond these steps in seeking and implementing an accommodation. Immediately upon reviewing Shiber's email that she may need an accommodation, Robinson scheduled a meeting with Shiber for that same day. SOF ¶ 26; Ex. 18 at 24:6-16, 32:3-33:5. During that meeting, Shiber advised Robinson that she "had a medical disability which, for healthy management, required eight to nine hours of sleep per night and that ideally would have a somewhat consistent sleep schedule." SOF ¶ 27; Ex. 20; Ex. 19 at 244:4-19. And during that meeting, Robinson confirmed that Shiber's health was the firm's top priority and assured Shiber that she did the right thing by coming to Robinson. SOF ¶¶ 28, 30; Ex. 18 at 35:14-16; Ex. 20; Ex. 19 at 219:16-220:6.

Later that day, upon learning that Shiber was on an active live deal that would likely have her working unpredictable hours that were inconsistent with her sleep needs, Robinson contacted Kim, a senior partner on project Dragon, to ensure that Shiber's sleep would be protected in the near term. SOF ¶¶ 35-36. Some combination of Shiber, Robinson, and Kim met several times throughout that Friday leading into what would inevitably be a demanding weekend for Shiber's team to determine how best to meet Shiber's requested accommodation. SOF ¶¶ 30-37.

When Robinson proposed a "guardrails" approach that would permit Shiber not to work between midnight and 9:00 a.m., Shiber responded that she did not want anyone on her team to know that she required any different treatment. SOF ¶¶ 37-38. Hearing Shiber's concerns,

Robinson recommended that she and Shiber have a call with Kim.  SOF ¶ 39; Ex. 20; Ex. 19 at 286:10-287:8.  As an alternative to the "guardrails" approach, Kim offered to take Shiber off the live deal she was on; however, Shiber refused, stating that she did not want to be removed from that live deal and wanted to continue to be staffed on live deals.  SOF ¶ 41; Ex. 19 at 292:13-19; Ex. 18 at 52:16-54:11, 72:9-15, 80:16-81:2, 110:7-23; Ex. 10 at 101:9-19, 130:17-131:4. Ultimately, Shiber agreed that Kim could tell her team about the guardrails so that her sleep would be protected, and Kim honored her request not to advise the team as to the reason for the guardrails.

In sum, Centerview, including three individuals with leadership roles, worked together and with Shiber to identify a solution that might work for Shiber.  There is no factual dispute that Centerview and Shiber had multiple conversations regarding possible accommodations and the feasibility thereof.  Centerview fulfilled its obligations under NJLAD.  The fact that, ultimately, no solution was viable, does not negate Centerview's good faith engagement in the interactive process.  *Victor v. State*, 203 N.J. 383, 4 A.3d 126 (2010) (NJLAD requires employers to seek accommodations in good faith but does not dictate what accommodations must be provided).

## VII. SUMMARY JUDGMENT SHOULD BE GRANTED IN CENTERVIEW'S FAVOR ON SHIBER'S RETALIATION CLAIM (N.Y.C. ADMIN. CODE §8-107(7)).

To establish a prima facie case of retaliation under the NYCHRL, Shiber must prove that (1) she engaged in "protected activity" as defined in the NYCHRL; (2) participation in protected activity was known to Centerview; (3) there was an employment action disadvantaging Shiber; and (4) a causal connection exists between her protected activity and the adverse employment action.  *Mi-Kyung Cho v. Young Bin Cafe,* 42 F. Supp. 3d 495, 506 (S.D.N.Y. 2013).  Centerview does not dispute that Shiber engaged in protected activity under the NYCHRL by requesting accommodations, New York City, N.Y., Code § 8-107(7)(v), that Centerview was aware of her request for accommodations, or that Shiber was terminated from Centerview.  Rather, Shiber's

23

retaliation claim fails because she cannot show that there was "a causal connection" between her request for accommodations and Centerview's "subsequent action" or that Centerview's legitimate reason for her termination was "pretextual or motivated at least in part by an impermissible motive." *Adams v. Montefiore Med. Ctr.*, 2017 WL 4417695, at *6 (S.D.N.Y. Oct. 3, 2017).

There is no evidence Centerview terminated Shiber out of retaliation against her request for accommodations. Rather, the record confirms that Centerview terminated Shiber because she was not qualified to perform the analyst role without accommodation, and that Centerview could not sustain the accommodation she had requested, as it presented an undue burden on Centerview's staffing and resources. *See supra* at 11-17.

Even if this Court finds there was a causal connection between Shiber's request for accommodations and her termination suggesting retaliatory motive (there is not), Centerview has a legitimate, non-discriminatory reason for her termination. As set forth above, *supra* at 11-17, the evidence shows that Shiber could not perform the essential functions of the analyst role with or without reasonable accommodation. *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 802 (S.D.N.Y. 2020) (granting employer summary judgment on NYCHRL retaliation claim because employer's "unfavorable treatment" arose from its belief that plaintiff "could not perform the essential functions of her job," which was not a "retaliatory motive"). As Shiber cannot point to any evidence of Centerview's reason as pretextual, *supra* at 19-21, the Court must grant Centerview summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, Centerview respectfully requests that the Court enter summary judgment in Centerview's favor on Counts 1 and 3-11.

Dated: September 9, 2024
New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:  /s/ *Jennifer Barrett*
Jennifer Barrett
Hope D. Skibitsky
Janice Yoon
Maheema Haque
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel. (212) 849-7000
Fax (212) 849-7100
jenniferbarrett@quinnemanuel.com
hopeskibitsky@quinnemanuel.com
janiceyoon@quinnemanuel.com
maheemahaque@quinnemanuel.com

*Attorneys for Centerview Partners,*
*LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of September, 2024, I electronically filed the

foregoing **Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF

system which will send notification of such filing to the following:

SCHWARTZ PERRY & HELLER LLP
David S. Perry
Brian Adam Heller

CLAYMAN & ROSENBERG LLP
James Francis Valentino

/s/ *Hope D. Skibitsky*
Hope D. Skibitsky