# EXHIBIT A

Page 1

1

2   UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3   _____

4   KATHRYN SHIBER,

5                          Plaintiff,

6            -against-

7   CENTERVIEW PARTNERS LLC,

8                          Defendant.

9   1:21-cv-03649 (ER)

_____

10

11                     January 25, 2023

12                     10:06 a.m.

13

14

15          DEPOSITION of KATHRYN SHIBER,

16   taken by Defendant, pursuant to Notice,

17   held at the offices of QUINN EMANUEL

18   URQUHART & SULLIVAN LLP, 51 Madison

19   Avenue, New York, New York before Wayne

20   Hock, a Notary Public of the State of New

21   York.

22

23

24

25

Page 2

1
2 A P P E A R A N C E S :
3
   SCHWARTZ PERRY & HELLER LLP
4    Attorneys for Plaintiff
       3 Park Avenue
5      New York, New York 10016
   BY:   BRIAN HELLER, ESQ.
6      bheller@sphlegal.com
7
       -and-
8
   CLAYMAN ROSENBERG KIRSHNER & LINDER LLP
9      305 Madison Avenue
       New York, New York 10165
10  BY:   JAMES F. VALENTINO, ESQ.
       valentino@clayro.com
11
12
13 QUINN EMANUEL URQUHART & SULLIVAN LLP
   Attorneys for Defendant
14     51 Madison Avenue
       New York, New York 10010
15  BY:   HOPE D. SKIBITSKY, ESQ.
       hopeskibitsky@quinnemanuel.com
16      JENNIFER J. BARRETT, ESQ.
       jenniferbarrett@quinnemanuel.com
17      JANICE YOON, ESQ.
       janiceyoon@quinnemanuel.com
18
19
20 ALSO PRESENT:
       ANTON EVANGELISTA,
21     Videographer
       AMANDA KOSOWSKY
22
              *    *    *
23
24
25

Page 3

1
2        THE VIDEOGRAPHER: Good morning.
3    We are going on the record at 10:06
4    a.m. on January 25, 2023.
5        Please note that the microphones
6    are sensitive and may pick up
7    whispering and private conversations.
8        Please mute your phones at this
9    time.
10       Audio and video recording will
11   continue to take place, unless all
12   parties agree to go off the record.
13       This is media unit one of the
14   video recorded deposition of Kathryn
15   Shiber taken by counsel for Plaintiff
16   [sic] in the matter of Kathryn Shiber
17   versus Centerview Partners filed in
18   the United States District Court,
19   Southern District of New York, case
20   number 1:21-CV-03649-ER.
21       The location of the deposition
22   is Quinn Emanuel, 51 Madison Avenue in
23   New York City.
24       My name is Anton Evangelista
25   representing Veritext, and I am the

Page 4

1
2    videographer.
3        The court reporter is Wayne Hock
4    from the firm Veritext.
5        I'm not authorized to administer
6    an oath, I'm not related to any party
7    in this action, nor am I financially
8    interested in the outcome.
9        If there are any objections to
10   proceeding, please state them at the
11   time of your appearance.
12       Counsel and all present will now
13   state their appearances and
14   affiliations for the record, beginning
15   with the noticing attorney.
16       MS. SKIBITSKY: Hope Skibitsky
17   from Quinn, Emanuel, Urquhart and
18   Sullivan here with my colleagues
19   Jennifer Barrett and Janice Yoon, and
20   we are here on behalf of Centerview
21   Partners LLC.
22       MR. HELLER: Brian Heller of
23   Schwartz Perry and Heller for the
24   plaintiff.
25       MR. VALENTINO: James Valentino,

Page 5

1
2    Clayman Rosenberg Kirshner and Linder,
3    on behalf of the plaintiff.
4        THE WITNESS:  Kathryn Shiber,
5    the plaintiff.
6        THE VIDEOGRAPHER: And will the
7    court reporter please swear in the
8    witness, and then counsel may proceed.
9 K A T H R Y N   S H I B E R, having
10     been first duly sworn by a
11     Notary Public of the State of
12     New York, upon being examined,
13     testified as follows:
14 EXAMINATION BY
15 MS. SKIBITSKY:
16   Q.   Good morning, Ms. Shiber.
17   A.   Good morning.
18   Q.   As you just heard, my name is
19 Hope Skibitsky.  I'm an attorney for
20 Centerview.
21       Have you been deposed before?
22   A.   No.
23   Q.   This is your first deposition?
24   A.   Yes.
25   Q.   Are you on any medications

2 (Pages 2 - 5)

K. Shiber

1
2 today?
3    A.   No.
4    Q.   You're not taking any
5 medications at all today?
6    A.   No.
7    Q.   Is there any reason, medical or
8 otherwise, that you would not be able to
9 provide truthful testimony today?
10    A.   No.
11    Q.   Do you understand that you were
12 just sworn in, and so everything that you
13 testify to today means that you are under
14 oath and you're required to testify
15 truthfully?
16    A.   Yes, I understand.
17    Q.   And so your testimony today has
18 the same impact as if we were sitting in a
19 court with the judge present.
20       Do you understand that?
21    A.   Yes, I understand that.
22    Q.   I'm going to ask you some
23 questions and your answers will be
24 recorded by our court reporter, so I'd ask
25 that you give verbal answers as opposed to

K. Shiber

1
2 head nods and not uh-huhs and uh-uh and
3 those sorts of terms.
4       And I'll also ask that you
5 please let me finish my question before
6 you start answering and I'll try to do the
7 same when you answer, and that's for the
8 benefit of the court reporter.
9       It's really important that you
10 understand the questions that I'm asking,
11 so if you don't understand a question,
12 please let me know and I'll do my best to
13 clarify the question.
14       Your attorneys may object to my
15 question.  If he does so, I'd ask that you
16 answer the question, unless he instructs
17 you otherwise.
18       And we'll take regular breaks,
19 but if at appoint you need a break, just
20 let us know and we can take that break.  I
21 just ask that you wait until you've
22 answered the question that's pending
23 before you go ahead and do that.
24       Do you have any questions?
25    A.   No questions.

K. Shiber

1
2    Q.   Ms. Shiber, what is your current
3 address?
4    A.   ██████████████, San
5 Francisco, California 94117.
6    Q.   How long have you been living at
7 Frederick Street?
8    A.   Since January of 2022.
9    Q.   Who do you live with at
10 Frederick Street?
11    A.   I live by myself.
12    Q.   Where were you living prior to
13 the Frederick Street address?
14    A.   Immediately prior?
15    Q.   Immediately prior to January,
16 2022.
17    A.   I was living at ██████████
18 ██████ North Arlington, New Jersey.
19    Q.   And who were you living with at
20 Belmount Ave?
21    A.   My cousin and her fiancé.
22    Q.   What period of time were you
23 living at the Belmount Ave address?
24    A.   Just a few months, from about
25 September of 2021 to December of 2021.

K. Shiber

1
2    Q.   And prior to the Belmount Ave
3 address, where were you living?
4    A.   ██████████████ River Vale,
5 New Jersey 07675.
6    Q.   Who were you living with in
7 River Vale?
8    A.   My mother and my brother.
9    Q.   And what period of time were you
10 at that River Vale address?
11    A.   Intermittently, because I was in
12 college, but that was my permanent
13 residence since 2013, I believe.
14    Q.   And when you were at college,
15 were you living on or near the campus?
16    A.   In different years I lived in
17 different places.
18    Q.   All close to Dartmouth; is that
19 right?
20    A.   Yes.
21    Q.   And what period of time were you
22 actually living in New Hampshire?
23    A.   I was living in New Hampshire
24 from August of 2016 through June of 2020,
25 like I mentioned, with breaks.

K. Shiber

1
2    Q.   Through June of 2020, so that
3 was during COVID that you were still
4 living in New Hampshire?
5    A.   Yes.
6    Q.   Did you graduate in June, 2020
7 from Dartmouth?
8    A.   Yes, I graduated.
9    Q.   So after you left the Orange
10 Court address and you went to -- did you
11 go straight to Belmount Avenue?  That was
12 your next residence?
13    A.   That was my next residence, yes.
14    Q.   Okay.
15        And you went there in September
16 of 2021.
17        Did you move to the Belmount
18 address from the Orange Court location, or
19 were you living somewhere after Orange
20 Court before you went to live with your
21 cousin and her fiancé?
22    A.   No, I was living at Orange Court
23 and then I went to live at the Belmount
24 address at that time.
25    Q.   Why did you move to the Belmount

K. Shiber

1
2 address in September of 2021?
3    A.   The house that we were living in
4 was -- my family had been renting and it
5 was for sale and the landlord wanted my
6 family to move out so that they could
7 proceed with the sale.
8    Q.   And then why did you decide to
9 move -- in December of 2021, you then
10 moved to San Francisco; is that correct?
11    A.   I moved in January of 2022.
12    Q.   January of 2022 you moved to San
13 Francisco.
14        Why did you decide to move to
15 San Francisco in January of 2022?
16    A.   It was a condition of my job
17 that I had started working in September.
18 The company is based in the Bay Area, and
19 so they were remote at the time but there
20 was the expectation that I would have to
21 be in the Bay Area when they return to
22 office following COVID, so that's why I
23 moved.
24    Q.   And that's -- you're currently
25 living in the Bay Area in the Frederick

K. Shiber

1
2 Street; is that correct?
3    A.   Yes.
4    Q.   What did you do to prepare for
5 today's deposition?
6    A.   I met with my lawyers several
7 times, I reviewed the documents that we
8 provided and that you provided, and I
9 reviewed the complaint.
10    Q.   When did you first meet with
11 your lawyers to prepare for the
12 deposition?
13    A.   Specifically to prepare for the
14 deposition?  I don't recall the exact
15 date.  About -- yeah, I don't recall the
16 exact date.
17    Q.   Was it in January of this year?
18    A.   Yes, I believe so.
19    Q.   And how many times did you meet
20 with your lawyers in preparation for the
21 deposition?
22    A.   In person or virtually?
23    Q.   We'll do in person first.
24        How many times did you meet with
25 your lawyers in person in preparation for

K. Shiber

1
2 the deposition?
3    A.   In person, I met with the
4 lawyers one time for preparation.
5    Q.   And do you recall when that
6 meeting was?
7    A.   I don't recall the exact date.
8    Q.   And did you meet with your
9 lawyers in a format other than in person?
10    A.   Yes, I met on the phone and
11 video as well.
12    Q.   And do you recall approximately
13 how many times you met with your lawyers
14 on the phone in preparation for the
15 deposition?
16    A.   On the phone, I met with them
17 about twice, I believe.
18    Q.   And was there any -- you met
19 with your attorneys on video; is that
20 right?
21    A.   Yes, I also met on video.
22    Q.   Okay.
23        And how many times did you meet
24 with your attorneys on video in
25 preparation for the deposition?

4 (Pages 10 - 13)

K. Shiber

2    A.    About three times.
3    Q.    Approximately how long were your
4  meeting with your attorneys preparing for
5  the deposition?
6    A.    The first one in person was
7  about six hours.  The subsequent ones over
8  video were about two hours each.  And over
9  the phone total probably less than one
10  hour.
11    Q.    And were both of your attorneys
12  sitting here today present for each of
13  those meetings?
14    A.    Not every single meeting.
15    Q.    Was there anyone else present at
16  any of the meetings that we just
17  discussed?
18    A.    No.
19    Q.    Did any of the documents that
20  you looked at in preparation for today's
21  deposition refresh your recollection of
22  any events?
23        MR. HELLER: Objection.
24        You can answer.
25        THE WITNESS:  Of any events in a

K. Shiber

2  certain category, any events at all?
3    Q.    Of any events during your time
4  at Centerview.
5        MR. HELLER: Objection.
6        THE WITNESS:  Can you define
7    refresh my recollection, please?
8    Q.    Sure.
9        Were you reading any or
10  reviewing any documents and you thought
11  oh, I remember that incident or I remember
12  that e-mail, for example?
13    A.    I don't believe there were any
14  events or incidents referred to in the
15  documents that I was aware of at the time
16  and then forgot and re-remembered.
17    Q.    Understood.
18        So did you look at documents
19  that you were not necessarily aware of at
20  the time that they were authored or
21  created?
22    A.    Yes.
23    Q.    Okay.
24        Ms. Shiber, in this lawsuit, you
25  are alleging that you were discriminated

K. Shiber

2  against because of a disability; is that
3  correct?
4    A.    Yes.
5    Q.    What disability are you alleging
6  that you had while you were employed by
7  Centerview?
8    A.    Anxiety disorder and mood
9  disorder.
10    Q.    When were you diagnosed with
11  anxiety disorder?
12    A.    In high school.
13    Q.    Were you diagnosed by a medical
14  provider with anxiety disorder in high
15  school?
16    A.    Yes.
17    Q.    Do you recall that provider's
18  name?
19    A.    No.
20    Q.    Do you recall what year that
21  diagnosis was?
22    A.    I don't recall the exact year.
23    Q.    What caused you in high school
24  to inquire about a potential diagnosis or
25  to see a medical provider about a

K. Shiber

2  diagnosis?
3    A.    I didn't see a provider
4  specifically seeking a diagnosis, but I
5  sought medical treatment for symptoms that
6  I was experiencing.
7    Q.    What were those symptoms that
8  you were experiencing in high school?
9        MR. HELLER: Objection.
10        You can answer.
11        THE WITNESS:  Specifically
12    related to anxiety or all of the
13    symptoms that I experienced in high
14    school?
15    Q.    All of the symptoms that you
16  experienced in high school.
17    A.    I experienced anxiety,
18  ruminating thoughts, headaches, migraines,
19  panic attacks, compulsive behaviors,
20  sensitivity to noise, sensitivity to
21  sound, trouble concentrating, fatigue,
22  trouble falling asleep, additional
23  physical symptoms that I can't recall but
24  common illnesses, colds, fevers, coughs,
25  mood swings, depression, low self-esteem.

K. Shiber

1          K. Shiber
2  I'm not sure the list is
3  conclusive, but those are included in the
4  symptoms that I experienced. Or
5  exhaustive, sorry, not conclusive.
6     Q.  Were you prescribed any
7  medications in high school to assist with
8  any of the symptoms that you just
9  identified?
10      MR. HELLER: Objection.
11      I'm going to object to the
12  medication she took when she was a
13  minor in high school. I don't see how
14  that's relevant to the claims in this
15  case.
16      MS. SKIBITSKY: I think it's
17  absolutely relevant to the claims in
18  this case.
19      MR. HELLER: In what way?
20      MS. SKIBITSKY: In the way that
21  she's alleging that she has an anxiety
22  and mood disorder and I'm trying to
23  understand the genesis of that anxiety
24  and mood disorder.
25      MR. HELLER: I'm going to object

1          K. Shiber
2  to going into the specifics of what
3  her medication was when she was in
4  high school and I'm going to direct
5  the witness not to answer that. We've
6  spoken about this before and we object
7  to any type of intrusion into her
8  medical records when she was a minor.
9  I don't see how that relates to why
10  she was not accommodated at
11  Centerview.
12      MS. SKIBITSKY: I don't see the
13  difference between my asking a
14  question about her diagnoses of
15  anxiety in high school and how she was
16  treated as a result of those
17  diagnoses, any medical treatment that
18  she sought.
19      MR. HELLER: I do. You asked her
20  what led her to seek treatment, the
21  symptoms, where that's not the
22  treatment she received.
23      MS. SKIBITSKY: She's claiming
24  that -- the plaintiff is claiming that
25  her treatment from Centerview caused

1          K. Shiber
2  certain symptoms and we're entitled to
3  probe when those symptoms arose and
4  the veracity of those symptoms based
5  on whether she was, A, diagnosed and,
6  B, treated with any sorts of
7  medication. That's highly relevant to
8  the symptoms that she's saying were
9  caused by her treatment by Centerview.
10      MR. HELLER: I would agree that
11  you're entitled to investigate that in
12  2020. I don't think you're entitled
13  to question whether or not she was
14  lying as a child about these symptoms.
15  I don't think that's fair and I think
16  that's a far intrusion into her
17  personal life as a minor and I'm going
18  to instruct the witness not to answer.
19  We can call the court if you'd like.
20     Q.  At what point in time --
21      MS. SKIBITSKY: I have intentions
22  to ask about the medications she was
23  prescribed at Dartmouth, which are
24  certainly relevant.
25      At what point in time is it your

1          K. Shiber
2  position that you're going to instruct
3  the witness not to answer questions
4  about medications she was on?
5      MR. HELLER: We've discussed this
6  and we've agreed to disclosure to
7  anything that happened when she was at
8  Dartmouth. I think when she's in high
9  school is unnecessary and an
10  intrusion. So I would say from when
11  she went to Dartmouth would be an
12  appropriate starting point to inquire
13  into her emotional condition.
14      MS. SKIBITSKY: I'm going to ask
15  a question of Ms. Shiber, and I
16  understand that you may object, but
17  I'm going to ask the question.
18     Q.  Ms. Shiber, were you prescribed
19  any medications to deal with any of the
20  symptoms that you've just identified while
21  you were in high school?
22      MR. HELLER: I'm going to object,
23  but I am going to allow the witness to
24  answer that question.
25      THE WITNESS: Sorry, could you

Page 22

K. Shiber

1
2    repeat the question?
3    Q.   Sure.
4         When you were in high school,
5    were you prescribed any medications to
6    deal with anxiety?
7    A.   When I was in high school, I was
8    not prescribed any medications intended
9    specifically for the treatment of anxiety
10   disorder.
11   Q.   What do you mean by "intended
12   specifically for the treatment of anxiety
13   disorder"?
14   A.   There are a variety of symptoms
15   related to anxiety disorder which have
16   treatments for those individual symptoms,
17   but I was not prescribed a medication that
18   is intended for the broad condition of
19   anxiety disorder.
20   Q.   Were you prescribed any
21   medications that would deal with some of
22   the attendant symptoms of anxiety disorder
23   or did you take medications that might
24   have been over-the-counter medications,
25   for example?

Page 23

K. Shiber

1
2    A.   Yes, I was prescribed and did
3    take medications related to some of the
4    symptoms.
5    Q.   What symptoms specifically were
6    those medications related to?
7    A.   Headaches, nausea, I took
8    additional over-the-counter medication
9    that was not prescribed, including
10   melatonin.  I may have been prescribed
11   additional medication beyond what I can
12   recall, as it was -- it is not in my
13   immediate recollection.
14   Q.   And were you diagnosed with mood
15   disorder in high school?
16   A.   No.
17   Q.   Do you believe that you had mood
18   disorder in high school?
19      MR. HELLER:  Objection.
20      You can answer.
21      THE WITNESS:  I'm not a medical
22   professional, so I don't think I can
23   make any claims as to what conditions
24   I may or may not have had.
25   Q.   Do you have mood disorder

Page 24

K. Shiber

1
2    currently?
3    A.   Yes.
4    Q.   What are the symptoms of mood
5    disorder as you currently have it that you
6    experience?
7    A.   Mood swings, periods of elevated
8    high mood described as mania, periods of
9    low mood described as depression or
10   depressive episodes, racing thoughts,
11   elevated heart rate, little interest or
12   pleasure in doing things, feeling down and
13   hopeless, having -- as the name implies,
14   having sudden shifts in mood between
15   different conditions or states.  This
16   again may not be an exhaustive list.
17   Q.   And you identified one of the
18   symptoms of anxiety that you were
19   experiencing in high school as depression;
20   is that right?
21   A.   Yes, I think there's -- yes.
22   Q.   How did the depression that you
23   experienced in high school manifest during
24   high school?
25   A.   It manifested as low

Page 25

K. Shiber

1
2    self-esteem, low mood, little interest in
3    doing things, not getting pleasure from
4    activities one might normally think are
5    enjoyable, avoiding being in social
6    situations or in public, thoughts of --
7    existential thoughts, thoughts of ending
8    my life, negative mood and feelings
9    towards others, ruminating thoughts and --
10   yeah.
11       Again, there may be additional
12   that I'm not recalling right now.
13   Q.   Where and what you just
14   identified were the symptoms that you
15   experienced which you would characterize
16   as the symptoms of your depression while
17   in high school; is that correct?
18   A.   Yes.
19   Q.   When were you diagnosed with
20   unspecified mood disorder?
21   A.   I was diagnosed with that in
22   college.  I believe it was 2017 or 2018.
23   Q.   Do you recall who diagnosed you
24   with that?
25   A.   Dr. Da-shih Hu.

7 (Pages 22 - 25)

K. Shiber

1
2    Q.   Did you see any therapist while
3    you were in high school?
4    A.   Yes.
5    Q.   What was the reason that you saw
6    a therapist when you were in high school?
7         MR. HELLER: Objection.
8         You can answer.
9         THE WITNESS:  I saw a therapist
10   in high school for several reasons,
11   including the conditions that we've
12   discussed, coping strategies for
13   symptoms of depression and anxiety,
14   concerns about my social position in
15   high school and friendships and things
16   of that nature.
17   Q.   Since the diagnosis of the
18   anxiety disorder which you've identified
19   as having been diagnosed while you were in
20   high school and the diagnosis of mood
21   disorder which you've identified as having
22   been diagnosed while at Dartmouth, have
23   you been diagnosed with any other mental
24   health-related issues or conditions?
25   A.   I don't think so.

K. Shiber

1
2         Actually, sorry, can I ask you
3    to clarify what do you mean by mental
4    health-related issues or conditions?
5    Q.   Sure.
6         I'm not interested in hearing
7    whether you've been diagnosed with the flu
8    or COVID, but any medical diagnosis that
9    would require you being seen or treated by
10   a professional medical provider with a
11   background in either psychology or
12   somebody who is an M.D., somebody with a
13   medical degree, or a therapist.
14   A.   Yes, I was also diagnosed with
15   postconcussive syndrome as well as
16   hyposomnia.
17   Q.   When were you diagnosed with
18   postconcussive syndrome?
19   A.   Starting in around 2012.
20   Q.   That would have been while you
21   were in high school?
22   A.   Yes.
23   Q.   What were the symptoms of
24   postconcussive syndrome that you
25   experienced?

K. Shiber

1
2    A.   Headaches, migraines,
3    sensitivity to noise, sensitivity to
4    light, excessive sleepiness, daytime
5    fatigue, trouble concentrating, trouble
6    focusing for extended periods of time,
7    slowness in reading, decreased memory
8    skills, and need for additional sleep to
9    combat the fatigue and other symptoms.
10   Q.   Were you diagnosed with
11   postconcussive syndrome on multiple
12   occasions or was it that 2012 diagnosis?
13   A.   I don't recall if, when I was
14   seen over time, if conditioned
15   conversation or discussion about that
16   syndrome was a new diagnosis or if it was
17   recognition of an ongoing diagnosis or
18   situation, but I experienced it beyond
19   2012.
20   Q.   In 2012, when you were diagnosed
21   with postconcussive syndrome, were you
22   prescribed any sort of treatment plan?
23   A.   Yes.
24   Q.   And what was the treatment that
25   you were prescribed in 2012?

K. Shiber

1
2         MR. HELLER: Objection.
3         You can answer.
4         THE WITNESS:  The treatment that
5    I was prescribed was to, in the short
6    term immediately following the
7    concussion, was to stop my normal
8    activities, stay home, stay in the
9    dark, avoid noises, avoid bright
10   lights, not to look at screens, spend
11   a lot of time resting and sleeping,
12   eat nutritious foods, stay hydrated,
13   and overall rest.  Oh, and -- well,
14   not drink alcohol.
15        In the longer period -- in the
16   longer term beyond the immediate
17   symptoms of that concussion with the
18   postconcussive syndrome, many of those
19   treatments stayed the same, such as
20   avoiding loud noises, having time to
21   rest and disconnect, sleeping, and --
22   yeah.
23   Q.   Have you had multiple concussive
24   experiences, multiple concussions?
25   A.   Yes.

K. Shiber

2 Q. How many concussions have you
3 had?
4 A. About six.
5 Q. When did you have those
6 concussions?
7 A. The first one was in July of
8 2012. The following four occurred when I
9 was in high school. I do not remember the
10 exact dates of each one. And the sixth
11 one occurred in November of 2016.
12 Q. Okay.
13 So you identified a list of
14 symptoms that you experienced when you
15 were diagnosed with postconcussive
16 syndrome in 2012.
17 I want to understand how long
18 those symptoms have lasted or lasted and
19 whether they were temporary symptoms or
20 whether they were continuous symptoms,
21 from your perspective.
22 So when you were diagnosed with
23 postconcussive syndrome in 2012 and you
24 had headaches, how long did you have the
25 headaches after that diagnosis?

K. Shiber

2 A. I don't think I can say which
3 headaches were due to the postconcussive
4 syndrome and which headaches may have been
5 due to other illnesses or daily life. I
6 still continue to have headaches.
7 Q. What about migraines?
8 A. Similarly, I can't attribute
9 which are due to what cause, but I
10 continue to have migraines.
11 Q. Did you have migraines in high
12 school --
13 MS. SKIBITSKY: Strike that.
14 Q. Did you have migraines at any
15 point in time before the 2012 diagnosis of
16 postconcussive syndrome?
17 A. I can't recall if I did.
18 Q. Do you recall whether you
19 experienced headaches at any point in time
20 before the 2012 postconcussive syndrome?
21 A. I can't recall a specific
22 headache, but I think it likely that I
23 experienced headaches before that.
24 Q. And you identified one of the
25 symptoms of the postconcussive syndrome as

K. Shiber

2 being sensitive to noise; is that right?
3 A. Yes.
4 Q. How long did that noise
5 sensitivity last?
6 A. I still experience noise
7 sensitivity.
8 Q. And sensitivity to light, how
9 long did that sensitivity to light last?
10 A. I don't know exactly when it --
11 how long it lasted. I currently believe
12 that I have a similar sensitivity to light
13 as anyone might.
14 Q. You said, "I currently believe I
15 have a similar sensitivity to light as
16 anyone might".
17 What do you mean by that?
18 A. I mean I think when it's
19 particularly bright out or there's
20 artificial lights like a concert or a
21 similar event, I think most people
22 experience sensitivity to bright light in
23 those settings. But walking down the
24 street, they don't typically experience --
25 except if it's very sunny, they don't

K. Shiber

2 typically experience sensitivity to
3 standard light, so I think that my
4 experience is in line with what anyone
5 might experience.
6 Q. Understood.
7 A. Currently.
8 Q. So in other words, is it correct
9 to say that any light sensitivity that you
10 might currently experience you would not
11 attribute to having been diagnosed with
12 postconcussive syndrome today?
13 MR. HELLER: Objection.
14 THE WITNESS: I don't think I
15 can speculate as to what I might
16 attribute it to. I think it depends
17 on the situation and what I was
18 experiencing.
19 Q. Is the light sensitivity that
20 you experience on occasion today similar
21 to the light sensitivity that you might
22 have experienced before you were diagnosed
23 with postconcussive syndrome?
24 MR. HELLER: Objection.
25 THE WITNESS: I don't -- I don't

1          K. Shiber
2    recall exactly how sensitive I was to
3    light when I was twelve years old but
4    -- so I cannot say.
5      Q.   How old were you when you were
6    diagnosed with postconcussive syndrome in
7    2012?
8      A.   At that time I was thirteen.
9      Q.   You identified sleepiness as one
10   of the symptoms of postconcussive syndrome
11   that you experienced in 2012.
12         How long did that sleepiness
13   syndrome last?
14     A.   Again, I cannot say what parts
15   of my experience today might have been
16   caused specifically due to postconcussive
17   syndrome.  I still -- I still experience
18   excessive daytime fatigue and sleepiness.
19     Q.   You said that you still
20   experience excessive daytime fatigue and
21   sleepiness.
22         Are those experiences ones that
23   you've had somewhat consistently since
24   2012?
25     A.   Yes.

1          K. Shiber
2      Q.   You identified trouble focusing
3    as a symptom of the postconcussive
4    syndrome diagnosis in 2012.
5          How long did that trouble
6    focusing as a symptom last?
7      A.   I believe that -- I can't say
8    exactly how long it lasted starting from
9    the incident in 2012, but it did reoccur
10   and persist as I experienced additional
11   concussions and lasted for several months
12   following my most recent concussion.
13     Q.   Was that most recent concussion
14   in November, 2016?
15     A.   Yes.
16     Q.   So the trouble focusing that you
17   experienced as a result of the November,
18   2016 concussion lasted for a couple of
19   months after that concussion; is that
20   correct?
21     A.   I believe so, but I can't say
22   exactly when it ended.
23     Q.   Do you experience trouble
24   focusing today?
25     A.   I do not think so.  Actually, on

1          K. Shiber
2    its own as just trouble focusing -- sorry,
3    can you just clarify?  Sometimes, yes, I
4    experience trouble focusing on occasion.
5      Q.   Can you explain what you meant
6    when you testified that you experienced
7    trouble focusing after your concussions?
8    What does that mean, in your experience,
9    to have trouble focusing?
10     A.   It means that it's difficult to
11   keep your mind on the task at hand, it's
12   hard to retain information in your working
13   memory and continue, you know, working on
14   a discrete task and easily distracted and
15   easily kind of lose your place.
16     Q.   And those feelings persisted
17   after the November, 2016 concussion for
18   approximately seven months after that
19   concussion; is that correct?
20     A.   Yeah, I would say months to
21   years.  Again, I'm not exactly sure at
22   what point I can say that when that
23   symptoms caused by the postconcussive
24   syndrome ended, but I still experience
25   trouble focusing on occasion.

1          K. Shiber
2      Q.   Do you think the experience that
3    you still have on occasion of trouble
4    focusing was caused by any concussions
5    you've had?
6          MR. HELLER: Objection.
7          THE WITNESS: I'm not a doctor.
8    I can't say what I've experienced is
9    caused by what.  I believe it may have
10   been a trigger.
11     Q.   You identified slowness reading
12   as a symptom of postconcussive syndrome as
13   you were diagnosed in 2012.
14         How did that symptom last
15   after the 2012 diagnosis?
16     A.   I would say similar to the
17   previous symptom.  I can't say exactly how
18   long it lasted, several months to years,
19   but I don't know the exact entity.
20     Q.   All of the symptoms that you
21   identified in -- that you experienced in
22   2012 as a result of postconcussive
23   syndrome, did you experience all of the
24   same symptoms that you identified after
25   each of your subsequent concussions?

Page 38

K. Shiber
1
2    A.    For the most part, yes, to
3  different degrees, and also it depended
4  upon the situation.  For example, the
5  concussion that occurred in 2012 occurred
6  in July.  I wasn't in school.  And so, you
7  know, being in a different environment,
8  different symptoms, you know, were more
9  relevant to the situation, but it was
10 broadly the same group of symptoms each
11 time.
12   Q.    And have you ever been
13 prescribed any medication as a result of
14 concussions?
15       MR. HELLER: Objection.
16       You can answer.
17       THE WITNESS:  Well, I can't say
18   again like which symptoms were caused
19   necessarily by what situation.  I was
20   not prescribed any concussion-specific
21   medication.  But at a time following
22   each of the concussions, I took
23   over-the-counter medications and also
24   like prescribed stronger doses of
25   similar medications.

Page 39

K. Shiber
1
2    Q.    What would those prescribed
3  stronger doses of similar medications have
4  been?
5       MR. HELLER: Objection.
6       You can answer.
7       THE WITNESS:  I believe
8   something like a stronger dose of
9   Tylenol, for example, that they
10   prescribed but, in my understanding,
11   essentially is just a stronger version
12   of what you can buy at the store.  To
13   my knowledge, I was not prescribed
14   anything else.  I may have been
15   prescribed something, but I don't
16   know.
17   Q.    When do you think that you were
18 prescribed with that stronger dose of
19 Tylenol?  Approximately what year would
20 that have been?
21   A.    I can't say what year that would
22 have been.  I don't know -- again, I don't
23 remember the exact prescription.  It's my
24 understanding that that may have occurred,
25 but I don't know exactly when.

Page 40

K. Shiber
1
2    Q.    Ms. Shiber, you testified that
3  you experience -- you began experiencing
4  anxiety before Centerview; is that
5  correct?
6    A.    Yes.
7    Q.    Did you experience anxiety while
8  you were at employed by Centerview?
9    A.    Yes.
10   Q.    Did you experience anxiety after
11 you were employed by Centerview?
12   A.    Yes.
13   Q.    When -- are you still
14 experiencing anxiety after having been
15 employed by Centerview?
16   A.    Yes.
17   Q.    Did you experience
18 postconcussive syndrome before having been
19 employed by Centerview?
20   A.    Yes.
21   Q.    Did you experience symptoms of
22 postconcussive syndrome while you were
23 employed by Centerview?
24   A.    I can't say necessarily what
25 symptoms I experienced were caused by

Page 41

K. Shiber
1
2  postconcussive syndrome specifically.
3    Q.    Did you experience depression
4  before you were employed by Centerview?
5    A.    Yes.
6    Q.    Did you experience depression
7  while you were employed by Centerview?
8    A.    Yes.
9    Q.    Did you experience depression
10 after you were employed by Centerview?
11   A.    Yes.
12   Q.    When did you first start
13 experiencing depression?
14   A.    I first started experiencing
15 depression during my freshman year of high
16 school.
17   Q.    Did you experience symptoms of a
18 mood disorder before your employment with
19 Centerview?
20   A.    Yes.
21   Q.    Did you experience symptoms of a
22 mood disorder during your employment with
23 Centerview?
24   A.    Yes.
25   Q.    Did you experience symptoms of a

11 (Pages 38 - 41)

K. Shiber

1
2 mood disorder after your employment with
3 Centerview?
4     A.    Yes.
5     Q.    When did those symptoms of a
6 mood disorder that you experienced after
7 your employment at Centerview end?
8     A.    They have not ended.
9     Q.    Did you experience bipolar
10 disorder before you were employed by
11 Centerview?
12     A.    To my knowledge, I've never been
13 formally diagnosed with bipolar disorder
14 specifically.
15     Q.    At any point in time; is that
16 correct?
17     A.    That's correct.
18     Q.    Have you been diagnosed or
19 experienced any other cognitive,
20 psychological, or emotional impairments
21 that we have not already discussed?
22         MR. HELLER:  Objection.
23         THE WITNESS:  I've experienced
24     grief, which I think is an emotional
25     impairment, that we have not

K. Shiber

1
2 discussed.
3         Do you mean specifically like
4     diagnosed things or just experiences
5     of being emotionally affected or
6     impaired?
7     Q.    Let's do first diagnoses.
8     A.    I think that we've covered the
9 formal diagnoses.
10     Q.    Okay.
11         You've said that you experienced
12 grief.
13         When did you experience grief?
14     A.    I've experienced grief several
15 times starting in 2015, 2020, 2021, 2022
16 multiple times.
17     Q.    What was the cause of the grief
18 that you experienced in 2015?
19     A.    Death of my grandfather.
20     Q.    And what were -- what was the
21 manifestations of that grief, if any?
22     A.    Strong depressive feelings,
23 little interest in doing things, lack of
24 enjoyment of life, down -- negative
25 thoughts in general, feelings of

K. Shiber

1
2 isolation, sadness, feeling like almost
3 like moving in slow motion.  It's not an
4 exhaustive list.
5     Q.    What was the cause of the grief
6 that you experienced in 2020?
7     A.    Sorry.
8         In 2020, several people that I
9 knew died, including a close friend.
10     Q.    Do you recall what months those
11 individuals who you knew died in 2020?
12     A.    April, 2020.
13     Q.    What were the symptoms of the
14 grief that you experienced in April, 2020?
15         MR. HELLER:  Objection.
16         You can answer.
17         THE WITNESS:  I think broadly
18     similar to the experience -- the grief
19     experience that I previously
20     described.  Specifically a feeling of
21     shock, of surprise, anger, feelings of
22     confusion, just not understanding,
23     empathy.
24     Q.    Was depression one of the
25 symptoms of that grief you experienced in

K. Shiber

1
2 April, 2020?
3     A.    Yes.
4     Q.    Do you still experience that
5 grief, those feelings of grief that you
6 experienced in April of 2020 today?
7     A.    Yes.
8     Q.    Were you experiencing those
9 feelings of grief at the period of time
10 when you were employed by Centerview that
11 you experienced in April, 2020?
12     A.    Yes.
13     Q.    What was the cause of the grief
14 you experienced in 2021?
15     A.    Similar cause.
16     Q.    And what month did that event
17 occur?
18     A.    I don't know exactly.  In 2021,
19 I don't know exactly.
20     Q.    Do you recall the season?
21     A.    No.  In 2021, it was a less of a
22 close relationship.
23     Q.    You said, when I asked you what
24 was the cause of the grief you experienced
25 in 2021, you said similar situation.

12 (Pages 42 - 45)

Page 46

1          K. Shiber
2       What was -- what was the cause
3 of the grief?
4    A.   My friend's parent died.
5    Q.   Was this a friend that you were
6 close with?
7    A.   I mean, not my best friend ever,
8 but a friend.
9    Q.   Are you still experiencing
10 symptoms of the grief you experienced in
11 2021 as a result of that death?
12   A.   Not regularly.
13   Q.   How frequently are you
14 experiencing any of the symptoms of the
15 grief you experienced -- you began
16 experiencing as a result of that 2021
17 death?
18   A.   When prompted by specific
19 situations, but specifically it's not a
20 consistent experience.
21   Q.   What might prompt an experience
22 -- what might prompt a manifestation of
23 that grief that you experienced as a
24 result of the 2021 death?
25   A.   Hearing my friend talk about how

Page 47

1          K. Shiber
2 she doesn't have a father anymore, reading
3 things about him, reading about similar
4 situations of people who lost parents to
5 COVID.
6    Q.   What was the cause of the grief
7 you experienced in 2022?
8    A.   Two deaths.
9    Q.   Who were the individuals who
10 died?
11   A.   One was a member of my college
12 sorority.  Another was another one of my
13 friends in my grade at Dartmouth.
14   Q.   The member of your college
15 sorority, when in 2022 did she die?
16   A.   I don't recall the exact date.
17   Q.   Do you recall the month?
18   A.   No.
19   Q.   Do you recall the season?
20   A.   Yeah, the spring.
21   Q.   And your other friend from
22 Dartmouth, do you recall the month that he
23 or she died?
24   A.   Yeah, he died in August.
25   Q.   What were the symptoms of the

Page 48

1          K. Shiber
2 grief you experienced when your -- the
3 member of your college sorority passed?
4    A.   Similar to the ones I've listed
5 previously, but additional shock and fear
6 and anxiety surrounding the manner of her
7 death.
8    Q.   Did you experience depression as
9 a result of that 2022 death?
10   A.   Yes.
11   Q.   How long did that depression
12 that you experienced as a result of the
13 2022 death last?
14   A.   I experience depression on an
15 ongoing basis.  There are specific
16 triggers which can intensify it for
17 periods.  That was one of them.  I don't
18 know exactly.  I'm still depressed.  I
19 don't know if that's, you know, how much
20 of that is because of her death, how much
21 is because of something else.
22   Q.   What was the cause of your
23 sorority sister's death?
24        MR. HELLER: Objection.
25        THE WITNESS: I can answer.

Page 49

1          K. Shiber
2 It's in the news.
3        She was -- she was shot in her
4 home by an intruder who she knew.
5    Q.   What was the cause of your
6 friend from Dartmouth's death?
7    A.   I don't know the exact cause.
8 It was a physical injury sustained as part
9 of an accident.  I don't know exactly the
10 medical cause.
11   Q.   What accident?  Was it a car
12 accident?
13   A.   It was not a car accident.
14       I wasn't there at the time, so I
15 don't think that my story of exactly what
16 happened is necessarily accurate.  But he
17 was swimming in a river and was -- there
18 were rocks involved.  I don't know exactly
19 the story.
20   Q.   Your friend who was shot by an
21 intruder in her home, where did she live
22 at the time?
23        MR. HELLER: Objection.
24        What's the relevance to where
25   the friend who was shot lived?

13 (Pages 46 - 49)

K. Shiber

1  
2      MS. SKIBITSKY: Ms. Shiber  
3  testified that she experienced anxiety  
4  as a result of the manner of the way  
5  in which her friend died.  
6      MR. HELLER: And you asked about  
7  that.  
8      MS. SKIBITSKY: I'm entitled to  
9  understand the basis of Ms. Shiber's  
10  anxiety as a result of her friend's  
11  death.  
12      MR. HELLER: She never said she  
13  had anxiety because of her friend's  
14  death.  
15      MS. SKIBITSKY: I believe she did  
16  testify that she had anxiety over the  
17  manner in which her friend died.  
18  Q.     Ms. Shiber --  
19      MS. SKIBITSKY: I'll strike the  
20  question, I'll strike the question.  
21      We've been going about an hour.  
22  Should we take a break?  
23      MR. HELLER: That sounds like a  
24  good idea.  
25      THE VIDEOGRAPHER: We are going

K. Shiber

1  
2  off the record.  
3      The time on the video monitor is  
4  11:06 a.m.  
5      (Whereupon a break was taken)  
6      THE VIDEOGRAPHER: We are now  
7  back on the record.  
8      The time on the video monitor is  
9  11:22 a.m.  
10  Q.     Ms. Shiber, when you were at  
11  Dartmouth, do you recall seeing a medical  
12  provider by the name of Dr. Lichtenstein?  
13  A.     Yes.  
14  Q.     And why did you see Dr.  
15  Lichtenstein?  
16  A.     I saw Dr. Lichtenstein for a  
17  neuropsychological evaluation.  
18  Q.     Do you recall when you saw Dr.  
19  Lichtenstein?  
20  A.     I believe it was 2017 and 2018.  
21  Q.     Why did you see Dr. Lichtenstein  
22  for a neuropsychological evaluation?  
23  A.     It was related to extending my  
24  academic accommodations at Dartmouth.  
25  Q.     Did you see Dr. Lichtenstein in

K. Shiber

1  
2  order to get a recommendation as to  
3  whether your academic accommodations at  
4  Dartmouth should be extended?  
5  A.     Yes.  
6  Q.     Did you start Dartmouth with  
7  academic accommodations?  
8  A.     I did not have academic  
9  accommodations when I first started at  
10  Dartmouth.  
11  Q.     Did you have academic  
12  accommodations when you were in high  
13  school?  
14  A.     Yes.  
15  Q.     Can what were those academic  
16  accommodations?  
17  A.     I don't recall an exhaustive  
18  list, but they included extra time on  
19  exams and assignments.  
20  Q.     And why did you obtain academic  
21  accommodations in high school?  
22      MR. HELLER: Objection.  
23      You can answer.  
24      THE WITNESS: Following my  
25  concussions and postconcussive

K. Shiber

1  
2  syndrome and the symptoms that I was  
3  experiencing, the academic  
4  accommodations were in place to  
5  accommodate those symptoms.  
6      MS. SKIBITSKY: Can we mark  
7  Exhibit 1, please.  
8      (Whereupon, a letter dated  
9  October 28, 2022 was marked  
10  Defendant's Exhibit 1  
11  for identification.)  
12  Q.     Ms. Shiber, do you have  
13  Exhibit 1 in front of you?  
14  A.     Yes.  
15  Q.     I'll give you a second to skim  
16  through, but these are medical records  
17  that we received from Dr. Lichtenstein at  
18  Dartmouth and that we produced to your  
19  counsel bearing Bates stamps at the bottom  
20  PROVIDERS_1 through PROVIDERS_18.  
21      Have you seen this document  
22  before, Ms. Shiber?  
23  A.     Yes, I've seen what Dr.  
24  Lichtenstein provided.  
25  Q.     And if you go to -- the first

14 (Pages 50 - 53)

K. Shiber

1       K. Shiber
2 page is a cover letter and it's from
3 Dartmouth Health dated October 28, 2022
4 and it states, "attached please find the
5 requested medical information regarding
6 Kathryn Shiber".
7       Do you see that?
8    A.   Yes.
9    Q.   And then on the page with the
10 Bates stamp at the bottom -- the Bates
11 stamp is the number that says PROVIDERS on
12 the bottom right.  So at the bottom it's
13 Bates stamped PROVIDERS_4.
14       Do you see an authorization for
15 release of health information pursuant to
16 HIPAA form there?
17    A.   Yes.
18    Q.   Okay.
19       And this is a medical release
20 that you signed in order for Centerview to
21 obtain Dr. Lichtenstein's records; is that
22 correct?
23    A.   Yes.
24    Q.   Okay.
25       Let's take a look at the -- Dr.

1       K. Shiber
2 Lichtenstein's records.
3       The first record that we have
4 here is from March 28, 2017, and that's
5 located at PROVIDERS_10.
6       Do you see up at the top it says
7 3/28/17 office visit?
8    A.   Yes.
9    Q.   Do you recall seeing Dr.
10 Lichtenstein in March of 2017?
11    A.   Yes.
12    Q.   Do you recall Dr. Lichtenstein
13 performing certain neurological exams?
14    A.   Which certain neurological
15 exams?
16    Q.   Any neurological exams.
17    A.   Yes.
18    Q.   During that March, 2017 visit?
19    A.   Yes.
20    Q.   Can you describe those exams?
21    A.   Yeah, there were a variety of
22 tests, they were measuring different areas
23 of my cognitive function, and there's like
24 verbal memory, spatial memory, similar to
25 like an IQ test.  There's also some

1       K. Shiber
2 physical things I had to do, and also just
3 verbally his own questioning and
4 assessment.
5    Q.   Do you recall Dr. Lichtenstein
6 telling you that he didn't believe that
7 you were performing the test consistent to
8 the best of your ability?
9    A.   I don't recall him saying that.
10    Q.   Do you recall Dr. Lichtenstein
11 telling you that he wasn't sure whether he
12 can confidently assess the results of your
13 test because he thought that you may have
14 been underperforming intentionally?
15    A.   I don't recall him saying that.
16       Is that in the document
17 somewhere?
18    Q.   Do you recall him saying that?
19    A.   I don't recall him saying.
20    Q.   Did you underperform the test in
21 order to get an accommodation at
22 Dartmouth?
23    A.   No.
24    Q.   You knew going into the test
25 with Dr. Lichtenstein that if you

1       K. Shiber
2 performed well, you would not -- he would
3 not sign off on accommodations for
4 Dartmouth; isn't that right?
5    A.   What do you mean by well,
6 performed well?
7    Q.   If Dr. Lichtenstein administered
8 neurological tests and you had no issues
9 in responding to the tests, then Dr.
10 Lichtenstein would determine that you did
11 not have a need for an accommodation for
12 Dartmouth; correct?
13       MR. HELLER:  Objection.  That's
14 speculation.
15       You can answer if you can.
16       THE WITNESS:  I don't -- I don't
17 know if I really understand the
18 question.
19    Q.   Well, you testified that you saw
20 Dr. Lichtenstein in connection with your
21 request for accommodation, academic
22 accommodations at Dartmouth; correct?
23    A.   Yes.
24    Q.   And so the purpose of you seeing
25 Dr. Lichtenstein was for him to give an

15 (Pages 54 - 57)

Page 58

1          K. Shiber
2  opinion as to whether you would require
3  academic accommodations at Dartmouth;
4  correct?
5          MR. HELLER: Objection.
6          You can answer, if you can.
7          THE WITNESS: I don't think that
8      was the full purpose of the visit in
9      its entirety, but that was one
10     component of the intended outcome.
11     Q.   And you wanted the outcome of
12  the test to be that Dr. Lichtenstein
13  determined that you needed continued
14  academic accommodations; right?
15     A.   I wanted the outcome of the test
16  to be that Dr. Lichtenstein determined his
17  own opinion of what I was experiencing and
18  made a proper recommendation as a medical
19  provider.
20     Q.   And you intentionally
21  manipulated the tests that Dr.
22  Lichtenstein administered so that you
23  would get the recommendation that you
24  wanted from Dr. Lichtenstein; right?
25     A.   No.

Page 59

1          K. Shiber
2          MR. HELLER: Objection, for a
3      number of reasons.
4      Q.   Can we look at PROVIDERS_12.
5          Ms. Shiber, right above the
6  summary paragraph -- and this is from the
7  March 28, 2017 visit -- it states,
8  "performance validity testing results were
9  variable, suggesting that Kate's
10  engagement with the testing process was
11  questionable at times".
12         Do you see that?
13     A.   Yes.
14     Q.   Did Dr. Lichtenstein tell you
15  that he believed that your engagement with
16  the testing process was questionable at
17  times?
18         MR. HELLER: Objection. Asked
19      and answered.
20         You can answer again.
21         THE WITNESS: I don't recall him
22      doing so.
23     Q.   Do you recall him telling you
24  that he didn't believe that you were
25  performing the test to the best of your

Page 60

1          K. Shiber
2  ability?
3          MR. HELLER: Same objection.
4          THE WITNESS: I don't recall him
5      telling me that.
6      Q.   Dr. Lichtenstein goes on to
7  write, "therefore, there are some concerns
8  about the validity of the current
9  findings".
10         Do you see that?
11     A.   Yes.
12     Q.   Do you recall Dr. Lichtenstein
13  telling you that there were concerns about
14  the validity of his findings?
15     A.   No, I don't recall that.
16     Q.   Do you recall having any
17  discussions with Dr. Lichtenstein about
18  the results of his test?
19     A.   I recall a discussion about
20  results of testing. I don't recall if it
21  was the tests performed on this date or
22  another time.
23     Q.   How many tests did Dr.
24  Lichtenstein administer --
25         MS. SKIBITSKY: Strike that.

Page 61

1          K. Shiber
2      Q.   How many times did you see Dr.
3  Lichtenstein?
4      A.   I don't recall the exact number.
5      Q.   Do you recall the dates, the
6  general months and years that you would
7  have seen him?
8      A.   2017 into 2018.
9      Q.   Okay.
10         Would you have seen him in 2019?
11         MR. HELLER: Objection.
12         THE WITNESS: I may have, but I
13      don't recall it.
14     Q.   Okay.
15         Under the summary section, it
16  says, "Kate's objective test performance
17  ranged from the very superior to extremely
18  low range. However, there is evidence
19  that she did not consistently perform to
20  the best of her ability".
21         Isn't it true that you did not
22  consistently perform to the best of your
23  ability on Dr. Lichtenstein's test in
24  March, 2017?
25         MR. HELLER: Objection.

16 (Pages 58 - 61)

K. Shiber

1
2    You can answer, if you can.
3        THE WITNESS:  I don't think I
4    can answer that question.
5    Q.   Why can't you answer that
6    question?
7    A.   Because I don't recall not
8    consistently performing to the best of my
9    ability or looking at a sentence that says
10   there is evidence that I did so, so if
11   you're asking me if there's evidence, I
12   don't know.
13   Q.   Do you have any reason to doubt
14   that what Dr. Lichtenstein wrote in his
15   report is his accurate assessment of the
16   situation in March of 2017?
17       MR. HELLER:  Objection.
18       You can answer.
19       THE WITNESS:  I think it's his
20   assessment to the best of his ability
21   at the time.
22   Q.   And then he goes on to say,
23   "Kate is currently successful at a very
24   competitive college, suggesting that she
25   is capable of stronger functioning than

K. Shiber

1
2    was measured during this evaluation".
3        Do you see that?
4    A.   Yes.
5    Q.   And that's consistent with what
6    we read before that Dr. Lichtenstein wrote
7    there is evidence that you did not
8    consistently perform to the best of your
9    ability?
10       MR. HELLER:  Objection.
11       THE WITNESS:  I don't know that
12   I would grade it consistent.
13   Q.   Dr. Lichtenstein's statement
14   that you did not consistently perform to
15   the best of your ability is consistent
16   with his statement above that summary line
17   that says, "performance validity testing
18   results were variable, suggesting that
19   Kate's engagement with the testing process
20   was questionable at times"?  You would
21   agree that those two sentences are
22   consistent; correct?
23       MR. HELLER:  Objection.  That's
24       the exact same question you just
25       asked.

K. Shiber

1
2        You can answer it again, if you
3    can.
4        THE WITNESS:  I don't think
5    those two sentences are necessarily
6    the same.
7    Q.   If we look at the paragraph in
8    the middle of the page that starts "with
9    regard to", the second sentence says,
10   "however, her performance on memory tests,
11   particularly those involving visual
12   memory, was extremely low and likely
13   underestimates her true memory abilities".
14       Do you see that?
15   A.   Yes.
16   Q.   And so Dr. Lichtenstein is
17   saying here that he thinks your
18   performance on the memory test is not an
19   accurate reality; is that correct?
20       MR. HELLER:  Objection to
21       counsel's speculation as to what Dr.
22       Lichtenstein was thinking.
23       Answer if you can.
24       THE WITNESS:  I don't think I
25   can say what Dr. Lichtenstein meant.

K. Shiber

1
2    Q.   You have no reason to doubt that
3    Dr. Lichtenstein wrote his actual
4    understanding of your test performance in
5    this medical record; do you?
6        MR. HELLER:  Objection.  That's
7        the third time you asked this
8        question.
9        You can answer it again if you
10       can.
11       THE WITNESS:  I don't think I
12   can answer that question.
13   Q.   Is there any reason Dr.
14   Lichtenstein would write something not
15   truthful in his report?
16       MR. HELLER:  Objection.
17       How could she ask about Dr.
18       Lichtenstein's motivations?
19       MS. SKIBITSKY:  Brian, it's
20   objection.  You don't need the
21   speaking objection.
22       MR. HELLER:  But these questions
23   that are repetitive and you're asking
24   her -- now you're just flat out asking
25   her what Dr. Lichtenstein thought.

1          K. Shiber
2    That's an inappropriate question and
3    I'm going to direct the witness not to
4    answer it.
5          MS. SKIBITSKY: I'm going to
6    object on the record to your speaking
7    objections and coaching the witness on
8    how to answer the questions.
9          MR. HELLER: These questions are
10   improper.
11   Q.   Dr. Lichtenstein goes on to
12   write, "given these disparities among
13   scores and the question of optimal effort,
14   the status of Kate's cognitive status in
15   regard to her recent concussion or the
16   potential cumulative effects of multiple
17   injuries cannot be adequately determined
18   at this time".
19       Do you see that?
20   A.   Yes.
21   Q.   And so Dr. Lichtenstein's
22   statement that the question -- he writes
23   that there is a question of optimal effort
24   in your testing; correct?
25   A.   Yes, he writes that.

1          K. Shiber
2    Q.   And he goes on to say, "in
3    discussing these results with Kate, it
4    became evident that she may become
5    flustered by tasks in which she cannot
6    readily figure out a way to solve them,
7    e.g. visual memory tests".
8        Do you see that?
9    A.   Yes.
10   Q.   It appears from this sentence
11   that begins with "in discussing these
12   results with Kate", you and Dr.
13   Lichtenstein did discuss the results of
14   his test.
15       Do you recall those discussions?
16       MR. HELLER: Objection.
17   You can answer.
18       THE WITNESS: I do recall
19   discussing the results of the test.
20   Q.   And what do you recall about
21   those discussions?
22   A.   I recall Dr. Lichtenstein
23   presenting me with the results and us
24   discussing my performance.
25   Q.   Do you recall what you discussed

1          K. Shiber
2    about your performance?
3    A.   I do recall some parts of what
4    he has said, including having a range of
5    results and his assessment that my
6    becoming flustered or anxiety may have
7    impacted my true capabilities as measured
8    by these tests.
9    Q.   Did he ask you during those
10   discussions whether you were performing to
11   the best of your abilities during the
12   test?
13   A.   I don't recall if he asked me
14   that.
15   Q.   And the result of the March,
16   2017 testing was that you should continue
17   to receive certain accommodations; is that
18   correct?
19   A.   Yes.
20   Q.   Dr. Lichtenstein wrote in the
21   last paragraph on the page ending in 12,
22   "while the status of Kate's concussion
23   recovery is uncertain, she currently
24   requires a longer amount of time to
25   complete her work and must work harder

1          K. Shiber
2    than usual to learn new information.  On
3    account of this as well as nonneurological
4    factors that impact her self-confidence,
5    she will continue to benefit from
6    appropriate accommodations until the
7    status of her recovery can be more
8    accurately assessed".
9        Do you see that?
10   A.   Yes.
11   Q.   Did Dr. Lichtenstein tell you
12   that you should come back for a follow-up
13   so he can further assess whether you would
14   require additional or extended
15   accommodations?
16   A.   Yes.
17   Q.   And he writes in section two
18   here, "we recommend that Kate return to
19   our clinic in full 2017 for a follow-up
20   neuropsychological evaluation".
21       Do you see that?
22   A.   Yes.
23   Q.   And he writes, "the follow-up
24   should be useful in determining whether
25   she will continue to require

Page 70

1              K. Shiber
2  concussion-related accommodations in the
3  future".
4          Do you see that?
5      A.   Yes.
6      Q.   And so you understand that in
7  the second time you were going to see Dr.
8  Lichtenstein, that was again to determine
9  whether you would require continued
10  accommodations; is that correct?
11      A.   Yes, that was part of the
12  purpose.
13      Q.   And Dr. Lichtenstein in the
14  third itemized note here under therapy, he
15  writes, "given Kate's history of anxiety,
16  we recommend that she obtain an
17  evidence-based therapy cognitive
18  behavioral therapy to work on skills to
19  reduce her level of anxiety". He goes on
20  to say, "she can obtain therapy at Dick's
21  House. We particularly recommend that she
22  work with Dr. Mark Hyatt, a sports
23  psychologist, who has experience working
24  with student athletes".
25          Did you ever obtain

Page 71

1              K. Shiber
2  evidence-based therapy while at Dartmouth?
3      A.   Yes.
4      Q.   Who did you obtain
5  evidence-based therapy from?
6      A.   I spoke to multiple therapists
7  through Dick's House who were certified in
8  evidence-based therapy.
9      Q.   Do you recall their names?
10      A.   I believe one was Todd Lindsley.
11  The other one I believe her first name was
12  Sarah, but I do not recall her full name.
13  There may have been others that I don't
14  recall the names of.
15      Q.   Can we look at page ten of the
16  medical records.
17          Dr. Lichtenstein notes under the
18  background section at the end of the first
19  paragraph, he writes, "Kate does not
20  currently take any medications".
21          Was that true as of March, 2017?
22      A.   Can you clarify what medications
23  and time period you're referring to?
24      Q.   As of March 28, 2017, were you
25  taking any over-the-counter --

Page 72

1              K. Shiber
2          MS. SKIBITSKY: Strike that.
3      Q.   Were you taking my prescribed
4  medications as of March 28, 2017?
5      A.   I don't believe so.
6      Q.   Dr. Lichtenstein writes in the
7  second paragraph under background at the
8  very bottom, "because she was always in
9  some stage of concussion recovery, Kate
10  usually received informal extended time
11  accommodations on exams and large
12  assignments throughout high school. She
13  did not receive any accommodations on her
14  SATs or upon entering Dartmouth College".
15          Do you see that?
16      A.   Yes.
17      Q.   How did you obtain
18  accommodations in high school? What was
19  the process by which you went about
20  obtaining those accommodations?
21          MR. HELLER: Objection.
22          You can answer.
23          THE WITNESS: Following my
24      meetings with doctors in -- at my high
25      school, they would recommend

Page 73

1              K. Shiber
2      accommodations. I don't know the
3      process with -- on the school side,
4      but they were in communication with
5      someone from the school.
6      Q.   And why did you -- did you seek
7  to receive accommodations on the SATs?
8      A.   I don't believe so.
9      Q.   Did you not feel that you needed
10  accommodations to sit for the SATs?
11      A.   At the time that I took the
12  SATs, I did not feel that I needed
13  accommodations.
14      Q.   Was it the case that only during
15  certain periods of high school you
16  required accommodations, or was it
17  throughout the entire high school
18  experience that you required
19  accommodations?
20      A.   It was during certain periods.
21  It was not broadly applied to my entire
22  high school experience.
23      Q.   What were those periods -- what
24  was the basis of those specific periods
25  where you were obtaining academic

19 (Pages 70 - 73)

Page 74

1          K. Shiber
2 accommodations?
3     A.   It was following -- for a period
4 of time following the concussion, each
5 concussion.
6     Q.   And so you didn't require any
7 accommodations at the time that you sat
8 for the SATs; is that right?
9        MR. HELLER: Objection to form.
10       THE WITNESS: Can you define
11 "require"?
12    Q.   Sure.
13       When you were preparing to take
14 the SATs, did you have the thought that I
15 would really benefit from an accommodation
16 of the type that I've had at certain
17 points in my experience at high school?
18    A.   I don't recall exactly what I
19 thought at the time.  I can't say what I
20 thought at the time.
21    Q.   Did you talk to anyone about
22 whether you might be able to receive
23 accommodations for taking the SATs?
24    A.   I don't believe so.
25    Q.   Were you happy with your score

Page 75

1          K. Shiber
2 on the SATs?
3     A.   Yes.
4     Q.   And Dr. Lichtenstein notes that
5 you did not receive any accommodations
6 upon entering Dartmouth College; is that
7 correct?
8     A.   Yes.
9     Q.   Did you not need accommodations
10 upon entering Dartmouth College?
11       MR. HELLER: Objection.
12       THE WITNESS: I don't think I
13 can say what I might have needed.
14    Q.   At what point at Dartmouth did
15 you seek academic accommodations?
16    A.   Following my concussion in
17 November of 2016.
18    Q.   And how did you get that
19 concussion in November of 2016?
20    A.   I hit my head on a shelf.
21    Q.   Who diagnosed you with
22 concussions -- with a concussion as of
23 that November, 2016 date?
24    A.   The athletic trainer as well as
25 a doctor.

Page 76

1          K. Shiber
2     Q.   Do you recall what tests they
3 performed in diagnosing that concussion?
4     A.   No, I don't recall.
5     Q.   Do you recall if they did an
6 MRI?
7     A.   Following that concussion, they
8 did not do an MRI.
9     Q.   And Dr. Lichtenstein notes here
10 in the next paragraph down that you were
11 seen by a doctor and athletic trainer over
12 the following two days after this event
13 when you bumped your head.  Both diagnosed
14 you with concussion.
15       Do you see that?
16    A.   Yes.
17    Q.   Do you recall the name of the
18 doctor that diagnosed you with a
19 concussion?
20    A.   No.
21    Q.   Do you know whether Dr.
22 Lichtenstein had medical records
23 reflecting that diagnosis?
24    A.   No.
25    Q.   Do you recall the name of the

Page 77

1          K. Shiber
2 athletic trainer who diagnosed you with a
3 concussion?
4     A.   No.
5     Q.   And do you know whether Dr.
6 Lichtenstein had records reflecting that
7 athletic trainer's diagnosis?
8     A.   I don't know what he had.
9     Q.   And as a result of that -- well,
10 do you remember that that event took place
11 just about a week prior to the finals week
12 at Dartmouth?
13    A.   Yes.
14    Q.   And Dr. Lichtenstein notes "the
15 concussion occurred just prior to finals
16 week, so she was not required to attend
17 classes".
18       Do you recall that you were not
19 required to attend classes after that
20 11/16 event?
21    A.   I wouldn't have recalled that
22 independently.
23    Q.   Sitting here today, do you
24 remember that, after you leaned back --
25 I'm reading from the medical record here

20 (Pages 74 - 77)

K. Shiber

1
2 where it says that you reportedly leaned
3 back aggressively against the headboard of
4 a bed while sitting in her friend's room.
5       So do you recall after that
6 event asking Dartmouth that you not attend
7 classes the following week or in the days
8 that followed?
9    A.   No, I don't recall asking that.
10    Q.   Do you know how it came to be
11 that you were not attending classes just
12 prior to finals week?
13       MR. HELLER: Objection.
14       You can answer.
15       THE WITNESS: I don't know how
16    it came to be that I was not attending
17    classes during that week.
18    Q.   And you testified earlier that
19 the symptoms from the November, 2016
20 concussion lasted for approximately
21 several months after that concussion; is
22 that correct?
23    A.   I believe that's what I said
24 earlier.
25    Q.   And your accommodations

K. Shiber

1
2 throughout Dartmouth lasted throughout
3 your entire tenure at Dartmouth; correct?
4    A.   Yes.
5    Q.   Why did you need accommodations
6 after -- years after the November, 2016
7 concussion if your symptoms of that
8 concussion ceased several months after the
9 concussion itself?
10       MR. HELLER: Objection.
11       You can answer.
12       THE WITNESS: Like I mentioned,
13    I can't say which symptoms are due to
14    this specific event or due to other
15    conditions in my life.
16    Q.   Do you know why you were needing
17 accommodations throughout the entirety of
18 Dartmouth?
19       MS. SKIBITSKY: Let me strike the
20    question.
21    Q.   What -- what was the reason you
22 sought accommodations while at Dartmouth?
23    A.   I sought accommodations at
24 Dartmouth because I suffer from symptoms
25 related to disability which negatively

K. Shiber

1
2 impact as mentioned my ability to focus,
3 concentrate, remember, and cause me to --
4 cause me to take more time on assignments
5 and things of that nature, so I sought
6 accommodations to help accommodate those
7 symptoms so that my performance would
8 reflect my abilities.
9    Q.   What is the disability from
10 which you suffer the symptoms that cause
11 the need for accommodations?
12       MR. HELLER: Objection.
13       THE WITNESS: I can't determine
14    what -- what disability caused each
15    symptom, whether it was anxiety due to
16    having anxiety disorder or anxiety due
17    to postconcussive syndrome, et cetera,
18    for those other symptoms.
19    Q.   If we go to the next paragraph,
20 Dr. Lichtenstein writes in the middle of
21 the paragraph, "although most of her
22 classes do not require her to take exams,
23 she has been receiving double time on her
24 exams when needed and uses the full amount
25 of time allotted".

K. Shiber

1
2       Do you see that?
3    A.   Yes.
4    Q.   "At the present time Kate
5 continues to have occasional headaches and
6 sensitivity to prolonged loud noises".
7       Do you see that?
8    A.   Yes.
9    Q.   "According to Kate, her doctors
10 have expressed uncertainty as to whether
11 she will continue to require academic
12 accommodations in the future".
13       Do you see that?
14    A.   Yes.
15    Q.   What doctors expressed this
16 uncertainty as to whether you would
17 continue to require academic
18 accommodations?
19       MR. HELLER: Objection.
20       THE WITNESS: I don't recall
21    which doctors.
22    Q.   Do you recall having that
23 conversation with anyone about whether you
24 would be able to continue academic
25 accommodations?

21 (Pages 78 - 81)

Page 82

K. Shiber

1
2    A.   No, I don't recall any
3  conversations like that.
4    Q.   Do you recall that conversation
5  with Dr. Lichtenstein?
6    A.   Could you clarify which
7  conversation do I recall with Dr.
8  Lichtenstein?
9    Q.   Do you recall a conversation
10  with Dr. Lichtenstein as to whether you
11  might continue to require academic
12  accommodations in the future?
13    A.   Yes, that was part of -- yes.
14    Q.   And then the next time you saw
15  Dr. Lichtenstein was January, 2018.
16      Do you recall that?
17    A.   Yes.
18    Q.   Dartmouth has a winter term, is
19  that right, a winter break period?
20    A.   Yes.
21    Q.   What are the months of that?
22    A.   The winter break is from just
23  before Thanksgiving until just after New
24  Year's.
25    Q.   Is there a reason you didn't

Page 83

K. Shiber

1
2  return to Dr. Lichtenstein in the fall of
3  2017 for a test as he had recommended?
4      MR. HELLER: Do you mean fall of
5    2018? I'm sorry.
6      MS. SKIBITSKY: Fall of 2017.
7      THE WITNESS: I believe it was
8    due to scheduling, but I don't recall
9    the exact reason.
10    Q.   And so the next time that you
11  saw Dr. Lichtenstein was January 31, 2018;
12  is that right? If we're looking at this
13  provider record, page seven, the top note
14  says January 31, 2018.
15    A.   Yes.
16    Q.   At that point had you already
17  started classes again at Dartmouth?
18    A.   Yes.
19    Q.   Had you already established your
20  accommodations for that semester at
21  Dartmouth?
22    A.   I believe it was a continuation
23  of the existing accommodations but it
24  wasn't new ones.
25    Q.   Okay.

Page 84

K. Shiber

1
2      And at this January, 2018 visit,
3  Dr. Lichtenstein performed another series
4  of tests; is that right?
5    A.   Yes.
6    Q.   And Dr. Lichtenstein opined that
7  there was evidence again that you did not
8  consistently perform to the best of your
9  ability, rendering the results invalid;
10  isn't that right?
11      MR. HELLER: Objection.
12      THE WITNESS: I don't recall
13    that.
14    Q.   If we look under the summary and
15  recommendations section on page seven, it
16  says, "Kate's objective test performance
17  ranged dramatically from impaired to very
18  superior. However, there is evidence that
19  she did not consistently perform to the
20  best of her ability, rendering the results
21  invalid and interpretation of poor
22  performance undetermined".
23      Do you see that?
24    A.   Yes.
25    Q.   And isn't it true that you were

Page 85

K. Shiber

1
2  not consistently performing to the best of
3  your ability on these exams in March of
4  2018? Sorry, in January of 2018?
5      MR. HELLER: Objection.
6      THE WITNESS: I don't think
7    that's true.
8    Q.   You don't recall underperforming
9  intentionally during the January, 2018
10  testing by Dr. Lichtenstein?
11      MR. HELLER: Objection.
12      THE WITNESS: No, I did not
13    underperform intentionally.
14    Q.   And do you recall that Dr.
15  Lichtenstein believed that you were
16  capable of stronger functioning than the
17  functioning you exhibited during his
18  exams?
19      MR. HELLER: Objection.
20      THE WITNESS: I do recall that.
21    Q.   And what did he say to you about
22  that, the fact that you were capable of
23  better performance than what you performed
24  during his exams?
25    A.   What I recall from that

22 (Pages 82 - 85)

K. Shiber

1
2 discussion was that any lack of
3 demonstration of my performance abilities
4 was due to -- he determined to be due to
5 my anxiety and emotions interfering.
6    Q.   And you told Dr. Lichtenstein
7 that you were concerned about losing your
8 accommodations; isn't that right?
9    A.   I don't recall what I told him.
10    Q.   One of the accommodations that
11 you wanted was sporadic absences; is that
12 right?
13    A.   One of the accommodations that I
14 had had and was looking to be extended was
15 sporadic absences.
16    Q.   And you recall that Dr. Hu told
17 you that he doesn't generally support an
18 accommodation of sporadic absences?
19    A.   I don't recall that, but I have
20 seen that in the documents, his note.
21    Q.   Did you have discussions with
22 Dr. Hu about the request for the
23 accommodation of sporadic absences?
24    A.   I don't recall any specific
25 discussions about them.

K. Shiber

1
2    Q.   And in January of 2018, Dr.
3 Lichtenstein notes that -- this is the
4 very bottom of page seven -- that "Kate
5 revealed a significant amount of anxiety
6 that has been interfering with involvement
7 in daily activities, including a lack of
8 interest engaging on social activities,
9 withdrawal, and isolation".
10    Do you see that?
11    A.   Yes.
12    Q.   So you were experiencing
13 withdrawal and isolation in January, 2018?
14    A.   Yes.
15    Q.   Dr. Lichtenstein again says in
16 his January, 2018 report -- this is on
17 PROVIDERS_6 -- in the middle of the page
18 there's a paragraph that starts "Kate
19 reported significant concerns".
20    A.   Yes.
21    Q.   It says, "she recently received
22 a diagnostic evaluation at Dick's House.
23 Kate stated that it was recommended that
24 she work with a provider in the community
25 rather than with mental health providers

K. Shiber

1
2 at Dick's House.  However, Kate has not
3 followed up on seeking psychotherapy
4 services".
5    Do you see that?
6    A.   Yes.
7    Q.   It's true that you did not
8 follow up with seeking psychotherapy
9 services in January, 2018 outside of
10 Dick's House; correct?
11    A.   I don't recall if I had followed
12 up on seeking psychotherapy services at
13 that time.
14    Q.   At any time when you were at
15 Dartmouth, did you seek psychotherapy
16 services outside of Dick's House?
17    A.   Yes.
18    Q.   And who did you seek those
19 services from?
20    A.   I contacted providers in the
21 area, including Hanover Psychiatry.  I
22 don't recall any other specific providers.
23    Q.   Did you actually meet with any
24 of those providers who you contacted?
25    A.   I don't recall.

K. Shiber

1
2    Q.   And you testified that you met
3 with two individuals at Dartmouth who you
4 said had -- were trained in evidence-based
5 therapy; is that right?
6    A.   Yes, I said that.
7    Q.   And that was Todd Lindsley and
8 was that Sarah Chung?
9    A.   Probably.
10    Q.   How do you know that they were
11 trained in evidence-based therapy?
12    MR. HELLER: Objection.
13    THE WITNESS:  I don't know
14 specifically.  It was my understanding
15 that, since I was recommended to seek
16 evidence-based therapy and recommended
17 to see them, that they would have been
18 trained in it, but I don't know their
19 exact qualifications.
20    Q.   And you only saw each of them
21 one time; is that right?
22    A.   I believe so.
23    Q.   You've testified that you
24 experienced anxiety while at Dartmouth.
25    Can you tell me the symptoms of

23 (Pages 86 - 89)

K. Shiber

1        K. Shiber
2 anxiety you experienced while at
3 Dartmouth?
4        MR. HELLER: Objection.
5        You can answer.
6        THE WITNESS: I experienced
7    racing thoughts, ruminating thoughts,
8    panic attacks, avoidance of social
9    situations, isolation, withdrawal,
10   difficulty focusing, long-term
11   planning, compulsive behaviors. There
12   may have been other symptoms that I'm
13   not listing now.
14   Q.   Did you experience depression
15 while at Dartmouth?
16   A.   Yes.
17   Q.   Were you treated for anxiety at
18 Dartmouth?
19   A.   Can you define "treatment"?
20   Q.   Did you see any medical
21 providers to help treat anxiety while at
22 Dartmouth?
23   A.   Yes.
24   Q.   Who did you see?
25   A.   I saw Dr. Da-shih Hu, I saw

1        K. Shiber
2 Marylee Verdi, I saw several other nurses
3 I don't recall the names of, I saw Dr.
4 Lichtenstein, I saw the therapist you
5 previously named. Again, there may be
6 other providers that I'm not including
7 now.
8    Q.   You didn't see Dr. Lichtenstein
9 to treat anxiety; did you?
10       MR. HELLER: Objection.
11       THE WITNESS: Can you define
12   "treat", please?
13   Q.   When you saw Dr. Lichtenstein,
14 you didn't see him with the intention of
15 getting medication prescribed because of
16 anxiety or coping mechanisms to deal with
17 anxiety; did you?
18   A.   I would disagree with that. I
19 think that he evaluated -- he observed and
20 -- he observed my anxiety and part of
21 coping with the symptoms -- the
22 accommodations were involved in coping
23 with the symptoms, and he also recommended
24 other treatments, like therapy and the
25 others that he's listed here for treating

1        K. Shiber
2 the anxiety.
3    Q.   And did Dr. Hu prescribe you any
4 medications to deal with anxiety?
5    A.   I don't know that Dr. Hu
6 specifically was the one to prescribe them
7 for an anxiety-specific medication.
8    Q.   Were you prescribed anxiety or
9 mood-related medications while at
10 Dartmouth?
11   A.   Yes.
12   Q.   And what medications were those?
13   A.   They were fluoxetine and
14 lamotrigine.
15   Q.   When were you prescribed those?
16   A.   I was prescribed fluoxetine
17 around winter of 2018. I don't recall
18 exactly when I was prescribed the
19 lamotrigine.
20   Q.   Did Dr. Hu give you any other
21 plan or medication in order to treat
22 either anxiety or mood disorder?
23   A.   Yes, he made a variety of
24 recommendations beyond the medication.
25   Q.   What were those recommendations?

1        K. Shiber
2    A.   They were seek therapy, maintain
3 a consistent sleep schedule and sleep
4 hygiene, and other lifestyle factors that
5 are known to help with those conditions.
6    Q.   What were those other lifestyle
7 factors?
8    A.   I don't recall exactly what Dr.
9 Hu said at the time.
10   Q.   Did Marylee Verdi -- is it
11 Verity or Verdi?
12   A.   I don't really know.
13   Q.   Did Nurse Marylee prescribe any
14 medications?
15   A.   Yes, I believe so.
16   Q.   Do you recall what she
17 prescribed?
18   A.   I believe she initially
19 prescribed the fluoxetine. Like I
20 mentioned, it may have been Dr. Hu, it may
21 have been her.
22   Q.   And did Nurse Marylee prescribe
23 any mechanisms or recommendations for
24 dealing with anxiety or mood disorder?
25   A.   Yes, she recommended additional

24 (Pages 90 - 93)

Page 94

K. Shiber

1  mechanisms.
2
3      Q.   And what did she recommend?
4      A.   There was -- there were many, so
5  this may not be exhaustive, but she
6  recommended maintaining a consistent sleep
7  schedule, getting a sufficient amount of
8  sleep every night, she recommended eating
9  nutritiously, pursuing regular exercise,
10  spending time socializing in the
11  community, therapy.  There may be
12  additional things I'm not recalling now.
13      Q.   Did you receive therapy while at
14  Dartmouth?
15      A.   Could you please define
16  "therapy"?
17      Q.   Well, you said that Nurse
18  Marylee recommended therapy, so I'm
19  wondering if you took that advice and got
20  therapy, however it was intended by Nurse
21  Marylee.
22      A.   I met with several therapists
23  following that recommendation.  I also
24  feel that I received a form of talk
25  therapy through my ongoing discussions

Page 95

K. Shiber

1
2  with Verdi.
3      Q.   Who were the therapists that you
4  met with following that recommendation?
5      A.   I don't recall the exact order
6  of the therapists in the recommendation,
7  but it included Todd Lindsley and Sarah
8  Chung and, as I mentioned, Verdi.
9      Q.   Do you know why you haven't
10  disclosed Todd Lindsley or Sarah Chung in
11  connection with this litigation?
12      MR. HELLER:  Objection.
13      I think we gave the name of the
14  facility and gave you an authorization
15  for the facility.
16      MS. SKIBITSKY:  Can we mark as
17  Exhibit 2 Plaintiff's response to
18  Defendant's second set of
19  interrogatories.
20      (Whereupon, a document entitled
21  Plaintiff's Response to Defendant's
22  Second Set of Interrogatories was
23  marked Defendant's Exhibit 2
24  for identification.)
25      Q.   Ms. Shiber, you have in front of

Page 96

K. Shiber

1
2  you Exhibit 2 which is titled Plaintiff's
3  Response to Defendant's Second Set of
4  Interrogatories.
5      Do you see that?
6      A.   Yes.
7      Q.   Do you recognize this document
8  as your responses to Centerview's
9  interrogatories, second set?
10      A.   Yes.
11      Q.   And you verified the accuracy of
12  this document; is that correct?
13      A.   Yes.
14      Q.   And this interrogatory number
15  four, if you turn to the first page, it
16  requests the identity of all persons
17  and/or entities who provided you with any
18  health or medical care or consultation
19  from September 1, 2018 to present.
20      Do you see that?
21      A.   Yes.
22      Q.   And then you listed a number of
23  individuals on pages two and three of the
24  interrogatory response, but you didn't
25  list these therapists Sarah Chung or Todd

Page 97

K. Shiber

1
2  Lindsley; correct?
3      A.   Correct, they're not listed.
4      Q.   Is there a reason why you didn't
5  list them?
6      A.   My understanding is they're
7  included in all of Dartmouth College
8  Health Service as an entity.
9      Q.   But you listed Marylee Verdi
10  specifically and Da-shih Hu but you didn't
11  list these two other individuals; correct?
12      A.   Yes.
13      Q.   Can you tell me about your
14  relationship with Nurse Verdi?
15      A.   Yes, I can tell you about it.
16      Q.   What was your relationship like
17  with Nurse Verdi?
18      A.   She was -- she was a
19  nurse-practitioner who I saw regularly.
20      Q.   How regularly did you see her?
21      A.   There wasn't an exact cadence,
22  but I saw her over a period of several
23  years.
24      Q.   And you texted with her;
25  correct?

K. Shiber

1
2    A.   Yes.
3    Q.   How often did you text with her?
4    A.   Not often.
5    Q.   Did you text with her after you
6 left Dartmouth?
7    A.   Yes.
8    Q.   Do you recall when you texted
9 with her after you left Dartmouth?
10    A.   I recall that I texted with her
11 in July of 2020.  I don't recall any other
12 times when I texted with her.
13    Q.   Why did you text with her in
14 July of 2020?
15    A.   I was experiencing a medical --
16 what I thought might be a medical issue
17 and wanted her opinion.
18    Q.   What was the medical issue you
19 were experiencing in July of 2020?
20    A.   I was having elevated heart rate
21 and a sense of light-headedness over a
22 period of a few hours.
23    Q.   Do you recall what was exchanged
24 in those text messages back and forth in
25 July of 2020 between you and Nurse Verdi?

K. Shiber

1
2    A.   No, I don't recall the
3 specifics.
4    Q.   Do you recall what Nurse Verdi
5 told you in July of 2020?
6    A.   In the text messages?
7    Q.   Yes.
8    A.   No.
9    Q.   Did you speak with her on the
10 phone in connection with that discussion
11 about the symptoms you were experiencing
12 in July of 2020?
13    A.   Yes.
14    Q.   And what was -- can you tell me
15 everything that you recall about that
16 conversation you had with her in July of
17 2020?
18    A.   I recall that she asked about
19 how I was -- from my recollection, we
20 spoke the day following when I was
21 experiencing that incident.  She asked how
22 I was feeling and she recommended that I
23 see a doctor, medical provider
24 immediately.
25    Q.   And did you?

K. Shiber

1
2    A.   Yes.
3    Q.   Who did you see?
4    A.   Outer Cape Health Services.
5    Q.   And what did Outer Cape Health
6 Services tell you you were experiencing?
7    A.   They told me it was likely that
8 I had experienced a supraventricular
9 tachycardia.
10    Q.   Do you know what that is?
11    A.   My understanding is that it's
12 when your -- there's like an issue with
13 the electrical system of your heart and it
14 briefly misfires and then tries to get
15 back on a steady heartbeat and it can
16 cause the elevated heart rate and chest
17 pain that I was experiencing.
18    Q.   And did Outer Cape Health
19 Services prescribe you with any medication
20 or treatment plan to deal with that
21 situation?
22    A.   Yes, they recommended a
23 treatment plan.
24    Q.   What was the treatment plan?
25    A.   The treatment plan was to rest,

K. Shiber

1
2 stay hydrated, avoid caffeine.  I believe
3 there may have been other things they
4 recommended.
5    Q.   You deleted the text messages
6 you exchanged with Nurse Verdi; correct?
7    A.   No.
8    Q.   Do you still have the text
9 messages with Nurse Verdi?
10    A.   No.
11    Q.   What happened to the text
12 messages you exchanged with Nurse Verdi?
13    A.   My phone automatically deletes
14 all text messages over thirty days old.
15    Q.   When you brought this
16 litigation, you didn't take any
17 precautions to preserve any documents or
18 communications that might be responsive to
19 the litigation?
20        MR. HELLER: Objection to the
21 implication that these text messages
22 are responsive to this litigation.
23        You can answer.
24        THE WITNESS:  I made an effort
25 to maintain any documents or

Page 102

1          K. Shiber
2    communications that may be responsive
3    to litigation.
4    Q.   What did you do in your efforts
5    to maintain any documents or
6    communications that might be relevant to
7    the litigation?
8          MR. HELLER: At what time are you
9    talking about?
10         THE WITNESS:  At what point?
11   Q.   At what point did you determine
12   that you would potentially bring a lawsuit
13   against Centerview?
14         MR. HELLER: Objection.
15         Answer if you can.
16         THE WITNESS:  I can't say the
17   exact date.  It was following my
18   termination.
19   Q.   How long after your termination
20   did you speak with a lawyer?
21   A.   The next day.
22   Q.   Did you take any steps to make
23   sure that any relevant or responsive
24   documents or communications were being
25   preserved?

Page 103

1          K. Shiber
2    A.   Yes.
3    Q.   What steps did you take?
4    A.   I kept track of my job search
5    history as I tried to find a new job
6    following the termination, I maintained
7    e-mail communications that I had with the
8    firm, any notes or other documents that I
9    had about the situation.
10   Q.   After you were terminated from
11   Centerview -- that occurred on August 15,
12   2020; is that correct?
13   A.   No.
14   Q.   I'm sorry, September 15, 2020;
15   is that correct?
16   A.   Yes.
17   Q.   Did you text anyone that day
18   after your termination?
19   A.   In general or about this?
20   Q.   In general.
21   A.   I may have texted people on that
22   day.
23   Q.   Would you have texted anyone
24   about the termination?
25   A.   No.

Page 104

1          K. Shiber
2    Q.   Why not?
3    A.   Because following the
4    termination, I was extremely shocked,
5    embarrassed, ashamed, upset, freaking out
6    about the situation, and would not have
7    wanted to share that information with
8    anyone over text message.
9          MS. SKIBITSKY: Should we go off
10   the record for a minute.
11         MR. HELLER: Sure.
12         THE VIDEOGRAPHER: We are now off
13   the record.
14         The time on the video monitor is
15   12:24 p.m.
16         (Whereupon a break was taken)
17         THE VIDEOGRAPHER: We are now
18   back on the record.
19         The time on the video monitor is
20   12:37 p.m.
21         MS. SKIBITSKY: Janice, can we
22   mark tab C as Exhibit 3, please.
23         (Whereupon, a document entitled
24   Plaintiff's Initial Disclosures
25   was marked Defendant's Exhibit 3

Page 105

1          K. Shiber
2    for identification.)
3    Q.   Ms. Shiber, do you have
4    Exhibit 3 in front of you?
5    A.   Yes.
6    Q.   And so do you see this is
7    Plaintiff's initial disclosures?
8    A.   Yes.
9    Q.   Have you seen this document
10   before?
11   A.   Yes.
12   Q.   Can we turn to the last page of
13   the document, page ten.
14   A.   Yes.
15   Q.   Under the section front pay for
16   the next five years, do you see that?
17   A.   Yes.
18   Q.   Let's look at the middle
19   paragraph there.  It says, "Shiber also
20   seeks compensatory damages for the
21   emotional anxiety, distress, and
22   significant diminution in the quality of
23   her life as a result of Centerview's
24   discrimination, which will continue in the
25   future and remain an irreparable and

27 (Pages 102 - 105)

Page 106

```
 1              K. Shiber
 2 irreversible source of loss".
 3          Do you see that?
 4    A.   Yes.
 5    Q.   Isn't it true that today you're
 6 living your best life in your attempts to
 7 be a full-time artist?
 8    A.   No.
 9    Q.   Isn't it true that you're trying
10 to make art your full-time job?
11    A.   No.
12    Q.   Isn't it true that being an
13 artist is your dream, a full-time artist
14 is your dream?
15    A.   Can you define "dream"?
16    Q.   Ms. Shiber, you have several Tik
17 Tok accounts; is that right?
18    A.   Not currently.
19    Q.   Did you at one point have Tik
20 Tok accounts?
21    A.   Yes.
22    Q.   And is one of the handles
23 @kathrynshiber?
24    A.   Yes.
25        MS. SKIBITSKY: I'd like to mark
```

Page 107

```
 1              K. Shiber
 2 as Exhibit 4 a Tik Tok that Centerview
 3 has produced and it's bearing Bates
 4 label Centerview 3208.
 5        And this Tik Tok I can represent
 6 is dated February 17, 2021.
 7        (Whereupon, a video file
 8 was deemed marked Defendant's
 9 Exhibit 4 for identification.)
10    Q.   Ms. Shiber, before we play it,
11 do you recognize this Tik Tok?
12    A.   So far, yes.
13        MS. SKIBITSKY: You can play
14 that.
15        (Whereupon a video was played)
16    Q.   Okay.
17        Do you recall recording that Tik
18 Tok, Ms. Shiber?
19    A.   Yes.
20    Q.   And that was recorded in
21 February of 2021?
22    A.   Yes.
23    Q.   And you wrote, "I'm a
24 twenty-one-year-old photographer in San
25 Francisco chasing my dream of being an
```

Page 108

```
 1              K. Shiber
 2 artist full time"; correct?  We can play
 3 it again, if that would be helpful.
 4    A.   Sure.
 5        MS. SKIBITSKY: And stop it at
 6 four seconds.
 7        (Whereupon a video was played)
 8        THE WITNESS:  Yes.
 9    Q.   And so as of February, 2021, you
10 were a twenty-one-year-old photographer in
11 San Francisco chasing your dream of being
12 an artist full time; correct?
13    A.   No.
14    Q.   What is not correct about that?
15    A.   What's not correct is that
16 wasn't my real dream.  I wasn't being an
17 artist full time.  And those parts are not
18 correct.
19    Q.   What was your real dream?
20    A.   My dream was to work at
21 Centerview.
22    Q.   Isn't it true that you were
23 putting all of your time, effort, and
24 money into pursuing art full time as of
25 February, 2021?
```

Page 109

```
 1              K. Shiber
 2    A.   No.
 3    Q.   Why did you publish this Tik Tok
 4 if it's not true that you were chasing
 5 your full-time dream of being an artist as
 6 of February, 2021?
 7    A.   I was trying to grow a following
 8 on Tik Tok related to being an artist and
 9 gain customers through the platform.
10    Q.   Did that work?
11    A.   Define "work".
12    Q.   Did you gain customers through
13 the platform of Tik Tok?
14    A.   I don't believe so.
15    Q.   Have you made any money off of
16 selling your artwork?
17    A.   Yes.
18    Q.   How much money have you made off
19 of selling your artwork?
20    A.   At what point in time?
21    Q.   From -- let's start at the
22 period of time that you were employed by
23 Centerview.
24        So July, 2020 through
25 September 15, 2020, how much money did you
```

28 (Pages 106 - 109)

1          K. Shiber
2  make during that time selling your
3  artwork?
4     A.   During that time, I don't
5  believe I made any money selling my
6  artwork.
7     Q.   From September 15 to present,
8  how much money have you made selling your
9  artwork?
10    A.   Can you define "money made",
11 please?
12    Q.   How much have customers paid you
13 for the artwork that you've made?  So I'm
14 not talking net profits, I'm talking total
15 if you calculate all of the pieces you've
16 sold and the money you received from
17 customers, what does that total from
18 September 15, 2020 to present?
19    A.   I don't recall the exact total.
20 I would estimate between ten and $30,000.
21    Q.   Is there a reason you didn't
22 disclose this to Centerview in the
23 Exhibit 4 that we're looking at,
24 Plaintiff's initial disclosures?  Take a
25 look at page nine, third paragraph from

1          K. Shiber
2  the bottom.  It starts in the fourth
3  paragraph from the bottom, "accordingly,
4  Shiber could have earned ██████████
   ████████████████████████
   ████████████  since her unlawful
7  termination.  Shiber deducts from this
8  amount what she has actually earned since
9  her termination on September 15, 2020".
10         Did you disclose at any point
11 this ten to thirty thousand?
12         MR. HELLER:  I'm going to
13    represent on the record these numbers
14    do include that figure.
15         MS. SKIBITSKY:  Brian, this
16    question is for the witness.
17         MR. HELLER:  You are
18    misrepresenting the record and I'm
19    trying to correct it.  If you don't
20    want me to correct it, then that's
21    fine, then ask your incorrect question
22    and you'll get an incorrect answer.
23         MS. SKIBITSKY:  I can ask the
24    witness the question that I like and
25    she can answer accurately.

1          K. Shiber
2          MR. HELLER:  Okay.  I thought you
3    wanted information.
4          MS. SKIBITSKY:  I did not ask you
5    a question, Brian.
6     Q.   Ms. Shiber, did you disclose any
7  income you've received from your art in
8  this document?
9          MR. HELLER:  Objection.
10         THE WITNESS:  Yes, it's included
11 in my -- in the sentence "worked as a
12 consultant".
13    Q.   And so which of these amounts
14 reflect the income you've received as an
15 artist since September 15, 2020?
16    A.   All of them reflect any earnings
17 from being an artist.
18    Q.   So when it says, "Shiber has
19 worked as a consultant from which she
20 earned $3,999 in 2020", does that term
21 "consultant" include the work you were
22 doing selling art?
23    A.   Yes.
24    Q.   Do you consider yourself a
25 consultant as an artist?

1          K. Shiber
2     A.   Yes.
3     Q.   And then in 2021, there's
4  $30,215 listed.
5          Does that account for all of the
6  income you've made selling art in 2021?
7     A.   Yes.  These figures are net
8  income during those time periods.
9     Q.   And then it says in the first
10 six months of 2022, there's six thousand.
11         Does that account for any of the
12 artwork you've sold in the first six
13 months of 2022?
14    A.   Yes.
15    Q.   Isn't it true, Ms. Shiber, that
16 you were spending all of your time,
17 effort, and money into pursuing art full
18 time in 2021?
19    A.   No.
20         MS. SKIBITSKY:  I'd like to mark
21    as Exhibit 6 tab NNN.  This is another
22    Tik Tok from the Kathryn Shiber
23    account.
24         (Whereupon, a video file
25    was deemed marked Defendant's

Page 114

1          K. Shiber
2  Exhibit 5 for identification.)
3          MR. HELLER: Is this five or six?
4          MR. VALENTINO: I think we're up
5  to five.
6          MR. HELLER: I don't have a five.
7          MS. SKIBITSKY: Oh, right because
8  we don't have hard copies. This is
9  six because the last Tik Tok was
10  Exhibit 5.
11          MR. HELLER: Then what was four?
12          MS. SKIBITSKY: Four was the
13  initial disclosure.
14          Can we go off the record for a
15  second.
16          THE VIDEOGRAPHER: We are now off
17  the record.
18          The time on the video monitor is
19  12:49 p.m.
20          (Whereupon a break was taken)
21          THE VIDEOGRAPHER: We are now
22  back on the record.
23          The time on the video monitor is
24  12:50 p.m.
25      Q.   Ms. Shiber, this is a Tik Tok

Page 115

1          K. Shiber
2  that I can represent is dated February 28,
3  2021 that Centerview produced at 3254.
4          Do you recognize this without us
5  first playing it?
6      A.   Yes.
7      Q.   And do you recall preparing this
8  Tik Tok?
9      A.   No.
10      Q.   Do you see at the very beginning
11  it says, "me putting all my time, effort,
12  and money into pursuing art full time"?
13      A.   Yes.
14      Q.   And isn't it true that in
15  February of 2021, you were putting all
16  your time, effort, and money into pursuing
17  art full time?
18      A.   No.
19      Q.   Why did you publish this
20  statement?
21      A.   Similar to the previous one. I
22  was trying to grow a Tik Tok account
23  related to my art in an attempt to gain
24  customers and makes sales of art through
25  the platform.

Page 116

1          K. Shiber
2          MS. SKIBITSKY: Let's play this,
3  Janice, please.
4          (Whereupon a video was played)
5      Q.   What is it that you were doing
6  full time in February of 2021 if you were
7  not devoting all of your time and
8  resources into making art your full-time
9  job?
10      A.   I wasn't doing anything specific
11  full time.
12      Q.   What were you doing in general
13  in February, 2021? How were you spending
14  your days?
15      A.   I was applying to jobs, I was
16  applying for consulting projects, I was
17  attempting -- I was making art and
18  attempting to make money through selling
19  that art, I was spending time with
20  friends, exercising, sleeping, eating,
21  feeling upset about the fact that I had
22  just lost what I considered to be my dream
23  job, and I was feeling hopeless about my
24  career prospects going forward.
25      Q.   So is it the case that we can't

Page 117

1          K. Shiber
2  trust the representations that you make on
3  Tik Tok to be accurate?
4      A.   Yes.
5      Q.   Can we trust the representations
6  that you make to medical providers to be
7  accurate?
8      A.   Yes.
9          MS. SKIBITSKY: I'm going to mark
10  this.
11          (Whereupon, a document entitled
12      Progress Notes was marked Defendant's
13      Exhibit 6 for identification.)
14      Q.   Ms. Shiber, you testified
15  earlier that working at Centerview was
16  your dream job; right?
17      A.   Yes.
18      Q.   That's not true; is it?
19      A.   It is true.
20      Q.   Being an artist is your dream
21  job?
22      A.   No.
23      Q.   Isn't it true that you want to
24  work -- isn't it true that you want to
25  work just as hard enough at a day job to

Page 118

1          K. Shiber
2 be good enough but spend most of your
3 attention on art?
4     A.   I believe you're referencing
5 this document.  I do recall saying that.
6     Q.   Let's look at the document.
7         This is Exhibit 6 in front of
8 you, Ms. Shiber.
9         Do you have progress notes from
10 Allison Lee in front of you?
11    A.   Yes.
12    Q.   And the first one is dated
13 January 18, 2022.
14        Do you see that?
15    A.   Yes.
16    Q.   Who is Allison Lee?
17    A.   Allison Lee is a psychiatrist
18 and therapist.
19    Q.   When did you start seeing Dr.
20 Lee?
21    A.   In the fall of 2021.
22    Q.   And let's look at page
23 PROVIDERS_66.  Actually, let's look at
24 PROVIDERS_70.
25        This is a progress note from

Page 119

1          K. Shiber
2 October 28, 2021.
3         Do you see that?
4     A.   Yes.
5     Q.   And under subjective, Dr. Lee
6 writes, "taking meds as prescribed.  Mood
7 stable.  Eclectic particular therapy.
8 Themes: Art show coming up next weekend in
9 Brooklyn; biggest yet".
10        Do you recall that, the art show
11 coming up in Brooklyn in October of 2021?
12    A.   Yes.
13    Q.   And did you spend a lot of time
14 preparing for that art show?
15    A.   Yes.
16    Q.   How much time did you spend
17 working on your art while you were at
18 Centerview?
19    A.   Minimal time.  I can't give an
20 exact number.
21    Q.   Was it more than ten hours a
22 week?
23    A.   No.
24    Q.   Was it more than ten hours a
25 month?

Page 120

1          K. Shiber
2     A.   I don't believe so.
3     Q.   How much time have you spent
4 working on your art since you left
5 Centerview on a weekly basis?
6     A.   It's been highly dependent on
7 the week.
8     Q.   How many hours per day on
9 average do you spend working on your art?
10    A.   I don't think I can give an
11 amount on average throughout the entire
12 time period you're referencing.
13    Q.   Let's talk about September, 2020
14 after you left Centerview.
15        How much time per day did you
16 spend working on your art?
17    A.   For those two weeks, I can't
18 give an exact number.
19    Q.   Can you give an estimate?
20    A.   During those two weeks, I would
21 estimate less than three hours per day.
22    Q.   What was the most you would have
23 been working on your art per day during
24 those two weeks?
25    A.   The most during those two weeks

Page 121

1          K. Shiber
2 I would say three to five hours.
3     Q.   Per day?
4     A.   On any one -- on one day.  Like
5 I said, on average less than three hours.
6     Q.   Isn't it true that even in the
7 fall of 2020 while you were still employed
8 by Centerview, you were applying to open
9 calls at galleries?
10    A.   When is the fall?
11    Q.   September, 2020.
12    A.   I don't believe I applied to any
13 during September, 2020.
14    Q.   Did you apply to any an in the
15 any open galleries at any point in time
16 when you were working at Centerview?
17    A.   Yes.
18    Q.   When?
19    A.   I don't recall the exact date I
20 applied.
21    Q.   What galleries did you apply to?
22    A.   I recall that I applied to an
23 open exhibit, a gallery in Texas.
24    Q.   Okay.
25        And here in this progress note

31 (Pages 118 - 121)

1          K. Shiber
2 from Dr. Lee, you write -- Dr. Lee notes,
3 "initially thought it could only be a
4 hobby for now. Would make banking money
5 and then retire early and do art".
6          Do you see that?
7    A.   Yes.
8    Q.   So your preference was to do
9 art, not make banking money; correct?
10   A.   No.
11   Q.   If you had money enough to
12 retire, isn't it the case that you would
13 just retire and do art full time?
14   A.   I can't speculate about what I
15 would do if I had enough money to retire.
16   Q.   And Dr. Lee goes on to say,
17 "last fall applied to open calls at
18 galleries.  Got one just as lost her job".
19         Do you see that?
20   A.   Yes.
21   Q.   Okay.
22         And so in other words, you were
23 applying to open calls at galleries while
24 you were employed by Centerview; correct?
25   A.   Yes.

1          K. Shiber
2    Q.   And what does one do in order to
3 apply to an open call at a gallery?
4    A.   Submit a portfolio of work and
5 write a brief -- fill out a form, write a
6 brief application statement.
7    Q.   How much time did that take you
8 to apply for an open call at that gallery?
9    A.   Probably less than one hour.
10   Q.   The artwork that you submitted
11 in connection with that application, did
12 you make that artwork while you were at
13 Centerview?
14   A.   I don't recall exactly what art
15 I submitted as part of that application.
16   Q.   And Dr. Lee goes on to say,
17 "thought re artist, why not me.
18 Researched a lot about being a working
19 artist.  Wants to work just hard enough at
20 day job to be good enough but most of
21 attention on art".
22         That's true, isn't it, that you
23 wanted to work just hard enough to be good
24 at day job but most of attention on art?
25   A.   At what point -- at what time

1          K. Shiber
2 period are you asking about?
3    Q.   As of October, 2021, is that
4 true?
5    A.   As of October, 2021, I did say
6 that to Allison Lee.
7    Q.   And as of even today, it's true
8 that you want to focus all of your
9 attention on art; correct?
10   A.   No.
11         MS. SKIBITSKY: Lunch?
12         MR. HELLER: Sure.
13         THE VIDEOGRAPHER: We are now off
14 the record.
15         The time on the video monitor is
16 1:01 p.m.
17         (Lunch recess taken at 1:01
18 p.m.)
19
20
21
22
23
24
25

1          K. Shiber
2    A F T E R N O O N   S E S S I O N
3         January 25, 2023
4         1:39 p.m.
5         THE VIDEOGRAPHER: We are now
6 back on the record.
7         The time on the video monitor is
8 1:39 p.m.
9  K A T H R Y N   S H I B E R, having
10    been previously duly sworn by a
11    Notary Public of the State of
12    New York, upon being examined,
13    testified as follows:
14 EXAMINATION CONTINUED BY
15 MS. SKIBITSKY:
16   Q.   Ms. Shiber, do you still have
17 the records of Dr. Lee in front of you?
18   A.   Yes.
19   Q.   So I had asked you about the
20 statement in Dr. Lee's report that said,
21 "initially thought art could only be a
22 hobby for now; would make banking money
23 and then retire early and do art"; right?
24         And then a few sentences down
25 there's a sentence that says, "wants to

Page 126

1           K. Shiber
2  work just hard enough at day job to be
3  good enough, but most of attention on
4  art".
5        Do you see that?
6  A.   Yes.
7     Q.   And you had testified that, as
8  of October 28, 2021, that was accurate; is
9  that correct?
10  A.   Yes.  I was feeling very
11  disillusioned about my career, had just
12  started a job I wasn't that excited about,
13  and felt like it didn't matter how hard I
14  worked.  If I could just be fired for my
15  disability, then it didn't matter.
16     Q.   So it's true that, as of
17  October 28, 2021, you wanted to work just
18  hard enough at your day job to be good
19  enough but most of your attention you
20  wanted to pay to art; correct?
21  A.   Is that different from the
22  previous question?  I think, yes.
23     Q.   At what point did it become true
24  that you wanted to work just hard enough
25  at your day job to be good enough but

Page 127

1           K. Shiber
2  wanted to devote most of your attention on
3  art?
4  A.   As I thought about my career
5  after losing what had been my dream job
6  and what I thought was going to set me up
7  for the career that I had wanted, that's
8  when I started feeling like there was --
9  it didn't matter how hard I worked because
10  I had worked hard at Centerview, it didn't
11  matter, they fired me because of my
12  disability, so why should it matter how
13  hard I worked at my current day job if
14  that could still happen to me again.
15     Q.   That doesn't really answer the
16  question.
17        At what point in time -- let me
18  put it that way?
19        At what point in time did it
20  become true that you wanted to work just
21  hard enough at your day job and devote
22  most of your attention to art?
23        MR. HELLER:  Objection.
24        THE WITNESS:  I can't say the
25  exact day that that particular

Page 128

1           K. Shiber
2  sentiment became -- I realized that
3  particular sentiment.
4     Q.   Was it true when you were in
5  college?
6  A.   No.
7     Q.   Was it true in October, 2020?
8  A.   I can't say.
9     Q.   Was it true in September, 2020?
10  A.   I can't say.
11     Q.   Was it true in August, 2020?
12  A.   No.
13     Q.   At what point -- I think you
14  testified that this sentiment that is
15  expressed in Dr. Lee's records that we've
16  been discussing is not currently true; is
17  that correct?
18  A.   Yes, I believe I said that.
19     Q.   So your testimony is that it's
20  not currently true that you want to work
21  just hard enough at day job to be good
22  enough but most of attention to devote to
23  art; correct?
24  A.   It's not true currently because
25  I am not devoting most of my attention to

Page 129

1           K. Shiber
2  art.
3     Q.   The question is not whether you
4  are or are not currently devoting most of
5  your attention to art but whether you want
6  to devote most of your attention to art.
7        Today, do you want to be
8  devoting most of your attention to art?
9        MR. HELLER:  Objection.
10        THE WITNESS:  No.
11     Q.   At what point did it not become
12  true that you want to work just hard
13  enough at your day job to be good enough
14  but most attention on art?
15  A.   I can't say at what point that
16  happened.
17     Q.   Was it in November, 2021 that
18  that statement became not true?
19  A.   Sorry, could you clarify which
20  -- like could you just --
21     Q.   I'm trying to get a sense of you
22  told Dr. Lee as we see in those notes --
23  that -- and this is on October 28, 2021
24  you told Dr. Lee that you want to work
25  just hard enough at your day job to be

Page 130

K. Shiber

1
2 good enough but spend most of your
3 attention on art. So we've established
4 that that was said to Dr. Lee in October
5 of 2021.
6          And then I believe your
7 testimony was that you don't currently
8 feel that way, and so I'm trying to get a
9 sense of at what point after this
10 October 28, 2021 meeting did you stop
11 feeling that you wanted to work just hard
12 enough at your day job to be good enough
13 but devote most of your attention to art?
14     A.   I don't know exactly when --
15 when that changed.
16     Q.   Did it change at some point in
17 2021?
18     A.   I don't recall.
19     Q.   Did it change at some point in
20 2022?
21     A.   I don't recall.
22     Q.   Did it change at some point this
23 month?
24     A.   I don't recall.
25     Q.   Did it ever change?

Page 131

K. Shiber

1
2     A.   Yes.
3     Q.   What is it that you currently
4 want to be devoting your attention to now?
5          MR. HELLER: Objection.
6          THE WITNESS: In what context?
7     Q.   Well, this sentence says, wants
8 "to work just hard enough at day job to be
9 good enough but most of attention on art".
10         Is this an accurate
11 representation of your current feelings?
12         MR. HELLER: Objection. Asked
13    and answered multiple times.
14         THE WITNESS: No, it's not a
15    representation of my current feelings.
16     Q.   Can you tell me what your
17 current feelings are on the connection
18 between your day job and your artwork?
19     A.   I don't currently feel that I
20 want to devote most of my attention to
21 art.
22     Q.   What do you currently feel that
23 you want to devote most of your attention
24 to?
25     A.   I want to devote my attention to

Page 132

K. Shiber

1
2 a variety of different things, not
3 necessarily a majority on a specific topic
4 but inclusive of my current day job, art,
5 my health, my family, hobbies,
6 friendships, relationships, a variety of
7 different things.
8     Q.   Are these the same things -- is
9 there anything else that you want to be
10 devoting your attention to today?
11     A.   I guess I did include additional
12 efforts to earn money through consulting
13 beyond my day job.
14     Q.   So when I asked you what do you
15 currently feel that you want to devote
16 most of your attention to today, you gave
17 a list just now; correct?
18     A.   Yes.
19     Q.   In July of 2020 when you started
20 with Centerview, what did you want to
21 devote most of your attention to at that
22 time? Is it the same list or is it a
23 different list?
24     A.   It's a similar list, but I would
25 say that the emphasis on the current day

Page 133

K. Shiber

1
2 job was significantly larger, including --
3 yeah, was significantly more of a focus at
4 that time.
5     Q.   Why is it that your day job is
6 less of a focus at this time on the list
7 of things you want to devote your
8 attention to?
9     A.   Because I feel like no matter
10 how much attention I focus on my day job,
11 it can always be taken away from me by
12 surprise without my feelings -- without
13 doing anything wrong, for being disabled.
14 So I don't think that -- I'm currently
15 feeling disillusioned with -- and feeling
16 like it's not worth focusing on my
17 performance at my day job because I could
18 lose it regardless.
19     Q.   What is your current day job?
20     A.   I'm a strategic financial
21 analyst at Google.
22     Q.   What are your hours with Google?
23     A.   There's no set hours.
24     Q.   Is it a consulting job or is it
25 a salary-based job?

34 (Pages 130 - 133)

K. Shiber

1
2    A.   It's a full-time salary
3    position.
4    Q.   Do you work from home?
5    A.   I have a hybrid schedule.
6    Q.   Okay.
7         Do you typically start your day
8    at a certain time?
9    A.   Yes.
10   Q.   What time do you usually start
11   your day?
12   A.   I start working between --
13   around 8:00 a.m.
14   Q.   And what time do you typically
15   end your day, your working day?
16   A.   It really depends on the day.
17   Typically between 5:00 p.m. and 8:00 p.m.
18   Q.   Have you requested any
19   accommodations from Google with respect to
20   your disabilities?
21   A.   No.
22   Q.   Can we look at Plaintiff's
23   initial disclosures, which I believe is
24   Exhibit 3.
25        Ms. Shiber, if we look at page

K. Shiber

1
2    nine here, under back pay from
3    September 15, 2020 [sic] through June 30,
4    2020 [sic], is this a list of what you are
5    demanding from Centerview in connection
6    with this lawsuit for what you claim to be
7    monetary losses from your termination?
8         MR. HELLER: Objection.
9         You can answer.
10        THE WITNESS:  I believe that
11   this is a component of the full amount
12   of monetary loss.
13   Q.   Okay.
14        And in the middle section of the
15   document it says, "accordingly, Shiber
16   could have earned $▓▓▓▓▓ since her
17   unlawful termination".
18        Do you see that?
19   A.   Yes.
20   Q.   And then it goes on to deduct
21   from this amount what you actually earned
22   since your termination on September 15,
23   2020; correct?
24   A.   Yes.
25   Q.   You were offered a job that

K. Shiber

1
2    would have paid $85,000 as a base salary
3    with Compass; correct?
4    A.   Yes.
5    Q.   And you declined to take that
6    job?
7    A.   Yes.
8    Q.   Why did you decline to take at
9    that job offer?
10   A.   There were several reasons, one
11   of which I did not think that the salary
12   and bonus amount was an appropriate market
13   rate.  And I also felt uncomfortable with
14   some of the conditions of the employment
15   contract.  And it also felt -- yeah,
16   that's it.
17   Q.   What were the conditions of the
18   employment contract that you were
19   uncomfortable with?
20   A.   There were conditions related to
21   outside work that I did not want to --
22   that I didn't feel comfortable with.
23   Q.   What were those conditions?
24   A.   That I could not -- from my
25   recollection, it was that I could not earn

K. Shiber

1
2    money from sources besides Compass during
3    the time of my employment.
4    Q.   What were the sources of income
5    other than Compass that you would have
6    been interested in earning money from had
7    you taken the Compass position?
8    A.   I can't speculate what I would
9    have done had I taken the Compass
10   position.
11   Q.   My question is what were the
12   sources of income other than Compass that
13   made you uncomfortable with accepting that
14   restriction in the Compass employment
15   agreement?
16   A.   I was earning money as a
17   consultant and was also in the process of
18   trying to earn money from my art and had
19   also recently gotten a real estate license
20   which I had been interested in pursuing as
21   another source of income.
22   Q.   Who were you consulting for --
23        MS. SKIBITSKY: Let me take a
24   step back.
25   Q.   When did you receive the Compass

35 (Pages 134 - 137)

1          K. Shiber
2 offer?
3    A.   It was January of 2021.
4         MS. SKIBITSKY: Okay.
5         Can we mark as Exhibit 7,
6    please.
7         (Whereupon, a letter dated
8    December 23, 2020 was marked
9    Defendant's Exhibit 7
10   for identification.)
11   Q.   Ms. Shiber, do you have exhibit
12 in front of you?
13   A.   Yes.
14   Q.   Is this the Compass offer letter
15 that you received?
16   A.   I believe so.
17   Q.   And you can see the date on this
18 is December 3 -- I'm sorry, December 23,
19 2020; correct?
20   A.   Yes.
21   Q.   So close in time to the January,
22 2021 date that you had previously
23 testified to?
24   A.   Yes.
25   Q.   And this December 23, 2020 offer

1          K. Shiber
2 came just a few months after your
3 termination from Centerview; right?
4         MR. HELLER: Objection.
5         You can answer.
6         THE WITNESS: Yes.
7    Q.   Okay.
8         So you testified that you turned
9 down the offer because you were
10 uncomfortable with the restriction that
11 you couldn't be earning money from other
12 sources, and one of those sources that you
13 were earning money from, as you testified,
14 was as a consultant; right?
15   A.   Yes, I also said I was
16 uncomfortable because of the salary
17 amount.  But yes, one source was as a
18 consultant.
19   Q.   Were you consulting for anyone
20 in particular as of December, 2020?
21   A.   Yes.
22   Q.   Who were you consulting for as
23 of December, 2020?
24   A.   As of December, 2020, I was
25 consulting for Threadstone Capital.

1          K. Shiber
2    Q.   What is Threadstone Capital?
3    A.   It's an investment bank.
4    Q.   When did you start consulting
5 for Threadstone Capital?
6    A.   Around November, 2020.
7    Q.   And are you still consulting for
8 Threadstone Capital?
9    A.   No.
10   Q.   How long did that consulting
11 arrangement go?
12   A.   Until January or February of
13 2021.
14   Q.   How many hours a week were you
15 spending as a consultant for Threadstone
16 in November, 2020 through January or
17 February, 2021?
18   A.   I believe it was about twenty
19 hours a week.
20   Q.   Were you paid on an hourly
21 basis?
22   A.   No.
23   Q.   What was your compensation
24 structure?
25   A.   It was a weekly payment.

1          K. Shiber
2    Q.   Do you recall what your weekly
3 payment was?
4    A.   No.
5    Q.   Did you request any
6 accommodations from Threadstone?
7    A.   No.
8    Q.   Do you have a general
9 recollection of what your weekly payment
10 was with Threadstone?
11   A.   I think that it was calculated
12 something like seventy-five or eighty-five
13 thousand divided by like on a weekly
14 basis.
15   Q.   Was it seventy-five or eighty
16 thousand per year that was then divided by
17 the weeks of the year?
18   A.   Yes, sorry.
19   Q.   Okay.
20        But it wasn't a salary-based
21 position; is that right?
22   A.   No, it was a contract position.
23   Q.   And you also were interested in
24 making money through selling artwork,
25 which was another reason you turned down

Page 142

1          K. Shiber
2 the Compass offer; is that right?
3     A.    Yes.
4     Q.    And do you have any recollection
5 of how much money you made selling artwork
6 in 2020?
7     A.    No.
8     Q.    Do you keep track of the amount
9 of money you make through selling art?
10    A.    Yes.
11    Q.    How do you keep track of that?
12    A.    I keep a spreadsheet where I
13 keep track of the amount I received for
14 selling the art and subtract expenses
15 related to creating and selling art.
16    Q.    When did you start maintaining
17 that spreadsheet?
18    A.    I think I started maintaining it
19 in conjunction with filing my taxes, so I
20 looked back at my transactions to fill it
21 in.
22    Q.    Do you report to the IRS the
23 money that had you make from your art
24 sales?
25    A.    Yeah, I have an LLC that I use

Page 143

1          K. Shiber
2 for both consulting and art, so and I
3 reflect -- the LLC reports its earnings to
4 the IRS.
5     Q.    Does the LLC differentiate
6 between the consulting work you do and the
7 artwork that you do?
8     A.    No, the LLC doesn't
9 differentiate.
10    Q.    What's the name of the LLC?
11    A.    West Englewood LLC.
12    Q.    How do your customers pay you
13 when they purchase art?
14    A.    It depends on the venue that
15 they purchase.  So I've had customers pay
16 in cash, through the Square point-of-sale
17 system, through Venmo, and I've also
18 received payments when I've sold through
19 an art fair, then the art fair will pay
20 through PayPal.
21    Q.    And you haven't produced any of
22 those payments in connection with this
23 litigation; is that correct?
24    A.    I produced my tax filings which
25 includes payments.

Page 144

1          K. Shiber
2     Q.    You haven't produced that
3 spreadsheet that you've been preparing
4 that identifies your compensation from
5 art; is that correct?
6     A.    I don't believe so.
7     Q.    Okay.
8          So if you were making about
9 seventy-five or eighty thousand from
10 Threadstone and that was divided up
11 weekly, that would be about fourteen
12 hundred per week.
13         Does that sound about right?  I
14 don't need an exact number, but fourteen
15 hundred, fifteen hundred per week while
16 you were advising -- consulting for
17 Threadstone?
18    A.    Yeah, that sounds about right.
19    Q.    And you only advised for --
20 consulted for Threadstone for a few month
21 period from November, 2020 to January or
22 February of 2021; is that right?
23    A.    Yes.
24    Q.    Had you not turned down the
25 Compass position, you would have made

Page 145

1          K. Shiber
2 eighty-five thousand a year before bonus
3 and benefits; correct?
4     A.    I can't say what would have
5 happened had I not turned down the
6 position.
7     Q.    But you understood that the
8 salary they were offering you was $85,000
9 a year without even considering a bonus;
10 correct?
11    A.    Yes.
12    Q.    Okay.
13         And had you made $85,000 over
14 the past two years, you would have
15 necessarily deducted that amount from the
16 amount of damages you're claiming
17 Centerview owes you; correct?
18    A.    Yes, we've deducted how much
19 money I made, so if I made a different
20 amount, we likely would have deducted that
21 as well.
22    Q.    So had you accepted the Compass
23 offer, you would have deducted
24 approximately one hundred seventy thousand
25 from the amount that you're claiming

37 (Pages 142 - 145)

Page 146

K. Shiber

2 Centerview currently owes you of █████
3 is that correct?
4          MR. HELLER: Objection.
5          Are you asking the witness to
6 speculate on what she would have
7 earned or could have earned had
8 something else happened in history?
9          MS. SKIBITSKY: I am asking the
10 witness a question and you're free to
11 object but you're not free to offer
12 speaking objections.
13          MR. HELLER: I'm going to allow
14 the witness to answer the question,
15 but I'm going to direct her not to
16 speculate, which I think you would
17 agree with.
18          MS. SKIBITSKY: And I'm going to
19 ask you to cease the speaking
20 objections. It's not appropriate in
21 this district, Brian.
22          MR. HELLER: I don't think it's
23 appropriate for you to start asking
24 her about what she could have earned,
25 about --

Page 147

K. Shiber

2          MS. SKIBITSKY: I'm going to ask
3 you to stop, Brian. I need you to
4 stop coaching the witness and with the
5 speaking objections. It's not fair to
6 this deposition.
7          MR. HELLER: Your questions are
8 incredibly inappropriate. You're now
9 literally asking her to speculate on
10 what she could have earned. You're
11 basically making argument in the form
12 of questions.
13          MS. SKIBITSKY: Brian, you need
14 to stop with the speaking objection.
15          MR. HELLER: And you haven't even
16 gotten to anything relevant to this.
17          MS. SKIBITSKY: You need to stop
18 with the speaking objections.
19          MR. HELLER: These aren't
20 speaking objections, Hope, this is me
21 responding to you and your accusations
22 that I'm making speaking objections.
23 And I'm allowed to make my point on
24 the record.
25          I also want to note you haven't

Page 148

K. Shiber

2 gotten to anything relevant to this
3 case yet, and we are not going to
4 agree to a second day.
5          It's your time. You've got
6 seven hours, and I advise you to use
7 it appropriately.
8          MS. SKIBITSKY: You're right,
9 it's my time, and I'd ask you to stop
10 wasting it.
11     Q.   Ms. Shiber, had you accepted the
12 Compass offer, you would have been
13 receiving $85,000 a year in a salary;
14 correct?
15          MR. HELLER: Objection.
16          THE WITNESS: I don't think I
17 can say what I would have received had
18 I accepted. Just accepting on offer
19 doesn't mean I would have worked there
20 the whole year. It doesn't mean I
21 would have earned that exact amount.
22     Q.   Is there any reason for you to
23 believe sitting here today that, if you
24 had accepted the Compass offer, you
25 wouldn't have worked at Compass for a

Page 149

K. Shiber

2 year?
3          MR. HELLER: Objection.
4          Answer if you can.
5          THE WITNESS: I can't speculate
6 on how long I would have worked at
7 Compass should I have accepted the
8 offer.
9     Q.   What is the position that you
10 were hired for for Compass?
11     A.   I wasn't hired for any position.
12     Q.   What was the position that you
13 received an offer for from Compass?
14     A.   Revenue strategy and operations
15 analyst.
16     Q.   And what did that position
17 entail?
18     A.   From my understanding, it
19 entailed analyzing revenue earned by the
20 firm, analyzing the compensation structure
21 that they used with their agents, and
22 participating in directing the strategy of
23 the company.
24     Q.   Is there a reason you haven't
25 produced in this litigation the

38 (Pages 146 - 149)

K. Shiber

1
2 spreadsheet itemizing what you've made
3 selling your art?
4        MR. HELLER: Objection.
5        THE WITNESS: I produced the net
6    outcome of that, which is my tax
7    returns, tax filings.
8    Q.   Ms. Shiber, you were a double
9 major at Dartmouth; right?
10   A.   Yes.
11   Q.   What were those majors?
12   A.   Quantitative social science and
13 studio art.
14   Q.   What is studio art?
15   A.   Studio art is the practice of
16 fine arts, such as photography, painting,
17 drawing, sculpture.
18   Q.   And at some point in time you
19 started applying to jobs; is that correct?
20 Jobs for post graduation from Dartmouth.
21   A.   Yes.
22   Q.   Okay.
23        Where did you apply?
24   A.   I applied to several firms and
25 companies.

K. Shiber

1
2    Q.   Do you recall the names of any
3 of those firms or companies?
4    A.   I recall the names of some but
5 not all of them.
6    Q.   What were the ones that you
7 recall?
8    A.   Centerview, Bank of America,
9 Goldman Sachs, other banks, Wayfair,
10 BlackRock. There were more, but I don't
11 -- maybe more but I don't recall.
12   Q.   Setting aside Centerview, did
13 you receive any offers of employment?
14   A.   I did not receive any other
15 offers of employment for postgraduation
16 jobs at that time.
17   Q.   You did not receive any other
18 offers of employment while you were at
19 Dartmouth for postgraduation jobs other
20 than from Centerview; is that correct?
21   A.   Once I received the offer from
22 Centerview, I withdrew my candidacy at the
23 other firms and companies.
24   Q.   But you had not actually
25 received an offer from the other firms and

K. Shiber

1
2 companies at the time that you were
3 accepted by Centerview; is that correct?
4    A.   That's correct.
5    Q.   What sort of research did you do
6 into what it was like to work at these big
7 investment firms and companies that you
8 identified?
9        MR. HELLER: Objection.
10       You can answer.
11       MS. SKIBITSKY: Let me clarify
12   the question.
13   Q.   At or around the time that you
14 were applying for postgraduation
15 employment, what research did you do into
16 what it was like to work for big companies
17 such as Centerview or Goldman Sachs?
18   A.   I spoke to employees and former
19 interns at those firms. I read online on
20 the companies' websites and on other
21 websites about the roles and
22 responsibilities and what it was like to
23 work at those companies, and I -- yeah,
24 that's the research that I did.
25   Q.   Do you recall anyone in

K. Shiber

1
2 particular who you spoke with about what
3 it was like to work at any of these
4 companies?
5    A.   I spoke to the interviewers of
6 -- my connections at the -- the people I
7 was speaking to in connection with
8 potentially being employed at those
9 companies. I spoke to -- I spoke to
10 friends who were former interns at the
11 firms. I spoke to professional mentor and
12 former employer and prior co-workers.
13   Q.   Did you speak to any of these
14 individuals about what the hours
15 requirement might be at a firm like
16 Centerview?
17   A.   Yes.
18   Q.   And what did -- do you have a
19 specific recollection of any of the
20 conversations with individuals that you
21 just identified, or is it a general
22 recollection of your conversations?
23   A.   I have specific recollections of
24 some of them.
25   Q.   Okay.

39 (Pages 150 - 153)

K. Shiber

1  
2        So let's start with the specific
3  recollections.
4        Who do you specifically recall
5  speaking to?
6     A.   I spoke to -- about Centerview
7  or about all firms?
8     Q.   Who do you recall speaking to
9  about the lifestyle and/or hours
10 expectations of any investment bank?
11       MR. HELLER: Objection.
12       You can answer.
13       THE WITNESS:  I spoke to my
14 friends who are former interns at
15 several of them and I spoke to my -- a
16 former employer.
17    Q.   Okay.
18       What's the name of one of the
19 friends who you spoke to?
20    A.   ███████████████
21    Q.   And did you and ██████ speak
22 about the expectations of investment banks
23 or firms in terms of hours of availability
24 or workflow or lifestyle?
25    A.   Yes.

K. Shiber

1  
2     Q.   And what is it that you spoke
3  about? Can you tell me everything you
4  recall about the conversations that you
5  had with ██████?
6     A.   Yes.
7        I recall that she told me that
8  she didn't think that she had worked that
9  late during the internship and typically
10 ended around 10:00 or 10:30 p.m.
11    Q.   And who did ██████ intern with?
12    A.   Centerview.
13    Q.   Did she tell you that the hours
14 were unpredictable?
15    A.   I don't recall her saying that.
16    Q.   And she was an intern at
17 Centerview; correct?
18    A.   She was an intern, yes.
19    Q.   And who else do you recall
20 speaking to about the hours or lifestyle
21 or expectations of an investment bank?
22    A.   I spoke to my former -- a former
23 employer.
24    Q.   And who was that?
25    A.   William Susman.

K. Shiber

1  
2     Q.   How do you know Mr. Susman?
3     A.   I worked for him during two
4  different internships.
5     Q.   And can you tell me everything
6  that you remember about your discussions
7  with Mr. Susman about what it's like to
8  work at a big firm?
9     A.   I remember he characterized
10 different firms in different ways
11 regarding the lifestyle that working there
12 might require.
13    Q.   How did he characterize -- what
14 are the different firms that he
15 characterized?
16    A.   I don't recall the list
17 exhaustively.  We spoke about firms like
18 Citibank, Bank of America, Centerview,
19 Goldman, Evercore, Jefferies, Credit
20 Suisse.
21    Q.   And what did Mr. Susman say
22 about Citibank?
23    A.   I don't recall specifically what
24 he said.
25    Q.   Do you recall generally what he

K. Shiber

1  
2  said about Citibank?
3     A.   No.
4     Q.   Do you recall specifically or
5  generally what Mr. Susman said about Bank
6  of America?
7     A.   No.
8     Q.   Do you recall specifically or
9  generally what Mr. Susman said about
10 Centerview?
11    A.   Yes.
12    Q.   And what did Mr. Susman say
13 about Centerview?
14    A.   He said -- this is not a quote,
15 but he said that it was a great place to
16 work and that it wasn't the sweatshop the
17 way some other firms were and he thought
18 that they had a great culture, that I
19 would learn a ton during training, they
20 had a lot of really smart people working
21 there, they worked on interesting deals,
22 you got a lot of exposure to interesting
23 deals because it was a smaller firm
24 compared to others but still worked on --
25 worked on a lot of interesting and large

1          K. Shiber
2 deals.  He may have said more that I'm not
3 remembering.
4     Q.   Do you recall specifically or
5 generally what Mr. Susman said about
6 Goldman?
7     A.   No.
8     Q.   How about do you recall
9 specifically or generally what Mr. Susman
10 said about Evercore?
11     A.   No.
12     Q.   Who else do you recall speaking
13 to about what it was like to work at an
14 investment bank?
15     A.   I spoke to some of the people
16 who I was interviewing with at other
17 firms.  I spoke to my friend ███ as
18 mentioned.  I spoke to other friends who
19 had worked at other firms as well.
20     Q.   What is it that you learned at a
21 high level through your investigation and
22 research about what it was like to work at
23 an investment firm?
24          MR. HELLER:  Objection.
25          You can answer.

1          K. Shiber
2          THE WITNESS:  I learned that it
3      was a very interesting role and
4      opportunity.  I learned that you
5      worked on deals and projects related
6      to a variety of different companies
7      and their business dealings or capital
8      raises, M&A activity, that you would
9      do a variety of tasks including
10      research and financial modeling and
11      preparing presentations and decks;
12      that it could be a good place to start
13      your career, learn a lot about
14      financial services and become really
15      knowledgeable and set you up for a
16      career in financial services
17      long-term.
18     Q.   And did you learn that jobs at
19 investment banks were demanding for first
20 year analysts?
21     A.   Can you define "demanding",
22 please?
23     Q.   Stressful.
24          MR. HELLER:  Objection to form.
25          THE WITNESS:  I don't recall

1          K. Shiber
2      learning that specifically.
3     Q.   Do you recall learning that
4 working for an investment bank as a first
5 year analyst was oftentimes difficult?
6     A.   I don't recall learning that.
7     Q.   Did you have an expectation when
8 you were applying to investment banks that
9 it would be an easy position to be a first
10 year analyst at a large investment bank?
11     A.   No.
12     Q.   What was your expectation when
13 you were applying to investment banks as
14 to what being a first year analyst at one
15 of -- at an investment bank would be like?
16     A.   Like I mentioned, I thought that
17 it would be a great opportunity.  I
18 thought that I would work hard.  I thought
19 that I would learn a lot about how
20 companies operate, how they make
21 decisions, how they raise money, how they
22 determine whether or not to buy another
23 company or sell themselves.  I thought
24 that I would participate and contribute to
25 a variety of projects and deals with other

1          K. Shiber
2 different companies and firms.
3     Q.   Did you anticipate that the
4 hours would be long?
5     A.   Can you define "long", please?
6     Q.   Did you think that you would be
7 working a 9:00 to 5:00 if you started
8 working for an investment bank?
9     A.   No.
10     Q.   What did you think your hours
11 would be if you started working for an
12 investment bank?
13     A.   I don't think I can say exactly
14 what I thought at the time of what my
15 hours would be.
16     Q.   Did you have a general sense
17 that you could be working very late some
18 nights?
19     A.   Can you define "very late"?
20     Q.   Well, ███ told you that she
21 worked until 10:30 sometimes at
22 Centerview; right?
23     A.   Yes.
24     Q.   Did you have an expectation
25 that, as a baseline, you could be working

41 (Pages 158 - 161)

Page 162

K. Shiber

1          K. Shiber
2  until 10:30 p.m. some nights while at
3  Centerview?
4      A.   Yes.
5      Q.   Do you consider 10:30 p.m. very
6  late?
7      A.   I think it depends on the
8  context.
9      Q.   Did ████ tell you --
10         MS. SKIBITSKY: Strike that.
11     Q.   You interviewed with Centerview
12  in August of 2019, is that correct, your
13  first interview?
14     A.   Yes.
15     Q.   And that was a phone interview?
16     A.   Yes.
17     Q.   Do you recall who you
18  interviewed with?
19     A.   ████ I believe.
20     Q.   And did you have any discussions
21  with ████ about what it was like to
22  work at Centerview?
23     A.   I don't recall exactly.
24     Q.   Did you discuss with ████
25  about what your hours at Centerview might

Page 163

1          K. Shiber
2  look like?
3      A.   I don't recall.
4          (Whereupon, an e-mail dated
5      September 15, 2020 was marked
6      Defendant's Exhibit 8
7      for identification.)
8      Q.   Ms. Shiber, ████ was a summer
9  intern when you spoke with her, right,
10  about her experience at Centerview?
11     A.   I don't think she was actively
12  an intern at the time I spoke to her.
13     Q.   But her experience at Centerview
14  had been as an intern rather than as a
15  first year analyst; correct?
16     A.   Yes.
17     Q.   Okay.
18         Ms. Shiber, do you recognize
19  what's been marked as Exhibit 8?
20     A.   Yep.
21     Q.   So this is a document that you
22  produced in this litigation that begins
23  with Bates stamp Shiber 105. And it's an
24  e-mail from kshiber@gmail.com.
25         Is that you?

Page 164

1          K. Shiber
2      A.   Yes.
3      Q.   To yourself and William Susman
4  at Threadstone.
5          That's the Mr. Susman we've been
6  speaking about?
7      A.   Yes.
8      Q.   Okay.
9          And you write, "hi, attached is
10  a timeline of what I can remember right
11  now about all of my interactions with this
12  firm".
13         Do you recall preparing a
14  timeline about what you can remember about
15  your interactions with Centerview?
16     A.   Yes.
17     Q.   When did you do that?
18     A.   I did that after I had been
19  terminated and cried and freaked out about
20  the situation and I spoke to -- and after
21  I spoke to Mr. Susman is when I prepared
22  it, that same night.
23     Q.   Did Mr. Susman suggest that you
24  prepare a timeline like this?
25     A.   Yes.

Page 165

1          K. Shiber
2      Q.   Is this -- is everything in this
3  timeline then -- it looks like you sent it
4  on September 15, 2020 at 11:19 p.m.
5          Is it fair to say that this
6  timeline captures everything you remember
7  specifically about your interactions with
8  Centerview?
9          MR. HELLER: Objection.
10         THE WITNESS: I think this is
11     part of what I remember about my
12     interactions with the firm but is not
13     necessarily exhaustive of everything
14     that I remember.
15     Q.   Okay.
16         Then let's look at the timeline
17  that's attached. And you write, "timeline
18  of my interactions with Centerview
19  Partners" and underneath you write, "to
20  the best of my current memory at 11:00
21  p.m. on 9/15 with no access to e-mails or
22  any firm contacts or call records.
23  Apologies for subjective emotional
24  content. I tried to write this out as
25  soon as possible to best preserve the

42 (Pages 162 - 165)

K. Shiber

1           K. Shiber
2   memory, so I was not able to edit it all
3   out in the recollection".
4       Do you see that?
5   A.   Yes.
6   Q.   So is it fair to say that this
7   document is the best preservation of the
8   memories you have from your time at
9   Centerview?
10  A.   Could you define "best
11  preparation" [sic], please?
12  Q.   Sure.
13      Given that you prepared this
14  document on September 15, 2020, would any
15  significant --
16      MS. SKIBITSKY: Strike that.
17  Q.   Let's look at the third -- the
18  third bullet point down in your timeline.
19  Actually, let's look at the second bullet
20  point.
21      You write, "I had a
22  thirty-minute technical phone interview
23  with analyst CJ" and then last name in
24  brackets "in August, 2019. I then had a
25  three-round super day in September, 2019

1           K. Shiber
2   with two technical interviewers I do not
3   recall the names of, CEO Robert Pruzan and
4   ████████████ for behavioral round and
5   Tony Kim and a third year analyst for a
6   brain teaser round".
7       Do you see that?
8   A.   Yes.
9   Q.   And then you write, "none of my
10  interviews detailed the exact hours
11  bankers were expected or required to
12  work."
13      Did any of your -- is it the
14  case that none of your interviews detailed
15  the exact hours bankers were expected or
16  required to work?
17  A.   Yes, that's the case.
18  Q.   Did any of your interviews
19  detail in general the hours expectations
20  of the job?
21  A.   No.
22  Q.   Do you think that there are
23  exact hours that bankers are expected to
24  work at a firm like Centerview?
25      MR. HELLER: Objection.

1           K. Shiber
2       THE WITNESS: I don't think I
3   can answer that question.
4   Q.   Well, you write, "none of my
5   interviews detailed the exact hours
6   bankers were expected or required to
7   work"; right?
8   A.   Yes.
9   Q.   So was it your expectation that
10  the interviewer should have detailed exact
11  hours that bankers were expected or
12  required to work at Centerview?
13  A.   I think in writing this, I was
14  trying to say that I felt that I was
15  terminated for not working a specific set
16  of specific set of expected or required
17  hours but those expected or required hours
18  were not given to me throughout the
19  interview process.
20  Q.   And would you agree with me that
21  there really are no exact hours that
22  bankers at Centerview are expected to
23  work?
24  A.   I don't think I would agree with
25  that.

1           K. Shiber
2   Q.   What wouldn't you agree with
3   that? Why wouldn't you agree with that?
4   A.   When I was terminated, I was
5   told that due to the accommodations that
6   Centerview had put in place saying I was
7   available at specific hours, I was told
8   those accommodations don't work because
9   they can't accommodate someone who's not
10  available specific hours, so clearly
11  there's some sort of expectation about
12  when people are required to be available.
13  Q.   Were you told Centerview can't
14  accommodate people who are not available
15  during specific hours?
16      MR. HELLER: Objection to form.
17      THE WITNESS: I was told that
18  the accommodations that Centerview had
19  put in place about specific hours were
20  not working.
21  Q.   Okay.
22      And you would agree with me that
23  there was no exact hours that Centerview
24  bankers were expected to work? When I say
25  exact, I mean from X time to Y time.

Page 170

K. Shiber

1          K. Shiber
2   A.  I don't think I agree with that
3 statement.
4   Q.  Why don't you agree with that
5 statement?
6   A.  Because with the accommodations
7 that they put in place, if I wasn't
8 available from 12:00 a.m. to 9:00 a.m. and
9 that wasn't working, then there must have
10 been an expectation that I would have been
11 available during those times.
12   Q.  In your timeline in the fifth
13 bullet point down you say, "I signed and
14 returned all paperwork promptly and was
15 extremely exited at this, as this was my
16 dream opportunity".
17      Do you see that?
18   A.  Yes.
19   Q.  You say, "I ended communications
20 and multiple other recruiting processes,
21 passing up on those that gave me job
22 offers or those near completion which I
23 perceived as likely to end in positive
24 offers including".
25      Do you see that?

Page 171

1          K. Shiber
2   A.  Yes.
3   Q.  But the statement that you
4 passed up on job offers is not true;
5 right?
6   A.  Well, I would disagree with
7 that.  By withdrawing my candidacy, I
8 passed up on job offers that could have
9 happened.
10   Q.  Well, you write it here as if
11 you had received a job offer, passing up
12 on those that gave me job offers; right?
13 No one gave you a job offer other than
14 Centerview?
15   A.  To my recollection, no one gave
16 me a job offer except Centerview.
17   Q.  Why did you tell Mr. Susman that
18 you passed up on job offers if that wasn't
19 true?
20   A.  I don't know why.
21   Q.  And then you go on to detail
22 what your experience was like according to
23 you while you were employed at Centerview.
24      So let's look at the last bullet
25 point on this first page at Shiber 106.

Page 172

1          K. Shiber
2 You note, "I was staffed on a healthcare
3 pharma account which was in an account
4 maintenance phase.  There was not much
5 required work.  My primary contact was
6 associate ████████  I completed all
7 tasks which I was asked to do, I received
8 standard comments regarding formatting of
9 slides, et cetera, as well as praise such
10 as nice work on this".
11      Do you recall in general the
12 hours that you were working when you were
13 staffed on this healthcare pharma account?
14   A.  I think when I was staffed on
15 that account, I was working about forty
16 hours to fifty hours per week.
17

Page 173

1          K. Shiber
2

8   Q.  Okay.
9      And then the next week you were
10 staffed on an additional account, a
11 media/tech account.
12      Do you recall that?
13   A.  I don't recall that staffing.
14   Q.  Okay.
15      You go on to say, "my primary
16 contact was ██████████ [sic]", and you
17 have an SP question in brackets.  "My
18 assignment was to research the firm and
19 previous materials, but it was also in a
20 stagnant mode, so I was not required to do
21 much".
22      Do you see that?
23   A.  Yes.
24   Q.  So the following week it sounds
25 like was also somewhat of a low key week

44 (Pages 170 - 173)

Page 174

K. Shiber

1  at Centerview; correct?
2  
3      A.   In my experience with the work
4  that was assigned, it seemed low key at
5  that time, yes.
6      Q.   And you were not told that there
7  are exact hours that you need to be
8  working during these -- during these
9  assignments that you were staffed on;
10  correct?  These being the two that we just
11  discussed.
12      A.   I was not told exact hours.
13      Q.   Okay.
14          And then you write, "two weeks
15  later I was assigned to a live situation,
16  a utility account facing both an
17  unsolicited strategic bid and an activist
18  approach".
19          Do you see that?
20      A.   Yes.
21      Q.   Do you recall this account?
22      A.   Yes.
23

Page 175

K. Shiber

2

6      Q.   And you write, "this account was
7  much busier than the previous account
8  assigned.  This deal was referred to as
9  'the most interesting thing anyone is
10  working on right now' and 'potentially the
11  biggest M&A deal ever should it go
12  through'".
13          Do you see that?
14      A.   Yes.
15      Q.   Do you recall being excited
16  about being placed on this account?
17      A.   I had mixed feelings about being
18  placed at first.  I was not extremely
19  excited, I was not particularly interested
20  in utilities.  But as I learned more about
21  the account and as people -- about the
22  situation and as people were talking about
23  it, I was definitely excited to be working
24  on it.
25      Q.   Can you explain to me what it

Page 176

K. Shiber

1  was that you were working on in connection
2  with the live situation?  I don't need to
3  know client name.  I'm just trying to
4  understand what does it mean to be working
5  on a live situation, a utility account
6  facing both an unsolicited strategic bid
7  and an activist approach?  What does that
8  mean?
9      A.   Yeah, our client was a utility
10  provider and they had recently received a
11  bid from another utility provider to
12  purchase them and they also had activist
13  investor within the company who was buying
14  up shares and trying to make certain --
15  make the company act in their interest.
16      Q.   And do you recall that this was
17  potentially the biggest M&A deal ever?
18      A.   That's what I recall someone
19  mentioning.
20      Q.   And so what was it that your
21  team specifically was doing on behalf of
22  your client to help them with this live
23  situation?
24      A.   We were doing a variety of

Page 177

K. Shiber

1  different pieces of analysis to
2  essentially determine whether the -- going
3  through with the purchase or what the
4  demands that the activist investor had
5  were in the best interest of the
6  shareholders of that company.  It was a
7  public company.  So we were doing research
8  and analysis to support the advice that
9  the firm was going to give.
10      Q.   And was there a deadline by
11  which you had to --
12          MS. SKIBITSKY:  Strike that.
13      Q.   What was the ultimate work
14  product or report that had to be produced
15  or disclosed or recommended to the client?
16  Was there something that you were
17  ultimately working towards?
18      A.   I don't know the exact bigger
19  picture of everything that we were working
20  towards.  We were working on materials to
21  share with I believe the executives of the
22  company as well as the shareholders.
23      Q.   Did you have a deadline by which
24  those materials needed to be shared?

45 (Pages 174 - 177)

1          K. Shiber
2     A.   I don't recall.
3     Q.   Do you recall the team working
4 to meet a deadline?
5     A.   I think there were multiple
6 checkpoints throughout the process that
7 the team was working towards meeting.
8     Q.   And each of the checkpoints was
9 there for a specific reason; is that
10 correct?
11    A.   I don't -- I don't know.  I was
12 a first year analyst on the deal.  I don't
13 know why each checkpoint was in place.
14    Q.   And you were reporting to Matt
15 Gallea and Tim Ernst on this live deal;
16 right?
17    A.   Yes, along with other people on
18 the deal.
19    Q.   You write in the middle of the
20 page -- it's a long paragraph -- "in the
21 second week of working on this deal, the
22 time-based expectations ramped up
23 significantly".
24         Do you recall that happening?
25    A.   Yes.

1          K. Shiber
2     Q.   Do you know why the time-based
3 expectations ramped up significantly
4 during that second week of the deal?
5     A.   No.
6     Q.   Was there a deadline by which a
7 project or a piece of the deal -- piece of
8 the work that you were doing had to be
9 done?
10    A.   I knew that we were working on
11 preparing materials for specific meetings
12 with the client.  I didn't necessarily
13 know exactly which part of the work
14 product had to be done by which meeting or
15 when those meetings were.
16    Q.   And working on an M&A deal is by
17 nature time-sensitive; correct?
18         MR. HELLER: Objection.
19         THE WITNESS: I don't know that
20    it is.
21    Q.   Why don't you -- do you not
22 thinking that working -- do you not think
23 that M&A deals are time-sensitive or do
24 you not know that working on an M&A deal
25 is time-sensitive?

1          K. Shiber
2     A.   I don't know.
3     Q.   This was a live situation;
4 correct?
5         MR. HELLER: Objection.
6         THE WITNESS:  Yes.
7     Q.   What does that mean that it was
8 a live situation?
9     A.   To me it meant that we were
10 advising them on a specific situation that
11 they were -- needed to respond to as
12 opposed to other projects like the ones we
13 previously discussed where it was account
14 management and seemed to me to be more of
15 a relationship maintenance type of phase.
16    Q.   So the client in this live
17 situation was looking for advice from
18 Centerview with respect to a situation
19 that needed to be handled or addressed,
20 and that situation presumably being this
21 activist investor who wanted some sort of
22 involvement in the M&A deal; is that
23 correct?
24    A.   I believe so.
25    Q.   And you write, "two or three

1          K. Shiber
2 days in a row I worked from 7:30 a.m. to
3 2:00 a.m."
4         Do you see that?
5     A.   Yes.
6     Q.   "At that time I logged off my
7 computer and went to sleep, as I believed
8 my tasks for the evening were complete".
9         Do you see that?
10    A.   Yes.
11    Q.   Do you whether at that time the
12 other teammates logged off of their
13 computers?
14    A.   At that time I did not know.
15    Q.   You write, "during this time,
16 both Tim and Matt and possibly some other
17 team members who I did not have as close
18 interactions with worked until between
19 4:00 a.m. and 8:00 a.m., at which point
20 the next day's meetings and tasks would
21 start".
22         Do you see that?
23    A.   Yes.
24    Q.   The members of the team that you
25 were on were working until 4:00 or 8:00

Page 182

1            K. Shiber
2  a.m. because they needed to get the
3  project done; right?  It was not that they
4  decided that they wanted to stay up
5  working until 4:00 or 8:00 a.m. because
6  they just didn't want to sleep at night;
7  is that accurate?
8       MR. HELLER:  Objection.
9       THE WITNESS:  I can't say their
10    motivations for anything that they
11    did.
12    Q.   Do you believe that your team
13  members on this live situation desired to
14  be working at 4:00 a.m.?
15       MR. HELLER:  Objection.
16       THE WITNESS:  I can't say what
17    -- I don't know what they desired.
18    Q.   You can't say whether you
19  believe that the teammates that you worked
20  with wanted to be working up to 4:00 a.m.
21  or 8:00 a.m.?
22       MR. HELLER:  Objection.  Asked
23    and answered.
24       THE WITNESS:  I can't say.
25       MS. SKIBITSKY:  Can we look at

Page 183

1            K. Shiber
2  tab eleven.  This is going to be
3  Exhibit 9.
4       (Whereupon, an e-mail dated
5  August 28, 2020 was marked Defendant's
6  Exhibit 9 for identification.)
7    Q.   Okay.
8       Ms. Shiber, do you have an
9  e-mail in front of you with the top
10  message from Timothy Ernst to William
11  Stewart --
12    A.   Yes.
13    Q.   -- at August 28, 2020?
14    A.   Yes.
15    Q.   Okay.
16       Do you recognize this e-mail
17  chain?
18    A.   I recognize the -- not the top
19  part from Tim to Will Stewart, but I
20  recognize the rest.
21    Q.   And for the record, this
22  document bears Bates stamp
23  Centerview 000162.
24       Let's look at the first in time
25  e-mail, which is the e-mail that starts on

Page 184

1            K. Shiber
2  the bottom of the first page.
3       And this is from August 28,
4  2020, and the subject is Dragon.
5       Do you see that?
6    A.   Yes.
7    Q.   Dragon is the code name for the
8  live deal you were working on; is that
9  right?
10    A.   Yes.
11    Q.   And Tim writes, "Kate, can you
12  go through and pull all the titles and
13  footnotes that we have in our current CVP
14  format into the Dragon slides"; right?
15    A.   Yes.
16    Q.   And then he writes, "we should
17  also talk today generally about
18  expectations on communication and
19  expectations for a live project like
20  this".
21       Do you see that?
22    A.   Yes.
23    Q.   "Matt and I shouldn't be up
24  alone working.  We are a team and will
25  need everyone on the same page pulling

Page 185

1            K. Shiber
2  their weight".
3       Do you see that?
4    A.   Yes.
5    Q.   "Things may come up and you
6  aren't able to get to/finish stuff, but I
7  need to know that and can help out".
8       Do you see that?
9    A.   Yes.
10    Q.   "It's not helpful to think you
11  are working on stuff and then realize it's
12  not done.  Let's plan to talk in the
13  afternoon to make sure we are aligned".
14       Do you see that?
15    A.   Yes.
16    Q.   How did you feel when you
17  received that e-mail?
18    A.   I felt -- I felt embarrassed and
19  upset and shame, like I was in trouble.
20    Q.   And did you understand, when you
21  received that e-mail, that Tim and Matt
22  did not, in fact, want to be up working as
23  late as they were that night?
24    A.   Sorry, can you define "want to
25  be working"?

47 (Pages 182 - 185)

K. Shiber

2  Q.  Sure.
3     Do you think that Tim and Matt
4  were happy about the fact that they were
5  up working on this Dragon deal at night
6  and that you were not working with them?
7  A.  I can't say what they felt when
8  they were working.
9  Q.  Okay.
10    So you respond to Tim's e-mail;
11 right?
12 A.  Yes.
13 Q.  And then Tim responds to your
14 e-mail and he responds, "sure, and I know
15 you are just seeing it" --
16    MS. SKIBITSKY: Strike that.
17 Q.  Tim writes, "sure, and I know
18 you are just starting so it will be
19 helpful to talk.  One part of this job,
20 and the worst part of this job, is many
21 times you can't get ahead of things or
22 work through things early because there
23 will always be more for you to do.  Late
24 nights are just part of the job,
25 especially on a live deal like this".

K. Shiber

2     Do you see that?
3  A.  Yes.
4  Q.  And so reading this paragraph,
5  do you now understand that Tim's position
6  is late nights are not ideal but it's part
7  of the job?
8     MR. HELLER: Objection.
9     THE WITNESS: I mean, he doesn't
10    say it's not ideal.  He does say it's
11    part of the job.
12 Q.  And he does say, "one part of
13 this job and the worst part of this job is
14 many times you can't get ahead of things
15 or work through things early"; correct?
16 A.  Yes, he does say that.
17 Q.  Okay.
18    He then writes, "in general,
19 when you are fished, let me or Matt know
20 and we will take a look because we will
21 definitely have comments.  Just part of
22 being a first year.  And then those need
23 to be finished before signing off".
24    Do you see that?
25 A.  Yes.

K. Shiber

2  Q.  So reading this, you understand
3  that, as a first year analyst, the
4  comments that you were receiving on your
5  work product did need to be addressed
6  before you could log off; correct?
7  A.  Yes.  And at the time I thought
8  that I had finished addressing the
9  comments that were provided before logging
10 off.
11 Q.  And Tim goes on to write, "when
12 I was first starting, I wasn't sure if I
13 was done or not, I would always
14 e-mail/Jabber my associate/analyst to make
15 sure there was nothing else for me to be
16 doing or if I was done for the night.  I
17 think you'll get the hang of it, but in
18 general, the finish line is always going
19 to be moving, so we can't just wake up
20 with a clear task of three things we need
21 to do.  It will change hour by hour".
22    Do you see that?
23 A.  Yes.
24 Q.  And did you have an
25 understanding based on Tim's e-mail here

K. Shiber

2  and also based on your experience working
3  on this live deal that it was the case, in
4  fact, that the finish line was always
5  going to be moving?
6  A.  I did understand based on this
7  e-mail that it was the case that the
8  finish line was always going to be moving.
9  Q.  And finally, Tim says, "trust
10 me, we don't want to be working late
11 either"; right?
12 A.  Yes.
13 Q.  So you would now agree that Tim
14 and Matt did not, in fact, want to be
15 working until 4:00 or 8:00 a.m.; correct?
16    MR. HELLER: Objection.
17    THE WITNESS: That's what he
18    says in this e-mail.  I can't say how
19    he felt.
20 Q.  You have no reason to think that
21 he was lying in this e-mail; do you?
22    MR. HELLER: Objection.
23    THE WITNESS: I can't say
24    whether he was lying or not.
25 Q.  Okay.

Page 190

1          K. Shiber
2          Do you have any reason to think
3 he was lying in this e-mail when he said,
4 "trust me, we don't want to be working
5 late either"?
6          MR. HELLER: Objection. Asked
7 and answered seconds ago.
8          THE WITNESS: I don't think I
9 can say anything about his intentions
10 in this line.
11     Q.   That's not what I'm asking. I'm
12 just asking if you have a reason to think
13 he would lie to you in this e-mail.
14          MR. HELLER: Objection.
15          THE WITNESS: I'm just trying to
16 say I think there's a difference
17 between me having -- I can't say why
18 he wrote what he wrote, so I don't
19 know if he was lying, if he was not
20 lying. I can't say if I had any
21 reason to -- at the time to think
22 anything about his intentions.
23     Q.   Okay.
24          So to read the whole line, he
25 says, "trust me, we don't want to be

Page 191

1          K. Shiber
2 working late either, and if we don't need
3 to be, we won't. But there will be many
4 late nights on this".
5          Do you see that?
6     A.   Yes.
7     Q.   Okay.
8          So it is the case, at least
9 according to your supervisor, Tim, that he
10 was working late because he needed to be,
11 correct, not because he desired to be
12 working late?
13          MR. HELLER: Objection. Asked
14 and answered. This will be the last
15 time.
16          You can answer it if you can.
17          THE WITNESS: Like I said, I
18 don't know what he truly wanted or his
19 intentions in anything.
20     Q.   What was your reaction when you
21 got this e-mail at 10:39 a.m. from Tim?
22          MS. SKIBITSKY: Let me strike
23 that.
24     Q.   What was your reaction to Tim's
25 statements to you that there will be many

Page 192

1          K. Shiber
2 late nights on this deal?
3     A.   I was very concerned about the
4 prospect of having many late nights on
5 this deal defined as working later than I
6 had signed off working, as he's saying,
7 and I was worried about how that would
8 interfere with my need for sleep and to
9 manage my symptoms as part of my
10 disability.
11     Q.   Were you surprised to see Tim
12 explaining to you that there were going to
13 be many late nights on this deal?
14          MR. HELLER: Strike that.
15     Q.   Were you surprised to hear from
16 Tim that there were going to be many late
17 nights on this deal?
18          MR. HELLER: Objection.
19          THE WITNESS: I don't recall if
20 I was surprised.
21     Q.   After you received this e-mail
22 where Tim said, "there will be many late
23 nights on this deal", was working at
24 Centerview still your dream job?
25     A.   Yes.

Page 193

1          K. Shiber
2     Q.   Were you interested in working
3 many late nights on this deal?
4          MR. HELLER: Objection to form.
5          THE WITNESS: I was concerned
6 about how working many late nights on
7 this deal might affect and exacerbate
8 the symptoms of my disability.
9     Q.   Understanding that you had that
10 concern, was working at Centerview still
11 your dream job?
12     A.   Yes.
13     Q.   Did you understand that there
14 would be other deals that required many
15 late nights if you were to continue
16 working at Centerview?
17          MR. HELLER: Objection.
18          THE WITNESS: I don't think I
19 can answer that question.
20     Q.   You understood by this point
21 that the hours expectations on a week to
22 week or even day-to-day basis at
23 Centerview were unpredictable; right?
24          MR. HELLER: Objection.
25          THE WITNESS: Based on this

49 (Pages 190 - 193)

Page 194

K. Shiber

1    e-mail, I thought that there would be
2    frequent, persistent, constantly late
3    nights on deals going forward.
4    Q.    On all deals going forward?
5    A.    As he said, on a live deal like
6    this.
7    Q.    Okay.
8        So you understood that -- as of
9    August 28, 2020, which is the date of this
10   e-mail, you understood that going forward
11   during your time at Centerview there would
12   be live deals that required many late
13   nights; correct?
14        MR. HELLER: Objection. I find
15   that question very vague.
16        Answer it if you can.
17        THE WITNESS: I don't think I
18   can answer that question.
19   Q.    What is it that you don't
20   understand about that question?
21   A.    I don't understand what's
22   defined as a late night. I don't
23   understand how many -- the frequency of
24   live deals, what deals are involved, what

Page 195

K. Shiber

1    "required" means. I don't understand any
2    part of that question.
3    Q.    Okay.
4        Let's break it down.
5        What is your understanding --
6    what do you consider a late night as far
7    as working for Centerview?
8    A.    I don't have an opinion on what
9    a late night is working for Centerview.
10   Q.    You don't have an opinion on
11   what a late night might be working for
12   Centerview?
13   A.    No, I don't.
14   Q.    Well, you understood that your
15   teammates were out working until, as you
16   said, 4:00 a.m. or 8:00 a.m. on some
17   occasions during this live deal; correct?
18   A.    Yes.
19   Q.    Would you consider that a late
20   night?
21   A.    Yes.
22   Q.    And so Tim says in his e-mail,
23   "there will be many late nights on this";
24   right?

Page 196

K. Shiber

1    A.    Yes.
2    Q.    Okay.
3        Would you consider 1:00 a.m. a
4    late night?
5    A.    In what context?
6    Q.    In the context of working at
7    Centerview.
8    A.    In what type of situation while
9    working at Centerview?
10   Q.    Is there one situation while
11   working at Centerview where working until
12   2:00 a.m. would be considered not a late
13   night?
14   A.    Based on this e-mail, when I had
15   stopped working at 2:00 a.m. and then was
16   told that that was not late enough, it
17   seemed that 2:00 a.m. would not be
18   considered a late night on this deal.
19   Q.    Okay.
20       In your opinion, is working
21   until 2:00 a.m. on a deal, on a live deal,
22   a late night?
23       MR. HELLER: Objection.
24       THE WITNESS: I don't have an

Page 197

K. Shiber

1    opinion on the situation.
2    Q.    You don't have an opinion on
3    whether working until 2:00 a.m. was
4    working late while at Centerview?
5    A.    Currently or at the time?
6    Q.    As of August, 2020, if your
7    friend had asked you on August 29, 2020
8    have you been working late nights, what
9    would you have said?
10   A.    If a friend had asked me on
11   August, 2020 after I had worked until 2:00
12   or 3:00 a.m. if I had been working late
13   nights, I would have said yes, I have been
14   working late nights.
15   Q.    And you understood that there
16   would be many late nights while working at
17   Centerview going forward; right?
18       MR. HELLER: Objection.
19       THE WITNESS: I think the
20   definition I just defined of late
21   nights is different than Tim's
22   definition here, so I can't say what I
23   would have expected going forward.
24   Q.    Let's use your definition of

K. Shiber
1            K. Shiber
2  late nights.
3            It sounds like your definition
4  of late nights is what you were working on
5  while you were on this live deal when you
6  were working until 2:00 a.m.; correct?
7       A.   As of August 28, 2020, no,
8  that's not correct.
9       Q.   What did you understand Tim to
10 mean when he sent this e-mail and said,
11 "there will be many late nights on this"?
12 What did you think the next few days or
13 weeks on this deal might look like in
14 terms of what time you would go to bed?
15            MR. HELLER:  Objection.
16            THE WITNESS:  I thought he meant
17    by that statement that the next few
18    days and weeks would involve staying
19    up until 8:00 a.m. on a regular basis.
20       Q.   And what did you think when you
21 saw that e-mail and had that understanding
22 as to what he meant?
23            MR. HELLER:  Objection.  Asked
24    and answered.
25            THE WITNESS:  I was immediately

1            K. Shiber
2    concerned about the situation,
3    concerned that based on this response,
4    he perceived me as lazy or letting the
5    team down, and I was concerned about
6    how -- abiding by that expectation and
7    working until 8:00 a.m., meaning
8    working twenty-four hours straight
9    multiple nights in a row for weeks on
10   end would exacerbate the symptoms of
11   my disability.
12       Q.   And were you concerned that
13 there would be other assignments while at
14 Centerview that also required late nights
15 of the type that we're talking about on
16 this live deal?
17       A.   What do you mean by that also
18 required?
19       Q.   You realized at this point in
20 August, 2020 that working at Centerview
21 would require on occasion very late
22 nights, including up to 4:00 or 8:00 a.m.;
23 is that correct?
24       A.   I don't think that's correct,
25 that working at Centerview would require

1            K. Shiber
2    that.
3       Q.   On occasion, you don't think
4  that's correct?
5       A.   No.
6       Q.   Did you think that this live
7  deal was a bit of a fluke in terms of the
8  expectations of what might need to --
9            MS. SKIBITSKY:  Strike that.
10       Q.   Did you think that this live
11 deal was very rare in terms of what it
12 meant for the work hours while at
13 Centerview?
14       A.   Based on Tim saying there will
15 be many late nights like this such as
16 working until 8:00 a.m. twenty-four hours
17 straight, I did not -- throughout being a
18 first year, I did not think that this deal
19 was a fluke.
20       Q.   So you understood that there
21 were other deals that you might be
22 assigned to in the future that might
23 likewise require very late nights, meaning
24 up to potentially 8:00 a.m.; is that
25 correct?

1            K. Shiber
2            MR. HELLER:  Objection.
3            THE WITNESS:  I can't answer
4    that question.
5       Q.   Why can't you answer that
6  question?
7       A.   Because of what "require" means.
8       Q.   Did you expect at this point
9  that there would be other deals you'd be
10 assigned to that would have a similar
11 workflow as this live deal that you were
12 working on in August, 2020?
13       A.   Yes.
14       Q.   And did that concern you?
15       A.   Yes.  As I've stated, it
16 concerned me.
17       Q.   Why did it concern you?
18            MR. HELLER:  Objection.  Asked
19    and answered.
20            THE WITNESS:  It concerned me
21    because I was worried about how the
22    impact of working such a schedule
23    would exacerbate my symptoms of my
24    disability and how that might impact
25    my work performance.

51 (Pages 198 - 201)

Page 202

1         K. Shiber
2    Q.   What did you do after you
3  received this e-mail from Tim?
4    A.   After I received this e-mail, I
5  started crying and having a panic attack.
6         MR. HELLER: Hope, I'm not trying
7  to stop, but maybe when we get to a
8  spot where you switch to a new
9  document we can take a break.
10        MS. SKIBITSKY: Yeah, that's
11  fine.  A few minutes.
12        MR. HELLER: If you want to do it
13  now.
14        MS. SKIBITSKY: We can do it now.
15  That's fine.
16        Off the record.
17        THE VIDEOGRAPHER: We are now off
18  the record.
19        The time on the video monitor is
20  3:08 p.m.
21        (Whereupon a break was taken)
22        THE VIDEOGRAPHER: We are now
23  back on the record.
24        The time on the video monitor is
25  3:21 p.m.

Page 203

1         K. Shiber
2    Q.   Ms. Shiber, do you still have
3  the e-mail we were just looking at in
4  front of you?
5    A.   Number nine?  Yeah.
6    Q.   Okay.
7         So the e-mail that you responded
8  to, Tim Ernst e-mails you at August 8,
9  2020, that's the first in time e-mail that
10  we've already discussed; right?
11    A.   Yes.
12    Q.   And that e-mail's at 10:08 a.m.;
13  correct?
14    A.   Yes.
15    Q.   Then you respond at 10:30 a.m.;
16  correct?
17    A.   Yes.
18    Q.   And then at 10:33 a.m., two
19  minutes after you respond to Mr. Ernst,
20  then you e-mail Cheryl Robinson of
21  Centerview's HR department; correct?
22    A.   I don't recall the exact time.
23        MS. SKIBITSKY: Let's mark
24  Exhibit 10, please.
25        (Whereupon, an e-mail dated

Page 204

1         K. Shiber
2  August 28, 2020 was marked Defendant's
3  Exhibit 10 for identification.)
4    Q.   You recall though e-mailing Ms.
5  Robinson ever you got that e-mail from Mr.
6  Ernst on the morning of August 28, 2020?
7    A.   Yes.
8    Q.   Before you e-mailed Ms.
9  Robinson, did you speak to anyone between
10  your receipt of that e-mail from Mr. Ernst
11  at 10:08 a.m. on August 28 and e-mailing
12  Ms. Robinson?
13    A.   Yes.
14    Q.   Who did you speak to?
15    A.   I spoke to my mother.  I may
16  have spoken to other people.  I don't
17  recall.
18    Q.   And what did you say to your
19  mother?  Can you tell me everything you
20  recall about that conversation with your
21  mother?
22    A.   I recall that I was -- sorry,
23  actually, can you remind me which time
24  period we're talking about?
25    Q.   Sure.

Page 205

1         K. Shiber
2         So after you received an e-mail
3  from Mr. Ernst at 10:08 a.m., you then
4  e-mailed Ms. Shiber [sic] requesting a
5  time to speak; correct?
6    A.   Ms. Robinson.
7    Q.   I'm sorry, Ms. Robinson
8  requesting a time to speak; is that right?
9    A.   Yes.
10    Q.   And that's the exhibit that you
11  have in front of you currently,
12  Exhibit 10; correct?
13    A.   Yes.
14    Q.   So what I'm curious about is
15  between the time that you received Mr.
16  Ernst's e-mail on August 28 at 10:08 a.m.
17  and the time that you reached out to Ms.
18  Robinson that same day at 10:33 a.m., who
19  did you speak to?
20    A.   So spoke to my mother and  I may
21  have spoken to other people.  I don't
22  recall.
23    Q.   Tell me everything that you
24  recall about your conversation with your
25  mother.

52 (Pages 202 - 205)

K. Shiber

2  A.  I recall that I was really
3  freaked out about the situation and I
4  thought, based on Tim's e-mail at 10:08, I
5  thought that he was implying that I was
6  not pulling my weight as a member of the
7  team and I was worried I had a negative
8  perception in his eyes and I expected,
9  based on him saying that "I shouldn't be
10 up alone working", that he would -- like
11 that he would expect me to work the hours
12 that he and Matt had worked that night.
13 And I was concerned about that because, as
14 I mentioned, I was concerned that working
15 until 8:00 a.m. would significantly
16 exacerbate the symptoms that I experienced
17 due to my disabilities, and so because of
18 that, we discussed that I might need an
19 accommodation or just some sort of -- that
20 it might be a good idea to reach out to HR
21 to understand more about the expectations
22 and see if I needed an accommodation.
23    Q.  And what did your mom say during
24 that conversation?
25    A.  She was comforting to my

K. Shiber

2  concerns and she thought that it might be
3  a good idea to reach out to HR to discuss
4  the possibility, and she encouraged me --
5  yeah, that's what I can recall.
6     Q.  Was this conversation over the
7  phone?
8     A.  No, it was in person.
9     Q.  And did your mom agree with you
10 that working late nights could exacerbate
11 the symptoms you had on account of your
12 disabilities?
13    MR. HELLER:  Objection.
14    THE WITNESS:  I don't know how
15 -- what definition of "late nights"
16 are we using?
17    Q.  We're using the definition that
18 we agreed that you found to be a late
19 night, which is working until 2:00 a.m.
20    MR. HELLER:  Objection.
21    THE WITNESS:  I don't think we
22 agreed that I found it to be a late
23 night working until 2:00 a.m. as a
24 blanket statement.
25    Q.  Was your mom concerned -- did

K. Shiber

2  your mom express concern that the work
3  hours that you had been experiencing over
4  the past few days while working on this
5  live deal at Centerview might be harmful
6  to your health?
7     A.  My mom is not a medical
8  professional, so she can't say exactly
9  what anything might cause.  But she did
10 think that given one of my coping
11 mechanisms for dealing with my anxiety was
12 to have consistent and regular sleep, she
13 thought that their expectations that I
14 would work longer than I had the previous
15 night, meaning longer than 2:00 a.m.,
16 until 4:00 a.m. or 8:00 a.m., might
17 exacerbate the symptoms.
18    Q.  Is there anything else about
19 that conversation with your mom that you
20 remember other than what you've already
21 told me?
22    A.  About what she said, about how I
23 felt?
24    Q.  About what was said between the
25 two of you.

K. Shiber

2  A.  No, I don't recall anything
3  else.
4     Q.  And who else did you speak with
5  before you e-mailed Ms. Robinson on
6  August 28 at 10:33 a.m.?
7     A.  I don't recall exactly who else
8  I spoke with, if anyone.
9     Q.  Okay.
10       So let's look at Exhibit 10.
11 And this is the first in time e-mail --
12 this is a document Bates stamped
13 Centerview 001864.  And the first in time
14 e-mail is from you to Cheryl Robinson.
15       And Ms. Robinson was in
16 Centerview's HR department; correct?
17    A.  Yes.
18    Q.  Okay.
19       And you write, "hi, Cheryl.  Can
20 we please set up an appointment to speak
21 some time today.  I am very concerned with
22 learning how to communicate with my team
23 and manage expectations".
24       Do you see that?
25    A.  Yes.

53 (Pages 206 - 209)

K. Shiber

1
2    Q.    What did you mean by that, that
3    you were concerned with learning how to
4    communicate with your team and manage
5    expectations?
6    A.    I was referring to Tim's e-mail
7    where he said we should talk today about
8    expectations on communications and
9    expectations for a live project.
10    Q.    And so were you worried about
11    having that conversation with Tim?
12    A.    Yes.
13    Q.    Did you have that conversation
14    with Tim, the one that he references about
15    talking about expectations?
16    A.    We had a phone conversation
17    after this e-mail exchange on that day.
18    Q.    Okay.
19         And you write, "I may need
20    accommodations and do not feel comfortable
21    advocating for myself, so I would really
22    appreciate your help on this".
23         Do you see that?
24    A.    Yes.
25    Q.    What did you have in mind when

K. Shiber

1
2    you said, "I may need accommodations"?
3    A.    I had in mind that I may need
4    accommodations with regard to the timing
5    of the workflow so that I could get enough
6    sleep to manage the symptoms of my
7    disabilities.
8    Q.    What specific accommodations did
9    you have in mind that would help manage
10    the timing of workflow?
11    A.    I didn't have any specific
12    accommodations in mind.
13    Q.    Did you have any thoughts at all
14    as to how Centerview might be able to
15    accommodate you in order to manage the
16    timing of workflow?
17    A.    That was what I wanted to
18    discuss with Cheryl as the HR professional
19    in the situation.
20    Q.    And you did talk to Ms. Robinson
21    on August 28; correct?
22    A.    I believe so.
23    Q.    Okay.
24         Can you tell me everything that
25    you recall about that conversation with

K. Shiber

1
2    Ms. Robinson?
3    A.    Yes.
4         In our initial conversation, I
5    described what had happened the night
6    before, how I had worked until 2:00,
7    believed I had finished responding to all
8    of the comments on the work that I was
9    provided, and sent the work over and then
10    signed off and then had received an e-mail
11    from Tim where it seemed like that was not
12    -- that was not accepted behavior.  And so
13    I mentioned to her that I have a
14    disability and was concerned about how
15    working until 8:00 a.m. on a regular basis
16    would exacerbate its symptoms and affect
17    my life and my work performance.  She
18    mentioned that she didn't have anything in
19    mind immediately but that she would -- she
20    would work on it and think about the best
21    way to handle the situation.
22    Q.    And you told Ms. Robinson during
23    that conversation that you had a medical
24    disability which, for healthy management,
25    required eight to nine hours of sleep per

K. Shiber

1
2    night; is that correct?
3    A.    I don't recall saying that.
4    Q.    Can we look at the timeline
5    e-mail?  I think it's marked as Exhibit 8.
6    Let's look at Shiber 108 and the second
7    full bullet pointed paragraph from the top
8    that starts with, "later that day".
9    A.    Hundred.
10    Q.    You write, "later that day I had
11    a call with Cheryl Robinson in response to
12    my previous e-mail.  I felt that I could
13    trust confiding in her, as I believed HR
14    was a confidential resource.  I told her
15    that I had a medical disability".
16         Do you recall telling Ms.
17    Robinson that you had a medical
18    disability?
19    A.    Yes.
20    Q.    And what was that medical
21    disability that you were referring to when
22    you told Ms. Robinson on August 28 during
23    your call that you had a medical
24    disability?
25    A.    I didn't tell her what

54 (Pages 210 - 213)

K. Shiber
1
2  disability it was.
3     Q.   What did you understand the
4  disability to be?
5     A.   Anxiety disorder, mood disorder,
6  and postconcussive syndrome.
7     Q.   Do you still have postconcussive
8  syndrome today?
9     A.   I don't know.
10    Q.   Do you know whether you had
11 postconcussive syndrome in August of 2020?
12    A.   I don't know.  As I mentioned, I
13 cannot say what symptoms are due to what
14 cause with regards to a diagnoses.
15    Q.   So when you told her I -- that
16 you had a medical disability, in your mind
17 you were considering those or that
18 disability to be one of anxiety disorder,
19 mood disorder, or postconcussive syndrome;
20 is that correct?
21    A.   No, it's not one of those.  My
22 understanding was it's all of them.
23    Q.   Okay.
24       And then I'm going to read the
25 full sentence again.  "I told her that I

K. Shiber
1
2  had a medical disability which, for
3  healthy management, required eight to nine
4  hours of sleep per might and that ideally
5  would have a somewhat consistent sleep
6  schedule".
7       Do you see that?
8     A.   Yes.
9     Q.   Okay.
10       So you did tell Ms. Robinson,
11 when you spoke with her on August 28, that
12 you had a medical disability which, for
13 healthy management, required eight to nine
14 hours of sleep per night; correct?
15    A.   I don't recall doing so.
16    Q.   Well, you wrote that in your
17 timeline that you sent to Mr. Susman;
18 correct?
19    A.   Yes.  I'm just saying at this
20 present moment I don't exactly remember
21 the exact words I said in that first
22 meeting specifically.
23    Q.   Would you have had a better
24 recollection of that first meeting
25 specifically on September 15, 2020 than

K. Shiber
1
2  you do sitting here today?
3     A.   I can't speculate what might
4  have happened in my recollection.
5     Q.   I'm not asking you to speculate
6  about anything.  I'm just asking was your
7  memory of what happened between you and
8  Ms. Robinson on August 28, 2020 better
9  years ago on September 15, 2020 than it
10 was -- than it is sitting here today with
11 regards to that specific discussion?
12    A.   On that day two weeks after the
13 discussion, yes, it was better than today.
14    Q.   And do you have any reason to
15 believe that you lied to Mr. Susman when
16 you said in this timeline that you told
17 Ms. Robinson that you had a medical
18 disability which, for healthy management,
19 required eight to nine hours of sleep per
20 night and that ideally would have a
21 somewhat consistent sleep schedule?
22    A.   No, I would never lie to him.
23    Q.   But we do see that you had told
24 him that you had withdrawn from offers but
25 that was a lie; correct?

K. Shiber
1
2       MR. HELLER: Objection.  That's
3    argumentative.  You're just arguing
4    with the witness.  I'm going to direct
5    the witness not to answer.
6       MS. SKIBITSKY: Brian, I'm going
7    to ask you to stop with the
8    speaking --
9       MR. HELLER: That's a lie?  I
10   mean, that's just an offensive
11   question.  It's completely
12   unnecessary.
13    Q.   Ms. Shiber, was it true when you
14 told Mr. Susman that you withdrew offers
15 after you received the Centerview offer;
16 yes or no?
17       MR. HELLER: Objection to form.
18       THE WITNESS: I don't recall.
19    Q.   Well, we just looked at this in
20 the timeline.  We can turn back to it,
21 Shiber 106.  It's the fifth bullet point
22 up from the bottom.  You wrote, "I ended
23 communications and multiple other
24 recruiting processes, passing up on those
25 that gave me job offers".

55 (Pages 214 - 217)

Page 218

K. Shiber

1         K. Shiber
2     And that is not true; correct?
3 You did not pass up on any job offers
4 after you received the Centerview offer;
5 correct?
6     MR. HELLER: Asked and answered.
7     THE WITNESS: I don't recall at
8 this time.
9    Q. Do you have any reason to
10 believe that you wouldn't have been
11 reporting your truthful recollection to
12 Mr. Susman when you told him that you told
13 Ms. Robinson that you required eight to
14 nine hours of sleep per night on account
15 of a medical disability?
16    A. I have no reason to think I was
17 lying. I would never lie to him
18 intentionally.
19    Q. So when you told Ms. Robinson
20 that you have a medical disability which
21 required eight to nine hours of sleep per
22 night and ideally would have somewhat of a
23 consistent sleep schedule, was it your
24 understanding that Ms. -- that you were
25 asking Ms. Robinson to help you manage

Page 219

K. Shiber

1         K. Shiber
2 that medical disability by allowing you --
3 enabling you to sleep eight to nine hours
4 of sleep per night on a consistent sleep
5 schedule?
6    A. I was not asking Ms. Robinson to
7 help manage my disability. I have doctors
8 manage my disability.
9    Q. So what were you asking Ms.
10 Robinson to do during that meeting?
11    A. I was asking for her advice and
12 opinion as to whether there might be a
13 possible accommodation that would work for
14 the firm and avoid exacerbating the
15 symptoms of my medical disability.
16    Q. And when you told Ms. Robinson
17 that you require eight it nine hours of
18 sleep her night, she responded and was
19 extremely adamant that Centerview was
20 concerned about your health and that was
21 the firm's top priority; isn't that
22 correct?
23    A. That was one of my understanding
24 of her response.
25    Q. Did Ms. Robinson tell you that

Page 220

K. Shiber

1         K. Shiber
2 she was -- did Ms. Robinson convey or tell
3 you that she was extremely adamant that
4 Centerview was concerned about your health
5 and that was the firm's top priority?
6    A. Yes.
7    Q. Okay.
8    And what did Ms. Robinson --
9 what was your subsequent conversation with
10 Ms. Robinson with respect to your request
11 for an accommodation?
12    A. At what point in time?
13    Q. Well, let's go to the next
14 bullet point here that starts with, "later
15 that day".
16    You write, "later that day
17 Cheryl called me and suggested her idea of
18 the accommodations which were that she put
19 up guardrails such that I would be able to
20 have eight hours of sleep each night". I
21 think there should be a period there.
22    Do you recall Ms. Robinson
23 telling you that she had an idea that they
24 would put up guardrails that you would be
25 able to have eight hours of sleep each

Page 221

K. Shiber

1         K. Shiber
2 night?
3    A. Yes, I recall.
4    Q. Okay.
5    And then you write that you
6 immediately said I was not in favor of
7 this plan; correct?
8    A. Yes.
9    Q. Was there a plan that you
10 believe Centerview would have adopted
11 that would have enabled you to sleep eight
12 to nine hours a night on a somewhat
13 consistent schedule other than what Ms.
14 Robinson proposed?
15    A. I can't say what the firm could
16 have suggested.
17    Q. If it were up to you entirely to
18 come up with an accommodation that would
19 work for you -- I read this paragraph as
20 you not being happy with this guardrails
21 approach that Ms. Robinson suggested; is
22 that correct? You were not happy with
23 that guardrails approach?
24    A. When she initially proposed it,
25 I was not happy with that approach.

56 (Pages 218 - 221)

Page 222

K. Shiber

1
2    Q.   And why -- was there another
3  approach that you would have preferred
4  other than this guardrails approach?
5    A.   There's a -- I can't say what --
6  any specific approach.  There's a variety
7  of the firm could have -- she could have
8  said a variety of things and I would have
9  had a variety of opinions to them.
10   Q.   Isn't it the case that any
11 accommodation that would not allow for
12 eight to nine hours of sleep per night on
13 a somewhat consistent sleep schedule could
14 potentially be sacrificing your health?
15   A.   What do you mean by sacrificing
16 my health?
17   Q.   You wrote to -- you wrote in
18 this timeline that for healthy management,
19 you require eight to nine hours per night
20 on a somewhat consistent sleep schedule;
21 correct?
22   A.   Yes.
23   Q.   So what happens if you don't get
24 eight to nine hours of sleep per night?
25   A.   If I don't, well, on one day?

Page 223

K. Shiber

1
2  How long?  Can you clarify the time range?
3    Q.   On one day, what happens if you
4  don't get eight to nine hours of sleep per
5  night?
6    A.   How many hours of sleep do I
7  get?
8    Q.   You write here that you require
9  eight to nine hours of sleep.
10       My question is if you don't get
11 that, what is the impact?  If you don't
12 get eight to nine hours of sleep, what is
13 the impact?
14   A.   I'm telling you there's a
15 difference.  If I don't get eight to nine
16 hours of sleep, there's a whole range of
17 things that could happen.  Did I get seven
18 and a half, did I get zero?  This outcome
19 is very different depending upon the
20 situation.
21   Q.   Let's say you had stayed up
22 until 4:00 a.m. on one of these nights of
23 the live deal with Tim and Matt and then
24 you woke up at 8:00 a.m. to get on a call
25 about the live deal.

Page 224

K. Shiber

1
2        That's four hours of sleep;
3  correct?
4        What would the impact have been
5  on your health?
6        MR. HELLER:  Objection.
7        THE WITNESS:  On that one day
8    alone, I would have had -- I can't say
9    exactly what would have happened to
10   me.  That's not happened, so I can't
11   say what would have happened to my
12   health if it did.
13   Q.   But you agree that you require
14 eight to nine hours of sleep per night on
15 a somewhat consistent schedule in order to
16 manage your health; correct?
17       MR. HELLER:  Objection.
18       THE WITNESS:  In order to best
19   manage my disabilities and avoid
20   exacerbating the effects of them, I
21   maintain a lifestyle which includes
22   eight to nine hours of sleep per
23   night, on average.
24   Q.   And if you don't maintain
25 consistent sleep for eight to nine hours,

Page 225

K. Shiber

1
2  you are at a significant risk for
3  exacerbation of your illness; is that
4  correct?
5    A.   What time period?
6        MS. SKIBITSKY:  Can we look at
7    tab two.
8        (Whereupon, a letter dated
9    September 1, 2020 was marked
10   Defendant's Exhibit 11
11   for identification.)
12   Q.   Okay.
13       Ms. Shiber, do you have
14 Exhibit 11 in front of you?
15   A.   Yes.
16   Q.   And this is the letter that you
17 provided to Centerview from Marylee Verdi,
18 a nurse at Dartmouth College; is that
19 correct?
20   A.   Yes.
21   Q.   Okay.
22       And in this letter, Ms. Verdi
23 writes, "I am writing on behalf of Kathryn
24 Shiber, as I have been her primary care
25 provider for the last two years".

57 (Pages 222 - 225)

1           K. Shiber
2        Do you see that?
3    A.   Yes.
4    Q.   "Because of her underlying
5  medical diagnosis, she requires consistent
6  sleep, eight to nine hours".
7        Do you see that?
8    A.   Yes.
9    Q.   "If she is not able to maintain
10  a regular sleep schedule, she is at
11  significant risk for exacerbation of her
12  illness".
13        Do you see that?
14    A.   Yes.
15    Q.   So you do agree that if you do
16  not maintain a regular sleep schedule, you
17  are at significant risk for exacerbation
18  of your illness; is that correct?
19    A.   I think that you're taking this
20  letter out of context as it was produced
21  to support the accommodation that Cheryl
22  had put in place and it's not all
23  encompassing of what happens if I don't
24  sleep eight to nine hours.
25    Q.   Well, the context of this letter

1           K. Shiber
2  is that you provided it to Centerview, to
3  Ms. Robinson, in connection with your
4  request for her to help you; correct?
5    A.   No, I don't think that's
6  correct.
7    Q.   What's incorrect about what I
8  just said?
9    A.   I don't think I provided it in
10  conjunction with my request for her to
11  help me.
12    Q.   Why did you give this letter to
13  Ms. Robinson?
14    A.   Once she had put in place this
15  guardrails approach during which -- which
16  set up a schedule of sleeping eight to
17  nine hours on a consistent basis, she
18  asked for medical documentation to support
19  that and I provided this document.
20    Q.   So you would agree with the
21  contents of this document that if you are
22  not able to maintain a regular sleep
23  schedule, you are at significant risk for
24  exacerbation of your illness; is that
25  correct?

1           K. Shiber
2    A.   Yes.
3    Q.   And what did does that mean,
4  significant risk for exacerbation of your
5  illness?
6    A.   That means that the symptoms of
7  my disabilities are significantly
8  increased to even further impair my
9  day-to-day life and my work performance,
10  my relationship with others, and my
11  emotional condition, and all of the other
12  arenas that these symptoms impact me in.
13    Q.   And it would have been
14  unreasonable for Centerview to disregard
15  the fact that you would be at a
16  significant risk for exacerbation of your
17  illnesses if you are not able to work --
18  if you are not able to have a consistent
19  eight to nine hours of sleep on a regular
20  sleep schedule; is that correct?
21    A.   I can't say what's reasonable
22  for the firm to do.
23    Q.   You can't say whether it's
24  reasonable for Centerview to disregard the
25  impact that not sleeping might have on

1           K. Shiber
2  your health?
3    A.   I can't -- it's not my -- I
4  don't have an opinion on what's reasonable
5  for the firm to do in regards for --
6  sorry, can you repeat the question?
7    Q.   You can't say whether it's
8  reasonable for Centerview to disregard the
9  impact that not sleeping might have on
10  your health?
11    A.   I can't say what it's reasonable
12  for the firm to regard or disregard.
13    Q.   You expected, when you gave
14  Centerview this letter from your medical
15  provider, that Centerview would understand
16  that if you don't have eight to nine hours
17  of sleep per night on a consistent basis,
18  you are at a significant risk of
19  exacerbating your illness; is that
20  correct?
21    A.   I expected them to understand
22  what it says in the letter, so yes.
23    Q.   Do you think Centerview should
24  have disregarded what it says in the
25  letter about the consequences of your not

58 (Pages 226 - 229)

K. Shiber

1
2 getting eight to nine hours of sleep on a
3 somewhat consistent basis?
4      A.   I can't say what the firm should
5 have done in regards to regarding or
6 disregarding.
7      Q.   I'm not asking what the firm
8 should have done.  I'm asking what you
9 think.
10      Do you think Centerview should
11 have disregarded your request to sleep
12 eight to nine hours on a consistent basis?
13      A.   You're asking what I think the
14 firm should have done.  You just said
15 that.  I don't think I can say what the
16 firm should have done with regarding or
17 disregarding.
18      Q.   Once you told the firm that if
19 you don't get eight to nine hours of sleep
20 on a somewhat consistent basis, you would
21 be at a significant risk of exacerbating
22 of illness, the firm was required to act
23 on that?
24      MS. SKIBITSKY: Strike that.
25      Q.   Once you told the firm that if

K. Shiber

1
2 you don't get eight to nine hours of sleep
3 on a somewhat consistent basis, you were
4 at significant risk for exacerbation of
5 your illness, it would have been
6 unreasonable for the firm not to act upon
7 that information.  They would have been
8 putting you at a risk to your health;
9 correct?
10      MR. HELLER: Objection.
11      THE WITNESS:  This was part of
12      what I understood to be a process of
13      determining what accommodations would
14      both work for the firm and also
15      accommodate my -- I am an employee
16      with a disability.  In that process, I
17      can't say what the firm -- how the
18      firm should have regarded or
19      disregarded.  There's a wide range of
20      things they could have done besides
21      completely disregard this or besides
22      this specific accommodation or besides
23      terminating me.
24      Q.   At some point in time you later
25 asked to revoke this letter; isn't that

K. Shiber

1
2 right?
3      A.   I think that's out of context.
4 I said that in an emotional state after I
5 had just been told I was terminated from
6 my dream job.
7      Q.   So you did tell Centerview that
8 you were willing to revoke this letter;
9 correct?
10      A.   At that time, yes, I did.
11      Q.   Okay.
12      And so if you had revoked this
13 letter and pretended you had never given
14 it to Centerview, was Centerview expected
15 then to still put you at a significant
16 risk of harm by having you work for -- in
17 a capacity that did not allow for eight to
18 nine hours of sleep on a somewhat
19 consistent basis?
20      MR. HELLER: Objection.
21      THE WITNESS:  They had already
22      told me I was terminated and it was
23      irrevocable, so they wouldn't have
24      been expected to do anything after I
25      said that.

K. Shiber

1
2      Q.   Okay.
3      But you are -- let's turn back
4 at Exhibit 8.
5      You're looking at the timeline,
6 Ms. Shiber?
7      A.   Yes.
8      Q.   Okay.
9      Let's look at Shiber 110.  We'll
10 start at Shiber 109, which is the first
11 bullet point -- it's the last bullet point
12 on the page but it's the black bullet
13 point.  You write, "at 6:00 p.m. I joined
14 a Webex video call with Jeanne Vicari and
15 Cheryl Robinson.  Jeanne began talking
16 about my accommodations.  The following
17 quotes from Jeanne are verbatim but not
18 necessarily in the correct order.
19 Throughout what I should have known refers
20 to the one hundred twenty-hour weeks".
21 And then there are sub-bullet points.
22      So let's look at the second to
23 last sub-bullet point.
24      You indicate here that Ms.
25 Robison said, "we can't ignore the

Page 234

K. Shiber

1
2  evidence you've presented to us that the
3  requirements of this job will have a
4  negative impact on your health", bracket,
5  "to all statements that I would be willing
6  to revoke the letter completely", end
7  bracket; correct?
8      A.   I don't know that it was Cheryl
9  that said that, if it's Vicari or Cheryl
10 Robison.
11     Q.   So either Ms. Robinson or Ms.
12 Vicari said, "we can't ignore the evidence
13 you presented to us that the requirements
14 of this job will have a negative impact on
15 your health"; right?
16     A.   Yes, I believe that's what they
17 said.
18     Q.   And it's true, right, they
19 couldn't ignore the evidence from a
20 medical provider that not getting eight to
21 nine hours of sleep on a consistent
22 schedule will have a negative impact on
23 your health; could they?
24     A.   As I've said, there's a wide
25 range of things that they could have done.

Page 235

K. Shiber

1
2  They could have started an interactive
3  process by which they asked me what
4  disability I had, they could have spoken
5  to my medical provider about what my
6  disability was, what the symptoms were,
7  how it affected my life and potentially my
8  work, what this schedule would have done
9  to my health, what the impacts were, what
10 accommodations might be possible or
11 reasonable to manage my health.  There's a
12 wide range of things they could have done
13 in relation to that statement.
14     Q.   Did they need to do that when
15 they had the letter from your medical
16 provider saying you required eight to nine
17 hours of consistent sleep per night?
18         MR. HELLER: Objection.
19         THE WITNESS:  I'm not a legal
20     professional, but it's myself
21     understanding that the interactive
22     process is part of the process by
23     which a firm is supposed to determine
24     what accommodations and -- what should
25     be done when an employee has a

Page 236

K. Shiber

1
2  disability, how they should be
3  accommodated.
4      Q.   Did you think you should just
5  not be put on any deals that would require
6  you to not always sleep eight to nine
7  hours on a consistent schedule?
8      A.   No.
9      Q.   You did not think that --
10         MS. SKIBITSKY: Strike that.
11     Q.   You did not think that you
12 should just be put on any deals that would
13 not require you to work in a manner that
14 wouldn't allow you to sleep eight to nine
15 hours on a consistent schedule; correct?
16         MR. HELLER: Objection.  Asked
17     and answered.
18         THE WITNESS:  I did not think
19     that.
20     Q.   Did you ever suggest that
21 Centerview speak to your medical
22 providers?
23     A.   I don't believe I suggested it.
24     Q.   And had Centerview spoken to
25 your medical providers, the medical

Page 237

K. Shiber

1
2  providers would have presumably agreed
3  with the letter that Nurse Verdi wrote
4  which says if you don't get eight to nine
5  hours of consistent sleep, you were at an
6  increased risk of exacerbating your
7  illness; correct?
8          MR. HELLER: Objection.
9          THE WITNESS:  I can't say what
10     would have happened the firm spoken to
11     my medical providers.
12     Q.    You agree that the letter from
13 Nurse Verdi is accurate and truthful;
14 correct?
15         MR. HELLER: Objection.
16         THE WITNESS:  I think there are
17     a variety of interpretations of this
18     letter.  I think that Verdi wrote it
19     to be accurate and truthful.
20     Q.   You told Ms. Verdi what to write
21 in the letter; right?
22     A.   No.
23         MS. SKIBITSKY: Can we mark tab
24     twelve.
25         (Whereupon, an e-mail dated

60 (Pages 234 - 237)

Page 238

```
1              K. Shiber
2    September 1, 2020 was marked
3    Defendant's Exhibit 12
4    for identification.)
5    Q.   Okay.
6        Ms. Shiber, do you have
7  Exhibit 12 in front of you?
8    A.   Yes.
9    Q.   And this is a document you
10  produced at Shiber 116; is that right?
11   A.   Yes.
12   Q.   The first e-mail here is from
13 Kathryn Shiber to Marylee Verdi from
14 August 31, 2020.
15       Do you see that?
16   A.   Yes.
17   Q.   Do you recall sending this
18 e-mail?
19   A.   Yes.
20   Q.   And you write, "hi, Marylee,
21 thank you so much for doing this.  I think
22 the letter just needs to say I have
23 significant medical conditions which
24 require nine hours of sleep per night.
25 Consistent times offer a consistent sleep
```

Page 239

```
1              K. Shiber
2  schedule".
3        Do you see that?
4    A.   Yes.
5    Q.   "In order to function properly
6  and maintain my health"; correct?
7    A.   Yes.
8    Q.   And that is what Nurse Verdi
9  wrote in her letter; right?
10       MR. HELLER: Objection.
11       THE WITNESS:  It's not exactly
12   the same.
13   Q.   Do you see any meaningful
14 difference between what you said here and
15 what Nurse Verdi wrote in her letter?
16       MR. HELLER: Objection.
17       THE WITNESS:  Yes.
18   Q.   Okay.
19       And what are those meaningful
20 differences?
21   A.   I did not say to whom it may
22 concern; I did not say I'm writing on
23 behalf of Kathryn Shiber as I have been
24 her primary care provider for the last two
25 years; I did not say because of her
```

Page 240

```
1              K. Shiber
2  underlying medical diagnoses; I did not
3  say she requires consistent sleep eight to
4  nine hours; I did not say if she is not
5  able to maintain a regular sleep schedule,
6  she is at significant risk for
7  exacerbation of her illness; and I did not
8  say, sincerely Marylee Verdi.
9    Q.   Okay.
10       What of those things that you
11 just said is a significant difference in
12 terms of the letter in terms of the
13 content of what it is that you provided to
14 Centerview?
15       MR. HELLER: Objection.
16       THE WITNESS:  The difference is
17   that Verdi wrote this letter of her
18   own accord as a medical provider.  I
19   here in my e-mail listed what Cheryl
20   had told me to include to support the
21   accommodations that Cheryl had
22   suggested.  And we had spoken -- I had
23   spoken on the phone with Verdi
24   regarding the situation.  She asked me
25   just to note down what Cheryl had said
```

Page 241

```
1              K. Shiber
2  to include.  I was just passing along
3  what Cheryl had said to include.  I
4  did not actually write the contents of
5  this letter.
6    Q.   Did you speak with Nurse Verdi
7  before you e-mailed her this e-mail?
8    A.   I believe so.
9    Q.   And did you speak on the phone
10 or did you speak via text or any other
11 manner?
12   A.   I believe we spoke on the phone.
13   Q.   And can you tell me everything
14 you recall about that conversation?
15   A.   What I recall is I had -- we had
16 caught up a bit as I hadn't spoken with
17 her since early July.  I told her about
18 that I had been working at Centerview, and
19 I explained that I had been concerned
20 about maintaining my sleep schedule and to
21 avoid -- and generally being able to avoid
22 exacerbating my illness while meeting the
23 expectations at Centerview, and that I had
24 reached out to HR about potentially
25 seeking an accommodation, that they had
```

61 (Pages 238 - 241)

K. Shiber

1         K. Shiber
2 put one in place.  I told her my thoughts
3 about their suggestion.  And I told her
4 that they had requested a letter from a
5 medical provider to support the
6 accommodations that they had put in place.
7     Q.    And what were the thoughts about
8 their suggestion that you told Nurse
9 Verdi?
10     A.    They were similar to the
11 thoughts that I told Cheryl and Tony when
12 they had -- after Cheryl had proposed the
13 accommodation, that I was worried about
14 the fact that the guardrails would need to
15 be communicated to my team.  That meant
16 that I would be -- that every team member
17 that I worked with would know that there
18 was something different about me, would
19 know that there was something wrong with
20 me, and given the significant stigma of
21 mental and psychological illnesses, I
22 thought that they would treat me
23 differently or look down upon me, and --
24     Q.    And --
25     A.    And I thought that that was not

1         K. Shiber
2 necessarily the only solution.
3     Q.    And what did you think was
4 another solution?
5     A.    I didn't have a specific other
6 solution in mind.
7     Q.    Where did Ms. Robinson first get
8 the understanding that you required eight
9 to nine hours of sleep on a consistent
10 basis?
11     A.    I don't know where she first got
12 that understanding.
13     Q.    Well, she did get it from you;
14 correct?
15     A.    I don't know.
16     Q.    Let's look at Exhibit 9.  Let's
17 look again at Shiber 108.
18     A.    That's not Exhibit 9.
19     Q.    Exhibit 8, the timeline.
20          Okay.  So we read this bullet
21 point before, but the second full bullet
22 point from the top of Shiber 108, you
23 explained, "I told her that" -- and to be
24 clear, this is in your initial meeting
25 with Ms. Robinson on August 28; correct?

1         K. Shiber
2     A.    Initial meeting on August 28,
3 yes.
4     Q.    And during that initial meeting
5 on August 28, you told Ms. Robinson you
6 had a medical disability which, for
7 healthy management, required eight to nine
8 hours of sleep per night and that ideally
9 would have a somewhat consistent sleep
10 schedule; correct?
11     A.    Yes.
12     Q.    So Ms. Robinson got this idea
13 that you required eight to nine hours of
14 medical --
15          MS. SKIBITSKY: Strike that.
16     Q.    Ms. Robinson got this idea that
17 you required eight to nine hours of sleep
18 per night from you; correct?
19     A.    I told her that.
20     Q.    And did you ever propose any
21 other accommodation to Ms. Robinson or
22 anyone at Centerview that was different
23 from the guardrails approach?
24     A.    I didn't propose any specific
25 accommodations at all.

1         K. Shiber
2     Q.    Did you propose any general
3 accommodations or any thoughts about
4 accommodations?
5     A.    I did not propose any general
6 accommodations.
7     Q.    What other accommodations would
8 have been sufficient?
9          MR. HELLER: Objection.
10          THE WITNESS: I can't say.
11     Q.    You have no idea of any
12 accommodations that might allow you to
13 sleep eight to nine hours on a somewhat
14 consistent schedule?
15     A.    I personally don't have any
16 specific accommodations in mind.
17     Q.    Are you aware of the possibility
18 of any accommodations other than that
19 which Ms. Robinson proposed that might
20 allow you to sleep eight to nine hours per
21 night on a somewhat consistent basis?
22     A.    Yes.
23     Q.    What would that have been?
24     A.    I can't say what it would have
25 been.  I think there's a broad range of

62 (Pages 242 - 245)

Page 246

1          K. Shiber
2  potential approaches that would have to be
3  evaluated in terms of how they both work
4  for avoiding exacerbating my disability as
5  well as how they work for the firm.
6      Q.   Okay.
7          So you said that there's a broad
8  range.
9          Can you give me any potential
10 accommodation on that broad range?
11     A.   No, because I can't offer an
12 opinion as to what would have worked for
13 the firm.
14     Q.   Okay.
15         What would have worked for you?
16 Forget about what would have worked for
17 the firm.
18         My question is what would have
19 worked for you other than a guardrail
20 situation where your teams are told Ms.
21 Shiber's not working from this time to
22 this time?
23     A.   Again, there's so many
24 possibilities, I cannot list -- I cannot
25 list all of the options of possibilities

Page 247

1          K. Shiber
2  that would allow me to sleep eight to nine
3  hours per night.
4      Q.   Can you list a single one other
5  than the guardrails approach?
6      A.   Yes.
7      Q.   Okay.
8          What is that accommodation?
9      A.   One of many possible
10 accommodations could be that I was
11 assigned to deals that didn't require this
12 type of staying up all night.
13     Q.   But that's not what you would
14 have wanted; correct?
15     A.   I can't say what I would have
16 wanted.
17     Q.   You testified -- I had asked you
18 this question earlier, would one
19 accommodation have been that you not work
20 on any live deals, and you said, if I'm
21 remembering correctly, no, wouldn't have
22 wanted that.
23         Is that an incorrect
24 recollection?
25         MR. HELLER: That's a different

Page 248

1          K. Shiber
2  question than the one you just asked.
3          THE WITNESS:  It is a different
4  question than what you just asked.
5      Q.   Okay.
6          My question is: Would you have
7  wanted the accommodation that you just
8  proposed as a possible solution that you
9  don't work on any live deals ever at
10 Centerview?
11         MR. HELLER: Objection.
12         THE WITNESS:  I can't say what I
13 would have wanted.  I can't say what I
14 would have wanted.
15     Q.   You don't know whether you would
16 have wanted to just be placed on deals
17 that were not live deals?
18     A.   I think you're asking me to
19 speculate about what I would have wanted
20 at the time.
21     Q.   I'm not asking you to speculate
22 about anything.
23         Is this potential accommodation
24 one that you had in mind in September,
25 2020 before your termination?

Page 249

1          K. Shiber
2      A.   In September, 2020 before my
3  termination, I did not have specific
4  accommodations in mind.
5      Q.   Okay.
6          Sitting here today, does this
7  approach of not putting you on any live
8  deals sound like a reasonable approach?
9      A.   I didn't say not put me on any
10 live deals.
11     Q.   Okay.
12         What would be your ideal
13 accommodation in that case?
14     A.   I don't have an ideal
15 accommodation.
16     Q.   You can't describe a single
17 accommodation sitting here today that you
18 would have agreed was sufficient?
19     A.   Sufficient for what purpose?
20     Q.   For your purposes.
21     A.   What are my purposes?
22     Q.   I don't know.
23         What did you consider your
24 purposes to be in September, 2020 when you
25 requested an accommodation?

63 (Pages 246 - 249)

Page 250

K. Shiber
1        K. Shiber
2        MR. HELLER: Objection.
3        THE WITNESS: My intent was to
4    work with the firm to find a solution
5    that allowed me to fulfill the
6    responsibilities of the role,
7    contribute to the firm's success, and
8    also avoid exacerbating my
9    disabilities.
10   Q.   And you understood, as we've
11   discussed, that the responsibilities of
12   the role included some unpredictable late
13   nights; correct?
14       MR. HELLER: Objection.
15       THE WITNESS: No.
16   Q.   You didn't understand that, if
17   you worked at Centerview, you would likely
18   be working late nights at times, late
19   nights being up to 2:00 a.m. or even 4:00
20   a.m.?
21   A.   At what time period are you
22   asking about whether I understood that?
23   Q.   On August 29, 2020, did you
24   understand that, if you stayed at
25   Centerview, you would be working late

Page 251

1        K. Shiber
2    nights at times?
3    A.   No, I don't think I understood
4    that.
5    Q.   Didn't Tim tell you in his
6    e-mail on August 28 that this job is
7    unpredictable and sometimes we work late
8    nights?
9    A.   Tim didn't say this job is
10   unpredictable. Tim, an associate, said
11   late nights are just part of the job.
12   Q.   Why did you call out that he's
13   an associate?
14   A.   Because I feel like you're
15   trying to imply that, based on this one
16   paragraph, I should have an understanding
17   of the requirements of the role that were
18   not communicated by anyone else and that
19   in the previous four weeks had not been a
20   requirement of my role in my experience.
21   Q.   As an associate, Tim had been
22   had gone through Centerview's three-year
23   analyst program; correct?
24   A.   I don't know.
25   Q.   You understand, as a general

Page 252

1        K. Shiber
2    matter, an analyst in Centerview's program
3    is there for three years and then may be
4    promoted to the associate position?
5    A.   Yes, generally.
6    Q.   Okay.
7        And you understand that Tim was
8    an associate; correct?
9    A.   Yes.
10   Q.   And do you know how long he had
11   been at the firm?
12   A.   No.
13   Q.   But you understood he had been
14   there for enough time to be in supervisory
15   role over the analysts; correct?
16       MR. HELLER: Objection.
17       THE WITNESS: I don't know that
18   I understood that.
19   Q.   Well, you worked for him; right?
20   A.   That was not my understanding.
21   Q.   Did you report to him?
22   A.   In what context?
23   Q.   Did he check your work?
24   A.   Yes.
25   Q.   And he asked you to make certain

Page 253

1        K. Shiber
2    edits and then you obliged and made
3    certain edits?
4    A.   Yes.
5    Q.   Is there anyone better than an
6    associate working on the deal that you're
7    working onto give you insight into the
8    expectations of the analysts on Centerview
9    deals?
10   A.   I can't say exactly who should
11   be defining the expectations.
12   Q.   But Tim explained to you the
13   reality of the position, right, in his
14   August 28 e-mail?
15       MR. HELLER: Objection.
16       THE WITNESS: I don't -- no, he
17   didn't.
18   Q.   He says, "trust me" -- I'm
19   reading the last sentence in the second
20   paragraph of this e-mail. "Trust me, we
21   don't want to be working late either and
22   if we don't need to be, we won't, but
23   there will be many late nights on this";
24   correct?
25   A.   Yes.

64 (Pages 250 - 253)

Page 254

K. Shiber

1    K. Shiber
2    Q.   And we've already established
3    that you understood there would be many
4    late nights if you continued to work at
5    Centerview; right?
6    A.   No.
7        MR. HELLER: I have to object to
8    this continued use of this phrase
9    "late night" without any definition.
10       MS. SKIBITSKY: Brian, I need to
11   object to your speaking objections.
12       MR. HELLER: No, hours you've
13   been playing around with this.  I'm
14   going to put this on the record
15   because you've been playing around
16   with the witness with the wording and
17   it's really inappropriate.  You should
18   define "late night".
19       MS. SKIBITSKY: Brian, you need
20   to stop coaching the witness and
21   wasting my time and the deposition.
22       MR. HELLER: You need to stop
23   asking the same question about sixty
24   times and hoping that you'll get a
25   different answer.  You've read this

Page 255

K. Shiber

1    K. Shiber
2    sentence about fifteen times so far.
3    You've never addressed what a late
4    night is.  You've relied on it
5    consistently --
6        MS. SKIBITSKY: Brian --
7        MR. HELLER: The objection is
8    that this question is vague and
9    ambiguous.
10       MS. SKIBITSKY: Okay.  That's all
11   you had to say; objection, vague and
12   ambiguous, that's the way the district
13   works here.
14       MR. HELLER: I think the district
15   would frown upon these questions.
16       MS. SKIBITSKY: I'm going to ask
17   you to stop wasting time, and I'm
18   going to reserve additional time if
19   these objections, these longwinded
20   objections continue.
21       MR. HELLER: You are wasting
22   enough time for everybody here.  I'm
23   trying to move this along by asking
24   you to not rehash the same things over
25   and over again.

Page 256

K. Shiber

1    K. Shiber
2        MS. SKIBITSKY: Okay.  It's
3    objection.
4        MR. HELLER: I don't think
5    objection is sufficient given the
6    questions we're getting here.
7        MS. SKIBITSKY: I think the
8    district would disagree with you.
9        Should we go off the record for
10   a few minutes?
11       MR. HELLER: Sure.
12       THE VIDEOGRAPHER: We are now off
13   the record.
14       The time on the video monitor is
15   4:21 p.m.
16       (Whereupon a break was taken)
17       THE VIDEOGRAPHER: We are now
18   back on the record.
19       The time on the video monitor is
20   4:37 p.m.
21   Q.   Ms. Shiber, before the break,
22   you had testified that one of the many
23   possible accommodations could be that I
24   was assigned deals that didn't require
25   this staying up all night.

Page 257

K. Shiber

1    K. Shiber
2        Do you recall that testimony?
3    A.   Yes.
4    Q.   Can you explain what you meant
5    by being assigned deals that didn't
6    require this staying up all night?
7    A.   In my experience at the firm, I
8    had been assigned to several accounts that
9    -- where it did not seem that the
10   expectation was that I stay up all night
11   and it seemed to me that others at the
12   firm were -- other first year analysts
13   were also assigned to deals that did not
14   require them to -- or have a team member
15   with any expectations that they stay up
16   all night, so I thought that -- so I meant
17   that, as one accommodation, I could be
18   assigned to deals where it wasn't -- that
19   wasn't the expectation that I would stay
20   up all night every night.
21   Q.   The deals that you had been
22   assigned to prior to the live deal that we
23   were discussing were not live deals; is
24   that correct?
25   A.   That's my understanding.

65 (Pages 254 - 257)

K. Shiber
1
2   Q.   They were in low activity
3 stages; is that right?
4   A.   That was my understanding.
5   Q.   So is part of this potential
6 accommodation that you would be assigned
7 only to nonlive deals?
8       MR. HELLER: Objection.
9       THE WITNESS:  No, it was not my
10   understanding that every single live
11   deal there would be an expectation of
12   staying up all night every night.
13   Q.   Was it your thought that you
14 could be assigned only to potential phases
15 of deals that were in a slow period?
16   A.   No, that's not my understanding.
17 That's not what I meant when I said the
18 previous statement.
19   Q.   Were you aware that there were a
20 steady stream of deals or assignments of
21 low activity at Centerview?
22   A.   I was not aware of the deal flow
23 of the entire firm.  I was only, you know,
24 specifically aware of the activity levels
25 of those two accounts that we've

K. Shiber
1
2 mentioned.
3   Q.   And those were accounts that
4 were not at an active stage; correct?
5   A.   Yes.
6   Q.   I had asked you was it your
7 thought that you could be assigned only to
8 potential phases of deals that were in a
9 slow period and you said, "no, that's not
10 what I meant when I said the previous
11 statement".
12       So what did you mean when you
13 said that you could potentially be
14 assigned to deals that didn't require this
15 staying up all night?
16   A.   In my understanding, there's a
17 difference between an account that's in a
18 relationship management phase and requires
19 -- and is in this low activity phase.
20 There's a difference between that and a
21 live deal and there's a difference between
22 a live deal and a live deal with an
23 expectation or requirement of working
24 through the night and staying up for
25 twenty-four hours straight potentially

K. Shiber
1
2 every day.
3   Q.   And the activity -- the deals
4 that you had been on were in the
5 relationship management phase previously;
6 is that right?
7   A.   The first two deals I was
8 assigned, yes, that is my understanding.
9   Q.   And so is your potential
10 accommodation that you would be assigned
11 to deals only on the relationship
12 management phase?
13   A.   No, that's not what I said in
14 the proposed accommodation.  I said I
15 would work on deals where I didn't have to
16 stay up all night potentially every night.
17   Q.   Are you aware of live deals at
18 Centerview that have consistent hours
19 requirements?
20       MR. HELLER: Objection.
21       THE WITNESS:  What do you mean
22   by "consistent hours requirements"?
23   Q.   Are you aware of any live views
24 at Centerview that would allow for the
25 team to sleep eight to nine hours on a

K. Shiber
1
2 consistent schedule?
3       MR. HELLER: Objection.
4       THE WITNESS:  I'm not presently
5   aware of any live deals at Centerview
6   as I no longer work at the firm.
7   Q.   When you were at Centerview,
8 were you aware of any live deals that
9 would allow for every member of the team
10 to sleep eight to nine hours on a somewhat
11 consistent schedule?
12   A.   I was -- I was not aware of what
13 other live deals there were and how much
14 sleep the people that were working on
15 those got and whether that was required or
16 not.
17   Q.   So the answer is no, you were
18 not aware of any live deals that allowed
19 for the team to sleep eight to nine hours
20 a night on a consistent schedule; correct?
21       MR. HELLER: Objection.
22       THE WITNESS:  I was not aware of
23   the details of any of the live deals.
24   Q.   And you were not aware of any
25 deals that had the team working set hours

Page 262

1            K. Shiber
2 during the day; were you?  For example,
3 from 9:00 to 6:00 every day or from 10:00
4 to 10:00 every day.
5     A.   I was not aware of any deal
6 where that was a publicized schedule.
7     Q.   You were not aware of any deal
8 where that was a schedule, publicized or
9 not; correct?
10     A.   In speaking with other members
11 of the analyst class, they were on other
12 deals and accounts that had what seemed to
13 be perhaps a schedule like you're
14 describing.  I was not aware if they were
15 live or not; I was not aware what their
16 exact hours or schedule were.  They may
17 have worked those hours or other hours.
18     Q.   So the answer to do you know
19 whether there were live deals or any
20 deals, in fact, that had specific hours
21 expectations while you were at Centerview,
22 the answer is no; correct?
23     A.   Well, yes.
24     Q.   So putting aside --
25     A.   Wait, sorry, when I said yes, I

Page 263

1            K. Shiber
2 meant yes, I was aware of such deals.
3     Q.   Of deals that had specific hours
4 expectations?
5     A.   Well, it depends on what we're
6 defining as expectations.  But based on
7 this communication from Tim, it seemed to
8 me that there were expectations that on
9 this deal I would be available 24/7, which
10 seems to me to be a live deal with
11 specific hours expectations.
12     Q.   Are you aware with -- were you
13 aware while you were at Centerview of any
14 deals, live deals or not, that had
15 predictable hours that the team was
16 instructed to be working on that would fit
17 within your requested -- that would fit
18 within Nurse Verdi's letter of eight to
19 nine hours of consistent sleep per night?
20     A.   Yes.
21     Q.   What deals were those?
22     A.   The ones that I was most aware
23 of were the two previous ones that I was
24 assigned to, but there may have been
25 additional ones and based -- I can't

Page 264

1            K. Shiber
2 speculate exactly what hours and how much
3 sleep every person on every other deal
4 got. ███████████████████████
███████████████████████████
███████████████████████████████
████████████████████████████████
██████████████████████████
10     Q.   Putting aside this potential
11 accommodation that you identified as
12 assigning you to deals that didn't require
13 this staying up all night and putting
14 aside the guardrails approach, are you
15 aware of any other potential accommodation
16 that would have enabled you to get eight
17 to nine hours of sleep on a somewhat
18 consistent basis?
19     A.   Yes.
20     Q.   And what would those
21 accommodations have been?
22     A.   I think that there's a lot of
23 options.  I think one option could have
24 been that if one night I worked very late,
25 then the next night I was guaranteed to be

Page 265

1            K. Shiber
2 able to sleep, to catch up and make up on
3 that sleep debt.  Or if for a week or two
4 weeks or however long an active period of
5 a deal was that required even staying up
6 all night, we could talk to my medical
7 provider and see what would be the impact
8 on my health should I do that, is that
9 okay.  Perhaps that would have been an
10 option if I had been given the opportunity
11 to speak to my medical provider and figure
12 out what different accommodations were.
13 We could have -- you know, I could have
14 been assigned different phases, I could
15 have been assigned live active deals which
16 didn't require or have this expectation of
17 staying up all night, I could have spoken
18 -- like I said, there's a wide range of
19 options I could have -- but I just needed
20 the opportunity to be able to both speak
21 with the firm further about my situation
22 and speak with my medical providers.  I
23 never had that opportunity because they
24 presented this guardrails and put it in
25 place and said it would work and everyone

Page 266

1          K. Shiber
2 seemed to think it would work.  Cheryl
3 said it would work, Tony said it would
4 work, and then later they said it wouldn't
5 work, took it away, fired me.  So there's
6 a lot of -- but there are a lot of other
7 options that could have -- of
8 accommodations that could have happened.
9     Q.   But you had already told
10 Centerview that if you don't work eight to
11 nine hours -- if you don't sleep for eight
12 to nine hours on a somewhat consistent
13 basis, that could seriously exacerbate
14 your medical illness; right?
15         MR. HELLER: Objection.
16         THE WITNESS:  Yes, I believe
17    that's what in the letter.
18    Q.   And so the potential
19 accommodation of working one night very
20 late and then being guaranteed to be able
21 to sleep the next night isn't consistent
22 with that representation to Centerview
23 that your health could be in danger if you
24 are not sleeping eight to nine hours a
25 night on a consistent schedule; correct?

Page 267

1          K. Shiber
2         MR. HELLER: Objection.
3         THE WITNESS:  I think there's
4    room in the word -- in the word
5    "consistent".  It doesn't mean every
6    single night of the entire year you
7    must sleep eight to nine hours or
8    something terrible will happen.
9    There's a range of possibilities and
10   there's a range of results.
11    Q.   So how would this proposal that
12 -- how would this proposal work out where
13 you could work late one night and then be
14 guaranteed to be able to sleep the
15 following night?  How would that have been
16 consistent with Nurse Verdi's
17 representation that you need eight to nine
18 hours of sleep each night and on a
19 somewhat consistent basis?
20    A.   Well, Verdi said requires
21 consistent sleep eight to nine hours, in
22 my understanding, and we could have spoken
23 to her about what that exactly meant.  In
24 my understanding, that is not necessarily
25 a guaranteed amount every single day.

Page 268

1          K. Shiber
2         So in a proposal like you're
3 describing like I mentioned where there's,
4 you know, a night of working all night and
5 then a night to catch up, that might have
6 been an option.
7    Q.   But it's not just Verdi that
8 said you required eight to nine hours of
9 sleep per night.  It's you that told Ms.
10 Robinson that you require eight to nine
11 hours of sleep per night; correct?  And
12 this is Exhibit 8, the timeline.  It's
13 Shiber 108.
14    A.   Yes, I wrote I have a medical
15 disability which, for healthy management,
16 required eight to nine hours of sleep per
17 night and that ideally would have a
18 somewhat consistent sleep schedule.  To me
19 that's a different statement from every
20 single night I need to sleep eight to nine
21 hours per night every single day.
22    Q.   What does "ideally would have a
23 somewhat consistent sleep schedule" mean
24 to you?
25    A.   To me it means that in a perfect

Page 269

1          K. Shiber
2 world with nothing going on in life that
3 might require an adjustment to the time of
4 your sleep, you would sleep -- go to sleep
5 and wake up at the same time each day.
6 But ideally would have a somewhat
7 consistent sleep schedule means that --
8 ideally it would be somewhat similar
9 times, but it's not necessarily the exact
10 same time, and that's also only in the
11 most ideal, which very few people practice
12 the exact most ideal version of how they
13 should manage their health.
14    Q.   Okay.
15         And is there an accommodation
16 that you can think of putting aside the
17 one we discussed about putting you
18 potentially on deals that wouldn't have
19 you working late nights and putting aside
20 the guardrails that would enable you to
21 have a consistent sleep schedule where
22 you're sleeping eight to nine hours of
23 sleep per night in an ideal world?
24    A.   Yes.
25    Q.   How many late nights would be

68 (Pages 266 - 269)

Page 270

K. Shiber

1  reasonable, in your opinion?
2  
3    A.   What's a late night?
4    Q.   Let's say until 2:00 a.m. which
5  you considered a late night.
6    A.   When we previously defined late
7  nights, I said in the context of texting
8  one of my friends, I considered 2:00 a.m.
9  a late night.  That's not the same as in
10  the context of all of the times that I
11  would work.  And I can't say how many --
12  how many nights.  I would have to speak
13  with my medical providers about what the
14  impact to my health might be.  I can't
15  say.
16    Q.   Didn't you tell Nurse Verdi to
17  include in her letter the fact that your
18  significant medical conditions required
19  nine hours of sleep per night?
20    A.   I said, "I think the letter
21  needs to say that".
22    Q.   And that's because you believe
23  
24  that your medical conditions require nine
25  hours of sleep per night; right?

Page 271

K. Shiber

1  
2    A.   As I've said, ideally to best
3  manage my medical conditions, I would have
4  eight to nine hours of sleep per night.
5  The reason I included it in this letter is
6  that's because what Cheryl informed me the
7  letter should say to support the
8  accommodations that she proposed.
9    Q.   Right.
10    And as we've established, you're
11  the one who came up -- who explained and
12  put it into Ms. Robinson's mind that you
13  required eight to nine hours of sleep per
14  night; right?
15    A.   Yes, I told her that.
16    Q.   So any accommodation that did
17  not allow you to sleep eight to nine hours
18  per night would not be ideal for your
19  medical condition; is that right?
20    A.   I can't say what the impact
21  might be should I have gotten -- received
22  an accommodation that included a different
23  schedule.
24    Q.   You said -- you testified that
25  "ideally, to best manage my medical

Page 272

K. Shiber

1  
2  conditions, I would have eight to nine
3  hours of sleep per night".
4    If you don't get eight to nine
5  hours of sleep per night, you are not best
6  managing your medical conditions; is that
7  correct?
8    A.   That is my understanding.
9    Q.   And so if Centerview -- and you
10  and Centerview come up with an
11  accommodation that does not give you eight
12  to nine hours of sleep per night, you are
13  not receiving -- you are not best managing
14  your medical conditions; right?
15    A.   I'm not sure.  It's possible
16  that, if I had a different amount of sleep
17  but did -- perhaps used other coping
18  strategies or perhaps had naps throughout
19  the day but didn't have that amount of
20  direct sleep per night or a variety of
21  different situations, again I'm not a
22  medical provider, I can't say exactly how
23  that -- how my health should have been
24  managed.
25    Q.   But you did because you told

Page 273

K. Shiber

1  
2  Centerview that you required eight to nine
3  hours of sleep per night; right?
4    A.   That was my understanding at the
5  time.
6    Q.   And then you told Nurse Verdi to
7  write you a letter that says you required
8  eight to nine hours of sleep per night;
9  right?
10    A.   Based on Cheryl telling me to do
11  so.
12    Q.   And Cheryl told you to do so
13  because you had represented to Centerview
14  that you required eight to nine hours of
15  sleep per night; correct?
16    MR. HELLER:  Objection.
17    THE WITNESS:  I can't say why
18  Cheryl told me that.  I think there's
19  a difference between -- my
20  understanding was that Cheryl told me
21  what to have my provider include in
22  the letter to support the
23  accommodations she had put in place,
24  which is different from me telling --
25  yeah, I don't know why -- I can't say

69 (Pages 270 - 273)

Page 274

K. Shiber

1  why specifically she told me to
2  include it in the letter. That was my
3  understanding at the time.
4  Q. Okay.
5       So the only potential
6  accommodations we've discussed that would
7  allow you to get eight to nine hours of
8  sleep per night to best manage your
9  medical conditions is the guardrails
10  approach and the proposal that you came up
11  with today where you would be assigned to
12  deals that didn't require this staying up
13  all night; correct?
14  A. No, I think there are additional
15  options.
16  Q. What are the additional options
17  that would allow you to get eight to nine
18  hours of sleep per night?
19       MR. HELLER: Objection.
20       THE WITNESS: There are a range
21  of different options. To get eight to
22  nine hours of sleep per night, I could
23  have worked on the same deal but on
24  owned work streams or tasks that

Page 275

K. Shiber

1  weren't active in the middle of the
2  night. I could have slept a different
3  eight to nine hours each night, such
4  as 4:00 a.m. to 12:00 p.m. I could
5  have -- there's a variety of
6  approaches that even still in this
7  limitation you're giving of per every
8  single night I could have done. And
9  if we interpret -- well, you said per
10  night, so even per night, I think
11  there's still a range. To me that
12  doesn't mean every single night.
13  There's a broad set of options,
14  including working increased hours one
15  week, sleeping more the next, even
16  between the days like we mentioned.
17  Q. I'm looking for accommodations
18  that allow you to sleep eight to nine
19  hours per night.
20       So one of your proposals that
21  you just testified to was you could have
22  slept a different eight to nine hours each
23  night.
24       What did you mean by that?

Page 276

K. Shiber

1  A. I meant that if you're looking
2  for accommodations where it's eight to
3  nine hours per night, it doesn't mean the
4  same hours, those hours don't have to
5  occur at the same time, which is different
6  than the guardrails approach and is
7  different than being assigned to different
8  deals.
9  Q. But didn't you tell Cheryl that
10  you required eight to nine hours of sleep
11  per night on a somewhat consistent basis?
12  A. Yes, ideally on a somewhat
13  consistent schedule.
14  Q. How is sleeping --
15       MS. SKIBITSKY: Strike that.
16  Q. You testified, "I meant that if
17  you're looking for accommodations where
18  it's eight to nine hours per night, it
19  doesn't mean the same hours. Those hours
20  don't have to occur at the same time,
21  which is different than the guardrails
22  approach and it's different from being
23  assigned to different deals".
24       What does this mean it's eight

Page 277

K. Shiber

1  to nine hours per night, it doesn't mean
2  the same hours, what does that mean?
3  A. That just means that, when I say
4  eight to nine hours per night, it doesn't
5  mean 12:00 a.m. to 8:00 a.m. or 9:00 a.m.
6  That just means within a say
7  twenty-four-hour period there's eight to
8  nine hours of sleep.
9  Q. Are you aware of any deals at
10  Centerview that would have the flexibility
11  for you to sign off at a certain time and
12  log in the next day at a certain time that
13  would allow you to get eight to nine hours
14  of sleep per night? Are you aware of such
15  deals that are so predictable as that?
16  A. As I mentioned, the deals I was
17  previously assigned. And additionally,
18  given that deals are highly confidential
19  and given that I had just started with the
20  firm and didn't have that many friends
21  that I was even discussing my -- anything
22  about, my work with at the firm, I don't
23  think -- I just don't think it means
24  anything that I didn't know what other

70 (Pages 274 - 277)

Page 278

1          K. Shiber
2 deals were going on or are still.
3    Q.   The deal you were -- the two
4 deals you were previously assigned before
5 the live deal were in inactive phases of
6 the deal; correct?
7    A.   That's my understanding.
8    Q.   Okay.
9         And the question I asked was
10 were you aware of any deal at Centerview
11 that would allow for the flexibility for
12 you to sign off at a certain time and log
13 on the next day eight to nine hours later
14 and the answer to that question is no, you
15 were not aware of any such deal at
16 Centerview when you were employed by
17 Centerview; is that correct?
18    A.   I was not aware of any such
19 deals or any other deals really.
20    Q.   Could you have done your job at
21 Centerview if you were sleeping from 4:00
22 a.m. to noon when the rest of your team
23 was working during the day?
24    A.   I don't think it's my place to
25 say whether I could have done my job.

Page 279

1          K. Shiber
2 That's --
3    Q.   Are you aware of any deals or
4 phases of deals that were going on while
5 you were employed by Centerview that would
6 have permitted a member of the team to
7 sleep from 4:00 a.m. to noon, for example?
8    A.   I can't say what other analysts
9 experienced on other deals.
10    Q.   My question is are you aware of
11 any deals that would permit an analyst to
12 sleep from 4:00 a.m. to noon?
13    A.   I don't know.
14    Q.   So the answer is no, you were
15 not aware of any deals that would permit
16 an analyst to sleep from 4:00 a.m. to
17 noon?
18    A.   No, the answer is I don't know.
19 Because, for example, the deals we've been
20 talking about, these low activity deals, I
21 don't know if it would have been -- if the
22 members of the team would have permitted
23 -- would have been okay, would have
24 permitted me to sleep from 4:00 a.m. to
25 12:00 a.m. Even the deal that we're

Page 280

1          K. Shiber
2 talking about, I don't know if they would
3 have -- you know, if that would have been
4 permitted on that deal.
5    Q.   So you don't know whether there
6 were any such deals that would enable an
7 analyst to sleep from 4:00 a.m. to noon
8 every day; correct?
9         MR. HELLER: Objection.
10         THE WITNESS: Correct, I don't
11    know.
12    Q.   You were not aware of any
13 specific deals that would have allowed an
14 analyst to sleep from 4:00 a.m. to noon
15 each day; correct?
16    A.   No, that's the same question you
17 just asked two questions ago.
18    Q.   Is the answer no, that you were
19 not aware of any specific deals that would
20 have allowed an associate --
21    A.   What I'm trying to say -- sorry.
22    Q.   You cannot identify sitting here
23 today any deals where analysts or
24 associates were able, as a matter of fact,
25 to sleep from 4:00 a.m. to 12:00 p.m. each

Page 281

1          K. Shiber
2 day during the course of the deal;
3 correct?
4         MR. HELLER: Objection.
5         THE WITNESS: I don't know.
6    Q.   Okay.
7         So as far as any potential
8 accommodations that would allow you to
9 sleep for eight to nine hours per night,
10 we've discussed the guardrails approach,
11 the approach to potentially putting you on
12 deals that would not require you to work
13 late nights, and a proposal where you just
14 sleep eight to nine hours a night at
15 various times; is that correct?
16    A.   No. The second proposal -- the
17 second one is not no deals where I have no
18 late nights. It's no deals -- it's deals
19 where I can still sleep eight to nine
20 hours per night.
21    Q.   The way you phrased the proposal
22 was to be assigned deals that didn't
23 require this staying up all night.
24    A.   Yes.
25    Q.   Aside from those -- aside from

71 (Pages 278 - 281)

K. Shiber

1            K. Shiber
2 those three proposals, are you aware of
3 any other accommodations that might allow
4 you to sleep eight to nine hours of sleep
5 per night?
6        MR. HELLER: Objection.
7        THE WITNESS: Yes.
8    Q.   And what would that have been?
9    A.   When you say -- I guess when you
10 say eight to nine hours of sleep per
11 night, do you mean eight to nine hours of
12 sleep every single night?
13   Q.   Yes.
14   A.   So to my understanding, the
15 proposals include working on deals that
16 don't require staying up all night,
17 guardrails approach of signing off at
18 specific times, and sleeping different
19 hours each night. I mean, I can't think
20 of additional -- I feel like -- I feel
21 like either sleeping the same hours every
22 night or sleeping different hours every
23 night covers -- variations of those cover
24 all the possibilities of sleeping eight to
25 nine hours every single night.

1            K. Shiber
2    Q.   Okay.
3        Let's turn back to Exhibit 8 and
4 let's look at Shiber 108. And the third
5 full bullet point down, it starts with,
6 "Cheryl stated". You wrote, "Cheryl
7 stated that I had done the right thing by
8 contacting HR. She said that they 'had
9 never had an accommodation of this sort
10 but that she would see what she could do'.
11 She was extremely adamant that they were
12 very concerned about my health and that
13 was the firm's top priority. She didn't
14 know what the accommodation would be
15 necessarily but she said she would get
16 back to me"; correct?
17   A.   Yes.
18   Q.   And so that was the first
19 conversation you had with Centerview with
20 respect to a potential accommodation;
21 right? That discussion with Cheryl on
22 August 28?
23   A.   The first was the e-mail, but
24 yes, this was the first phone
25 conversation.

1            K. Shiber
2    Q.   Okay.
3        And the first was the e-mail
4 that you sent Cheryl on August 28 where
5 you said can we have a phone conversation;
6 correct?
7    A.   Yes.
8    Q.   Okay.
9        And so then the second
10 discussion you had with anyone at
11 Centerview with respect to your request
12 for an accommodation was this conversation
13 with Cheryl where she explained that she
14 had never had an accommodation of this
15 sort but that she would see what she could
16 do; correct?
17   A.   Yes.
18   Q.   And then the third conversation
19 with Cheryl occurs later that same day;
20 right?
21   A.   Correct.
22   Q.   I'm looking at the next bullet
23 point down that starts, "later that day".
24   A.   Yes.
25   Q.   So it says, "later that day,

1            K. Shiber
2 Cheryl called me and suggested her idea of
3 the accommodations, which were that she
4 put up guardrails such that I would be
5 able to have eight hours of sleep each
6 night".
7        Do you see that?
8    A.   Yes.
9    Q.   Okay.
10       And then you explained, "I
11 immediately said that I was not in favor
12 of this plan".
13       Do you see that?
14   A.   Yes.
15   Q.   "I did not want my team to know
16 about the situation, as I was concerned
17 they would view me differently due to the
18 stigmas around having a disability as well
19 as the general 'suck it up' nature of the
20 financial industry"; correct?
21   A.   Yes.
22   Q.   And she stated that, in order
23 for such boundaries to be respected, my
24 team would have to be made aware of them.
25       Do you see that?

72 (Pages 282 - 285)

Page 286

1              K. Shiber
2    A.   Yes.
3    Q.   "I repeated to Cheryl multiple
4    times that I was not comfortable with this
5    and did not want it to affect what deals I
6    was staffed on or the opportunities and
7    experiences I was exposed to at the firm".
8         Do you see that?
9    A.   Yes.
10   Q.   And then you write, "she", being
11   Cheryl, "suggested that we have a call
12   with a senior banker show could offer
13   input from the banker side of things".
14        Do you see that?
15   A.   Yes.
16   Q.   And so that recommendation from
17   Ms. Robinson to have a call with a senior
18   banker who could offer input was in
19   response to your statements that you did
20   not want your team to know about the
21   situation; correct?
22   A.   In response to that and also in
23   response to my concerns about the deals
24   I'm staffed on, opportunities and
25   experiences that I had in my growth at the

Page 287

1              K. Shiber
2    firm.
3    Q.   Okay.
4         And so Ms. Robinson, hearing
5    your concerns, suggested Tony Kim and said
6    he was a good resource for this type of
7    thing; correct?
8    A.   Yes.
9    Q.   And so you subsequently did have
10   a call with Ms. Robinson and Tony Kim;
11   right?
12   A.   Yes.
13   Q.   And that phone call, did that
14   occur the same day, August 28?
15   A.   I don't recall the exact date.
16   Q.   Okay.
17        And then you wrote, "shortly
18   after that, the three of us had a phone
19   call.  Tony stated that he was not
20   speaking as the partner who happened to be
21   on my deal team but rather in his capacity
22   handling various administrative things at
23   the firm.  Tony listened to my concerns
24   about not wanting my disability to limit
25   my professional career.  He said that the

Page 288

1              K. Shiber
2    team would not have to know the exact
3    specifics of the situation, just that I
4    was not always available".
5         Do you recall Tony saying that?
6    A.   Yes.
7    Q.   And you write, "I cannot
8    emphasize enough how many times I
9    expressed that I only wanted to go through
10   with this if it would not impact my career
11   negatively in a way".
12        Do you see that?
13   A.   Yes.
14   Q.   What do you mean by "only wanted
15   to go through with it" in this sentence?
16   A.   I only wanted to go through with
17   the accommodation that Cheryl proposed if
18   I felt like I would not be stigmatized
19   against and discriminated against and
20   viewed differently by my teammates due to
21   having a disability.
22   Q.   And then Tony responded to that
23   that he understood your concerns but that
24   there were plenty of reasons why someone
25   would not be available at a specific time

Page 289

1              K. Shiber
2    and that, for example, if you were on
3    another busy deal, you could not have the
4    same availability for this team and they
5    would have to understand that.
6         Do you see that?
7    A.   Yes.
8    Q.   Okay.
9         And so Tony understood your
10   concern and he responded by saying that
11   there were plenty of reasons why someone
12   might not be available at specific times;
13   correct?
14   A.   Yes, that's what he said.
15   Q.   And then you write, "this made
16   me feel that my professional treatment
17   would not change so I said okay"; right?
18   A.   Yes.
19   Q.   Okay.
20        And then you had another
21   conversation with Cheryl about this
22   proposed accommodation; correct?
23   A.   No.
24   Q.   Well, the second bullet point
25   says -- the first full bullet point on

73 (Pages 286 - 289)

K. Shiber

1          K. Shiber
2   page Shiber 109 says, "Cheryl said they
3   had put something in place for over that
4   weekend and we would be in touch the next
5   week to discuss specifics"; right?
6      A.   Yes.
7      Q.   And then you write, "at the
8   beginning of the next week, she told me
9   that the team had been informed I would be
10  off for a certain amount of time each
11  day".
12         Do you recall that conversation?
13     A.   Yes.
14     Q.   Was that via e-mail or phone?
15     A.   That part I believe was over the
16  phone.
17     Q.   And what do you recall about
18  that conversation?
19     A.   Which, the put something in
20  place over the weekend or at the beginning
21  of the next week?
22     Q.   The sentence that says, "at the
23  beginning of the next week, she told me
24  the team had been informed I would be off
25  for a certain amount of time each day".

1          K. Shiber
2         So when Cheryl told you that,
3   that was a phone conversation; is that
4   right?
5      A.   I believe so.
6      Q.   And what do you remember about
7   what was said during that phone
8   conversation?
9      A.   I don't really remember the
10  specifics.
11     Q.   And then you write, "the day
12  after that, I e-mailed and asked for
13  specifics on how to handle communicating
14  that, whether I should tell my team
15  members when I was signing off each day
16  and whether the hours should change day by
17  day depending on when our earliest
18  engagement was the next day so that I
19  could maximize the time I was available
20  for the team.  She responded that Tony had
21  communicated to the team that I had a hard
22  stop between midnight and 9:00 a.m."
23         Do you see that?
24     A.   Yes.
25     Q.   Do you recall -- we just read

1          K. Shiber
2   through a series of discussions that you
3   had with Ms. Robinson and/or Mr. Kim while
4   you were at Centerview.
5         Do you recall any aspect of
6   those discussions or conversations that's
7   not memorialized here in your bullet
8   points?
9      A.   (Reviewing).
10         Yes.
11     Q.   What is it that you recall
12  that's not memorialized here?
13     A.   I recall that Tony stated that
14  he could take me off of the deal that I
15  was currently working on.
16     Q.   And what was your response to
17  Tony stating that?
18     A.   That I did not want Tony to do
19  that.
20     Q.   Why did you not want Tony to do
21  that?
22     A.   At the time I felt like if he
23  took me off the deal, that the other
24  members of the deal team would perceive me
25  as being incompetent and I was afraid that

1          K. Shiber
2   this would start a trend where I was -- I
3   was not treated as having the abilities of
4   the rest of the first year analysts in my
5   deal assignments.
6      Q.   And you had testified and you
7   put in your timeline that you did not want
8   the team to be aware of your need to sign
9   off; is that right?
10     A.   Yes.
11     Q.   Okay.
12         How was the team supposed to
13  work with you and respect that boundary if
14  they didn't know that you needed to sign
15  off at a period of time and not be
16  working?
17     A.   I think what I really meant by
18  not wanting the team to know was I didn't
19  want the team to know that I was disabled
20  and view me -- view me negatively or as
21  less than because of that.
22     Q.   Did you explain that to Ms.
23  Robinson as what you meant by you didn't
24  want the team to know?
25     A.   Yes.

74 (Pages 290 - 293)

Page 294

K. Shiber

1    Q.   Did anyone at Centerview ever
2  suggest that they would tell the team that
3  you were disabled?
4    A.   What do you mean by "suggest"?
5    Q.   Did anyone at Centerview -- you
6  testified that you did not want the team
7  knowing that you were disabled.
8        Did anyone at Centerview ever
9  say that they were going to tell your team
10 that you were disabled?
11   A.   No, they didn't say that.
12   Q.   And so what they said was they
13 were going to tell your team that you
14 would be signing off at a certain point
15 and logging on at another time the next
16 morning; right?
17   A.   Yes.
18   Q.   And that was necessary to
19 communicate to the team so that the team
20 would know to respect that boundary;
21 correct?
22   A.   I don't know that that was
23 necessary.
24   Q.   How would the team have been

Page 295

K. Shiber

1  able to function without knowing that one
2  of the team members is not available while
3  everyone else is working?
4    A.   First of all, I don't think that
5  everyone else on the team was working the
6  hours that I couldn't work as part of the
7  guardrails.
8        Also, even with those guardrails
9  in place, that doesn't mean that -- there
10 could have been different ways -- I guess
11 what I'm trying to say is I could have
12 still worked during those hours without
13 like -- exclusively during those hours
14 without it being communicated in this
15 sign-on/signoff method.
16   Q.   How would that have worked?
17   A.   I can't say exactly how it would
18 have worked, but as I mentioned, for
19 example, I could have -- for example, in
20 the -- I could have worked and submitted
21 my hours during that time period without
22 it being communicated as such.
23   Q.   I don't -- what does it mean "I
24 could have worked and submitted my hours

Page 296

K. Shiber

1  during that time period without it being
2  communicated as such"?
3    A.   Sorry, I mean submitted my work
4  during that time period.
5    Q.   What time period?
6    A.   During the time period that
7  Cheryl suggested that I would have been
8  working with this plan in place.
9    Q.   And when you submitted your
10 work, you would get comments from those
11 working above you; correct?
12   A.   Yes.
13   Q.   And they would ask that you
14 implemented your comments; correct?
15   A.   Yes.
16   Q.   And so how would people know if
17 they were not made aware that you were
18 offline at a certain point in time that
19 they shouldn't expect a revised draft of
20 whatever it is that you were working on if
21 they were not told that you would have set
22 hours?
23   A.   I think that different people,
24 different teams, different firms have

Page 297

K. Shiber

1  different expectations and understandings
2  of the response time on implementing
3  changes.
4    Q.   And you understood that, at
5  least on the deal that you were on, the
6  live deal, the expectation was that it
7  would be a quick turnaround time; right?
8    A.   I think quick is a broad -- I
9  don't know what quick means.
10   Q.   What would happen if a team
11 member sent you an urgent assignment while
12 you were sleeping and they were not aware
13 that you were not working?
14   A.   I don't know what would happen
15 in that situation.
16   Q.   Wouldn't the impression that
17 that would convey be that you were
18 ignoring them?
19       MR. HELLER: Objection.
20       THE WITNESS: I don't know what
21 impression they might -- they might
22 have.
23   Q.   How would your not responding to
24 an urgent e-mail while you were sleeping

75 (Pages 294 - 297)

1          K. Shiber
2  impact your reputation at Centerview?
3          MR. HELLER: Objection.
4          THE WITNESS: I don't know.
5     Q.   Wouldn't you presumably get an
6  e-mail like the one you did get from Mr.
7  Ernst on August 28 saying we need to
8  discuss communications and that he and Mr.
9  -- and Matt Gallea should not be up
10 working alone?
11         MR. HELLER: Objection.
12         THE WITNESS: I don't know that
13    everyone I ever worked with at
14    Centerview would have sent such an
15    e-mail.
16    Q.   How would you respond if you
17 were sleeping and you received an urgent
18 e-mail from a teammate asking you to get
19 something done and then you didn't get it
20 done and then the next morning you
21 received an e-mail like the one you
22 received from Mr. Ernst?
23         MR. HELLER: Objection.
24         THE WITNESS: I don't know that
25    I've seen any example of Ernst sending

1          K. Shiber
2     me an urgent e-mail while I was
3     sleeping.
4     Q.   Well, you've seen an example of
5  Mr. Ernst asking where you didn't respond
6  to an e-mail; isn't that right?
7     A.   In my read of this in this
8  e-mail, it doesn't say that.
9     Q.   Who would have -- who was
10 supposed to be covering your work while
11 you were sleeping?
12    A.   At which point, on August 28?
13    Q.   No, if the guardrail proposal
14 was instituted and no one on your team was
15 told that you would be offline during a
16 certain period of time, is there somebody
17 who was supposed to -- who would have been
18 doing the work when you didn't respond to
19 an e-mail?
20    A.   I can't say what would have
21 happened in that situation.
22    Q.   Was there another first year
23 analyst on the team, on the live deal team
24 at the time other than you?
25    A.   No.

1          K. Shiber
2     Q.   So there would have not been a
3  first year analyst available to do -- to
4  cover the work that you couldn't get to
5  while you were sleeping; correct?
6     A.   I don't know.
7     Q.   Well, in the case of the live
8  deal team, there was not a first year
9  analyst other than yourself on that team;
10 correct?
11    A.   Correct.
12    Q.   Okay.
13         So if you didn't respond to an
14 e-mail that Tim Ernst sent while you were
15 sleeping, Tim couldn't ask another first
16 year analyst who was already on that team
17 and was familiar with the deal to step in;
18 correct?
19    A.   Since at the time there was no
20 other first year analyst on the deal, Tim
21 could not have asked another first year
22 analyst anything who was on the deal.
23    Q.   And so was Tim supposed to do
24 the work if he didn't get a response
25 e-mail turning edits or getting something

1          K. Shiber
2  done?
3         MR. HELLER: Objection.
4         THE WITNESS: I don't know.
5     Q.   Was Matt supposed to cover the
6  work if you couldn't respond to an e-mail
7  while you were sleeping?
8         MR. HELLER: Objection.
9         THE WITNESS: I don't know. No
10    one ever discussed what was going to
11    happen while I was sleeping with the
12    accommodations that Cheryl and Tony
13    agreed upon and put in place.
14    Q.   Well, you didn't want Centerview
15 to communicate that you had to be offline
16 during a certain period of time; right?
17    A.   When the accommodation was first
18 proposed, I did not want that.
19    Q.   And after discussing the
20 proposal and communicating the guardrails,
21 the hours to the team with Mr. Kim, you
22 changed your mind; correct?
23         MR. HELLER: Objection.
24         THE WITNESS: After discussing
25    with Robinson and Kim the -- and

Page 302

K. Shiber

2 receiving assurances from Kim that
3 there were a lot of reasons why
4 someone might not be available at a
5 certain time, that this wouldn't
6 immediately expose that I had a
7 disability to my team, yes, I realized
8 that to put in place the specific
9 accommodations they had proposed and
10 have my team respect those boundaries,
11 then the team would have to be made
12 aware of them. So yes, after that
13 conversation, I changed my mind.
14    Q.    Ms. Shiber, you have an
15 Instagram, a page for your artwork;
16 correct?
17    A.    Yes.
18    Q.    And is that handle
19 @kathrynshiber?
20    A.    Yes.
21    Q.    When did you first create that
22 Instagram page?
23    A.    I don't recall when it was first
24 created.
25    Q.    Was it before you joined

Page 303

K. Shiber

2 Centerview?
3    A.    I believe so.
4    Q.    And you were active on that page
5 while you were at Centerview; correct?
6    A.    Yes.
7    Q.    How much time did you spend
8 posting on the Shiber -- Kathryn Shiber
9 Instagram page on a daily basis while you
10 were employed by Centerview?
11    A.    I can't say.
12        MS. SKIBITSKY: Can you mark
13    this, please, Exhibit 13.
14        (Whereupon, a multipage document
15    was marked Defendant's Exhibit 13
16    for identification.)
17    Q.    Ms. Shiber, you have in front of
18 you a collection of posts from the Kathryn
19 Shiber Instagram page that Centerview has
20 produced.
21        Do you recognize the first post
22 on this page?
23    A.    Yes.
24    Q.    And this is from July 12, 2020.
25        Do you see that?

Page 304

K. Shiber

2    A.    Posted, yes.
3    Q.    And you were employed by
4 Centerview on July 12; correct?
5    A.    Yes.
6    Q.    Is this an image of a photo that
7 you took?
8    A.    Yes.
9    Q.    When did you take this photo?
10    A.    I don't recall.
11    Q.    Was it while you were employed
12 by Centerview?
13    A.    No.
14    Q.    Was it before you were employed
15 by Centerview?
16    A.    Yes.
17    Q.    And before uploading -- before
18 posting this photo, did you make any edits
19 to it or revise it in any way?
20    A.    Yes.
21    Q.    At what point in time were you
22 editing the photo?
23    A.    I don't know.
24    Q.    Would it have been immediately
25 prior to your posting it?

Page 305

K. Shiber

2    A.    I would have edited the photo
3 initially upon taking the photo.
4    Q.    And before you posted it, would
5 you have edited it further?
6    A.    Potentially.
7    Q.    Do you recall whether you edited
8 this photo further?
9    A.    No.
10    Q.    Okay.
11        And then let's go to the next
12 page, which is Centerview 3040. This is
13 another photo.
14        Was this photo taken by you?
15    A.    Yes.
16    Q.    And it was posted on July 12,
17 2020.
18        Do you see that?
19    A.    Yes.
20    Q.    Do you recall when I took this
21 photo?
22    A.    Not the exact date.
23    Q.    Did you take the photo while you
24 were working at Centerview?
25    A.    No.

77 (Pages 302 - 305)

Page 306

K. Shiber

1
2    Q.   Did you edit the photo while you
3  were working at Centerview?
4    A.   I don't know.
5    Q.   And the subsequent photo is also
6  posted on July 12, 2020.
7       Do you see that?
8    A.   Yes.
9    Q.   And the geotag is Hanover, New
10 Hampshire.
11      Do you see that?
12   A.   Yes.
13   Q.   Were you in Hanover, New
14 Hampshire when you posted the photo on
15 July 12, 2020?
16   A.   No.
17   Q.   Did you take the photo while you
18 were working at Centerview?
19   A.   No.
20   Q.   Did you edit the photo before
21 posting it?
22   A.   Yes.
23   Q.   Did you edit it while working at
24 Centerview?
25   A.   I don't know.

Page 307

K. Shiber

1
2    Q.   The next page which is
3  Centerview 3139, that was also posted on
4  July 12, 2020.
5       Do you see that?
6    A.   Yes.
7    Q.   The next page was also posted
8  July 12, 2020.
9       Do you see that?
10   A.   Yes.
11   Q.   And that's Centerview 3118.
12      The next page was also posted on
13 July 12, 2020.
14      Do you see that?
15   A.   Yes.
16   Q.   And that's Centerview 3069.
17      Do you see that?
18   A.   Yes.
19   Q.   And the subsequent page is also
20 posted on July 12, 2020, and that's
21 Centerview 3075.
22      Do you see that?
23   A.   Yes.
24   Q.   And then the following page,
25 which is Centerview 3004, was also posted

Page 308

K. Shiber

1
2  on July 12, 2020.
3       Do you see that?
4    A.   Yes.
5    Q.   And the next page, which is
6  Centerview 3033, was also posted on
7  July 12, 2020.
8       Do you see that?
9    A.   Yes.
10   Q.   And finally, the subsequent page
11 was also posted on July 12, 2020, and
12 that's Centerview 3084.
13      Do you see that?
14   A.   Yes.
15   Q.   Do you recall posting these
16 photos on July 12, 2020?
17   A.   I recall posting the photos.  I
18 don't recall the exact date.  I presume it
19 was July 12, 2020.
20   Q.   How much time would it have
21 taken you to identify and decide to post
22 these photos on the day that you posted
23 them?
24   A.   I don't know exactly how much
25 time it took.

Page 309

K. Shiber

1
2    Q.   How much time did you devote to
3  your art Instagram account on a daily
4  basis while you were working at
5  Centerview?
6    A.   I don't know exactly, and I
7  don't think it was a daily basis.
8    Q.   Do you have an estimate of how
9  much time on the days that you were
10 working on your Instagram -- your art
11 Instagram account, how much time on
12 average you were spending on that account?
13   A.   I could estimate less than
14 thirty minutes.
15   Q.   What time of day would you
16 typically be posting on that art Instagram
17 account while you were employed by
18 Centerview?
19   A.   I don't know.
20   Q.   Do you know whether it would
21 have been the morning?
22   A.   I don't know.
23   Q.   And you also maintained certain
24 Tik Tok handles while you were employed by
25 Centerview; correct?

78 (Pages 306 - 309)

Page 310

K. Shiber

1
2    A.  Yes.
3    Q.  Do you recall how much time you
4 spent per day posting on Tik Tok while you
5 were employed by Centerview?
6    A.  No.
7    Q.  Other than creating social media
8 content, what were the other hobbies that
9 you had during your employment at
10 Centerview?
11   A.  My hobbies were creating art and
12 reading.  Those were my main hobbies.
13   Q.  How much time would you spend
14 reading on average per day while you were
15 employed by Centerview?
16   A.  I don't know.
17   Q.  Was it more than one hour per
18 day that you would spend reading while at
19 Centerview?
20   A.  No.
21   Q.  Was it more than one hour per
22 day that you would spend on Tik Tok while
23 at Centerview?
24   A.  I don't know.
25   Q.  Do you know whether it was more

Page 311

K. Shiber

1
2 than a half hour a day that you would
3 spend on Tik Tok while you were at
4 Centerview?
5    A.  I don't know.
6    Q.  How much time would you spend on
7 Instagram during your employment at
8 Centerview?
9    A.  I don't know.
10   Q.  Was it more than one hour per
11 day?
12   A.  I don't know.
13   Q.  Was it more than a half hour per
14 day?
15   A.  I don't know.
16   Q.  Let's skip to in the exhibit in
17 front of you the page Centerview 2953.
18 They're in chronological order.  That's a
19 head shot.
20       So that's Centerview 2953.
21       Do you see that?
22   A.  Yes.
23   Q.  Is this a head shot that you
24 took?
25   A.  Yes.

Page 312

K. Shiber

1
2    Q.  And this was posted on
3 August 19, 2020; correct?
4    A.  Yes.
5    Q.  Did you post this -- did you
6 take this head shot while you were
7 employed by Centerview?
8    A.  No.  I did not take the head
9 shot while I was employed by Centerview.
10   Q.  Did you -- when did you take the
11 head shot?
12   A.  I took the head shot while I was
13 in school.  I don't know the exact date.
14   Q.  And did you spend time editing
15 the head shot before you posted it?
16   A.  After taking the photo, yes, I
17 edited it.
18   Q.  And did you edit it while you
19 were employed by Centerview?
20   A.  No.
21   Q.  Did you take any photos -- did
22 you take any head shots while you were
23 employed by Centerview?
24   A.  Can you define a head shot,
25 please?

Page 313

K. Shiber

1
2    Q.  Did you take any photos of
3 individuals while you were employed by
4 Centerview?
5    A.  Yes.
6    Q.  Did you do that for commissions?
7    A.  No.
8    Q.  What you do -- what was the
9 purpose of you are taking photos of
10 individuals while you were employed by
11 Centerview?
12   A.  I took photos of other people as
13 part of documenting life and -- yeah.
14   Q.  Let's look at the -- it's the
15 sort of third from last page in
16 Exhibit 13.
17       Are these photos that you took?
18   A.  Yes.
19   Q.  And are they photos that you
20 took in Central Park?
21   A.  Yes.
22   Q.  Did you take these photos while
23 you were employed by Centerview?
24   A.  I don't recall.
25   Q.  Do you recall being in New York

79 (Pages 310 - 313)

Page 314

1        K. Shiber
2  City on September 1, 2012?
3        MS. SKIBITSKY: Strike that.
4    Q.   Do you recall being in New York
5  City on September 1, 2020?
6    A.   I don't recall.
7    Q.   Do you recall taking these
8  photos?
9    A.   Yes.
10   Q.   And you don't recall when you
11  took these photos?
12   A.   No.
13   Q.   How long after you take a photo
14  do you generally post it on Instagram?
15   A.   It could be a wide range. Some
16  of these photos are several years old.
17   Q.   You did make money on your
18  artwork while you were at Centerview;
19  correct?
20   A.   I don't recall.
21   Q.   You don't recall whether you
22  sold any artwork while you were employed
23  by Centerview?
24   A.   No, I don't recall.
25   Q.   Do you recall that you told

Page 315

1        K. Shiber
2  Centerview and requested the opportunity
3  -- the ability to be able to make money by
4  selling your artwork?
5    A.   Yes.
6    Q.   And that request was granted;
7  correct?
8    A.   Yes.
9    Q.   And how much time did you devote
10  to your artwork on a daily basis while you
11  were employed by Centerview?
12   A.   I don't know.
13   Q.   In February, 2021, you reached
14  out to Dartmouth to collect your medical
15  records; is that right?
16   A.   Yes.
17   Q.   Why do you reach out to
18  Dartmouth in February --
19       MS. SKIBITSKY: Strike that.
20   Q.   You reached out to Dartmouth as
21  early as November, 2020 to request your
22  medical records; correct?
23   A.   I don't recall when I first
24  reached out.
25       (Whereupon, an e-mail dated

Page 316

1        K. Shiber
2  February 12, 2021 was marked
3  Defendant's Exhibit 14
4  for identification.)
5    Q.   Ms. Shiber, you have in front of
6  you Exhibit 14?
7    A.   Yes.
8    Q.   And this -- the top e-mail is an
9  e-mail from yourself to
10  hunterkiessling@dartmouth.edu.
11       Do you see that?
12   A.   Yes.
13   Q.   And that e-mail is dated
14  February 12, 2021; correct?
15   A.   Yes.
16   Q.   Okay.
17       Let's turn to the first in time
18  e-mail, which is on Shiber 185.
19       And that's dated November 4,
20  2020; right?
21   A.   Yes.
22   Q.   And you write to Dick's House
23  medical records; is that right?
24   A.   Yes.
25   Q.   And you say, "hi, I would like

Page 317

1        K. Shiber
2  to request a copy of my medical records.
3  This is in preparation for a potential
4  lawsuit, so I would like to see whatever
5  would be released if it were requested as
6  part of discovery in the lawsuit".
7       Do you see that?
8    A.   Yes.
9    Q.   And you received certain records
10  in response to that request; right?
11   A.   Yes.
12   Q.   And you were confused about
13  those records once you received them;
14  right?
15   A.   Yes.
16   Q.   And you were confused because
17  you believed that you had been diagnosed
18  with bipolar disorder?
19   A.   That was one of the reasons.
20   Q.   What were the other reasons, if
21  any?
22   A.   I also felt that -- I was not
23  familiar with what doctors and medical
24  professionals typically write in the notes
25  and I was confused because I thought that

Page 318

K. Shiber

1            K. Shiber
2 some records may not be as comprehensive
3 as I, not knowing anything, would have
4 imagined.
5     Q.   What would you have imagined the
6 records to include that they didn't?
7     A.   I don't know specifics that I
8 thought were not included beyond this
9 bipolar diagnosis.
10     Q.   And you did receive certain
11 records in response to this request;
12 right?
13     A.   Yes.
14     Q.   And did you preserve those
15 records?
16     A.   Yes.
17     Q.   Okay.
18        Do you know why those records
19 weren't produced in connection with this
20 litigation?
21     MR. HELLER: Objection.
22     THE WITNESS: I believe they
23 were, as we provided -- I believe they
24 were.
25     MS. SKIBITSKY: Okay.

Page 319

1            K. Shiber
2        Can we look at tab -- we're
3 going to mark Exhibit 15.
4        (Whereupon, an e-mail dated
5 February 12, 2021 was marked
6 Defendant's Exhibit 15
7 for identification.)
8     Q.   Ms. Shiber, do you have
9 Exhibit 15 in front of you?
10     A.   Yes.
11     Q.   This is an e-mail from yourself
12 to Marylee Verdi and Da-shih Hu at
13 Dartmouth; correct?
14     A.   Yes.
15     Q.   And Marylee is Nurse Marylee who
16 we've spoken about; correct?
17     A.   Yes.
18     Q.   And Dr. Hu is a doctor at
19 Dartmouth who you saw; correct?
20     A.   Yes.
21     Q.   And you write in this e-mail,
22 "hi, Marylee and Dr. Hu, I hope you're
23 doing well. I am writing about my medical
24 records from my time at Dartmouth. I
25 recently requested my medical records and

Page 320

1            K. Shiber
2 am confused about the contents. The two
3 of you diagnosed me with bipolar disorder
4 and prescribed the appropriate medication,
5 which I have now been taking successfully
6 for several years, yet this is not
7 mentioned in the record that you sent
8 over. Please send me over the relevant
9 notes and/or records supporting this or
10 any additional documentation you can
11 provide which supports this diagnosis and
12 subsequent corresponding treatment".
13        Do you see this?
14     A.   Yes.
15     Q.   Why did you believe that -- did
16 you believe that you had been diagnosed
17 with bipolar by Nurse Verdi and Dr. Hu?
18     A.   Yes, I believe that.
19     Q.   Why do you believe that?
20     A.   When I spoke with Verdi, when we
21 spoke about my condition and -- I thought
22 that she had said that that was the
23 diagnosis and she described the medication
24 that I was on for mood disorder as
25 something that is used during bipolar

Page 321

1            K. Shiber
2 treatment and that I was taking that
3 medication and responding well to it, so I
4 was under the impression that they had
5 diagnosed me with bipolar disorder.
6     Q.   At the time that you requested
7 an accommodation from Centerview, did you
8 believe that you had been diagnosed with
9 bipolar disorder?
10     A.   Yes.
11     Q.   And what did you mean when you
12 asked for "or any additional documentation
13 you can provide which supports this
14 diagnosis"? What is it that you were
15 specifically asking for?
16     A.   I meant that, as I mentioned,
17 since these -- my understanding of the
18 diagnosis was in large part due to my
19 verbal conversations with -- specifically
20 with Verdi, I meant that perhaps she could
21 provide documentation that referenced what
22 I perceived to have been the diagnosis and
23 subsequent corresponding treatment as we
24 discussed in those conversations.
25     Q.   Were you asking her to create

81 (Pages 318 - 321)

Page 322

```
1            K. Shiber
2  records which would support a diagnosis of
3  bipolar disorder?
4      A.   I was asked her to create
5  records which accurately described what
6  she believed to be my diagnosis.
7      Q.   Why did you think that Nurse
8  Verdi believed bipolar to be your
9  diagnosis?
10     A.   Because she had told me that I
11 had exhibited signs of a mood disorder
12 which is similar to bipolar disorder.  And
13 when she described the medication that she
14 was putting -- that she was recommending I
15 be prescribed, she said that the
16 medication was for the treatment of
17 bipolar disorder.
18     Q.   So you were asking her to create
19 a medical record in February, 2021;
20 correct?
21     MR. HELLER: Objection.
22     THE WITNESS:  No.  I was just
23 asking for documentation.
24     Q.   And did you receive that
25 documentation that would have supported a
```

Page 323

```
1            K. Shiber
2  bipolar diagnosis?
3      A.   No.
4      Q.   In February, 2021, you asked
5  Nurse Verdi and Dr. Hu to write you a
6  letter; is that right?
7      A.   I don't recall.
8      MR. HELLER: When we get a
9  second, we could take a break.  We've
10 been going like an hour and a half.
11     MS. SKIBITSKY: We can take a
12 break.
13     THE VIDEOGRAPHER: We are now off
14 the record.
15     The time on the video monitor is
16 6:03 p.m.
17     (Whereupon a break was taken)
18     THE VIDEOGRAPHER: We are now
19 back on the record.
20     The time on the video monitor is
21 6:16 p.m.
22     Q.   Ms. Shiber, can we look at
23 Exhibit 3 in front of you, which is
24 Plaintiff's initial disclosures.
25     MR. HELLER: So we're not looking
```

Page 324

```
1            K. Shiber
2  at the one you just handed, just to be
3  clear?
4      MS. SKIBITSKY: Right, Exhibit 3.
5      Q.   Okay.
6      And Ms. Shiber, we discussed
7  this document previously.
8      You recognize this as your
9  initial disclosures in this case?
10     A.   Yes.
11     Q.   Can we look at the last page,
12 page ten.  And under the section front pay
13 for the next five years, the second
14 paragraph says, "Shiber also seeks
15 compensatory damages for the emotional
16 anxiety, distress, and significant
17 diminution in the quality of her life as a
18 result of Centerview's discrimination".
19     Do you see that?
20     A.   Yes.
21     Q.   What are the physical
22 manifestations of the emotional anxiety
23 and distress that you are claiming you
24 experienced as a result of Centerview's
25 conduct?
```

Page 325

```
1            K. Shiber
2      MR. HELLER: Objection.
3      THE WITNESS:  What do you mean
4  by "physical manifestations"?
5      Q.   Do you have any physical
6  symptoms as a result of any emotional
7  anxiety --
8      MS. SKIBITSKY: Let me take a
9  step back.
10     Q.   What is the emotional anxiety
11 that you believe is as a result of
12 Centerview's discrimination that you were
13 experiencing?
14     A.   There are a lot of different
15 levels of anxiety and distress that I'm
16 experiencing as a result of Centerview's
17 discrimination.
18     I'm experiencing low
19 self-esteem.  I am experiencing
20 hopelessness that I will be ever able to
21 -- that I will ever be able to be part of
22 the industry that I had dreamt of and
23 intended to be in.  I'm experiencing
24 hopelessness that my hard work doesn't
25 matter because I could just at any point
```

Page 326

K. Shiber

1       K. Shiber
2  lose what I'm working at due to being
3  stigmatized due to having a disability.  I
4  have experienced anxiety about what -- and
5  distress about what to tell people when
6  they asked -- when they ask why I only
7  worked at Centerview for three months, how
8  I'm supposed to explain that to potential
9  employers; what to say in an interview
10 should they ask about that; anxiety that I
11 could never find a job comparable to the
12 one that I had at Centerview; that my life
13 is permanently marked by this incident;
14 that people view me as less capable and
15 less competent because of my disability; I
16 that should anyone -- I have constant
17 anxiety that should anyone I work with
18 ever find out about my being disabled,
19 that I will experience bad outcomes, I
20 will experience discrimination.
21      I have anxiety that any time I
22 meet with my manager at my current job, I
23 think that she's going to fire me.  I have
24 ongoing like distress about what happened.
25 I'm afraid to ever ask for -- or to ever

Page 327

K. Shiber

1       K. Shiber
2  mention to anyone or request any
3  accommodations to cope with my disability
4  in the future.
5       I'm distressed about my
6  reputation and the results of -- I've had
7  ruminating thoughts about what was
8  everyone saying about the fact that I was
9  fired so soon and, to my knowledge, the
10 only analyst to be terminated in their
11 first year of working at Centerview.  And
12 I just have anxiety that I will never be
13 treated as an equal in the workplace.
14 Q.   Do you have any -- have you
15 experienced any medical symptoms as a
16 result of that anxiety other than what
17 you've just --
18      MS. SKIBITSKY: Strike that.
19 Q.   Have you experienced any
20 symptoms as a result of that anxiety other
21 than what you've just identified?
22      MR. HELLER: Objection.
23      THE WITNESS:  I think what I've
24 described -- I'm trying to describe
25 that I've experienced exacerbation of

Page 328

K. Shiber

1       K. Shiber
2  -- those are new things that I had
3  never experienced before being
4  terminated from Centerview and I've
5  also experienced exacerbation of my
6  existing disabilities of anxiety and
7  mood disorders.  I've experienced
8  exacerbation of the symptoms I've
9  listed this morning.
10 Q.   How do you know that
11 Centerview's -- how do you know that your
12 termination from Centerview is the result
13 of what you claim to be exacerbations of
14 the symptoms you listed this morning?
15 A.   I think my termination from
16 Centerview was not the result of
17 exacerbation of the symptoms.
18 Q.   I might have misstated that.
19 Let me try it again.
20      How do you know that your
21 termination from Centerview caused
22 exacerbation of the symptoms that you've
23 identified this morning?
24 A.   I know because I've experienced
25 how any time I've thought about the word

Page 329

K. Shiber

1       K. Shiber
2  "Centerview", my heart rate is elevated.
3  Any time I think about working at the firm
4  I have racing thoughts, I have
5  ruminations, I have depression about how I
6  was treated and the experience that I've
7  had since then and whether it's -- so in
8  part, I know because the things I
9  previously listed specifically in regards
10 to concerns about treatment in the
11 workplace, I never had those before being
12 terminated from Centerview.  And then in
13 terms of just exacerbation of continuing
14 things, I know because it's specifically
15 triggered -- it's specifically triggered
16 by any reference to Centerview.  And also
17 just in general it's just -- is made
18 worse, has been worse following
19 Centerview's termination of me and the
20 things that have happened in my life as a
21 result of that termination since then.
22 Q.   Have you seen any medical
23 providers in order to treat or deal with
24 what you've just identified as the
25 consequences from your perspective of the

83 (Pages 326 - 329)

K. Shiber

1           K. Shiber
2 termination by Centerview?
3    A.   Yes.
4    Q.   And who was the first medical
5 provider you saw in order to treat the
6 symptoms that you've just identified as
7 being a result of your termination from
8 Centerview?
9    A.   I believe the -- I believe the
10 first one was Amy Eiten.
11    Q.   And when did you first see Amy
12 Eiten?
13    A.   I don't recall.
14    Q.   Did you see her in 2020?
15    A.   No.
16      Can I take back my statement
17 that she was the first one?
18    Q.   Sure.
19      Who was the first provider that
20 you saw to deal with what you've
21 identified as the symptoms of the
22 termination from Centerview?
23    A.   I don't recall the first one.
24    Q.   Okay.
25      Was there somebody prior to Amy

1           K. Shiber
2 Eiten?
3    A.   I just don't recall the timing,
4 so --
5    Q.   Okay.
6      Who is it that you are thinking
7 of?
8    A.   Well, I sought -- I don't recall
9 if I -- Dr. McGugins Hill. I don't recall
10 what the order that I saw them in.
11    Q.   And who is Dr. McGugins Hill?
12    A.   She is a primary care physician.
13    Q.   Okay.
14      And did she treat you for any of
15 the symptoms you've just identified?
16    A.   Can you define "treat"?
17    Q.   Did you speak to her about any
18 of the symptoms you've just identified?
19    A.   Yes.
20    Q.   Okay.
21      Are you experiencing any
22 physical or have you or are you currently
23 experiencing any physical symptoms as a
24 result of the emotional distress that you
25 claim Centerview caused?

1           K. Shiber
2    A.   Sorry, what do you mean by
3 "physical symptoms"?
4    Q.   Something other than a state of
5 mind.
6    A.   Yes.
7    Q.   Okay.
8      And what are those physical
9 symptoms?
10    A.   Elevated heart rate, difficulty
11 falling asleep, difficulty focusing,
12 increased perspiration. There may be
13 additionals that I'm not listing now as I
14 don't tend to think about them
15 specifically as physical.
16    Q.   Heart rate, difficulty falling
17 asleep, difficulty focusing, and increased
18 perspiration, those are the physical
19 manifestations of the emotional distress
20 that you claim Centerview has caused?
21    A.   I mean, in terms of physical
22 manifestations, I've also avoided being in
23 situations where the situation with
24 Centerview might come up, withdrawn from
25 social settings, increased fatigue.

1           K. Shiber
2    Q.   And you had difficulty falling
3 asleep before you were employed by
4 Centerview; right?
5    A.   At times.
6    Q.   And you had difficulty focusing
7 before you were employed by Centerview;
8 right?
9    A.   At times.
10    Q.   Okay.
11      What is the name of the doctor
12 who you said you saw to treat the symptoms
13 that you claim are the result of your
14 termination from Centerview?
15    A.   I saw several doctors.
16    Q.   Okay.
17      What is the --
18    A.   You mean the first one?
19    Q.   The first one, yes.
20    A.   I said it was McGugins Hill. It
21 might have been Eiten. I can't recall.
22    Q.   And that's Dr. Jennifer McGugins
23 Hill in Park Ridge, New Jersey?
24    A.   Yes.
25    Q.   And did Dr. McGugins Hill

Page 334

1        K. Shiber
2  prescribe you any medication to treat any
3  of the symptoms that you've identified
4  resulting from your termination from
5  Centerview?
6    A.  Yes.
7    Q.  What did Dr. McGugins Hill
8  prescribe?
9    A.  Fluoxetine and lamotrigine.
10   Q.  And what is fluoxetine?
11   A.  It is a medication.  The brand
12 name is Prozac.  It's typically used for
13 anxiety -- treatment of anxiety and
14 depression.
15   Q.  And you had previously been on
16 that medication while you were at
17 Dartmouth; correct?
18   A.  Yes.
19   Q.  Were you on that medication
20 while you were employed by Centerview?
21   A.  Yes.
22   Q.  At what point in time did you
23 stop going on that medication?
24     MS. SKIBITSKY: Strike that.
25   Q.  At what point this time did you

Page 335

1        K. Shiber
2  stop taking fluoxetine?
3    A.  In about the spring of 2022.
4    Q.  And so you saw Dr. McGugins Hill
5  in -- at some point after the spring of
6  2022; is that correct?
7    A.  No.
8    Q.  Did she -- you testified that
9  she prescribed you fluoxetine; is that
10 right?
11   A.  Yes.
12   Q.  Were you taking that already I
13 by the time that you saw her?
14   A.  Yes.
15   Q.  Did she increase your dosage?
16   A.  No.
17   Q.  Did she decrease your dosage?
18   A.  No.
19   Q.  So your dosage of fluoxetine
20 remained the same as a result of your
21 seeing Dr. McGugins Hill?
22   A.  Yes.
23   Q.  And what was the name of the
24 second medication that Dr. McGugins Hill
25 prescribed you?

Page 336

1        K. Shiber
2    A.  Lamotrigine.
3    Q.  And were you taking lamotrigine
4  before you saw Dr. McGugins Hill?
5    A.  Yes.
6    Q.  When did you start taking that
7  medication?
8    A.  I don't recall.
9    Q.  Was it while you were at
10 Dartmouth?
11   A.  Yes.
12   Q.  And were you taking that
13 medication while you were employed by
14 Centerview?
15   A.  Yes.
16   Q.  And were you taking that
17 medication at the time that you met with
18 Dr. McGugins Hill and she prescribed that
19 medication?
20   A.  Yes.
21   Q.  Did she increase that
22 medication, the dosage?
23   A.  No.
24   Q.  Did she decrease the dosage of
25 that medication?

Page 337

1        K. Shiber
2    A.  No.
3    Q.  Oh, what other medications or
4  treatment, if any, did Dr. McGugins Hill
5  prescribe when you saw her to treat the
6  symptoms that you've identified as being
7  caused by your termination from
8  Centerview?
9    A.  She recommended that I see a
10 psychiatrist and therapist.
11   Q.  Is that it?  Any other
12 treatments or recommendations?
13   A.  Yes.  She recommended a variety
14 of factors related to having a healthy
15 lifestyle, including maintaining a sleep
16 schedule and regular exercise, nutritious
17 eating.  I don't recall the entire list.
18   Q.  And when you were at Dartmouth,
19 your providers also recommended that you
20 see a therapist; correct?
21   A.  Yes.
22   Q.  And they also recommended that
23 you see a psychiatrist; correct?
24   A.  Yes.
25   Q.  And when you were at Dartmouth,

85 (Pages 334 - 337)

1        K. Shiber
2   your providers also recommended that you
3   have a healthy lifestyle; correct?
4        A.   Yes.
5        Q.   And they also recommended that
6   you maintain a sleep schedule and regular
7   exercise; correct?
8        A.   Yes.
9        Q.   Did they also recommend -- your
10  providers at Dartmouth, did your providers
11  at Dartmouth also recommend that you
12  maintain nutritious eating habits?
13       A.   Yes.
14       Q.   Did Dr. McGugins Hill prescribe
15  any other treatments or prescribe any
16  medication that you haven't already
17  identified?
18       A.   I don't recall.
19       Q.   And did you see a therapist or a
20  psychiatrist at the recommendation of Dr.
21  McGugins Hill?
22       A.   Yes.
23       Q.   Who did you see?
24       A.   I don't recall the order of who
25  I saw at which time.

1        K. Shiber
2        Q.   Okay.
3        Did you see Amy Eiten?
4        A.   Yes.
5        Q.   Okay.
6        And who is Amy Eiten?
7        A.   A therapist.
8        MS. SKIBITSKY: Can you mark this
9   document.
10       (Whereupon, an e-mail dated
11  March 18, 2021 was marked Defendant's
12  Exhibit 16 for identification.)
13       Q.   Okay.
14       Ms. Shiber, do you recognize
15  this e-mail as between yourself and Amy
16  Eiten?
17       A.   Yes.
18       Q.   And it's dated March 18, 2021;
19  correct?
20       A.   Yes.
21       Q.   And this is marked Shiber 118?
22       A.   Yes.
23       Q.   This e-mail dated March 18,
24  2021, does this refresh your recollection
25  as to when you started seeing Amy Eiten?

1        K. Shiber
2        A.   Yes.
3        Q.   And do you know what Amy Eiten's
4   medical qualifications are, if any?
5        A.   I don't recall.
6        Q.   And how long did you see Amy
7   Eiten?
8        A.   I don't recall.
9        Q.   Did she diagnose you with any
10  medical conditions -- has she diagnosed
11  you with any medical conditions?
12       A.   I don't know.
13       Q.   Are you still seeing Amy Eiten?
14       A.   No.
15       Q.   And you don't know whether she's
16  diagnosed you with any medical conditions.
17       How do you not know whether
18  she's diagnosed you with any medical
19  conditions?
20       MR. HELLER: Objection.
21       THE WITNESS: When -- in my
22  experience, when you speak to a
23  provider, there's not necessarily a
24  formal point at which they say I've
25  diagnosed you with any specific

1        K. Shiber
2   medical condition.
3        Q.   Okay.
4        And Amy Eiten is -- doesn't have
5   a medical degree; is that right?
6        A.   I don't know.
7        Q.   She's a licensed clinical social
8   worker; is that right?
9        A.   I don't know.
10       Q.   And who else have you seen --
11  have you seen any other therapists or
12  psychiatrists at the recommendation of Dr.
13  McGugins Hill or otherwise since your
14  termination from Centerview?
15       A.   Yes.
16       Q.   Who else?
17       A.   Allison Lee, Heather Nelson.
18       Specifically therapists or
19  psychiatrists?
20       Q.   Or psychologists.
21       A.   I don't recall the exact
22  qualifications of any additional people
23  that I -- doctors that I met with since my
24  termination.
25       Q.   Do you recall meeting with any

1          K. Shiber
2 therapists or psychologists or
3 psychiatrists or mental health
4 professionals between September, 2020 when
5 you left Centerview and March, 2021 when
6 we've just identified that you started
7 speaking with Amy Eiten?
8     A.   I don't recall.
9     Q.   Okay.
10         And we already marked Dr. Lee's
11 medical records. I think that was
12 Exhibit 1, if you could pull that up.
13    A.   No, it's six.
14    Q.   Okay.
15         And let's look at Exhibit 6, Dr.
16 Lee's medical records, the second to last
17 page. Actually, it's probably starting at
18 the fourth to last page with the Bates
19 numbers ending in 72.
20    A.   Okay.
21    Q.   And do you see the date of
22 consultation on the top there as
23 October 13 of 2021?
24    A.   Yes.
25    Q.   And does this appear to be the

1          K. Shiber
2 first date of notes in this medical record
3 of Dr. Lee?
4     A.   It appears so on this document.
5     Q.   Okay.
6         So does this refresh your
7 recollection that you first started seeing
8 Dr. Allison Lee in October of 2021?
9     A.   Yes.
10    Q.   And has Dr. Lee diagnosed you
11 with any medical conditions?
12    A.   I don't recall.
13    Q.   Has Dr. Lee prescribed any
14 medications?
15    A.   I don't recall.
16    Q.   Do you recall whether Dr. Lee
17 has prescribed any treatment methods to
18 deal with what you've identified as the
19 symptoms of your termination from
20 Centerview?
21    A.   I don't recall.
22    Q.   How long did you meet -- how
23 long were you seeing Dr. Lee for?
24    A.   About two months.
25    Q.   And when did you -- why did you

1          K. Shiber
2 stop seeing Dr. Lee?
3     A.   I moved to California and she is
4 not licensed in California.
5     Q.   Okay.
6         And then did you see any
7 providers after you saw Dr. Lee?
8     A.   Yes.
9     Q.   Who was that?
10    A.   All providers?
11    Q.   Who was the next provider that
12 you can recall seeing after Dr. Lee?
13    A.   The next provider I believe was
14 Scott Rodriguez.
15    Q.   And what are Scott Rodriguez's
16 qualifications?
17    A.   I don't recall.
18    Q.   Did Scott Rodriguez diagnose you
19 with any medical conditions or symptoms?
20    A.   I don't recall.
21    Q.   How long did you see Scott
22 Rodriguez?
23    A.   I'm still seeing him.
24    Q.   And do you recall when you began
25 seeing him?

1          K. Shiber
2     A.   Winter at the beginning of 2022.
3     Q.   Is Scott Rodriguez your primary
4 care physician?
5     A.   Yes.
6     Q.   And do you recall seeing a
7 doctor by the name of Dr. Freedlander?
8     A.   Yes.
9     Q.   When did you see Dr.
10 Freedlander?
11    A.   I believe in the fall of 2022.
12    Q.   How many times did you see Dr.
13 Freedlander?
14    A.   One time.
15    Q.   Why did you see Dr. Freedlander
16 only one time?
17    A.   Because I did not like him. I
18 felt like he just wanted to put me on an
19 increased dose or a very intense
20 medication with many side effects and I
21 felt that -- I didn't feel comfortable
22 with that recommendation after -- with
23 that recommendation.
24    Q.   How many mental health providers
25 have you seen only one time?

87 (Pages 342 - 345)

Page 346

1              K. Shiber
2    A.   I don't recall.
3    Q.   Well, we've talked about the two
4  from Dartmouth.
5        I think the names were Tony and
6  Sarah, the first names, who you saw one
7  time; correct?
8    A.   I think it was Todd.
9    Q.   Todd.
10   A.   I don't recall how many times I
11 saw them?
12   Q.   Okay.
13       And you saw Dr. Hu one time;
14 correct?
15   A.   Can you define "saw"?
16   Q.   Sure.
17       How many times did you consult
18 with Dr. Hu in person?
19   A.   I believe it was twice.
20   Q.   Okay.
21       And you saw Dr. Freedlander
22 once; correct?
23   A.   Yes.
24   Q.   You've also identified Dr.
25 Heather -- I don't know if she's a doctor,

Page 347

1              K. Shiber
2  but Heather Nelson as an individual in
3  this litigation who you've seen?
4    A.   Yes.
5    Q.   Okay.
6        When did you start seeing
7  Heather Nelson?
8    A.   In the fall of 2022.
9    Q.   Do you recall what month?
10   A.   No.
11   Q.   And why did you start seeing Dr.
12 Nelson?
13   A.   I started seeing her because I
14 thought that I could benefit from seeing a
15 mental health provider on an ongoing basis
16 in speaking with them and getting their
17 advice.
18   Q.   How many times have you seen Dr.
19 Nelson?
20   A.   I don't recall.
21   Q.   And you've disclosed in this
22 litigation that you are intending to rely
23 on Dr. Nelson as to your disability and
24 the emotional distress that you have
25 suffered due to Centerview's

Page 348

1              K. Shiber
2  discriminatory conduct; is that accurate?
3    A.   Yes.
4    Q.   Okay.
5        In what way is Dr. Nelson going
6  to support your allegations that you've
7  suffered emotional distress due to
8  Centerview's termination?
9        MR. HELLER: Objection.
10       THE WITNESS:  I can't say what
11   she might say.
12   Q.   You don't recall how many times
13 I've seen Dr. Nelson since you began
14 seeing her in the fall of 2022; is that
15 correct?
16   A.   That is correct.
17   Q.   Is it more than five times?
18   A.   I don't recall.
19   Q.   Do you know whether it's one
20 time?
21   A.   It's not one time.
22   Q.   Is it two times?
23   A.   It's not two times.
24   Q.   Is it three times?
25   A.   It's not three times.

Page 349

1              K. Shiber
2    Q.   Is it four times?
3    A.   I don't recall.
4    Q.   Okay.
5        So it's at least three times but
6  you don't know whether it's more than
7  that; is that fair to say?
8    A.   I know it's more than three
9  times.  I don't know exactly the number.
10   Q.   Okay.
11       And what have you discussed with
12 Dr. Nelson?
13   A.   I've discussed a variety of
14 topics about my life, my history, my
15 symptoms of my disabilities, things that
16 have happened to me in my life.
17   Q.   And has Dr. Nelson told you that
18 you are suffering emotional distress as a
19 result of your termination from
20 Centerview?
21   A.   What do you mean by told me?
22   Q.   Is it your understanding, based
23 on your communications with and meetings
24 with Dr. Nelson, that you are, in fact,
25 suffering emotional distress as a result

1              K. Shiber
2 of Centerview's termination?
3    A.   Yes.
4    Q.   What is the basis of that
5 understanding based on your meetings with
6 Dr. Nelson?
7    A.   I feel that she has -- she's
8 listened to what I described experiencing
9 and confirmed that I appear to be
10 suffering from distress and other issues
11 as a result of the situation.
12    Q.   How has she confirmed that you
13 appear to be suffering from distress and
14 other issues as a result of the situation?
15    A.   I mean, I can't recall an exact
16 quote, so I don't want to misattribute
17 words when I can't recall exactly what she
18 said.
19    Q.   Do you recall anything that she
20 said that would in your mind lead you to
21 believe that she was confirming that you
22 were suffering from distress as a result
23 of the Centerview termination?
24    A.   Yes.
25    Q.   And what was that?

1              K. Shiber
2    A.   One example was I described to
3 her how I had had an anxiety attack during
4 a meeting with my current manager and she
5 -- she acknowledged that she felt that the
6 anxiety and the distress that I was
7 experiencing were likely due to my
8 experience of being mistreated at
9 Centerview and that if someone had
10 something like this happen to them in
11 their first job out of college as I did,
12 that it was definitely likely and obvious
13 that this would continue to affect me on
14 an ongoing basis.
15    Q.   Has she -- has Dr. Nelson
16 prescribed you with any medication?
17    A.   No.
18    Q.   Has she prescribed any treatment
19 plans to help you deal with any of the
20 symptoms you've identified as resulting
21 from Centerview's conduct?
22    A.   Yes.
23    Q.   And what are those treatment
24 plans?
25    A.   Additional therapy using a

1              K. Shiber
2 variety of modalities, including cognitive
3 behavioral therapy, continuation of
4 variety a healthy lifestyle factors, and
5 working on coping strategies to try and
6 mitigate the impacts of the exacerbations
7 of symptoms that I've been experiencing.
8    Q.   And have you sought or obtained
9 cognitive behavioral therapy since first
10 meeting with Dr. Nelson?
11    A.   Yes.
12    Q.   With who?
13    A.   Dr. Nelson.
14        MS. SKIBITSKY:  Okay.
15        Can we mark as an exhibit what
16 you guys have already but it's not
17 marked.
18        (Whereupon, a six-page document
19    was marked Defendant's Exhibit 17
20    for identification.)
21    Q.   Ms. Shiber, do you have
22 Exhibit 17 in front of you?
23    A.   Yes.
24    Q.   And do you recognize this as a
25 medical record from Dr. Hu at Dartmouth?

1              K. Shiber
2    A.   Yes.
3    Q.   Okay.
4        Let's look at the second to last
5 page, and it ends in priors underscore
6 253.
7    A.   Okay.
8    Q.   And this is a February 12, 2021
9 e-mail from Dr. Hu to yourself and Marylee
10 Verdi.
11        Do you see that?
12    A.   Yes.
13    Q.   And Dr. Hu writes, "Kate, hi.
14 One, I only actually ever saw you once and
15 there are only two notes from me in your
16 chart, one of which is about the
17 correspondence we had about
18 accommodations".
19        Do you see that?
20    A.   Yes.
21    Q.   Does this refresh your
22 recollection that you only saw Dr. Hu one
23 time?
24        MR. HELLER:  Objection.
25        THE WITNESS:  I don't recall how

K. Shiber

1      K. Shiber
2    many times I saw him.
3    Q.   Do you have any reason to
4  believe that Dr. Hu was being inaccurate
5  when he said in this e-mail that he only
6  ever saw you once?
7    A.   Well, I thought that we had
8  defined "saw" as speaking to Dr. Hu
9  essentially whereas in my interpretation
10 of that sentence, he's referring to seeing
11 in person.
12   Q.   Okay.
13       So would you agree that you only
14 saw in person Dr. Hu one time?
15   A.   I don't recall.
16   Q.   Well, that's what this medical
17 record says at least; correct?
18       MR. HELLER: Objection.
19       THE WITNESS: Yes.
20   Q.   And you only saw Todd and Sarah
21 at Dartmouth one time; correct?
22   A.   As I said, I don't recall.
23   Q.   And you only saw Dr. Freedlander
24 one time?
25   A.   Yes.

K. Shiber

1      K. Shiber
2    Q.   You asked Dr. Hu to write you a
3  letter in connection -- for this
4  litigation; is that correct?
5    A.   I don't recall.
6    Q.   Well, let's look at the same
7  exhibit we've been looking at, Exhibit 17
8  and priors underscore 251. Dr. Hu writes,
9  "Kate, here's the letter and note. Let me
10 know if you'd like me to change the letter
11 and if I think I can reasonably do that, I
12 will".
13       Do you see that?
14   A.   Yes.
15   Q.   Okay.
16       And so does that refresh your
17 recollection that you did ask Dr. Hu to
18 write you a letter in connection with this
19 litigation?
20       MR. HELLER: Objection.
21       THE WITNESS: I don't recall.
22   Q.   And let's look at this page
23 PROVIDERS_250.
24       Do you see that?
25   A.   Yes.

K. Shiber

1      K. Shiber
2    Q.   And under subjective it says,
3  "twenty-one-year-old F graduated 2020/06
4  who asked to speak with me".
5        Do you see that?
6    A.   Yes.
7    Q.   And then if we go down to the
8  third paragraph from the bottom, Dr. Hu
9  writes, "she requested that I write
10 something summarizing my one visit work
11 with her or later a letter attesting that
12 my note is the one I wrote. Could be
13 addressed to her or to whom it may
14 concern. I will scan and e-mail it".
15       Do you recall asking Dr. Hu now
16 to write something summarizing your visit
17 with him?
18   A.   I don't recall.
19   Q.   Okay.
20       And Dr. Hu does actually provide
21 you with a letter; correct? If we look at
22 PROVIDERS_248, it's the second page of the
23 document. He says, "here's the letter and
24 note" on February 17, 2021?
25   A.   Yes.

K. Shiber

1      K. Shiber
2    Q.   Does that refresh your
3  recollection that you asked him to write
4  you a letter and he did?
5    A.   I don't recall.
6    Q.   Let's look at the first page of
7  the document and the first e-mail on the
8  chain. It's from you February 17, 2021.
9    A.   Sorry, which page?
10   Q.   The first page of Exhibit 17.
11       MR. HELLER: When you say the
12   first page, do you mean the last page?
13       THE WITNESS: Is it 247?
14   Q.   247, that's the first page. You
15 write, "hi, Dr. Hu, thank you for speaking
16 with me earlier. Would you mind removing
17 the one time".
18       That's from the letter that he
19 drafted; right?
20   A.   I don't recall.
21       MS. SKIBITSKY: Can you please
22   mark as Exhibit 18 this document.
23       (Whereupon, a letter dated
24 February 17, 2021 was marked
25 Defendant's Exhibit 18

90 (Pages 354 - 357)

Page 358

1           K. Shiber
2    for identification.)
3    Q.   Ms. Shiber, did you ever
4    receive --
5           MR. HELLER: I think we've hit
6    seven hours.
7           THE VIDEOGRAPHER: I can't give
8    you an accurate reading until we go
9    off the record, but it's real close.
10          MR. HELLER: Why don't you finish
11   asking about this document.
12          MS. SKIBITSKY: Thanks.
13   Q.   Ms. Shiber, you have Exhibit 18
14   in front of you; is that right?
15   A.   Yes.
16   Q.   Is this a letter that Dr. Hu
17   wrote to you upon your request?  Does this
18   refresh your recollection?
19   A.   I don't recall the request.
20   Q.   Okay.
21          Do you recall receiving this
22   letter from Dr. Hu?
23   A.   Yes.
24   Q.   Okay.
25          And do you still have this

Page 359

1           K. Shiber
2    letter from Dr. Hu?
3    A.   Yes.
4    Q.   Do you know why this letter
5    wasn't produced in the course of this
6    litigation?
7           MR. HELLER: Objection.
8           THE WITNESS:  I believe that it
9    was.
10   Q.   Was it produced by you in the
11   course of this litigation?
12   A.   I don't know.
13          MS. SKIBITSKY: No further
14   questions.
15          MR. HELLER: No questions.  Thank
16   you.
17          THE VIDEOGRAPHER: That concludes
18   the testimony today of Ms. Kathryn
19   Shiber.
20          We are now off the record.
21          The time on the video monitor is
22   6:58 p.m.
23          (TIME NOTED:  6:58 p.m.)
24
25

Page 360

1   SHIBER vs. CENTERVIEW PARTNERS
2   1/25/2023 - KATHRYN SHIBER
3       ACKNOWLEDGEMENT OF DEPONENT
4     I, KATHRYN SHIBER, do hereby declare
5   that I have read the foregoing transcript,
6   I have made any corrections, additions, or
7   changes I deemed necessary as noted on the
8   Errata to be appended hereto, and that the
9   same is a true, correct and complete
10  transcript of the testimony given by me.
11
12  _____  _____
13  KATHRYN SHIBER           Date
14  *If notary is required
15
16     SUBSCRIBED AND SWORN TO BEFORE ME THIS
17     _____ DAY OF _____, 20___.
18
19
20  _____
21  NOTARY PUBLIC
22
23
24
25

Page 361

1
2          *    *    *
3
4           I N D E X
5   WITNESS       EXAMINED BY       PAGE
6   K. Shiber    Ms. Skibitsky      5
7
8           E X H I B I T S
9   DEFENDANT'S      DESCRIPTION      PAGE
10  Exhibit 1  Letter dated
11         October 28, 2022       53
12  Exhibit 2  Document entitled
13         Plaintiff's Response to
14         Defendant's Second Set of
15         Interrogatories       95
16  Exhibit 3  Document entitled
17         Plaintiff's Initial
18         Disclosures       104
19  Exhibit 4  Video clip (deemed marked) 107
20  Exhibit 5  Video clip (deemed marked) 113
21  Exhibit 6  Document entitled
22         Progress Notes        117
23  Exhibit 7  Letter dated
24         December 23, 2020       138
25

91 (Pages 358 - 361)

Page 362

1
2         I N D E X (continued)
3       E X H I B I T S (continued)
4 DEFENDANT'S      DESCRIPTION      PAGE
5 Exhibit 8  E-mail dated
6        September 15, 2020      163
7 Exhibit 9  E-mail dated
8        August 28, 2020      183
9 Exhibit 10 E-mail dated
10       August 28, 2020      203
11 Exhibit 11 Letter dated
12       September 1, 2020      225
13 Exhibit 12 E-mail dated
14       September 1, 2020      237
15 Exhibit 13 Multipage document    303
16 Exhibit 14 E-mail dated
17       February 12, 2021      315
18 Exhibit 15 E-mail dated
19       February 12, 2021      319
20 Exhibit 16 E-mail dated
21       March 18, 2021      339
22 Exhibit 17 Six-page document    352
23
24
25

Page 363

1
2         I N D E X (continued)
3       E X H I B I T S (continued)
4 DEFENDANT'S      DESCRIPTION      PAGE
5 Exhibit 18 Letter dated
6        February 17, 2021      357
7
8
9          *    *    *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 364

```
1
2        CERTIFICATION BY REPORTER
3
4    I, Wayne Hock, a Notary Public of the
5  State of New York, do hereby certify:
6    That the testimony in the within
7  proceeding was held before me at the
8  aforesaid time and place;
9    That said witness was duly sworn
10 before the commencement of the testimony,
11 and that the testimony was taken
12 stenographically by me, then transcribed
13 under my supervision, and that the within
14 transcript is a true record of the
15 testimony of said witness.
16    I further certify that I am not
17 related to any of the parties to this
18 action by blood or marriage, that I am not
19 interested directly or indirectly in the
20 matter in controversy, nor am I in the
21 employ of any of the counsel.
22    IN WITNESS WHEREOF, I have hereunto
23 set my hand this 27th day of January, 2023.
24
25        Wayne Hock
```

Page 365

```
1 SHIBER vs. CENTERVIEW PARTNERS
2 1/25/2023 - KATHRYN SHIBER
3      E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 KATHRYN SHIBER      Date
25
```

92 (Pages 362 - 365)

[& - 2018]                                                          Page 1

**&**

**&**   1:18 2:3,8,13

**0**

**000162**   183:23
**001864**   209:13
**03649**   1:9 3:20
**07675**   9:5

**1**

**1**   53:7,10,13,20
  96:19 225:9
  238:2 314:2,5
  342:12 361:10
  362:12,14
**1/25/2023**
  360:2 365:2
**10**   55:5 203:24
  204:3 205:12
  209:10 362:9
**10010**   2:14
**10016**   2:5
**10165**   2:9
**104**   361:18
**105**   163:23
**106**   171:25
  217:21
**107**   361:19
**108**   213:6
  243:17,22
  268:13 283:4
**109**   233:10
  290:2
**10:08**   203:12
  204:11 205:3
  205:16 206:4

**10:30**   155:10
  161:21 162:2,5
  203:15
**10:33**   203:18
  205:18 209:6
**10:39**   191:21
**11**   225:10,14
  362:11
**11/16**   77:20
**110**   233:9
**113**   361:20
**116**   238:10
**117**   361:22
**118**   339:21
**11:06**   51:4
**11:19**   165:4
**11:22**   51:9
**12**   59:4 68:21
  238:3,7 303:24
  304:4 305:16
  306:6,15 307:4
  307:8,13,20
  308:2,7,11,16
  308:19 316:2
  316:14 319:5
  353:8 362:13
  362:17,19
**12:00**   170:8
  275:5 277:6
  279:25 280:25
**12:24**   104:15
**12:37**   104:20
**12:49**   114:19
**12:50**   114:24

**13**   303:13,15
  313:16 342:23
  362:15
**137**   8:17
**138**   361:24
**14**   316:3,6
  362:16
**15**   103:11,14
  109:25 110:7
  110:18 111:9
  112:15 135:3
  135:22 163:5
  165:4 166:14
  215:25 216:9
  319:3,6,9
  362:6,18
**16**   339:12
  362:20
**163**   362:6
**17**   107:6
  352:19,22
  355:7 356:24
  357:8,10,24
  362:22 363:6
**18**   53:20
  118:13 339:11
  339:18,23
  357:22,25
  358:13 362:21
  363:5
**183**   362:8
**185**   316:18
**19**   312:3
**1:00**   196:4

**1:21**   1:9 3:20
**1:39**   125:4,8

**2**

**2**   95:17,23 96:2
  361:12
**20**   360:17
**2012**   27:19
  28:12,19,20,25
  30:8,16,23
  31:15,20 34:7
  34:11,24 35:4
  35:9 37:13,15
  37:22 38:5
  314:2
**2013**   9:13
**2015**   43:15,18
**2016**   9:24
  30:11 35:14,18
  36:17 75:17,19
  75:23 78:19
  79:6
**2017**   25:22
  51:20 55:4,10
  55:18 59:7
  61:8,24 62:16
  68:16 69:19
  71:21,24 72:4
  83:3,6
**2018**   25:22
  51:20 61:8
  82:15 83:5,11
  83:14 84:2
  85:4,4,9 87:2
  87:13,16 88:9
  92:17 96:19

**[2019 - 315]**                                                    Page 2

**2019**  61:10
162:12 166:24
166:25
**2020**  9:24 10:2
10:6 20:12
43:15 44:6,8
44:11,12,14
45:2,6,11
98:11,14,19,25
99:5,12,17
103:12,14
109:24,25
110:18 111:9
112:15,20
120:13 121:7
121:11,13
128:7,9,11
132:19 135:3,4
135:23 138:8
138:19,25
139:20,23,24
140:6,16 142:6
144:21 163:5
165:4 166:14
183:5,13 184:4
194:10 197:7,8
197:12 198:7
199:20 201:12
203:9 204:2,6
214:11 215:25
216:8,9 225:9
238:2,14
248:25 249:2
249:24 250:23
303:24 305:17

306:6,15 307:4
307:8,13,20
308:2,7,11,16
308:19 312:3
314:5 315:21
316:20 330:14
342:4 361:24
362:6,8,10,12
362:14
**2020/06**  356:3
**2021**  8:25,25
10:16 11:2,9
43:15 45:14,18
45:21,25 46:11
46:16,24 107:6
107:21 108:9
108:25 109:6
113:3,6,18
115:3,15 116:6
116:13 118:21
119:2,11 124:3
124:5 126:8,17
129:17,23
130:5,10,17
138:3,22
140:13,17
144:22 315:13
316:2,14 319:5
322:19 323:4
339:11,18,24
342:5,23 343:8
353:8 356:24
357:8,24
362:17,19,21
363:6

**2022**  8:8,16
11:11,12,15
43:15 47:7,15
48:9,13 53:9
54:3 113:10,13
118:13 130:20
335:3,6 345:2
345:11 347:8
348:14 361:11
**2023**  1:11 3:4
125:3 364:23
**203**  362:10
**225**  362:12
**23**  138:8,18,25
361:24
**237**  362:14
**24/7**  263:9
**247**  357:13,14
**248**  356:22
**25**  1:11 3:4
125:3
**250**  355:23
**251**  355:8
**253**  353:6
**27th**  364:23
**28**  53:9 54:3
55:4 59:7
71:24 72:4
115:2 119:2
126:8,17
129:23 130:10
183:5,13 184:3
194:10 198:7
204:2,6,11
205:16 209:6

211:21 213:22
215:11 216:8
243:25 244:2,5
251:6 253:14
283:22 284:4
287:14 298:7
299:12 361:11
362:8,10
**29**  197:8
250:23
**2953**  311:17,20

**3**

**3**  2:4 104:22,25
105:4 134:24
138:18 323:23
324:4 361:16
**3,999**  112:20
**3/28/17**  55:7
**30**  135:3
**30,000**  110:20
**30,215**  113:4
**3004**  307:25
**303**  362:15
**3033**  308:6
**3040**  305:12
**305**  2:9
**3069**  307:16
**3075**  307:21
**3084**  308:12
**31**  83:11,14
238:14
**3118**  307:11
**3139**  307:3
**315**  362:17

**319** 362:19
**3208** 107:4
**3254** 115:3
**335,376** 135:16
 146:2
**339** 362:21
**352** 362:22
**357** 363:6
**3922** 364:24
**3:00** 197:13
**3:08** 202:20
**3:21** 202:25

**4**

**4** 54:13 107:2,9
 110:23 316:19
 361:19
**462** 8:4
**4:21** 256:15
**4:37** 256:20

**5**

**5** 114:2,10
 361:6,20
**51** 1:18 2:14
 3:22
**53** 361:11
**5:00** 134:17
 161:7

**6**

**6** 87:17 113:21
 117:13 118:7
 342:15 361:21
**66** 118:23
**6:00** 233:13
 262:3

**6:03** 323:16
**6:16** 323:21
**6:58** 359:22,23

**7**

**7** 138:5,9
 361:23
**70** 118:24
**705** 9:4
**72** 342:19
**7:30** 181:2

**8**

**8** 163:6,19
 203:8 213:5
 233:4 243:19
 268:12 283:3
 362:5
**85,000** 136:2
 145:8,13
 148:13

**9**

**9** 183:3,6
 243:16,18
 362:7
**9/15** 165:21
**94117** 8:5
**95** 361:15
**9:00** 161:7
 170:8 262:3
 277:6 291:22

**a**

**a.m.** 1:12 3:4
 51:4,9 134:13
 170:8,8 181:2
 181:3,19,19

182:2,5,14,20
182:21 189:15
191:21 195:17
195:17 196:4
196:13,16,18
196:22 197:4
197:13 198:6
198:19 199:7
199:22 200:16
200:24 203:12
203:15,18
204:11 205:3
205:16,18
206:15 207:19
207:23 208:15
208:16,16
209:6 212:15
223:22,24
250:19,20
270:4,8 275:5
277:6,6,6
278:22 279:7
279:12,16,24
279:25 280:7
280:14,25
291:22
**abiding** 199:6
**abilities** 64:13
 68:11 80:8
 86:3 293:3
**ability** 56:8
 60:2 61:20,23
 62:9,20 63:9
 63:15 80:2
 84:9,20 85:3

315:3
**able** 6:8 74:22
 81:24 166:2
 185:6 211:14
 220:19,25
 226:9 227:22
 228:17,18
 240:5 241:21
 265:2,20
 266:20 267:14
 280:24 285:5
 295:2 315:3
 325:20,21
**above** 59:5
 63:16 296:12
**absences** 86:11
 86:15,18,23
**absolutely**
 18:17
**academic** 51:24
 52:3,7,8,11,15
 52:20 53:3
 57:21 58:3,14
 73:25 75:15
 81:11,17,24
 82:11
**accepted**
 145:22 148:11
 148:18,24
 149:7 152:3
 212:12
**accepting**
 137:13 148:18
**access** 165:21

| | | | |
|---|---|---|---|
| **accident** 49:9 | 69:6,15 70:2 | 115:22 172:3,3 | **actively** 163:11 |
| 49:11,12,13 | 70:10 72:11,13 | 172:13,15 | **activist** 174:17 |
| **accommodate** | 72:18,20 73:2 | 173:6,10,11 | 176:8,13 177:5 |
| 53:5 80:6 | 73:7,10,13,16 | 174:16,21 | 180:21 |
| 169:9,14 | 73:19 74:2,7 | 175:6,7,16,21 | **activities** 25:4 |
| 211:15 231:15 | 74:23 75:5,9 | 176:6 180:13 | 29:8 87:7,8 |
| **accommodated** | 75:15 78:25 | 207:11 218:14 | **activity** 159:8 |
| 19:10 236:3 | 79:5,17,22,23 | 259:17 309:3 | 258:2,21,24 |
| **accommodati...** | 80:6,11 81:12 | 309:11,12,17 | 259:19 260:3 |
| 56:21 57:11,21 | 81:18,25 82:12 | **accounts** | 279:20 |
| 74:15 86:18,23 | 83:20,23 86:8 | 106:17,20 | **actual** 65:3 |
| 206:19,22 | 86:10,13 91:22 | 257:8 258:25 | **actually** 9:22 |
| 219:13 220:11 | 134:19 141:6 | 259:3 262:12 | 27:2 35:25 |
| 221:18 222:11 | 169:5,8,18 | **accuracy** 96:11 | 88:23 111:8 |
| 226:21 231:22 | 170:6 210:20 | **accurate** 49:16 | 118:23 135:21 |
| 241:25 242:13 | 211:2,4,8,12 | 62:15 64:19 | 151:24 166:19 |
| 244:21 246:10 | 220:18 231:13 | 117:3,7 126:8 | 173:4 204:23 |
| 247:8,19 248:7 | 233:16 235:10 | 131:10 182:7 | 241:4 342:17 |
| 248:23 249:13 | 235:24 240:21 | 237:13,19 | 353:14 356:20 |
| 249:15,17,25 | 242:6 244:25 | 348:2 358:8 | **adamant** |
| 257:17 258:6 | 245:3,4,6,7,12 | **accurately** 69:8 | 219:19 220:3 |
| 260:10,14 | 245:16,18 | 111:25 322:5 | 283:11 |
| 264:11,15 | 247:10 249:4 | **accusations** | **additional** |
| 266:19 269:15 | 256:23 264:8 | 147:21 | 17:22 23:8,11 |
| 271:16,22 | 264:21 265:12 | **acknowledged** | 25:11 28:8 |
| 272:11 283:9 | 266:8 271:8 | 351:5 | 35:10 48:5 |
| 283:14,20 | 273:23 274:7 | **acknowledge...** | 69:14 93:25 |
| 284:12,14 | 275:18 276:3 | 360:3 | 94:12 132:11 |
| 288:17 289:22 | 276:18 281:8 | **act** 176:16 | 173:10 255:18 |
| 301:17 321:7 | 282:3 285:3 | 230:22 231:6 | 263:25 274:15 |
| **accommodati...** | 301:12 302:9 | **action** 4:7 | 274:17 282:20 |
| 51:24 52:3,7,9 | 327:3 353:18 | 364:18 | 320:10 321:12 |
| 52:12,16,21 | **accord** 240:18 | **active** 259:4 | 341:22 351:25 |
| 53:4 57:3,22 | **account** 69:3 | 265:4,15 275:2 | **additionally** |
| 58:3,14 68:17 | 113:5,11,23 | 303:4 | 277:18 |

**[additionals - answer]**                                                    Page 5

**additionals**
332:13
**additions** 360:6
**address** 8:3,13
8:23 9:3,10
10:10,18,24
11:2
**addressed**
180:19 188:5
255:3 356:13
**addressing**
188:8
**adequately**
66:17
**adjustment**
269:3
**administer** 4:5
60:24
**administered**
57:7 58:22
**administrative**
287:22
**adopted** 221:10
**advice** 94:19
177:9 180:17
219:11 347:17
**advise** 148:6
**advised** 144:19
**advising**
144:16 180:10
**advocating**
210:21
**affect** 193:7
212:16 286:5
351:13

**affected** 43:5
235:7
**affiliations**
4:14
**aforesaid** 364:8
**afraid** 292:25
326:25
**afternoon**
185:13
**agents** 149:21
**aggressively**
78:3
**ago** 190:7
216:9 280:17
**agree** 3:12
20:10 63:21
146:17 148:4
168:20,24
169:2,3,22
170:2,4 189:13
207:9 224:13
226:15 227:20
237:12 354:13
**agreed** 21:6
207:18,22
237:2 249:18
301:13
**agreement**
137:15
**ahead** 7:23
186:21 187:14
**alcohol** 29:14
**aligned** 185:13
**allegations**
348:6

**alleging** 15:25
16:5 18:21
**allison** 118:10
118:16,17
124:6 341:17
343:8
**allotted** 80:25
**allow** 21:23
146:13 222:11
232:17 236:14
245:12,20
247:2 260:24
261:9 271:17
274:8,18
275:19 277:14
278:11 281:8
282:3
**allowed** 147:23
250:5 261:18
264:7 280:13
280:20
**allowing** 219:2
**amanda** 2:21
**ambiguous**
255:9,12
**america** 151:8
156:18 157:6
**amount** 68:24
80:24 87:5
94:7 111:8
120:11 135:11
135:21 136:12
139:17 142:8
142:13 145:15
145:16,20,25

148:21 267:25
272:16,19
290:10,25
**amounts**
112:13
**amy** 330:10,11
330:25 339:3,6
339:15,25
340:3,6,13
341:4 342:7
**analysis** 177:2
177:9
**analyst** 133:21
149:15 160:5
160:10,14
163:15 166:23
167:5 174:24
178:12 188:3
188:14 251:23
252:2 262:11
279:11,16
280:7,14
299:23 300:3,9
300:16,20,22
327:10
**analysts** 159:20
252:15 253:8
257:12 264:5
279:8 280:23
293:4
**analyzing**
149:19,20
**anger** 44:21
**answer** 7:7,16
14:24 17:10

**[answer - art]**                                                    Page 6

19:5 20:18
21:3,24 23:20
26:8 29:3
38:16 39:6
44:16 48:25
52:23 57:15
58:6 59:20
62:2,4,5,18
64:2,23 65:9
65:12 66:4,8
67:17 72:22
78:14 79:11
90:5 101:23
102:15 111:22
111:25 127:15
135:9 139:5
146:14 149:4
152:10 154:12
158:25 168:3
191:16 193:19
194:17,19
201:3,5 217:5
254:25 261:17
262:18,22
278:14 279:14
279:18 280:18
**answered** 7:22
59:19 131:13
182:23 190:7
191:14 198:24
201:19 218:6
236:17
**answering** 7:6
**answers** 6:23
6:25

**anticipate**
161:3
**anton** 2:20 3:24
**anxiety** 16:8,11
16:14 17:12,17
18:21,23 19:15
22:6,9,12,15,19
22:22 24:18
26:13,18 40:4
40:7,10,14
48:6 50:3,10
50:13,16 68:6
70:15,19 80:15
80:16,16 86:5
87:5 89:24
90:2,17,21
91:9,16,17,20
92:2,4,7,8,22
93:24 105:21
208:11 214:5
214:18 324:16
324:22 325:7
325:10,15
326:4,10,17,21
327:12,16,20
328:6 334:13
334:13 351:3,6
**anymore** 47:2
**apologies**
165:23
**appear** 342:25
350:9,13
**appearance**
4:11

**appearances**
4:13
**appears** 67:10
343:4
**appended**
360:8
**application**
123:6,11,15
**applied** 73:21
121:12,20,22
122:17 150:24
**apply** 121:14
121:21 123:3,8
150:23
**applying**
116:15,16
121:8 122:23
150:19 152:14
160:8,13
**appoint** 7:19
**appointment**
209:20
**appreciate**
210:22
**approach**
174:18 176:8
221:21,23,25
222:3,4,6
227:15 244:23
247:5 249:7,8
264:14 274:11
276:7,23
281:10,11
282:17

**approaches**
246:2 275:7
**appropriate**
21:12 69:6
136:12 146:20
146:23 320:4
**appropriately**
148:7
**approximately**
13:12 14:3
36:18 39:19
78:20 145:24
**april** 44:12,14
45:2,6,11
**area** 11:18,21
11:25 88:21
**areas** 55:22
**arenas** 228:12
**arguing** 217:3
**argument**
147:11
**argumentative**
217:3
**arlington** 8:18
**arose** 20:3
**arrangement**
140:11
**art** 106:10
108:24 112:7
112:22 113:6
113:17 115:12
115:17,23,24
116:8,17,19
118:3 119:8,10
119:14,17

**[art - attending]** Page 7

| | | | |
|---|---|---|---|
| 120:4,9,16,23 | **ashamed** 104:5 | 219:11 230:7,8 | **assignments** |
| 122:5,9,13 | **aside** 151:12 | 230:13 248:18 | 52:19 72:12 |
| 123:14,21,24 | 262:24 264:10 | 248:21 250:22 | 80:4 174:9 |
| 124:9 125:21 | 264:14 269:16 | 254:23 255:23 | 199:13 258:20 |
| 125:23 126:4 | 269:19 281:25 | 298:18 299:5 | 293:5 |
| 126:20 127:3 | 281:25 | 321:15,25 | **assist** 18:7 |
| 127:22 128:23 | **asked** 19:19 | 322:18,23 | **associate** 172:6 |
| 129:2,5,6,8,14 | 45:23 50:6 | 356:15 358:11 | 174:24 188:14 |
| 130:3,13 131:9 | 59:18 63:25 | **asleep** 17:22 | 251:10,13,21 |
| 131:21 132:4 | 65:7 68:13 | 332:11,17 | 252:4,8 253:6 |
| 137:18 142:9 | 99:18,21 | 333:3 | 280:20 |
| 142:14,15,23 | 125:19 131:12 | **aspect** 292:5 | **associates** |
| 143:2,13,19,19 | 132:14 172:7 | **assess** 56:12 | 280:24 |
| 144:5 150:3,13 | 182:22 190:6 | 69:13 | **assurances** |
| 150:14,15 | 191:13 197:8 | **assessed** 69:8 | 302:2 |
| 309:3,10,16 | 197:11 198:23 | **assessment** | **athletes** 70:24 |
| 310:11 | 201:18 218:6 | 56:4 62:15,20 | **athletic** 75:24 |
| **artificial** 32:20 | 227:18 231:25 | 68:5 | 76:11 77:2,7 |
| **artist** 106:7,13 | 235:3 236:16 | **assigned** 174:4 | **attached** 54:4 |
| 106:13 108:2 | 240:24 247:17 | 174:15 175:8 | 164:9 165:17 |
| 108:12,17 | 248:2,4 252:25 | 200:22 201:10 | **attack** 202:5 |
| 109:5,8 112:15 | 259:6 278:9 | 247:11 256:24 | 351:3 |
| 112:17,25 | 280:17 291:12 | 257:5,8,13,18 | **attacks** 17:19 |
| 117:20 123:17 | 300:21 321:12 | 257:22 258:6 | 90:8 |
| 123:19 | 322:4 323:4 | 258:14 259:7 | **attempt** 115:23 |
| **arts** 150:16 | 326:6 355:2 | 259:14 260:8 | **attempting** |
| **artwork** 109:16 | 356:4 357:3 | 260:10 263:24 | 116:17,18 |
| 109:19 110:3,6 | **asking** 7:10 | 265:14,15 | **attempts** 106:6 |
| 110:9,13 | 19:13 62:11 | 274:12 276:8 | **attend** 77:16,19 |
| 113:12 123:10 | 65:23,24 78:6 | 276:24 277:18 | 78:6 |
| 123:12 131:18 | 78:9 124:2 | 278:4 281:22 | **attendant** |
| 141:24 142:5 | 146:5,9,23 | **assigning** | 22:22 |
| 143:7 302:15 | 147:9 190:11 | 264:12 | **attending** |
| 314:18,22 | 190:12 216:5,6 | **assignment** | 78:11,16 |
| 315:4,10 | 218:25 219:6,9 | 173:18 297:12 | |

**[attention - based]**                                          Page 8

**attention** 118:3
  123:21,24
  124:9 126:3,19
  127:2,22
  128:22,25
  129:5,6,8,14
  130:3,13 131:4
  131:9,20,23,25
  132:10,16,21
  133:8,10
**attesting**
  356:11
**attorney** 4:15
  5:19
**attorneys** 2:4
  2:13 7:14
  13:19,24 14:4
  14:11
**attribute** 31:8
  33:11,16
**audio** 3:10
**august** 9:24
  47:24 103:11
  128:11 162:12
  166:24 183:5
  183:13 184:3
  194:10 197:7,8
  197:12 198:7
  199:20 201:12
  203:8 204:2,6
  204:11 205:16
  209:6 211:21
  213:22 214:11
  215:11 216:8
  238:14 243:25

  244:2,5 250:23
  251:6 253:14
  283:22 284:4
  287:14 298:7
  299:12 312:3
  362:8,10
**authored** 15:20
**authorization**
  54:14 95:14
**authorized** 4:5
**automatically**
  101:13
**availability**
  154:23 289:4
**available** 169:7
  169:10,12,14
  170:8,11
  172:22 263:9
  288:4,25
  289:12 291:19
  295:3 300:3
  302:4
**ave** 8:18,20,23
  9:2
**avenue** 1:19 2:4
  2:9,14 3:22
  10:11
**average** 120:9
  120:11 121:5
  224:23 309:12
  310:14
**avoid** 29:9,9
  101:2 219:14
  224:19 241:21
  241:21 250:8

**avoidance** 90:8
**avoided** 332:22
**avoiding** 25:5
  29:20 246:4
**aware** 15:15,19
  245:17 258:19
  258:22,24
  260:17,23
  261:5,8,12,18
  261:22,24
  262:5,7,14,15
  263:2,12,13,22
  264:15 277:10
  277:15 278:10
  278:15,18
  279:3,10,15
  280:12,19
  282:2 285:24
  293:8 296:18
  297:13 302:12

**b**

**b** 5:9 20:6
  125:9 361:8
  362:3 363:3
**back** 51:7
  69:12 77:24
  78:3 98:24
  100:15 104:18
  114:22 125:6
  135:2 137:24
  142:20 202:23
  217:20 233:3
  256:18 283:3
  283:16 323:19
  325:9 330:16

**background**
  27:11 71:18
  72:7
**bad** 326:19
**bank** 140:3
  151:8 154:10
  155:21 156:18
  157:5 158:14
  160:4,10,15
  161:8,12
**banker** 286:12
  286:13,18
**bankers** 167:11
  167:15,23
  168:6,11,22
  169:24
**banking** 122:4
  122:9 125:22
**banks** 151:9
  154:22 159:19
  160:8,13
**baron** 174:25
**barrett** 2:16
  4:19
**base** 136:2
**based** 11:18
  20:4 70:17
  71:2,5,8 89:4
  89:11,16
  133:25 141:20
  178:22 179:2
  188:25 189:2,6
  193:25 196:15
  199:3 200:14
  206:4,9 251:15

**[based - blood]**                                                    Page 9

263:6,25
273:10 349:22
350:5
**baseline**  161:25
**basically**
147:11
**basis**  48:15
50:9 73:24
120:5 140:21
141:14 193:22
198:19 212:15
227:17 229:17
230:3,12,20
231:3 232:19
243:10 245:21
264:18 266:13
267:19 276:12
303:9 309:4,7
315:10 347:15
350:4 351:14
**bates**  53:19
54:10,10,13
107:3 163:23
183:22 209:12
342:18
**bay**  11:18,21
11:25
**bearing**  53:19
107:3
**bears**  183:22
**becoming**  68:6
**bed**  78:4
198:14
**beer**  175:2

**began**  40:3
46:15 233:15
344:24 348:13
**beginning**  4:14
115:10 290:8
290:20,23
345:2
**begins**  67:11
163:22
**behalf**  4:20 5:3
176:22 225:23
239:23
**behavior**
212:12
**behavioral**
70:18 167:4
352:3,9
**behaviors**
17:19 90:11
**believe**  9:13
12:18 13:17
15:13 23:17
25:22 32:11,14
35:7,21 37:9
39:7 50:15
51:20 56:6
59:24 71:10,11
72:5 73:8
74:24 78:23
83:7,22 89:22
93:15,18 101:2
109:14 110:5
118:4 120:2
121:12 128:18
130:6 134:23

135:10 138:16
140:18 144:6
148:23 162:19
177:22 180:24
182:12,19
211:22 216:15
218:10 221:10
234:16 236:23
241:8,12
266:16 270:23
290:15 291:5
303:3 318:22
318:23 320:15
320:16,18,19
321:8 325:11
330:9,9 344:13
345:11 346:19
350:21 354:4
359:8
**believed**  59:15
85:15 181:7
212:7 213:13
317:17 322:6,8
**belmount**  8:17
8:20,23 9:2
10:11,17,23,25
**benefit**  7:8 69:5
74:15 347:14
**benefits**  145:3
**best**  7:12 46:7
56:8 59:25
61:20,22 62:8
62:20 63:8,15
68:11 84:8,20
85:2 106:6

165:20,25
166:7,10 177:6
212:20 224:18
271:2,25 272:5
272:13 274:9
**better**  85:23
215:23 216:8
216:13 253:5
**beyond**  23:11
28:18 29:16
92:24 132:13
318:8
**bheller**  2:6
**bid**  174:17
176:7,12
**big**  152:6,16
156:8
**bigger**  177:19
**biggest**  119:9
175:11 176:18
**bipolar**  42:9,13
317:18 318:9
320:3,17,25
321:5,9 322:3
322:8,12,17
323:2
**bit**  200:7
241:16
**black**  233:12
**blackrock**
151:10
**blair**  175:3
**blanket**  207:24
**blood**  364:18

**[bonus - ceased]**                                                          Page 10

**bonus** 136:12
 145:2,9
**bottom** 53:19
 54:10,12,12
 72:8 87:4
 111:2,3 184:2
 217:22 356:8
**boundaries**
 285:23 302:10
**boundary**
 293:13 294:21
**bracket** 234:4,7
**brackets**
 166:24 173:17
**brain** 167:6
**brand** 334:11
**break** 7:19,20
 50:22 51:5
 82:19,22
 104:16 114:20
 195:5 202:9,21
 256:16,21
 323:9,12,17
**breaks** 7:18
 9:25
**brian** 2:5 4:22
 65:19 111:15
 112:5 146:21
 147:3,13 217:6
 254:10,19
 255:6
**brief** 123:5,6
**briefly** 100:14
**bright** 29:9
 32:19,22

**bring** 102:12
**broad** 22:18
 245:25 246:7
 246:10 275:14
 297:9
**broadly** 38:10
 44:17 73:21
**brooklyn** 119:9
 119:11
**brother** 9:8
**brought** 101:15
**bullet** 166:18
 166:19 170:13
 171:24 172:17
 213:7 217:21
 220:14 233:11
 233:11,12,21
 233:23 243:20
 243:21 283:5
 284:22 289:24
 289:25 292:7
**bumped** 76:13
**busier** 175:7
**business** 159:7
 172:23
**busy** 289:3
**buy** 39:12
 160:22
**buying** 176:14

**c**

**c** 2:2 104:22
**cadence** 97:21
**caffeine** 101:2
**calculate**
 110:15

**calculated**
 141:11
**california** 8:5
 344:3,4
**call** 20:19
 123:3,8 165:22
 213:11,23
 223:24 233:14
 251:12 286:11
 286:17 287:10
 287:13,19
**called** 220:17
 285:2
**calls** 121:9
 122:17,23
**campus** 9:15
**candidacy**
 151:22 171:7
**capabilities**
 68:7
**capable** 62:25
 85:16,22
 326:14
**capacity**
 232:17 287:21
**cape** 100:4,5,18
**capital** 139:25
 140:2,5,8
 159:7
**captures** 165:6
**car** 49:11,13
**care** 96:18
 225:24 239:24
 331:12 345:4

**career** 116:24
 126:11 127:4,7
 159:13,16
 287:25 288:10
**case** 3:19 18:15
 18:18 73:14
 116:25 122:12
 148:3 167:14
 167:17 189:3,7
 191:8 222:10
 249:13 300:7
 324:9
**cash** 143:16
**catch** 265:2
 268:5
**category** 15:2
**caught** 241:16
**cause** 31:9
 43:17 44:5
 45:13,15,24
 46:2 47:6
 48:22 49:5,7
 49:10 80:3,4
 80:10 100:16
 208:9 214:14
**caused** 16:23
 19:25 20:9
 34:16 36:23
 37:4,9 38:18
 40:25 80:14
 328:21 331:25
 332:20 337:7
**cease** 146:19
**ceased** 79:8

**centerview** 1:7
3:17 4:20 5:20
15:4 16:7
19:11,25 20:9
40:4,8,11,15,19
40:23 41:4,7
41:10,19,23
42:3,7,11
45:10 54:20
102:13 103:11
107:2,4 108:21
109:23 110:22
115:3 117:15
119:18 120:5
120:14 121:8
121:16 122:24
123:13 127:10
132:20 135:5
139:3 145:17
146:2 151:8,12
151:20,22
152:3,17
153:16 154:6
155:12,17
156:18 157:10
157:13 161:22
162:3,11,22,25
163:10,13
164:15 165:8
165:18 166:9
167:24 168:12
168:22 169:6
169:13,18,23
171:14,16,23
174:2 180:18

183:23 192:24
193:10,16,23
194:12 195:8
195:10,13
196:8,10,12
197:5,18
199:14,20,25
200:13 208:5
209:13 211:14
217:15 218:4
219:19 220:4
221:10 225:17
227:2 228:14
228:24 229:8
229:14,15,23
230:10 232:7
232:14,14
236:21,24
240:14 241:18
241:23 244:22
248:10 250:17
250:25 253:8
254:5 258:21
260:18,24
261:5,7 262:21
263:13 266:10
266:22 272:9
272:10 273:2
273:13 277:11
278:10,16,17
278:21 279:5
283:19 284:11
292:4 294:2,6
294:9 298:2,14
301:14 303:2,5

303:10,19
304:4,12,15
305:12,24
306:3,18,24
307:3,11,16,21
307:25 308:6
308:12 309:5
309:18,25
310:5,10,15,19
310:23 311:4,8
311:17,20
312:7,9,19,23
313:4,11,23
314:18,23
315:2,11 321:7
326:7,12
327:11 328:4
328:12,16,21
329:2,12,16
330:2,8,22
331:25 332:20
332:24 333:4,7
333:14 334:5
334:20 336:14
337:8 341:14
342:5 343:20
349:20 350:23
351:9 360:1
365:1
**centerview's**
96:8 105:23
203:21 209:16
251:22 252:2
324:18,24
325:12,16

328:11 329:19
347:25 348:8
350:2 351:21
**central** 313:20
**ceo** 167:3 175:3
**certain** 15:2
20:2 55:13,14
68:17 73:15,20
74:16 134:8
176:15 252:25
253:3 277:12
277:13 278:12
290:10,25
294:15 296:19
299:16 301:16
302:5 309:23
317:9 318:10
**certainly** 20:24
**certification**
364:2
**certified** 71:7
**certify** 364:5,16
**cetera** 80:17
172:9
**chain** 183:17
357:8
**change** 130:16
130:19,22,25
188:21 289:17
291:16 355:10
365:4,7,10,13
365:16,19
**changed**
130:15 301:22
302:13

**[changes - companies]**

changes 297:4
360:7
characterize
25:15 156:13
characterized
156:9,15
chart 353:16
chasing 107:25
108:11 109:4
check 252:23
checkpoint
178:13
checkpoints
178:6,8
cheryl 203:20
209:14,19
211:18 213:11
220:17 226:21
233:15 234:8,9
240:19,21,25
241:3 242:11
242:12 266:2
271:6 273:10
273:12,18,20
276:10 283:6,6
283:21 284:4
284:13,19
285:2 286:3,11
288:17 289:21
290:2 291:2
296:8 301:12
chest 100:16
child 20:14
chronological
311:18

chung 89:8
95:8,10 96:25
citibank 156:18
156:22 157:2
city 3:23 314:2
314:5
cj 166:23
claim 135:6
328:13 331:25
332:20 333:13
claiming 19:23
19:24 145:16
145:25 324:23
claims 18:14,17
23:23
clarify 7:13
27:3 36:3
71:22 82:6
129:19 152:11
223:2
class 262:11
classes 77:17
77:19 78:7,11
78:17 80:22
83:17
clayman 2:8
5:2
clayro.com
2:10
clear 188:20
243:24 324:3
clearly 169:10
client 176:4,10
176:23 177:16
179:12 180:16

clinic 69:19
clinical 341:7
clip 361:19,20
close 9:18 44:9
45:22 46:6
138:21 181:17
358:9
coaching 66:7
147:4 254:20
code 184:7
cogan 175:2
cognitive 42:19
55:23 66:14
70:17 352:2,9
colds 17:24
colleagues 4:18
collect 315:14
collection
303:18
college 9:12,14
25:22 47:11,14
48:3 62:24
72:14 75:6,10
97:7 128:5
225:18 351:11
combat 28:9
come 69:12
185:5 221:18
272:10 332:24
comfortable
136:22 210:20
286:4 345:21
comforting
206:25

coming 119:8
119:11
commencem...
364:10
comments
172:8 187:21
188:4,9 212:8
296:11,15
commissions
313:6
common 17:24
communicate
209:22 210:4
294:20 301:15
communicated
242:15 251:18
291:21 295:15
295:23 296:3
communicating
291:13 301:20
communication
73:4 184:18
263:7
communicati...
101:18 102:2,6
102:24 103:7
170:19 210:8
217:23 298:8
349:23
community
87:24 94:11
companies
150:25 151:3
151:23 152:2,7
152:16,20,23

153:4,9 159:6
160:20 161:2
**company**   11:18
149:23 160:23
176:14,16
177:7,8,23
**comparable**
326:11
**compared**
157:24
**compass**   136:3
137:2,5,7,9,12
137:14,25
138:14 142:2
144:25 145:22
148:12,24,25
149:7,10,13
**compensation**
140:23 144:4
149:20
**compensatory**
105:20 324:15
**competent**
326:15
**competitive**
62:24
**complaint**   12:9
**complete**   68:25
181:8 360:9
**completed**
172:6
**completely**
217:11 231:21
234:6

**completion**
170:22
**component**
58:10 135:11
**comprehensive**
318:2
**compulsive**
17:19 90:11
**computer**
181:7
**computers**
181:13
**concentrate**
80:3
**concentrating**
17:21 28:5
**concern**   193:10
201:14,17
208:2 239:22
289:10 356:14
**concerned**   86:7
192:3 193:5
199:2,3,5,12
201:16,20
206:13,14
207:25 209:21
210:3 212:14
219:20 220:4
241:19 283:12
285:16
**concerns**   26:14
60:7,13 87:19
207:2 286:23
287:5,23
288:23 329:10

**concert**   32:20
**concludes**
359:17
**conclusive**   18:3
18:5
**concussion**
29:7,17 35:12
35:13,18,19
36:17,19 38:5
38:20 66:15
68:22 70:2
72:9 74:4,5
75:16,19,22
76:3,7,14,19
77:3,15 78:20
78:21 79:7,8,9
**concussions**
29:24 30:2,6
35:11 36:7
37:4,25 38:14
38:22 52:25
75:22
**concussive**
29:23
**condition**   11:16
21:13 22:18
228:11 271:19
320:21 341:2
**conditioned**
28:14
**conditions**
23:23 24:15
26:11,24 27:4
79:15 93:5
136:14,17,20

136:23 238:23
270:18,24
271:3 272:2,6
272:14 274:10
340:10,11,16
340:19 343:11
344:19
**conduct**   324:25
348:2 351:21
**confidence**
69:4
**confidential**
213:14 277:19
**confidently**
56:12
**confiding**
213:13
**confirmed**
350:9,12
**confirming**
350:21
**confused**
317:12,16,25
320:2
**confusion**
44:22
**conjunction**
142:19 227:10
**connection**
57:20 95:11
99:10 123:11
131:17 135:5
143:22 153:7
176:2 227:3
318:19 355:3

355:18
**connections**
153:6
**consequences**
229:25 329:25
**consider**
112:24 162:5
195:7,20 196:4
249:23
**considered**
116:22 196:13
196:19 270:5,8
**considering**
145:9 173:5
214:17
**consistent**
46:20 56:7
63:5,12,15,22
93:3 94:6
208:12 215:5
216:21 218:23
219:4 221:13
222:13,20
224:15,25
226:5 227:17
228:18 229:17
230:3,12,20
231:3 232:19
234:21 235:17
236:7,15 237:5
238:25,25
240:3 243:9
244:9 245:14
245:21 260:18
260:22 261:2

261:11,20
263:19 264:18
266:12,21,25
267:5,16,19,21
268:18,23
269:7,21
276:12,14
**consistently**
34:23 61:19,22
62:8 63:8,14
84:8,19 85:2
255:5
**constant**
326:16
**constantly**
194:3
**consult**  346:17
**consultant**
112:12,19,21
112:25 137:17
139:14,18
140:15
**consultation**
96:18 342:22
**consulted**
144:20
**consulting**
116:16 132:12
133:24 137:22
139:19,22,25
140:4,7,10
143:2,6 144:16
**contact**  172:5
173:16

**contacted**
88:20,24
**contacting**
283:8
**contacts**  165:22
**content**  165:24
240:13 310:8
**contents**
227:21 241:4
320:2
**context**  131:6
162:8 196:6,7
226:20,25
232:3 252:22
270:7,10
**continuation**
83:22 352:3
**continue**  3:11
31:6,10 36:13
68:16 69:5,25
81:11,17,24
82:11 105:24
193:15 255:20
351:13
**continued**
58:13 70:9
125:14 254:4,8
362:2,3 363:2
363:3
**continues**  81:5
**continuing**
329:13
**continuous**
30:20

**contract**
136:15,18
141:22
**contribute**
160:24 250:7
**controversy**
364:20
**conversation**
28:15 81:23
82:4,7,9 99:16
204:20 205:24
206:24 207:6
208:19 210:11
210:13,16
211:25 212:4
212:23 220:9
241:14 283:19
283:25 284:5
284:12,18
289:21 290:12
290:18 291:3,8
302:13
**conversations**
3:7 82:3
153:20,22
155:4 292:6
321:19,24
**convey**  220:2
297:18
**cope**  327:3
**copies**  114:8
**coping**  26:12
91:16,21,22
208:10 272:17
352:5

| | | | |
|---|---|---|---|
| **copy** 317:2 | 198:6,8 199:23 | 287:7 289:13 | **counter** 22:24 |
| **correct** 11:10 | 199:24 200:4 | 289:22 294:22 | 23:8 38:23 |
| 12:2 16:3 | 200:25 203:13 | 296:12,15 | 71:25 |
| 25:17 33:8 | 203:16,21 | 300:5,10,11,18 | **couple** 35:18 |
| 35:20 36:19 | 205:5,12 | 301:22 302:16 | **course** 281:2 |
| 40:5 42:16,17 | 209:16 211:21 | 303:5 304:4 | 359:5,11 |
| 54:22 57:12,22 | 213:2 214:20 | 309:25 312:3 | **court** 1:2 3:18 |
| 58:4 63:22 | 215:14,18 | 314:19 315:7 | 4:3 5:7 6:19,24 |
| 64:19 66:24 | 216:25 218:2,5 | 315:22 316:14 | 7:8 9:4 10:10 |
| 68:18 70:10 | 219:22 221:7 | 319:13,16,19 | 10:18,20,22 |
| 75:7 78:22 | 221:22 222:21 | 322:20 334:17 | 20:19 |
| 79:3 88:10 | 224:3,16 225:4 | 335:6 337:20 | **cousin** 8:21 |
| 96:12 97:2,3 | 225:19 226:18 | 337:23 338:3,7 | 10:21 |
| 97:11,25 101:6 | 227:4,6,25 | 339:19 346:7 | **cover** 54:2 |
| 103:12,15 | 228:20 229:20 | 346:14,22 | 282:23 300:4 |
| 108:2,12,14,15 | 231:9 232:9 | 348:15,16 | 301:5 |
| 108:18 111:19 | 233:18 234:7 | 354:17,21 | **covered** 43:8 |
| 111:20 122:9 | 236:15 237:7 | 355:4 356:21 | **covering** |
| 122:24 124:9 | 237:14 239:6 | 360:9 | 299:10 |
| 126:9,20 | 243:14,25 | **corrections** | **covers** 282:23 |
| 128:17,23 | 244:10,18 | 360:6 | **covid** 10:3 |
| 132:17 135:23 | 247:14 250:13 | **correctly** | 11:22 27:8 |
| 136:3 138:19 | 251:23 252:8 | 247:21 | 47:5 |
| 143:23 144:5 | 252:15 253:24 | **corresponden...** | **create** 302:21 |
| 145:3,10,17 | 257:24 259:4 | 353:17 | 321:25 322:4 |
| 146:3 148:14 | 261:20 262:9 | **corresponding** | 322:18 |
| 150:19 151:20 | 262:22 266:25 | 320:12 321:23 | **created** 15:21 |
| 152:3,4 155:17 | 268:11 272:7 | **cortlandt** | 302:24 |
| 162:12 163:15 | 273:15 274:14 | 162:19,21,24 | **creating** 142:15 |
| 174:2,10 | 278:6,17 280:8 | **coughs** 17:24 | 310:7,11 |
| 178:10 179:17 | 280:10,15 | **counsel** 3:15 | **credit** 156:19 |
| 180:4,23 | 281:3,15 | 4:12 5:8 53:19 | **cried** 164:19 |
| 187:15 188:6 | 283:16 284:6 | 364:21 | **crying** 202:5 |
| 189:15 191:11 | 284:16,21 | **counsel's** 64:21 | **culture** 157:18 |
| 194:14 195:18 | 285:20 286:21 | | |

**cumulative**
66:16
**curious**  205:14
**current**  8:2
60:8 127:13
131:11,15,17
132:4,25
133:19 165:20
184:13 326:22
351:4
**currently**  11:24
24:2,5 32:11
32:14 33:7,10
62:23 68:23
71:20 106:18
128:16,20,24
129:4 130:7
131:3,19,22
132:15 133:14
146:2 197:6
205:11 292:15
331:22
**customers**
109:9,12
110:12,17
115:24 143:12
143:15
**cv**  1:9 3:20
**cvp**  184:13

**d**

**d**  2:15 361:4
362:2 363:2
**da**  25:25 90:25
97:10 319:12

**daily**  31:5 87:7
303:9 309:3,7
315:10
**damages**
105:20 145:16
324:15
**danger**  266:23
**dark**  29:9
**dartmouth**
9:18 10:7
20:23 21:8,11
26:22 47:13,22
51:11,24 52:4
52:6,10 53:18
54:3 56:22
57:4,12,22
58:3 71:2
72:14 75:6,10
75:14 77:12
78:6 79:2,3,18
79:22,24 82:18
83:17,21 88:15
89:3,24 90:3
90:15,18,22
92:10 94:14
97:7 98:6,9
150:9,20
151:19 225:18
315:14,18,20
319:13,19,24
334:17 336:10
337:18,25
338:10,11
346:4 352:25
354:21

**dartmouth's**
49:6
**dartmouth.edu.**
316:10
**date**  12:15,16
13:7 47:16
60:21 75:23
102:17 121:19
138:17,22
194:10 287:15
305:22 308:18
312:13 342:21
343:2 360:13
365:24
**dated**  53:8 54:3
107:6 115:2
118:12 138:7
163:4 183:4
203:25 225:8
237:25 315:25
316:13,19
319:4 339:10
339:18,23
357:23 361:10
361:23 362:5,7
362:9,11,13,16
362:18,20
363:5
**dates**  30:10
61:5
**day**  99:20
102:21 103:17
103:22 117:25
120:8,15,21,23
121:3,4 123:20

123:24 126:2
126:18,25
127:13,21,25
128:21 129:13
129:25 130:12
131:8,18 132:4
132:13,25
133:5,10,17,19
134:7,11,15,15
134:16 148:4
166:25 193:22
193:22 205:18
210:17 213:8
213:10 216:12
220:15,16
222:25 223:3
224:7 228:9,9
260:2 262:2,3
262:4 267:25
268:21 269:5
272:19 277:13
278:13,23
280:8,15 281:2
284:19,23,25
287:14 290:11
290:25 291:11
291:15,16,17
291:18 308:22
309:15 310:4
310:14,18,22
311:2,11,14
360:17 364:23
**day's**  181:20
**days**  76:12 78:7
101:14 116:14

181:2 198:12
198:18 208:4
275:17 309:9
**daytime** 28:4
34:18,20
**deadline**
177:11,24
178:4 179:6
**deal** 21:19 22:6
22:21 91:16
92:4 100:20
175:8,11
176:18 178:12
178:15,18,21
179:4,7,16,24
180:22 184:8
186:5,25 189:3
192:2,5,13,17
192:23 193:3,7
194:6 195:18
196:19,22,22
198:5,13
199:16 200:7
200:11,18
201:11 208:5
223:23,25
253:6 257:22
258:11,22
259:21,22,22
262:5,7 263:9
263:10 264:3
265:5 274:24
278:3,5,6,10,15
279:25 280:4
281:2 287:21

289:3 292:14
292:23,24
293:5 297:6,7
299:23 300:8
300:17,20,22
329:23 330:20
343:18 351:19
**dealing** 93:24
208:11
**dealings** 159:7
**deals** 157:21,23
158:2 159:5
160:25 179:23
193:14 194:4,5
194:13,25,25
200:21 201:9
236:5,12
247:11,20
248:9,16,17
249:8,10 253:9
256:24 257:5
257:13,18,21
257:23 258:7
258:15,20
259:8,14 260:3
260:7,11,15,17
261:5,8,13,18
261:23,25
262:12,19,20
263:2,3,14,14
263:21 264:6
264:12 265:15
269:18 274:13
276:9,24
277:10,16,17

277:19 278:2,4
278:19,19
279:3,4,9,11,15
279:19,20
280:6,13,19,23
281:12,17,18
281:18,22
282:15 286:5
286:23
**death** 43:19
46:11,17,24
48:7,9,13,20,23
49:6 50:11,14
**deaths** 47:8
**debt** 265:3
**december** 8:25
11:9 138:8,18
138:18,25
139:20,23,24
361:24
**decide** 11:8,14
308:21
**decided** 182:4
**decisions**
160:21
**decks** 159:11
**declare** 360:4
**decline** 136:8
**declined** 136:5
**decrease**
335:17 336:24
**decreased** 28:7
**deduct** 135:20
**deducted**
145:15,18,20

145:23
**deducts** 111:7
**deemed** 107:8
113:25 360:7
361:19,20
**defendant** 1:8
1:16 2:13
**defendant's**
53:10 95:18,21
95:23 96:3
104:25 107:8
113:25 117:12
138:9 163:6
183:5 204:2
225:10 238:3
303:15 316:3
319:6 339:11
352:19 357:25
361:9,14 362:4
363:4
**define** 15:6
74:10 90:19
91:11 94:15
106:15 109:11
110:10 159:21
161:5,19
166:10 185:24
254:18 312:24
331:16 346:15
**defined** 192:5
194:23 197:21
270:6 354:8
**defining** 253:11
263:6

**definitely**
  175:23 187:21
  351:12
**definition**
  197:21,23,25
  198:3 207:15
  207:17 254:9
**degree** 27:13
  341:5
**degrees** 38:3
**deleted** 101:5
**deletes** 101:13
**demanding**
  135:5 159:19
  159:21
**demands** 177:5
**demonstration**
  86:3
**department**
  203:21 209:16
**depended** 38:3
**dependent**
  120:6
**depending**
  223:19 291:17
**depends** 33:16
  134:16 143:14
  162:7 263:5
**deponent** 360:3
**deposed** 5:21
**deposition** 1:15
  3:14,21 5:23
  12:5,12,14,21
  13:2,15,25
  14:5,21 147:6

254:21
**depressed**
  48:18
**depression**
  17:25 24:9,19
  24:22 25:16
  26:13 41:3,6,9
  41:13,15 44:24
  48:8,11,14
  90:14 329:5
  334:14
**depressive**
  24:10 43:22
**describe** 55:20
  249:16 327:24
**described** 24:8
  24:9 44:20
  212:5 320:23
  322:5,13
  327:24 350:8
  351:2
**describing**
  262:14 268:3
**description**
  361:9 362:4
  363:4
**desired** 182:13
  182:17 191:11
**detail** 167:19
  171:21
**detailed** 167:10
  167:14 168:5
  168:10
**details** 261:23

**determine**
  57:10 70:8
  80:13 102:11
  160:22 177:3
  235:23
**determined**
  58:13,16 66:17
  86:4
**determining**
  69:24 231:13
**devote** 127:2,21
  128:22 129:6
  130:13 131:20
  131:23,25
  132:15,21
  133:7 309:2
  315:9
**devoting** 116:7
  128:25 129:4,8
  131:4 132:10
**diagnose** 340:9
  344:18
**diagnosed**
  16:10,13 20:5
  23:14 25:19,21
  25:23 26:19,22
  26:23 27:7,14
  27:17 28:10,20
  30:15,22 33:11
  33:22 34:6
  37:13 42:13,18
  43:4 75:21
  76:13,18 77:2
  317:17 320:3
  320:16 321:5,8

340:10,16,18
  340:25 343:10
**diagnoses**
  19:14,17 43:7
  43:9 214:14
  240:2
**diagnosing**
  76:3
**diagnosis** 16:21
  16:24 17:2,4
  26:17,20 27:8
  28:12,16,17
  30:25 31:15
  35:4 37:15
  76:23 77:7
  226:5 318:9
  320:11,23
  321:14,18,22
  322:2,6,9
  323:2
**diagnostic**
  87:22
**dick's** 70:20
  71:7 87:22
  88:2,10,16
  316:22
**die** 47:15
**died** 44:9,11
  46:4 47:10,23
  47:24 50:5,17
**difference**
  19:13 190:16
  223:15 239:14
  240:11,16
  259:17,20,21

273:19
**differences**
239:20
**different** 9:16
9:17 24:15
38:3,7,8 55:22
126:21 132:2,7
132:23 145:19
156:4,10,10,14
159:6 161:2
177:2 197:22
223:19 242:18
244:22 247:25
248:3 254:25
265:12,14
268:19 271:22
272:16,21
273:24 274:22
275:3,23 276:6
276:8,8,22,23
276:24 282:18
282:22 295:11
296:24,25,25
297:2 325:14
**differentiate**
143:5,9
**differently**
242:23 285:17
288:20
**difficult** 36:10
160:5
**difficulty** 90:10
332:10,11,16
332:17 333:2,6

**diminution**
105:22 324:17
**direct** 19:4 66:3
146:15 217:4
272:20
**directing**
149:22
**directly** 364:19
**disabilities**
134:20 206:17
207:12 211:7
224:19 228:7
250:9 328:6
349:15
**disability** 16:2
16:5 79:25
80:9,14 126:15
127:12 192:10
193:8 199:11
201:24 212:14
212:24 213:15
213:18,21,24
214:2,4,16,18
215:2,12
216:18 218:15
218:20 219:2,7
219:8,15
231:16 235:4,6
236:2 244:6
246:4 268:15
285:18 287:24
288:21 302:7
326:3,15 327:3
347:23

**disabled**
133:13 293:19
294:4,8,11
326:18
**disagree** 91:18
171:6 256:8
**disclose** 110:22
111:10 112:6
**disclosed** 95:10
177:16 347:21
**disclosure** 21:6
114:13
**disclosures**
104:24 105:7
110:24 134:23
323:24 324:9
361:18
**disconnect**
29:21
**discovery**
317:6
**discrete** 36:14
**discriminated**
15:25 288:19
**discrimination**
105:24 324:18
325:12,17
326:20
**discriminatory**
348:2
**discuss** 67:13
162:24 207:3
211:18 290:5
298:8

**discussed** 14:17
21:5 26:12
42:21 43:2
67:25 174:11
180:13 203:10
206:18 250:11
269:17 274:7
281:10 301:10
321:24 324:6
349:11,13
**discussing** 67:3
67:11,19,24
128:16 257:23
277:22 301:19
301:24
**discussion**
28:15 60:19
86:2 99:10
216:11,13
283:21 284:10
**discussions**
60:17 67:15,21
68:10 86:21,25
94:25 156:6
162:20 292:2,6
**disillusioned**
126:11 133:15
**disorder** 16:8,9
16:11,14 18:22
18:24 22:10,13
22:15,19,22
23:15,18,25
24:5 25:20
26:18,21 41:18
41:22 42:2,6

42:10,13 80:16
92:22 93:24
214:5,5,18,19
317:18 320:3
320:24 321:5,9
322:3,11,12,17
**disorders** 328:7
**disparities**
66:12
**disregard**
228:14,24
229:8,12
231:21
**disregarded**
229:24 230:11
231:19
**disregarding**
230:6,17
**distracted**
36:14
**distress** 105:21
324:16,23
325:15 326:5
326:24 331:24
332:19 347:24
348:7 349:18
349:25 350:10
350:13,22
351:6
**distressed**
327:5
**district** 1:2,2
3:18,19 146:21
255:12,14
256:8

**divided** 141:13
141:16 144:10
**doctor** 37:7
75:25 76:11,18
99:23 319:18
333:11 345:7
346:25
**doctors** 72:24
81:9,15,21
219:7 317:23
333:15 341:23
**document**
53:21 56:16
95:20 96:7,12
104:23 105:9
105:13 112:8
117:11 118:5,6
135:15 163:21
166:7,14
183:22 202:9
209:12 227:19
227:21 238:9
303:14 324:7
339:9 343:4
352:18 356:23
357:7,22
358:11 361:12
361:16,21
362:15,22
**documentation**
227:18 320:10
321:12,21
322:23,25
**documenting**
313:13

**documents**
12:7 14:19
15:10,15,18
86:20 101:17
101:25 102:5
102:24 103:8
**doing** 24:12
25:3 43:23
59:22 112:22
116:5,10,12
133:13 176:22
176:25 177:8
179:8 188:16
215:15 238:21
299:18 319:23
**dosage** 335:15
335:17,19
336:22,24
**dose** 39:8,18
345:19
**doses** 38:24
39:3
**double** 80:23
150:8
**doubt** 62:13
65:2
**dr** 25:25 51:12
51:14,16,18,21
51:25 53:17,23
54:21,25 55:9
55:12 56:5,10
56:25 57:7,9
57:20,25 58:12
58:16,21,24
59:14 60:6,12

60:17,23 61:2
61:23 62:14
63:6,13 64:16
64:21,25 65:3
65:13,17,25
66:11,21 67:12
67:22 68:20
69:11 70:7,13
70:22 71:17
72:6 75:4 76:9
76:21 77:5,14
80:20 82:5,7
82:10,15 83:2
83:11 84:3,6
85:10,14 86:6
86:16,22 87:2
87:15 90:25
91:3,8,13 92:3
92:5,20 93:8
93:20 118:19
119:5 122:2,2
122:16 123:16
125:17,20
128:15 129:22
129:24 130:4
319:18,22
320:17 323:5
331:9,11
333:22,25
334:7 335:4,21
335:24 336:4
336:18 337:4
338:14,20
341:12 342:10
342:15 343:3,8

343:10,13,16
343:23 344:2,7
344:12 345:7,9
345:12,15
346:13,18,21
346:24 347:11
347:18,23
348:5,13
349:12,17,24
350:6 351:15
352:10,13,25
353:9,13,22
354:4,8,14,23
355:2,8,17
356:8,15,20
357:15 358:16
358:22 359:2
**draft** 296:20
**drafted** 357:19
**dragon** 184:4,7
184:14 186:5
**dramatically**
84:17
**drawing**
150:17
**dream** 106:13
106:14,15
107:25 108:11
108:16,19,20
109:5 116:22
117:16,20
127:5 170:16
192:24 193:11
232:6

**dreamt** 325:22
**drink** 29:14
**due** 31:3,5,9
34:16 79:13,14
80:15,16 83:8
86:4,4 169:5
206:17 214:13
285:17 288:20
321:18 326:2,3
347:25 348:7
351:7
**duly** 5:10
125:10 364:9

**e**

**e** 2:2,2 5:9
15:12 103:7
125:2,2,9
163:4,24
165:21 183:4,9
183:16,25,25
185:17,21
186:10,14
188:14,25
189:7,18,21
190:3,13
191:21 192:21
194:2,11
195:23 196:15
198:10,21
202:3,4 203:3
203:7,8,9,12,20
203:25 204:4,5
204:8,10,11
205:2,4,16
206:4 209:5,11

209:14 210:6
210:17 212:10
213:5,12
237:25 238:12
238:18 240:19
241:7,7 251:6
253:14,20
283:23 284:3
290:14 291:12
297:25 298:6
298:15,18,21
299:2,6,8,19
300:14,25
301:6 315:25
316:8,9,13,18
319:4,11,21
339:10,15,23
353:9 354:5
356:14 357:7
361:4,8 362:2
362:3,5,7,9,13
362:16,18,20
363:2,3 365:3
365:3,3
**e.g.** 67:7
**earlier** 78:18
78:24 117:15
247:18 357:16
**earliest** 291:17
**early** 122:5
125:23 186:22
187:15 241:17
315:21
**earn** 132:12
136:25 137:18

**earned** 111:4,8
112:20 135:16
135:21 146:7,7
146:24 147:10
148:21 149:19
**earning** 137:6
137:16 139:11
139:13
**earnings**
112:16 143:3
**easily** 36:14,15
**easy** 160:9
**eat** 29:12
**eating** 94:8
116:20 337:17
338:12
**eclectic** 119:7
**edit** 166:2
306:2,20,23
312:18
**edited** 305:2,5
305:7 312:17
**editing** 304:22
312:14
**edits** 253:2,3
300:25 304:18
**effects** 66:16
224:20 345:20
**effort** 66:13,23
101:24 108:23
113:17 115:11
115:16
**efforts** 102:4
132:12

**[efron - enjoyment]**                                                                    Page 22

**efron**  175:3
**eight**  212:25
  215:3,13
  216:19 218:13
  218:21 219:3
  219:17 220:20
  220:25 221:11
  222:12,19,24
  223:4,9,12,15
  224:14,22,25
  226:6,24
  227:16 228:19
  229:16 230:2
  230:12,19
  231:2 232:17
  234:20 235:16
  236:6,14 237:4
  240:3 243:8
  244:7,13,17
  245:13,20
  247:2 260:25
  261:10,19
  263:18 264:16
  266:10,11,24
  267:7,17,21
  268:8,10,16,20
  269:22 271:4
  271:13,17
  272:2,4,11
  273:2,8,14
  274:8,18,22
  275:4,19,23
  276:3,11,19,25
  277:5,8,14
  278:13 281:9

  281:14,19
  282:4,10,11,24
  285:5
**eighty**  141:12
  141:15 144:9
  145:2
**eiten**  330:10,12
  331:2 333:21
  339:3,6,16,25
  340:7,13 341:4
  342:7
**eiten's**  340:3
**either**  27:11
  92:22 189:11
  190:5 191:2
  234:11 253:21
  282:21
**electrical**
  100:13
**elevated**  24:7
  24:11 98:20
  100:16 329:2
  332:10
**eleven**  183:2
**emanuel**  1:17
  2:13 3:22 4:17
**embarrassed**
  104:5 185:18
**emily**  167:4
  172:6
**emotional**
  21:13 42:20,24
  105:21 165:23
  228:11 232:4
  324:15,22

  325:6,10
  331:24 332:19
  347:24 348:7
  349:18,25
**emotionally**
  43:5
**emotions**  86:5
**empathy**  44:23
**emphasis**
  132:25
**emphasize**
  288:8
**employ**  364:21
**employed**  16:6
  40:8,11,15,19
  40:23 41:4,7
  41:10 42:10
  45:10 109:22
  121:7 122:24
  153:8 171:23
  278:16 279:5
  303:10 304:3
  304:11,14
  309:17,24
  310:5,15 312:7
  312:9,19,23
  313:3,10,23
  314:22 315:11
  333:3,7 334:20
  336:13
**employee**
  231:15 235:25
**employees**
  152:18

**employer**
  153:12 154:16
  155:23
**employers**
  326:9
**employment**
  41:18,22 42:2
  42:7 136:14,18
  137:3,14
  151:13,15,18
  152:15 310:9
  311:7
**enable**  269:20
  280:6
**enabled**  221:11
  264:16
**enabling**  219:3
**encompassing**
  226:23
**encouraged**
  207:4
**ended**  35:22
  36:24 42:8
  155:10 170:19
  217:22
**ends**  353:5
**engagement**
  59:10,15 63:19
  291:18
**engaging**  87:8
**englewood**
  143:11
**enjoyable**  25:5
**enjoyment**
  43:24

entail 149:17
entailed 149:19
entering 72:14
  75:6,10
entire 73:17,21
  79:3 120:11
  258:23 267:6
  337:17
entirely 221:17
entirety 58:9
  79:17
entities 96:17
entitled 20:2,11
  20:12 50:8
  95:20 104:23
  117:11 361:12
  361:16,21
entity 37:19
  97:8
environment
  38:7
episodes 24:10
equal 327:13
er 1:9 3:20
ernst 174:25
  178:15 183:10
  203:8,19 204:6
  204:10 205:3
  298:7,22,25
  299:5 300:14
ernst's 205:16
errata 360:8
especially
  186:25

esq 2:5,10,15
  2:16,17
essentially
  39:11 177:3
  354:9
established
  83:19 130:3
  254:2 271:10
estate 137:19
esteem 17:25
  25:2 325:19
estimate
  110:20 120:19
  120:21 309:8
  309:13
et 80:17 172:9
evaluated
  91:19 246:3
evaluation
  51:17,22 63:2
  69:20 87:22
evangelista
  2:20 3:24
evening 181:8
event 32:21
  45:16 76:12
  77:10,20 78:6
  79:14
events 14:22,25
  15:2,3,14
evercore
  156:19 158:10
everybody
  255:22

evidence 61:18
  62:10,11 63:7
  70:17 71:2,5,8
  84:7,18 89:4
  89:11,16 234:2
  234:12,19
evident 67:4
exacerbate
  193:7 199:10
  201:23 206:16
  207:10 208:17
  212:16 266:13
exacerbating
  219:14 224:20
  229:19 230:21
  237:6 241:22
  246:4 250:8
exacerbation
  225:3 226:11
  226:17 227:24
  228:4,16 231:4
  240:7 327:25
  328:5,8,17,22
  329:13
exacerbations
  328:13 352:6
exact 12:14,16
  13:7 16:22
  30:10 37:19
  39:23 47:16
  49:7 61:4
  63:24 83:9
  89:19 95:5
  97:21 102:17
  110:19 119:20

120:18 121:19
127:25 144:14
148:21 167:10
167:15,23
168:5,10,21
169:23,25
174:7,12
177:19 203:22
215:21 262:16
269:9,12
287:15 288:2
305:22 308:18
312:13 341:21
350:15
exactly 32:10
  34:2 35:8,22
  36:21 37:17
  39:25 45:18,19
  48:18 49:9,15
  49:18 74:18
  92:18 93:8
  123:14 130:14
  161:13 162:23
  179:13 208:8
  209:7 215:20
  224:9 239:11
  253:10 264:2
  267:23 272:22
  295:18 308:24
  309:6 349:9
  350:17
examination
  5:14 125:14
examined 5:12
  125:12 361:5

| | | | |
|---|---|---|---|
| **example** 15:12 | **exhibit** 53:7,10 | **exhibited** 85:17 | 229:21 232:14 |
| 22:25 38:4 | 53:13 95:17,23 | 322:11 | 232:24 |
| 39:9 262:2 | 96:2 104:22,25 | **existential** 25:7 | **expenses** |
| 279:7,19 289:2 | 105:4 107:2,9 | **existing** 83:23 | 142:14 |
| 295:20,20 | 110:23 113:21 | 328:6 | **experience** 24:6 |
| 298:25 299:4 | 114:2,10 | **exited** 170:15 | 32:6,22,24 |
| 351:2 | 117:13 118:7 | **expect** 201:8 | 33:2,4,5,10,20 |
| **exams** 52:19 | 121:23 134:24 | 206:11 296:20 | 34:15,17,20 |
| 55:13,15,16,20 | 138:5,9,11 | **expectation** | 35:23 36:4,8 |
| 72:11 80:22,24 | 163:6,19 183:3 | 11:20 160:7,12 | 36:24 37:2,23 |
| 85:3,18,24 | 183:6 203:24 | 161:24 168:9 | 40:3,7,10,17,21 |
| **except** 32:25 | 204:3 205:10 | 169:11 170:10 | 41:3,6,9,17,21 |
| 171:16 | 205:12 209:10 | 199:6 257:10 | 41:25 42:9 |
| **excessive** 28:4 | 213:5 225:10 | 257:19 258:11 | 43:13 44:18,19 |
| 34:18,20 | 225:14 233:4 | 259:23 265:16 | 45:4 46:20,21 |
| **exchange** | 238:3,7 243:16 | 297:7 | 48:8,14 70:23 |
| 210:17 | 243:18,19 | **expectations** | 73:18,22 74:17 |
| **exchanged** | 268:12 283:3 | 154:10,22 | 90:14 163:10 |
| 98:23 101:6,12 | 303:13,15 | 155:21 167:19 | 163:13 171:22 |
| **excited** 126:12 | 311:16 313:16 | 178:22 179:3 | 174:3 189:2 |
| 175:15,19,23 | 316:3,6 319:3 | 184:18,19 | 251:20 257:7 |
| **exclusively** | 319:6,9 323:23 | 193:21 200:8 | 326:19,20 |
| 295:14 | 324:4 339:12 | 206:21 208:13 | 329:6 340:22 |
| **executives** | 342:12,15 | 209:23 210:5,8 | 351:8 |
| 177:22 | 352:15,19,22 | 210:9,15 | **experienced** |
| **exercise** 94:9 | 355:7,7 357:10 | 241:23 253:8 | 17:13,16,17 |
| 337:16 338:7 | 357:22,25 | 253:11 257:15 | 18:4 24:23 |
| **exercising** | 358:13 361:10 | 262:21 263:4,6 | 25:15 27:25 |
| 116:20 | 361:12,16,19 | 263:8,11 297:2 | 28:18 30:14 |
| **exhaustive** 18:5 | 361:20,21,23 | **expected** | 31:19,23 33:22 |
| 24:16 44:4 | 362:5,7,9,11,13 | 167:11,15,23 | 34:11 35:10,17 |
| 52:17 94:5 | 362:15,16,18 | 168:6,11,16,17 | 36:6 37:8,21 |
| 165:13 | 362:20,22 | 168:22 169:24 | 40:25 42:6,19 |
| **exhaustively** | 363:5 | 172:22 197:24 | 42:23 43:11,14 |
| 156:17 | | 206:8 229:13 | 43:18 44:6,14 |

44:25 45:6,11
45:14,24 46:10
46:15,23 47:7
48:2,12 50:3
89:24 90:2,6
100:8 206:16
279:9 324:24
326:4 327:15
327:19,25
328:3,5,7,24
**experiences**
29:24 34:22
43:4 286:7,25
**experiencing**
17:6,8 24:19
33:18 40:3,14
41:13,14 45:8
46:9,14,16
53:3 58:17
87:12 98:15,19
99:11,21 100:6
100:17 208:3
325:13,16,18
325:19,23
331:21,23
350:8 351:7
352:7
**explain**  36:5
175:25 257:4
293:22 326:8
**explained**
241:19 243:23
253:12 271:11
284:13 285:10

**explaining**
192:12
**expose**  302:6
**exposed**  286:7
**exposure**
157:22
**express**  208:2
**expressed**
81:10,15
128:15 288:9
**extended**  28:6
52:4 69:14
72:10 86:14
**extending**
51:23
**extra**  52:18
**extremely**
61:17 64:12
104:4 170:15
175:18 219:19
220:3 283:11
**eyes**  206:8

**f**

**f**  2:10 125:2
356:3
**facility**  95:14
95:15
**facing**  174:16
176:7
**fact**  85:22
116:21 185:22
186:4 189:4,14
228:15 242:14
262:20 270:17
280:24 327:8

349:24
**factors**  69:4
93:4,7 337:14
352:4
**fair**  20:15
143:19,19
147:5 165:5
166:6 349:7
**fall**  83:2,4,6
118:21 121:7
121:10 122:17
345:11 347:8
348:14
**falling**  17:22
332:11,16
333:2
**familiar**  300:17
317:23
**family**  11:4,6
132:5
**far**  20:16
107:12 195:7
255:2 281:7
**father**  47:2
**fatigue**  17:21
28:5,9 34:18
34:20 332:25
**favor**  221:6
285:11
**fear**  48:5
**february**  107:6
107:21 108:9
108:25 109:6
115:2,15 116:6
116:13 140:12

140:17 144:22
315:13,18
316:2,14 319:5
322:19 323:4
353:8 356:24
357:8,24
362:17,19
363:6
**feel**  73:9,12
94:24 130:8
131:19,22
132:15 133:9
136:22 185:16
210:20 251:14
282:20,20
289:16 345:21
350:7
**feeling**  24:12
44:2,20 99:22
116:21,23
126:10 127:8
130:11 133:15
133:15
**feelings**  25:8
36:16 43:22,25
44:21 45:5,9
131:11,15,17
133:12 175:17
**felt**  126:13
136:13,15
168:14 185:18
185:18 186:7
189:19 208:23
213:12 288:18
292:22 317:22

345:18,21
351:5
**fevers** 17:24
**fiancé** 8:21
10:21
**fifteen** 144:15
255:2
**fifth** 170:12
217:21
**fifty** 172:16
**figure** 67:6
111:14 265:11
**figures** 113:7
**file** 107:7
113:24
**filed** 3:17
**filing** 142:19
**filings** 143:24
150:7
**fill** 123:5
142:20
**finally** 189:9
308:10
**finals** 77:11,15
78:12
**financial**
133:20 159:10
159:14,16
285:20
**financially** 4:7
**find** 54:4 103:5
194:15 250:4
326:11,18
**findings** 60:9
60:14

**fine** 111:21
150:16 202:11
202:15
**finish** 7:5 185:6
188:18 189:4,8
358:10
**finished** 187:23
188:8 212:7
**fire** 326:23
**fired** 126:14
127:11 266:5
327:9
**firm** 4:4 103:8
149:20 153:15
156:8 157:23
158:23 164:12
165:12,22
167:24 173:18
177:10 219:14
221:15 222:7
228:22 229:5
229:12 230:4,7
230:14,16,18
230:22,25
231:6,14,17,18
235:23 237:10
246:5,13,17
250:4 252:11
257:7,12
258:23 261:6
264:9 265:21
277:21,23
286:7 287:2,23
329:3

**firm's** 219:21
220:5 250:7
283:13
**firms** 150:24
151:3,23,25
152:7,19
153:11 154:7
154:23 156:10
156:14,17
157:17 158:17
158:19 161:2
296:25
**first** 5:10,23
12:10,23 14:6
30:7 41:12,14
43:7 52:9
53:25 55:3
71:11,18 96:15
113:9,12 115:5
118:12 159:19
160:4,9,14
162:13 163:15
171:25 175:18
178:12 183:24
184:2 187:22
188:3,12
200:18 203:9
209:11,13
215:21,24
233:10 238:12
243:7,11
257:12 260:7
283:18,23,24
284:3 289:25
293:4 295:5

299:22 300:3,8
300:15,20,21
301:17 302:21
302:23 303:21
315:23 316:17
327:11 330:4
330:10,11,17
330:19,23
333:18,19
343:2,7 346:6
351:11 352:9
357:6,7,10,12
357:14
**fished** 187:19
**fit** 263:16,17
**five** 105:16
111:5 114:3,5
114:6 121:2
141:12,12,15
144:9 145:2
324:13 348:17
**flat** 65:24
**flexibility**
277:11 278:11
**flow** 258:22
**flu** 27:7
**fluke** 200:7,19
**fluoxetine**
92:13,16 93:19
334:9,10 335:2
335:9,19
**flustered** 67:5
68:6
**focus** 80:2
124:8 133:3,6

133:10
**focusing** 28:6
35:2,6,16,24
36:2,4,7,9,25
37:4 90:10
133:16 332:11
332:17 333:6
**follow** 69:12,19
69:23 88:8
**followed** 78:8
88:3,11
**following** 11:22
29:6 30:8
35:12 38:21
52:24 72:23
74:3,4 75:16
76:7,12 78:7
94:23 95:4
99:20 102:17
103:6 104:3
109:7 173:24
233:16 267:15
307:24 329:18
**follows** 5:13
125:13
**foods** 29:12
**footnotes**
184:13
**foregoing**
360:5
**forget** 246:16
**forgot** 15:16
**form** 54:16
74:9 94:24
123:5 147:11

159:24 169:16
193:4 217:17
**formal** 43:9
340:24
**formally** 42:13
**format** 13:9
184:14
**formatting**
172:8
**former** 152:18
153:10,12
154:14,16
155:22,22
**forth** 98:24
**forty** 172:15,20
173:2,5
**forward** 116:24
194:4,5,11
197:18,24
**found** 207:18
207:22
**four** 30:8 96:15
108:6 114:11
114:12 199:8
200:16 224:2
251:19 259:25
277:8 349:2
**fourteen**
144:11,14
**fourth** 111:2
342:18
**francisco** 8:5
11:10,13,15
107:25 108:11

**freaked** 164:19
206:3
**freaking** 104:5
**frederick** 8:4,7
8:10,13 11:25
**free** 146:10,11
**freedlander**
345:7,10,13,15
346:21 354:23
**frequency**
194:24
**frequent** 194:3
**frequently**
46:13
**freshman**
41:15
**friend** 44:9
46:5,7,8,25
47:21 49:6,20
49:25 50:5,17
158:17 197:8
197:11
**friend's** 46:4
50:10,13 78:4
**friends** 47:13
116:20 153:10
154:14,19
158:18 270:8
277:21
**friendships**
26:15 132:6
**front** 53:13
95:25 105:4,15
118:7,10
125:17 138:12

183:9 203:4
205:11 225:14
238:7 303:17
311:17 316:5
319:9 323:23
324:12 352:22
358:14
**frown** 255:15
**fulfill** 250:5
**full** 58:8 69:19
71:12 80:24
106:7,10,13
108:2,12,17,24
109:5 113:17
115:12,17
116:6,8,11
122:13 134:2
135:11 213:7
214:25 243:21
283:5 289:25
**function** 55:23
239:5 295:2
**functioning**
62:25 85:16,17
**further** 69:13
228:8 265:21
305:5,8 359:13
364:16
**future** 70:3
81:12 82:12
105:25 200:22
327:4

**g**

**gain** 109:9,12
115:23
**gallea** 174:24
178:15 298:9
**galleries** 121:9
121:15,21
122:18,23
**gallery** 121:23
123:3,8
**general** 43:25
61:6 103:19,20
116:12 141:8
153:21 161:16
167:19 172:11
187:18 188:18
245:2,5 251:25
285:19 329:17
**generally** 86:17
156:25 157:5,9
158:5,9 184:17
241:21 252:5
314:14
**genesis** 18:23
**geotag** 306:9
**getting** 25:3
91:15 94:7
230:2 234:20
256:6 300:25
347:16
**give** 6:25 53:15
57:25 92:20
119:19 120:10
120:18,19
177:10 227:12

246:9 253:7
272:11 358:7
**given** 66:12
70:15 166:13
168:18 208:10
232:13 242:20
256:5 265:10
277:19,20
360:10
**giving** 275:8
**gmail.com.**
163:24
**go** 3:12 7:23
10:11 53:25
80:19 104:9
114:14 140:11
171:21 173:15
175:11 184:12
198:14 220:13
256:9 269:4
288:9,15,16
305:11 356:7
358:8
**goes** 60:6 62:22
66:11 67:2
70:19 122:16
123:16 135:20
188:11
**going** 3:3 6:22
18:11,25 19:2
19:4 20:17
21:2,14,17,22
21:23 50:21,25
56:24 66:3,5
70:7 111:12

116:24 117:9
127:6 146:13
146:15,18
147:2 148:3
177:3,10 183:2
188:18 189:5,8
192:12,16
194:4,5,11
197:18,24
214:24 217:4,6
254:14 255:16
255:18 269:2
278:2 279:4
294:10,14
301:10 319:3
323:10 326:23
334:23 348:5
**goldman** 151:9
152:17 156:19
158:6
**good** 3:2 5:16
5:17 50:24
118:2 123:20
123:23 126:3
126:18,25
128:21 129:13
130:2,12 131:9
159:12 206:20
207:3 287:6
**google** 133:21
133:22 134:19
**gotten** 137:19
147:16 148:2
271:21

**grade** 47:13
63:12
**graduate** 10:6
**graduated** 10:8
356:3
**graduation**
150:20
**grandfather**
43:19
**granted** 315:6
**great** 157:15,18
160:17
**grief** 42:24
43:12,13,14,17
43:21 44:5,14
44:18,25 45:5
45:5,9,13,24
46:3,10,15,23
47:6 48:2
**group** 38:10
**grow** 109:7
115:22
**growth** 286:25
**guaranteed**
264:25 266:20
267:14,25
**guardrail**
246:19 299:13
**guardrails**
220:19,24
221:20,23
222:4 227:15
242:14 244:23
247:5 264:14
265:24 269:20

**[guardrails - heller]**                                     Page 29

274:10 276:7
276:22 281:10
282:17 285:4
295:8,9 301:20
**guess**  132:11
282:9 295:11
**guys**  352:16

**h**

**h**  5:9,9 125:9,9
361:8 362:3
363:3 365:3
**habits**  338:12
**half**  223:18
311:2,13
323:10
**hampshire**
9:22,23 10:4
306:10,14
**hand**  36:11
364:23
**handed**  324:2
**handle**  212:21
291:13 302:18
**handled**  180:19
**handles**  106:22
309:24
**handling**
287:22
**hang**  188:17
**hanover**  88:21
306:9,13
**happen**  127:14
223:17 267:8
297:11,15
301:11 351:10

**happened**  21:7
49:16 101:11
129:16 145:5
146:8 171:9
212:5 216:4,7
224:9,10,11
237:10 266:8
287:20 299:21
326:24 329:20
349:16
**happening**
178:24
**happens**
222:23 223:3
226:23
**happy**  74:25
186:4 221:20
221:22,25
**hard**  36:12
114:8 117:25
123:19,23
126:2,13,18,24
127:9,10,13,21
128:21 129:12
129:25 130:11
131:8 160:18
291:21 325:24
**harder**  68:25
**harm**  232:16
**harmful**  208:5
**head**  7:2 75:20
76:13 311:19
311:23 312:6,8
312:11,12,15
312:22,24

**headache**  31:22
**headaches**
17:18 23:7
28:2 30:24,25
31:3,4,6,19,23
81:5
**headboard**
78:3
**headedness**
98:21
**health**  26:24
27:4 54:3,15
87:25 96:18
97:8 100:4,5
100:18 132:5
208:6 219:20
220:4 222:14
222:16 224:5
224:12,16
229:2,10 231:8
234:4,15,23
235:9,11 239:6
265:8 266:23
269:13 270:14
272:23 283:12
342:3 345:24
347:15
**healthcare**
172:2,13
**healthy**  212:24
215:3,13
216:18 222:18
244:7 268:15
337:14 338:3
352:4

**hear**  192:15
**heard**  5:18
**hearing**  27:6
46:25 287:4
**heart**  24:11
98:20 100:13
100:16 329:2
332:10,16
**heartbeat**
100:15
**heather**  341:17
346:25 347:2,7
**held**  1:17 364:7
**heller**  2:3,5
4:22,22,23
14:23 15:5
17:9 18:10,19
18:25 19:19
20:10 21:5,22
23:19 26:7
29:2 33:13,24
37:6 38:15
39:5 42:22
44:15 48:24
49:23 50:6,12
50:23 52:22
57:13 58:5
59:2,18 60:3
61:11,25 62:17
63:10,23 64:20
65:6,16,22
66:9 67:16
72:21 74:9
75:11 78:13
79:10 80:12

| | | | |
|---|---|---|---|
| 81:19 83:4 | 235:18 236:16 | **hereto** 360:8 | 349:14 |
| 84:11 85:5,11 | 237:8,15 | **hereunto** | **hit** 75:20 358:5 |
| 85:19 89:12 | 239:10,16 | 364:22 | **hobbies** 132:5 |
| 90:4 91:10 | 240:15 245:9 | **hi** 164:9 209:19 | 310:8,11,12 |
| 95:12 101:20 | 247:25 248:11 | 238:20 316:25 | **hobby** 122:4 |
| 102:8,14 | 250:2,14 | 319:22 353:13 | 125:22 |
| 104:11 111:12 | 252:16 253:15 | 357:15 | **hock** 1:20 4:3 |
| 111:17 112:2,9 | 254:7,12,22 | **high** 16:12,14 | 364:4,25 |
| 114:3,6,11 | 255:7,14,21 | 16:23 17:8,13 | **home** 29:8 49:4 |
| 124:12 127:23 | 256:4,11 258:8 | 17:16 18:7,13 | 49:21 134:4 |
| 129:9 131:5,12 | 260:20 261:3 | 19:4,15 21:8 | **hope** 2:15 4:16 |
| 135:8 139:4 | 261:21 266:15 | 21:21 22:4,7 | 5:19 147:20 |
| 146:4,13,22 | 267:2 273:16 | 23:15,18 24:8 | 202:6 319:22 |
| 147:7,15,19 | 274:20 280:9 | 24:19,23,24 | **hopeless** 24:13 |
| 148:15 149:3 | 281:4 282:6 | 25:17 26:3,6 | 116:23 |
| 150:4 152:9 | 297:20 298:3 | 26:10,15,20 | **hopelessness** |
| 154:11 158:24 | 298:11,23 | 27:21 30:9 | 325:20,24 |
| 159:24 165:9 | 301:3,8,23 | 31:11 41:15 | **hopeskibitsky** |
| 167:25 169:16 | 318:21 322:21 | 52:12,21 72:12 | 2:15 |
| 179:18 180:5 | 323:8,25 325:2 | 72:18,24 73:15 | **hoping** 254:24 |
| 182:8,15,22 | 327:22 340:20 | 73:17,22 74:17 | **hour** 14:10 |
| 187:8 189:16 | 348:9 353:24 | 158:21 | 50:21 123:9 |
| 189:22 190:6 | 354:18 355:20 | **highly** 20:7 | 188:21,21 |
| 190:14 191:13 | 357:11 358:5 | 120:6 277:19 | 233:20 277:8 |
| 192:14,18 | 358:10 359:7 | **hill** 331:9,11 | 310:17,21 |
| 193:4,17,24 | 359:15 | 333:20,23,25 | 311:2,10,13 |
| 194:15 196:24 | **help** 80:6 90:21 | 334:7 335:4,21 | 323:10 |
| 197:19 198:15 | 93:5 176:23 | 335:24 336:4 | **hourly** 140:20 |
| 198:23 201:2 | 185:7 210:22 | 336:18 337:4 | **hours** 14:7,8 |
| 201:18 202:6 | 211:9 218:25 | 338:14,21 | 98:22 119:21 |
| 202:12 207:13 | 219:7 227:4,11 | 341:13 | 119:24 120:8 |
| 207:20 217:2,9 | 351:19 | **hipaa** 54:16 | 120:21 121:2,5 |
| 217:17 218:6 | **helpful** 108:3 | **hired** 149:10,11 | 133:22,23 |
| 224:6,17 | 185:10 186:19 | **history** 70:15 | 140:14,19 |
| 231:10 232:20 | | 103:5 146:8 | 148:6 153:14 |

154:9,23
155:13,20
161:4,10,15
162:25 167:10
167:15,19,23
168:5,11,17,17
168:21 169:7
169:10,15,19
169:23 172:12
172:16,16,18
172:20,23
173:2,5 174:7
174:12 193:21
199:8 200:12
200:16 206:11
208:3 212:25
215:4,14
216:19 218:14
218:21 219:3
219:17 220:20
220:25 221:12
222:12,19,24
223:4,6,9,12,16
224:2,14,22,25
226:6,24
227:17 228:19
229:16 230:2
230:12,19
231:2 232:18
234:21 235:17
236:7,15 237:5
238:24 240:4
243:9 244:8,13
244:17 245:13
245:20 247:3

254:12 259:25
260:18,22,25
261:10,19,25
262:16,17,17
262:20 263:3
263:11,15,19
264:2,5,17
266:11,12,24
267:7,18,21
268:8,11,16,21
269:22 270:19
270:25 271:4
271:13,17
272:3,5,12
273:3,8,14
274:8,19,23
275:4,15,20,23
276:4,5,5,11,19
276:20,20
277:2,3,5,9,14
278:13 281:9
281:14,20
282:4,10,11,19
282:21,22,25
285:5 291:16
295:7,13,14,22
295:25 296:23
301:21 358:6
**house** 11:3
70:21 71:7
87:22 88:2,10
88:16 316:22
**hr** 203:21
206:20 207:3
209:16 211:18

213:13 241:24
283:8
**hu** 25:25 86:16
86:22 90:25
92:3,5,20 93:9
93:20 97:10
319:12,18,22
320:17 323:5
346:13,18
352:25 353:9
353:13,22
354:4,8,14
355:2,8,17
356:8,15,20
357:15 358:16
358:22 359:2
**huhs** 7:2
**hundred** 111:4
111:5 144:12
144:15,15
145:24 213:9
233:20
**hunterkiessling**
316:10
**hyatt** 70:22
**hybrid** 134:5
**hydrated** 29:12
101:2
**hygiene** 93:4
**hyposomnia**
27:16

**i**

**idea** 50:24
206:20 207:3
220:17,23

244:12,16
245:11 285:2
**ideal** 187:6,10
249:12,14
269:11,12,23
271:18
**ideally** 215:4
216:20 218:22
244:8 268:17
268:22 269:6,8
271:2,25
276:13
**identification**
53:11 95:24
105:2 107:9
114:2 117:13
138:10 163:7
183:6 204:3
225:11 238:4
303:16 316:4
319:7 339:12
352:20 358:2
**identified** 18:9
21:20 24:17
25:14 26:18,21
30:13 31:24
34:9 35:2
37:11,21,24
152:8 153:21
264:11 327:21
328:23 329:24
330:6,21
331:15,18
334:3 337:6
338:17 342:6

343:18 346:24
351:20
**identifies** 144:4
**identify** 280:22
308:21
**identity** 96:16
**ignore** 233:25
234:12,19
**ignoring**
297:19
**illness** 225:3
226:12,18
227:24 228:5
229:19 230:22
231:5 237:7
240:7 241:22
266:14
**illnesses** 17:24
31:5 228:17
242:21
**image** 304:6
**imagined** 318:4
318:5
**immediate**
23:13 29:16
**immediately**
8:14,15 29:6
99:24 198:25
212:19 221:6
285:11 302:6
304:24
**impact** 6:18
69:4 80:2
201:22,24
223:11,13

224:4 228:12
228:25 229:9
234:4,14,22
265:7 270:14
271:20 288:10
298:2
**impacted** 68:7
**impacts** 235:9
352:6
**impair** 228:8
**impaired** 43:6
84:17
**impairment**
42:25
**impairments**
42:20
**implemented**
296:15
**implementing**
297:3
**implication**
101:21
**implies** 24:13
**imply** 251:15
**implying** 206:5
**important** 7:9
**impression**
297:17,22
321:4
**improper** 66:10
**inaccurate**
354:4
**inactive** 278:5
**inappropriate**
66:2 147:8

254:17
**incident** 15:11
35:9 99:21
326:13
**incidents** 15:14
**include** 111:14
112:21 132:11
240:20 241:2,3
270:17 273:21
274:3 282:15
318:6
**included** 18:3
52:18 95:7
97:7 112:10
250:12 271:5
271:22 318:8
**includes** 143:25
224:21
**including** 23:9
26:11 44:9
68:4 87:7
88:21 91:6
133:2 159:9
170:24 199:22
275:15 337:15
352:2
**inclusive** 132:4
**income** 112:7
112:14 113:6,8
137:4,12,21
**incompetent**
292:25
**incorrect**
111:21,22
227:7 247:23

**increase** 335:15
336:21
**increased**
228:8 237:6
275:15 332:12
332:17,25
345:19
**incredibly**
147:8
**independently**
77:22
**indicate** 233:24
**indirectly**
364:19
**individual**
22:16 347:2
**individuals**
44:11 47:9
89:3 96:23
97:11 153:14
153:20 313:3
313:10
**industry**
285:20 325:22
**informal** 72:10
**information**
36:12 54:5,15
69:2 104:7
112:3 231:7
**informed** 271:6
290:9,24
**initial** 104:24
105:7 110:24
114:13 134:23
212:4 243:24

**[initial - istaffing]**                                                    Page 33

244:2,4 323:24
324:9 361:17
**initially**  93:18
122:3 125:21
221:24 305:3
**injuries**  66:17
**injury**  49:8
**input**  286:13
286:18
**inquire**  16:24
21:12
**insight**  253:7
**instagram**
302:15,22
303:9,19 309:3
309:10,11,16
311:7 314:14
**instituted**
299:14
**instruct**  20:18
21:2
**instructed**
263:16
**instructs**  7:16
**intended**  22:8
22:11,18 58:10
94:20 325:23
**intending**
347:22
**intense**  345:19
**intensify**  48:16
**intent**  250:3
**intention**  91:14
**intentionally**
56:14 58:20

85:9,13 218:18
**intentions**
20:21 190:9,22
191:19
**interactions**
164:11,15
165:7,12,18
181:18
**interactive**
235:2,21
**interest**  24:11
25:2 43:23
87:8 176:16
177:6
**interested**  4:8
27:6 137:6,20
141:23 175:19
193:2 364:19
**interesting**
157:21,22,25
159:3 175:9
**interfere**  192:8
**interfering**
86:5 87:6
**intermittently**
9:11
**intern**  155:11
155:16,18
163:9,12,14
**interns**  152:19
153:10 154:14
**internship**
155:9
**internships**
156:4

**interpret**
275:10
**interpretation**
84:21 354:9
**interpretations**
237:17
**interrogatories**
95:19,22 96:4
96:9 361:15
**interrogatory**
96:14,24
**interview**
162:13,15
166:22 168:19
326:9
**interviewed**
162:11,18
**interviewer**
168:10
**interviewers**
153:5 167:2
**interviewing**
158:16
**interviews**
167:10,14,18
168:5
**intruder**  49:4
49:21
**intrusion**  19:7
20:16 21:10
**invalid**  84:9,21
**investigate**
20:11
**investigation**
158:21

**investment**
140:3 152:7
154:10,22
155:21 158:14
158:23 159:19
160:4,8,10,13
160:15 161:8
161:12
**investor**  176:14
177:5 180:21
**involve**  198:18
**involved**  49:18
91:22 194:25
**involvement**
87:6 180:22
**involving**  64:11
**iq**  55:25
**irreparable**
105:25
**irreversible**
106:2
**irrevocable**
232:23
**irs**  142:22
143:4
**isolation**  44:2
87:9,13 90:9
**issue**  98:16,18
100:12
**issues**  26:24
27:4 57:8
350:10,14
**istaffing**  172:19
173:3

**[itemized - k]**                                                Page 34

| | | | |
|---|---|---|---|
| **itemized**  70:14 | 122:18 123:20 | 241:17 303:24 | 83:1 84:1 85:1 |
| **itemizing**  150:2 | 123:24 126:2 | 304:4 305:16 | 86:1 87:1 88:1 |
| **j** | 126:12,18,25 | 306:6,15 307:4 | 89:1 90:1 91:1 |
| | 127:5,13,21 | 307:8,13,20 | 92:1 93:1 94:1 |
| **j**  2:16 | 128:21 129:13 | 308:2,7,11,16 | 95:1 96:1 97:1 |
| **jabber**  188:14 | 129:25 130:12 | 308:19 | 98:1 99:1 |
| **james**  2:10 4:25 | 131:8,18 132:4 | **june**  9:24 10:2 | 100:1 101:1 |
| **janice**  2:17 | 132:13 133:2,5 | 10:6 135:3 | 102:1 103:1 |
| 4:19 104:21 | 133:10,17,19 | **k** | 104:1 105:1 |
| 116:3 | 133:24,25 | | 106:1 107:1 |
| **janiceyoon** | 135:25 136:6,9 | **k**  5:9 6:1 7:1 | 108:1 109:1 |
| 2:17 | 167:20 170:21 | 8:1 9:1 10:1 | 110:1 111:1 |
| **january**  1:11 | 171:4,8,11,12 | 11:1 12:1 13:1 | 112:1 113:1 |
| 3:4 8:8,15 | 171:13,16,18 | 14:1 15:1 16:1 | 114:1 115:1 |
| 11:11,12,15 | 186:19,20,24 | 17:1 18:1 19:1 | 116:1 117:1 |
| 12:17 82:15 | 187:7,11,13,13 | 20:1 21:1 22:1 | 118:1 119:1 |
| 83:11,14 84:2 | 192:24 193:11 | 23:1 24:1 25:1 | 120:1 121:1 |
| 85:4,9 87:2,13 | 217:25 218:3 | 26:1 27:1 28:1 | 122:1 123:1 |
| 87:16 88:9 | 232:6 234:3,14 | 29:1 30:1 31:1 | 124:1 125:1,9 |
| 118:13 125:3 | 251:6,9,11 | 32:1 33:1 34:1 | 126:1 127:1 |
| 138:3,21 | 278:20,25 | 35:1 36:1 37:1 | 128:1 129:1 |
| 140:12,16 | 326:11,22 | 38:1 39:1 40:1 | 130:1 131:1 |
| 144:21 364:23 | 351:11 | 41:1 42:1 43:1 | 132:1 133:1 |
| **jeanne**  233:14 | **jobs**  116:15 | 44:1 45:1 46:1 | 134:1 135:1 |
| 233:15,17 | 150:19,20 | 47:1 48:1 49:1 | 136:1 137:1 |
| **jefferies**  156:19 | 151:16,19 | 50:1 51:1 52:1 | 138:1 139:1 |
| **jennifer**  2:16 | 159:18 | 53:1 54:1 55:1 | 140:1 141:1 |
| 4:19 333:22 | **john**  175:2 | 56:1 57:1 58:1 | 142:1 143:1 |
| **jenniferbarrett** | **joined**  233:13 | 59:1 60:1 61:1 | 144:1 145:1 |
| 2:16 | 302:25 | 62:1 63:1 64:1 | 146:1 147:1 |
| **jersey**  8:18 9:5 | **judge**  6:19 | 65:1 66:1 67:1 | 148:1 149:1 |
| 333:23 | **july**  30:7 38:6 | 68:1 69:1 70:1 | 150:1 151:1 |
| **job**  11:16 103:4 | 98:11,14,19,25 | 71:1 72:1 73:1 | 152:1 153:1 |
| 103:5 106:10 | 99:5,12,16 | 74:1 75:1 76:1 | 154:1 155:1 |
| 116:9,23 | 109:24 132:19 | 77:1 78:1 79:1 | 156:1 157:1 |
| 117:16,21,25 | | 80:1 81:1 82:1 | |

**[k - know]**                                                   Page 35

| | | | |
|---|---|---|---|
| 158:1 159:1 | 228:1 229:1 | 298:1 299:1 | 81:4,9 87:4,18 |
| 160:1 161:1 | 230:1 231:1 | 300:1 301:1 | 87:23 88:2 |
| 162:1 163:1 | 232:1 233:1 | 302:1 303:1 | 184:11 353:13 |
| 164:1 165:1 | 234:1 235:1 | 304:1 305:1 | 355:9 |
| 166:1 167:1 | 236:1 237:1 | 306:1 307:1 | **kate's** 59:9 |
| 168:1 169:1 | 238:1 239:1 | 308:1 309:1 | 61:16 63:19 |
| 170:1 171:1 | 240:1 241:1 | 310:1 311:1 | 66:14 68:22 |
| 172:1 173:1 | 242:1 243:1 | 312:1 313:1 | 70:15 84:16 |
| 174:1 175:1 | 244:1 245:1 | 314:1 315:1 | **kathryn** 1:4,15 |
| 176:1 177:1 | 246:1 247:1 | 316:1 317:1 | 3:14,16 5:4 |
| 178:1 179:1 | 248:1 249:1 | 318:1 319:1 | 54:6 113:22 |
| 180:1 181:1 | 250:1 251:1 | 320:1 321:1 | 225:23 238:13 |
| 182:1 183:1 | 252:1 253:1 | 322:1 323:1 | 239:23 303:8 |
| 184:1 185:1 | 254:1 255:1 | 324:1 325:1 | 303:18 359:18 |
| 186:1 187:1 | 256:1 257:1 | 326:1 327:1 | 360:2,4,13 |
| 188:1 189:1 | 258:1 259:1 | 328:1 329:1 | 365:2,24 |
| 190:1 191:1 | 260:1 261:1 | 330:1 331:1 | **kathrynshiber** |
| 192:1 193:1 | 262:1 263:1 | 332:1 333:1 | 106:23 302:19 |
| 194:1 195:1 | 264:1 265:1 | 334:1 335:1 | **keep** 36:11 |
| 196:1 197:1 | 266:1 267:1 | 336:1 337:1 | 142:8,11,12,13 |
| 198:1 199:1 | 268:1 269:1 | 338:1 339:1 | **kept** 103:4 |
| 200:1 201:1 | 270:1 271:1 | 340:1 341:1 | **key** 173:25 |
| 202:1 203:1 | 272:1 273:1 | 342:1 343:1 | 174:4 |
| 204:1 205:1 | 274:1 275:1 | 344:1 345:1 | **kim** 167:5 |
| 206:1 207:1 | 276:1 277:1 | 346:1 347:1 | 175:2 287:5,10 |
| 208:1 209:1 | 278:1 279:1 | 348:1 349:1 | 292:3 301:21 |
| 210:1 211:1 | 280:1 281:1 | 350:1 351:1 | 301:25 302:2 |
| 212:1 213:1 | 282:1 283:1 | 352:1 353:1 | **kind** 36:15 |
| 214:1 215:1 | 284:1 285:1 | 354:1 355:1 | **kirshner** 2:8 |
| 216:1 217:1 | 286:1 287:1 | 356:1 357:1 | 5:2 |
| 218:1 219:1 | 288:1 289:1 | 358:1 359:1 | **knew** 44:9,11 |
| 220:1 221:1 | 290:1 291:1 | 361:6 | 49:4 56:24 |
| 222:1 223:1 | 292:1 293:1 | **kate** 62:23 67:3 | 179:10 |
| 224:1 225:1 | 294:1 295:1 | 67:12 69:18 | **know** 7:12,20 |
| 226:1 227:1 | 296:1 297:1 | 71:19 72:9 | 32:10 36:13 |

**[know - lee]**                                                    Page 36

37:19 38:7,8
39:16,22,25
45:18,19 48:18
48:19,19 49:7
49:9,18 57:17
62:12 63:11
73:2 76:21
77:5,8 78:10
78:15 79:16
89:10,13,18
92:5 93:12
95:9 100:10
130:14 156:2
171:20 176:4
177:19 178:11
178:13 179:2
179:13,19,24
180:2 181:14
182:17 185:7
186:14,17
187:19 190:19
191:18 207:14
214:9,10,12
234:8 242:17
242:19 243:11
243:15 248:15
249:22 251:24
252:10,17
258:23 262:18
265:13 268:4
273:25 277:25
279:13,18,21
280:2,3,5,11
281:5 283:14
285:15 286:20

288:2 293:14
293:18,19,24
294:21,23
296:17 297:10
297:15,21
298:4,12,24
300:6 301:4,9
304:23 306:4
306:25 308:24
309:6,19,20,22
310:16,24,25
311:5,9,12,15
312:13 315:12
318:7,18
328:10,11,20
328:24 329:8
329:14 340:3
340:12,15,17
341:6,9 346:25
348:19 349:6,8
349:9 355:10
359:4,12
**knowing** 294:8
295:2 318:3
**knowledge**
39:13 42:12
327:9
**knowledgeable**
159:15
**known** 93:5
233:19
**kosowsky** 2:21
**kshiber** 163:24

**l**

**label** 107:4
**lack** 43:23 86:2
87:7
**lamotrigine**
92:14,19 334:9
336:2,3
**landlord** 11:5
**large** 72:11
157:25 160:10
321:18
**larger** 133:2
**lasted** 30:18,18
32:11 35:8,11
35:18 37:18
78:20 79:2
**late** 155:9
161:17,19
162:6 185:23
186:23 187:6
189:10 190:5
191:2,4,10,12
192:2,4,13,16
192:22 193:3,6
193:15 194:3
194:13,23
195:7,10,12,20
195:24 196:5
196:13,17,19
196:23 197:5,9
197:13,15,17
197:21 198:2,4
198:11 199:14
199:21 200:15
200:23 207:10

207:15,18,22
250:12,18,18
250:25 251:7
251:11 253:21
253:23 254:4,9
254:18 255:3
264:24 266:20
267:13 269:19
269:25 270:3,5
270:6,9 281:13
281:18
**lawsuit** 15:24
102:12 135:6
317:4,6
**lawyer** 102:20
**lawyers** 12:6
12:11,20,25
13:4,9,13
**lazy** 199:4
**lead** 350:20
**leaned** 77:24
78:2
**learn** 69:2
157:19 159:13
159:18 160:19
**learned** 158:20
159:2,4 175:20
**learning** 160:2
160:3,6 209:22
210:3
**led** 19:20
**lee** 118:10,16
118:17,20
119:5 122:2,2
122:16 123:16

**[lee - litigation]**                                                      Page 37

124:6 125:17
129:22,24
130:4 341:17
343:3,8,10,13
343:16,23
344:2,7,12
**lee's** 125:20
128:15 342:10
342:16
**left** 10:9 98:6,9
120:4,14 342:5
**legal** 235:19
**letter** 53:8 54:2
138:7,14 225:8
225:16,22
226:20,25
227:12 229:14
229:22,25
231:25 232:8
232:13 234:6
235:15 237:3
237:12,18,21
238:22 239:9
239:15 240:12
240:17 241:5
242:4 263:18
266:17 270:17
270:20 271:5,7
273:7,22 274:3
323:6 355:3,9
355:10,18
356:11,21,23
357:4,18,23
358:16,22
359:2,4 361:10

361:23 362:11
363:5
**letting** 199:4
**level** 70:19
158:21
**levels** 258:24
325:15
**license** 137:19
**licensed** 341:7
344:4
**lichtenstein**
51:12,15,16,19
51:21,25 53:17
53:24 55:10,12
56:5,10,25
57:7,10,20,25
58:12,16,22,24
59:14 60:6,12
60:17,24 61:3
62:14 63:6
64:16,22,25
65:3,14,25
66:11 67:13,22
68:20 69:11
70:8,13 71:17
72:6 75:4 76:9
76:22 77:6,14
80:20 82:5,8
82:10,15 83:2
83:11 84:3,6
85:10,15 86:6
87:3,15 91:4,8
91:13
**lichtenstein's**
54:21 55:2

61:23 63:13
65:18 66:21
**lie** 190:13
216:22,25
217:9 218:17
**lied** 216:15
**life** 20:17 25:8
31:5 43:24
79:15 105:23
106:6 212:17
228:9 235:7
269:2 313:13
324:17 326:12
329:20 349:14
349:16
**lifestyle** 93:4,6
154:9,24
155:20 156:11
224:21 337:15
338:3 352:4
**light** 28:4 32:8
32:9,12,15,22
33:3,9,19,21
34:3 98:21
**lights** 29:10
32:20
**likely** 31:22
64:12 100:7
145:20 170:23
173:4 250:17
351:7,12
**likewise** 200:23
**limit** 287:24
**limitation**
275:8

**linder** 2:8 5:2
**lindsley** 71:10
89:7 95:7,10
97:2
**line** 33:4 63:16
188:18 189:4,8
190:10,24
365:4,7,10,13
365:16,19
**list** 18:2 24:16
30:13 44:4
52:18 96:25
97:5,11 132:17
132:22,23,24
133:6 135:4
156:16 246:24
246:25 247:4
337:17
**listed** 48:4
91:25 96:22
97:3,9 113:4
240:19 328:9
328:14 329:9
**listened** 287:23
350:8
**listing** 90:13
332:13
**literally** 147:9
**litigation** 95:11
101:16,19,22
102:3,7 143:23
149:25 163:22
318:20 347:3
347:22 355:4
355:19 359:6

**[litigation - m.d.]**                                                    Page 38

359:11
**little**   24:11 25:2
   43:23
**live**   8:9,11
   10:20,23 49:21
   174:15 176:3,6
   176:23 178:15
   180:3,8,16
   182:13 184:8
   184:19 186:25
   189:3 194:6,13
   194:25 195:18
   196:22 198:5
   199:16 200:6
   200:10 201:11
   208:5 210:9
   223:23,25
   247:20 248:9
   248:17 249:7
   249:10 257:22
   257:23 258:10
   259:21,22,22
   260:17,23
   261:5,8,13,18
   261:23 262:15
   262:19 263:10
   263:14 265:15
   278:5 297:7
   299:23 300:7
**lived**   9:16
   49:25
**living**   8:6,12,17
   8:19,23 9:3,6
   9:15,22,23
   10:4,19,22

11:3,25 106:6
**llc**   1:7 4:21
   142:25 143:3,5
   143:8,10,11
**llp**   1:18 2:3,8
   2:13
**located**   55:5
**location**   3:21
   10:18
**log**   172:21
   188:6 277:13
   278:12
**logged**   172:19
   181:6,12
**logging**   188:9
   294:16
**long**   8:6 14:3
   30:17,24 32:4
   32:9,11 34:12
   35:5,8 37:14
   37:18 48:11
   90:10 102:19
   140:10 149:6
   159:17 161:4,5
   178:20 223:2
   252:10 265:4
   314:13 340:6
   343:22,23
   344:21
**longer**   29:15,16
   68:24 208:14
   208:15 261:6
**longwinded**
   255:19

**look**   15:18
   29:10 54:25
   59:4 64:7
   71:15 84:14
   105:18 110:25
   118:6,22,23
   134:22,25
   163:2 165:16
   166:17,19
   171:24 182:25
   183:24 187:20
   198:13 209:10
   213:4,6 225:6
   233:9,22
   242:23 243:16
   243:17 283:4
   313:14 319:2
   323:22 324:11
   342:15 353:4
   355:6,22
   356:21 357:6
**looked**   14:20
   142:20 217:19
**looking**   62:9
   83:12 86:14
   110:23 180:17
   203:3 233:5
   264:4 275:18
   276:2,18
   284:22 323:25
   355:7
**looks**   165:3
**lose**   36:15
   133:18 326:2

**losing**   86:7
   127:5
**loss**   106:2
   135:12
**losses**   135:7
**lost**   47:4
   116:22 122:18
**lot**   29:11
   119:13 123:18
   157:20,22,25
   159:13 160:19
   264:22 266:6,6
   302:3 325:14
**loud**   29:20 81:6
**low**   17:25 24:9
   24:25 25:2
   61:18 64:12
   173:25 174:4
   258:2,21
   259:19 279:20
   325:18
**lunch**   124:11
   124:17
**lying**   20:14
   189:21,24
   190:3,19,20
   218:17

**m**

**m**   255:22
**m&a**   159:8
   175:11 176:18
   179:16,23,24
   180:22
**m.d.**   27:12

**[made - mark]** Page 39

**made** 58:18
92:23 101:24
109:15,18
110:5,8,10,13
113:6 137:13
142:5 144:25
145:13,19,19
150:2 253:2
285:24 289:15
296:18 302:11
329:17 360:6
**madison** 1:18
2:9,14 3:22
**mail** 15:12
103:7 163:4,24
183:4,9,16,25
183:25 185:17
185:21 186:10
186:14 188:14
188:25 189:7
189:18,21
190:3,13
191:21 192:21
194:2,11
195:23 196:15
198:10,21
202:3,4 203:3
203:7,9,20,25
204:5,10 205:2
205:16 206:4
209:11,14
210:6,17
212:10 213:5
213:12 237:25
238:12,18

240:19 241:7
251:6 253:14
253:20 283:23
284:3 290:14
297:25 298:6
298:15,18,21
299:2,6,8,19
300:14,25
301:6 315:25
316:8,9,13,18
319:4,11,21
339:10,15,23
353:9 354:5
356:14 357:7
362:5,7,9,13,16
362:18,20
**mail's** 203:12
**mailed** 204:8
205:4 209:5
241:7 291:12
**mailing** 204:4
204:11
**mails** 165:21
203:8
**main** 310:12
**maintain** 93:2
101:25 102:5
224:21,24
226:9,16
227:22 239:6
240:5 338:6,12
**maintained**
103:6 309:23
**maintaining**
94:6 142:16,18

241:20 337:15
**maintenance**
172:4 173:6
180:15
**major** 150:9
**majority** 132:3
**majors** 150:11
**make** 23:23
102:22 106:10
110:2 116:18
117:2,6 122:4
122:9 123:12
125:22 142:9
142:23 147:23
160:20 176:15
176:16 185:13
188:14 252:25
265:2 304:18
314:17 315:3
**makes** 115:24
**making** 116:8
116:17 141:24
144:8 147:11
147:22
**manage** 192:9
209:23 210:4
211:6,9,15
218:25 219:7,8
224:16,19
235:11 269:13
271:3,25 274:9
**managed**
272:24
**management**
180:14 212:24

215:3,13
216:18 222:18
244:7 259:18
260:5,12
268:15
**manager**
326:22 351:4
**managing**
272:6,13
**mania** 24:8
**manifest** 24:23
**manifestation**
46:22
**manifestations**
43:21 324:22
325:4 332:19
332:22
**manifested**
24:25
**manipulated**
58:21
**manner** 48:6
50:4,17 236:13
241:11
**march** 55:4,10
55:18 59:7
61:24 62:16
68:15 71:21,24
72:4 85:3
339:11,18,23
342:5 362:21
**mark** 53:6
70:22 95:16
104:22 106:25
113:20 117:9

138:5 173:17
203:23 237:23
303:12 319:3
339:8 352:15
357:22
**marked** 53:9
95:23 104:25
107:8 113:25
117:12 138:8
163:5,19 183:5
204:2 213:5
225:9 238:2
303:15 316:2
319:5 326:13
339:11,21
342:10 352:17
352:19 357:24
361:19,20
**market** 136:12
**marriage**
364:18
**marylee** 91:2
93:10,13,22
94:18,21 97:9
225:17 238:13
238:20 240:8
319:12,15,15
319:22 353:9
**materials**
173:19 177:21
177:25 179:11
**matt** 174:24,25
178:14 181:16
184:23 185:21
186:3 187:19

189:14 206:12
223:23 298:9
301:5
**matter** 3:16
126:13,15
127:9,11,12
133:9 252:2
280:24 325:25
364:20
**maximize**
291:19
**mcgugins**
331:9,11
333:20,22,25
334:7 335:4,21
335:24 336:4
336:18 337:4
338:14,21
341:13
**md** 174:25
**mean** 22:11
27:3 32:17,18
36:8 43:3 46:7
57:5 83:4
148:19,20
169:25 176:5,9
180:7 187:9
198:10 199:17
210:2 217:10
222:15 228:3
259:12 260:21
267:5 268:23
275:13,25
276:4,20,25
277:2,3,6

282:11,19
288:14 294:5
295:10,24
296:4 321:11
325:3 332:2,21
333:18 349:21
350:15 357:12
**meaning** 199:7
200:23 208:15
**meaningful**
239:13,19
**means** 6:13
36:10 195:2
201:7 228:6
268:25 269:7
277:4,7,24
297:10
**meant** 36:5
64:25 180:9
198:16,22
200:12 242:15
257:4,16
258:17 259:10
263:2 267:23
276:2,17
293:17,23
321:16,20
**measured** 63:2
68:7
**measuring**
55:22
**mechanisms**
91:16 93:23
94:2 208:11

**media** 3:13
173:11 310:7
**medical** 6:7
16:13,25 17:5
19:8,17 23:21
27:8,10,13
49:10 51:11
53:16 54:5,19
58:18 65:5
71:16 76:22
77:25 90:20
96:18 98:15,16
98:18 99:23
117:6 208:7
212:23 213:15
213:17,20,23
214:16 215:2
215:12 216:17
218:15,20
219:2,15 226:5
227:18 229:14
234:20 235:5
235:15 236:21
236:25,25
237:11 238:23
240:2,18 242:5
244:6,14 264:8
265:6,11,22
266:14 268:14
270:13,18,24
271:3,19,25
272:6,14,22
274:10 315:14
315:22 316:23
317:2,23

**[medical - misattribute]** Page 41

319:23,25
322:19 327:15
329:22 330:4
340:4,10,11,16
340:18 341:2,5
342:11,16
343:2,11
344:19 352:25
354:16
**medication**
18:12 19:3
20:7 22:17
23:8,11 38:13
38:21 91:15
92:7,21,24
100:19 320:4
320:23 321:3
322:13,16
334:2,11,16,19
334:23 335:24
336:7,13,17,19
336:22,25
338:16 345:20
351:16
**medications**
5:25 6:5 18:7
20:22 21:4,19
22:5,8,21,23,24
23:3,6 38:23
38:25 39:3
71:20,22 72:4
92:4,9,12
93:14 337:3
343:14

**meds** 119:6
**meet** 12:10,19
12:24 13:8,23
88:23 178:4
326:22 343:22
**meeting** 13:6
14:4,14 130:10
178:7 179:14
215:22,24
219:10 241:22
243:24 244:2,4
341:25 351:4
352:10
**meetings** 14:13
14:16 72:24
179:11,15
181:20 349:23
350:5
**mehmet** 173:16
**melatonin**
23:10
**member** 47:11
47:14 48:3
206:6 242:16
257:14 261:9
279:6 297:12
**members**
181:17,24
182:13 262:10
279:22 291:15
292:24 295:3
**memorialized**
292:7,12
**memories**
166:8

**memory** 28:7
36:13 55:24,24
64:10,12,13,18
67:7 165:20
166:2 216:7
**mental** 26:23
27:3 87:25
242:21 342:3
345:24 347:15
**mention** 327:2
**mentioned** 9:25
79:12 80:2
93:20 95:8
158:18 160:16
206:14 212:13
212:18 214:12
259:2 268:3
275:17 277:17
295:19 320:7
321:16
**mentioning**
176:20
**mentor** 153:11
**message** 104:8
183:10
**messages** 98:24
99:6 101:5,9
101:12,14,21
**met** 12:6 13:3
13:10,13,16,18
13:21 89:2
94:22 95:4
264:8 336:17
341:23

**method** 295:16
**methods**
343:17
**microphones**
3:5
**middle** 64:8
80:20 87:17
105:18 135:14
178:19 275:2
**midnight**
291:22
**migraines**
17:18 28:2
31:7,10,11,14
**mind** 36:11
210:25 211:3,9
211:12 212:19
214:16 243:6
245:16 248:24
249:4 271:12
301:22 302:13
332:5 350:20
357:16
**minimal** 119:19
**minimum**
172:21
**minor** 18:13
19:8 20:17
**minute** 104:10
166:22
**minutes** 202:11
203:19 256:10
309:14
**misattribute**
350:16

**[misfires - need]** Page 42

**misfires** 100:14
**misrepresenti...**
  111:18
**misstated**
  328:18
**mistreated**
  351:8
**mitigate** 352:6
**mixed** 175:17
**modalities**
  352:2
**mode** 173:20
**modeling**
  159:10
**mom** 206:23
  207:9,25 208:2
  208:7,19
**moment** 215:20
**monetary**
  135:7,12
**money** 108:24
  109:15,18,25
  110:5,8,10,16
  113:17 115:12
  115:16 116:18
  122:4,9,11,15
  125:22 132:12
  137:2,6,16,18
  139:11,13
  141:24 142:5,9
  142:23 145:19
  160:21 314:17
  315:3
**monitor** 51:3,8
  104:14,19

114:18,23
124:15 125:7
202:19,24
256:14,19
323:15,20
359:21
**month** 45:16
  47:17,22
  119:25 130:23
  144:20 347:9
**months** 8:24
  35:11,19 36:18
  36:20 37:18
  44:10 61:6
  78:21 79:8
  82:21 113:10
  113:13 139:2
  326:7 343:24
**mood** 16:8
  17:25 18:22,24
  23:14,17,25
  24:4,7,8,9,14
  25:2,8,20
  26:20 41:18,22
  42:2,6 92:9,22
  93:24 119:6
  214:5,19
  320:24 322:11
  328:7
**morning** 3:2
  5:16,17 204:6
  294:17 298:20
  309:21 328:9
  328:14,23

**mother** 9:8
  204:15,19,21
  205:20,25
**motion** 44:3
**motivations**
  65:18 182:10
**move** 10:17,25
  11:6,9,14
  255:23
**moved** 11:10
  11:11,12,23
  344:3
**moving** 44:3
  188:19 189:5,8
**mri** 76:6,8
**multipage**
  303:14 362:15
**multiple** 28:11
  29:23,24 43:16
  66:16 71:6
  131:13 170:20
  178:5 199:9
  217:23 286:3
**mute** 3:8

**n**

**n** 2:2 5:9 125:2
  125:2,2,9
  361:4 362:2
  363:2
**name** 3:24 5:18
  16:18 24:13
  51:12 71:11,12
  76:17,25 95:13
  143:10 154:18
  166:23 176:4

184:7 333:11
334:12 335:23
345:7
**named** 91:5
**names** 71:9,14
  91:3 151:2,4
  167:3 346:5,6
**naps** 272:18
**nature** 26:16
  80:5 179:17
  285:19
**nausea** 23:7
**near** 9:15
  170:22
**necessarily**
  15:19 38:19
  40:24 49:16
  64:5 132:3
  145:15 165:13
  179:12 233:18
  243:2 267:24
  269:9 283:15
  340:23
**necessary**
  294:19,24
  360:7
**need** 7:19 28:8
  57:11 65:20
  75:9 79:5
  80:11 144:14
  147:3,13,17
  174:7 176:3
  184:25 185:7
  187:22 188:5
  188:20 191:2

192:8 200:8
206:18 210:19
211:2,3 235:14
242:14 253:22
254:10,19,22
267:17 268:20
293:8 298:7
**needed** 58:13
73:9,12 75:13
80:24 177:25
180:11,19
182:2 191:10
206:22 265:19
293:14
**needing** 79:16
**needs** 238:22
264:9 270:21
**negative** 25:8
43:24 206:7
234:4,14,22
**negatively**
79:25 288:11
293:20
**nelson** 341:17
347:2,7,12,19
347:23 348:5
348:13 349:12
349:17,24
350:6 351:15
352:10,13
**net** 110:14
113:7 150:5
**neurological**
55:13,14,16
57:8

**neuropsychol...**
51:17,22 69:20
**never** 42:12
50:12 216:22
218:17 232:13
255:3 265:23
283:9 284:14
326:11 327:12
328:3 329:11
**new** 1:2,19,19
1:20 2:5,5,9,9
2:14,14 3:19
3:23 5:12 8:18
9:5,22,23 10:4
28:16 69:2
82:23 83:24
103:5 125:12
202:8 306:9,13
313:25 314:4
328:2 333:23
364:5
**news** 49:2
**nice** 172:10
**night** 94:8
164:22 182:6
185:23 186:5
188:16 194:23
195:7,10,12,21
196:5,14,19,23
206:12 207:19
207:23 208:15
212:5 213:2
215:14 216:20
218:14,22
219:4,18

220:20 221:2
221:12 222:12
222:19,24
223:5 224:14
224:23 229:17
235:17 238:24
244:8,18
245:21 247:3
247:12 254:9
254:18 255:4
256:25 257:6
257:10,16,20
257:20 258:12
258:12 259:15
259:24 260:16
260:16 261:20
263:19 264:13
264:24,25
265:6,17
266:19,21,25
267:6,13,15,18
268:4,4,5,9,11
268:17,20,21
269:23 270:3,5
270:9,19,25
271:4,14,18
272:3,5,12,20
273:3,8,15
274:9,14,19,23
275:3,4,9,11,11
275:13,20,24
276:4,12,19
277:2,5,15
281:9,14,20,23
282:5,11,12,16

282:19,22,23
282:25 285:6
**nights** 161:18
162:2 186:24
187:6 191:4
192:2,4,13,17
192:23 193:3,6
193:15 194:4
194:14 195:24
197:9,14,15,17
197:22 198:2,4
198:11 199:9
199:14,22
200:15,23
207:10,15
223:22 250:13
250:18,19
251:2,8,11
253:23 254:4
269:19,25
270:7,12
281:13,18
**nine** 110:25
135:2 203:5
212:25 215:3
215:13 216:19
218:14,21
219:3,17
221:12 222:12
222:19,24
223:4,9,12,15
224:14,22,25
226:6,24
227:17 228:19
229:16 230:2

230:12,19
231:2 232:18
234:21 235:16
236:6,14 237:4
238:24 240:4
243:9 244:7,13
244:17 245:13
245:20 247:2
260:25 261:10
261:19 263:19
264:17 266:11
266:12,24
267:7,17,21
268:8,10,16,20
269:22 270:19
270:24 271:4
271:13,17
272:2,4,12
273:2,8,14
274:8,18,23
275:4,19,23
276:4,11,19
277:2,5,9,14
278:13 281:9
281:14,19
282:4,10,11,25
**nnn** 113:21
**nods** 7:2
**noise** 17:20
28:3 32:2,4,6
**noises** 29:9,20
81:6
**nonlive** 258:7
**nonneurologi...**
69:3

**noon** 278:22
279:7,12,17
280:7,14
**normal** 29:7
**normally** 25:4
**north** 8:18
**notary** 1:20
5:11 125:11
360:14,21
364:4
**note** 3:5 70:14
83:13 86:20
118:25 121:25
147:25 172:2
240:25 355:9
356:12,24
**noted** 359:23
360:7
**notes** 71:17
75:4 76:9
77:14 87:3
103:8 117:12
118:9 122:2
129:22 317:24
320:9 343:2
353:15 361:22
**notice** 1:16
**noticing** 4:15
**november**
30:11 35:14,17
36:17 75:17,19
75:23 78:19
79:6 129:17
140:6,16
144:21 315:21

316:19
**number** 3:20
54:11 59:3
61:4 96:14,22
119:20 120:18
144:14 203:5
349:9
**numbers**
111:13 342:19
**nurse** 93:13,22
94:17,20 97:14
97:17,19 98:25
99:4 101:6,9
101:12 225:18
237:3,13 239:8
239:15 241:6
242:8 263:18
267:16 270:16
273:6 319:15
320:17 322:7
323:5
**nurses** 91:2
**nutritious**
29:12 337:16
338:12
**nutritiously**
94:9

**o**

**o** 125:2,2,2
**oath** 4:6 6:14
**object** 7:14
18:11,25 19:6
21:16,22 66:6
146:11 254:7
254:11

**objection** 14:23
15:5 17:9
18:10 23:19
26:7 29:2
33:13,24 37:6
38:15 39:5
42:22 44:15
48:24 49:23
52:22 57:13
58:5 59:2,18
60:3 61:11,25
62:17 63:10,23
64:20 65:6,16
65:20,21 67:16
72:21 74:9
75:11 78:13
79:10 80:12
81:19 84:11
85:5,11,19
89:12 90:4
91:10 95:12
101:20 102:14
112:9 127:23
129:9 131:5,12
135:8 139:4
146:4 147:14
148:15 149:3
150:4 152:9
154:11 158:24
159:24 165:9
167:25 169:16
179:18 180:5
182:8,15,22
187:8 189:16
189:22 190:6

**[objection - okay]**

| | | | |
|---|---|---|---|
| 190:14 191:13 | 254:11 255:19 | 343:8 361:11 | 61:14 83:25 |
| 192:18 193:4 | 255:20 | **offensive** | 107:16 112:2 |
| 193:17,24 | **objective**  61:16 | 217:10 | 121:24 122:21 |
| 194:15 196:24 | 84:16 | **offer**  136:9 | 134:6 135:13 |
| 197:19 198:15 | **obliged**  253:2 | 138:2,14,25 | 138:4 139:7 |
| 198:23 201:2 | **observed**  91:19 | 139:9 142:2 | 141:19 144:7 |
| 201:18 207:13 | 91:20 | 145:23 146:11 | 145:12 150:22 |
| 207:20 217:2 | **obtain**  52:20 | 148:12,18,24 | 153:25 154:17 |
| 217:17 224:6 | 54:21 70:16,20 | 149:8,13 | 163:17 164:8 |
| 224:17 231:10 | 70:25 71:4 | 151:21,25 | 165:15 169:21 |
| 232:20 235:18 | 72:17 | 171:11,13,16 | 173:8,14 |
| 236:16 237:8 | **obtained**  352:8 | 217:15 218:4 | 174:13 183:7 |
| 237:15 239:10 | **obtaining** | 238:25 246:11 | 183:15 186:9 |
| 239:16 240:15 | 72:20 73:25 | 286:12,18 | 187:17 189:25 |
| 245:9 248:11 | **obvious**  351:12 | **offered**  135:25 | 190:23 191:7 |
| 250:2,14 | **occasion**  33:20 | **offering**  145:8 | 194:8 195:4 |
| 252:16 253:15 | 36:4,25 37:3 | **offers**  151:13 | 196:3,20 203:6 |
| 255:7,11 256:3 | 199:21 200:3 | 151:15,18 | 209:9,18 |
| 256:5 258:8 | **occasional**  81:5 | 170:22,24 | 210:18 211:23 |
| 260:20 261:3 | **occasions**  28:12 | 171:4,8,12,18 | 214:23 215:9 |
| 261:21 266:15 | 195:18 | 216:24 217:14 | 220:7 221:4 |
| 267:2 273:16 | **occur**  45:17 | 217:25 218:3 | 225:12,21 |
| 274:20 280:9 | 276:6,21 | **office**  11:22 | 232:11 233:2,8 |
| 281:4 282:6 | 287:14 | 55:7 | 238:5 239:18 |
| 297:20 298:3 | **occurred**  30:8 | **offices**  1:17 | 240:9 243:20 |
| 298:11,23 | 30:11 38:5,5 | **offline**  296:19 | 246:6,14 247:7 |
| 301:3,8,23 | 39:24 77:15 | 299:15 301:15 | 248:5 249:5,11 |
| 318:21 322:21 | 103:11 | **oftentimes** | 252:6 255:10 |
| 325:2 327:22 | **occurs**  284:19 | 160:5 | 256:2 265:9 |
| 340:20 348:9 | **october**  53:9 | **oh**  15:11 29:13 | 269:14 274:5 |
| 353:24 354:18 | 54:3 119:2,11 | 114:7 337:3 | 278:8 279:23 |
| 355:20 359:7 | 124:3,5 126:8 | **okay**  10:14 | 281:6 283:2 |
| **objections**  4:9 | 126:17 128:7 | 13:22 15:23 | 284:2,8 285:9 |
| 66:7 146:12,20 | 129:23 130:4 | 30:12 43:10 | 287:3,16 289:8 |
| 147:5,18,20,22 | 130:10 342:23 | 54:18,24 61:9 | 289:17,19 |

**[okay - painting]** Page 46

293:11 300:12
305:10 316:16
318:17,25
324:5 330:24
331:5,13,20
332:7 333:10
333:16 339:2,5
339:13 341:3
342:9,14,20
343:5 344:5
346:12,20
347:5 348:4
349:4,10
352:14 353:3,7
354:12 355:15
356:19 358:20
358:24
**old** 34:3,5
101:14 107:24
108:10 314:16
356:3
**once** 151:21
227:14 230:18
230:25 317:13
346:22 353:14
354:6
**ones** 14:7 34:22
48:4 83:24
151:6 180:12
263:22,23,25
**ongoing** 28:17
48:15 94:25
326:24 347:15
351:14

**online** 152:19
**open** 121:8,15
121:23 122:17
122:23 123:3,8
**operate** 160:20
**operations**
149:14
**opined** 84:6
**opinion** 58:2,17
98:17 195:9,11
196:21 197:2,3
219:12 229:4
246:12 270:2
**opinions** 222:9
**opportunities**
286:6,24
**opportunity**
159:4 160:17
170:16 265:10
265:20,23
315:2
**opposed** 6:25
180:12
**optimal** 66:13
66:23
**option** 264:23
265:10 268:6
**options** 246:25
264:23 265:19
266:7 274:16
274:17,22
275:14
**orange** 9:4 10:9
10:18,19,22

**order** 52:2
54:20 56:21
92:21 95:5
123:2 211:15
224:15,18
233:18 239:5
285:22 311:18
329:23 330:5
331:10 338:24
**outcome** 4:8
58:10,11,15
150:6 223:18
**outcomes**
326:19
**outer** 100:4,5
100:18
**outside** 88:9,16
136:21
**overall** 29:13
**owes** 145:17
146:2
**own** 36:2 56:3
58:17 240:18
**owned** 274:25

**p**

**p** 2:2,2
**p.m.** 104:15,20
114:19,24
124:16,18
125:4,8 134:17
134:17 155:10
162:2,5 165:4
165:21 202:20
202:25 233:13
256:15,20

275:5 280:25
323:16,21
359:22,23
**page** 54:2,9
64:8 68:21
71:15 83:13
84:15 87:4,17
96:15 105:12
105:13 110:25
118:22 134:25
171:25 178:20
184:2,25
233:12 290:2
302:15,22
303:4,9,19,22
305:12 307:2,7
307:12,19,24
308:5,10
311:17 313:15
324:11,12
342:17,18
352:18 353:5
355:22 356:22
357:6,9,10,12
357:12,14
361:5,9 362:4
362:22 363:4
365:4,7,10,13
365:16,19
**pages** 96:23
**paid** 110:12
136:2 140:20
**pain** 100:17
**painting**
150:16

**[panic - permitted]**

**panic** 17:19
90:8 202:5
**paperwork**
170:14
**paragraph**
59:6 64:7
68:21 71:19
72:7 76:10
80:19,21 87:18
105:19 110:25
111:3 178:20
187:4 213:7
221:19 251:16
253:20 324:14
356:8
**parent** 46:4
**parents** 47:4
**park** 2:4
313:20 333:23
**part** 38:2 49:8
70:11 82:13
91:20 123:15
165:11 179:13
183:19 186:19
186:20,24
187:6,11,12,13
187:21 192:9
195:3 231:11
235:22 251:11
258:5 290:15
295:7 313:13
317:6 321:18
325:21 329:8
**participate**
160:24

**participating**
149:22
**particular**
119:7 127:25
128:3 139:20
153:2
**particularly**
32:19 64:11
70:21 175:19
**parties** 3:12
364:17
**partner** 287:20
**partners** 1:7
3:17 4:21
165:19 175:2
360:1 365:1
**parts** 34:14
68:3 108:17
**party** 4:6
**pass** 218:3
**passed** 48:3
171:4,8,18
**passing** 170:21
171:11 217:24
241:2
**past** 145:14
208:4
**patrick** 167:4
172:6
**pay** 105:15
126:20 135:2
143:12,15,19
324:12
**payment**
140:25 141:3,9

**payments**
143:18,22,25
**paypal** 143:20
**pending** 7:22
**people** 32:21
44:8 47:4
103:21 153:6
157:20 158:15
169:12,14
175:21,22
178:17 204:16
205:21 261:14
269:11 296:17
296:24 313:12
326:5,14
341:22
**perceive**
292:24
**perceived**
170:23 199:4
321:22
**perception**
206:8
**perfect** 268:25
**perform** 61:19
61:22 63:8,14
84:8,19
**performance**
59:8 61:16
63:17 64:10,18
65:4 67:24
68:2 80:7
84:16,22 85:23
86:3 133:17
201:25 212:17

228:9
**performed** 57:2
57:6 60:21
76:3 84:3
85:23
**performing**
55:13 56:7
59:25 62:8
68:10 85:2
**period** 8:22 9:9
9:21 29:15
45:9 71:23
74:3 82:19
97:22 98:22
109:22 120:12
124:2 144:21
204:24 220:21
225:5 250:21
258:15 259:9
265:4 277:8
293:15 295:22
296:2,5,6,7
299:16 301:16
**periods** 24:7,8
28:6 48:17
73:15,20,23,24
113:8
**permanent**
9:12
**permanently**
326:13
**permit** 279:11
279:15
**permitted**
279:6,22,24

280:4

**perry** 2:3 4:23
**persist** 35:10
**persisted** 36:16
**persistent**
  194:3
**person** 12:22
  12:23,25 13:3
  13:9 14:6
  207:8 264:3
  346:18 354:11
  354:14
**personal** 20:17
**personally**
  245:15
**persons** 96:16
**perspective**
  30:21 329:25
**perspiration**
  332:12,18
**pharma** 172:3
  172:13
**phase** 172:4
  173:6 180:15
  259:18,19
  260:5,12
**phases** 258:14
  259:8 265:14
  278:5 279:4
**phone** 13:10,14
  13:16 14:9
  99:10 101:13
  162:15 166:22
  207:7 210:16
  240:23 241:9

241:12 283:24
284:5 287:13
287:18 290:14
290:16 291:3,7
**phones** 3:8
**photo** 304:6,9
  304:18,22
  305:2,3,8,13,14
  305:21,23
  306:2,5,14,17
  306:20 312:16
  314:13
**photographer**
  107:24 108:10
**photography**
  150:16
**photos** 308:16
  308:17,22
  312:21 313:2,9
  313:12,17,19
  313:22 314:8
  314:11,16
**phrase** 254:8
**phrased** 281:21
**physical** 17:23
  49:8 56:2
  324:21 325:4,5
  331:22,23
  332:3,8,15,18
  332:21
**physician**
  331:12 345:4
**pick** 3:6
**picture** 177:20

**piece** 179:7,7
**pieces** 110:15
  177:2
**place** 3:11
  36:15 53:4
  77:10 157:15
  159:12 169:6
  169:19 170:7
  178:13 226:22
  227:14 242:2,6
  265:25 273:23
  278:24 290:3
  290:20 295:10
  296:9 301:13
  302:8 364:8
**placed** 175:16
  175:18 248:16
**places** 9:17
**plaintiff** 1:5 2:4
  3:15 4:24 5:3,5
  19:24
**plaintiff's**
  95:17,21 96:2
  104:24 105:7
  110:24 134:22
  323:24 361:13
  361:17
**plan** 28:22
  92:21 100:20
  100:23,24,25
  185:12 221:7,9
  285:12 296:9
**planning** 90:11
**plans** 351:19
  351:24

**platform** 109:9
  109:13 115:25
**play** 107:10,13
  108:2 116:2
**played** 107:15
  108:7 116:4
**playing** 115:5
  254:13,15
**please** 3:5,8
  4:10 5:7 7:5,12
  15:7 53:7 54:4
  91:12 94:15
  104:22 110:11
  116:3 138:6
  159:22 161:5
  166:11 203:24
  209:20 303:13
  312:25 320:8
  357:21
**pleasure** 24:12
  25:3
**plenty** 288:24
  289:11
**point** 20:20,25
  21:12 31:15,19
  36:22 42:15
  75:14 83:16
  102:10,11
  106:19 109:20
  111:10 121:15
  123:25 126:23
  127:17,19
  128:13 129:11
  129:15 130:9
  130:16,19,22

**[point - prescription]**

143:16 147:23
150:18 166:18
166:20 170:13
171:25 172:18
181:19 193:20
199:19 201:8
217:21 220:12
220:14 231:24
233:11,11,13
233:23 243:21
243:22 283:5
284:23 289:24
289:25 294:15
296:19 299:12
304:21 325:25
334:22,25
335:5 340:24
**pointed** 213:7
**points** 74:17
233:21 292:8
**poor** 84:21
**portfolio** 123:4
**position** 21:2
26:14 134:3
137:7,10
141:21,22
144:25 145:6
149:9,11,12,16
160:9 187:5
252:4 253:13
**positive** 170:23
**possibilities**
246:24,25
267:9 282:24

**possibility**
207:4 245:17
**possible** 165:25
219:13 235:10
247:9 248:8
256:23 272:15
**possibly** 181:16
**post** 150:20
303:21 308:21
312:5 314:14
**postconcussive**
27:15,18,24
28:11,21 29:18
30:15,23 31:3
31:16,20,25
33:12,23 34:6
34:10,16 35:3
36:23 37:12,22
40:18,22 41:2
52:25 80:17
214:6,7,11,19
**posted** 304:2
305:4,16 306:6
306:14 307:3,7
307:12,20,25
308:6,11,22
312:2,15
**postgraduation**
151:15,19
152:14
**posting** 303:8
304:18,25
306:21 308:15
308:17 309:16
310:4

**posts** 303:18
**potential** 16:24
66:16 246:2,9
248:23 258:5
258:14 259:8
260:9 264:10
264:15 266:18
274:6 281:7
283:20 317:3
326:8
**potentially**
102:12 153:8
175:10 176:18
200:24 222:14
235:7 241:24
259:13,25
260:16 269:18
281:11 305:6
**practice** 150:15
269:11
**practitioner**
97:19
**praise** 172:9
**precautions**
101:17
**predictable**
263:15 277:16
**preference**
122:8
**preferred**
222:3
**preparation**
12:20,25 13:4
13:14,25 14:20
166:11 317:3

**prepare** 12:4
12:11,13
164:24
**prepared**
164:21 166:13
**preparing** 14:4
74:13 115:7
119:14 144:3
159:11 164:13
179:11
**prescribe** 92:3
92:6 93:13,22
100:19 334:2,8
337:5 338:14
338:15
**prescribed**
18:6 20:23
21:18 22:5,8
22:17,20 23:2
23:9,10 28:22
28:25 29:5
38:13,20,24
39:2,10,13,15
39:18 72:3
91:15 92:8,15
92:16,18 93:17
93:19 119:6
320:4 322:15
335:9,25
336:18 343:13
343:17 351:16
351:18
**prescription**
39:23

**[present - provide]**                                    Page 50

**present**  2:20
  4:12 6:19
  14:12,15 81:4
  96:19 110:7,18
  215:20
**presentations**
  159:11
**presented**
  234:2,13
  265:24
**presenting**
  67:23
**presently**  261:4
**preservation**
  166:7
**preserve**
  101:17 165:25
  318:14
**preserved**
  102:25
**presumably**
  180:20 237:2
  298:5
**presume**
  308:18
**pretended**
  232:13
**previous**  37:17
  115:21 126:22
  173:19 175:7
  208:14 213:12
  251:19 258:18
  259:10 263:23
**previously**
  44:19 48:5

91:5 125:10
138:22 180:13
260:5 270:6
277:18 278:4
324:7 329:9
334:15
**primary**  172:5
  173:15 225:24
  239:24 331:12
  345:3
**principal**
  174:25
**prior**  8:12,14
  8:15 9:2 77:11
  77:15 78:12
  153:12 257:22
  304:25 330:25
**priority**  219:21
  220:5 283:13
**priors**  353:5
  355:8
**private**  3:7
**probably**  14:9
  89:9 123:9
  342:17
**probe**  20:3
**proceed**  5:8
  11:7
**proceeding**
  4:10 364:7
**process**  59:10
  59:16 63:19
  72:19 73:3
  137:17 168:19
  178:6 231:12

231:16 235:3
235:22,22
**processes**
  170:20 217:24
**produced**
  53:18 107:3
  115:3 143:21
  143:24 144:2
  149:25 150:5
  163:22 177:15
  226:20 238:10
  303:20 318:19
  359:5,10
**product**  177:15
  179:14 188:5
**professional**
  23:22 27:10
  153:11 208:8
  211:18 235:20
  287:25 289:16
**professionals**
  317:24 342:4
**profits**  110:14
**program**
  251:23 252:2
**progress**
  117:12 118:9
  118:25 121:25
  361:22
**project**  179:7
  182:3 184:19
  210:9
**projects**  116:16
  159:5 160:25
  180:12

**prolonged**  81:6
**promoted**
  252:4
**prompt**  46:21
  46:22
**prompted**
  46:18
**promptly**
  170:14
**proper**  58:18
**properly**  239:5
**proposal**
  267:11,12
  268:2 274:11
  281:13,16,21
  299:13 301:20
**proposals**
  275:21 282:2
  282:15
**propose**  244:20
  244:24 245:2,5
**proposed**
  221:14,24
  242:12 245:19
  248:8 260:14
  271:8 288:17
  289:22 301:18
  302:9
**prospect**  192:4
**prospects**
  116:24
**provide**  6:9
  320:11 321:13
  321:21 356:20

**[provided - questionable]**                    Page 51

**provided** 12:8
  12:8 53:24
  96:17 188:9
  212:9 225:17
  227:2,9,19
  240:13 318:23
**provider** 16:14
  16:25 17:3
  27:10 51:12
  58:19 83:13
  87:24 99:23
  176:11,12
  225:25 229:15
  234:20 235:5
  235:16 239:24
  240:18 242:5
  265:7,11
  272:22 273:21
  330:5,19
  340:23 344:11
  344:13 347:15
**provider's**
  16:17
**providers**
  53:20,20 54:11
  54:13 55:5
  59:4 87:17,25
  88:20,22,24
  90:21 91:6
  117:6 118:23
  118:24 236:22
  236:25 237:2
  237:11 265:22
  270:13 329:23
  337:19 338:2

338:10,10
  344:7,10
  345:24 355:23
  356:22
**prozac** 334:12
**pruzan** 167:3
**psychiatrist**
  118:17 337:10
  337:23 338:20
**psychiatrists**
  341:12,19
  342:3
**psychiatry**
  88:21
**psychological**
  42:20 242:21
**psychologist**
  70:23
**psychologists**
  341:20 342:2
**psychology**
  27:11
**psychotherapy**
  88:3,8,12,15
**public** 1:20
  5:11 25:6
  125:11 177:8
  360:21 364:4
**publicized**
  262:6,8
**publish** 109:3
  115:19
**pull** 184:12
  342:12

**pulling** 184:25
  206:6
**purchase**
  143:13,15
  176:13 177:4
**purpose** 57:24
  58:8 70:12
  249:19 313:9
**purposes**
  249:20,21,24
**pursuant** 1:16
  54:15
**pursuing** 94:9
  108:24 113:17
  115:12,16
  137:20
**put** 127:18
  169:6,19 170:7
  220:18,24
  226:22 227:14
  232:15 236:5
  236:12 242:2,6
  249:9 254:14
  265:24 271:12
  273:23 285:4
  290:3,19 293:7
  301:13 302:8
  345:18
**putting** 108:23
  115:11,15
  231:8 249:7
  262:24 264:10
  264:13 269:16
  269:17,19
  281:11 322:14

**q**

**qualifications**
  89:19 340:4
  341:22 344:16
**quality** 105:22
  324:17
**quantitative**
  150:12
**question** 7:5,11
  7:13,15,16,22
  19:14 20:13
  21:15,17,24
  22:2 50:20,20
  57:18 62:4,6
  63:24 65:8,12
  66:2,13,22,23
  79:20 111:16
  111:21,24
  112:5 126:22
  127:16 129:3
  137:11 146:10
  146:14 152:12
  168:3 173:17
  193:19 194:16
  194:19,21
  195:3 201:4,6
  217:11 223:10
  229:6 246:18
  247:18 248:2,4
  248:6 254:23
  255:8 278:9,14
  279:10 280:16
**questionable**
  59:11,16 63:20

**questioning**
  56:3
**questions** 6:23
  7:10,24,25
  21:3 65:22
  66:8,9 147:7
  147:12 255:15
  256:6 280:17
  359:14,15
**quick** 297:8,9
  297:10
**quinn** 1:17
  2:13 3:22 4:17
**quinnemanue...**
  2:15,16,17
**quote** 157:14
  350:16
**quotes** 233:17

**r**

**r** 2:2 5:9,9
  125:2,9,9
  365:3,3
**racing** 24:10
  90:7 329:4
**raise** 160:21
**raises** 159:8
**ramped** 178:22
  179:3
**range** 61:18
  68:4 223:2,16
  231:19 234:25
  235:12 245:25
  246:8,10
  265:18 267:9
  267:10 274:21

275:12 314:15
**ranged** 61:17
  84:17
**rare** 200:11
**rate** 24:11
  98:20 100:16
  136:13 329:2
  332:10,16
**rather** 87:25
  163:14 287:21
**reach** 206:20
  207:3 315:17
**reached** 205:17
  241:24 315:13
  315:20,24
**reaction** 191:20
  191:24
**read** 63:6
  152:19 190:24
  214:24 221:19
  243:20 254:25
  291:25 299:7
  360:5
**readily** 67:6
**reading** 15:9
  28:7 37:11
  47:2,3 77:25
  187:4 188:2
  253:19 310:12
  310:14,18
  358:8
**real** 108:16,19
  137:19 358:9
**reality** 64:19
  253:13

**realize** 185:11
**realized** 128:2
  199:19 302:7
**really** 7:9 57:17
  74:15 93:12
  127:15 134:16
  157:20 159:14
  168:21 206:2
  210:21 254:17
  278:19 291:9
  293:17
**reason** 6:7 26:5
  62:13 65:2,13
  79:21 82:25
  83:9 97:4
  110:21 141:25
  148:22 149:24
  178:9 189:20
  190:2,12,21
  216:14 218:9
  218:16 271:5
  354:3 365:6,9
  365:12,15,18
  365:21
**reasonable**
  228:21,24
  229:4,8,11
  235:11 249:8
  270:2
**reasonably**
  355:11
**reasons** 26:10
  59:3 136:10
  288:24 289:11
  302:3 317:19

317:20
**recall** 12:14,15
  13:5,7,12
  16:17,20,22
  17:23 23:12
  25:23 28:13
  31:17,18,21
  34:2 44:10
  45:20 47:16,17
  47:19,22 51:11
  51:18 52:17
  55:9,12 56:5,9
  56:10,15,18,19
  59:21,23 60:4
  60:12,15,16,19
  60:20 61:4,5
  61:13 62:7
  67:15,18,20,22
  67:25 68:3,13
  71:9,12,14
  74:18 76:2,4,5
  76:17,25 77:18
  78:5,9 81:20
  81:22 82:2,4,7
  82:9,16 83:8
  84:12 85:8,14
  85:20,25 86:9
  86:16,19,24
  88:11,22,25
  91:3 92:17
  93:8,16 95:5
  98:8,10,11,23
  99:2,4,15,18
  107:17 110:19
  115:7 118:5

| | | | |
|---|---|---|---|
| 119:10 121:19 | 310:3 313:24 | 358:4 | 339:14 352:24 |
| 121:22 123:14 | 313:25 314:4,6 | **received** 19:22 | **recollection** |
| 130:18,21,24 | 314:7,10,20,21 | 53:17 72:10 | 14:21 15:7 |
| 141:2 151:2,4 | 314:24,25 | 87:21 94:24 | 23:13 99:19 |
| 151:7,11 | 315:23 323:7 | 110:16 112:7 | 136:25 141:9 |
| 152:25 154:4,8 | 330:13,23 | 112:14 138:15 | 142:4 153:19 |
| 155:4,7,15,19 | 331:3,8,9 | 142:13 143:18 | 153:22 166:3 |
| 156:16,23,25 | 333:21 336:8 | 148:17 149:13 | 171:15 215:24 |
| 157:4,8 158:4 | 337:17 338:18 | 151:21,25 | 216:4 218:11 |
| 158:8,12 | 338:24 340:5,8 | 171:11 172:7 | 247:24 339:24 |
| 159:25 160:3,6 | 341:21,25 | 176:11 185:17 | 343:7 353:22 |
| 162:17,23 | 342:8 343:12 | 185:21 192:21 | 355:17 357:3 |
| 163:3 164:13 | 343:15,16,21 | 202:3,4 205:2 | 358:18 |
| 167:3 172:11 | 344:12,17,20 | 205:15 212:10 | **recollections** |
| 173:3,7,12,13 | 344:24 345:6 | 217:15 218:4 | 153:23 154:3 |
| 174:21 175:15 | 346:2,10 347:9 | 271:21 298:17 | **recommend** |
| 176:17,19 | 347:20 348:12 | 298:21,22 | 69:18 70:16,21 |
| 178:2,3,24 | 348:18 349:3 | 317:9,13 | 72:25 94:3 |
| 192:19 203:22 | 350:15,17,19 | **receiving** 80:23 | 338:9,11 |
| 204:4,17,20,22 | 353:25 354:15 | 148:13 188:4 | **recommendat...** |
| 205:22,24 | 354:22 355:5 | 272:13 302:2 | 52:2 58:18,23 |
| 206:2 207:5 | 355:21 356:15 | 358:21 | 94:23 95:4,6 |
| 209:2,7 211:25 | 356:18 357:5 | **recent** 35:12,13 | 286:16 338:20 |
| 213:3,16 | 357:20 358:19 | 66:15 | 341:12 345:22 |
| 215:15 217:18 | 358:21 | **recently** 87:21 | 345:23 |
| 218:7 220:22 | **recalled** 77:21 | 137:19 176:11 | **recommendat...** |
| 221:3 238:17 | **recalling** 25:12 | 319:25 | 84:15 92:24,25 |
| 241:14,15 | 94:12 | **recess** 124:17 | 93:23 337:12 |
| 257:2 287:15 | **receipt** 204:10 | **recognition** | **recommended** |
| 288:5 290:12 | **receive** 68:17 | 28:17 | 83:3 87:23 |
| 290:17 291:25 | 72:13 73:7 | **recognize** 96:7 | 89:15,16 91:23 |
| 292:5,11,13 | 74:22 75:5 | 107:11 115:4 | 93:25 94:6,8 |
| 302:23 304:10 | 94:13 137:25 | 163:18 183:16 | 94:18 99:22 |
| 305:7,20 | 151:13,14,17 | 183:18,20 | 100:22 101:4 |
| 308:15,17,18 | 318:10 322:24 | 303:21 324:8 | 177:16 337:9 |

**[recommended - removing]**

337:13,19,22
338:2,5
**recommending**
322:14
**record** 3:3,12
4:14 51:2,7
55:3 65:5 66:6
77:25 83:13
104:10,13,18
111:13,18
114:14,17,22
124:14 125:6
147:24 183:21
202:16,18,23
254:14 256:9
256:13,18
320:7 322:19
323:14,19
343:2 352:25
354:17 358:9
359:20 364:14
**recorded** 3:14
6:24 107:20
**recording** 3:10
107:17
**records** 19:8
53:16 54:21
55:2 71:16
76:22 77:6
125:17 128:15
165:22 264:4
315:15,22
316:23 317:2,9
317:13 318:2,6
318:11,15,18

319:24,25
320:9 322:2,5
342:11,16
**recovery** 68:23
69:7 72:9
**recruiting**
170:20 217:24
**reduce** 70:19
**reference**
329:16
**referenced**
321:21
**references**
210:14
**referencing**
118:4 120:12
**referred** 15:14
175:8
**referring** 71:23
210:6 213:21
354:10
**refers** 233:19
**reflect** 80:8
112:14,16
143:3
**reflecting**
76:23 77:6
**refresh** 14:21
15:7 339:24
343:6 353:21
355:16 357:2
358:18
**regard** 64:9
66:15 211:4
229:12

**regarded**
231:18
**regarding** 54:5
156:11 172:8
230:5,16
240:24
**regardless**
133:18
**regards** 214:14
216:11 229:5
230:5 329:9
**regular** 7:18
94:9 198:19
208:12 212:15
226:10,16
227:22 228:19
240:5 337:16
338:6
**regularly** 46:12
97:19,20
**rehash** 255:24
**related** 4:6
17:12 22:15
23:3,6 26:24
27:4 51:23
70:2 79:25
92:9 109:8
115:23 136:20
142:15 159:5
337:14 364:17
**relates** 19:9
**relation** 235:13
**relationship**
45:22 97:14,16
180:15 228:10

259:18 260:5
260:11
**relationships**
132:6
**release** 54:15
54:19
**released** 317:5
**relevance**
49:24
**relevant** 18:14
18:17 20:7,24
38:9 102:6,23
147:16 148:2
320:8
**relied** 255:4
**rely** 347:22
**remain** 105:25
**remained**
335:20
**remember**
15:11,11 30:9
39:23 77:10,24
80:3 156:6,9
164:10,14
165:6,11,14
208:20 215:20
291:6,9
**remembered**
15:16
**remembering**
158:3 247:21
**remind** 204:23
**remote** 11:19
**removing**
357:16

**[rendering - response]**

**rendering** 84:9
84:20
**renting** 11:4
**reoccur** 35:9
**repeat** 22:2
229:6
**repeated** 286:3
**repetitive**
65:23
**report** 62:15
65:15 87:16
125:20 142:22
177:15 252:21
**reported** 87:19
172:19 173:2
**reportedly** 78:2
**reporter** 4:3
5:7 6:24 7:8
364:2
**reporting**
178:14 218:11
**reports** 143:3
**represent**
107:5 111:13
115:2
**representation**
131:11,15
266:22 267:17
**representations**
117:2,5
**represented**
273:13
**representing**
3:25

**reputation**
298:2 327:6
**request** 57:21
86:22 141:5
220:10 227:4
227:10 230:11
284:11 315:6
315:21 317:2
317:10 318:11
327:2 358:17
358:19
**requested** 54:5
134:18 242:4
249:25 263:17
315:2 317:5
319:25 321:6
356:9
**requesting**
205:4,8
**requests** 96:16
**require** 27:9
58:2 69:14,25
70:9 74:6,11
80:22 81:11,17
82:11 156:12
199:21,25
200:23 201:7
219:17 222:19
223:8 224:13
236:5,13
238:24 247:11
256:24 257:6
257:14 259:14
264:12 265:16
268:10 269:3

270:24 273:7
274:13 281:12
281:23 282:16
**required** 6:14
73:16,18 77:16
77:19 167:11
167:16 168:6
168:12,16,17
169:12 172:5
173:20 193:14
194:13 195:2
199:14,18
212:25 215:3
215:13 216:19
218:13,21
230:22 235:16
243:8 244:7,13
244:17 261:15
265:5 268:8,16
270:18 271:13
273:2,14
276:11 360:14
**requirement**
153:15 251:20
259:23
**requirements**
234:3,13
251:17 260:19
260:22
**requires** 68:24
226:5 240:3
259:18 267:20
**research** 152:5
152:15,24
158:22 159:10

173:18 177:8
**researched**
123:18
**reserve** 255:18
**residence** 9:13
10:12,13
**resource**
213:14 287:6
**resources**
116:8
**respect** 134:19
180:18 220:10
283:20 284:11
293:13 294:21
302:10
**respected**
285:23
**respond** 180:11
186:10 203:15
203:19 298:16
299:5,18
300:13 301:6
**responded**
203:7 219:18
288:22 289:10
291:20
**responding**
57:9 147:21
212:7 297:24
321:3
**responds**
186:13,14
**response** 95:17
95:21 96:3,24
199:3 213:11

219:24 286:19
286:22,23
292:16 297:3
300:24 317:10
318:11 361:13
**responses**  96:8
**responsibilities**
  152:22 250:6
  250:11
**responsive**
  101:18,22
  102:2,23
**rest**  29:13,21
  100:25 183:20
  278:22 293:4
**resting**  29:11
**restriction**
  137:14 139:10
**result**  19:16
  35:17 37:22
  38:13 46:11,16
  46:24 48:9,12
  50:4,10 68:15
  77:9 105:23
  324:18,24
  325:6,11,16
  327:16,20
  328:12,16
  329:21 330:7
  331:24 333:13
  335:20 349:19
  349:25 350:11
  350:14,22
**resulting**  334:4
  351:20

**results**  56:12
  59:8 60:18,20
  63:18 67:3,12
  67:13,19,23
  68:5 84:9,20
  267:10 327:6
**retain**  36:12
**retire**  122:5,12
  122:13,15
  125:23
**return**  11:21
  69:18 83:2
**returned**
  170:14
**returns**  150:7
**revealed**  87:5
**revenue**  149:14
  149:19
**reviewed**  12:7
  12:9
**reviewing**
  15:10 292:9
**revise**  304:19
**revised**  296:20
**revoke**  231:25
  232:8 234:6
**revoked**  232:12
**ridge**  333:23
**right**  9:19
  13:20 24:20
  25:12 32:2
  54:12 57:4
  58:14,24 59:5
  74:8 82:19
  83:12 84:4,10

86:8,12 89:5
89:21 106:17
114:7 117:16
125:23 139:3
139:14 141:21
142:2 144:13
144:18,22
148:8 150:9
161:22 163:9
164:10 168:7
171:5,12
175:10 178:16
182:3 184:9,14
186:11 189:11
193:23 195:25
197:18 203:10
205:8 232:2
234:15,18
237:21 238:10
239:9 252:19
253:13 254:5
258:3 260:6
266:14 270:22
270:25 271:9
271:14,19
272:14 273:3,9
283:7,21
284:20 287:11
289:17 290:5
291:4 293:9
294:17 297:8
299:6 301:16
315:15 316:20
316:23 317:10
317:14 318:12

323:6 324:4
333:4,8 335:10
341:5,8 357:19
358:14
**risk**  225:2
  226:11,17
  227:23 228:4
  228:16 229:18
  230:21 231:4,8
  232:16 237:6
  240:6
**river**  9:4,7,10
  49:17
**robert**  167:3
**robinson**
  203:20 204:5,9
  204:12 205:6,7
  205:18 209:5
  209:14,15
  211:20 212:2
  212:22 213:11
  213:17,22
  215:10 216:8
  216:17 218:13
  218:19,25
  219:6,10,16,25
  220:2,8,10,22
  221:14,21
  227:3,13
  233:15 234:11
  243:7,25 244:5
  244:12,16,21
  245:19 268:10
  286:17 287:4
  287:10 292:3

293:23 301:25
**robinson's**
271:12
**robison** 233:25
234:10
**rocks** 49:18
**rodriguez**
344:14,18,22
345:3
**rodriguez's**
344:15
**role** 159:3
250:6,12
251:17,20
252:15
**roles** 152:21
**room** 78:4
267:4
**rosenberg** 2:8
5:2
**round** 166:25
167:4,6
**row** 181:2
199:9
**ruminating**
17:18 25:9
90:7 327:7
**ruminations**
329:5

**s**

**s** 2:2 5:9 125:2
125:2,2,9
361:8 362:3
363:3 365:3

**sachs** 151:9
152:17
**sacrificing**
222:14,15
**sadness** 44:2
**saklad** 173:16
**salary** 133:25
134:2 136:2,11
139:16 141:20
145:8 148:13
**sale** 11:5,7
143:16
**sales** 115:24
142:24
**sambuco**
154:20
**san** 8:4 11:10
11:12,15
107:24 108:11
**sarah** 71:12
89:8 95:7,10
96:25 346:6
354:20
**sat** 74:7
**sats** 72:14 73:7
73:10,12 74:8
74:14,23 75:2
**saw** 26:5,9
51:16,18 57:19
82:14 83:11
89:20 90:25,25
91:2,3,4,13
97:19,22
198:21 319:19
330:5,20

331:10 333:12
333:15 335:4
335:13 336:4
337:5 338:25
344:7 346:6,11
346:13,15,21
353:14,22
354:2,6,8,14,20
354:23
**saying** 20:8
56:9,15,18,19
64:17 118:5
155:15 169:6
192:6 200:14
206:9 213:3
215:19 235:16
288:5 289:10
298:7 327:8
**says** 54:11 55:6
61:16 62:9
63:17 64:9
78:2 83:14
84:16 87:15,21
105:19 112:18
113:9 115:11
125:25 131:7
135:15 189:9
189:18 190:25
195:23 229:22
229:24 237:4
253:18 273:7
284:25 289:25
290:2,22
324:14 354:17
356:2,23

**scan** 356:14
**schedule** 93:3
94:7 134:5
201:22 215:6
216:21 218:23
219:5 221:13
222:13,20
224:15 226:10
226:16 227:16
227:23 228:20
234:22 235:8
236:7,15 239:2
240:5 241:20
244:10 245:14
261:2,11,20
262:6,8,13,16
266:25 268:18
268:23 269:7
269:21 271:23
276:14 337:16
338:6
**scheduling**
83:8
**school** 16:12,15
16:23 17:8,14
17:16 18:7,13
19:4,15 21:9
21:21 22:4,7
23:15,18 24:19
24:23,24 25:17
26:3,6,10,15,20
27:21 30:9
31:12 38:6
41:16 52:13,21
72:12,18,25

**[school - selling]**

| | | | |
|---|---|---|---|
| 73:3,5,15,17,22 | 135:14 324:12 | 226:13 238:15 | **seek** 19:20 73:6 |
| 74:17 312:13 | **see** 16:25 17:3 | 239:3,13 265:7 | 75:15 88:15,18 |
| **schwartz** 2:3 | 18:13 19:9,12 | 283:10 284:15 | 89:15 93:2 |
| 4:23 | 26:2 51:14,21 | 285:7,13,25 | **seeking** 17:4 |
| **science** 150:12 | 51:25 54:7,14 | 286:8,14 | 88:3,8,12 |
| **score** 74:25 | 55:6 59:12 | 288:12 289:6 | 241:25 |
| **scores** 66:13 | 60:10 61:2 | 291:23 303:25 | **seeks** 105:20 |
| **scott** 344:14,15 | 63:3 64:14 | 305:18 306:7 | 324:14 |
| 344:18,21 | 66:19 67:8 | 306:11 307:5,9 | **seem** 257:9 |
| 345:3 | 69:9,21 70:4,7 | 307:14,17,22 | **seemed** 174:4 |
| **screens** 29:10 | 72:15 76:15 | 308:3,8,13 | 180:14 196:18 |
| **sculpture** | 81:2,7,13 | 311:21 316:11 | 212:11 257:11 |
| 150:17 | 84:23 87:10 | 317:4,7 320:13 | 262:12 263:7 |
| **search** 103:4 | 88:5 89:17 | 324:19 330:11 | 266:2 |
| **season** 45:20 | 90:20,24 91:8 | 330:14 337:9 | **seems** 263:10 |
| 47:19 | 91:14 96:5,20 | 337:20,23 | 264:6 |
| **second** 53:15 | 97:20 99:23 | 338:19,23 | **seen** 27:9 28:14 |
| 64:9 70:7 72:7 | 100:3 105:6,16 | 339:3 340:6 | 53:21,23 61:7 |
| 95:18,22 96:3 | 106:3 115:10 | 342:21 344:6 | 61:10 76:11 |
| 96:9 114:15 | 118:14 119:3 | 344:21 345:9 | 86:20 105:9 |
| 148:4 166:19 | 122:6,19 126:5 | 345:12,15 | 298:25 299:4 |
| 174:23 178:21 | 129:22 135:18 | 353:11,19 | 329:22 341:10 |
| 179:4 213:6 | 138:17 166:4 | 355:13,24 | 341:11 345:25 |
| 233:22 243:21 | 167:7 170:17 | 356:5 | 347:3,18 |
| 253:19 281:16 | 170:25 172:24 | **seeing** 51:11 | 348:13 |
| 281:17 284:9 | 173:22 174:19 | 55:9 57:24 | **self** 17:25 25:2 |
| 289:24 323:9 | 175:4,13 181:4 | 118:19 186:15 | 69:4 325:19 |
| 324:13 335:24 | 181:9,22 184:5 | 335:21 339:25 | **sell** 160:23 |
| 342:16 353:4 | 184:21 185:3,8 | 340:13 343:7 | **selling** 109:16 |
| 356:22 361:14 | 185:14 187:2 | 343:23 344:2 | 109:19 110:2,5 |
| **seconds** 108:6 | 187:24 188:22 | 344:12,23,25 | 110:8 112:22 |
| 190:7 | 191:5 192:11 | 345:6 347:6,11 | 113:6 116:18 |
| **section** 61:15 | 206:22 209:24 | 347:13,14 | 141:24 142:5,9 |
| 69:17 71:18 | 210:23 215:7 | 348:14 354:10 | 142:14,15 |
| 84:15 105:15 | 216:23 226:2,7 | | 150:3 315:4 |

**[semester - shiber]** Page 59

**semester** 83:20
**send** 320:8
**sending** 238:17
  298:25
**senior** 286:12
  286:17
**sense** 98:21
  129:21 130:9
  161:16
**sensitive** 3:6
  32:2 34:2
  179:17,23,25
**sensitivity**
  17:20,20 28:3
  28:3 32:5,7,8,9
  32:12,15,22
  33:2,9,19,21
  81:6
**sent** 165:3
  198:10 212:9
  215:17 284:4
  297:12 298:14
  300:14 320:7
**sentence** 62:9
  64:9 67:10
  112:11 125:25
  131:7 214:25
  253:19 255:2
  288:15 290:22
  354:10
**sentences** 63:21
  64:5 125:24
**sentiment**
  128:2,3,14

**september** 8:25
  10:15 11:2,17
  96:19 103:14
  109:25 110:7
  110:18 111:9
  112:15 120:13
  121:11,13
  128:9 135:3,22
  163:5 165:4
  166:14,25
  215:25 216:9
  225:9 238:2
  248:24 249:2
  249:24 314:2,5
  342:4 362:6,12
  362:14
**series** 84:3
  292:2
**seriously**
  266:13
**service** 97:8
**services** 88:4,9
  88:12,16,19
  100:4,6,19
  159:14,16
**set** 95:18,22
  96:3,9 127:6
  133:23 159:15
  168:15,16
  209:20 227:16
  261:25 275:14
  296:22 361:14
  364:23
**setting** 151:12

**settings** 32:23
  332:25
**seven** 36:18
  83:13 84:15
  87:4 148:6
  223:17 358:6
**seventy** 111:6
  141:12,15
  144:9 145:24
**several** 12:6
  26:10 35:11
  37:18 43:14
  44:8 78:21
  79:8 91:2
  94:22 97:22
  106:16 136:10
  150:24 154:15
  257:8 314:16
  320:6 333:15
**shame** 185:19
**share** 104:7
  177:22
**shared** 177:25
**shareholders**
  177:7,23
**shares** 176:15
**shelf** 75:20
**shiber** 1:4,15
  3:15,16 5:4,16
  6:1 7:1 8:1,2
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1,24 16:1
  17:1 18:1 19:1
  20:1 21:1,15

21:18 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  40:2 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1,2,18
  51:1,10 52:1
  53:1,12,22
  54:1,6 55:1
  56:1 57:1 58:1
  59:1,5 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1
  82:1 83:1 84:1
  85:1 86:1 87:1
  88:1 89:1 90:1
  91:1 92:1 93:1
  94:1 95:1,25
  96:1 97:1 98:1
  99:1 100:1
  101:1 102:1
  103:1 104:1
  105:1,3,19
  106:1,16 107:1
  107:10,18

**[shiber - shiber's]**                                              Page 60

| | | | |
|---|---|---|---|
| 108:1 109:1 | 172:1 173:1 | 238:10,13 | 304:1 305:1 |
| 110:1 111:1,4 | 174:1 175:1 | 239:1,23 240:1 | 306:1 307:1 |
| 111:7 112:1,6 | 176:1 177:1 | 241:1 242:1 | 308:1 309:1 |
| 112:18 113:1 | 178:1 179:1 | 243:1,17,22 | 310:1 311:1 |
| 113:15,22 | 180:1 181:1 | 244:1 245:1 | 312:1 313:1 |
| 114:1,25 115:1 | 182:1 183:1,8 | 246:1 247:1 | 314:1 315:1 |
| 116:1 117:1,14 | 184:1 185:1 | 248:1 249:1 | 316:1,5,18 |
| 118:1,8 119:1 | 186:1 187:1 | 250:1 251:1 | 317:1 318:1 |
| 120:1 121:1 | 188:1 189:1 | 252:1 253:1 | 319:1,8 320:1 |
| 122:1 123:1 | 190:1 191:1 | 254:1 255:1 | 321:1 322:1 |
| 124:1 125:1,16 | 192:1 193:1 | 256:1,21 257:1 | 323:1,22 324:1 |
| 126:1 127:1 | 194:1 195:1 | 258:1 259:1 | 324:6,14 325:1 |
| 128:1 129:1 | 196:1 197:1 | 260:1 261:1 | 326:1 327:1 |
| 130:1 131:1 | 198:1 199:1 | 262:1 263:1 | 328:1 329:1 |
| 132:1 133:1 | 200:1 201:1 | 264:1 265:1 | 330:1 331:1 |
| 134:1,25 135:1 | 202:1 203:1,2 | 266:1 267:1 | 332:1 333:1 |
| 135:15 136:1 | 204:1 205:1,4 | 268:1,13 269:1 | 334:1 335:1 |
| 137:1 138:1,11 | 206:1 207:1 | 270:1 271:1 | 336:1 337:1 |
| 139:1 140:1 | 208:1 209:1 | 272:1 273:1 | 338:1 339:1,14 |
| 141:1 142:1 | 210:1 211:1 | 274:1 275:1 | 339:21 340:1 |
| 143:1 144:1 | 212:1 213:1,6 | 276:1 277:1 | 341:1 342:1 |
| 145:1 146:1 | 214:1 215:1 | 278:1 279:1 | 343:1 344:1 |
| 147:1 148:1,11 | 216:1 217:1,13 | 280:1 281:1 | 345:1 346:1 |
| 149:1 150:1,8 | 217:21 218:1 | 282:1 283:1,4 | 347:1 348:1 |
| 151:1 152:1 | 219:1 220:1 | 284:1 285:1 | 349:1 350:1 |
| 153:1 154:1 | 221:1 222:1 | 286:1 287:1 | 351:1 352:1,21 |
| 155:1 156:1 | 223:1 224:1 | 288:1 289:1 | 353:1 354:1 |
| 157:1 158:1 | 225:1,13,24 | 290:1,2 291:1 | 355:1 356:1 |
| 159:1 160:1 | 226:1 227:1 | 292:1 293:1 | 357:1 358:1,3 |
| 161:1 162:1 | 228:1 229:1 | 294:1 295:1 | 358:13 359:1 |
| 163:1,8,18,23 | 230:1 231:1 | 296:1 297:1 | 359:19 360:1,2 |
| 164:1 165:1 | 232:1 233:1,6 | 298:1 299:1 | 360:4,13 361:6 |
| 166:1 167:1 | 233:9,10 234:1 | 300:1 301:1 | 365:1,2,24 |
| 168:1 169:1 | 235:1 236:1 | 302:1,14 303:1 | **shiber's**   50:9 |
| 170:1 171:1,25 | 237:1 238:1,6 | 303:8,8,17,19 | 246:21 |

**[shifts - skibitsky]**                              Page 61

**shifts**  24:14
**shih**  25:25
  90:25 97:10
  319:12
**shock**  44:21
  48:5
**shocked**  104:4
**short**  29:5
**shortly**  287:17
**shot**  49:3,20,25
  311:19,23
  312:6,9,11,12
  312:15,24
**shots**  312:22
**show**  119:8,10
  119:14 286:12
**sic**  3:16 135:3,4
  166:11 173:16
  205:4
**side**  73:3
  286:13 345:20
**sign**  57:3
  277:12 278:12
  293:8,14
  295:16
**signature**
  364:24
**signed**  54:20
  170:13 192:6
  212:10
**significant**  87:5
  87:19 105:22
  166:15 225:2
  226:11,17
  227:23 228:4

  228:16 229:18
  230:21 231:4
  232:15 238:23
  240:6,11
  242:20 270:18
  324:16
**significantly**
  133:2,3 178:23
  179:3 206:15
  228:7
**signing**  187:23
  282:17 291:15
  294:15
**signoff**  295:16
**signs**  322:11
**similar**  32:12
  32:15,21 33:20
  37:16 38:25
  39:3 44:18
  45:15,25 47:3
  48:4 55:24
  115:21 132:24
  201:10 242:10
  269:8 322:12
**similarly**  31:8
**sincerely**  240:8
**single**  14:14
  247:4 249:16
  258:10 267:6
  267:25 268:20
  268:21 275:9
  275:13 282:12
  282:25
**sister's**  48:23

**sit**  73:10
**sitting**  6:18
  14:12 77:23
  78:4 148:23
  216:2,10 249:6
  249:17 280:22
**situation**  28:18
  33:17 38:4,9
  38:19 45:25
  62:16 100:21
  103:9 104:6
  164:20 174:15
  175:22 176:3,6
  176:24 180:3,8
  180:10,17,18
  180:20 182:13
  196:9,11 197:2
  199:2 206:3
  211:19 212:21
  223:20 240:24
  246:20 265:21
  285:16 286:21
  288:3 297:16
  299:21 332:23
  350:11,14
**situations**  25:6
  46:19 47:4
  90:9 272:21
  332:23
**six**  14:7 30:4
  111:6 113:10
  113:10,12
  114:3,9 342:13
  352:18 362:22

**sixth**  30:10
**sixty**  254:23
**skibitsky**  2:15
  4:16,16 5:15
  5:19 18:16,20
  19:12,23 20:21
  21:14 31:13
  50:2,8,15,19
  53:6 60:25
  65:19 66:5
  72:2 79:19
  83:6 95:16
  104:9,21
  106:25 107:13
  108:5 111:15
  111:23 112:4
  113:20 114:7
  114:12 116:2
  117:9 124:11
  125:15 137:23
  138:4 146:9,18
  147:2,13,17
  148:8 152:11
  162:10 166:16
  177:13 182:25
  186:16 191:22
  200:9 202:10
  202:14 203:23
  217:6 225:6
  230:24 236:10
  237:23 244:15
  254:10,19
  255:6,10,16
  256:2,7 276:16
  303:12 314:3

**[skibitsky - sort]**

315:19 318:25
323:11 324:4
325:8 327:18
334:24 339:8
352:14 357:21
358:12 359:13
361:6
**skills** 28:8
70:18
**skim** 53:15
**skip** 311:16
**sleep** 28:8 93:3
93:3 94:6,8
181:7 182:6
192:8 208:12
211:6 212:25
215:4,5,14
216:19,21
218:14,21,23
219:3,4,4,18
220:20,25
221:11 222:12
222:13,20,24
223:4,6,9,12,16
224:2,14,22,25
226:6,10,16,24
227:22 228:19
228:20 229:17
230:2,11,19
231:2 232:18
234:21 235:17
236:6,14 237:5
238:24,25
240:3,5 241:20
243:9 244:8,9

244:17 245:13
245:20 247:2
260:25 261:10
261:14,19
263:19 264:3
264:17 265:2,3
266:11,21
267:7,14,18,21
268:9,11,16,18
268:20,23
269:4,4,4,7,21
269:23 270:19
270:25 271:4
271:13,17
272:3,5,12,16
272:20 273:3,8
273:15 274:9
274:19,23
275:19 276:11
277:9,15 279:7
279:12,16,24
280:7,14,25
281:9,14,19
282:4,4,10,12
285:5 337:15
338:6
**sleepiness** 28:4
34:9,12,18,21
**sleeping** 29:11
29:21 116:20
227:16 228:25
229:9 266:24
269:22 275:16
276:15 278:21
282:18,21,22

282:24 297:13
297:25 298:17
299:3,11 300:5
300:15 301:7
301:11
**slept** 275:3,23
**slides** 172:9
184:14
**sloane** 154:20
154:21 155:5
155:11 158:17
161:20 162:9
163:8
**slow** 44:3
258:15 259:9
**slowness** 28:7
37:11
**smaller** 157:23
**smart** 157:20
**social** 25:5
26:14 87:8
90:8 150:12
310:7 332:25
341:7
**socializing**
94:10
**sold** 110:16
113:12 143:18
314:22
**solution** 243:2
243:4,6 248:8
250:4
**solve** 67:6
**somebody**
27:12,12

299:16 330:25
**somewhat**
34:23 173:25
215:5 216:21
218:22 221:12
222:13,20
224:15 230:3
230:20 231:3
232:18 244:9
245:13,21
261:10 264:17
266:12 267:19
268:18,23
269:6,8 276:12
276:13
**soon** 165:25
327:9
**sorority** 47:12
47:15 48:3,23
**sorry** 18:5
21:25 27:2
36:2 44:7 83:5
85:4 103:14
129:19 138:18
141:18 185:24
204:22 205:7
229:6 262:25
280:21 296:4
332:2 357:9
**sort** 28:22
152:5 169:11
180:21 206:19
283:9 284:15
313:15

**[sorts - staffing]**                                                    Page 63

**sorts**  7:3 20:6
**sought**  17:5
   19:18 79:22,23
   80:5 331:8
   352:8
**sound**  17:21
   144:13 249:8
**sounds**  50:23
   144:18 173:24
   198:3
**source**  106:2
   137:21 139:17
**sources**  137:2,4
   137:12 139:12
   139:12
**southern**  1:2
   3:19
**sp**  173:17
**spatial**  55:24
**speak**  99:9
   102:20 153:13
   154:21 204:9
   204:14 205:5,8
   205:19 209:4
   209:20 236:21
   241:6,9,10
   265:11,20,22
   270:12 331:17
   340:22 356:4
**speaking**  65:21
   66:6 146:12,19
   147:5,14,18,20
   147:22 153:7
   154:5,8 155:20
   158:12 164:6

217:8 254:11
262:10 287:20
342:7 347:16
354:8 357:15
**specific**  31:21
   38:20 46:18
   48:15 73:24
   79:14 86:24
   88:22 92:7
   116:10 132:3
   153:19,23
   154:2 168:15
   168:16 169:7
   169:10,15,19
   178:9 179:11
   180:10 211:8
   211:11 216:11
   222:6 231:22
   243:5 244:24
   245:16 249:3
   262:20 263:3
   263:11 280:13
   280:19 282:18
   288:25 289:12
   302:8 340:25
**specifically**
   12:13 17:4,11
   22:9,12 23:5
   34:16 41:2
   42:14 43:3
   44:20 46:19
   89:14 92:6
   97:10 154:4
   156:23 157:4,8
   158:4,9 160:2

165:7 176:22
215:22,25
258:24 274:2
321:15,19
329:9,14,15
332:15 341:18
**specifics**  19:2
   99:3 288:3
   290:5 291:10
   291:13 318:7
**speculate**  33:15
   122:14 137:8
   146:6,16 147:9
   149:5 216:3,5
   248:19,21
   264:2
**speculation**
   57:14 64:21
**spend**  29:10
   118:2 119:13
   119:16 120:9
   120:16 130:2
   303:7 310:13
   310:18,22
   311:3,6 312:14
**spending**  94:10
   113:16 116:13
   116:19 140:15
   309:12
**spent**  120:3
   310:4
**sphlegal.com**
   2:6
**spoke**  71:6
   99:20 152:18

153:2,5,9,9,11
154:6,13,15,19
155:2,22
156:17 158:15
158:17,18
163:9,12
164:20,21
204:15 205:20
209:8 215:11
241:12 320:20
320:21
**spoken**  19:6
   204:16 205:21
   235:4 236:24
   237:10 240:22
   240:23 241:16
   265:17 267:22
   319:16
**sporadic**  86:11
   86:15,18,23
**sports**  70:22
**spot**  202:8
**spreadsheet**
   142:12,17
   144:3 150:2
**spring**  47:20
   335:3,5
**square**  143:16
**stable**  119:7
**staffed**  172:2
   172:13,14
   173:10 174:9
   286:6,24
**staffing**  173:13

**stage** 72:9 259:4
**stages** 258:3
**stagnant** 173:20
**stamp** 54:10,11 163:23 183:22
**stamped** 54:13 209:12
**stamps** 53:19
**standard** 33:3 172:8
**start** 7:6 41:12 52:6 109:21 118:19 134:7 134:10,12 140:4 142:16 146:23 154:2 159:12 181:21 233:10 293:2 336:6 347:6,11
**started** 11:17 41:14 52:9 83:17 126:12 127:8 132:19 142:18 150:19 161:7,11 202:5 235:2 277:20 339:25 342:6 343:7 347:13
**starting** 21:12 27:19 35:8 43:15 186:18 188:12 342:17

**starts** 64:8 87:18 111:2 183:25 213:8 220:14 283:5 284:23
**state** 1:20 4:10 4:13 5:11 125:11 232:4 332:4 364:5
**stated** 87:23 201:15 283:6,7 285:22 287:19 292:13
**statement** 63:13,16 66:22 115:20 123:6 125:20 129:18 170:3,5 171:3 198:17 207:24 235:13 258:18 259:11 268:19 330:16
**statements** 191:25 234:5 286:19
**states** 1:2 3:18 24:15 54:4 59:7
**stating** 292:17
**status** 66:14,14 68:22 69:7
**stay** 29:8,8,12 101:2 182:4 257:10,15,19 260:16

**stayed** 29:19 223:21 250:24
**staying** 198:18 247:12 256:25 257:6 258:12 259:15,24 264:13 265:5 265:17 274:13 281:23 282:16
**steady** 100:15 258:20
**stenographic...** 364:12
**step** 137:24 300:17 325:9
**steps** 102:22 103:3
**stewart** 183:11 183:19
**stigma** 242:20
**stigmas** 285:18
**stigmatized** 288:18 326:3
**stop** 29:7 108:5 130:10 147:3,4 147:14,17 148:9 202:7 217:7 254:20 254:22 255:17 291:22 334:23 335:2 344:2
**stopped** 196:16
**store** 39:12
**story** 49:15,19

**straight** 10:11 199:8 200:17 259:25
**strategic** 133:20 174:17 176:7
**strategies** 26:12 272:18 352:5
**strategy** 149:14 149:22
**stream** 258:20
**streams** 274:25
**street** 8:4,7,10 8:13 12:2 32:24
**stressful** 159:23
**strike** 31:13 50:19,20 60:25 72:2 79:19 162:10 166:16 177:13 186:16 191:22 192:14 200:9 230:24 236:10 244:15 276:16 314:3 315:19 327:18 334:24
**strong** 43:22
**stronger** 38:24 39:3,8,11,18 62:25 85:16
**structure** 140:24 149:20

**[student - symptoms]** Page 65

student 70:24
studio 150:13
  150:14,15
stuff 185:6,11
sub 233:21,23
subject 184:4
subjective
  119:5 165:23
  356:2
submit 123:4
submitted
  123:10,15
  295:21,25
  296:4,10
subscribed
  360:16
subsequent
  14:7 37:25
  220:9 306:5
  307:19 308:10
  320:12 321:23
subsequently
  287:9
subtract
  142:14
success 250:7
successful
  62:23
successfully
  320:5
suck 285:19
sudden 24:14
suffer 79:24
  80:10

suffered 347:25
  348:7
suffering
  349:18,25
  350:10,13,22
sufficient 94:7
  245:8 249:18
  249:19 256:5
suggest 164:23
  236:20 294:3,5
suggested
  220:17 221:16
  221:21 236:23
  240:22 285:2
  286:11 287:5
  296:8
suggesting 59:9
  62:24 63:18
suggestion
  242:3,8
suisse 156:20
sullivan 1:18
  2:13 4:18
summarizing
  356:10,16
summary 59:6
  61:15 63:16
  84:14
summer 163:8
sunny 32:25
super 166:25
superior 61:17
  84:18
supervision
  364:13

supervisor
  191:9
supervisory
  252:14
support 86:17
  177:9 226:21
  227:18 240:20
  242:5 271:7
  273:22 322:2
  348:6
supported
  322:25
supporting
  320:9
supports
  320:11 321:13
supposed
  235:23 293:12
  299:10,17
  300:23 301:5
  326:8
supraventricu...
  100:8
sure 15:8 18:2
  22:3 27:5
  36:21 56:11
  74:12 102:23
  104:11 108:4
  124:12 166:12
  185:13 186:2
  186:14,17
  188:12,15
  204:25 256:11
  272:15 330:18
  346:16

surprise 44:21
  133:12
surprised
  192:11,15,20
surrounding
  48:6
susman 155:25
  156:2,7,21
  157:5,9,12
  158:5,9 164:3
  164:5,21,23
  171:17 215:17
  216:15 217:14
  218:12
sustained 49:8
swear 5:7
sweatshop
  157:16
swimming
  49:17
swings 17:25
  24:7
switch 202:8
sworn 5:10
  6:12 125:10
  360:16 364:9
symptom 35:3
  35:6 37:12,14
  37:17 80:15
symptoms 17:5
  17:7,13,15,23
  18:4,8 19:21
  20:2,3,4,8,14
  21:20 22:14,16
  22:22 23:4,5

**[symptoms - teams]**                                                   Page 66

24:4,18 25:14
25:16 26:13
27:23 28:9
29:17 30:14,18
30:19,20 31:25
34:10 36:23
37:20,24 38:8
38:10,18 40:21
40:25 41:17,21
41:25 42:5
44:13,25 46:10
46:14 47:25
53:2,5 78:19
79:7,13,24
80:7,10,18
89:25 90:12
91:21,23 99:11
192:9 193:8
199:10 201:23
206:16 207:11
208:17 211:6
212:16 214:13
219:15 228:6
228:12 235:6
325:6 327:15
327:20 328:8
328:14,17,22
330:6,21
331:15,18,23
332:3,9 333:12
334:3 337:6
343:19 344:19
349:15 351:20
352:7

**syndrome**
27:15,18,24
28:11,16,21
29:18 30:16,23
31:4,16,20,25
33:12,23 34:6
34:10,13,17
35:4 36:24
37:12,23 40:18
40:22 41:2
53:2 80:17
214:6,8,11,19
**system**   100:13
143:17

**t**

**t**   5:9 125:2,9
361:8 362:3
363:3 365:3,3
**tab**   104:22
113:21 183:2
225:7 237:23
319:2
**tachycardia**
100:9
**take**   3:11 7:18
7:20 22:23
23:3 50:22
54:25 71:20
74:13 80:4,22
101:16 102:22
103:3 110:24
123:7 136:5,8
137:23 187:20
202:9 292:14
304:9 305:23

306:17 312:6,8
312:10,21,22
313:2,22
314:13 323:9
323:11 325:8
330:16
**taken**   1:16 3:15
51:5 104:16
114:20 124:17
133:11 137:7,9
202:21 256:16
305:14 308:21
323:17 364:11
**talk**   46:25
74:21 94:24
120:13 184:17
185:12 186:19
210:7 211:20
265:6
**talked**   346:3
**talking**   102:9
110:14,14
175:22 199:15
204:24 210:15
233:15 279:20
280:2
**task**   36:11,14
188:20
**tasks**   67:5
159:9 172:7
181:8,20
274:25
**tax**   143:24
150:6,7

**taxes**   142:19
**team**   174:23
176:22 178:3,7
181:17,24
182:12 184:24
199:5 206:7
209:22 210:4
242:15,16
257:14 260:25
261:9,19,25
263:15 278:22
279:6,22
285:15,24
286:20 287:21
288:2 289:4
290:9,24
291:14,20,21
292:24 293:8
293:12,18,19
293:24 294:3,7
294:10,14,20
294:20,25
295:3,6 297:11
299:14,23,23
300:8,9,16
301:21 302:7
302:10,11
**teammate**
298:18
**teammates**
181:12 182:19
195:16 288:20
**teams**   246:20
296:25

**[teaser - things]**

| | | | |
|---|---|---|---|
| **teaser** 167:6 | **terminated** | 67:14,19 68:12 | **texted** 97:24 |
| **tech** 173:11 | 103:10 164:19 | 83:3 84:16 | 98:8,10,12 |
| **technical** | 168:15 169:4 | **testified** 5:13 | 103:21,23 |
| 166:22 167:2 | 232:5,22 | 36:6 40:2 50:3 | **texting** 270:7 |
| **tell** 59:14 69:11 | 327:10 328:4 | 57:19 78:18 | **thank** 238:21 |
| 89:25 97:13,15 | 329:12 | 89:2,23 117:14 | 357:15 359:15 |
| 99:14 100:6 | **terminating** | 125:13 126:7 | **thanks** 358:12 |
| 131:16 155:3 | 231:23 | 128:14 138:23 | **thanksgiving** |
| 155:13 156:5 | **termination** | 139:8,13 | 82:23 |
| 162:9 171:17 | 102:18,19 | 247:17 256:22 | **themes** 119:8 |
| 204:19 205:23 | 103:6,18,24 | 271:24 275:22 | **therapist** 26:2 |
| 211:24 213:25 | 104:4 111:7,9 | 276:17 293:6 | 26:6,9 27:13 |
| 215:10 219:25 | 135:7,17,22 | 294:7 335:8 | 91:4 118:18 |
| 220:2 232:7 | 139:3 248:25 | **testify** 6:13,14 | 337:10,20 |
| 241:13 251:5 | 249:3 328:12 | 50:16 | 338:19 339:7 |
| 270:16 276:10 | 328:15,21 | **testimony** 6:9 | **therapists** 71:6 |
| 291:14 294:3 | 329:19,21 | 6:17 128:19 | 94:22 95:3,6 |
| 294:10,14 | 330:2,7,22 | 130:7 257:2 | 96:25 341:11 |
| 326:5 | 333:14 334:4 | 359:18 360:10 | 341:18 342:2 |
| **telling** 56:6,11 | 337:7 341:14 | 364:6,10,11,15 | **therapy** 70:14 |
| 59:23 60:5,13 | 341:24 343:19 | **testing** 59:8,10 | 70:17,18,20 |
| 213:16 220:23 | 348:8 349:19 | 59:16 60:20 | 71:2,5,8 89:5 |
| 223:14 273:10 | 350:2,23 | 63:17,19 66:24 | 89:11,16 91:24 |
| 273:24 | **terms** 7:3 | 68:16 85:10 | 93:2 94:11,13 |
| **temporary** | 154:23 198:14 | **tests** 55:22 57:8 | 94:16,18,20,25 |
| 30:19 | 200:7,11 | 57:9 58:21 | 119:7 351:25 |
| **ten** 71:15 | 240:12,12 | 60:21,23 64:10 | 352:3,9 |
| 105:13 110:20 | 246:3 329:13 | 67:7 68:8 76:2 | **thing** 175:9 |
| 111:11 119:21 | 332:21 | 84:4 | 283:7 287:7 |
| 119:24 324:12 | **terrible** 267:8 | **texas** 121:23 | **things** 24:12 |
| **tend** 332:14 | **test** 55:25 56:7 | **text** 98:3,5,13 | 25:3 26:15 |
| **tenure** 79:3 | 56:13,20,24 | 98:24 99:6 | 43:4,23 47:3 |
| **term** 29:6,16 | 58:12,15 59:25 | 101:5,8,11,14 | 56:2 80:5 |
| 82:18 90:10 | 60:18 61:16,23 | 101:21 103:17 | 94:12 101:3 |
| 112:20 159:17 | 64:18 65:4 | 104:8 241:10 | 132:2,7,8 |

**[things - tim]**

133:7 185:5
186:21,22
187:14,15
188:20 222:8
223:17 231:20
234:25 235:12
240:10 255:24
286:13 287:22
328:2 329:8,14
329:20 349:15
**think**  18:16
20:12,15,15
21:8 23:22
24:21 25:4
26:25 31:2,22
32:18,21 33:3
33:14,16 35:25
37:2 39:17
42:24 43:8
44:17 49:15
58:7 62:3,19
64:4,24 65:11
75:12 85:6
91:19 95:13
114:4 120:10
126:22 128:13
133:14 136:11
141:11 142:18
146:16,22
148:16 155:8
161:6,10,13
162:7 163:11
165:10 167:22
168:2,13,24
170:2 172:14

178:5 179:22
185:10 186:3
188:17 189:20
190:2,8,12,16
190:21 193:18
194:18 197:20
198:12,20
199:24 200:3,6
200:10,18
207:21 208:10
212:20 213:5
218:16 220:21
226:19 227:5,9
229:23 230:9
230:10,13,15
232:3 236:4,9
236:11,18
237:16,18
238:21 243:3
245:25 248:18
251:3 255:14
256:4,7 264:22
264:23 266:2
267:3 269:16
270:20 273:18
274:15 275:11
277:24,24
278:24 282:19
293:17 295:5
296:24 297:9
309:7 322:7
326:23 327:23
328:15 329:3
332:14 342:11
346:5,8 355:11

358:5
**thinking**  64:22
179:22 331:6
**thinks**  64:17
**third**  65:7
70:14 110:25
166:17,18
167:5 283:4
284:18 313:15
356:8
**thirteen**  34:8
**thirty**  101:14
111:5,11
166:22 309:14
**thought**  15:10
56:13 65:25
74:14,19,20
98:16 112:2
122:3 123:17
125:21 127:4,6
157:17 160:16
160:18,18,23
161:14 188:7
194:2 198:16
206:4,5 207:2
208:13 242:22
242:25 257:16
258:13 259:7
317:25 318:8
320:21 328:25
347:14 354:7
**thoughts**  17:18
24:10 25:6,7,7
25:9 43:25
90:7,7 211:13

242:2,7,11
245:3 327:7
329:4
**thousand**  111:5
111:11 113:10
141:13,16
144:9 145:2,24
**threadstone**
139:25 140:2,5
140:8,15 141:6
141:10 144:10
144:17,20
164:4
**three**  14:2
96:23 111:4,5
120:21 121:2,5
166:25 180:25
188:20 251:22
252:3 282:2
287:18 326:7
348:24,25
349:5,8
**tik**  106:16,19
107:2,5,11,17
109:3,8,13
113:22 114:9
114:25 115:8
115:22 117:3
309:24 310:4
310:22 311:3
**tim**  174:24
178:15 181:16
183:19 184:11
185:21 186:3
186:13,17

188:11 189:9
189:13 191:9
191:21 192:11
192:16,22
195:23 198:9
200:14 202:3
203:8 210:11
210:14 212:11
223:23 251:5,9
251:10,21
252:7 253:12
263:7 300:14
300:15,20,23
**tim's** 186:10
187:5 188:25
191:24 197:22
206:4 210:6
**time** 3:9 4:11
8:22 9:9,21
10:24 11:19
13:4 15:3,15
15:20 20:20,25
28:6,14 29:11
29:20 31:15,19
34:8 38:11,21
42:15 45:9
49:14,22 51:3
51:8 52:18
60:22 62:21
65:7 66:18
68:24 70:7
71:23 72:10
73:11 74:4,7
74:19,20 80:4
80:23,25 81:4

82:14 83:10
88:13,14 89:21
93:9 94:10
102:8 104:14
104:19 106:7
106:10,13
108:2,12,17,23
108:24 109:5
109:20,22
110:2,4 113:8
113:16,18
114:18,23
115:11,12,16
115:17 116:6,7
116:8,11,19
119:13,16,19
120:3,12,15
121:15 122:13
123:7,25
124:15 125:7
127:17,19
132:22 133:4,6
134:2,8,10,14
137:3 138:21
148:5,9 150:18
151:16 152:2
152:13 161:14
163:12 166:8
169:25,25
174:5 178:22
179:2,17,23,25
181:6,11,14,15
183:24 188:7
190:21 191:15
194:12 197:6

198:14 202:19
202:24 203:9
203:22 204:23
205:5,8,15,17
209:11,13,21
218:8 220:12
223:2 225:5
231:24 232:10
246:21,22
248:20 250:21
252:14 254:21
255:17,18,22
256:14,19
269:3,5,10
273:5 274:4
276:6,21
277:12,13
278:12 288:25
290:10,25
291:19 292:22
293:15 294:16
295:22 296:2,5
296:6,7,19
297:3,8 299:16
299:24 300:19
301:16 302:5
303:7 304:21
308:20,25
309:2,9,11,15
310:3,13 311:6
312:14 315:9
316:17 319:24
321:6 323:15
323:20 326:21
328:25 329:3

334:22,25
335:13 336:17
338:25 345:14
345:16,25
346:7,13
348:20,21
353:23 354:14
354:21,24
357:17 359:21
359:23 364:8
**timeline** 164:10
164:14,24
165:3,6,16,17
166:18 170:12
213:4 215:17
216:16 217:20
222:18 233:5
243:19 268:12
293:7
**times** 12:7,19
12:24 13:13,23
14:2 43:15,16
59:11,17 61:2
63:20 98:12
131:13 170:11
186:21 187:14
238:25 250:18
251:2 254:24
255:2 269:9
270:10 281:15
282:18 286:4
288:8 289:12
333:5,9 345:12
346:10,17
347:18 348:12

**[times - tried]**                                                Page 70

| | | | |
|---|---|---|---|
| 348:17,22,23 | **told** 86:6,9,16 | 292:17,18,20 | **transcribed** |
| 348:24,25 | 99:5 100:7 | 301:12 346:5 | 364:12 |
| 349:2,5,9 | 129:22,24 | **took** 18:12 23:7 | **transcript** |
| 354:2 | 155:7 161:20 | 38:22 73:11 | 360:5,10 |
| **timing** 211:4,10 | 169:5,7,13,17 | 77:10 94:19 | 364:14 |
| 211:16 331:3 | 172:20 174:6 | 266:5 292:23 | **treat** 90:21 |
| **timothy** 183:10 | 174:12 196:17 | 304:7 305:20 | 91:9,12 92:21 |
| **titled** 96:2 | 208:21 212:22 | 308:25 311:24 | 242:22 329:23 |
| **titles** 184:12 | 213:14,22 | 312:12 313:12 | 330:5 331:14 |
| **today** 6:2,5,9 | 214:15,25 | 313:17,20 | 331:16 333:12 |
| 6:13,17 14:12 | 216:16,23 | 314:11 | 334:2 337:5 |
| 33:12,20 34:15 | 217:14 218:12 | **top** 55:6 83:13 | **treated** 19:16 |
| 35:24 45:6 | 218:12,19 | 183:9,18 213:7 | 20:6 27:9 |
| 77:23 106:5 | 219:16 230:18 | 219:21 220:5 | 90:17 293:3 |
| 124:7 129:7 | 230:25 232:5 | 243:22 283:13 | 327:13 329:6 |
| 132:10,16 | 232:22 237:20 | 316:8 342:22 | **treating** 91:25 |
| 148:23 184:17 | 240:20 241:17 | **topic** 132:3 | **treatment** 17:5 |
| 209:21 210:7 | 242:2,3,8,11 | **topics** 349:14 | 19:17,20,22,25 |
| 214:8 216:2,10 | 243:23 244:5 | **total** 14:9 | 20:9 22:9,12 |
| 216:13 249:6 | 244:19 246:20 | 110:14,17,19 | 28:22,24 29:4 |
| 249:17 274:12 | 266:9 268:9 | **touch** 290:4 | 90:19 100:20 |
| 280:23 359:18 | 271:15 272:25 | **towards** 25:9 | 100:23,24,25 |
| **today's** 12:5 | 273:6,12,18,20 | 177:18,21 | 289:16 320:12 |
| 14:20 | 274:2 290:8,23 | 178:7 | 321:2,23 |
| **todd** 71:10 89:7 | 291:2 296:22 | **track** 103:4 | 322:16 329:10 |
| 95:7,10 96:25 | 299:15 314:25 | 142:8,11,13 | 334:13 337:4 |
| 346:8,9 354:20 | 322:10 349:17 | **trained** 89:4,11 | 343:17 351:18 |
| **tok** 106:17,20 | 349:21 | 89:18 | 351:23 |
| 107:2,5,11,18 | **ton** 157:19 | **trainer** 75:24 | **treatments** |
| 109:3,8,13 | **tony** 167:5 | 76:11 77:2 | 22:16 29:19 |
| 113:22 114:9 | 175:2 242:11 | **trainer's** 77:7 | 91:24 337:12 |
| 114:25 115:8 | 266:3 287:5,10 | **training** 157:19 | 338:15 |
| 115:22 117:3 | 287:19,23 | 172:21 | **trend** 293:2 |
| 309:24 310:4 | 288:5,22 289:9 | **transactions** | **tried** 103:5 |
| 310:22 311:3 | 291:20 292:13 | 142:20 | 165:24 |

tries 100:14
trigger 37:10
triggered
  329:15,15
triggers 48:16
trouble 17:21
  17:22 28:5,5
  35:2,5,16,23
  36:2,4,7,9,25
  37:3 185:19
true 61:21
  64:13 68:7
  71:21 84:25
  85:7 88:7
  106:5,9,12
  108:22 109:4
  113:15 115:14
  117:18,19,23
  117:24 121:6
  123:22 124:4,7
  126:16,23
  127:20 128:4,7
  128:9,11,16,20
  128:24 129:12
  129:18 171:4
  171:19 217:13
  218:2 234:18
  360:9 364:14
truly 191:18
trust 117:2,5
  189:9 190:4,25
  213:13 253:18
  253:20
truthful 6:9
  65:15 218:11

237:13,19
truthfully 6:15
try 7:6 328:19
  352:5
trying 18:22
  106:9 109:7
  111:19 115:22
  129:21 130:8
  137:18 168:14
  176:4,15
  190:15 202:6
  251:15 255:23
  280:21 295:12
  327:24
turn 96:15
  105:12 217:20
  233:3 283:3
  316:17
turnaround
  297:8
turned 139:8
  141:25 144:24
  145:5
turning 300:25
twelve 34:3
  237:24
twenty 107:24
  108:10 140:18
  199:8 200:16
  233:20 259:25
  277:8 356:3
twice 13:17
  346:19
two 14:8 47:8
  63:21 64:5

69:17 76:12
89:3 96:23
97:11 120:17
120:20,24,25
145:14 156:3
167:2 174:10
174:14 180:25
203:18 208:25
216:12 225:7
225:25 239:24
258:25 260:7
263:23 265:3
278:3 280:17
320:2 343:24
346:3 348:22
348:23 353:15
tylenol 39:9,19
type 19:7 74:16
  180:15 196:9
  199:15 247:12
  287:6
typically 32:24
  33:2 134:7,14
  134:17 155:9
  309:16 317:24
  334:12

| u |
| --- |

uh 7:2,2,2
ultimate
  177:14
ultimately
  177:18
uncertain
  68:23

uncertainty
  81:10,16
uncomfortable
  136:13,19
  137:13 139:10
  139:16
under 6:13
  61:15 70:14
  71:17 72:7
  84:14 105:15
  119:5 135:2
  321:4 324:12
  356:2 364:13
underestimates
  64:13
underlying
  226:4 240:2
underneath
  165:19
underperform
  56:20 85:13
underperfor...
  56:14 85:8
underscore
  353:5 355:8
understand
  6:11,16,20,21
  7:10,11 18:23
  21:16 30:17
  50:9 57:17
  70:6 176:5
  185:20 187:5
  188:2 189:6
  193:13 194:21
  194:22,24

195:2 198:9
206:21 214:3
229:15,21
250:16,24
251:25 252:7
289:5
**understanding**
39:10,24 44:22
65:4 89:14
97:6 100:11
149:18 188:25
193:9 195:6
198:21 214:22
218:24 219:23
235:21 243:8
243:12 251:16
252:20 257:25
258:4,10,16
259:16 260:8
267:22,24
272:8 273:4,20
274:4 278:7
282:14 321:17
349:22 350:5
**understandings**
297:2
**understood**
15:17 33:6
145:7 193:20
194:9,11
195:15 197:16
200:20 231:12
250:10,22
251:3 252:13
252:18 254:3

288:23 289:9
297:5
**undetermined**
84:22
**unit** 3:13
**united** 1:2 3:18
**unlawful** 111:6
135:17
**unnecessary**
21:9 217:12
**unpredictable**
155:14 193:23
250:12 251:7
251:10
**unreasonable**
228:14 231:6
**unsolicited**
174:17 176:7
**unspecified**
25:20
**uploading**
304:17
**upset** 104:5
116:21 185:19
**urgent** 297:12
297:25 298:17
299:2
**urquhart** 1:18
2:13 4:17
**use** 142:25
148:6 197:25
254:8
**used** 149:21
272:17 320:25
334:12

**useful** 69:24
**uses** 80:24
**using** 207:16
207:17 351:25
**usual** 69:2
**usually** 72:10
134:10
**utilities** 175:20
**utility** 174:16
176:6,10,12

**v**

**vague** 194:16
255:8,11
**vale** 9:4,7,10
**valentino** 2:10
2:10 4:25,25
114:4
**validity** 59:8
60:8,14 63:17
**variable** 59:9
63:18
**variations**
282:23
**variety** 22:14
55:21 92:23
132:2,6 159:6
159:9 160:25
176:25 222:6,8
222:9 237:17
272:20 275:6
337:13 349:13
352:2,4
**various** 281:15
287:22

**venmo** 143:17
**venue** 143:14
**veracity** 20:4
**verbal** 6:25
55:24 321:19
**verbally** 56:3
**verbatim**
233:17
**verdi** 91:2
93:10,11 95:2
95:8 97:9,14
97:17 98:25
99:4 101:6,9
101:12 225:17
225:22 237:3
237:13,18,20
238:13 239:8
239:15 240:8
240:17,23
241:6 242:9
267:20 268:7
270:16 273:6
319:12 320:17
320:20 321:20
322:8 323:5
353:10
**verdi's** 263:18
267:16
**verified** 96:11
**veritext** 3:25
4:4
**verity** 93:11
**version** 39:11
264:7 269:12

**versus** 3:17
**vicari** 233:14
  234:9,12
**video** 3:10,14
  13:11,19,21,24
  14:8 51:3,8
  104:14,19
  107:7,15 108:7
  113:24 114:18
  114:23 116:4
  124:15 125:7
  202:19,24
  233:14 256:14
  256:19 323:15
  323:20 359:21
  361:19,20
**videographer**
  2:21 3:2 4:2
  5:6 50:25 51:6
  104:12,17
  114:16,21
  124:13 125:5
  202:17,22
  256:12,17
  323:13,18
  358:7 359:17
**view** 285:17
  293:20,20
  326:14
**viewed** 288:20
**views** 260:23
**virtually** 12:22
**visit** 55:7,18
  58:8 59:7 84:2
  356:10,16

**visual** 64:11
  67:7
**vs** 360:1 365:1

**w**

**wait** 7:21
  262:25
**wake** 188:19
  269:5
**walking** 32:23
**want** 30:17
  111:20 117:23
  117:24 124:8
  128:20 129:5,7
  129:12,24
  131:4,20,23,25
  132:9,15,20
  133:7 136:21
  147:25 182:6
  185:22,24
  189:10,14
  190:4,25
  202:12 253:21
  285:15 286:5
  286:20 292:18
  292:20 293:7
  293:19,24
  294:7 301:14
  301:18 350:16
**wanted** 11:5
  58:11,15,24
  86:11 98:17
  104:7 112:3
  123:23 126:17
  126:20,24
  127:2,7,20

  130:11 180:21
  182:4,20
  191:18 211:17
  247:14,16,22
  248:7,13,14,16
  248:19 288:9
  288:14,16
  345:18
**wanting** 287:24
  293:18
**wants** 123:19
  125:25 131:7
**wasting** 148:10
  254:21 255:17
  255:21
**way** 18:19,20
  50:4 67:6
  127:18 130:8
  157:17 212:21
  255:12 281:21
  288:11 304:19
  348:5
**wayfair** 151:9
**wayne** 1:19 4:3
  364:4,25
**ways** 156:10
  295:11
**we've** 19:5 21:5
  21:6 26:11
  43:8 50:21
  128:15 130:3
  145:18 164:5
  203:10 250:10
  254:2 258:25
  271:10 274:7

  279:19 281:10
  319:16 323:9
  342:6 346:3
  355:7 358:5
**webex** 233:14
**websites**
  152:20,21
**week** 77:11,11
  77:16 78:7,12
  78:17 119:22
  120:7 140:14
  140:19 144:12
  144:15 172:16
  172:18,20
  173:3,5,9,24,25
  178:21 179:4
  193:21,22
  265:3 275:16
  290:5,8,21,23
**weekend** 119:8
  290:4,20
**weekly** 120:5
  140:25 141:2,9
  141:13 144:11
**weeks** 120:17
  120:20,24,25
  141:17 174:14
  198:13,18
  199:9 216:12
  233:20 251:19
  265:4
**weight** 185:2
  206:6
**went** 10:10,15
  10:20,23 21:11

**[went - work]**                                                    Page 74

| | | | |
|---|---|---|---|
| 72:19 181:7 | 61:12 62:3,19 | 217:18 218:7 | 350:17 |
| **west** 143:11 | 63:11 64:4,24 | 224:7,18 | **work** 68:25,25 |
| **whereof** 364:22 | 65:11 66:3,7 | 231:11 232:21 | 70:18,22 87:24 |
| **whispering** 3:7 | 67:18 72:23 | 235:19 236:18 | 108:20 109:10 |
| **wide** 231:19 | 74:10 75:12 | 237:9,16 | 109:11 112:21 |
| 234:24 235:12 | 78:15 79:12 | 239:11,17 | 117:24,25 |
| 265:18 314:15 | 80:13 81:20 | 240:16 245:10 | 123:4,19,23 |
| **willem** 174:25 | 83:7 84:12 | 248:3,12 250:3 | 126:2,17,24 |
| **william** 155:25 | 85:6,12,20 | 250:15 252:17 | 127:20 128:20 |
| 164:3 183:10 | 89:13 90:6 | 253:16 254:16 | 129:12,24 |
| **willing** 232:8 | 91:11 101:24 | 254:20 258:9 | 130:11 131:8 |
| 234:5 | 102:10,16 | 260:21 261:4 | 134:4 136:21 |
| **winter** 82:18 | 108:8 111:16 | 261:22 266:16 | 143:6 152:6,16 |
| 82:19,22 92:17 | 111:24 112:10 | 267:3 273:17 | 152:23 153:3 |
| 345:2 | 127:24 129:10 | 274:21 280:10 | 156:8 157:16 |
| **withdrawal** | 131:6,14 | 281:5 282:7 | 158:13,22 |
| 87:9,13 90:9 | 135:10 139:6 | 297:21 298:4 | 160:18 162:22 |
| **withdrawing** | 146:5,10,14 | 298:12,24 | 167:12,16,24 |
| 171:7 | 147:4 148:16 | 301:4,9,24 | 168:7,12,23 |
| **withdrawn** | 149:5 150:5 | 318:22 322:22 | 169:8,24 172:5 |
| 216:24 332:24 | 154:13 159:2 | 325:3 327:23 | 172:10 174:3 |
| **withdrew** | 159:25 165:10 | 340:21 348:10 | 177:14 179:8 |
| 151:22 217:14 | 168:2 169:17 | 353:25 354:19 | 179:13 186:22 |
| **witness** 5:4,8 | 179:19 180:6 | 355:21 357:13 | 187:15 188:5 |
| 14:25 15:6 | 182:9,16,24 | 359:8 361:5 | 200:12 201:25 |
| 17:11 19:5 | 187:9 189:17 | 364:9,15,22 | 206:11 208:2 |
| 20:18 21:3,23 | 189:23 190:8 | **woke** 223:24 | 208:14 212:8,9 |
| 21:25 23:21 | 190:15 191:17 | **wondering** | 212:17,20 |
| 26:9 29:4 | 192:19 193:5 | 94:19 | 219:13 221:19 |
| 33:14,25 37:7 | 193:18,25 | **word** 267:4,4 | 228:9,17 |
| 38:17 39:7 | 194:18 196:25 | 328:25 | 231:14 232:16 |
| 42:23 44:17 | 197:20 198:16 | **wording** | 235:8 236:13 |
| 48:25 52:24 | 198:25 201:3 | 254:16 | 246:3,5 247:19 |
| 57:16 58:7 | 201:20 207:14 | **words** 33:8 | 248:9 250:4 |
| 59:21 60:4 | 207:21 217:4,5 | 122:22 215:21 | 251:7 252:23 |

**[work - writing]**                                                      Page 75

254:4 260:15
261:6 265:25
266:2,3,4,5,10
267:12,13
270:11 274:25
277:23 281:12
293:13 295:7
296:4,11
299:10,18
300:4,24 301:6
325:24 326:17
356:10
**worked**  112:11
112:19 126:14
127:9,10,13
148:19,25
149:6 155:8
156:3 157:21
157:24,25
158:19 159:5
161:21 173:4
181:2,18
182:19 197:12
206:12 212:6
242:17 246:12
246:15,16,19
250:17 252:19
262:17 264:9
264:24 274:24
295:13,17,19
295:21,25
298:13 326:7
**worker**  341:8
**workers**  153:12

**workflow**
154:24 201:11
211:5,10,16
**working**  11:17
36:12,13 70:23
117:15 119:17
120:4,9,16,23
121:16 123:18
134:12,15
156:11 157:20
160:4 161:7,8
161:11,17,25
168:15 169:20
170:9 172:12
172:15 174:8
175:10,23
176:2,5 177:18
177:20,21
178:3,7,21
179:10,16,22
179:24 181:25
182:5,14,20
184:8,24
185:11,22,25
186:5,6,8
189:2,10,15
190:4 191:2,10
191:12 192:5,6
192:23 193:2,6
193:10,16
195:8,10,12,16
196:7,10,12,12
196:16,21
197:4,5,9,13,15
197:17 198:4,6

199:7,8,20,25
200:16 201:12
201:22 206:10
206:14 207:10
207:19,23
208:4 212:15
241:18 246:21
250:18,25
253:6,7,21
259:23 261:14
261:25 263:16
266:19 268:4
269:19 275:15
278:23 282:15
292:15 293:16
295:4,6 296:9
296:12,21
297:14 298:10
305:24 306:3
306:18,23
309:4,10 326:2
327:11 329:3
352:5
**workplace**
327:13 329:11
**works**  255:13
**world**  269:2,23
**worried**  192:7
201:21 206:7
210:10 242:13
**worse**  329:18
329:18
**worst**  186:20
187:13

**worth**  133:16
**write**  60:7
65:14 66:12
122:2 123:5,5
164:9 165:17
165:19,24
166:21 167:9
168:4 171:10
172:17 174:14
174:23 175:6
178:19 180:25
181:15 188:11
209:19 210:19
213:10 220:16
221:5 223:8
233:13 237:20
238:20 241:4
273:7 286:10
288:7 289:15
290:7 291:11
316:22 317:24
319:21 323:5
355:2,18 356:9
356:16 357:3
357:15
**writes**  66:22,25
69:17,23 70:15
71:19 72:6
80:20 119:6
184:11,16
186:17 187:18
225:23 353:13
355:8 356:9
**writing**  168:13
225:23 239:22

**[writing - zero]**                                                    Page 76

| | |
|---|---|
| 319:23 | 141:16,17 |
| **wrong**  133:13 | 145:2,9 148:13 |
| 242:19 | 148:20 149:2 |
| **wrote**  62:14 | 159:20 160:5 |
| 63:6 65:3 | 160:10,14 |
| 68:20 107:23 | 163:15 167:5 |
| 190:18,18 | 174:24 178:12 |
| 215:16 217:22 | 187:22 188:3 |
| 222:17,17 | 200:18 251:22 |
| 237:3,18 239:9 | 257:12 267:6 |
| 239:15 240:17 | 293:4 299:22 |
| 268:14 283:6 | 300:3,8,16,20 |
| 287:17 356:12 | 300:21 327:11 |
| 358:17 | 356:3 |

**x**

**x**   169:25 361:4
361:8 362:2,3
363:2,3

**y**

**y**   5:9 125:9
169:25
**yeah**   12:15
25:10 29:22
36:20 47:20,24
55:21 133:3
136:15 142:25
144:18 152:23
176:10 202:10
203:5 207:5
273:25 313:13
**year**   12:17
16:20,22 39:19
39:21 41:15
107:24 108:10

**year's**  82:24
**years**   9:16 34:3
36:21 37:18
61:6 79:6
97:23 105:16
145:14 216:9
225:25 239:25
252:3 314:16
320:6 324:13
**yep**   163:20
**yoon**   2:17 4:19
**york**   1:2,19,19
1:21 2:5,5,9,9
2:14,14 3:19
3:23 5:12
125:12 313:25
314:4 364:5

**z**

**zero**   223:18

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.