# EXHIBIT B

Page 1

1
2                 ** CONFIDENTIAL **
3
4 UNITED STATES DISTRICT COURT
5 SOUTHERN DISTRICT OF NEW YORK
6 ------------------------------x
7 KATHRYN SHIBER,           : Civil Action No.
8              Plaintiff,   : 1:21-cv-03649-ER
9     -against-             :
10 CENTERVIEW PARTNERS, LLC, :
11              Defendant.   :
12 ------------------------------x
13              Via Zoom
14              February 24, 2023
15              9:15 a.m.
16
17    Deposition of JEANNE VICARI, taken by
18 Plaintiff, before Susan B. Ratner, a Shorthand
19 Reporter and Notary Public of the State of New York.
20
21
22
23
24
25

Page 3

1
2 A P P E A R A N C E S:
3 ALSO PRESENT:
4     KATHRYN SHIBER
5
6     AMANDA KOSOWSKY, ESQ.
7     Chief Compliance Officer
8     Centerview Partners, LLC
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1
2 A P P E A R A N C E S:
3
4 Attorneys for Plaintiff:
5 SCHWARTZ PERRY & HELLER LLP
6    3 Park Avenue
7    New York, New York 10016
8 BY:  BRIAN HELLER, ESQ.
9      -and-
10 CLAYMAN ROSENBERG KIRSHNER & LINDER LLP
11    305 Madison Avenue, Suite 650
12    New York, New York 10165
13 BY: JAMES F. VALENTINO, ESQ.
14    (Not Present)
15
16 Attorneys for Defendant:
17 QUINN EMANUEL URQUHART & SULLIVAN, LLP
18    51 Madison Avenue, 22nd Floor
19    New York, New York 10010
20 BY:  HOPE D. SKIBITSKY, ESQ.
21    JENNIFER J. BARRETT, ESQ.
22    JANICE YOON, ESQ.
23
24
25

Page 4

1
2    IT IS HEREBY STIPULATED AND AGREED, by and
3 between the attorneys for the respective parties
4 herein, that filing and sealing be and the same are
5 hereby waived.
6    IT IS FURTHER STIPULATED AND AGREED that all
7 objections, except as to the form of the question,
8 shall be reserved to the time of the trial.
9    IT IS FURTHER STIPULATED AND AGREED that the
10 within deposition may be signed and sworn to before
11 any officer authorized to administer an oath, with
12 the same force and effect as if signed and sworn to
13 before the officer before whom the within deposition
14 was taken.
15
16
17
18
19
20
21
22
23
24
25

Page 5

1
2 J E A N N E   V I C A R I,
3    called as a witness, having been first duly
4    sworn by the Notary Public (Susan B. Ratner),
5    stating her business address as 31 West 52nd
6    Street, 21st Floor, New York, New York 10019,
7    was examined and testified as follows:
8 EXAMINATION BY
9 MR. HELLER:
10    Q. Good morning, Ms. Vicari.
11       My name is Brian Heller.  I am an
12 attorney for Kate Shiber.
13       Have you ever been deposed before?
14    A. No, I have not.
15    Q. Have you ever been at a deposition
16 before?
17    A. No, I have not.
18    Q. I will be asking you a series of
19 questions today.
20       I will ask you to answer them as
21 truthfully as you are able to.
22       If you do not understand a question that
23 I have asked, please let me know, and I will be
24 happy to rephrase it.
25       If you want to take a break at any time,

Page 6

1    J. Vicari - Confidential
2 that is fine, just let me know.
3       I would only ask that we not take a break
4 when there is a question pending.
5       I would ask that you please wait until I
6 finish the question before you answer it, so that
7 the court reporter does not have to take us both
8 talking at the same time, which means even if you
9 know exactly what my question is, please wait until
10 I finish asking it to answer it.
11       Do you have any questions?
12    A. No.
13    Q. Is there any reason why you are unable to
14 answer questions truthfully today?
15    A. No.
16    Q. What did you do to prepare for today's
17 deposition?
18    A. I had a prep session with Hope yesterday
19 at Quinn Emanuel, and I had a short prep session, a
20 quick call last week, Thursday I think it was, with
21 Jen Barrett.
22    Q. Other than during your conversations with
23 your attorneys, have you reviewed any documents in
24 preparation for today?
25    A. No.

Page 7

1    J. Vicari - Confidential
2    Q. Did you speak with anybody at Centerview
3 in preparation for today?
4    A. No.
5    Q. Specifically, did you speak with either
6 Tony Kim or Cheryl Robinson --
7    A. No.
8    Q. -- in preparation for today?
9    A. No.
10    Q. Are you aware that each of them was
11 deposed?
12    A. Yes.
13    Q. Have you read a copy of either of their
14 transcripts?
15    A. No.
16    Q. What is the month and year of your birth?
17       I am specifically not asking you for the
18 day.
19    A. January 1962.
20    Q. So how old are you right now?
21    A. Sixty-one.
22    Q. What is your highest level of education?
23    A. A college degree.
24    Q. Where did you go to college?
25    A. Montclair State University.

Page 8

1    J. Vicari - Confidential
2    Q. When did you graduate?
3    A. 1984.
4    Q. What was your degree in?
5    A. A BS in accounting.
6    Q. Are you currently employed?
7    A. Yes.
8    Q. By whom are you employed?
9    A. Centerview Partners.
10    Q. When did you start working at Centerview
11 Partners?
12    A. 2005.
13       It was previously known as Pruzan & Co.
14    Q. It was previously known as what?
15    I'm sorry.
16    A. Pruzan & Co.
17    Q. Pruzan & Co.?
18    A. Yes.
19    Q. How did you come to work at Pruzan & Co.?
20    A. I spoke to Robert Pruzan, who I had
21 previously worked with.
22    Q. At what company did you previously work
23 with Robert Pruzan?
24    A. Wasserstein Perella.
25    Q. What was your position at Wasserstein

Page 9

1         J. Vicari - Confidential
2    Perella?
3         A.  CFO.
4            At the end it was CFO.
5            I had risen from assistant controller to
6    various positions over the 12 years to be CFO.
7         Q.  When you started at Pruzan & Co., what
8    was your title?
9         A.  I think it was VP and controller, or
10   something like that, just to -- I think it was VP
11   and controller, but honestly, I may not be exactly
12   accurate on that.
13        Q.  Were you there at the beginning of
14   Pruzan & Co.; you were there at the beginning?
15        A.  Shortly thereafter its initial formation.
16        Q.  So how long had it been in existence when
17   you joined?
18        A.  A year.
19        Q.  And when you joined, how many employees
20   were there, including you?
21        A.  Five.
22        Q.  When did you first meet Robert Pruzan?
23        A.  1989.
24        Q.  Was that at Wasserstein?
25        A.  Yes.

Page 10

1         J. Vicari - Confidential
2         Q.  What was his title when he left
3    Wasserstein?
4         A.  I don't really remember the titles at
5    Wasserstein.
6         Q.  Did he leave directly from Wasserstein to
7    start Pruzan & Co.?
8         MS. SKIBITSKY:  Objection.
9         Q.  You can answer.
10        A.  I believe he -- I do believe he did, but
11   there may have been a short period in between.
12            I wasn't there, so I don't really know
13   with 100 percent certainty, but I think he had a
14   short time -- he may have had a short time in
15   between.
16        Q.  Did there come a time when Pruzan & Co.
17   became Centerview Partners?
18        A.  Yes.
19        Q.  When was that?
20        A.  July of 2006.
21        Q.  What happened?
22        MS. SKIBITSKY:  Objection.
23        A.  A number of other partners joined the
24   firm, and we changed the name from Pruzan & Co. to
25   Centerview Partners.

Page 11

1         J. Vicari - Confidential
2         Q.  Were they also from Wasserstein or from
3    other entities?
4         A.  None of them were from Wasserstein.
5            They were all from other entities.
6         Q.  Did your title change when Centerview
7    Partners came into existence?
8         A.  I don't recall.
9         Q.  Currently, what is your title at
10   Centerview Partners?
11        A.  Chief operating officer.
12        Q.  Do you recall when you became chief
13   operating officer at Centerview?
14        A.  No.
15        Q.  Do you recall having any other title
16   besides COO at Centerview?
17        A.  At various times I have used various
18   titles for various reasons.
19            For example, I am also the FINOP for
20   regulatory purposes, which is a regulatory title.
21        Q.  What are your present responsibilities at
22   Centerview?
23        A.  I oversee all administrative functions of
24   the firm.
25        Q.  For how long have you served in that

Page 12

1         J. Vicari - Confidential
2    capacity?
3         A.  Over ten years.
4         Q.  How did it come to be that that became
5    your role?
6         A.  I was always the senior administrative
7    person.
8            The title and the date of the title, in
9    all honesty, has nothing to do with -- there is no
10   relevance in my mind.
11        Q.  I asked the question because you said for
12   the last ten years you have overseen all
13   administrative functions.
14        A.  I said for over ten years my title has
15   been chief operating officer, I believe.
16        Q.  Has there ever been a time when you did
17   not oversee all administrative functions at
18   Centerview?
19        A.  No.
20        Q.  Who do you report to?
21        A.  Jeanne's view of the administrative
22   function is that I report to everybody who is a
23   banker, whether they are a partner or a 22-year-old
24   analyst.
25        Q.  A 22-year-old analyst does not have the

Page 13

1      J. Vicari - Confidential
2 authority to fire you, correct?
3      A. Correct.
4      Q. At Centerview, who does have the
5 authority to fire you?
6      A. I believe it's, you know, the senior
7 partners of the firm.
8      Q. Who are the senior partners of the firm?
9      MS. SKIBITSKY: Objection.
10      A. Blair Effron and Robert Pruzan.
11      Q. What is Robert Pruzan's title at
12 Centerview?
13      A. He is a partner, and I believe for
14 regulatory purposes he also has the title of chief
15 executive officer.
16      Q. What do you mean, "for regulatory
17 purposes"?
18      A. For regulatory purposes FINRA has very
19 specific titles, and when we originally were approved
20 with FINRA -- which was previously known as the
21 NASD -- back in 2005, we had to -- Robert was the
22 one who had the title of chief executive officer,
23 which was a prior title for regulatory purposes.
24      Q. Is there one person who is in charge of
25 Centerview Partners?

Page 14

1      J. Vicari - Confidential
2      A. No.
3      Q. Is there a group of people who are in
4 charge at Centerview Partners?
5      MS. SKIBITSKY: Objection.
6      A. I guess I would say the senior partners
7 of the firm.
8      Q. Are you responsible at all for hiring and
9 firing decisions of employees at Centerview Partners?
10      A. Yes.
11      Q. With respect to first-year analysts, do
12 you have any responsibilities with respect to hiring?
13      A. I am not involved with the recruiting
14 process, yet the issuing of the offer letters is
15 part of my senior administrative functions, and if
16 there was anything, a flag that I had seen, that
17 would be raised before the offer letters were sent
18 out.
19      Q. Do you do any interviewing when it comes
20 to first-year analysts?
21      A. No.
22      Q. When did you first hear the name "Kate
23 Shiber"?
24      A. When the offer letters were prepared.
25      When her offer letter was prepared.

Page 15

1      J. Vicari - Confidential
2      Q. Did you prepare her offer letter?
3      A. No.
4      Q. Did you review her offer letter before it
5 was sent out?
6      A. I was aware that it was being issued, and
7 then -- you know, everyone in the class gets the same
8 offer letter, so the form of it -- I knew the form
9 of it, but I did not review it, per se.
10      Q. Were you at all involved in the decision
11 to select Kate as part of the analyst class for 2020?
12      A. No.
13      Q. Did there come a time when you learned
14 that Kate Shiber needed an accommodation at
15 Centerview Partners?
16      MS. SKIBITSKY: Objection.
17      A. Yes.
18      Q. Let me rephrase that.
19      Did there come a time when you learned
20 that Kate Shiber had requested an accommodation at
21 Centerview Partners?
22      A. I recall that she had requested an
23 advocate, not specifically an accommodation.
24      Q. What do you mean that she requested an
25 advocate?

Page 16

1      J. Vicari - Confidential
2      A. She called Cheryl Robinson late on a
3 Friday and said she needed someone to advocate for
4 her.
5      Q. Do you recall when that was?
6      A. I believe it was the Friday a week before
7 Labor Day in 2020.
8      Q. How did you become aware that Kate reached
9 out to Cheryl Robinson?
10      A. Cheryl reports to me and she -- as I
11 recall, she walked into my office and told me she
12 had a call with one of the new analysts.
13      Q. Was this Friday, August 28th of 2020?
14      A. I believe so.
15      Q. Were you in the office at that time, or
16 were you working remotely?
17      A. I was in the office, as was Cheryl.
18      Q. Did you ever work remotely during the
19 COVID-19 pandemic?
20      A. Yes.
21      Q. For how long?
22      A. March 20th to July 13, 2020.
23      Q. What did Cheryl say to you when she came
24 to you that day?
25      A. Cheryl said that Kate Shiber had called

Page 17

J. Vicari - Confidential
1    J. Vicari - Confidential
2 and asked her to advocate for her because she needed
3 to have consistent sleep at night; steady hours,
4 consistent sleep at night.
5    Q. Did she tell you anything else about her
6 conversation with Kate?
7    A. As we -- as I started to look into the
8 situation, Cheryl did tell me that Kate had said she
9 didn't want anyone else to be told anything, that
10 none of her colleagues or coworkers were to be told
11 anything, and she did not want to be taken off of an
12 active client that she was recently assigned to.
13    Q. Is there anything else that you recall?
14    A. No.
15    Q. Did Cheryl tell you at all the reason why
16 Kate needed to sleep?
17    A. I don't think she knew at that time.
18    Q. Do you recall what, if anything, you said
19 back to Cheryl during this meeting?
20    A. I pulled up the staffing system to see
21 which clients Kate had been assigned to, and I
22 realized that she had recently just been assigned to
23 a very active situation, which had multiple partners
24 on it, including Tony Kim.
25    I told Cheryl she is going to need to --

Page 18

1    J. Vicari - Confidential
2 she should call -- she could reach out to Tony, who
3 is a very -- he is very senior, and a member of our
4 firm's PDC, which is the Professional Development
5 Committee, which oversees the bankers and all
6 functions related to the management and development
7 of bankers.
8    Q. Do you recall if it was your idea for
9 Cheryl to speak to Tony, or had she already thought
10 of that, or something different?
11    A. I believe I told her to speak to Tony.
12    Q. Do you recall anything else that you said
13 to Cheryl during this conversation?
14    A. I just recall that I said, "You need to
15 speak to Tony" despite Cheryl telling me that Kate
16 did not want anyone spoken to.
17    It was Friday night. It was a very active
18 situation. I did not see how we were going to
19 protect her sleep if we didn't advise the team.
20    I spoke to the most senior level of
21 people -- I told Cheryl that she needs to speak to
22 the senior-level people on that team to assess what
23 the workload was going to be, and if it would be
24 possible to protect her sleep that weekend.
25    Q. Was there any question in your mind about

Page 19

1    J. Vicari - Confidential
2 whether Centerview would help Kate with her sleep?
3    A. No.
4    Q. Was there a decision that the firm would
5 assist Kate with her sleep?
6    MS. SKIBITSKY: Objection.
7    A. At the time, I believe we needed to do
8 whatever we could to protect her sleep based on the
9 very limited information we had at hand about what
10 it all meant and everything behind it.
11    Again, it was a Friday night. We were
12 going into a weekend with an active situation. We
13 had -- I had zero visibility as to the workload that
14 was going to be happening over the weekend.
15    Q. Did you understand the reason why Kate
16 needed sleep, meaning was it medical, was it just a
17 personal preference, or was it something else?
18    MS. SKIBITSKY: Objection.
19    A. I recall that it was a health situation.
20    Q. When you say, "health," what do you mean?
21    A. I mean that it was for her own health
22 that she needed to have consistent sleep at night.
23    Q. Consistent sleep at night is helpful for
24 everyone, correct?
25    MS. SKIBITSKY: Objection.

Page 20

1    J. Vicari - Confidential
2    A. So they say.
3    Q. Was there something unique about Kate's
4 request that differentiated it from someone else
5 needing sleep at night, that you recall?
6    MS. SKIBITSKY: Objection.
7    A. I didn't know enough about her situation.
8    Q. Did you ask Cheryl to find out any
9 information about why Kate needed sleep?
10    A. I believe I said that we were going to
11 need to get a doctor's note, but for now, given that
12 it's Friday night, we need to make sure we don't --
13 you know, we had no visibility into her work
14 environment because she was not in the office, and
15 had not been in the office.
16    So, again, since we had zero visibility
17 into her work environment, I felt that it was best
18 that we, you know, honor her request, and take her
19 word that she needed this.
20    So regardless of the lack of information,
21 we were going to do what we had to do to protect what
22 she said she needed.
23    Q. Do you recall if you brought up getting a
24 doctor's note or if Cheryl brought up getting a
25 doctor's note?

Page 21

1        J. Vicari - Confidential
2        A. Cheryl and I always talk about doctors'
3    notes.
4        Specific to that conversation, I don't
5    honestly recall, but I can't imagine that I did not
6    say that we need to get a doctor's note.
7        Q. Was it your understanding that Kate's
8    request derived from a medical requirement?
9        MS. SKIBITSKY: Objection.
10       A. I don't believe I cared.
11       I think she just said she needs it for
12   her -- you know, she needs consistent sleep at
13   night, and I was, like, okay.
14       I didn't know enough about anything else,
15   so we were going to do what we had to do for now,
16   and we will monitor the situation and assess it as
17   we go forward.
18       Q. Had you ever been involved with any other
19   employee asking for consistent sleep during your
20   time at Centerview?
21       A. I don't recall that specific request ever
22   being made before.
23       Q. You mentioned that this request came in
24   on a Friday night in the summer.
25       What did that mean to you at the time?

Page 22

1        J. Vicari - Confidential
2        A. Generally, in our industry, many bankers
3    try to take vacation those couple of weeks leading
4    up to Labor Day.
5        Many of our clients have, you know,
6    holidays at the end of the summer.
7        We are a global firm. In Europe they all
8    take off at the end of the summer.
9        Generally speaking, it was a quiet time,
10   and there were very few active situations going on.
11       Kate had recently been assigned to what
12   was one of them and I was aware of that.
13       Q. I am going to show you what has previously
14   been marked as Plaintiff's Exhibit 11.
15       (Plaintiff's Exhibit 11 placed on shared
16   screen.)
17       Q. Plaintiff's Exhibit 11 is an e-mail that
18   Kate sent to Cheryl Robinson on August 28th, and it
19   has a time stamp of 2:33 p.m.
20       Have you ever seen this document before?
21       A. I honestly don't recall reading this
22   particular e-mail.
23       Q. Had you ever been involved in a request
24   for an accommodation before?
25       A. Yes.

Page 23

1        J. Vicari - Confidential
2        Q. Generally, what types of accommodations
3    have you received requests for at Centerview?
4        A. They have ranged from needing a sit-stand
5    desk for people with various knee, back, shoulder
6    issues, to maternity leave, where people needed
7    accommodations perhaps during their pregnancy, or
8    during their maternity leave.
9        We have had employees with various, you
10   know, operations, you know, ailments and the like.
11       So we have been through a wide variety
12   of, you know, requests for accommodations.
13       Some have resulted in a short-term
14   disability leave.
15       Some have resulted in the firm purchasing
16   an employee a special keyboard or sit-stand desk.
17       Q. Have you ever had an employee request
18   intermittent leave, that you are aware of?
19       A. You need to define "intermittent."
20       Q. Where it's not a leave for a defined
21   period of time, but, rather, either on a day here,
22   or a day there, or a certain number of hours each
23   day are taken as a leave, or something along those
24   lines.
25       A. I don't recall anything that resulted in

Page 24

1        J. Vicari - Confidential
2    what I understand your definition of "intermittent
3    leave" to be.
4        There have been people who have needed to
5    go to, say, PT, and they -- you know, they would
6    have to leave early on -- you know, say, one day a
7    week when they were going for PT, physical therapy.
8        That has more been handled as just sick
9    time, or excused time, and not rising to what I
10   would interpret your definition of "intermittent
11   leave" is.
12       Q. Who at Centerview has the authority to
13   grant or deny a request for a reasonable
14   accommodation?
15       A. Ultimately, that would be a human
16   resources function where Cheryl or I would be the
17   one who ultimately, quote-unquote, approved it.
18       There may be times -- going back to your
19   last question -- there could be a time when, say, a
20   junior -- a member of a deal team tells the team
21   members that they are going to be going to physical
22   therapy one day a week, and the team, you know, may
23   just be aware of it, and it doesn't rise to the
24   level of, you know, human resources.
25       Q. Understood.

Page 25

J. Vicari - Confidential
1
2        But when it does rise to the level of
3  human resources, who has the final say; is it you,
4  Cheryl Robinson, someone else?
5        A.  Cheryl typically handles it and will
6  check in with me to make sure if I -- and if I have
7  a differing view, I will proceed to get involved.
8        Q.  Do you have any type of training in the
9  granting of reasonable accommodations?
10       MS. SKIBITSKY: Objection.
11       A.  I have worked in this industry for over
12  30 years, and I have been involved in many ways,
13  shapes, and forms over those 30 years, and I am not
14  sure what training would be available, to tell you
15  the truth.
16       I have 30 years of experience in this
17  field.  That is my training.
18       Q.  Do you have any training in
19  antidiscrimination policies?
20       A.  Yes.
21       Q.  What type of training do you have?
22       A.  We have -- you know, many, many years,
23  going back to, like, my whole time at Centerview,
24  and even before then in my life, I have been
25  involved in the writing of the firm's

Page 26

J. Vicari - Confidential
1
2  antidiscrimination, antiharassment policies, and I
3  have been a member of the team where if that has --
4  if someone raises a concern, the -- if someone
5  raised a complaint or a concern that someone has, I
6  would be part of that committee to assess and
7  investigate those complaints or concerns.
8        Q.  Have you taken any classes in what the
9  law requires when an employer considers a request
10  for a reasonable accommodation?
11       A.  We have worked with outside counsel --
12       MS. SKIBITSKY: I just want to interrupt
13       and instruct the witness not to reveal any
14       privileged communications with counsel.
15       You may proceed.
16       A.  We have conducted with outside counsel
17  numerous in-person anti -- workplace conduct.
18       I consider workplace conduct to encompass
19  antidisparagement, antiharassment, antidiscrimination
20  policies as one fulsome topic.
21       I have been part of the team coordinating
22  with outside counsel on -- that were brought in to
23  do in-house training for both employees and for
24  management across all of our offices globally, and I
25  have been, you know, both in that -- those training

Page 27

J. Vicari - Confidential
1
2  classes, and part of the committee that has, you
3  know, ultimately approved and coordinated with
4  outside counsel to design the training classes we
5  have our different employees do.
6        I have also done, more recently, some
7  things with on-line products to do -- to see various
8  types of what I call workplace conduct training
9  modules that you have people do on-line.
10       Especially post the pandemic, with people
11  being in various places and trying to utilize on-line
12  capabilities more, I think it's -- I think that the
13  days of getting everyone in one room are -- so
14  having segments, like, ten segments, where we take
15  the total and divide it by ten, and that is however
16  many people get into the room, that's -- I think
17  those days are gone.
18       So we have broadened that scope of
19  training to include on-line training modules from
20  various vendors, and we have -- I have been part of
21  those.  I have done those trainings and I have also
22  been part of the process of evaluating those modules.
23       Q.  During your training, have you ever heard
24  the phrase "interactive process"?
25       A.  I do not recall, per se.

Page 28

J. Vicari - Confidential
1
2        Q.  Do you know what the phrase "interactive
3  process" means with respect to an employee
4  requesting a reasonable accommodation?
5        A.  Yes.
6        Q.  What is your understanding of what an
7  "interactive process" is?
8        A.  I would say it's working with all of the
9  parties to work towards a -- you know, a mutually
10  workable situation.
11       Q.  Is that something you understand the law
12  to require an employer to do when considering a
13  request for a reasonable accommodation?
14       MS. SKIBITSKY: Objection.
15       Q.  You can answer.
16       A.  In my line, that is something that I
17  always do whether it's in the law or not.
18       Q.  After this conversation that you had with
19  Cheryl Robinson, what happened next with respect to
20  Kate Shiber?
21       MS. SKIBITSKY: Objection.
22       A.  Cheryl did talk to Tony, and the place
23  we thought was the best place to end up at was that
24  we needed to put in a very simple rule that -- she
25  was averse to leaving an active job, and she was

Page 29

1    J. Vicari - Confidential
2  averse to there being conversations about her
3  situation.
4         We felt that we needed to just take
5  everything that she said and schedule -- put out a
6  blackout period for the period she said she needed,
7  which, I believe, was 12:00 to 8:00, or 12:00 to
8  9:00, and just stick with that, and that is what we
9  needed to do.
10        Tony and Cheryl, I think, had a follow-up
11  phone call with Kate, and I was told that that was
12  going to be put in place for the weekend, and we
13  were going to monitor that, and see how that goes.
14     Q.  Do you recall when the decision was made
15  to limit Kate's hours?
16     A.  I believe the same night.
17     Q.  Did you ever hear the phrase "guardrails"?
18     A.  Yes.
19     Q.  How did you first hear the phrase
20  "guardrails" with respect to this request from Kate?
21     A.  Cheryl would use that term a lot as a --
22  to include the -- to include the steps that we are
23  going to try and take -- that we are willing to take
24  to work towards -- again, trying to figure out how
25  we are going to honor this request, and make -- and

Page 30

1    J. Vicari - Confidential
2  work with -- and enable the team to still work and
3  provide client service.
4         So Cheryl uses that term -- whatever were
5  the steps that we have decided to take, Cheryl will
6  often use the word "guardrails" to encompass or
7  cover the steps that we are taking.
8     Q.  Did she ever use the term "guardrails"
9  with respect to any other type of accommodation?
10     MS. SKIBITSKY:  Objection.
11     A.  As I recall, yes.
12     Q.  Do you remember what the situation was
13  where she used that phrase previously?
14     A.  When we have had a situation where
15  someone has said -- we had one situation where
16  someone was going to resign.  They felt that they
17  had -- they, you know, had gone to the doctor, and
18  they said they were under stress, and they wanted to
19  resign.
20         We encouraged that person to take -- as a
21  guardrail, we said, "Don't do anything hastily.  We
22  are not accepting your resignation.  Take some time
23  to deal with your medical situation, and let's
24  reserve all comments and decisions until a later
25  date.  Let us know how it's going.  Take some time

Page 31

1    J. Vicari - Confidential
2  off."
3         We have had situations where people had,
4  you know, family situations at home, and, you know,
5  a lot of our juniors -- our largest office is the
6  New York office, and lots of our juniors did not
7  grow up in New York City, and they will have family
8  and home life all over -- all over the country, and
9  from other countries, as well, and people have needed
10  to -- you know, will say -- you know, used the term
11  "guardrails" and said, "Listen, go deal with" --
12  "take some time for that and" -- you know, the
13  various steps that we have taken between giving them
14  time off, between letting them work remotely,
15  between -- you know, some have gone out on an actual
16  leave, trying to cover those steps that we have taken
17  to try to resolve the situation and work toward a --
18  again, so that we -- so that we ultimately end up in
19  a place that works.
20     Q.  So the guardrails that you are talking
21  about now from prior occasions dealt with time off
22  and working remotely, correct?
23     MS. SKIBITSKY:  Objection.
24     A.  Time off, working remotely, you know,
25  leaves, you know, FMLA time, you know, all of those

Page 32

1    J. Vicari - Confidential
2  things, yes.
3     Q.  Leaves and FMLA time are time off,
4  correct?
5     A.  Yes.
6         Ultimately, that may be where we landed,
7  but Cheryl -- I believe Cheryl uses that as a pet
8  phrase to cover ultimately all -- whatever steps we
9  are going to employ.
10     Q.  Has the phrase "guardrails," to your
11  knowledge, ever previously been used with respect to
12  an employee's hours of work?
13     A.  No.
14     Q.  You said earlier that you would always
15  ask for a doctor's note.
16         Do you recall that?
17     A.  Yes.
18     Q.  Would you request a doctor's note if an
19  employee wanted a sit-stand desk?
20     A.  We did.
21     Q.  Would you request a doctor's note if an
22  employee wanted physical therapy or wanted time off
23  to go to physical therapy?
24     A.  Yes, we would.
25     Q.  Who was involved in the decision to limit

Page 33

1    J. Vicari - Confidential
2 Kate's hours so she could sleep?
3    A. I believe it was Cheryl, myself, and Tony
4 that initial night, the initial Friday night.
5    Q. And that was determined on that Friday
6 night?
7    A. Yes.
8    Q. When you say, "Friday night," do you
9 recall what time it was?
10    A. I do not recall what time it was.
11    Q. Do you recall if it was before or after
12 6:00 p.m.?
13    A. I cannot specifically recall.
14    Q. Had you spoken to anybody besides Cheryl
15 and Tony regarding this accommodation before the
16 decision was made?
17    A. I did not speak to Tony that night.
18    Cheryl did speak to Tony that night.
19    I do not recall anyone else being involved
20 in any way, shape, or form other than the three of
21 us.
22    Again, she requested that we could not
23 talk about it to anyone else.
24    Q. "She" meaning who?
25    A. Kate had, as I understood it, said that

Page 34

1    J. Vicari - Confidential
2 she did not want anyone else being told. She did
3 not want to be taken off any active clients. She
4 just needed to her sleep protected to -- she
5 used the words "to sleep consistently every night."
6    Q. Just to be clear, did you speak to Robert
7 Pruzan on August 28, 2020 about Kate Shiber?
8    A. No.
9    Q. Did you speak with Kate on August 28,
10 2020?
11    A. I did not.
12    Q. How did you know Kate did not want anybody
13 else to be told about what she spoke to Cheryl about?
14    A. From Cheryl.
15    Q. What did Cheryl say with respect to that?
16    A. I think Cheryl -- as I was made aware of
17 the need for her to sleep and not be able to work
18 late hours, I believe Cheryl just said that -- you
19 know, I was, like, you know, the team needs to know,
20 and she was, like, she doesn't want anyone on the
21 team to know. She doesn't want anyone being told.
22    Q. Do you recall what specifically Kate
23 didn't want people to know?
24    A. Anything.
25    Anything about anything. The reason why

Page 35

1    J. Vicari - Confidential
2 or not the reason why.
3    It was just that she needed -- as I
4 recall, she wanted Cheryl to advocate for her, and
5 protect her from being able to -- from being on call
6 or available late hours.
7    Q. Did you speak at all to Kate on August 28,
8 2020?
9    A. No.
10    Q. Were you skeptical at all about what Kate
11 was asking for?
12    A. Not at all.
13    Q. She had just started as a first-year
14 analyst, correct?
15    A. Yes.
16    Q. Did you ever think maybe she just wasn't
17 aware of what the hours were expected to be?
18    A. Not at that time.
19    Q. Did you have any skepticism that Kate's
20 request was disingenuous?
21    A. No.
22    Q. Did you think that the accommodation of
23 setting these hours so she could sleep was reasonable
24 at the time?
25    MS. SKIBITSKY: Objection.

Page 36

1    J. Vicari - Confidential
2    A. It wasn't about reasonableness.
3    It was about what do we do.
4    So with the limited knowledge we had,
5 based upon the request that she had made, we did the
6 best we could to do something to make sure that she
7 wasn't, you know, available in the hours
8 or at a time when she would be off-line.
9    Q. Did you think that the accommodation that
10 you, Tony Kim, and Cheryl Robinson had come up with
11 would be successful?
12    MS. SKIBITSKY: Objection.
13    A. I felt it was the best thing to do to
14 honor her request, at least in the near term.
15    I would not conclude on anything in the
16 long term.
17    Q. Did you think that it would work in the
18 short term?
19    A. Yes, in that she would not be called upon
20 after hours and that there would be a hard stop.
21    By that definition it would work because
22 they were told they would not contact her.
23    The other team members were told there
24 was a blackout here, and this was a blackout here
25 for her to have sleep in those hours.

Page 37

1          J. Vicari - Confidential
2     Q.  The employees would have been told not to
3  contact Kate during those specific hours, correct?
4     A.  I believe they were told it was an HR
5  decision, and that Kate would be off-line from
6  12:00 a.m. to 8:00 a.m.
7         I think it was eight hours or nine, eight
8  or nine, I don't remember the hours, so from 12:00
9  to 8:00 a.m. or 12:00 to 9:00 a.m.
10     Q.  So Kate's coworkers were spoken to about
11  not contacting her during those specific hours,
12  correct?
13     A.  Tony communicated -- Tony Kim communicated
14  to the team that there would be blackout hours, if
15  you will, for Kate.
16     Q.  Kate was not averse to Centerview
17  contacting her coworkers about the hours they could
18  contact her, correct?
19        MS. SKIBITSKY:  Objection.
20     A.  I did not speak to Kate.
21     Q.  It would have been impossible for Kate to
22  obtain the accommodation she was requesting if
23  Centerview could not speak to anybody about that,
24  correct?
25     A.  Given the dynamics of the way deal teams

Page 38

1          J. Vicari - Confidential
2  work, I do not believe it could possibly have been
3  achieved without the deal team being told.
4     Q.  Was it your understanding that Kate was
5  averse to the deal team being told anything?
6     A.  Yes.
7     Q.  Do you know if Kate became upset that the
8  deal team was told anything?
9     A.  I did not speak to Kate, so I don't
10  really, honestly know.
11     Q.  So it was your understanding that Kate
12  wanted to have eight to nine hours a night to sleep,
13  and to not be interrupted by her coworkers, but she
14  didn't want her coworkers to be told not to interrupt
15  her?
16     A.  Right.
17     Q.  That is impossible, right?
18        MS. SKIBITSKY:  Objection.
19     A.  It's a difficult situation, and we did
20  the best we could to get to a better -- an answer
21  that at least protected Kate at face value.
22        We believed she needed these hours, and
23  we were trying to do what we could to get there.
24     Q.  Did you ever say to Kate Shiber that what
25  she was asking for was impossible?

Page 39

1          J. Vicari - Confidential
2     A.  I don't believe I ever said that.
3     Q.  Isn't it true that what Kate didn't want
4  her coworkers to know was that she had a medical
5  condition that required her to sleep?
6        MS. SKIBITSKY:  Objection.
7     A.  I believe so, but, again, I did not speak
8  to Kate myself.
9     Q.  Do you know what hours Kate was working
10  at the time she went to speak to Cheryl Robinson?
11     A.  I only know what Kate had reported.
12     Q.  And you know that from what Cheryl told
13  you, correct?
14     A.  No.
15        I knew that because I went into the
16  staffing system to see what she had reported.
17     Q.  What had she reported?
18     A.  I don't recall.
19        I have not looked at that in three years.
20  I have no idea right now.
21     Q.  Was that staffing system iStaff?
22     A.  Yes.
23     Q.  What you saw at the time, did that
24  corroborate or refute what Kate was saying to you?
25        MS. SKIBITSKY:  Objection.

Page 40

1          J. Vicari - Confidential
2     A.  I don't think she had said anything
3  about -- I don't recall her -- I don't recall being
4  told that she had said anything about her hours, you
5  know, in -- in the context of this, you know, request
6  for an advocate.
7     Q.  Do you recall Cheryl talking to you at
8  all about what hours Kate reported she was being
9  asked to work?
10     A.  No.
11     Q.  Was she working at 1:30 in the morning?
12     A.  I don't know.
13     Q.  Do you recall what Kate was actually
14  doing for Centerview in August of 2020?
15     A.  I recall having looked into the staffing
16  system, and I saw that she had been assigned to two
17  -- two initial projects that were not -- A, they
18  were not live deals, and, B, they did not seem to
19  have a lot of workload being given out to her.
20        The third assignment she had just been
21  given was actually a very live situation, and it
22  seemed to be -- in my mind, she was now being -- she
23  was on her first live deal, and it was going to be a
24  lot of hours.
25        I don't know who did what when, but I

Page 41

J. Vicari - Confidential

1 know live deals are a lot of hours, from my 30 years
2 of experience.
3       Q. Was the live deal that Kate was assigned
4 particularly complex and busy, or was it pretty
5 standard across the board for Centerview?
6       MS. SKIBITSKY: Objection.
7       A. We have a wide range of experiences on a
8 wide range of clients, and I don't think it was
9 atypical in any way based upon what I assessed the
10 situation to be.
11      Q. Was this a particularly busy deal?
12      A. At the time it was busy, yes.
13      Q. I understand that it was busy at the
14 time.
15          Was it unusually busy?
16      A. Not unusually busy for a live deal.
17      Q. Was there any discussion about removing
18 Kate from this project notwithstanding her desire to
19 remain on it?
20      A. It never become a fulsome conversation
21 because she had said she did not want to be taken
22 off of it.
23      Q. When Kate said she did not want to taken
24 off of this project, you said, "Well, then, we are

Page 42

J. Vicari - Confidential

1 not doing it," right?
2       MS. SKIBITSKY: Objection.
3       A. We were trying the best we could to meet
4 her request.
5       Q. If it had been best for Centerview to
6 remove her from the project as a first-year analyst
7 who had been there a little over a month, you would
8 have done that, correct?
9       A. Not without talking to the senior team
10 members and knowing what was going on.
11      Q. You would not have jeopardized this deal
12 because Kate wanted to sleep, right?
13      A. I don't think it was a question of
14 jeopardizing the deal.
15      Q. Did you ever think that Kate's involvement
16 on this deal would jeopardize Centerview's ability
17 to perform on that deal?
18      A. Can you repeat the question?
19      Q. Certainly.
20          Did you ever think that Kate's assignment
21 to that deal after August 28, 2020 put that deal in
22 any type of jeopardy?
23      A. I did not think that it would jeopardize
24 the deal.

Page 43

J. Vicari - Confidential

1       Q. Do you recall learning how many times
2 Tony or Cheryl spoke with Kate about her need for an
3 accommodation?
4       A. I don't know.
5       Q. I believe you said Tony Kim told the staff
6 about Kate having time off each night to sleep,
7 correct?
8       A. I believe Tony told the active deal team
9 that she was assigned to that she would need to be
10 off-line from 12:00 a.m. to 8:00 a.m., and that HR --
11 it was an HR decision.
12      Q. How do you know that Tony told them that?
13      A. That is the update I got from Cheryl
14 after Cheryl had talked to Tony, and I believe that
15 the two of them had talked to Kate, and that he was
16 going to do that, and I believe that is -- you know,
17 and that is why I believe that was done.
18      Q. How many conversations do you understand
19 that Tony and Cheryl had with Kate?
20      MS. SKIBITSKY: Objection; asked and
21 answered.
22      A. I don't know.
23      Q. Do you recall if Kate was asked if this
24 plan was acceptable to her?

Page 44

J. Vicari - Confidential

1       A. I believe that there was a conversation --
2 I understood that there was a conversation, and I
3 think she was initially, you know, resistant to the
4 idea of Tony being brought into the loop, and Cheryl
5 explained to her who Tony -- Tony's wider role in
6 the firm, not just on that deal team, and why he
7 would be -- as luck would have it, having him on
8 that deal team was good because he is one of the key
9 partners overseeing professional development, banker
10 development, so it was actually good, and that is
11 why, you know, we needed to bring him into the loop;
12 that he just wasn't another partner on another
13 client, he was actually a member of management of
14 the firm.
15          So I know that there was conversation
16 about that with Kate, and that Tony and Cheryl then
17 proceeded to have a conversation with Kate.
18      Q. What makes you say that you believe that
19 Kate was against bringing Tony into the conversation?
20      A. From what Cheryl said about her not
21 wanting to get anyone involved, and then Cheryl -- I
22 believe Cheryl went back to her and talked to her
23 about it, and she was initially resistant to the
24 idea, and then came around and understood better

Page 45

J. Vicari - Confidential
1  J. Vicari - Confidential
2  about Tony's role and why we were recommending that
3  that be the course of action.
4  Q. Did you ever speak to the staff about
5  Kate's accommodation?
6  MS. SKIBITSKY: Objection; vague.
7  A. I never spoke to the deal team that Kate
8  was working on. I never spoke to that deal team
9  assigned to that live situation.
10  I did not speak to Tony that initial
11  night. I did not -- I did speak -- I may have -- I
12  don't really honestly recall, but either Cheryl or I
13  reached out to the team member that was assigned --
14  that was in charge of assigning Kate, her staffer,
15  if you will, which was one gentleman, and, again, I
16  think we said that you cannot put her on anything
17  else right now, there is an HR situation, and we
18  need to -- before you think about putting her on
19  anything else, you need to talk to us.
20  I think from what I said -- I don't recall
21  with specificity -- I do know one of us reached out
22  to her staffer, which internally is how we do things.
23  There is one person from the staffing team assigned
24  to each class, and that person is the person who we
25  need brought into the loop.

Page 46

1  J. Vicari - Confidential
2  Q. Do you recall who that person was?
3  A. Will Stewart.
4  Q. Is there somebody named Karn Chopra?
5  K-a-r-n  C-h-o-p-r-a.
6  A. I know Karn. He is a senior member of
7  the staffing team.
8  Q. Does he report to Will Stewart?
9  A. I'm sorry, what was that?
10  Q. Does he report to William Stewart?
11  A. Karn is more senior than Will Stewart.
12  Karn oversaw more of the entire staffing
13  team.
14  Q. What about Susannah Coltman?
15  A. Susannah -- her nickname is "Sannah" --
16  Sannah is also a senior member of the staffing team.
17  So Karn would be higher than Sannah, and
18  Will would be, you know, lower than both of them.
19  Q. Was there any concern that Tony asking to
20  not staff Kate on other projects would go against
21  Kate not wanting anybody to know that she went to HR?
22  A. Can you repeat the question?
23  Q. Certainly.
24  Were you aware that Tony was going to
25  tell the staff not to put Kate on any other projects?

Page 47

1  J. Vicari - Confidential
2  MS. SKIBITSKY: Objection;
3  mischaracterizes testimony.
4  A. Ultimately, if there was a -- ultimately,
5  the staffing team would need to know about any HR
6  concerns, and it would not -- there may have -- I
7  believe that there were other times in the past when
8  HR told the staffing team -- and I cannot get
9  into -- I don't recall who, what, when, it's not --
10  it's a big team, it's a big job, and we take it very
11  seriously, and we try to do our best to make sure
12  that we -- you know, that each person has a staffer
13  to go to, and the staffer will coordinate with the
14  bigger staffing team on the right matrix of who,
15  what, when on any staffing assignment, so it would
16  be impossible to not update the staffing team that
17  we had an HR concern that we were working with.
18  It does not mean she would never be
19  staffed on another job again. That was not what we
20  were -- that is not what was happening.
21  Q. Did you think that on September 1st that
22  Kate's career at Centerview could continue?
23  A. On September 1st, yes.
24  Q. You had said that this was a decision that
25  would not be made until you received further

Page 48

1  J. Vicari - Confidential
2  information; is that correct?
3  A. Well, yes.
4  Q. What further information were you waiting
5  for?
6  A. Specifically, a doctor's note.
7  Q. Was there anything else besides a doctor's
8  note that you were waiting for?
9  A. Well, we were going to monitor the
10  staffing situation to make sure that that was
11  working.
12  So it was looking for feedback about how
13  this -- how this schedule we had figured -- on Friday
14  night, for better or worse, we went with what we
15  thought was the best thing to do, and we were looking
16  to see how that worked out with the team on that
17  client engagement.
18  Q. Do you know if anybody told the team that
19  Friday night to treat Kate at all differently over
20  the weekend?
21  A. I do not believe that was done or said at
22  all.
23  Q. Let me show you a document and ask you
24  about it.
25  MS. SKIBITSKY: Can I ask that we take a

Page 49

1      J. Vicari - Confidential
2    break if this is an appropriate stopping
3    point?
4        MR. HELLER:  Can I just get this document
5    done?
6        If you need a break --
7        MS. SKIBITSKY:  That is fine.
8        MR. HELLER:  I was going to take a break,
9    as well.
10       I don't think I am going to be very long.
11       (Plaintiff's Exhibit 7 placed on shared
12    screen.)
13    Q.  This has been previously marked as
14    Plaintiff's Exhibit 7.
15       It is a series of e-mails from August 31st
16    and September 1st, and there is an e-mail from you
17    to Cheryl Robinson that says, "Fyi - Seems the team
18    did a good job giving her space over the weekend."
19       Do you remember what that is from?
20    A.  I don't understand the question, do I
21    remember what that is from.
22    Q.  Do you remember what this means, "seems
23    the team did a good job giving her space over the
24    weekend"?
25    A.  I have -- again, I have access to many

Page 50

1      J. Vicari - Confidential
2    things as chief operating officer, and one of them
3    is our compliance e-mail system.
4        So I believe I had monitored e-mails, and
5    I was -- and I had been looking to make sure that
6    there were no e-mails or things being sent to her,
7    you know, on the -- you know, during the blackout
8    period that we had set up, and that it did not seem
9    that there were any.
10       So I believe what she meant there was that
11    the team honored the blackout period that we had set
12    up.
13    Q.  And you came to that conclusion based on
14    monitoring the e-mails?
15    A.  I -- yes.
16    Q.  Finally, there are two attachments here,
17    KS02.pdf and KSO1.pdf.
18       Do you recall what those attachments were?
19    A.  No.
20 RQ     MR. HELLER:  I am going to request copies
21    of the attachments.
22       Let's take a break.
23       Do you want to take ten minutes?
24       MS. SKIBITSKY:  Yes.
25       Thank you.

Page 51

1      J. Vicari - Confidential
2        MR. HELLER:  That will take us to 10:38.
3        Off the record.
4        (Discussion off the record.)
5        (Short recess taken from 10:28 a.m. to
6    10:39 a.m.)
7        MR. HELLER:  Back on the record.
8        I am going to show you a document that I
9    will be marking as Plaintiff's Exhibit 22.
10       It is in the chat and I will share my
11    screen, as well.
12       (Plaintiff's Exhibit 22, one-page
13    printout of e-mails, the top e-mail dated
14    9/1/2020, 2:06:04 PM, to Cheryl Robinson and
15    Tony Kim, from Jeanne Vicari, Bates stamped
16    No. Centerview_000325, marked for
17    identification, as of this date.)
18       (Plaintiff's Exhibit 22 placed on shared
19    screen.)
20    BY MR. HELLER:
21    Q.  Plaintiff's Exhibit 22 is an e-mail that
22    says it was sent by you to Cheryl Robinson and Tony
23    Kim on September 1, 2020, and it is Bates stamped
24    Centerview 325.
25       Please take a look at it, and let me know

Page 52

1      J. Vicari - Confidential
2    once you have had a chance to review it.
3    A.  I have read it.
4    Q.  You write here, "Per email I saw, I
5    believe she has 3 hour doc apt tomorrow (she emailed
6    Matt)."
7        How did you see an e-mail that Kate sent
8    to Matt?
9    A.  Again, I have access to our compliance
10    system, and as part of our compliance system we have
11    e-mails, and we are required by our regulators to
12    retain all e-mails.
13       I was monitoring her e-mails back and
14    forth to make sure that there was nothing that -- no
15    red flags that we needed to address.
16       I had seen her e-mail to -- I believe
17    it's Matt Gailea.
18       Maybe it was Matt Baron.  I don't recall.
19    Q.  Did you ever speak with Matt Gailea about
20    Kate Shiber?
21    A.  No.
22    Q.  Did you ever speak with Tim Ernst about
23    Kate Shiber?
24    A.  No.
25    Q.  Did you ever speak with Emily Patrick

Page 53

1       J. Vicari - Confidential
2 about Kate Shiber?
3     A. No.
4     Q. Did you ever speak with Matt Baron about
5 Kate Shiber?
6     A. No.
7     Q. I am going to show you what has previously
8 been marked as Plaintiff's Exhibit 18, which is
9 another relatively short e-mail.
10     (Plaintiff's Exhibit 18 placed on shared
11 screen.)
12     Q. Please take a look at this and let me
13 know once you have had a chance to review it.
14     My question will be, have you ever seen
15 this document.
16     A. I have read it.
17     What was the question?
18     Q. This is an e-mail from Tim Ernst to Kate
19 Shiber on August 28, 2020.
20     Have you ever seen this e-mail before?
21     A. I don't specifically recall, but I may
22 have on that day, that Friday, the 28th, when I
23 was -- when Cheryl alerted me to the situation.
24     Q. But you don't remember one way or the
25 other whether you saw this?

Page 54

1       J. Vicari - Confidential
2     A. No.
3     Q. Going back to Plaintiff's Exhibit 7, the
4 e-mail about giving Kate space over the weekend, I
5 have one further question.
6     Did you ever have a conversation with
7 anyone about the team giving Kate space over the
8 weekend?
9     A. Outside of Cheryl and Tony, no.
10     Q. Did you speak with Cheryl and Tony about
11 giving Kate space over the weekend?
12     A. I spoke to Cheryl on Friday, and Cheryl
13 spoke to Tony.
14     The following week we were -- you know,
15 afterwards, at some point I did speak to Tony about
16 it.
17     Q. Going into that weekend from Friday,
18 August 28th --
19     A. I did not speak to anyone other than
20 Cheryl.
21     Q. When you spoke with Cheryl on August 28th,
22 was there a discussion about giving Kate space over
23 the weekend?
24     A. It was about setting up the time frame to
25 black out for her to sleep, and that is what I mean

Page 55

1       J. Vicari - Confidential
2 by -- "space" and "blackout period" are the same
3 thing to me.
4     MR. HELLER: I am going to show you
5 another document.
6     This will be Plaintiff's Exhibit 23.
7     I have placed it in the chat and I am
8 going to share my screen.
9     (Plaintiff's Exhibit 23, three-page
10 document, the first page being printout of
11 e-mails, the top e-mail dated 9/2/2020,
12 11:48:06 AM, to Jeanne Vicari, from Cheryl
13 Robinson, with attachments, Bates stamped
14 Nos. Centerview_000185 through
15 Centerview_000187, marked for identification,
16 as of this date.)
17     (Plaintiff's Exhibit 23 placed on shared
18 screen.)
19 BY MR. HELLER:
20     Q. Plaintiff's Exhibit 23 is an e-mail dated
21 September 2, 2020, from Cheryl Robinson to you
22 forwarding a letter of medical necessity. It's
23 Bates Nos. Centerview 185, 186, and 187.
24     Please take a look at this, and let me
25 know when you have had a chance to review it.

Page 56

1       J. Vicari - Confidential
2     A. I have read it.
3     Q. Do you recall receiving this e-mail on
4 September 2, 2020?
5     A. Yes.
6     Q. I am going to look at the actual doctor's
7 letter.
8     Was there any new information that you
9 received as a result of this doctor's letter?
10     A. Yes.
11     Q. What was the new information that you
12 received?
13     A. That she is at significant risk for
14 exacerbation of her illness if she does not maintain
15 a regular sleep schedule.
16     Q. Did you already know that she had an
17 illness?
18     A. I knew that she said -- I don't know
19 whether -- I don't recall with specificity as to why
20 I thought it was a health issue on Friday, but I
21 wasn't -- we told her to get a doctor's note, and
22 she was getting a doctor's note, so I assumed that
23 it was health related.
24     Here we are saying, you know, that there
25 is significant risk, which I did not understand

Page 57

1         J. Vicari - Confidential
2    there to be significant risk before.
3         Q. What did you think that it was before if
4    not significant risk?
5         A. She said she needed it, so we were
6    honoring it.
7         I did not know -- I still don't know -- I
8    still don't know what actually the medical illness
9    is, but putting her at significant risk of
10    exacerbating the condition, that's different to me.
11         Q. Did you have any questions because of
12    this doctor's letter?
13         MS. SKIBITSKY: Objection.
14         A. I don't recall.
15         Q. You had already agreed upon a regular
16    sleep schedule for Kate at the time that you received
17    this letter, correct?
18         MS. SKIBITSKY: Objection.
19         A. We had implemented a step, a -- we had
20    implemented a blackout period for Kate before.
21         Q. So did it make any difference to you when
22    you learned from this letter that she was at
23    significant risk if she didn't get that, meaning did
24    that change anything for you?
25         MS. SKIBITSKY: Objection.

Page 58

1         J. Vicari - Confidential
2         A. The risk of something happening to Kate,
3    who was working from home and outside of our view,
4    was significant, and I did not think that it -- she
5    needed it, but I did not understand it to be a
6    significant risk to her well-being until this note
7    came in.
8         Q. What changed because you learned that she
9    was at significant risk if she didn't get a regular
10    sleep schedule, which you had already agreed upon?
11         MS. SKIBITSKY: Objection.
12         A. Previously she had said she needed it.
13         Okay, she needs it. We are going to do
14    what we can. We are going to honor it. Here we go.
15         The following week we get this note from
16    a medical professional that says she is at
17    significant risk.
18         It just heightened -- in my view, that is
19    a heightened risk that I wasn't aware of before.
20         Q. And did you do anything because you
21    learned of that heightened risk?
22         A. I don't recall doing anything
23    specifically.
24         Q. Did you view Kate differently because you
25    learned that she would be at significant risk if she

Page 59

1         J. Vicari - Confidential
2    didn't get to sleep?
3         A. No.
4         Q. So is it fair to say that although you
5    learned that she was at significant risk, that that
6    didn't affect the situation in any way?
7         MS. SKIBITSKY: Objection.
8         A. For me I -- what was that?
9         For me I believe it was just that this
10    situation was going to be an ongoing situation.
11         Q. Had you thought this would be a temporary
12    situation?
13         A. I didn't know.
14         I hadn't made any decision.
15         Q. Are employees at Centerview allowed to
16    sleep?
17         MS. SKIBITSKY: Objection.
18         A. Yes.
19         Q. Are employees at Centerview allowed to
20    sleep every night?
21         MS. SKIBITSKY: Objection.
22         A. I don't know what all employees do every
23    night.
24         Q. But as a policy, does Centerview allow
25    its employees to sleep every night?

Page 60

1         J. Vicari - Confidential
2         A. We have no policy that would prevent them
3    from sleeping every night.
4         Q. Is it an undue burden on Centerview to
5    allow an employee to sleep every night?
6         MS. SKIBITSKY: Objection.
7         A. On any given night, if someone is assigned
8    to an active situation and they walk off the job in
9    the middle of an active situation, their team members
10    are going to feel that burden, yes.
11         Q. So --
12         A. Any given night I have no way of
13    predicting what -- I am not involved and HR is not
14    involved in monitoring every live situation every
15    night.
16         Q. So is the baseline that employees should
17    not expect to sleep every night --
18         MS. SKIBITSKY: Objection.
19         Q. -- or should employees expect generally
20    that they will be allowed to sleep every night?
21         MS. SKIBITSKY: Objection.
22         A. Can you repeat the question?
23         Q. Certainly.
24         MR. HELLER: Susan, would you read that
25    back, please.

Page 61

J. Vicari - Confidential
1
2          (Question read.)
3      A. I don't know what you mean by "baseline,"
4  but I think, generally speaking, employees think
5  they will be able to sleep, but there will be times
6  when they may not get as much sleep as they do every
7  other night.
8      Q. How often are employees at Centerview
9  expected to go without sleep?
10     A. That is not a -- that is not something
11  that I can answer.
12     Q. Does Centerview have any policies about
13  employees sleeping?
14     MS. SKIBITSKY: Objection; asked and
15     answered.
16     MR. HELLER: I don't think that I ever
17     asked that one.
18     Q. You can answer.
19     A. Does --
20     Q. I will rephrase it.
21         Does Centerview have any written policies
22  that determine when employees are allowed to sleep,
23  or is there something that tells them they have to
24  sleep a certain number of hours, or something else?
25     A. We have no policy about -- we have no

Page 62

J. Vicari - Confidential
1
2  policies on employees' sleeping requirements or the
3  prevention of sleeping.
4      Q. Do you keep track of how often employees
5  are required to forgo sleep because of their duties
6  at Centerview?
7      A. No.
8      Q. Are employees at Centerview encouraged to
9  sleep each night?
10     A. They are not encouraged to sleep or not
11  sleep.
12         I don't know of any firm that has an
13  encouragement policy about sleep.
14     Q. Does Centerview have any policies that
15  govern employees' health, beyond health insurance,
16  any policies that dictate living a healthy lifestyle?
17     A. We encourage work-life balance, and that
18  is part of the dynamic that the staffing team is
19  charged with, and that is why we have staffers at
20  all levels, to be more in tune with things.
21         We break down -- we break down the
22  bankers so that everyone has a staffer, and that
23  staffer is available to them, and if there is any
24  concern about -- if there is any concern about sleep
25  or lack of sleep, given a client situation, that

Page 63

J. Vicari - Confidential
1
2  would be something where staffers are generally
3  brought into the loop, and that is something that
4  the PDC monitors and evaluates.
5          There are also mechanisms for employees
6  to self-report, if there are any concerns about
7  that, through their workload forms, and whatnot.
8          That is the way that people have, more
9  often than not, raised flags when they felt they
10  needed to.
11     Q. Did Kate raise a flag when she spoke to
12  Cheryl Robinson?
13     MS. SKIBITSKY: Objection.
14     A. I believe Kate did not raise a flag when
15  she filed her workload form shortly before speaking
16  to Cheryl, but after speaking with -- in speaking to
17  Cheryl she voiced a concern about needing an
18  advocate and an accommodation.
19         I don't know that I would classify that
20  as a flag in and of itself.
21     Q. When you say she said she needed an
22  advocate, what do you mean?
23     A. Those were her words, not mine.
24         She said that she needed an advocate.
25     Q. How do you know that that is what Kate

Page 64

J. Vicari - Confidential
1
2  said?
3      A. That is what Cheryl had told me.
4      Q. I am going to show you what has been
5  marked as Plaintiff's Exhibit 11.
6          (Plaintiff's Exhibit 11 placed on shared
7      screen.)
8      Q. Plaintiff's Exhibit 11 is Kate's first
9  e-mail to Cheryl where she wrote, "I may need
10  accommodations and do not feel comfortable advocating
11  for myself so I would really appreciate your help on
12  this."
13         Is that what Cheryl relayed to you, that
14  Kate did not feel comfortable advocating for herself?
15     A. I don't know.
16     Q. You had said before that Centerview
17  encourages work-life balance.
18         Does that include sleep?
19     A. Yes.
20     Q. Is there any concern that an employee's
21  work will deteriorate if they don't get sufficient
22  sleep?
23     A. Yes.
24     Q. How is that sentiment conveyed to
25  employees, if at all?

Page 65

J. Vicari - Confidential

1        J. Vicari - Confidential
2        A.  It's typical for deal teams to -- they
3   know their workload.  They know what's going on.
4   They are the ones who kind of say, "We need to
5   get" -- they kind of self-manage themselves, both
6   the workload and their own situation, and that is --
7   they have -- they will raise concerns about not
8   being able to get work done, and that is how -- that
9   is -- more often it is not typical for -- it's not
10  typical for HR or an administrative function to get
11  in the middle of that because the team actually
12  has -- we would generally be brought in if there was
13  a concern raised by the deal team, who are at the
14  front line of that monitoring and awareness.
15        Q.  Do you tell managers and staff to
16  self-monitor, or is that something that you just
17  expect is happening?
18  
23        So I believe between staffing and the PDC
24  that that is communicated, but it's not communicated
25  by HR, per se.

Page 66

1        J. Vicari - Confidential
2        Q.  What is the "PDC"?
3        A.  It is the Professional Development
4   Committee.
5        Q.  Do you know if the PDC issues any type of
6   written guidance regarding self-monitoring?
7        A.  I do not believe they issue anything.
8        Q.  You talked before about a prior individual
9   who came in, and Centerview did not accept their
10  resignation, and offered them more time as an
11  accommodation.
12        Was that person complaining about the
13  hours required to work?
14        A.  No.
15        Q.  Have you heard of any stories of employees
16  sleeping in the office at Centerview?
17        A.  What do you mean by "stories"?
18        Q.  Have you ever heard of any employee of
19  Centerview sleeping in the office because they did
20  not have the time to go home?
21        A.  I have heard of that over my 40 years of
22  experience, yes.
23        Q.  How often has that happened?
24        A.  I -- it has happened, but I do not profess
25  to know every time it has happened, but I would say

Page 67

1        J. Vicari - Confidential
2   it has probably been a handful of times maybe per
3   year.
4        Q.  Has that been discouraged or encouraged,
5   or has the company not taken any position on it, or
6   something else?
7        MS. SKIBITSKY:  Objection.
8        A.  It has not been encouraged.
9        Again, I believe that the deal teams
10  self-regulate that.
11        Q.  What makes you believe that the deal
12  teams self-regulate that?
13        A.  Because I have seen numerous e-mails and
14  whatnot between team members, and they are, like, "I
15  am going to go home now."
16        They take their turns going home.
17        I have seen many cars, where people have
18  taken cars home at, you know, early morning hours,
19  and they are -- they will say, like, "I'm going home
20  to shower and change," or whatever, and they will
21  take a car back in after they have a few hours to go
22  home, shower, change, and come back.
23        Again, in the workload forms I have seen
24  there's -- you know, we have certain flags that we
25  have put into that system so that people say how

Page 68

1        J. Vicari - Confidential
2   many hours they have -- you know, if they say they
3   are working a lot of hours over the weekend, or they
4   have a lot of hours in total for the week, there are
5   certain flags that go up, and the staffer who is --
6   the staffer -- their staffer will reach out to them
7   and talk to them about what is going on.
8        If they file this on Thursday, their
9   staffer will talk to them on Friday, before the
10  weekend.
11        So there are certain things that we have
12  done, and it's not in writing, but there are certain
13  things that we just do as a firm, and we do our best
14  to monitor those situations.
15        Staffers have come to us if they think
16  something has risen -- raised a flag, and they think
17  we need to protect this person, they need to get time
18  off, we are going to make them take time off, we are
19  going to make them do something, that -- that
20  happens, and that is why I think that it's not
21  unheard of, but I can't speak to every time.
22        Q.  What is the number of hours that triggers
23  Centerview to speak to an employee about how much
24  work they have done?
25        A.  I think that is different for every level

Page 69

J. Vicari - Confidential
1
2  of person, and I think that the staffers know better
3  than me what they actually do with that.
4      Q.  Did you ever compare Kate Shiber's hours
5  to the hours of other first-year analysts at the
6  time?
7      A.  No.
8      Q.  I am going to now show you what has been
9  marked as Plaintiff's Exhibit 12.
10      (Plaintiff's Exhibit 12 placed on shared
11      screen.)
12      Q.  Plaintiff's Exhibit 12 is a series of
13  e-mails.
14         You can look at the whole exhibit, of
15  course, but I am only going to ask you about the one
16  e-mail here from Tim Ernst to Tony Kim on
17  September 2nd, and I am going to ask you if you have
18  seen that e-mail before.
19      A.  I've read it.
20      Q.  Have you ever seen this e-mail before,
21  from Tim Ernst to Tony Kim on September 2nd?
22      A.  Yes.
23      Q.  When did you see it?
24      A.  I don't recall the exact date or time.
25      Q.  Was it before Kate Shiber was terminated

Page 70

J. Vicari - Confidential
1
2  from Centerview or was it after?
3      A.  Before.
4      Q.  You never spoke with Tim about this,
5  correct?
6      A.  Correct.
7      Q.  Did you ever speak with Tony Kim about
8  this e-mail?
9      A.  About the e-mail, no.
10      Q.  Did you ever speak to anybody about this
11  particular e-mail?
12      A.  No.
13      Q.  Did you ever speak to Robert Pruzan about
14  this e-mail?
15      A.  No.
16      Q.  You have talked about the hours that are
17  self-reported in iStaffing.
18         Do you trust those hours to be correct?
19      A.  It's not my place to trust those hours or
20  not trust those hours.
21         We take those hours at face value for
22  what people say that they are doing.
23      Q.  Do you think that employees are
24  misrepresenting in iStaffing the number of hours
25  they work?

Page 71

J. Vicari - Confidential
1
2      A.  I don't have an opinion on that.
3      MR. HELLER:  I am going to show you a
4  document that I will be marking as
5  Plaintiff's Exhibit 24.
6         It is in the chat and I will share my
7  screen, as well.
8         (Plaintiff's Exhibit 24, two-page
9      printout of e-mails, the top e-mail on the
10      first page dated 9/8/2020, 11:07:19 PM, to
11      Jeanne Vicari and Cheryl Robinson, from
12      Jeanne Vicari, Bates stamped Nos.
13      Centerview_002860 and Centerview_002861,
14      marked for identification, as of this date.)
15         (Plaintiff's Exhibit 24 placed on shared
16      screen.)
17  BY MR. HELLER:
18      Q.  Plaintiff's Exhibit 24 is two pages,
19  Bates Nos. 2860 to 2861.
20         The top e-mail is from Jeanne Vicari to
21  herself on September 8, 2020.
22         Please let me know when you have had a
23  chance to look at it.
24      A.  I have read it.
25      Q.  What is this document?

Page 72

J. Vicari - Confidential
1
2      A.  An e-mail.
3      Q.  This is you forwarding to yourself a
4  series of e-mails from about a year earlier, correct?
5      A.  They were forwarded to myself and Cheryl.
6      Q.  Fair enough.
7         You are forwarding a series of e-mails
8  about how Kate Shiber's resume came to Centerview;
9  is that correct?
10      A.  Yes.
11      Q.  It also appears to be a screenshot
12  identifying the interviews that Kate had when she
13  was hired; is that correct?
14      A.  It is the schedule for how many days Kate
15  interviewed, yes.
16      Q.  What made you forward this to yourself on
17  September 8, 2020?
18      A.  I don't recall the reason why anymore.
19      Q.  What happened between September 2nd and
20  September 8, 2020 when you forwarded this to yourself
21  and to Cheryl?
22      MS. SKIBITSKY:  Objection; vague.
23      Q.  If anything.
24      A.  We were continuing to monitor the
25  situation.  That is what was happening.



Page 73

1       J. Vicari - Confidential
2       Q.  And what had you uncovered as a result of
3   your monitoring?
4       A.  That the doctor's note had come in, and
5   that Kate's health continued to be at substantial
6   risk due to some illness that she had, and that the
7   deal team was having -- the situation with that
8   client did not die down, it appeared to be very
9   active, and the deal team -- the blackout period for
10  Kate was becoming increasingly difficult for the
11  deal team to work and manage around.
12      Q.  How did you learn that?
13      A.  I believe I had talked to Tony, and in
14  general the staffing -- and I was generally aware
15  that the deal team was having more difficulty.
16          I do not remember exactly who I spoke to
17  when and why, but it was -- it was Cheryl, me, and
18  Tony.
19          Tony was the main source of the feedback
20  from the deal team.
21      Q.  When did you speak to Tony?
22      A.  I don't recall the dates or times.
23      Q.  Are you sure you spoke to Tony about how
24  the deal team was handling the blackout period?
25      A.  I am fairly positive I spoke to Tony.

Page 74

1       J. Vicari - Confidential
2       Q.  Is there anything in writing between you
3   and Tony regarding the blackout period?
4       A.  I don't know.
5       Q.  Was Tony working in the office at that
6   time or was he working remotely?
7       A.  I don't honestly recall, but if I had to
8   guess, I would say he may have been still home.
9       Q.  I will tell you that I am going to ask
10  you not to guess.
11      A.  Okay.
12          Then I don't recall.
13      Q.  Okay.
14
18          What does that mean?
19      MS. SKIBITSKY:  Objection to the extent
20  that it mischaracterizes the document.
21      Q.  If I have mischaracterized it, please
22  correct me.
23
25      A.  This was her -- Kate's interview schedule

Page 75

1       J. Vicari - Confidential
2   for when she had a mini-day -- our terminology for a
3   small group coming in to interview.
4
20      Q.  Do you recall if you had spoken with Tony
21  Kim about the blackout period before or on September
22  8th of 2020, since September 2nd?
23      A.  I don't recall.
24      Q.  I am going to show you what has been
25  previously marked as Plaintiff's Exhibit 15.

Page 76

1       J. Vicari - Confidential
2       (Plaintiff's Exhibit 15 placed on shared
3       screen.)
4       Q.  Plaintiff's Exhibit 15 is e-mails from
5   September 11th of 2020.
6           Please take a look at them, and let me
7   know once you have had a chance to review them.
8           There is nothing to scroll through, so it
9   should be fine, but if you want me to put it in the
10  chat, I am certainly happy to.
11      A.  I have read the e-mails.
12      Q.  You sent an e-mail to Amanda Kosowsky and
13  Cheryl Robinson that says, "Read about the black
14  helmet," right?
15      A.  Yes.
16      Q.  What was Amanda Kosowsky's role at this
17  time?
18      A.  Amanda Kosowsky is my house -- one of my
19  in-house lawyers.
20      Q.  What was the "black helmet"?
21      A.  I believe it was a site.
22          The blackout -- the black helmet was -- I
23  believe there was a picture of Kate bearing a black
24  helmet, and it referenced that she wears it because
25  of concussions.

Page 77

1      J. Vicari - Confidential
2      Q. Why did you send this to Amanda and
3 Cheryl?
4      A. I believe I thought that Kate, you know,
5 had an issue with concussions.
6      Q. When did you learn that?
7      A. That day.
8      Q. Did you think that the concussions might
9 have caused the need for her to sleep consistently?
10      A. Yes.
11      Q. Were you Googling Kate?
12      A. Sure.
13      Q. Why?
14      A. Monitoring the situation.
15      Q. How was your Googling Kate monitoring the
16 situation?
17      A. In my efforts to understand the overall
18 situation better.
19      Q. Did your discovery of the concussions
20 change the way that you viewed Kate at all?
21      A. No.
22      Q. Did it make you perceive the significant
23 risk that she faced if she didn't get sleep
24 differently at all?
25      A. No.

Page 78

1      J. Vicari - Confidential
2      Q. Amanda Kosowsky responded to you and
3 cited another website, and you responded, "I've now
4 decided this site was her college application."
5      What did that mean?
6      A. As I recall, the site was a little -- a
7 couple of years old, and had not been updated, so in
8 my mind I thought it was just a site that she had
9 built as part of her college education.
10      The timing of when that was done and the
11 things that were posted on it, I kind of dismissed
12 it as a site that was just about a college
13 application, given the timing.
14      Q. Did you question the legitimacy of that
15 website?
16      A. No.
17      Q. Did you think that she had manufactured
18 that website to bolster her college application?
19      A. No.
20      I think it was just part of getting a
21 bit -- I thought -- I felt that it was just a site
22 that she put together to better present herself in
23 a -- to the admissions boards of universities.
24      Q. What made you think that it had something
25 to do with her college application rather than just

Page 79

1      J. Vicari - Confidential
2 that she had not updated it since high school?
3      A. It was just about the timing.
4      It was put up, and there was not much
5 posted on it, and then it had -- it was put up, a
6 couple of things were posted on it, and then it had
7 not been touched since, so I kind of just dismissed
8 it as something that was just for her college
9 application.
10      Q. Did you discuss either of these websites,
11 the katsails.com or the blackhelmet.com, with anybody
12 else besides Amanda Kosowsky and Cheryl Robinson?
13      A. No, I don't believe so.
14      Q. Did you discuss them with Tony Kim or
15 Robert Pruzan?
16      A. No.
17      Q. Who made the decision to terminate Kate
18 Shiber?
19      A. Ultimately, it was my decision.
20      Q. When you say, "ultimately," were there
21 other people involved in the decision?
22      A. There was a monitoring process that we
23 had put in place, and we had continued to do so, and
24 we were receiving feedback from the deal team about
25 how it was going, and we had the doctor's note saying

Page 80

1      J. Vicari - Confidential
2 that she was at significant risk of exacerbating an
3 existing illness.
4      Those things were all part of the process
5 that we went through, and ultimately I decided that
6 at that point this was an unsustainable situation,
7 we could not -- we could not afford to -- we could
8 not deal with this situation in a way that -- in a
9 long-term fashion anymore.
10      Q. I know that it was ultimately your
11 decision.
12      Who else was involved in the decision?
13      A. I believe it was my decision.
14      Q. Who did you talk to to arrive at that
15 decision?
16      A. In the end there are conversations
17 internally with senior members of the PDC and HR,
18 and, in fact, Amanda is our in-house legal.
19      Q. When you say, "senior members of the
20 PDC," who were they?
21      A. Tony Kim and Robert Pruzan.
22      Q. What was Tony Kim's involvement in the
23 decision to terminate Kate Shiber?
24      A. The decision was mine, and that is what I
25 believe I said.

Page 81

1        J. Vicari - Confidential
2        One of the things that the decision was
3 based upon was feedback from the team and the PDC,
4 so I -- I had spoken to Tony and Robert as part of
5 the PDC, and gotten information from them that --
6 Tony is part of the PDC, and he is -- he was a
7 senior partner on the deal team, and as part of that
8 process of gathering information and monitoring the
9 situation, I had spoken to Tony Kim.
10       Q. Did you ever speak with Tony Kim about
11 the decision to terminate Kate Shiber?
12       A. Before the decision was made?
13       I did not, no.
14       Q. Did you speak with Cheryl Robinson about
15 the decision before it was made?
16       A. Yes.
17       Q. How many times?
18       A. I don't recall.
19       Q. Was it more than once?
20       A. Yes.
21       Q. Do you remember when that was?
22       A. I don't recall.
23       Q. Was anybody else present when you spoke
24 with Cheryl Robinson?
25       A. I don't recall.

Page 82

1        J. Vicari - Confidential
2        Q. Did you speak with Robert Pruzan about
3 the decision to terminate Kate Shiber before the
4 decision was made?
5        A. No.
6        Q. Was there a meeting where you, Robert
7 Pruzan, and Cheryl Robinson arrived at the decision
8 to terminate Kate Shiber?
9        A. I would not characterize any meeting that
10 I ever had with Cheryl and Robert as such.
11       Q. Are you aware that Cheryl Robinson has
12 testified that the decision to terminate Kate Shiber
13 was made at a meeting between you, Robert Pruzan,
14 and herself?
15       A. No, I have no -- I know nothing about
16 Cheryl's deposition.
17       Q. Do you disagree with that statement, that
18 the decision to terminate Kate Shiber was made at a
19 meeting between you, Robert Pruzan, and Cheryl
20 Robinson?
21       A. Again, I would not characterize any
22 meeting I had with Cheryl and Robert as such.
23       Q. So you disagree with her?
24       A. I disagree with the characterization that
25 you have given me of what you say that she said. I

Page 83

1        J. Vicari - Confidential
2 don't know.
3        Q. When was the decision to terminate Kate
4 Shiber made?
5        A. At the end of the week before she was
6 terminated.
7        Q. I am going to represent to you that she
8 was terminated on September 15th of 2020, which was
9 a Tuesday.
10       Is it your testimony that she was let go
11 the prior Friday?
12       I'm sorry, is it your testimony that the
13 decision to let her go was made the prior Friday?
14       A. I believe that I had come to that
15 decision by the end of the week before.
16       Q. The prior Friday was September 11th of
17 2020.
18       Is it your testimony that you made the
19 decision to terminate Kate on the same day as your
20 e-mails with Amanda Kosowsky and Cheryl Robinson
21 about the concussions?
22       A. It is my testimony that I had come to
23 that conclusion by the end of that week.
24       If that Friday was September 11th, and if
25 that is the same day as the e-mails, it is what it

Page 84

1        J. Vicari - Confidential
2 is.
3        Q. Had you made the decision to terminate
4 Kate Shiber before or after you learned about her
5 history of concussions?
6        A. I can't -- I don't know the hour, to be
7 honest with you.
8        Q. Did the fact of your learning about Kate's
9 history of concussions play any role in your decision
10 to terminate Kate's employment?
11       A. No.
12       Q. Did you need any approval to terminate
13 Kate's employment?
14       A. As the chief operating officer, all
15 administrative functions report to me, including HR,
16 legal, and no, I do not need anyone else's approval.
17       Q. Did you, nevertheless, advise Robert
18 Pruzan about your decision to terminate Kate's
19 employment?
20       A. I may have told him.
21       I don't recall with specificity, but I
22 probably did tell him.
23       Q. How many times did you speak to Robert
24 Pruzan about Kate Shiber?
25       A. Two or three times maybe.

Page 85

1        J. Vicari - Confidential
2        Q.  Did you ever talk to him about the pros
3  and cons of terminating Kate Shiber's employment?
4        A.  I don't think I would have -- I don't
5  think that I spoke to him about the pros and cons of
6  terminating her employment.
7        Q.  You say that you don't think you would
8  have.
9        Do you recall --
10       A.  I do not recall having ever spoken to
11 Robert Pruzan about the pros and cons of Kate
12 Shiber's termination.
13       Q.  Did you ever consider that terminating
14 Kate a little over two weeks after she had asked for
15 a reasonable accommodation and provided a doctor's
16 note might create the appearance of disability
17 discrimination?
18       MS. SKIBITSKY:  Objection.
19       A.  I considered many things.
20       Q.  Like what?
21       A.  Monitoring the situation and having
22 feedback from the team after the accommodation was
23 put in place, or the guardrail was put into place,
24 or the blackout period was put into place, or however
25 you want to characterize it.

Page 86

1        J. Vicari - Confidential
2        We considered the actual doctor's note,
3  which said there is a very serious risk to Kate's
4  health -- existing health issue being exacerbated,
5  amongst other -- you know, the feedback, the
6  monitoring, how it was all going and whatnot.
7        Q.  Did you also consider the fact that firing
8  Kate so soon after her request might create the
9  appearance of discrimination?
10       A.  Yes.
11       Q.  And the decision was made to terminate
12 her anyway?
13       A.  Yes.
14       Q.  Can you understand how someone could look
15 at Kate's termination and think that it was motivated
16 by disability discrimination?
17       MS. SKIBITSKY:  Objection.
18       A.  Not to me.
19       Q.  Do you understand how someone who is not
20 you might look at the situation and think that that
21 creates the appearance of discrimination?
22       MS. SKIBITSKY:  Objection; calls for
23 speculation, improper hypothetical.
24       A.  Not to me.
25       Q.  The decision to terminate her was up to

Page 87

1        J. Vicari - Confidential
2  you, correct?
3        A.  Yes.
4        Q.  And you decided to terminate her
5  notwithstanding that it could create the appearance
6  of discrimination, right?
7        MS. SKIBITSKY:  Objection.
8        A.  I made the decision to terminate her,
9  terminate Kate, based upon the monitoring that we
10 had been doing of the situation over those couple of
11 weeks, and the inability to sustain that situation
12 any longer.
13       Q.  Did something happen that made you realize
14 that it could not be sustained any longer?
15       A.  I do not believe there was any one thing
16 that happened.
17       Q.  What made you realize, "We can no longer
18 sustain this"?
19       A.  It was not going to be a short-term
20 situation.  It was going to be a long-term situation.
21 It was going to be -- it was based upon the fact
22 that we did have to bring additional team members
23 onto the deal team because Kate needing to be
24 off-line consistently every night was -- did impact
25 the staffing situation, and the ability of Kate to

Page 88

1        J. Vicari - Confidential
2  contribute to the team was being negatively impacted
3  because she was not able to be given tasks because
4  there was no certainty as to when things were going
5  to happen, and how long will it take, and whatnot,
6  and the fact that she -- the fact that she had said
7  that she didn't -- she wanted to be on the active
8  deals, she didn't want to be coming off of them, she
9  didn't -- this was the one case in point that we
10 had, and it was not working out the way that
11 everyone hoped it would work out, and she was
12 insistent on being staffed on active deals and did
13 not want anyone to be told anything.
14       It was a hardship for everyone, and I did
15 not see the ability to actually sustain the situation
16 and be able to protect -- give her what she wanted,
17 put her on active deals and protect her sleep every
18 night.
19       I did not think that was -- they were not
20 compatible.
21       Q.  What made you think -- first of all, we
22 are talking about Kate sleeping at night, right?
23       MS. SKIBITSKY:  Objection.
24       Q.  In your mind, the issue that was not
25 sustainable was Kate sleeping every night, right?

Page 89

J. Vicari - Confidential

1      J. Vicari - Confidential
2     A. The issue that was not sustainable was
3  the blackout period being honored by the deal team.
4     Q. The blackout period was from midnight to
5  9:00 a.m., right?
6     A. Yes.
7     Q. Do you sleep every night?
8     MS. SKIBITSKY: Objection.
9     Q. You sleep every night, correct?
10    A. I get some sleep every night.
11    Q. Is employees sleeping an undue burden for
12  Centerview?
13    A. Employees sleeping is not an undue burden
14  for Centerview.
15    Q. Was Kate's need for consistent sleep an
16  undue burden?
17    A. Kate's request for uninterrupted sleep
18  every night, coupled with her request that she be
19  kept on live situations, coupled with her request
20  not to have anyone told anything about her situation
21  was an unsustainable situation for the firm.
22    Q. Did you ever think that Kate might be okay
23  with being taken off live deals if it was that versus
24  terminating her?
25    A. I did not think of the equation that way

Page 90

1      J. Vicari - Confidential
2  at the time.
3    Q. So if you had taken Kate off of live
4  deals, and if you had told coworkers why Kate needed
5  to sleep, would that have permitted you to grant Kate
6  the blackout period?
7    MS. SKIBITSKY: Objection.
8    A. There were a lot of "ifs" to that
9  question, so --
10    Q. You mentioned three things.
11    You said that you could not keep her on
12  live deals, coupled with not telling people why.
13    If you had taken away those two things,
14  was there a place for Kate at Centerview?
15    A. That place would probably not be -- it
16  would not be the same experience that all of the
17  analysts in the analyst program -- it's not the same
18  job anymore.
19    Q. Did you make that decision for Kate?
20    MS. SKIBITSKY: Objection.
21    A. I did not make any decisions for Kate.
22    Q. Did you ever talk to Kate about your
23  concerns regarding the blackout period?
24    A. No.
25    Q. You said before that you always do an

Page 91

1      J. Vicari - Confidential
2  interactive process.
3     Did you do an interactive process with
4  Kate?
5    A. I believe there was an interactive
6  process with Kate with regard to her accommodation
7  request.
8    There was not with regard to her
9  termination.
10    Q. Did you ever talk to Kate about the
11  concerns that you had regarding the blackout period
12  before you made the decision to terminate her?
13    A. No.
14    Q. Why not?
15    A. I don't recall.
16    Q. Were you aware that Kate had told Cheryl
17  Robinson that she did not want to be treated
18  differently because of her medical condition?
19    A. Yes.
20    Q. By making the decision that she could not
21  continue in the analyst program, weren't you treating
22  Kate differently because of her disability?
23    A. I made the decision that the firm could
24  not sustain the situation.
25    Q. You made that decision based on three

Page 92

1      J. Vicari - Confidential
2  factors: your monitoring of the situation, the
3  feedback from the deal team, and the note from the
4  doctor talking about a significant risk of
5  exacerbating her medical condition, right?
6    A. Yes.
7    Q. What was your monitoring of the situation?
8    A. There was a growing understanding that
9  this was a long-term situation.
10    The doctor's note was, you know, pretty
11  hard and fast that she cannot -- she needs to sleep
12  every night for nine hours, and that she was at
13  substantial risk if that was not done, and the
14  ability to make sure that that happened every day
15  for 365 days for a three-year period was not
16  something that we could -- that we were comfortable
17  that we would always be able to guarantee.
18    She wanted to be put on live deals, and
19  that was going to be a hardship every time if --
20  it's impossible to predict the hours when -- even
21  when things are not live, things become live, and
22  it's all unpredictable.
23    It would be too hard to manage that
24  process. It was not -- there was no predictable way
25  to manage that process long term.

Page 93

1          J. Vicari - Confidential
2          That is what we learned after monitoring
3    it for a couple of weeks, it becomes a problem.
4          If she is not able to be given certain
5    tasks to follow through on and own, that is not the
6    way that -- that is not going to be a sustainable
7    situation.
8          Q. Who told you that the blackout period was
9    a problem?
10         A. I learned it was a problem after
11   monitoring the situation, and all of the factors
12   that I have already discussed.
13         Q. When you say, "monitoring the situation,"
14   what were you doing?
15         A. Didn't I just answer that?
16         Q. I believe you said you don't remember if
17   you spoke to Tony --
18         A. I think I said that we continued to get
19   feedback from the team, we continued to see that it
20   was not working out, that she was not able to perform
21   the duties of a first-year analyst because she was
22   not able to get tasks and learn tasks because the
23   timing was unpredictable, and there was no way to
24   predict in live situations -- you cannot predict
25   what is going to be needed when, and that proved to

Page 94

1          J. Vicari - Confidential
2    be -- I felt that that proved to be an unsustainable
3    situation, needing to be able to protect her having
4    consistent sleep over 365 days a year for three
5    years, and to have her working on live situations.
6          Q. Is that based on your perception of things
7    or is that based on actual feedback from actual
8    people, and if it was from actual people, then who?
9          MS. SKIBITSKY: Objection.
10         A. It was based upon feedback that I had
11   gathered as a result of monitoring the situation,
12   the --
13         Q. What does that mean?
14         MS. SKIBITSKY: Brian, you need to let
15   Ms. Vicari finish her answer.
16         This is the third or fourth time you
17   have interrupted the witness.
18         MR. HELLER: I am getting the same canned
19   answer every time, and every time I try to
20   scratch the surface of it, I am getting the
21   same canned answer.
22         I understand that she was monitoring the
23   situation.
24         MS. SKIBITSKY: Brian, let's take a break.
25         MR. HELLER: How was she monitoring the

Page 95

1          J. Vicari - Confidential
2    situation?
3          MS. SKIBITSKY: Brian, let's take a break.
4          Q. From whom was this feedback?
5          I would like you to answer that before
6    we take a break.
7          MS. SKIBITSKY: Brian, you were getting
8    an answer until you interrupted the witness.
9          MR. HELLER: I disagree with that.
10         MS. SKIBITSKY: Brian, we need to take a
11   break.
12         MR. HELLER: No.
13         I just asked a question.
14         There is a pending question. I would like
15   an answer to it.
16         MS. SKIBITSKY: Brian, we need to take a
17   break.
18         MR. HELLER: I don't want you to give her
19   the answer when we are on a break.
20         I think it's fair for me to get an answer
21   to this question and then we can take a break.
22         I promise you that I will not ask a
23   follow-up question.
24         MS. SKIBITSKY: You can feel free to ask
25   her what was discussed on a break, but I feel

Page 96

1          J. Vicari - Confidential
2    that everybody needs a break right now.
3          The witness is not being treated properly
4    right now.
5          You are interrupting her answer and that
6    is not acceptable in this situation.
7          Let's take a break.
8          Please go off the record.
9          MR. HELLER: You are the one preventing
10   her from answering this question.
11         Q. Ms. Vicari, you are capable of answering
12   the question, right?
13         MS. SKIBITSKY: Brian, let's just take a
14   break.
15         We need to take a break.
16         Please respect this request.
17         MR. HELLER: Will you represent to me
18   that you will not talk to her about the
19   answer to this question on the break?
20         MS. SKIBITSKY: Yes, I will represent
21   that to you.
22         MR. HELLER: All right.
23         Do you want to come back at noon?
24         MS. SKIBITSKY: Yes.
25         MR. HELLER: Do you want to take a full

Page 97

1        J. Vicari - Confidential
2    ten minutes?
3        MS. SKIBITSKY:  Let's take ten minutes.
4        MR. HELLER:  All right.
5        We will take ten minutes.
6        Off the record.
7        (Discussion off the record.)
8        (Short recess taken from 11:50 a.m. to
9    12:00 p.m.)
10       MR. HELLER:  Back on the record.
11       MS. SKIBITSKY:  For the record,
12   Centerview is designating the entirety of
13   Ms. Vicari's deposition transcript, including
14   the exhibits, as confidential pursuant to
15   the protective order.
16       MR. HELLER:  Would you read back the
17   pending question, please.
18       (Question read.)
19   A.  So as part of monitoring the situation,
20   we had been gathering information from the deal
21   team, and that information was observing e-mails,
22   and having feedback from Tony over time, and knowing
23   that the staffing team put another staff person on
24   the job.  That is one thing.
25       The other thing that was heavily weighted

Page 98

1        J. Vicari - Confidential
2    was the doctor's note that said that Ms. Shiber is
3    at substantial risk of exacerbating an existing
4    illness, something like that, I don't remember
5    verbatim.
6        Those things coupled together led me,
7    Jeanne Vicari, with 30 years of experience in this
8    industry, to make the ultimate decision that this
9    was not a sustainable situation, and, therefore, we
10   would be terminating Kate Shiber.
11       Q.  Were you concerned that Kate continuing
12   to work at Centerview could cause harm to her because
13   of her medical condition?
14       A.  Yes.
15       Q.  How did you think Kate continuing to work
16   at Centerview might result in causing harm to her?
17       A.  We were monitoring the situation, and as
18   time went on, if she stayed at Centerview and was
19   put on other situations that became live, the ability
20   for new deal teams and new people who were working
21   with Kate to protect that blackout period over the
22   three years, in my opinion, was unsustainable in the
23   end.
24       Q.  Was Kate fired for her own good?
25       MS. SKIBITSKY:  Objection.

Page 99

1        J. Vicari - Confidential
2        A.  I believe Ms. Shiber's employment -- the
3    decision to terminate was based upon an unsustainable
4    situation that we found ourselves in.
5        Q.  And was part of the reason that that
6    situation was unsustainable was that continued
7    employment would, in your mind, be detrimental to
8    Kate's well-being?
9        A.  Yes.
10       Q.  Did you consider talking to Kate about
11   how much sleep she really needed?
12       A.  I did not view that doctor's note as
13   being negotiable.
14       Q.  Did you ever consider speaking to Kate's
15   doctor to find out what was really required versus
16   what was negotiable?
17       A.  I would honestly never do that.
18       I think it would be a violation of her
19   HIPAA rights if we did do something like that.
20       Q.  If you had asked for Kate's permission,
21   then that would not be a HIPAA violation, right?
22       MS. SKIBITSKY:  Objection.
23       It calls for a legal conclusion.
24       A.  Again, I think that it was -- I took
25   that doctor's note at face value for what it was

Page 100

1        J. Vicari - Confidential
2    worth.
3        It was very clear, and I did not think
4    that anything about that note was negotiable.
5        Q.  You said that you were observing e-mails.
6        Do you recall which e-mails you saw?
7        A.  No.
8        Q.  Do you --
9        A.  E-mails that centered around the fact
10   that a staff person had to be put on it; that
11   centered around the difficulty of Kate getting up to
12   speed, including Mr. Ernst's e-mail that you put up
13   on the screen a little while ago.
14       It was just all of those things together,
15   and I do believe I spoke to Tony about how things
16   were going with the team, which also reinforced what
17   was in the e-mails that I had observed.
18       Q.  You said that you felt this was not
19   sustainable for the future, correct?
20       A.  Yes.
21       Q.  It had been about two weeks since the
22   blackout period had started, right?
23       A.  Yes.
24       Q.  Did you think that maybe you were being a
25   bit hasty in deciding that Kate's entire employment

Page 101

1    J. Vicari - Confidential
2 would not work after two weeks?
3    A. No.
4    Q. Was it based on your view of what actually
5 happened or your perception of what would happen?
6    A. It was based upon my view of what was
7 actually happening, including getting that doctor's
8 note.
9    Q. When you say, "that doctor's note," you
10 are talking about your own concern for Kate's
11 well-being?
12    A. No.
13    I was talking about the doctor's note,
14 and it saying that there was substantial risk of
15 exacerbating the illness.
16    Q. But that sentiment comes from your concern
17 for Kate's well-being, right?
18    A. Yes.
19    Q. So if I understand this correctly, you
20 faced a choice of either putting Kate in a position
21 where she could increase the risk to herself, or
22 putting her in a position where she did not have the
23 first-year analyst experience; is that correct?
24    MS. SKIBITSKY: Objection.
25    A. I do not -- I do not agree with that

Page 102

1    J. Vicari - Confidential
2 equation, as you have phrased it.
3    Q. Were there more options?
4    How did you see this?
5    I hear two options from what you are
6 saying.
7    Is there something else out there?
8    MS. SKIBITSKY: Objection.
9    A. Again, Kate had communicated that she
10 wanted to be on the best active deals.
11    She wanted to be -- you know, not have
12 team members know.
13    We had a doctor's note confirming that
14 she consistently needed to have eight to nine
15 uninterrupted hours of sleep every night.
16    All of those things, coupled with the
17 reality of what it is to work on live deals at
18 Centerview or at any -- I think at any investment
19 bank, but certainly at our firm -- those were all
20 incompatible situations that could not be sustained
21 for a three-year analyst program.
22    Q. Did you ever weigh not putting Kate on
23 live deals, despite the fact that she wanted to work
24 on live deals, with terminating her?
25    A. Did I --

Page 103

1    J. Vicari - Confidential
2    Q. Let me rephrase that.
3    Did you ever consider removing Kate from
4 live deals as an alternative to terminating her?
5    A. Again, many things were considered, but
6 in the end even non-live deals can turn into live
7 deals, and even if we did try that I don't know that
8 that would have been sustainable either.
9    I don't believe that it would be
10 sustainable.
11    Q. And what is that based on?
12    A. Thirty years of experience in watching
13 deals with clients.
14    Even with clients that are called coverage
15 clients or house accounts, where we have done a lot
16 of regulatory stuff with them all throughout the
17 years, there come times when a solicited offer that
18 they get is -- when the situation becomes live.
19    Even house accounts or private accounts
20 can turn into live accounts.
21    There is no predictability as to when a
22 specific situation becomes, you know, live hours,
23 demanding, sprints instead of marathons, if you
24 will. It's unpredictable.
25    All that unpredictability, I decided, was

Page 104

1    J. Vicari - Confidential
2 unsustainable to protect her in the long run, to
3 protect that blackout period over a long, three-year
4 period.
5    Q. Does every live deal mean that the
6 employees working on that deal do not sleep?
7    A. No.
8    Q. You said that there was a new staffing
9 person that was brought onto the project, correct?
10    A. Correct.
11    Q. Did you ever consider that maybe the
12 project had not been staffed adequately before Kate
13 joined?
14    A. No.
15    Q. Kate had been at Centerview for a little
16 over a month, right?
17    A. Yes.
18    Q. The person who was brought onto the deal
19 was a second-year analyst, correct?
20    A. Yes.
21    Q. Did you ever consider that Kate was only
22 providing limited value anyway?
23    A. A first-year analyst on their first live
24 deal, is their contribution, you know, as you kind
25 of called it, more limited, and that I would expect

Page 105

1      J. Vicari - Confidential
2  her to be able to provide more on her second
3  transaction or her third transaction?
4      They learn, yes.
5      So the first real job they get put on, is
6  it going to be less of a contribution than what they
7  are hopefully providing down the road?
8      Yes, and that is not unusual.
9      What would be unusual -- I mean, yes, we
10 talked about having to put an analyst 2 on the job.
11     There was an analyst 3 on the job, and
12 Kate was an analyst 1.
13     To have three analysts on one job would
14 be -- I have never seen three analysts on one job,
15 an analyst 1, 2, and 3, we have never done that
16 before.
17     Q. Did you ever consider that the analysts
18 who were assigned to that were not working in a very
19 efficient manner?
20     A. The analyst 3 that happened to be on the
21 account was a very high-performing analyst 3.
22     The feedback received, you know, was that
23 he was, you know, working very hard and performing
24 at a very high level.
25     Q. When Kate was selected for the first-year

Page 106

1      J. Vicari - Confidential
2  analyst program, she was one of thousands of
3  candidates, correct?
4      A. We have tens of thousands of resumes that
5  we get applying for our analyst program.
6      Q. So there are tens of thousands of resumes
7  for about 30 spots, right?
8      A. Uh-huh.
9      Q. Yes?
10     A. Yes.
11     Q. After two weeks of the blackout period,
12 you decided that Kate would not be able to perform
13 in that role, correct?
14     A. Yes.
15     MR. HELLER:  I am going to show you a
16 document previously marked as Plaintiff's
17 Exhibit 21.
18     This is an invite that was sent to Kate
19 for a meeting on September 15th of 2020.
20     (Plaintiff's Exhibit 21 placed on shared
21 screen.)
22     Q. Do you see that?
23     A. Yes.
24     Q. Is this the meeting where Kate was
25 terminated?

Page 107

1      J. Vicari - Confidential
2      A. Yes.
3      Q. Where were you when this meeting took
4  place?
5      A. I believe I was home when that meeting
6  took place.
7      Q. Did you have any kind of talking points
8  that you read from during the meeting with Kate?
9      A. I did not read from any talking points.
10     I did have talking points.
11     Q. This is the meeting where Kate was
12 terminated, correct?
13     A. Uh-huh.
14     Q. Sorry, you have to answer verbally.
15     A. I'm sorry.
16     Yes.
17     Q. Do you recall any prior discussions with
18 Kate before this meeting on September 15th of 2020?
19     A. I did not have any prior conversations
20 with Kate.
21     Q. Do you recall if you ever spoke to Kate
22 about her outside business activities?
23     A. I do not recall having a conversation with
24 Kate about her outside business activities.
25     Q. Were you aware that she had been granted

Page 108

1      J. Vicari - Confidential
2  permission to do outside business activities?
3      A. I don't really remember that now, but I
4  think -- as I think about it, I do recall something
5  about that she was an artist, or something like that,
6  that she loved painting or photography or something
7  like that sounds familiar to me now.
8      Q. Did that play any role in the decision to
9  terminate Kate Shiber?
10     A. No.
11     Q. Did you ever speak to any of Kate's
12 medical providers --
13     A. No.
14     Q. -- about anything?
15     A. No.
16     Q. So the record is clear, my question was,
17 did you ever speak to any of Kate's medical
18 providers about anything.
19     A. No.
20     Q. Did anything that Kate said to a doctor
21 while she was in college play any role in the
22 decision to terminate Kate's employment?
23     A. No.
24     Q. Who wrote the talking points that you had
25 received?

1      J. Vicari - Confidential
2      A. I believe --
3         MS. SKIBITSKY: I am just going to caution
4   the witness to not reveal any privileged
5   communications.
6         MR. HELLER: And the question does not
7   ask for any privileged communications.
8         If it's a lawyer, I don't think that is
9   privileged, but if it involves her saying what
10  a lawyer said to her, or what she said to a
11  lawyer, then I don't want to know the answer.
12     Q. Do you recall who wrote the talking
13  points?
14     A. I believe I got them from my internal
15  legal department who spoke to outside counsel, but I
16  was not a party to those conversations.
17     Q. What happened during the meeting with
18  Kate on September 15th of 2020?
19     A. She joined the Zoom call, and I told her
20  that her employment was being terminated effective
21  immediately, and that the decision was irrevocable.
22        I believe she kind of yelled out or gasped
23  or something like that.
24        Someone entered her room that she was in.
25  They were not on camera.

1      J. Vicari - Confidential
2         She proceeded to say, you know, something
3   like, you know, she would not be able to get a job,
4   she was -- and I reminded her that the way her
5   employment was kind of -- that her interest in
6   joining Centerview was escalated by a referral from
7   someone who had employed her as a summer -- the
8   previous two summers or, like, two previous periods,
9   who had said that they would hire her back at any
10  time.
11        So I know that I said, you know, she
12  can -- "Your previous employer said that they would
13  hire you at any time. I don't believe you have no
14  future of any employment."
15        I do know that I told her that the -- you
16  know, her -- you know, her -- the job was going to
17  require her to be available, you know, not -- it was
18  not every day, every night, no one sleeps, but that
19  there are times in live situations where it is -- it
20  is unpredictable, and the ability to protect this
21  blackout period for her was not going to be
22  sustainable over a three-year analyst program.
23        I believe Kate offered to rescind her
24  accommodation request, and I reiterated that we
25  would not be able to do that given the doctor's note

1      J. Vicari - Confidential
2   that said there was a very serious risk here, that
3   we were not going to ignore that doctor's note.
4         I don't know -- I don't think that I
5   recall anything else off the top of my head.
6      Q. So the first time you spoke with Kate
7   about your concerns regarding the blackout period
8   she offered to have the blackout period removed,
9   correct?
10     A. I was not talking to Kate about my
11  concerns about -- you know, I was talking to Kate in
12  connection with the termination of her employment.
13     Q. When Kate offered to remove the blackout
14  period, that was relevant in your mind, correct?
15        MS. SKIBITSKY: Objection.
16     A. Relevant to what?
17     Q. To the decision to terminate her
18  employment.
19     A. It was not relevant to the decision to
20  terminate her employment.
21     Q. Did you anticipate that she would offer
22  to not follow the blackout period?
23     A. No.
24     Q. Why did you tell her at the beginning of
25  the call that the decision was irrevocable?

1      J. Vicari - Confidential
2      A. Unfortunately, I have fired many people
3   in my 30 years of doing this, and people sometimes
4   think that they have the option to go to someone
5   else to get another opinion on a matter.
6         So I would do that -- I have done that
7   many, many times, and I have done it every time
8   going forward.
9      Q. Did you tell Kate that due to these
10  accommodations she cannot perform the essential
11  functions of the job?
12     A. I don't know if I said, "due to these
13  accommodations."
14        I do believe I said, "You cannot" -- "you
15  cannot perform the essential functions of the job,
16  which require you to potentially be available 24/7
17  given any" -- "given the unpredictable workload in
18  situations going out into the future."
19     Q. Did you tell her, "You made a mistake in
20  accepting the job knowing you couldn't complete the
21  job"?
22     A. I probably -- I do believe she made a
23  mistake in accepting the job with respect to her own
24  health situation, and what a job at Centerview as an
25  analyst entails.

Page 113

1        J. Vicari - Confidential
2        Q.  Did you tell Kate that she should have
3    known that she would have been unable to do the job
4    and that the position would require many 120-hour
5    weeks over the three years, which she should have
6    known?
7        A.  I did not say that as such.
8        Q.  Did you tell her that she should have
9    known that the job would require 120-hour weeks?
10       A.  No.
11       Q.  Did you tell Kate, "Anyone who interviews
12   for this kind of job knows this.  It's not our fault
13   if there were gaps in your knowledge"?
14       A.  I probably -- that sounds more like what
15   I said, yes, because that information that we had --
16   information about working as an analyst in investment
17   banking is out there in the public domain on many
18   sites that candidates in this industry all look at.
19       Q.  How would Kate have known that accepting
20   an analyst role at Centerview would have required
21   her to go nights without sleep?
22       MS. SKIBITSKY:  Objection.
23       A.  I would not characterize it as "nights
24   without sleep."
25       I would characterize it as, at times you

Page 114

1        J. Vicari - Confidential
2    need to be available and on call after hours,
3    including after midnight.
4        Q.  How would Kate have known that?
5        A.  Again, out in the public domain there are
6    many sites, like Glassdoor, like the Vault, that all
7    kind of put out information about what it's like to
8    work in investment banking.
9        We have a very robust on-campus presence
10   with Dartmouth, which is the school she came from,
11   and we have had several employees at Centerview come
12   from Dartmouth, and it would be highly, highly,
13   highly unusual for a candidate who was interested in
14   doing -- in pursuing a career at Centerview, or in
15   investment banking, not to speak to the alumni that
16   had come from their school about what it's like in a
17   day-to-day -- you know, what it's like to work day
18   to day.
19       We do on-campus info sessions about what
20   it's like to be an analyst.
21       There are lots of things like that that
22   are out there and available, especially at her
23   school, given that we have a very strong recruiting
24   process with Dartmouth.
25       Q.  Are you aware that Kate did, in fact,

Page 115

1        J. Vicari - Confidential
2    speak with Dartmouth alumni who worked at Centerview
3    as analysts?
4        A.  I am not aware.
5        Q.  Are you aware that none of them told her
6    that she would have to work overnight?
7        MS. SKIBITSKY:  Objection.
8        A.  I don't know anything about any
9    conversations that Kate had with any individuals.
10       Q.  Are you aware of what the Vault says
11   about Centerview?
12       A.  At this moment I am not -- I don't know
13   it right now, at this moment.
14       Q.  When is the last time you looked at the
15   Vault reviews of Centerview?
16       A.  Probably a year ago.
17       Q.  Does Centerview do anything to ensure how
18   it comes across on the Vault?
19       MS. SKIBITSKY:  Objection; vague.
20       A.  I have no control over what the Vault
21   prints or doesn't print, so I have no idea what you
22   mean.
23       Q.  Does Centerview speak to any employees
24   about how they rate Centerview on the Vault or
25   Glassdoor?

Page 116

1        J. Vicari - Confidential
2        A.  The Vault is based upon employees
3    reporting things, and we do encourage our employees
4    to respond to the Vault survey, but everyone is --
5    you know, they are very smart, free-willed people
6    who write what they want to write.
7        Good, bad, or indifferent, we have no
8    control over it.
9        Q.  Are you aware that the Vault's reviews on
10   Centerview talk about work-life balance?
11       A.  I believe that is a category on the Vault
12   survey.
13       Q.  Have you ever seen any review on the Vault
14   that talks about working multiple nights at
15   Centerview without sleep?
16       A.  I don't -- I don't know off the top of my
17   head right now, as we sit here today.
18       Q.  Do you think that Centerview would have
19   tens of thousands of resumes if it was well known
20   that you are not allowed to sleep if you work there?
21       A.  Yes, I do.
22       Q.  And why is that?
23       A.  Because there are a lot of very ambitious,
24   good, smart people who want to work in investment
25   banking, and we are one of the top firms to do that

Page 117

1        J. Vicari - Confidential
2  at.
3        Yes, you work very hard, and yes, it is a
4  challenging environment given there's a lot of hard
5  things, and a lot of deadlines, and a lot of clients,
6  and it's unpredictable, and all of those kinds of
7  things, but yes, they want to -- they want a job as
8  an analyst here, and they learn, they -- it's a
9  very -- it's a very strong learning environment, and
10  you have a lot of exposure to senior people, more so
11  than at other firms.
12      Q.  Did you tell Kate during this meeting that
13  "You took a coveted spot in a program where you
14  agreed to fulfill the requirements for three years,
15  and given the accommodation you can't fulfill them"?
16      A.  Something like that, yes, that sounds
17  right.
18      Q.  Did you tell Kate that she took a spot
19  you could have given to someone else, which now you
20  can't because they have accepted another job?
21      A.  Well, the recruiting process is such that
22  it's -- there is not a recruiting process for people
23  six -- three months into another job.
24        In fact, we do not hire people who try to
25  leave an investment bank in less than a year.

Page 118

1        J. Vicari - Confidential
2      Q.  So did you tell her that "You took a spot
3  that we could have given to someone else"?
4      A.  Yes.
5      Q.  Did you think that Kate should have known
6  that because she has a disability she could not work
7  at Centerview?
8      MS. SKIBITSKY:  Objection.
9      A.  I think that Kate -- anyone who has a
10  medical need to sleep nine hours a night
11  consistently, consecutively, or else they are at
12  risk of a serious health -- exacerbating a serious
13  health situation, a job where the hours are
14  unpredictable and can be long hours, I think that
15  that would -- I do think that that is an inconsistent
16  situation.
17      Q.  Has Centerview ever granted any kind of
18  an accommodation in working hours to a woman who was
19  pregnant?
20      A.  Yes.
21      Q.  How many times?
22      A.  I mean, each case is evaluated separately
23  and distinctly and for different reasons.
24        I think that there has probably been
25  several times.

Page 119

1        J. Vicari - Confidential
2        I have not -- I have not thought about
3  that and looked into it specifically, but I think
4  that there are probably numerous times that we have
5  done that.
6      Q.  So Centerview has in the past granted
7  accommodations to people based on the amount of work
8  that is expected of them?
9      MS. SKIBITSKY:  Objection.
10      A.  Not -- not because of the amount of work
11  that is expected of them.
12      Q.  How were pregnant women accommodated, in
13  what way?
14      A.  Depending upon the situation, some have
15  been -- some have needed to go out on leave, some
16  have needed to get -- some have needed to leave for
17  doctors' appointments during business hours.
18        Some have taken -- extended their time at
19  the end of their leave, unpaid, to spend more time
20  at home, outside of our normal policy, but that is --
21  it's not because of the work.  It's because of their
22  medical situation, all of which were short term in
23  nature.
24      Q.  Has anybody who is pregnant or undergoing
25  cancer treatment ever requested something similar to

Page 120

1        J. Vicari - Confidential
2  the blackout hours that Kate had requested?
3      A.  No.
4      Q.  When Kate offered to rescind the
5  accommodation, did you say, "We can't ignore the
6  evidence you have presented to us that the
7  requirements of this job will have a negative impact
8  on your health"?
9      A.  I am sure that I did say that we cannot --
10  we cannot ignore this doctor's note that we have.
11        The rest of it, I don't recall.
12      Q.  Did you say to Kate, "It's detailed in
13  the letter.  That's all we're comfortable saying"?
14      A.  I don't recall exactly that.
15      Q.  Were you at all angry at Kate?
16      A.  No.
17      Q.  Were you upset that she had taken this
18  job knowing she could not do the job?
19      MS. SKIBITSKY:  Objection.
20      A.  I don't agree with the word "upset," no.
21      Q.  Were you frustrated?
22      A.  I do not think that I was frustrated, no.
23      Q.  How did you feel towards Kate?
24      MS. SKIBITSKY:  Objection.
25      A.  I don't think that I had any feelings

Page 121

1     J. Vicari - Confidential
2 towards Kate.
3        I think it was more that this is a -- you
4 know, this is an unfortunate situation that we were
5 all in.
6        That is how I felt.
7     Q. Did you think that Kate wanted the job?
8     A. Yes.
9     Q. Was it at all difficult for you to tell
10 her that she could not have the job because she
11 needed to sleep?
12     MS. SKIBITSKY: Objection.
13     A. I do not believe I told her that is why
14 she couldn't have the job.
15     Q. Was it a difficult meeting for you?
16     A. It was unfortunate, and it was not easy,
17 but it's something that I have had to do before.
18     Q. In retrospect, do you think that there
19 was something you could have done to try to make it
20 work?
21     A. I did not believe then and I do not
22 believe now that it was a sustainable situation.
23     Q. If you had to do this all over again, is
24 there anything that you would do differently?
25     A. No.

Page 122

1     J. Vicari - Confidential
2     MR. HELLER: I am going to show you one
3 other document.
4        Please take a look at it and let me know
5 once you have had a chance to review it.
6        It is Plaintiff's Exhibit 16.
7        (Plaintiff's Exhibit 16 placed on shared
8 screen.)
9     A. I have reviewed it.
10     Q. Have you ever seen this document before?
11     A. I think I have seen this.
12     Q. When do you think that you saw this?
13     A. Later.
14     Q. When you say, "Later," what do you mean?
15     A. It wasn't at the time that -- I think
16 perhaps -- I think that, like, Cheryl may have told
17 me that Will did reach out to the team, the staffing
18 team, to let them know.
19     Q. Did you ever speak to William Stewart
20 about Kate Shiber's employment being terminated?
21     A. No.
22     Q. I'm sorry?
23     A. No.
24     Q. Who was William Stewart at the time?
25     A. Kate's staffer.

Page 123

1     J. Vicari - Confidential
2     Q. Will writes, "Jeanne just let me know
3 that Kate Shiber is no longer with the firm."
4        Does that refresh your recollection at
5 all about whether or not you spoke to him?
6     A. I'm sorry, to clarify, the way that you
7 asked the question before, I thought that you were
8 asking me if he was involved in the decision, and I
9 did not speak to him -- I did not speak to him in
10 connection with the decision being made.
11        I spoke to him after the decision was
12 made because he was her staffer, and he would need
13 to know that she was no longer in his group to be
14 supervised.
15     Q. So you spoke with him after the decision
16 was made and you relayed the decision to him; is
17 that correct?
18     A. I spoke to him after the -- after it
19 had -- after Kate, in fact, had been terminated to
20 let him know.
21     Q. He writes, "Jeanne said it was ultimately
22 an HR decision because there was an irreconcilable
23 disconnect between Kate's understanding of the role
24 and the firm's expectations for an analyst."
25        Do you recall if that is what you said to

Page 124

1     J. Vicari - Confidential
2 him?
3     A. I don't think -- I think that is generally
4 the gist, but I don't know that those are the
5 specific words that I used.
6     Q. Do you recall the specific words that you
7 used?
8     A. No.
9     Q. Do you recall if you used the phrase
10 "irreconcilable differences"?
11     A. I may have used those words, yes.
12     MR. HELLER: Why don't we take a break.
13 I don't think we should take a lunch
14 break. I think I might be close to the end.
15     Do you want to take 15 minutes?
16     MS. SKIBITSKY: Okay.
17     THE WITNESS: That is fine.
18     MR. HELLER: Off the record.
19     (Discussion off the record.)
20     (Short recess taken from 12:42 p.m. to
21 12:52 p.m.)
22     MR. HELLER: Back on the record.
23 I have nothing further.
24 Thank you for your time.
25     MS. SKIBITSKY: Thank you.

Page 125

1    J. Vicari - Confidential
2        Nothing from us.
3        MR. HELLER:  Off the record.
4    (Discussion off the record.)
5        (Time noted: 12:53 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 127

1
2        C E R T I F I C A T E
3    STATE OF NEW YORK   )
4                : ss.
5    COUNTY OF NEW YORK  )
6
7        I, SUSAN B. RATNER, a Shorthand Reporter
8    and a Notary Public within and for the State of
9    New York, do hereby certify that the foregoing
10   examination of JEANNE VICARI was taken before me on
11   the 24th day of February, 2023;
12        That the said witness was duly sworn before
13   the commencement of her testimony; that the said
14   testimony was taken stenographically by me and then
15   transcribed.
16        I further certify that I am not related
17   by blood or marriage to any of the parties to this
18   action or interested directly or indirectly in the
19   matter in controversy; nor am I in the employ of any
20   of the counsel in this action.
21        IN WITNESS WHEREOF, I have hereunto
22   set my hand this 7th day of March, 2023.
23
24        Susan B Ratner
25        SUSAN B. RATNER

Page 126

1
2        A C K N O W L E D G E M E N T
3
4        I, JEANNE VICARI, hereby certify that I
5    have read the transcript of my testimony taken under
6    oath in my deposition of February 24, 2023; that the
7    transcript is a true, complete and correct record of
8    my testimony, and that the answers on the record as
9    given by me are true and correct.
10
11
12
13
14    _____
15    JEANNE VICARI
16
17
18   Subscribed and sworn to before me
19   on this the _____ day of _____, 2023.
20
21   _____ _____
22   Notary Public        My Commission Expires:
23
24
25

Page 128

1
2    February 24, 2023
3        I N D E X
4    WITNESS        EXAMINATION BY    PAGE
5    JEANNE VICARI      MR. HELLER    5-125
6
7    REQUESTS (RQ): 50
8        E X H I B I T S
9    PLAINTIFF'S            FOR IDENT
10   22 - One-page printout of e-mails, the top
11   e-mail dated 9/1/2020, 2:06:04 PM, to Cheryl
12   Robinson and Tony Kim, from Jeanne Vicari,
13   Bates stamped No. Centerview_000325........... 51
14   23 - Three-page document, the first page being
15   printout of e-mails, the top e-mail dated
16   9/2/2020, 11:48:06 AM, to Jeanne Vicari, from
17   Cheryl Robinson, with attachments, Bates
18   stamped Nos. Centerview_000185 through
19   Centerview_000187............................ 55
20   24 - Two-page printout of e-mails, the top
21   e-mail on the first page dated 9/8/2020,
22   11:07:19 PM, to Jeanne Vicari and Cheryl
23   Robinson, from Jeanne Vicari, Bates stamped
24   Nos. Centerview_002860 and
25   Centerview_002861............................ 71

Page 33 (Pages 129-129)

```
                                              Page 129
 1          E R R A T A
    CASE: KATHRYN SHIBER v. CENTERVIEW PARTNERS, LLC
 2  DATE: FEBRUARY 24, 2023  DEPOSITION OF: JEANNE VICARI
    If there are any corrections to your deposition,
 3  indicate them on this sheet of paper, give the change,
    page and line number, and reason for the change is:
 4      (1) To clarify the record;
        (2) To conform to the facts; or
 5      (3) To correct transcription errors.
 6  Page     LINE         REASON FOR CHANGE
 7  CHANGE             TO
 8  page     LINE         REASON FOR CHANGE
 9  CHANGE             TO
10  page     LINE         REASON FOR CHANGE
11  CHANGE             TO
12  page     LINE         REASON FOR CHANGE
13  CHANGE             TO
14  page     LINE         REASON FOR CHANGE
15  CHANGE             TO
16  page     LINE         REASON FOR CHANGE
17  CHANGE             TO
18  page     LINE         REASON FOR CHANGE
19  CHANGE             TO
20
21  JEANNE VICARI
22  Subscribed and sworn to before me
23  this     day of      , 2023.
24  _____    _____
25  (Notary Public)      My Commission Expires:
```

## A

**ability** 42:17, 87:25, 88:15
92:14, 98:19, 110:20
**able** 5:21, 34:17, 35:5, 61:5
65:8, 88:3, 88:16, 92:17, 93:4
93:20, 93:22, 94:3, 105:2
106:12, 110:3, 110:25
**accept** 66:9
**acceptable** 43:25, 96:6
**accepted** 117:20
**accepting** 30:22, 112:20
112:23, 113:19
**access** 49:25, 52:9
**accommodated** 119:12
**accommodation** 15:14, 15:20
15:23, 22:24, 24:14, 26:10
28:4, 28:13, 30:9, 33:15
35:22, 36:9, 37:22, 43:4, 45:5
63:18, 66:11, 85:15, 85:22
91:6, 110:24, 117:15, 118:18
120:5
**accommodations** 23:2, 23:7
23:12, 25:9, 64:10, 112:10
112:13, 119:7
**account** 105:21
**accounting** 8:5
**accounts** 103:15, 103:19
103:19, 103:20
**accurate** 9:12
**achieved** 38:3
**action** 1:7, 45:3, 127:18
127:20
**active** 17:12, 17:23, 18:17
19:12, 22:10, 28:25, 34:3
43:9, 60:8, 60:9, 73:9, 88:7
88:12, 88:17, 102:10
**activities** 107:22, 107:24
108:2
**actual** 31:15, 56:6, 86:2, 94:7
94:7, 94:8
**additional** 87:22
**address** 5:5, 52:15
**adequately** 104:12
**administer** 4:11
**administrative** 11:23, 12:6

12:13, 12:17, 12:21, 14:15
65:10, 84:15
**admissions** 78:23
**advise** 18:19, 84:17
**advocate** 15:23, 15:25, 16:3
17:2, 35:4, 40:6, 63:18, 63:22
63:24
**advocating** 64:10, 64:14
**affect** 59:6
**afford** 80:7
**ago** 100:13, 115:16
**agree** 101:25, 120:20
**agreed** 4:2, 4:6, 4:9, 57:15
58:10, 117:14
**ailments** 23:10
**alerted** 53:23
**allow** 59:24, 60:5
**allowed** 59:15, 59:19, 60:20
61:22, 116:20
**alternative** 103:4
**alumni** 114:15, 115:2
**Amanda** 3:6, 76:12, 76:16
76:18, 77:2, 78:2, 79:12
80:18, 83:20
**ambitious** 116:23
**amount** 119:7, 119:10
**analyst** 12:24, 12:25, 15:11
35:14, 42:7, 90:17, 91:21
93:21, 101:23, 102:21
104:19, 104:23, 105:10
105:11, 105:12, 105:15
105:20, 105:21, 106:2, 106:5
110:22, 112:25, 113:16
113:20, 114:20, 117:8
123:24
**analysts** 14:11, 14:20, 16:12
69:5, 90:17, 105:13, 105:14
105:17, 115:3
**angry** 120:15
**answer** 5:20, 6:6, 6:10, 6:14
10:9, 28:15, 38:20, 61:11
61:18, 93:15, 94:15, 94:19
94:21, 95:5, 95:8, 95:15
95:19, 95:20, 96:5, 96:19
107:14, 109:11
**answered** 43:22, 61:15

**answering** 96:10, 96:11
**answers** 126:8
**anti** 26:17
**anticipate** 111:21
**antidiscrimination** 25:19
26:2, 26:19
**antidisparagement** 26:19
**antiharassment** 26:2, 26:19
**anybody** 7:2, 33:14, 34:12
37:23, 46:21, 48:18, 70:10
79:11, 81:23, 119:24
**anymore** 72:18, 80:9, 90:18
**anyway** 86:12, 104:22
**appearance** 85:16, 86:9
86:21, 87:5
**appeared** 73:8
**appears** 72:11
**application** 78:4, 78:13
78:18, 78:25, 79:9
**applying** 106:5
**appointments** 119:17
**appreciate** 64:11
**approach** 75:19
**appropriate** 49:2
**approval** 84:12, 84:16
**approved** 13:19, 24:17, 27:3
**apt** 52:5
**arrive** 80:14
**arrived** 82:7
**artist** 108:5
**asked** 5:23, 12:11, 17:2, 40:9
43:21, 43:24, 61:14, 61:17
85:14, 95:13, 99:20, 123:7
**asking** 5:18, 6:10, 7:17
21:19, 35:11, 38:25, 46:19
123:8
**aspect** 75:7
**assess** 18:22, 21:16, 26:6
**assessed** 41:10
**assigned** 17:12, 17:21, 17:22
22:11, 40:16, 41:4, 43:10
45:9, 45:13, 45:23, 60:7
105:18
**assigning** 45:14
**assignment** 40:20, 42:21
47:15

assist  19:5
assistant  9:5
assumed  56:22
attachments  50:16, 50:18
  50:21, 55:13, 128:17
attorney  5:12
attorneys  2:4, 2:16, 4:3, 6:23
atypical  41:10
August  16:13, 22:18, 34:7
  34:9, 35:7, 40:14, 42:22
  49:15, 53:19, 54:18, 54:21
authority  13:2, 13:5, 24:12
authorized  4:11
available  25:14, 35:6, 62:23
  110:17, 112:16, 114:2
  114:22
Avenue  2:6, 2:11, 2:18
averse  28:25, 29:2, 37:16
  38:5
aware  7:10, 15:6, 16:8, 22:12
  23:18, 24:23, 34:16, 35:17
  46:24, 58:19, 73:14, 82:11
  91:16, 107:25, 114:25, 115:4
  115:5, 115:10, 116:9
awareness  65:14

## B

back  13:21, 17:19, 23:5
  24:18, 25:23, 44:23, 51:7
  52:13, 54:3, 60:25, 67:21
  67:22, 96:23, 97:10, 97:16
  110:9, 124:22
bad  116:7
balance  62:17, 64:17, 116:10
bank  102:19, 117:25
banker  12:23, 44:10
bankers  18:5, 18:7, 22:2
  62:22
banking  113:17, 114:8
  114:15, 116:25
Baron  52:18, 53:4
Barrett  2:21, 6:21
based  19:8, 36:5, 41:10
  50:13, 81:3, 87:9, 87:21
  91:25, 94:6, 94:7, 94:10, 99:3

101:4, 101:6, 103:11, 116:2
  119:7
baseline  60:16, 61:3
Bates  51:15, 51:23, 55:13
  55:23, 71:12, 71:19, 128:13
  128:17, 128:23
bearing  76:23
becoming  73:10
beginning  9:13, 9:14, 111:24
believe  10:10, 10:10, 12:15
  13:6, 13:13, 16:6, 16:14
  18:11, 19:7, 20:10, 21:10
  29:7, 29:16, 32:7, 33:3, 34:18
  37:4, 38:2, 39:2, 39:7, 43:6
  43:9, 43:15, 43:17, 43:18
  44:2, 44:19, 44:23, 47:7
  48:21, 50:4, 50:10, 52:5
  52:16, 59:9, 63:14, 65:18
  65:19, 65:23, 66:7, 67:9
  67:11, 73:13, 76:21, 76:23
  77:4, 79:13, 80:13, 80:25
  83:14, 87:15, 91:5, 93:16
  99:2, 100:15, 103:9, 107:5
  109:2, 109:14, 109:22
  110:13, 110:23, 112:14
  112:22, 116:11, 121:13
  121:21, 121:22
believed  38:22
best  20:17, 28:23, 36:6
  36:13, 38:20, 42:4, 42:6
  47:11, 48:15, 68:13, 102:10
better  38:20, 44:25, 48:14
  69:2, 77:18, 78:22
beyond  62:15
big  47:10, 47:10
bigger  47:14
birth  7:16
bit  78:21, 100:25
black  54:25, 76:13, 76:20
  76:22, 76:23
blackhelmet.com  79:11
blackout  29:6, 36:24, 36:24
  37:14, 50:7, 50:11, 55:2
  57:20, 73:9, 73:24, 74:3
  75:21, 76:22, 85:24, 89:3
  89:4, 90:6, 90:23, 91:11, 93:8

98:21, 100:22, 104:3, 106:11
  110:21, 111:7, 111:8, 111:13
  111:22, 120:2
Blair  13:10
blood  127:17
board  41:6
boards  78:23
bolster  78:18
break  5:25, 6:3, 49:2, 49:6
  49:8, 50:22, 62:21, 62:21
  94:24, 95:3, 95:6, 95:11
  95:17, 95:19, 95:21, 95:25
  96:2, 96:7, 96:14, 96:15
  96:19, 124:12, 124:14
Brian  2:8, 5:11, 94:14, 94:24
  95:3, 95:7, 95:10, 95:16
  96:13
bring  44:12, 87:22
bringing  44:20
broadened  27:18
brought  20:23, 20:24, 26:22
  44:5, 45:25, 63:3, 65:12
  104:9, 104:18
BS  8:5
built  78:9
burden  60:4, 60:10, 89:11
  89:13, 89:16
business  5:5, 107:22, 107:24
  108:2, 119:17
busy  41:5, 41:12, 41:13
  41:14, 41:16, 41:17

## C

C-h-o-p-r-a  46:5
call  6:20, 16:12, 18:2, 27:8
  29:11, 35:5, 109:19, 111:25
  114:2
called  5:3, 16:2, 16:25, 36:7
  36:19, 103:14, 104:25
calls  86:22, 99:23
camera  109:25
cancer  119:25
candidate  114:13
candidates  106:3, 113:18
canned  94:18, 94:21

Page 3

**capabilities** 27:12
**capable** 96:11
**capacity** 12:2
**car** 67:21
**cared** 21:10
**career** 47:22, 114:14
**cars** 67:17, 67:18
**case** 88:9, 118:22, 129:1
**category** 116:11
**cause** 98:12
**caused** 77:9
**causing** 98:16
**caution** 109:3
**centered** 100:9, 100:11
**Centerview** 1:10, 3:8, 7:2
 8:9, 8:10, 10:17, 10:25, 11:6
 11:10, 11:13, 11:16, 11:22
 12:18, 13:4, 13:12, 13:25
 14:4, 14:9, 15:15, 15:21, 19:2
 21:20, 23:3, 24:12, 25:23
 37:16, 37:23, 40:14, 41:6
 42:6, 47:22, 51:24, 55:23
 59:15, 59:19, 59:24, 60:4
 61:8, 61:12, 61:21, 62:6, 62:8
 62:14, 64:16, 66:9, 66:16
 66:19, 68:23, 70:2, 72:8
 89:12, 89:14, 90:14, 97:12
 98:12, 98:16, 98:18, 102:18
 104:15, 110:6, 112:24
 113:20, 114:11, 114:14
 115:2, 115:11, 115:15
 115:17, 115:23, 115:24
 116:10, 116:15, 116:18
 118:7, 118:17, 119:6, 129:1
**Centerview's** 42:17
**Centerview_000185** 55:14
 128:18
**Centerview_000187** 55:15
 128:19
**Centerview_000325** 51:16
 128:13
**Centerview_002860** 71:13
 128:24
**Centerview_002861** 71:13
 128:25
**certain** 23:22, 61:24, 67:24

 68:5, 68:11, 68:12, 93:4
**certainly** 42:20, 46:23, 60:23
 76:10, 102:19
**certainty** 10:13, 88:4
**certify** 126:4, 127:9, 127:16
**CFO** 9:3, 9:4, 9:6
**challenging** 117:4
**chance** 52:2, 53:13, 55:25
 71:23, 76:7, 122:5
**change** 11:6, 57:24, 67:20
 67:22, 77:20, 129:3, 129:3
 129:6, 129:7, 129:8, 129:9
 129:10, 129:11, 129:12
 129:13, 129:14, 129:15
 129:16, 129:17, 129:18
 129:19
**changed** 10:24, 58:8
**characterization** 82:24
**characterize** 82:9, 82:21
 85:25, 113:23, 113:25
**charge** 13:24, 14:4, 45:14
 65:19
**charged** 62:19
**chat** 51:10, 55:7, 71:6, 76:10
**check** 25:6
**Cheryl** 7:6, 16:2, 16:9, 16:10
 16:17, 16:23, 16:25, 17:8
 17:15, 17:19, 17:25, 18:9
 18:13, 18:15, 18:21, 20:8
 20:24, 21:2, 22:18, 24:16
 25:4, 25:5, 28:19, 28:22
 29:10, 29:21, 30:4, 30:5, 32:7
 32:7, 33:3, 33:14, 33:18
 34:13, 34:14, 34:15, 34:16
 34:18, 35:4, 36:10, 39:10
 39:12, 40:7, 43:3, 43:14
 43:15, 43:20, 44:5, 44:17
 44:21, 44:22, 44:23, 45:12
 49:17, 51:14, 51:22, 53:23
 54:9, 54:10, 54:12, 54:12
 54:20, 54:21, 55:12, 55:21
 63:12, 63:16, 63:17, 64:3
 64:9, 64:13, 71:11, 72:5
 72:21, 73:17, 76:13, 77:3
 79:12, 81:14, 81:24, 82:7
 82:10, 82:11, 82:19, 82:22

 83:20, 91:16, 122:16, 128:11
 128:17, 128:22
**Cheryl's** 82:16
**chief** 3:7, 11:11, 11:12, 12:15
 13:14, 13:22, 50:2, 84:14
**choice** 101:20
**Chopra** 46:4
**cited** 78:3
**City** 31:7
**Civil** 1:7
**clarify** 123:6, 129:4
**class** 15:7, 15:11, 45:24
**classes** 26:8, 27:2, 27:4
**classification** 75:4
**classify** 63:19
**CLAYMAN** 2:10
**clear** 34:6, 100:3, 108:16
**client** 17:12, 30:3, 44:14
 48:17, 62:25, 73:8
**clients** 17:21, 22:5, 34:3
 41:9, 103:13, 103:14, 103:15
 117:5
**close** 124:14
**colleagues** 17:10
**college** 7:23, 7:24, 78:4, 78:9
 78:12, 78:18, 78:25, 79:8
 108:21
**Coltman** 46:14
**column** 74:15, 74:23
**come** 8:19, 10:16, 12:4, 15:13
 15:19, 36:10, 67:22, 68:15
 73:4, 83:14, 83:22, 96:23
 103:17, 114:11, 114:16
**comes** 14:19, 101:16, 115:18
**comfortable** 64:10, 64:14
 92:16, 120:13
**coming** 75:3, 88:8
**commencement** 127:13
**comments** 30:24
**Commission** 126:22, 129:25
**committee** 18:5, 26:6, 27:2
 66:4
**communicated** 37:13, 37:13
 65:24, 65:24, 102:9
**communications** 26:14
 109:5, 109:7

**company** 8:22, 67:5
**compare** 69:4
**compatible** 88:20
**complaining** 66:12
**complaint** 26:5
**complaints** 26:7
**complete** 112:20, 126:7
**complex** 41:5
**compliance** 3:7, 50:3, 52:9
  52:10
**concern** 26:4, 26:5, 46:19
  47:17, 62:24, 62:24, 63:17
  64:20, 65:13, 101:10, 101:16
**concerned** 98:11
**concerns** 26:7, 47:6, 63:6
  65:7, 90:23, 91:11, 111:7
  111:11
**conclude** 36:15
**conclusion** 50:13, 83:23
  99:23
**concussions** 76:25, 77:5
  77:8, 77:19, 83:21, 84:5, 84:9
**condition** 39:5, 57:10, 91:18
  92:5, 98:13
**conduct** 26:17, 26:18, 27:8
**conducted** 26:16
**confidential** 1:2, 6:1, 7:1, 8:1
  9:1, 10:1, 11:1, 12:1, 13:1
  14:1, 15:1, 16:1, 17:1, 18:1
  19:1, 20:1, 21:1, 22:1, 23:1
  24:1, 25:1, 26:1, 27:1, 28:1
  29:1, 30:1, 31:1, 32:1, 33:1
  34:1, 35:1, 36:1, 37:1, 38:1
  39:1, 40:1, 41:1, 42:1, 43:1
  44:1, 45:1, 46:1, 47:1, 48:1
  49:1, 50:1, 51:1, 52:1, 53:1
  54:1, 55:1, 56:1, 57:1, 58:1
  59:1, 60:1, 61:1, 62:1, 63:1
  64:1, 65:1, 66:1, 67:1, 68:1
  69:1, 70:1, 71:1, 72:1, 73:1
  74:1, 75:1, 76:1, 77:1, 78:1
  79:1, 80:1, 81:1, 82:1, 83:1
  84:1, 85:1, 86:1, 87:1, 88:1
  89:1, 90:1, 91:1, 92:1, 93:1
  94:1, 95:1, 96:1, 97:1, 97:14
  98:1, 99:1, 100:1, 101:1

102:1, 103:1, 104:1, 105:1
106:1, 107:1, 108:1, 109:1
110:1, 111:1, 112:1, 113:1
114:1, 115:1, 116:1, 117:1
118:1, 119:1, 120:1, 121:1
122:1, 123:1, 124:1, 125:1
**confirming** 102:13
**conform** 129:4
**connection** 111:12, 123:10
**cons** 85:3, 85:5, 85:11
**consecutively** 118:11
**consider** 26:18, 85:13, 86:7
  99:10, 99:14, 103:3, 104:11
  104:21, 105:17
**considered** 85:19, 86:2
  103:5
**considering** 28:12
**considers** 26:9
**consistent** 17:3, 17:4, 19:22
  19:23, 21:12, 21:19, 89:15
  94:4
**consistently** 34:5, 77:9
  87:24, 102:14, 118:11
**contact** 36:22, 37:3, 37:18
**contacting** 37:11, 37:17
**context** 40:5
**continue** 47:22, 91:21
**continued** 73:5, 79:23, 93:18
  93:19, 99:6
**continuing** 72:24, 98:11
  98:15
**contribute** 88:2
**contribution** 104:24, 105:6
**control** 115:20, 116:8
**controller** 9:5, 9:9, 9:11
**controversy** 127:19
**conversation** 17:6, 18:13
  21:4, 28:18, 41:21, 44:2, 44:3
  44:16, 44:18, 44:20, 54:6
  107:23
**conversations** 6:22, 29:2
  43:19, 80:16, 107:19, 109:16
  115:9
**conveyed** 64:24
**COO** 11:16
**coordinate** 47:13

**coordinated** 27:3
**coordinating** 26:21
**copies** 50:20
**copy** 7:13
**correct** 13:2, 13:3, 19:24
  31:22, 32:4, 35:14, 37:3
  37:12, 37:18, 37:24, 39:13
  42:9, 43:8, 48:2, 57:17, 70:5
  70:6, 70:18, 72:4, 72:9, 72:13
  74:22, 87:2, 89:9, 100:19
  101:23, 104:9, 104:10
  104:19, 106:3, 106:13
  107:12, 111:9, 111:14
  123:17, 126:7, 126:9, 129:5
**corrections** 129:2
**correctly** 101:19
**corroborate** 39:24
**counsel** 26:11, 26:14, 26:16
  26:22, 27:4, 109:15, 127:20
**countries** 31:9
**country** 31:8
**COUNTY** 127:5
**couple** 22:3, 78:7, 79:6
  87:10, 93:3
**coupled** 89:18, 89:19, 90:12
  98:6, 102:16
**course** 45:3, 69:15
**court** 1:4, 6:7
**cover** 30:7, 31:16, 32:8, 75:8
**coverage** 103:14
**coveted** 117:13
**COVID-19** 16:19
**coworkers** 17:10, 37:10
  37:17, 38:13, 38:14, 39:4
  90:4
**create** 85:16, 86:8, 87:5
**creates** 86:21
**currently** 8:6, 11:9

## D

**Dartmouth** 114:10, 114:12
  114:24, 115:2
**date** 12:8, 30:25, 51:17
  55:16, 69:24, 71:14, 129:2
**dated** 51:13, 55:11, 55:20

71:10, 128:11, 128:15
128:21
**dates** 73:22
**day** 7:18, 16:7, 16:24, 22:4
23:21, 23:22, 23:23, 24:6
24:22, 53:22, 77:7, 83:19
83:25, 92:14, 110:18, 114:17
114:18, 126:19, 127:11
127:22, 129:23
**day-to-day** 114:17
**days** 27:13, 27:17, 72:14
92:15, 94:4
**deadlines** 117:5
**deal** 24:20, 30:23, 31:11
37:25, 38:3, 38:5, 38:8, 40:23
41:4, 41:12, 41:17, 42:12
42:15, 42:17, 42:18, 42:22
42:22, 42:25, 43:9, 44:7, 44:9
45:7, 45:8, 65:2, 65:13, 67:9
67:11, 73:7, 73:9, 73:11
73:15, 73:20, 73:24, 79:24
80:8, 81:7, 87:23, 89:3, 92:3
97:20, 98:20, 104:5, 104:6
104:18, 104:24
**deals** 40:18, 41:2, 88:8, 88:12
88:17, 89:23, 90:4, 90:12
92:18, 102:10, 102:17
102:23, 102:24, 103:4, 103:6
103:7, 103:13
**dealt** 31:21
**decided** 30:5, 78:4, 80:5
87:4, 103:25, 106:12
**deciding** 100:25
**decision** 15:10, 19:4, 29:14
32:25, 33:16, 37:5, 43:12
47:24, 59:14, 79:17, 79:19
79:21, 80:11, 80:12, 80:13
80:15, 80:23, 80:24, 81:2
81:11, 81:12, 81:15, 82:3
82:4, 82:7, 82:12, 82:18, 83:3
83:13, 83:15, 83:19, 84:3
84:9, 84:18, 86:11, 86:25
87:8, 90:19, 91:12, 91:20
91:23, 91:25, 98:8, 99:3
108:8, 108:22, 109:21
111:17, 111:19, 111:25

123:8, 123:10, 123:11
123:15, 123:16, 123:22
**decisions** 14:9, 30:24, 90:21
**Defendant** 1:11, 2:16
**define** 23:19
**defined** 23:20
**definition** 24:2, 24:10, 36:21
**degree** 7:23, 8:4
**demanding** 103:23
**deny** 24:13
**department** 109:15
**Depending** 119:14
**deposed** 5:13, 7:11
**deposition** 1:17, 4:10, 4:13
5:15, 6:17, 82:16, 97:13
126:6, 129:2, 129:2
**derived** 21:8
**design** 27:4
**designating** 97:12
**desire** 41:19
**desk** 23:5, 23:16, 32:19
**despite** 18:15, 102:23
**detailed** 120:12
**deteriorate** 64:21
**determine** 61:22
**determined** 33:5
**detrimental** 99:7
**development** 18:4, 18:6
44:10, 44:11, 66:3
**dictate** 62:16
**die** 73:8
**difference** 57:21
**differences** 124:10
**different** 18:10, 27:5, 57:10
68:25, 75:5, 118:23
**differentiated** 20:4
**differently** 48:19, 58:24
77:24, 91:18, 91:22, 121:24
**differing** 25:7
**difficult** 38:19, 73:10, 121:9
121:15
**difficulty** 73:15, 100:11
**directly** 10:6, 127:18
**disability** 23:14, 85:16, 86:16
91:22, 118:6
**disagree** 82:17, 82:23, 82:24

95:9
**disconnect** 123:23
**discouraged** 67:4
**discovery** 77:19
**discrimination** 85:17, 86:9
86:16, 86:21, 87:6
**discuss** 79:10, 79:14
**discussed** 93:12, 95:25
**discussion** 41:18, 51:4, 54:22
97:7, 124:19, 125:4
**discussions** 107:17
**disingenuous** 35:20
**dismissed** 78:11, 79:7
**distinctly** 118:23
**DISTRICT** 1:4, 1:5
**divide** 27:15
**doc** 52:5
**doctor** 30:17, 92:4, 99:15
108:20
**doctor's** 20:11, 20:24, 20:25
21:6, 32:15, 32:18, 32:21
48:6, 48:7, 56:6, 56:9, 56:21
56:22, 57:12, 73:4, 79:25
85:15, 86:2, 92:10, 98:2
99:12, 99:25, 101:7, 101:9
101:13, 102:13, 110:25
111:3, 120:10
**doctors** 21:2, 119:17
**document** 22:20, 48:23, 49:4
51:8, 53:15, 55:5, 55:10, 71:4
71:25, 74:20, 106:16, 122:3
122:10, 128:14
**documents** 6:23
**doing** 40:14, 42:2, 58:22
70:22, 87:10, 93:14, 112:3
114:14
**domain** 113:17, 114:5
**due** 73:6, 112:9, 112:12
**duly** 5:3, 127:12
**duties** 62:5, 93:21
**dynamic** 62:18
**dynamics** 37:25

## E

**e-mail** 22:17, 22:22, 49:16

50:3, 51:13, 51:21, 52:7
52:16, 53:9, 53:18, 53:20
54:4, 55:11, 55:20, 56:3, 64:9
69:16, 69:18, 69:20, 70:8
70:9, 70:11, 70:14, 71:9
71:20, 72:2, 76:12, 100:12
128:11, 128:15, 128:21
**e-mails** 49:15, 50:4, 50:6
50:14, 51:13, 52:11, 52:12
52:13, 55:11, 67:13, 69:13
71:9, 72:4, 72:7, 76:4, 76:11
83:20, 83:25, 97:21, 100:5
100:6, 100:9, 100:17, 128:10
128:15, 128:20
**earlier** 32:14, 72:4
**early** 24:6, 67:18
**easy** 121:16
**education** 7:22, 78:9
**effect** 4:12
**effective** 109:20
**efficient** 105:19
**efforts** 77:17
**Effron** 13:10
**eight** 37:7, 37:7, 38:12
102:14
**either** 7:5, 7:13, 23:21, 45:12
79:10, 101:20, 103:8
**else's** 84:16
**email** 52:4
**emailed** 52:5
**Emanuel** 2:17, 6:19
**Emily** 52:25
**employ** 32:9, 127:19
**employed** 8:6, 8:8, 110:7
**employee** 21:19, 23:16, 23:17
28:3, 32:19, 32:22, 60:5
66:18, 68:23
**employee's** 32:12, 64:20
**employees** 9:19, 14:9, 23:9
26:23, 27:5, 37:2, 59:15
59:19, 59:22, 59:25, 60:16
60:19, 61:4, 61:8, 61:13
61:22, 62:2, 62:4, 62:8, 62:15
63:5, 64:25, 66:15, 70:23
89:11, 89:13, 104:6, 114:11
115:23, 116:2, 116:3

**employer** 26:9, 28:12, 110:12
**employment** 84:10, 84:13
84:19, 85:3, 85:6, 99:2, 99:7
100:25, 108:22, 109:20
110:5, 110:14, 111:12
111:18, 111:20, 122:20
**enable** 30:2
**encompass** 26:18, 30:6
**encourage** 62:17, 116:3
**encouraged** 30:20, 62:8
62:10, 67:4, 67:8
**encouragement** 62:13
**encourages** 64:17
**engagement** 48:17
**ensure** 115:17
**entails** 112:25
**entered** 109:24
**entire** 46:12, 100:25
**entirety** 97:12
**entities** 11:3, 11:5
**entries** 74:15
**environment** 20:14, 20:17
117:4, 117:9
**equation** 89:25, 102:2
**Ernst** 52:22, 53:18, 69:16
69:21
**Ernst's** 100:12
**errors** 129:5
**escalated** 110:6
**especially** 27:10, 114:22
**ESQ** 2:8, 2:13, 2:20, 2:21
2:22, 3:6
**essential** 112:10, 112:15
**Europe** 22:7
**evaluated** 118:22
**evaluates** 63:4
**evaluating** 27:22
**everybody** 12:22, 96:2
**evidence** 120:6
**exacerbated** 86:4
**exacerbating** 57:10, 80:2
92:5, 98:3, 101:15, 118:12
**exacerbation** 56:14
**exact** 69:24
**exactly** 6:9, 9:11, 73:16
120:14

**examination** 5:8, 127:10
128:4
**examined** 5:7
**example** 11:19
**excused** 24:9
**executive** 13:15, 13:22
**exhibit** 22:14, 22:15, 22:17
49:11, 49:14, 51:9, 51:12
51:18, 51:21, 53:8, 53:10
54:3, 55:6, 55:9, 55:17, 55:20
64:5, 64:6, 64:8, 69:9, 69:10
69:12, 69:14, 71:5, 71:8
71:15, 71:18, 75:25, 76:2
76:4, 106:17, 106:20, 122:6
122:7
**exhibits** 97:14
**existence** 9:16, 11:7
**existing** 80:3, 86:4, 98:3
**expect** 60:17, 60:19, 65:17
104:25
**expectations** 123:24
**expected** 35:17, 61:9, 119:8
119:11
**experience** 25:16, 41:3
66:22, 90:16, 98:7, 101:23
103:12
**experiences** 41:8
**Expires** 126:22, 129:25
**explained** 44:6
**exposure** 117:10
**extended** 119:18
**extent** 74:19

**F**

**face** 38:21, 70:21, 99:25
**faced** 77:23, 101:20
**fact** 80:18, 84:8, 86:7, 87:21
88:6, 88:6, 100:9, 102:23
114:25, 117:24, 123:19
**factors** 92:2, 93:11
**facts** 129:4
**fair** 59:4, 72:6, 95:20
**fairly** 73:25
**familiar** 108:7
**family** 31:4, 31:7

**fashion** 80:9
**fast** 92:11
**fault** 113:12
**February** 1:14, 126:6
  127:11, 128:2, 129:2
**feedback** 48:12, 73:19, 79:24
  81:3, 85:22, 86:5, 92:3, 93:19
  94:7, 94:10, 95:4, 97:22
  105:22
**feel** 60:10, 64:10, 64:14
  75:18, 95:24, 95:25, 120:23
**feelings** 120:25
**felt** 20:17, 29:4, 30:16, 36:13
  63:9, 78:21, 94:2, 100:18
  121:6
**field** 25:17
**figure** 29:24
**figured** 48:13
**file** 68:8
**filed** 63:15
**filing** 4:4
**final** 25:3
**Finally** 50:16
**find** 20:8, 99:15
**fine** 6:2, 49:7, 76:9, 124:17
**finish** 6:6, 6:10, 94:15
**FINOP** 11:19
**FINRA** 13:18, 13:20
**fire** 13:2, 13:5
**fired** 98:24, 112:2
**firing** 14:9, 86:7
**firm** 10:24, 11:24, 13:7, 13:8
  14:7, 19:4, 22:7, 23:15, 44:7
  44:15, 62:12, 68:13, 89:21
  91:23, 102:19, 123:3
**firm's** 18:4, 25:25, 123:24
**firms** 116:25, 117:11
**first** 5:3, 9:22, 14:22, 29:19
  40:23, 55:10, 64:8, 71:10
  88:21, 104:23, 105:5, 111:6
  128:14, 128:21
**first-year** 14:11, 14:20, 35:13
  42:7, 69:5, 93:21, 101:23
  104:23, 105:25
**fit** 74:16, 75:12, 75:13, 75:13
**Five** 9:21

**flag** 14:16, 63:11, 63:14
  63:20, 68:16
**flags** 52:15, 63:9, 67:24, 68:5
**Floor** 2:18, 5:6
**FMLA** 31:25, 32:3
**follow** 93:5, 111:22
**follow-up** 29:10, 95:23
**following** 54:14, 58:15
**follows** 5:7
**force** 4:12
**foregoing** 127:9
**forgo** 62:5
**form** 4:7, 15:8, 15:8, 33:20
  63:15
**formation** 9:15
**forms** 25:13, 63:7, 67:23
**forth** 52:14
**forward** 21:17, 72:16, 112:8
**forwarded** 72:5, 72:20
**forwarding** 55:22, 72:3, 72:7
**found** 99:4
**fourth** 94:16
**frame** 54:24
**free** 95:24
**free-willed** 116:5
**Friday** 16:3, 16:6, 16:13
  18:17, 19:11, 20:12, 21:24
  33:4, 33:5, 33:8, 48:13, 48:19
  53:22, 54:12, 54:17, 56:20
  68:9, 83:11, 83:13, 83:16
  83:24
**front** 65:14
**frustrated** 120:21, 120:22
**fulfill** 117:14, 117:15
**full** 96:25
**fulsome** 26:20, 41:21
**function** 12:22, 24:16, 65:10
**functions** 11:23, 12:13, 12:17
  14:15, 18:6, 84:15, 112:11
  112:15
**further** 4:6, 4:9, 47:25, 48:4
  54:5, 124:23, 127:16
**future** 100:19, 110:14
  112:18
**Fyi** 49:17

**G**

**Gailea** 52:17, 52:19
**gaps** 113:13
**gasped** 109:22
**gathered** 94:11
**gathering** 81:8, 97:20
**general** 73:14, 75:7
**generally** 22:2, 22:9, 23:2
  60:19, 61:4, 63:2, 65:12
  73:14, 75:10, 75:11, 124:3
**gentleman** 45:15
**getting** 20:23, 20:24, 27:13
  56:22, 78:20, 94:18, 94:20
  95:7, 100:11, 101:7
**gist** 124:4
**give** 75:5, 75:6, 88:16, 95:18
  129:3
**given** 20:11, 37:25, 40:19
  40:21, 60:7, 60:12, 62:25
  78:13, 82:25, 88:3, 93:4
  110:25, 112:17, 112:17
  114:23, 117:4, 117:15
  117:19, 118:3, 126:9
**giving** 31:13, 49:18, 49:23
  54:4, 54:7, 54:11, 54:22
**Glassdoor** 114:6, 115:25
**global** 22:7
**globally** 26:24
**go** 7:24, 21:17, 24:5, 31:11
  32:23, 46:20, 47:13, 58:14
  61:9, 66:20, 67:15, 67:21
  68:5, 83:10, 83:13, 96:8
  112:4, 113:21, 119:15
**goes** 29:13
**going** 17:25, 18:18, 18:23
  19:12, 19:14, 20:10, 20:21
  21:15, 22:10, 22:13, 24:7
  24:18, 24:21, 24:21, 25:23
  29:12, 29:13, 29:23, 29:25
  30:16, 30:25, 32:9, 40:23
  42:11, 43:17, 46:24, 48:9
  49:8, 49:10, 50:20, 51:8, 53:7
  54:3, 54:17, 55:4, 55:8, 56:6
  58:13, 58:14, 59:10, 60:10
  64:4, 65:3, 67:15, 67:16

67:19, 68:7, 68:18, 68:19
69:8, 69:15, 69:17, 71:3, 74:9
75:24, 79:25, 83:7, 86:6
87:19, 87:20, 87:21, 88:4
92:19, 93:6, 93:25, 100:16
105:6, 106:15, 109:3, 110:16
110:21, 111:3, 112:8, 112:18
122:2
**good**  5:10, 44:9, 44:11, 49:18
49:23, 98:24, 116:7, 116:24
**Googling**  77:11, 77:15
**gotten**  81:5
**govern**  62:15
**graduate**  8:2
**grant**  24:13, 90:5
**granted**  107:25, 118:17
119:6
**granting**  25:9
**group**  14:3, 75:3, 123:13
**grow**  31:7
**growing**  92:8
**guarantee**  92:17
**guardrail**  30:21, 85:23
**guardrails**  29:17, 29:20, 30:6
30:8, 31:11, 31:20, 32:10
**guess**  14:6, 74:8, 74:10
**guidance**  66:6
**guidelines**  75:7

## H

**hand**  19:9, 127:22
**handful**  67:2
**handle**  75:15, 75:17
**handled**  24:8
**handles**  25:5
**handling**  73:24
**happen**  87:13, 88:5, 101:5
**happened**  10:21, 28:19
66:23, 66:24, 66:25, 72:19
87:16, 92:14, 101:5, 105:20
109:17
**happening**  19:14, 47:20
58:2, 65:17, 72:25, 101:7
**happens**  68:20
**happy**  5:24, 76:10

**hard**  36:20, 92:11, 92:23
105:23, 117:3, 117:4
**hardship**  88:14, 92:19
**harm**  98:12, 98:16
**hastily**  30:21
**hasty**  100:25
**head**  111:5, 116:17
**health**  19:19, 19:20, 19:21
56:20, 56:23, 62:15, 62:15
73:5, 86:4, 86:4, 112:24
118:12, 118:13, 120:8
**healthy**  62:16
**hear**  14:22, 29:17, 29:19
102:5
**heard**  27:23, 66:15, 66:18
66:21
**heavily**  97:25
**heightened**  58:18, 58:19
58:21
**Heller**  2:5, 2:8, 5:9, 5:11
49:4, 49:8, 50:20, 51:2, 51:7
51:20, 55:4, 55:19, 60:24
61:16, 71:3, 71:17, 94:18
94:25, 95:9, 95:12, 95:18
96:9, 96:17, 96:22, 96:25
97:4, 97:10, 97:16, 106:15
109:6, 122:2, 124:12, 124:18
124:22, 125:3, 128:5
**helmet**  76:14, 76:20, 76:22
76:24
**help**  19:2, 64:11
**helpful**  19:23
**hereunto**  127:21
**high**  79:2, 105:24
**high-performing**  105:21
**higher**  46:17
**highest**  7:22
**highly**  114:12, 114:12
114:13
**HIPAA**  99:19, 99:21
**hire**  110:9, 110:13, 117:24
**hired**  72:13
**hiring**  14:8, 14:12
**history**  84:5, 84:9
**holidays**  22:6
**home**  31:4, 31:8, 58:3, 66:20

67:15, 67:16, 67:18, 67:19
67:22, 74:8, 107:5, 119:20
**honest**  84:7
**honestly**  9:11, 21:5, 22:21
38:10, 45:12, 74:7, 99:17
**honesty**  12:9
**honor**  20:18, 29:25, 36:14
58:14
**honored**  50:11, 89:3
**honoring**  57:6
**Hope**  2:20, 6:18
**hoped**  88:11
**hopefully**  105:7
**hour**  52:5, 84:6
**hours**  17:3, 23:22, 29:15
32:12, 33:2, 34:18, 35:6
35:17, 35:23, 36:7, 36:20
36:25, 37:3, 37:7, 37:8, 37:11
37:14, 37:17, 38:12, 38:22
39:9, 40:4, 40:8, 40:24, 41:2
61:24, 66:13, 67:18, 67:21
68:2, 68:3, 68:4, 68:22, 69:4
69:5, 70:16, 70:18, 70:19
70:20, 70:21, 70:24, 92:12
92:20, 102:15, 103:22, 114:2
118:10, 118:13, 118:14
118:18, 119:17, 120:2
**house**  76:18, 103:15, 103:19
**HR**  37:4, 43:11, 43:12, 45:17
46:21, 47:5, 47:8, 47:17
60:13, 65:10, 65:25, 80:17
84:15, 123:22
**human**  24:15, 24:24, 25:3
**hypothetical**  75:14, 86:23

## I

**idea**  18:8, 39:20, 44:5, 44:25
115:21
**IDENT**  128:9
**identification**  51:17, 55:15
71:14
**identifying**  72:12
**ifs**  90:8
**ignore**  111:3, 120:5, 120:10
**illness**  56:14, 56:17, 57:8

73:6, 80:3, 98:4, 101:15
**imagine** 21:5
**immediately** 109:21
**impact** 87:24, 120:7
**impacted** 88:2
**implemented** 57:19, 57:20
**impossible** 37:21, 38:17
  38:25, 47:16, 92:20
**improper** 86:23
**in-house** 26:23, 76:19, 80:18
**in-person** 26:17
**inability** 87:11
**include** 27:19, 29:22, 29:22
  64:18
**including** 9:20, 17:24, 84:15
  97:13, 100:12, 101:7, 114:3
**incompatible** 102:20
**inconsistent** 118:15
**increase** 101:21
**increasingly** 73:10
**indicate** 65:21, 129:3
**indifferent** 116:7
**indirectly** 127:18
**individual** 66:8
**individuals** 115:9
**industry** 22:2, 25:11, 98:8
  113:18
**info** 114:19
**information** 19:9, 20:9
  20:20, 48:2, 48:4, 56:8, 56:11
  81:5, 81:8, 97:20, 97:21
  113:15, 113:16, 114:7
**initial** 9:15, 33:4, 33:4, 40:17
  45:10
**initially** 44:4, 44:24
**insistent** 88:12
**instruct** 26:13
**insurance** 62:15
**interactive** 27:24, 28:2, 28:7
  91:2, 91:3, 91:5
**interest** 110:5
**interested** 114:13, 127:18
**intermittent** 23:18, 23:19
  24:2, 24:10
**internal** 75:4, 109:14
**internally** 45:22, 80:17

**interpret** 24:10
**interrupt** 26:12, 38:14
**interrupted** 38:13, 94:17
  95:8
**interrupting** 96:5
**interview** 74:25, 75:3
**interviewed** 72:15
**interviewing** 14:19, 75:6
**interviews** 72:12, 75:5
  113:11
**investigate** 26:7
**investment** 102:18, 113:16
  114:8, 114:15, 116:24
  117:25
**invite** 106:18
**involved** 14:13, 15:10, 21:18
  22:23, 25:7, 25:12, 25:25
  32:25, 33:19, 44:22, 60:13
  60:14, 79:21, 80:12, 123:8
**involvement** 42:16, 80:22
**involves** 109:9
**irreconcilable** 123:22
  124:10
**irrevocable** 109:21, 111:25
**issue** 56:20, 66:7, 77:5, 86:4
  88:24, 89:2
**issued** 15:6
**issues** 23:6, 66:5
**issuing** 14:14
**iStaff** 39:21
**iStaffing** 70:17, 70:24

**J**

**JAMES** 2:13
**JANICE** 2:22
**January** 7:19
**Jeanne** 1:17, 51:15, 55:12
  71:11, 71:12, 71:20, 98:7
  123:2, 123:21, 126:4, 126:15
  127:10, 128:5, 128:12
  128:16, 128:22, 128:23
  129:2, 129:21
**Jeanne's** 12:21
**Jen** 6:21
**JENNIFER** 2:21

**jeopardize** 42:17, 42:24
**jeopardized** 42:12
**jeopardizing** 42:15
**jeopardy** 42:23
**job** 28:25, 47:10, 47:19
  49:18, 49:23, 60:8, 90:18
  97:24, 105:5, 105:10, 105:11
  105:13, 105:14, 110:3
  110:16, 112:11, 112:15
  112:20, 112:21, 112:23
  112:24, 113:3, 113:9, 113:12
  117:7, 117:20, 117:23
  118:13, 120:7, 120:18
  120:18, 121:7, 121:10
  121:14
**joined** 9:17, 9:19, 10:23
  104:13, 109:19
**joining** 110:6
**July** 10:20, 16:22
**junior** 24:20
**juniors** 31:5, 31:6, 65:21

**K**

**K-a-r-n** 46:5
**Karn** 46:4, 46:6, 46:11
  46:12, 46:17
**Kate** 5:12, 14:22, 15:11
  15:14, 15:20, 16:8, 16:25
  17:6, 17:8, 17:16, 17:21
  18:15, 19:2, 19:5, 19:15, 20:9
  22:11, 22:18, 28:20, 29:11
  29:20, 33:25, 34:7, 34:9
  34:12, 34:22, 35:7, 35:10
  37:3, 37:5, 37:15, 37:16
  37:20, 37:21, 38:4, 38:7, 38:9
  38:11, 38:21, 38:24, 39:3
  39:8, 39:9, 39:11, 39:24, 40:8
  40:13, 41:4, 41:19, 41:24
  42:13, 43:3, 43:7, 43:16
  43:20, 43:24, 44:17, 44:18
  44:20, 45:7, 45:14, 46:20
  46:21, 46:25, 48:19, 52:7
  52:20, 52:23, 53:2, 53:5
  53:18, 54:4, 54:7, 54:11
  54:22, 57:16, 57:20, 58:2

58:24, 63:11, 63:14, 63:25
64:14, 69:4, 69:25, 72:8
72:12, 72:14, 73:10, 76:23
77:4, 77:11, 77:15, 77:20
79:17, 80:23, 81:11, 82:3
82:8, 82:12, 82:18, 83:3
83:19, 84:4, 84:24, 85:3
85:11, 85:14, 86:8, 87:9
87:23, 87:25, 88:22, 88:25
89:22, 90:3, 90:4, 90:5, 90:14
90:19, 90:21, 90:22, 91:4
91:6, 91:10, 91:16, 91:22
98:10, 98:11, 98:15, 98:21
98:24, 99:10, 100:11, 101:20
102:9, 102:22, 103:3, 104:12
104:15, 104:21, 105:12
105:25, 106:12, 106:18
106:24, 107:8, 107:11
107:18, 107:20, 107:21
107:24, 108:9, 108:20
109:18, 110:23, 111:6
111:10, 111:11, 111:13
112:9, 113:2, 113:11, 113:19
114:4, 114:25, 115:9, 117:12
117:18, 118:5, 118:9, 120:2
120:4, 120:12, 120:15
120:23, 121:2, 121:7, 122:20
123:3, 123:19
**Kate's** 20:3, 21:7, 29:15
33:2, 35:19, 37:10, 42:16
42:21, 45:5, 47:22, 64:8, 73:5
74:25, 84:8, 84:10, 84:13
84:18, 86:3, 86:15, 89:15
89:17, 99:8, 99:14, 99:20
100:25, 101:10, 101:17
108:11, 108:17, 108:22
122:25, 123:23
**KATHRYN** 1:7, 3:4, 129:1
**katsails.com** 79:11
**keep** 62:4, 90:11
**kept** 89:19
**key** 44:9
**keyboard** 23:16
**Kim** 7:6, 17:24, 36:10, 37:13
43:6, 51:15, 51:23, 69:16
69:21, 70:7, 75:21, 79:14

80:21, 81:9, 81:10, 128:12
**Kim's** 80:22
**kind** 65:4, 65:5, 78:11, 79:7
104:24, 107:7, 109:22, 110:5
113:12, 114:7, 118:17
**kinds** 117:6
**KIRSHNER** 2:10
**knee** 23:5
**knew** 15:8, 17:17, 39:15
56:18
**know** 5:23, 6:2, 6:9, 10:12
13:6, 15:7, 20:7, 20:13, 20:18
21:12, 21:14, 22:5, 23:10
23:10, 23:12, 24:5, 24:6
24:22, 24:24, 25:22, 26:25
27:3, 28:2, 28:9, 30:17, 30:25
31:4, 31:4, 31:10, 31:10
31:12, 31:15, 31:24, 31:25
31:25, 34:12, 34:19, 34:19
34:19, 34:21, 34:23, 36:7
38:7, 38:10, 39:4, 39:9, 39:11
39:12, 40:5, 40:5, 40:12
40:25, 41:2, 43:5, 43:13
43:17, 43:23, 44:4, 44:12
44:16, 45:21, 46:6, 46:18
46:21, 47:5, 47:12, 48:18
50:7, 50:7, 51:25, 53:13
54:14, 55:25, 56:16, 56:18
56:24, 57:7, 57:7, 57:8, 59:13
59:22, 61:3, 62:12, 63:19
63:25, 64:15, 65:3, 65:3, 66:5
66:25, 67:18, 67:24, 68:2
69:2, 71:22, 74:4, 76:7, 77:4
80:10, 82:15, 83:2, 84:6, 86:5
92:10, 102:11, 102:12, 103:7
103:22, 104:24, 105:22
105:23, 109:11, 110:2, 110:3
110:11, 110:11, 110:15
110:16, 110:16, 110:17
111:4, 111:11, 112:12
114:17, 115:8, 115:12, 116:5
116:16, 121:4, 122:4, 122:18
123:2, 123:13, 123:20, 124:4
**knowing** 42:11, 97:22
112:20, 120:18
**knowledge** 32:11, 36:4

113:13
**known** 8:13, 8:14, 13:20
65:20, 113:3, 113:6, 113:9
113:19, 114:4, 116:19, 118:5
**knows** 113:12
**Kosowsky** 3:6, 76:12, 76:18
78:2, 79:12, 83:20
**Kosowsky's** 76:16
**KS02.pdf** 50:17
**KSO1.pdf** 50:17

## L

**Labor** 16:7, 22:4
**lack** 20:20, 62:25
**landed** 32:6
**largest** 31:5
**late** 16:2, 34:18, 35:6
**law** 26:9, 28:11, 28:17
**lawyer** 109:8, 109:10, 109:11
**lawyers** 76:19
**leading** 22:3
**learn** 73:12, 77:6, 93:22
105:4, 117:8
**learned** 15:13, 15:19, 57:22
58:8, 58:21, 58:25, 59:5, 84:4
93:2, 93:10
**learning** 43:2, 84:8, 117:9
**leave** 10:6, 23:6, 23:8, 23:14
23:18, 23:20, 23:23, 24:3
24:6, 24:11, 31:16, 117:25
119:15, 119:16, 119:19
**leaves** 31:25, 32:3
**leaving** 28:25
**led** 98:6
**left** 10:2
**legal** 80:18, 84:16, 99:23
109:15
**legitimacy** 78:14
**letter** 14:25, 15:2, 15:4, 15:8
55:22, 56:7, 56:9, 57:12
57:17, 57:22, 120:13
**letters** 14:14, 14:17, 14:24
**letting** 31:14
**level** 7:22, 18:20, 24:24, 25:2
68:25, 105:24

**levels** 62:20, 65:20
**life** 25:24, 31:8
**lifestyle** 62:16
**limit** 29:15, 32:25
**limited** 19:9, 36:4, 104:22
  104:25
**LINDER** 2:10
**line** 28:16, 65:14, 129:3
  129:6, 129:8, 129:10, 129:12
  129:14, 129:16, 129:18
**lines** 23:24
**Listen** 31:11
**little** 42:8, 78:6, 85:14
  100:13, 104:15
**live** 40:18, 40:21, 40:23, 41:2
  41:4, 41:17, 45:9, 60:14
  89:19, 89:23, 90:3, 90:12
  92:18, 92:21, 92:21, 93:24
  94:5, 98:19, 102:17, 102:23
  102:24, 103:4, 103:6, 103:18
  103:20, 103:22, 104:5
  104:23, 110:19
**living** 62:16
**LLC** 1:10, 3:8, 129:1
**LLP** 2:5, 2:10, 2:17
**long** 9:16, 11:25, 16:21
  36:16, 49:10, 88:5, 92:25
  104:2, 104:3, 118:14
**long-term** 80:9, 87:20, 92:9
**longer** 87:12, 87:14, 87:17
  123:3, 123:13
**look** 17:7, 51:25, 53:12
  55:24, 56:6, 69:14, 71:23
  76:6, 86:14, 86:20, 113:18
  122:4
**looked** 39:19, 40:15, 115:14
  119:3
**looking** 48:12, 48:15, 50:5
  74:14
**loop** 44:5, 44:12, 45:25, 63:3
**lot** 29:21, 31:5, 40:19, 40:24
  41:2, 68:3, 68:4, 90:8, 103:15
  116:23, 117:4, 117:5, 117:5
  117:10
**lots** 31:6, 114:21
**loved** 108:6

**lower** 46:18
**luck** 44:8
**lunch** 124:13

## M

**Madison** 2:11, 2:18
**main** 73:19
**maintain** 56:14
**making** 91:20
**manage** 73:11, 92:23, 92:25
**management** 18:6, 26:24
  44:14
**managers** 65:15
**manner** 105:19
**manufactured** 78:17
**marathons** 103:23
**March** 16:22, 127:22
**marked** 22:14, 49:13, 51:16
  53:8, 55:15, 64:5, 69:9, 71:14
  75:25, 106:16
**marking** 51:9, 71:4
**marriage** 127:17
**maternity** 23:6, 23:8
**math** 75:12
**matrix** 47:14
**Matt** 52:6, 52:8, 52:17, 52:18
  52:19, 53:4
**matter** 112:5, 127:19
**mean** 13:16, 15:24, 19:20
  19:21, 21:25, 47:18, 54:25
  61:3, 63:22, 66:17, 74:18
  74:24, 78:5, 94:13, 104:5
  105:9, 115:22, 118:22
  122:14
**meaning** 19:16, 33:24, 57:23
**means** 6:8, 28:3, 49:22
**meant** 19:10, 50:10
**mechanisms** 63:5
**medical** 19:16, 21:8, 30:23
  39:4, 55:22, 57:8, 58:16
  91:18, 92:5, 98:13, 108:12
  108:17, 118:10, 119:22
**meet** 9:22, 42:4
**meeting** 17:19, 82:6, 82:9
  82:13, 82:19, 82:22, 106:19

106:24, 107:3, 107:5, 107:8
  107:11, 107:18, 109:17
  117:12, 121:15
**member** 18:3, 24:20, 26:3
  44:14, 45:13, 46:6, 46:16
**members** 24:21, 36:23, 42:11
  60:9, 67:14, 80:17, 80:19
  87:22, 102:12
**mentioned** 21:23, 90:10
**middle** 60:9, 65:11
**midnight** 89:4, 114:3
**mind** 12:10, 18:25, 40:22
  78:8, 88:24, 99:7, 111:14
**mine** 63:23, 80:24
**mini-day** 75:2
**minutes** 50:23, 97:2, 97:3
  97:5, 124:15
**mischaracterized** 74:21
**mischaracterizes** 47:3, 74:20
**misrepresenting** 70:24
**mistake** 112:19, 112:23
**modeling** 75:12
**modules** 27:9, 27:19, 27:22
**moment** 115:12, 115:13
**monitor** 21:16, 29:13, 48:9
  68:14, 72:24
**monitored** 50:4
**monitoring** 50:14, 52:13
  60:14, 65:14, 73:3, 77:14
  77:15, 79:22, 81:8, 85:21
  86:6, 87:9, 92:2, 92:7, 93:2
  93:11, 93:13, 94:11, 94:22
  94:25, 97:19, 98:17
**monitors** 63:4
**Montclair** 7:25
**month** 7:16, 42:8, 104:16
**months** 117:23
**morning** 5:10, 40:11, 67:18
**motivated** 86:15
**multiple** 17:23, 116:14
**mutually** 28:9

## N

**name** 5:11, 10:24, 14:22
**named** 46:4

**NASD** 13:21
**nature** 119:23
**near** 36:14
**necessity** 55:22
**need** 17:25, 18:14, 20:11
  20:12, 21:6, 23:19, 34:17
  43:3, 43:10, 45:18, 45:19
  45:25, 47:5, 49:6, 64:9, 65:4
  68:17, 68:17, 77:9, 84:12
  84:16, 89:15, 94:14, 95:10
  95:16, 96:15, 114:2, 118:10
  123:12
**needed** 15:14, 16:3, 17:2
  17:16, 19:7, 19:16, 19:22
  20:9, 20:19, 20:22, 23:6, 24:4
  28:24, 29:4, 29:6, 29:9, 31:9
  34:4, 35:3, 38:22, 44:12
  52:15, 57:5, 58:5, 58:12
  63:10, 63:21, 63:24, 90:4
  93:25, 99:11, 102:14, 119:15
  119:16, 119:16, 121:11
**needing** 20:5, 23:4, 63:17
  87:23, 94:3
**needs** 18:21, 21:11, 21:12
  34:19, 58:13, 92:11, 96:2
**negative** 120:7
**negatively** 88:2
**negotiable** 99:13, 99:16
  100:4
**never** 41:21, 45:7, 45:8
  47:18, 70:4, 99:17, 105:14
  105:15
**nevertheless** 84:17
**new** 1:5, 1:19, 2:7, 2:7, 2:12
  2:12, 2:19, 2:19, 5:6, 5:6
  16:12, 31:6, 31:7, 56:8, 56:11
  98:20, 98:20, 104:8, 127:3
  127:5, 127:9
**nickname** 46:15
**night** 17:3, 17:4, 18:17
  19:11, 19:22, 19:23, 20:5
  20:12, 21:13, 21:24, 29:16
  33:4, 33:4, 33:6, 33:8, 33:17
  33:18, 34:5, 38:12, 43:7
  45:11, 48:14, 48:19, 59:20
  59:23, 59:25, 60:3, 60:5, 60:7

  60:12, 60:15, 60:17, 60:20
  61:7, 62:9, 87:24, 88:18
  88:22, 88:25, 89:7, 89:9
  89:10, 89:18, 92:12, 102:15
  110:18, 118:10
**nights** 113:21, 113:23
  116:14
**nine** 37:7, 37:8, 38:12, 92:12
  102:14, 118:10
**non-live** 103:6
**noon** 96:23
**normal** 119:20
**Nos** 55:14, 55:23, 71:12
  71:19, 128:18, 128:24
**Notary** 1:19, 5:4, 126:22
  127:8, 129:25
**note** 20:11, 20:24, 20:25
  21:6, 32:15, 32:18, 32:21
  48:6, 48:8, 56:21, 56:22, 58:6
  58:15, 73:4, 79:25, 85:16
  86:2, 92:3, 92:10, 98:2, 99:12
  99:25, 100:4, 101:8, 101:9
  101:13, 102:13, 110:25
  111:3, 120:10
**noted** 125:5
**notes** 21:3
**notwithstanding** 41:19, 87:5
**number** 10:23, 23:22, 61:24
  68:22, 70:24, 129:3
**numerous** 26:17, 67:13
  119:4

# O

**oath** 4:11, 126:6
**Objection** 10:8, 10:22, 13:9
  14:5, 15:16, 19:6, 19:18
  19:25, 20:6, 21:9, 25:10
  28:14, 28:21, 30:10, 31:23
  35:25, 36:12, 37:19, 38:18
  39:6, 39:25, 41:7, 42:3, 43:21
  45:6, 47:2, 57:13, 57:18
  57:25, 58:11, 59:7, 59:17
  59:21, 60:6, 60:18, 60:21
  61:14, 63:13, 67:7, 72:22
  74:19, 85:18, 86:17, 86:22

  87:7, 88:23, 89:8, 90:7, 90:20
  94:9, 98:25, 99:22, 101:24
  102:8, 111:15, 113:22, 115:7
  115:19, 118:8, 119:9, 120:19
  120:24, 121:12
**objections** 4:7
**observed** 100:17
**observing** 97:21, 100:5
**obtain** 37:22
**occasions** 31:21
**off-line** 36:8, 37:5, 43:11
  87:24
**offer** 14:14, 14:17, 14:24
  14:25, 15:2, 15:4, 15:8
  103:17, 111:21
**offered** 66:10, 110:23, 111:8
  111:13, 120:4
**office** 16:11, 16:15, 16:17
  20:14, 20:15, 31:5, 31:6
  66:16, 66:19, 74:5
**officer** 3:7, 4:11, 4:13, 11:11
  11:13, 12:15, 13:15, 13:22
  50:2, 84:14
**offices** 26:24
**okay** 21:13, 58:13, 74:11
  74:13, 89:22, 124:16
**old** 7:20, 78:7
**on-campus** 114:9, 114:19
**on-line** 27:7, 27:9, 27:11
  27:19
**once** 52:2, 53:13, 76:7, 81:19
  122:5
**one-page** 51:12, 128:10
**ones** 65:4
**ongoing** 59:10
**operating** 11:11, 11:13
  12:15, 50:2, 84:14
**operations** 23:10
**opinion** 71:2, 98:22, 112:5
**option** 112:4
**options** 102:3, 102:5
**order** 97:15
**originally** 13:19
**outside** 26:11, 26:16, 26:22
  27:4, 54:9, 58:3, 107:22
  107:24, 108:2, 109:15

119:20
**overall** 77:17
**overnight** 115:6
**oversaw** 46:12
**oversee** 11:23, 12:17
**overseeing** 44:10
**overseen** 12:12
**oversees** 18:5

## P

**p.m** 22:19, 33:12, 97:9
  124:20, 124:21, 125:5
**page** 55:10, 71:10, 128:4
  128:14, 128:21, 129:3, 129:6
  129:8, 129:10, 129:12
  129:14, 129:16, 129:18
**pages** 71:18
**painting** 108:6
**pandemic** 16:19, 27:10
**paper** 129:3
**Park** 2:6
**part** 14:15, 15:11, 26:6
  26:21, 27:2, 27:20, 27:22
  52:10, 62:18, 78:9, 78:20
  80:4, 81:4, 81:6, 81:7, 97:19
  99:5
**particular** 22:22, 70:11
**particularly** 41:5, 41:12
**parties** 4:3, 28:9, 127:17
**partner** 12:23, 13:13, 44:13
  81:7
**partners** 1:10, 3:8, 8:9, 8:11
  10:17, 10:23, 10:25, 11:7
  11:10, 13:7, 13:8, 13:25, 14:4
  14:6, 14:9, 15:15, 15:21
  17:23, 44:10, 129:1
**party** 109:16
**Patrick** 52:25
**PDC** 18:4, 63:4, 65:18, 65:23
  66:2, 66:5, 80:17, 80:20, 81:3
  81:5, 81:6
**pending** 6:4, 95:14, 97:17
**people** 14:3, 18:21, 18:22
  23:5, 23:6, 24:4, 27:9, 27:10
  27:16, 31:3, 31:9, 34:23, 63:8

67:17, 67:25, 70:22, 75:6
75:11, 79:21, 90:12, 94:8
94:8, 98:20, 112:2, 112:3
116:5, 116:24, 117:10
117:22, 117:24, 119:7
**perceive** 77:22
**percent** 10:13
**perception** 94:6, 101:5
**Perella** 8:24, 9:2
**perform** 42:18, 93:20
  106:12, 112:10, 112:15
**performing** 105:23
**period** 10:11, 23:21, 29:6
  29:6, 50:8, 50:11, 55:2, 57:20
  73:9, 73:24, 74:3, 75:21
  85:24, 89:3, 89:4, 90:6, 90:23
  91:11, 92:15, 93:8, 98:21
  100:22, 104:3, 104:4, 106:11
  110:21, 111:7, 111:8, 111:14
  111:22
**periods** 110:8
**permission** 99:20, 108:2
**permitted** 90:5
**PERRY** 2:5
**person** 12:7, 13:24, 30:20
  45:23, 45:24, 45:24, 46:2
  47:12, 66:12, 68:17, 69:2
  97:23, 100:10, 104:9, 104:18
**personal** 19:17
**pet** 32:7
**phone** 29:11
**photography** 108:6
**phrase** 27:24, 28:2, 29:17
  29:19, 30:13, 32:8, 32:10
  124:9
**phrased** 102:2
**physical** 24:7, 24:21, 32:22
  32:23
**picture** 76:23
**place** 28:22, 28:23, 29:12
  31:19, 70:19, 79:23, 85:23
  85:23, 85:24, 90:14, 90:15
  107:4, 107:6
**placed** 22:15, 49:11, 51:18
  53:10, 55:7, 55:17, 64:6
  69:10, 71:15, 76:2, 106:20

122:7
**places** 27:11
**Plaintiff** 1:8, 1:18, 2:4
**Plaintiff's** 22:14, 22:15
  22:17, 49:11, 49:14, 51:9
  51:12, 51:18, 51:21, 53:8
  53:10, 54:3, 55:6, 55:9, 55:17
  55:20, 64:5, 64:6, 64:8, 69:9
  69:10, 69:12, 71:5, 71:8
  71:15, 71:18, 75:25, 76:2
  76:4, 106:16, 106:20, 122:6
  122:7, 128:9
**plan** 43:25
**play** 84:9, 108:8, 108:21
**please** 5:23, 6:5, 6:9, 51:25
  53:12, 55:24, 60:25, 71:22
  74:21, 76:6, 96:8, 96:16
  97:17, 122:4
**PM** 51:14, 71:10, 128:11
  128:22
**point** 49:3, 54:15, 80:6, 88:9
**points** 107:7, 107:9, 107:10
  108:24, 109:13
**policies** 25:19, 26:2, 26:20
  61:12, 61:21, 62:2, 62:14
  62:16
**policy** 59:24, 60:2, 61:25
  62:13, 119:20
**position** 8:25, 67:5, 101:20
  101:22, 113:4
**positions** 9:6
**positive** 73:25
**possible** 18:24
**possibly** 38:2
**post** 27:10
**posted** 78:11, 79:5, 79:6
**potentially** 112:16
**predict** 92:20, 93:24, 93:24
**predictability** 103:21
**predictable** 92:24
**predicting** 60:13
**preference** 19:17
**pregnancy** 23:7
**pregnant** 118:19, 119:12
  119:24
**prep** 6:18, 6:19

**preparation** 6:24, 7:3, 7:8
**prepare** 6:16, 15:2
**prepared** 14:24, 14:25
**presence** 114:9
**present** 2:14, 3:3, 11:21
  78:22, 81:23
**presented** 75:16, 120:6
**pretty** 41:5, 92:10
**prevent** 60:2
**preventing** 96:9
**prevention** 62:3
**previous** 110:8, 110:8
  110:12
**previously** 8:13, 8:14, 8:21
  8:22, 13:20, 22:13, 30:13
  32:11, 49:13, 53:7, 58:12
  75:25, 106:16
**print** 115:21
**printout** 51:13, 55:10, 71:9
  128:10, 128:15, 128:20
**prints** 115:21
**prior** 13:23, 31:21, 66:8
  83:11, 83:13, 83:16, 107:17
  107:19
**private** 103:19
**privileged** 26:14, 109:4
  109:7, 109:9
**probably** 67:2, 84:22, 90:15
  112:22, 113:14, 115:16
  118:24, 119:4
**problem** 74:17, 75:14, 93:3
  93:9, 93:10
**proceed** 25:7, 26:15
**proceeded** 44:18, 110:2
**process** 14:14, 27:22, 27:24
  28:3, 28:7, 79:22, 80:4, 81:8
  91:2, 91:3, 91:6, 92:24, 92:25
  114:24, 117:21, 117:22
**products** 27:7
**profess** 66:24
**professional** 18:4, 44:10
  58:16, 66:3
**program** 90:17, 91:21
  102:21, 106:2, 106:5, 110:22
  117:13
**project** 41:19, 41:25, 42:7

104:9, 104:12
**projects** 40:17, 46:20, 46:25
**promise** 95:22
**properly** 96:3
**pros** 85:2, 85:5, 85:11
**protect** 18:19, 18:24, 19:8
  20:21, 35:5, 68:17, 88:16
  88:17, 94:3, 98:21, 104:2
  104:3, 110:20
**protected** 34:4, 38:21
**protective** 97:15
**proved** 93:25, 94:2
**provide** 30:3, 105:2
**provided** 85:15
**providers** 108:12, 108:18
**providing** 104:22, 105:7
**Pruzan** 8:13, 8:16, 8:17, 8:19
  8:20, 8:23, 9:7, 9:14, 9:22
  10:7, 10:16, 10:24, 13:10
  34:7, 70:13, 79:15, 80:21
  82:2, 82:7, 82:13, 82:19
  84:18, 84:24, 85:11
**Pruzan's** 13:11
**PT** 24:5, 24:7
**public** 1:19, 5:4, 113:17
  114:5, 126:22, 127:8, 129:25
**pulled** 17:20
**purchasing** 23:15
**purposes** 11:20, 13:14, 13:17
  13:18, 13:23
**pursuant** 97:14
**pursuing** 114:14
**put** 28:24, 29:5, 29:12, 42:22
  45:16, 46:25, 67:25, 76:9
  78:22, 79:4, 79:5, 79:23
  85:23, 85:23, 85:24, 88:17
  92:18, 97:23, 98:19, 100:10
  100:12, 105:5, 105:10, 114:7
**putting** 45:18, 57:9, 101:20
  101:22, 102:22

## Q

**question** 4:7, 5:22, 6:4, 6:6
  6:9, 12:11, 18:25, 24:19
  42:14, 42:19, 46:22, 49:20

53:14, 53:17, 54:5, 60:22
61:2, 78:14, 90:9, 95:13
95:14, 95:21, 95:23, 96:10
96:12, 96:19, 97:17, 97:18
108:16, 109:6, 123:7
**questions** 5:19, 6:11, 6:14
  57:11, 75:9
**quick** 6:20
**quiet** 22:9
**Quinn** 2:17, 6:19
**quote-unquote** 24:17

## R

**raise** 63:11, 63:14, 65:7
**raised** 14:17, 26:5, 63:9
  65:13, 68:16
**raises** 26:4
**range** 41:8, 41:9
**ranged** 23:4
**rate** 115:24
**Ratner** 1:18, 5:4, 127:7
  127:25
**reach** 18:2, 68:6, 122:17
**reached** 16:8, 45:13, 45:21
**read** 7:13, 52:3, 53:16, 56:2
  60:24, 61:2, 69:19, 71:24
  76:11, 76:13, 97:16, 97:18
  107:8, 107:9, 126:5
**reading** 22:21
**real** 105:5
**reality** 102:17
**realize** 87:13, 87:17
**realized** 17:22
**really** 10:4, 10:12, 38:10
  45:12, 64:11, 99:11, 99:15
  108:3
**reason** 6:13, 17:15, 19:15
  34:25, 35:2, 72:18, 99:5
  129:3, 129:6, 129:8, 129:10
  129:12, 129:14, 129:16
  129:18
**reasonable** 24:13, 25:9
  26:10, 28:4, 28:13, 35:23
  85:15
**reasonableness** 36:2

**reasons** 11:18, 118:23
**recall** 11:8, 11:12, 11:15
  15:22, 16:5, 16:11, 17:13
  17:18, 18:8, 18:12, 18:14
  19:19, 20:5, 20:23, 21:5
  21:21, 22:21, 23:25, 27:25
  29:14, 30:11, 32:16, 33:9
  33:10, 33:11, 33:13, 33:19
  34:22, 35:4, 39:18, 40:3, 40:3
  40:7, 40:13, 40:15, 43:2
  43:24, 45:12, 45:20, 46:2
  47:9, 50:18, 52:18, 53:21
  56:3, 56:19, 57:14, 58:22
  69:24, 72:18, 73:22, 74:7
  74:12, 75:20, 75:23, 78:6
  81:18, 81:22, 81:25, 84:21
  85:9, 85:10, 91:15, 100:6
  107:17, 107:21, 107:23
  108:4, 109:12, 111:5, 120:11
  120:14, 123:25, 124:6, 124:9
**received** 23:3, 47:25, 56:9
  56:12, 57:16, 105:22, 108:25
**receiving** 56:3, 79:24
**recess** 51:5, 97:8, 124:20
**recollection** 123:4
**recommending** 45:2
**record** 51:3, 51:4, 51:7, 96:8
  97:6, 97:7, 97:10, 97:11
  108:16, 124:18, 124:19
  124:22, 125:3, 125:4, 126:7
  126:8, 129:4
**recruiting** 14:13, 114:23
  117:21, 117:22
**red** 52:15
**referenced** 76:24
**referral** 110:6
**refresh** 123:4
**refute** 39:24
**regard** 91:6, 91:8
**regarding** 33:15, 66:6, 74:3
  90:23, 91:11, 111:7
**regardless** 20:20
**regular** 56:15, 57:15, 58:9
**regulators** 52:11
**regulatory** 11:20, 11:20
  13:14, 13:16, 13:18, 13:23

103:16
**reinforced** 100:16
**reiterated** 110:24
**related** 18:6, 56:23, 127:16
**relatively** 53:9
**relayed** 64:13, 123:16
**relevance** 12:10
**relevant** 111:14, 111:16
  111:19
**remain** 41:20
**remember** 10:4, 30:12, 37:8
  49:19, 49:21, 49:22, 53:24
  73:16, 81:21, 93:16, 98:4
  108:3
**reminded** 110:4
**remotely** 16:16, 16:18, 31:14
  31:22, 31:24, 74:6
**remove** 42:7, 111:13
**removed** 111:8
**removing** 41:18, 103:3
**repeat** 42:19, 46:22, 60:22
**rephrase** 5:24, 15:18, 61:20
  103:2
**report** 12:20, 12:22, 46:8
  46:10, 84:15
**reported** 39:11, 39:16, 39:17
  40:8
**reporter** 1:19, 6:7, 127:7
**reporting** 116:3
**reports** 16:10
**represent** 83:7, 96:17, 96:20
**request** 20:4, 20:18, 21:8
  21:21, 21:23, 22:23, 23:17
  24:13, 26:9, 28:13, 29:20
  29:25, 32:18, 32:21, 35:20
  36:5, 36:14, 40:5, 42:5, 50:20
  86:8, 89:17, 89:18, 89:19
  91:7, 96:16, 110:24
**requested** 15:20, 15:22
  15:24, 33:22, 119:25, 120:2
**requesting** 28:4, 37:22
**requests** 23:3, 23:12, 128:7
**require** 28:12, 110:17
  112:16, 113:4, 113:9
**required** 39:5, 52:11, 62:5
  66:13, 99:15, 113:20

**requirement** 21:8
**requirements** 62:2, 117:14
  120:7
**requires** 26:9
**rescind** 110:23, 120:4
**reserve** 30:24
**reserved** 4:8
**resign** 30:16, 30:19
**resignation** 30:22, 66:10
**resistant** 44:4, 44:24
**resolve** 31:17
**resources** 24:16, 24:24, 25:3
**respect** 14:11, 14:12, 28:3
  28:19, 29:20, 30:9, 32:11
  34:15, 96:16, 112:23
**respective** 4:3
**respond** 116:4
**responded** 78:2, 78:3
**responsibilities** 11:21, 14:12
**responsible** 14:8
**rest** 120:11
**result** 56:9, 73:2, 94:11
  98:16
**resulted** 23:13, 23:15, 23:25
**resume** 72:8
**resumes** 106:4, 106:6, 116:19
**retain** 52:12
**retrospect** 121:18
**reveal** 26:13, 109:4
**review** 15:4, 15:9, 52:2
  53:13, 55:25, 76:7, 116:13
  122:5
**reviewed** 6:23, 122:9
**reviews** 115:15, 116:9
**right** 7:20, 38:16, 38:17
  39:20, 42:2, 42:13, 45:17
  47:14, 76:14, 87:6, 88:22
  88:25, 89:5, 92:5, 96:2, 96:4
  96:12, 96:22, 97:4, 99:21
  100:22, 101:17, 104:16
  106:7, 115:13, 116:17
  117:17
**rights** 99:19
**rise** 24:23, 25:2
**risen** 9:5, 68:16
**rising** 24:9

**risk** 56:13, 56:25, 57:2, 57:4
  57:9, 57:23, 58:2, 58:6, 58:9
  58:17, 58:19, 58:21, 58:25
  59:5, 73:6, 77:23, 80:2, 86:3
  92:4, 92:13, 98:3, 101:14
  101:21, 111:2, 118:12
**road** 105:7
**Robert** 8:20, 8:23, 9:22
  13:10, 13:11, 13:21, 34:6
  70:13, 79:15, 80:21, 81:4
  82:2, 82:6, 82:10, 82:13
  82:19, 82:22, 84:17, 84:23
  85:11
**Robinson** 7:6, 16:2, 16:9
  22:18, 25:4, 28:19, 36:10
  39:10, 49:17, 51:14, 51:22
  55:13, 55:21, 63:12, 71:11
  76:13, 79:12, 81:14, 81:24
  82:7, 82:11, 82:20, 83:20
  91:17, 128:12, 128:17
  128:23
**robust** 114:9
**role** 12:5, 44:6, 45:2, 76:16
  84:9, 106:13, 108:8, 108:21
  113:20, 123:23
**room** 27:13, 27:16, 109:24
**ROSENBERG** 2:10
**RQ** 50:20, 128:7
**rule** 28:24
**run** 104:2

## S

**Sannah** 46:15, 46:16, 46:17
**saw** 39:23, 40:16, 52:4, 53:25
  100:6, 122:12
**saying** 39:24, 56:24, 79:25
  101:14, 102:6, 109:9, 120:13
**says** 49:17, 51:22, 58:16
  74:15, 76:13, 115:10
**schedule** 29:5, 48:13, 56:15
  57:16, 58:10, 72:14, 74:25
**school** 79:2, 114:10, 114:16
  114:23
**SCHWARTZ** 2:5
**scope** 27:18

**scratch** 94:20
**screen** 22:16, 49:12, 51:11
  51:19, 53:11, 55:8, 55:18
  64:7, 69:11, 71:7, 71:16, 76:3
  100:13, 106:21, 122:8
**screenshot** 72:11, 74:14
**scroll** 76:8
**se** 15:9, 27:25, 65:25
**sealing** 4:4
**second** 105:2
**second-year** 104:19
**see** 17:20, 18:18, 27:7, 29:13
  39:16, 48:16, 52:7, 69:23
  88:15, 93:19, 102:4, 106:22
**seen** 14:16, 22:20, 52:16
  53:14, 53:20, 67:13, 67:17
  67:23, 69:18, 69:20, 105:14
  116:13, 122:10, 122:11
**segments** 27:14, 27:14
**select** 15:11
**selected** 105:25
**self-manage** 65:5
**self-monitor** 65:16
**self-monitoring** 66:6
**self-regulate** 67:10, 67:12
**self-report** 63:6
**self-reported** 70:17
**send** 77:2
**senior** 12:6, 13:6, 13:8, 14:6
  14:15, 18:3, 18:20, 42:10
  46:6, 46:11, 46:16, 80:17
  80:19, 81:7, 117:10
**senior-level** 18:22
**sent** 14:17, 15:5, 22:18, 50:6
  51:22, 52:7, 76:12, 106:18
**sentiment** 64:24, 101:16
**separately** 118:22
**September** 47:21, 47:23
  49:16, 51:23, 55:21, 56:4
  69:17, 69:21, 71:21, 72:17
  72:19, 72:20, 75:21, 75:22
  76:5, 83:8, 83:16, 83:24
  106:19, 107:18, 109:18
**series** 5:18, 49:15, 69:12
  72:4, 72:7
**serious** 86:3, 111:2, 118:12

  118:12
**seriously** 47:11
**served** 11:25
**service** 30:3
**session** 6:18, 6:19
**sessions** 114:19
**set** 50:8, 50:11, 127:22
**setting** 35:23, 54:24
**shape** 33:20
**shapes** 25:13
**share** 51:10, 55:8, 71:6
**shared** 22:15, 49:11, 51:18
  53:10, 55:17, 64:6, 69:10
  71:15, 76:2, 106:20, 122:7
**sheet** 129:3
**Shiber** 1:7, 3:4, 5:12, 14:23
  15:14, 15:20, 16:25, 28:20
  34:7, 38:24, 52:20, 52:23
  53:2, 53:5, 53:19, 69:25
  79:18, 80:23, 81:11, 82:3
  82:8, 82:12, 82:18, 83:4, 84:4
  84:24, 98:2, 98:10, 108:9
  123:3, 129:1
**Shiber's** 69:4, 72:8, 85:3
  85:12, 99:2, 122:20
**short** 6:19, 10:11, 10:14
  10:14, 36:18, 51:5, 53:9, 97:8
  119:22, 124:20
**short-term** 23:13, 87:19
**Shorthand** 1:18, 127:7
**shortly** 9:15, 63:15
**shoulder** 23:5
**show** 22:13, 48:23, 51:8, 53:7
  55:4, 64:4, 69:8, 71:3, 75:24
  106:15, 122:2
**shower** 67:20, 67:22
**sick** 24:8
**signed** 4:10, 4:12
**significant** 56:13, 56:25, 57:2
  57:4, 57:9, 57:23, 58:4, 58:6
  58:9, 58:17, 58:25, 59:5
  77:22, 80:2, 92:4
**similar** 119:25
**simple** 28:24
**sit** 116:17
**sit-stand** 23:4, 23:16, 32:19

**site** 76:21, 78:4, 78:6, 78:8
78:12, 78:21
**sites** 113:18, 114:6
**situation** 17:8, 17:23, 18:18
19:12, 19:19, 20:7, 21:16
28:10, 29:3, 30:12, 30:14
30:15, 30:23, 31:17, 38:19
40:21, 41:11, 45:9, 45:17
48:10, 53:23, 59:6, 59:10
59:10, 59:12, 60:8, 60:9
60:14, 62:25, 65:6, 72:25
73:7, 75:17, 77:14, 77:16
77:18, 80:6, 80:8, 81:9, 85:21
86:20, 87:10, 87:11, 87:20
87:20, 87:25, 88:15, 89:20
89:21, 91:24, 92:2, 92:7, 92:9
93:7, 93:11, 93:13, 94:3
94:11, 94:23, 95:2, 96:6
97:19, 98:9, 98:17, 99:4, 99:6
103:18, 103:22, 112:24
118:13, 118:16, 119:14
119:22, 121:4, 121:22
**situations** 22:10, 31:3, 31:4
68:14, 75:15, 89:19, 93:24
94:5, 98:19, 102:20, 110:19
112:18
**six** 117:23
**Sixty-one** 7:21
**skeptical** 35:10
**skepticism** 35:19
**SKIBITSKY** 2:20, 10:8
10:22, 13:9, 14:5, 15:16, 19:6
19:18, 19:25, 20:6, 21:9
25:10, 26:12, 28:14, 28:21
30:10, 31:23, 35:25, 36:12
37:19, 38:18, 39:6, 39:25
41:7, 42:3, 43:21, 45:6, 47:2
48:25, 49:7, 50:24, 57:13
57:18, 57:25, 58:11, 59:7
59:17, 59:21, 60:6, 60:18
60:21, 61:14, 63:13, 67:7
72:22, 74:19, 85:18, 86:17
86:22, 87:7, 88:23, 89:8, 90:7
90:20, 94:9, 94:14, 94:24
95:3, 95:7, 95:10, 95:16
95:24, 96:13, 96:20, 96:24

97:3, 97:11, 98:25, 99:22
101:24, 102:8, 109:3, 111:15
113:22, 115:7, 115:19, 118:8
119:9, 120:19, 120:24
121:12, 124:16, 124:25
**sleep** 17:3, 17:4, 17:16, 18:19
18:24, 19:2, 19:5, 19:8, 19:16
19:22, 19:23, 20:5, 20:9
21:12, 21:19, 33:2, 34:4, 34:5
34:17, 35:23, 36:25, 38:12
39:5, 42:13, 43:7, 54:25
56:15, 57:16, 58:10, 59:2
59:16, 59:20, 59:25, 60:5
60:17, 60:20, 61:5, 61:6, 61:9
61:22, 61:24, 62:5, 62:9
62:10, 62:11, 62:13, 62:24
62:25, 64:18, 64:22, 77:9
77:23, 88:17, 89:7, 89:9
89:10, 89:15, 89:17, 90:5
92:11, 94:4, 99:11, 102:15
104:6, 113:21, 113:24
116:15, 116:20, 118:10
121:11
**sleeping** 60:3, 61:13, 62:2
62:3, 66:16, 66:19, 88:22
88:25, 89:11, 89:13
**sleeps** 110:18
**small** 75:3
**smart** 116:5, 116:24
**solicited** 103:17
**Solving** 74:17, 75:14
**somebody** 46:4
**soon** 86:8
**sorry** 8:15, 46:9, 83:12
107:14, 107:15, 122:22
123:6
**sounds** 108:7, 113:14, 117:16
**source** 73:19
**SOUTHERN** 1:5
**space** 49:18, 49:23, 54:4
54:7, 54:11, 54:22, 55:2
**speak** 7:2, 7:5, 18:9, 18:11
18:15, 18:21, 33:17, 33:18
34:6, 34:9, 35:7, 37:20, 37:23
38:9, 39:7, 39:10, 45:4, 45:10
45:11, 52:19, 52:22, 52:25

53:4, 54:10, 54:15, 54:19
68:21, 68:23, 70:7, 70:10
70:13, 73:21, 81:10, 81:14
82:2, 84:23, 108:11, 108:17
114:15, 115:2, 115:23
122:19, 123:9, 123:9
**speaking** 22:9, 61:4, 63:15
63:16, 63:16, 75:10, 75:11
99:14
**special** 23:16
**specific** 13:19, 21:4, 21:21
37:3, 37:11, 103:22, 124:5
124:6
**specifically** 7:5, 7:17, 15:23
33:13, 34:22, 48:6, 53:21
58:23, 119:3
**specificity** 45:21, 56:19
84:21
**speculation** 86:23
**speed** 100:12
**spend** 119:19
**spoke** 8:20, 18:20, 34:13
43:3, 45:7, 45:8, 54:12, 54:13
54:21, 63:11, 70:4, 73:16
73:23, 73:25, 81:23, 85:5
93:17, 100:15, 107:21
109:15, 111:6, 123:5, 123:11
123:15, 123:18
**spoken** 18:16, 33:14, 37:10
75:20, 81:4, 81:9, 85:10
**spot** 117:13, 117:18, 118:2
**spots** 106:7
**sprints** 103:23
**ss** 127:4
**staff** 43:6, 45:4, 46:20, 46:25
65:15, 65:21, 97:23, 100:10
**staffed** 47:19, 88:12, 104:12
**staffer** 45:14, 45:22, 47:12
47:13, 62:22, 62:23, 68:5
68:6, 68:6, 68:9, 122:25
123:12
**staffers** 62:19, 63:2, 65:20
68:15, 69:2
**staffing** 17:20, 39:16, 39:21
40:15, 45:23, 46:7, 46:12
46:16, 47:5, 47:8, 47:14

47:15, 47:16, 48:10, 62:18
65:23, 73:14, 87:25, 97:23
104:8, 122:17
**stamp** 22:19
**stamped** 51:15, 51:23, 55:13
71:12, 128:13, 128:18
128:23
**standard** 41:6
**start** 8:10, 10:7
**started** 9:7, 17:7, 35:13
100:22
**State** 1:19, 7:25, 127:3, 127:8
**statement** 82:17
**STATES** 1:4
**stating** 5:5
**stayed** 98:18
**steady** 17:3
**stenographically** 127:14
**step** 57:19
**steps** 29:22, 30:5, 30:7, 31:13
31:16, 32:8
**Stewart** 46:3, 46:8, 46:10
46:11, 122:19, 122:24
**stick** 29:8
**STIPULATED** 4:2, 4:6, 4:9
**stop** 36:20
**stopping** 49:2
**stories** 66:15, 66:17
**Street** 5:6
**stress** 30:18
**strong** 114:23, 117:9
**stuff** 103:16
**Subscribed** 126:18, 129:22
**substantial** 73:5, 92:13, 98:3
101:14
**successful** 36:11
**sufficient** 64:21
**Suite** 2:11
**SULLIVAN** 2:17
**summer** 21:24, 22:6, 22:8
110:7
**summers** 110:8
**supervised** 123:14
**sure** 20:12, 25:6, 25:14, 36:6
47:11, 48:10, 50:5, 52:14
73:23, 77:12, 92:14, 120:9

**surface** 94:20
**survey** 116:4, 116:12
**Susan** 1:18, 5:4, 60:24, 127:7
127:25
**Susannah** 46:14, 46:15
**sustain** 87:11, 87:18, 88:15
91:24
**sustainable** 88:25, 89:2, 93:6
98:9, 100:19, 103:8, 103:10
110:22, 121:22
**sustained** 87:14, 102:20
**sworn** 4:10, 4:12, 5:4, 126:18
127:12, 129:22
**system** 17:20, 39:16, 39:21
40:16, 50:3, 52:10, 52:10
67:25

## T

**take** 5:25, 6:3, 6:7, 20:18
22:3, 22:8, 27:14, 29:4, 29:23
29:23, 30:5, 30:20, 30:22
30:25, 31:12, 47:10, 48:25
49:8, 50:22, 50:23, 51:2
51:25, 53:12, 55:24, 67:16
67:21, 68:18, 70:21, 76:6
88:5, 94:24, 95:3, 95:6, 95:10
95:16, 95:21, 96:7, 96:13
96:15, 96:25, 97:3, 97:5
122:4, 124:12, 124:13
124:15
**taken** 1:17, 4:14, 17:11
23:23, 26:8, 31:13, 31:16
34:3, 41:22, 41:24, 51:5, 67:5
67:18, 89:23, 90:3, 90:13
97:8, 119:18, 120:17, 124:20
126:5, 127:10, 127:14
**talk** 21:2, 28:22, 33:23, 45:19
68:7, 68:9, 80:14, 85:2, 90:22
91:10, 96:18, 116:10
**talked** 43:15, 43:16, 44:23
66:8, 70:16, 73:13, 105:10
**talking** 6:8, 31:20, 40:7
42:10, 88:22, 92:4, 99:10
101:10, 101:13, 107:7, 107:9
107:10, 108:24, 109:12

111:10, 111:11
**talks** 116:14
**tasks** 88:3, 93:5, 93:22, 93:22
**team** 18:19, 18:22, 24:20
24:20, 24:22, 26:3, 26:21
30:2, 34:19, 34:21, 36:23
37:14, 38:3, 38:5, 38:8, 42:10
43:9, 44:7, 44:9, 45:7, 45:8
45:13, 45:23, 46:7, 46:13
46:16, 47:5, 47:8, 47:10
47:14, 47:16, 48:16, 48:18
49:17, 49:23, 50:11, 54:7
60:9, 62:18, 65:11, 65:13
65:18, 67:14, 73:7, 73:9
73:11, 73:15, 73:20, 73:24
79:24, 81:3, 81:7, 85:22
87:22, 87:23, 88:2, 89:3, 92:3
93:19, 97:21, 97:23, 100:16
102:12, 122:17, 122:18
**teams** 37:25, 65:2, 67:9
67:12, 98:20
**Technical** 74:16, 75:12
**tell** 17:5, 17:8, 17:15, 25:14
46:25, 65:15, 74:9, 84:22
111:24, 112:9, 112:19, 113:2
113:8, 113:11, 117:12
117:18, 118:2, 121:9
**telling** 18:15, 90:12
**tells** 24:20, 61:23
**temporary** 59:11
**ten** 12:3, 12:12, 12:14, 27:14
27:15, 50:23, 97:2, 97:3, 97:5
**tens** 106:4, 106:6, 116:19
**term** 29:21, 30:4, 30:8, 31:10
36:14, 36:16, 36:18, 92:25
119:22
**terminate** 79:17, 80:23
81:11, 82:3, 82:8, 82:12
82:18, 83:3, 83:19, 84:3
84:10, 84:12, 84:18, 86:11
86:25, 87:4, 87:8, 87:9, 91:12
99:3, 108:9, 108:22, 111:17
111:20
**terminated** 69:25, 83:6, 83:8
106:25, 107:12, 109:20
122:20, 123:19

**terminating** 85:3, 85:6
85:13, 89:24, 98:10, 102:24
103:4
**termination** 85:12, 86:15
91:9, 111:12
**terminology** 75:2
**testified** 5:7, 82:12
**testimony** 47:3, 83:10, 83:12
83:18, 83:22, 126:5, 126:8
127:13, 127:14
**Thank** 50:25, 124:24, 124:25
**therapy** 24:7, 24:22, 32:22
32:23
**thing** 36:13, 48:15, 55:3
87:15, 97:24, 97:25
**things** 27:7, 32:2, 45:22, 50:2
50:6, 62:20, 68:11, 68:13
75:19, 78:11, 79:6, 80:4, 81:2
85:19, 88:4, 90:10, 90:13
92:21, 92:21, 94:6, 98:6
100:14, 100:15, 102:16
103:5, 114:21, 116:3, 117:5
117:7
**think** 6:20, 9:9, 9:10, 10:13
17:17, 21:11, 27:12, 27:12
27:16, 29:10, 34:16, 35:16
35:22, 36:9, 36:17, 37:7, 40:2
41:9, 42:14, 42:16, 42:21
42:24, 44:4, 45:16, 45:18
45:20, 47:21, 49:10, 57:3
58:4, 61:4, 61:4, 61:16, 68:15
68:16, 68:20, 68:25, 69:2
70:23, 75:13, 77:8, 78:17
78:20, 78:24, 85:4, 85:5, 85:7
86:15, 86:20, 88:19, 88:21
89:22, 89:25, 93:18, 95:20
98:15, 99:18, 99:24, 100:3
100:24, 102:18, 108:4, 108:4
109:8, 111:4, 112:4, 116:18
118:5, 118:9, 118:14, 118:15
118:24, 119:3, 120:22
120:25, 121:3, 121:7, 121:18
122:11, 122:12, 122:15
122:16, 124:3, 124:3, 124:13
124:14
**third** 40:20, 94:16, 105:3

**Thirty** 103:12
**thought** 18:9, 28:23, 48:15
56:20, 59:11, 77:4, 78:8
78:21, 119:2, 123:7
**thousands** 106:2, 106:4
106:6, 116:19
**three** 33:20, 39:19, 84:25
90:10, 91:25, 94:4, 98:22
105:13, 105:14, 113:5
117:14, 117:23
**three-page** 55:9, 128:14
**three-year** 92:15, 102:21
104:3, 110:22
**Thursday** 6:20, 68:8
**Tim** 52:22, 53:18, 69:16
69:21, 70:4
**time** 4:8, 5:25, 6:8, 10:14
10:14, 10:16, 12:16, 15:13
15:19, 16:15, 17:17, 19:7
21:20, 21:25, 22:9, 22:19
23:21, 24:9, 24:9, 24:19
25:23, 30:22, 30:25, 31:12
31:14, 31:21, 31:24, 31:25
32:3, 32:3, 32:22, 33:9, 33:10
35:18, 35:24, 36:8, 39:10
39:23, 41:13, 41:15, 43:7
54:24, 57:16, 66:10, 66:20
66:25, 68:17, 68:18, 68:21
69:6, 69:24, 74:6, 75:9, 75:15
75:16, 76:17, 90:2, 92:19
94:16, 94:19, 94:19, 97:22
98:18, 110:10, 110:13, 111:6
112:7, 115:14, 119:18
119:19, 122:15, 122:24
124:24, 125:5
**times** 11:17, 24:18, 43:2
47:7, 61:5, 67:2, 73:22, 81:17
84:23, 84:25, 103:17, 110:19
112:7, 113:25, 118:21
118:25, 119:4
**timing** 78:10, 78:13, 79:3
93:23
**title** 9:8, 10:2, 11:6, 11:9
11:15, 11:20, 12:8, 12:8
12:14, 13:11, 13:14, 13:22
13:23

**titles** 10:4, 11:18, 13:19
**today** 5:19, 6:14, 6:24, 7:3
7:8, 116:17
**today's** 6:16
**told** 16:11, 17:9, 17:10, 17:25
18:11, 18:21, 29:11, 34:2
34:13, 34:21, 36:22, 36:23
37:2, 37:4, 38:3, 38:5, 38:8
38:14, 39:12, 40:4, 43:6, 43:9
43:13, 47:8, 48:18, 56:21
64:3, 84:20, 88:13, 89:20
90:4, 91:16, 93:8, 109:19
110:15, 115:5, 121:13
122:16
**tomorrow** 52:5
**Tony** 7:6, 17:24, 18:2, 18:9
18:11, 18:15, 28:22, 29:10
33:3, 33:15, 33:17, 33:18
36:10, 37:13, 37:13, 43:3
43:6, 43:9, 43:13, 43:15
43:20, 44:5, 44:6, 44:17
44:20, 45:10, 46:19, 46:24
51:15, 51:22, 54:9, 54:10
54:13, 54:15, 69:16, 69:21
70:7, 73:13, 73:18, 73:19
73:21, 73:23, 73:25, 74:3
74:5, 75:20, 79:14, 80:21
80:22, 81:4, 81:6, 81:9, 81:10
93:17, 97:22, 100:15, 128:12
**Tony's** 44:6, 45:2
**top** 51:13, 55:11, 71:9, 71:20
74:24, 111:5, 116:16, 116:25
128:10, 128:15, 128:20
**topic** 26:20
**total** 27:15, 68:4
**touched** 79:7
**track** 62:4
**training** 25:8, 25:14, 25:17
25:18, 25:21, 26:23, 26:25
27:4, 27:8, 27:19, 27:19
27:23
**trainings** 27:21
**transaction** 105:3, 105:3
**transcribed** 127:15
**transcript** 97:13, 126:5
126:7

**transcription** 129:5
**transcripts** 7:14
**treat** 48:19
**treated** 91:17, 96:3
**treating** 91:21
**treatment** 119:25
**trial** 4:8
**triggers** 68:22
**true** 39:3, 126:7, 126:9
**trust** 70:18, 70:19, 70:20
**truth** 25:15
**truthfully** 5:21, 6:14
**try** 22:3, 29:23, 31:17, 47:11
    75:6, 94:19, 103:7, 117:24
    121:19
**trying** 27:11, 29:24, 31:16
    38:23, 42:4
**Tuesday** 83:9
**tune** 62:20
**turn** 103:6, 103:20
**turns** 67:16
**two** 40:16, 40:17, 43:16
    50:16, 71:18, 74:15, 75:10
    84:25, 85:14, 90:13, 100:21
    101:2, 102:5, 106:11, 110:8
    110:8
**two-page** 71:8, 128:20
**type** 25:8, 25:21, 30:9, 42:23
    66:5, 74:15, 74:23, 75:4
**types** 23:2, 27:8, 75:5
**typical** 65:2, 65:9, 65:10
**typically** 25:5

**U**

**Uh-huh** 106:8, 107:13
**ultimate** 98:8
**ultimately** 24:15, 24:17, 27:3
    31:18, 32:6, 32:8, 47:4, 47:4
    79:19, 79:20, 80:5, 80:10
    123:21
**unable** 6:13, 113:3
**uncovered** 73:2
**undergoing** 119:24
**understand** 5:22, 19:15, 24:2
    28:11, 41:14, 43:19, 49:20

56:25, 58:5, 77:17, 86:14
    86:19, 94:22, 101:19
**understanding** 21:7, 28:6
    38:4, 38:11, 92:8, 123:23
**understood** 24:25, 33:25
    44:3, 44:25
**undue** 60:4, 89:11, 89:13
    89:16
**unfortunate** 121:4, 121:16
**Unfortunately** 112:2
**unheard** 68:21
**uninterrupted** 89:17, 102:15
**unique** 20:3
**UNITED** 1:4
**universities** 78:23
**University** 7:25
**unpaid** 119:19
**unpredictability** 103:25
**unpredictable** 92:22, 93:23
    103:24, 110:20, 112:17
    117:6, 118:14
**unsustainable** 80:6, 89:21
    94:2, 98:22, 99:3, 99:6, 104:2
**unusual** 105:8, 105:9, 114:13
**unusually** 41:16, 41:17
**update** 43:14, 47:16
**updated** 78:7, 79:2
**upset** 38:7, 120:17, 120:20
**URQUHART** 2:17
**use** 29:21, 30:6, 30:8
**uses** 30:4, 32:7
**utilize** 27:11

**V**

**vacation** 22:3
**vague** 45:6, 72:22, 115:19
**VALENTINO** 2:13
**value** 38:21, 70:21, 99:25
    104:22
**variety** 23:11
**various** 9:6, 11:17, 11:17
    11:18, 23:5, 23:9, 27:7, 27:11
    27:20, 31:13, 65:20
**Vault** 114:6, 115:10, 115:15
    115:18, 115:20, 115:24

116:2, 116:4, 116:11, 116:13
**Vault's** 116:9
**vendors** 27:20
**verbally** 107:14
**verbatim** 98:5
**versus** 89:23, 99:15
**Vicari** 1:17, 5:10, 6:1, 7:1
    8:1, 9:1, 10:1, 11:1, 12:1
    13:1, 14:1, 15:1, 16:1, 17:1
    18:1, 19:1, 20:1, 21:1, 22:1
    23:1, 24:1, 25:1, 26:1, 27:1
    28:1, 29:1, 30:1, 31:1, 32:1
    33:1, 34:1, 35:1, 36:1, 37:1
    38:1, 39:1, 40:1, 41:1, 42:1
    43:1, 44:1, 45:1, 46:1, 47:1
    48:1, 49:1, 50:1, 51:1, 51:15
    52:1, 53:1, 54:1, 55:1, 55:12
    56:1, 57:1, 58:1, 59:1, 60:1
    61:1, 62:1, 63:1, 64:1, 65:1
    66:1, 67:1, 68:1, 69:1, 70:1
    71:1, 71:11, 71:12, 71:20
    72:1, 73:1, 74:1, 75:1, 76:1
    77:1, 78:1, 79:1, 80:1, 81:1
    82:1, 83:1, 84:1, 85:1, 86:1
    87:1, 88:1, 89:1, 90:1, 91:1
    92:1, 93:1, 94:1, 94:15, 95:1
    96:1, 96:11, 97:1, 98:1, 98:7
    99:1, 100:1, 101:1, 102:1
    103:1, 104:1, 105:1, 106:1
    107:1, 108:1, 109:1, 110:1
    111:1, 112:1, 113:1, 114:1
    115:1, 116:1, 117:1, 118:1
    119:1, 120:1, 121:1, 122:1
    123:1, 124:1, 125:1, 126:4
    126:15, 127:10, 128:5
    128:12, 128:16, 128:22
    128:23, 129:2, 129:21
**Vicari's** 97:13
**view** 12:21, 25:7, 58:3, 58:18
    58:24, 99:12, 101:4, 101:6
**viewed** 77:20
**violation** 99:18, 99:21
**visibility** 19:13, 20:13, 20:16
**voiced** 63:17
**VP** 9:9, 9:10

## W

**wait**  6:5, 6:9
**waiting**  48:4, 48:8
**waived**  4:5
**walk**  60:8
**walked**  16:11
**want**  5:25, 17:9, 17:11, 18:16
  26:12, 34:2, 34:3, 34:12
  34:20, 34:21, 34:23, 38:14
  39:3, 41:22, 41:24, 50:23
  76:9, 85:25, 88:8, 88:13
  91:17, 95:18, 96:23, 96:25
  109:11, 116:6, 116:24, 117:7
  117:7, 124:15
**wanted**  30:18, 32:19, 32:22
  32:22, 35:4, 38:12, 42:13
  88:7, 88:16, 92:18, 102:10
  102:11, 102:23, 121:7
**wanting**  44:22, 46:21
**Wasserstein**  8:24, 8:25, 9:24
  10:3, 10:5, 10:6, 11:2, 11:4
**watching**  103:12
**way**  33:20, 37:25, 41:10
  53:24, 59:6, 60:12, 63:8
  77:20, 80:8, 88:10, 89:25
  92:24, 93:6, 93:23, 110:4
  119:13, 123:6
**ways**  25:12
**wears**  76:24
**website**  78:3, 78:15, 78:18
**websites**  79:10
**week**  6:20, 16:6, 24:7, 24:22
  54:14, 58:15, 68:4, 83:5
  83:15, 83:23
**weekend**  18:24, 19:12, 19:14
  29:12, 48:20, 49:18, 49:24
  54:4, 54:8, 54:11, 54:17
  54:23, 68:3, 68:10
**weeks**  22:3, 85:14, 87:11
  93:3, 100:21, 101:2, 106:11
  113:5, 113:9
**weigh**  102:22
**weighted**  97:25
**well-being**  58:6, 99:8, 101:11
  101:17

**went**  39:10, 39:15, 44:23
  46:21, 48:14, 80:5, 98:18
**West**  5:5
**whatnot**  63:7, 65:22, 67:14
  75:16, 86:6, 88:5
**WHEREOF**  127:21
**wide**  23:11, 41:8, 41:9
**wider**  44:6
**William**  46:10, 122:19
  122:24
**willing**  29:23
**witness**  5:3, 26:13, 94:17
  95:8, 96:3, 109:4, 124:17
  127:12, 127:21, 128:4
**woman**  118:18
**women**  119:12
**word**  20:19, 30:6, 120:20
**words**  34:5, 63:23, 124:5
  124:6, 124:11
**work**  8:19, 8:22, 16:18
  20:13, 20:17, 28:9, 29:24
  30:2, 30:2, 31:14, 31:17
  32:12, 34:17, 36:17, 36:21
  38:2, 40:9, 64:21, 65:8, 66:13
  68:24, 70:25, 73:11, 75:7
  88:11, 98:12, 98:15, 101:2
  102:17, 102:23, 114:8
  114:17, 115:6, 116:20
  116:24, 117:3, 118:6, 119:7
  119:10, 119:21, 121:20
**work-life**  62:17, 64:17
  116:10
**workable**  28:10
**worked**  8:21, 25:11, 26:11
  48:16, 115:2
**working**  8:10, 16:16, 28:8
  31:22, 31:24, 39:9, 40:11
  45:8, 47:17, 48:11, 58:3, 68:3
  74:5, 74:6, 88:10, 93:20, 94:5
  98:20, 104:6, 105:18, 105:23
  113:16, 116:14, 118:18
**workload**  18:23, 19:13
  40:19, 63:7, 63:15, 65:3, 65:6
  67:23, 112:17
**workplace**  26:17, 26:18, 27:8
**works**  31:19

**worse**  48:14
**worth**  100:2
**write**  52:4, 116:6, 116:6
**writes**  123:2, 123:21
**writing**  25:25, 68:12, 74:2
**written**  61:21, 66:6
**wrote**  64:9, 108:24, 109:12

## Y

**year**  7:16, 9:18, 67:3, 72:4
  94:4, 115:16, 117:25
**years**  9:6, 12:3, 12:12, 12:14
  25:12, 25:13, 25:16, 25:22
  39:19, 41:2, 66:21, 78:7, 94:5
  98:7, 98:22, 103:12, 103:17
  112:3, 113:5, 117:14
**yelled**  109:22
**yesterday**  6:18
**YOON**  2:22
**York**  1:5, 1:19, 2:7, 2:7, 2:12
  2:12, 2:19, 2:19, 5:6, 5:6
  31:6, 31:7, 127:3, 127:5
  127:9

## Z

**zero**  19:13, 20:16
**Zoom**  1:13, 109:19

## 1

**1**  51:23, 105:12, 105:15
  129:4
**1:21-cv-03649-ER**  1:8
**1:30**  40:11
**10:28**  51:5
**10:38**  51:2
**10:39**  51:6
**100**  10:13
**10010**  2:19
**10016**  2:7
**10019**  5:6
**10165**  2:12
**11**  22:14, 22:15, 22:17, 64:5
  64:6, 64:8

**11:07:19** 71:10, 128:22
**11:48:06** 55:12, 128:16
**11:50** 97:8
**11th** 76:5, 83:16, 83:24
**12** 9:6, 69:9, 69:10, 69:12
**12:00** 29:7, 29:7, 37:6, 37:8
  37:9, 43:11, 97:9
**12:42** 124:20
**12:52** 124:21
**12:53** 125:5
**120-hour** 113:4, 113:9
**13** 16:22
**15** 75:25, 76:2, 76:4, 124:15
**15th** 83:8, 106:19, 107:18
  109:18
**16** 122:6, 122:7
**18** 53:8, 53:10
**185** 55:23
**186** 55:23
**187** 55:23
**1962** 7:19
**1984** 8:3
**1989** 9:23
**1st** 47:21, 47:23, 49:16

## 2

**2** 55:21, 56:4, 105:10, 105:15
  129:4
**2:06:04** 51:14, 128:11
**2:33** 22:19
**2005** 8:12, 13:21
**2006** 10:20
**2020** 15:11, 16:7, 16:13
  16:22, 34:7, 34:10, 35:8
  40:14, 42:22, 51:23, 53:19
  55:21, 56:4, 71:21, 72:17
  72:20, 75:22, 76:5, 83:8
  83:17, 106:19, 107:18
  109:18
**2023** 1:14, 126:6, 126:19
  127:11, 127:22, 128:2, 129:2
  129:23
**20th** 16:22
**21** 106:17, 106:20
**21st** 5:6

**22** 51:9, 51:12, 51:18, 51:21
  128:10
**22nd** 2:18
**22-year-old** 12:23, 12:25
**23** 55:6, 55:9, 55:17, 55:20
  128:14
**24** 1:14, 71:5, 71:8, 71:15
  71:18, 126:6, 128:2, 128:20
  129:2
**24/7** 112:16
**24th** 127:11
**28** 34:7, 34:9, 35:7, 42:22
  53:19
**2860** 71:19
**2861** 71:19
**28th** 16:13, 22:18, 53:22
  54:18, 54:21
**2nd** 69:17, 69:21, 72:19
  75:22

## 3

**3** 2:6, 52:5, 105:11, 105:15
  105:20, 105:21, 129:5
**30** 25:12, 25:13, 25:16, 41:2
  98:7, 106:7, 112:3
**305** 2:11
**31** 5:5
**31st** 49:15
**325** 51:24
**365** 92:15, 94:4

## 4

**40** 66:21

## 5

**50** 128:7
**51** 2:18, 128:13
**5-125** 128:5
**52nd** 5:5
**55** 128:19

## 6

**6:00** 33:12
**650** 2:11

## 7

**7** 49:11, 49:14, 54:3
**71** 128:25
**7th** 127:22

## 8

**8** 71:21, 72:17, 72:20
**8:00** 29:7, 37:6, 37:9, 43:11
**8th** 75:22

## 9

**9/1/2020** 51:14, 128:11
**9/2/2020** 55:11, 128:16
**9/8/2020** 71:10, 128:21
**9:00** 29:8, 37:9, 89:5
**9:15** 1:15