# EXHIBIT E

Page 1

```
 1
 2 H              *** CONFIDENTIAL **
 3
 4 UNITED STATES DISTRICT COURT
 5 SOUTHERN DISTRICT OF NEW YORK
 6 ------------------------------x
 7 KATHRYN SHIBER,          : Civil Action No.
 8          Plaintiff,      : 1:21-cv-03649-ER
 9      -against-           :
10 CENTERVIEW PARTNERS, LLC,  :
11          Defendant.       :
12 ------------------------------x
13          Via Zoom
14          March 21, 2023
15          10:10 a.m.
16
17
18    Deposition of TIMOTHY ERNST, taken by
19 Plaintiff, before Susan B. Ratner, a Shorthand
20 Reporter and Notary Public of the State of New York.
21
22
23
24
25
```

Page 2

```
 1
 2 A P P E A R A N C E S:
 3
 4 Attorneys for Plaintiff:
 5 SCHWARTZ PERRY & HELLER LLP
 6    3 Park Avenue
 7    New York, New York 10016
 8 BY:  BRIAN HELLER, ESQ.
 9      -AND-
10 CLAYMAN ROSENBERG KIRSHNER & LINDER LLP
11    305 Madison Avenue, Suite 650
12    New York, New York 10165
13 BY:  JAMES F. VALENTINO, ESQ.
14
15 Attorneys for Defendant:
16 QUINN EMANUEL URQUHART & SULLIVAN, LLP
17    51 Madison Avenue, 22nd Floor
18    New York, New York 10010
19 BY:  HOPE D. SKIBITSKY, ESQ.
20
21
22
23
24
25
```

Page 3

```
 1
 2 A P P E A R A N C E S (Continued):
 3
 4 ALSO PRESENT:
 5    KATHRYN SHIBER
 6
 7    AMANDA KOSOWSKY, ESQ.,
 8    Chief Compliance Officer
 9    Centerview Partners, LLC
10
11    CHARLOTTE WALDMAN,
12    Clayman Rosenberg Kirshner & Linder LLP
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2    IT IS STIPULATED AND AGREED that all objections,
 3 except as to the form of the question, shall be
 4 reserved to the timeof the trial.
 5    IT IS FURTHER STIPULATED AND AGREED that the
 6 within deposition may be signed and sworn to before
 7 any officer authorized to administer an oath, with
 8 the same force and effect as if signed and sworn to
 9 before the officer before whom the within deposition
10 was taken.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1        T. Ernst - Confidential
2  T I M O T H Y   E R N S T,
3        called as a witness, having been first duly
4        sworn by the Notary Public (Susan B. Ratner),
5        stating his business address as 31 West 52nd
6        Street, 21st Floor, New York, New York 10019,
7        was examined and testified as follows:
8  EXAMINATION BY
9  MR. VALENTINO:
10        Q. Good morning, Mr. Ernst.
11        A. Good morning.
12        Q. My name is James Valentino. I, along
13  with Brian Heller, represent the plaintiff in this
14  case, Kathryn Shiber. I am going to be conducting
15  the deposition this morning.
16        Before we get started, I do want to
17  apologize on what happened a couple of weeks ago. I
18  got ill and had to cancel at the last minute.
19        I very much appreciate the accommodations
20  provided to me by both you and your counsel, so
21  thank you very much for that.
22        Mr. Ernst, have you ever been deposed
23  before?
24        A. I have not.
25        Q. Let me go through a few of the ground

Page 6

1        T. Ernst - Confidential
2  rules that we are going to follow today.
3        I am going to ask you a series of
4  questions.
5        I ask that you wait until I finish the
6  question before you answer.
7        Your answer needs to be verbal. It
8  cannot be any gestures because the court reporter
9  cannot take down gestures.
10        If you need the question repeated, please
11  let me know, and we will have the question reread
12  for you.
13        If you don't understand the question, let
14  me know, and we will see what we can do on that.
15        Your attorney will likely object. I hope
16  she won't, but I am sure she will object to at least
17  some of my questions today, so give her an
18  opportunity to do that.
19        Unless she instructs you not to answer
20  after her objection, you should answer the question.
21        If you need a break, let me know, I am
22  happy to accommodate that, as long as there is not a
23  question pending.
24        If there is a question pending, I just
25  ask that you answer the question before we take a

Page 7

1        T. Ernst - Confidential
2  break.
3        Finally, we are going to be showing you
4  some documents today. How we are going to do that
5  is, we are going to put the document in the chat
6  function of Zoom, as well as we are going to do a
7  screen-sharing function, so you will have an
8  opportunity to view it in a variety of ways.
9        Do you have any questions about that?
10        A. No.
11        Q. Did you prepare for your deposition
12  today?
13        A. Yes.
14        Q. What did you do to prepare?
15        A. I met with counsel, internal and
16  external.
17        Q. Who did you meet with?
18        A. Both Amanda and other Quinn Emmanuel
19  employees.
20        Q. Do you know who the other Quinn Emmanuel
21  employees were?
22        A. No.
23        I don't remember the names.
24        Q. How many times did you meet with your
25  attorneys to prepare for this deposition?

Page 8

1        T. Ernst - Confidential
2        A. Once in person and once a shorter,
3  briefing call before that.
4        Q. Did you review any documents in
5  preparation for your deposition today?
6        A. Yes.
7        Q. Did you review any deposition transcripts
8  in preparation for your deposition today?
9        A. No.
10        Q. Did you speak with anyone at Centerview,
11  other than counsel, about your deposition in this
12  case?
13        A. Just to tell them I was doing it, so I
14  wouldn't be available this morning, but otherwise,
15  nothing about it, no.
16        Q. Are you on any medications that would
17  impact your ability to answer questions truthfully
18  today?
19        A. No.
20        Q. How much sleep did you get last night?
21        A. Seven hours.
22        Q. What is your educational background?
23        A. I went to Brown University, studied
24  applied math-econ. I have a bachelor's degree. I
25  graduated in 2017.

Page 9

T. Ernst - Confidential

1     T. Ernst - Confidential
2    Q. What was your major?
3    A. Applied math-economics.
4    Q. How old are you?
5    A. I am 29.
6    Q. Do you have any graduate degrees?
7    A. No.
8    Q. Do you have any professional
9 certifications?
10    A. No.
11    Q. What was your first job once you graduated
12 from Brown?
13    A. Analyst at Centerview.
14    Q. Did you participate in the summer program
15 at Centerview?
16    A. I did.
17    Q. Can you explain when you participated in
18 that?
19    A. That was the summer of 2016.
20    Q. So was that in the summer of your junior
21 year at Brown?
22    A. Correct.
23    Q. Can you briefly explain the process by
24 which you applied for and received an offer to
25 participate in the summer program?

Page 10

1     T. Ernst - Confidential
2    A. Yes.
3    There is a recruiting portal, if you will,
4 at Brown, and Centerview advertises that they have a
5 summer internship, and you can drop your resume in
6 for a first-round on-campus interview, which I did,
7 and had an on-campus interview.
8    I was then instructed to move forward to
9 an interview at New York, or in New York at
10 Centerview's offices.
11    That's sort of five interviews back to
12 back, 30 minutes each, and then I received the offer
13 after that.
14    Q. Do you recall who conducted your on-campus
15 interview?
16    A. Yes.
17    Q. Who was that?
18    A. Richard Case.
19    Q. Do you recall any of the people who you
20 interviewed with at Centerview on the second round
21 of interviews?
22    A. One.
23    Q. Who is that?
24    A. Josh Boyd.
25    Q. Say that last name again, please.

Page 11

1     T. Ernst - Confidential
2    A. Boyd.
3    B-o-y-d.
4    Q. Did you get an offer the same day as the
5 five interviews at Centerview?
6    A. I did not, no.
7    Q. During the course of these interviews,
8 both on campus and at Centerview, did anybody at
9 Centerview discuss with you what it's like to work
10 at Centerview with respect to the hours of work?
11    A. Not in my first round, but definitely
12 the in New York second-round interviews.
13    I would ask them the question. They give
14 you time at the end, and I would ask one of the more
15 junior interviewees, "How do you manage the
16 workload?" because it was a question that I had
17 coming to the job.
18    Q. So you asked a question about the
19 workload?
20    A. Yes.
21    Q. And what was the answer that was provided
22 to you, if you can recall?
23    A. I don't recall.
24    Q. Do you recall generally what information
25 was provided to you on that topic?

Page 12

1     T. Ernst - Confidential
2    A. No.
3    Q. What was your understanding, going into
4 the summer program at Centerview, what the hours
5 would be like for you as a summer associate, or a
6 summer analyst?
7    A. Yes, sure.
8    I think I had a general understanding
9 that I would be -- that it would be busy, long
10 hours, but I did not have any, you know, specific
11 time requirements or anything like that.
12    I just had a general understanding.
13    Q. What was that general understanding from?
14    A. I think probably just researching the
15 position; multiple interviews with, not just
16 Centerview people, informational interviews, not
17 just with Centerview employees, but employees at
18 other banks, and then other friends at the university
19 that had gone through similar programs.
20    Q. Did anyone tell you that there was an
21 hours requirement for a summer analyst at Centerview?
22    A. No.
23    Q. What were the hours like as a summer
24 analyst at Centerview?
25    A. Variable, I think.

Page 13

T. Ernst - Confidential
1    T. Ernst - Confidential
2        There were some weeks when they were
3    pretty light, and then, just depending on the project
4    you are on, for me the back half of my summer was
5    much busier than the front half.
6        Q. How long was the program?
7        A. It was ten weeks.
8        Q. When you say, "the back half," the last
9    five weeks were busier?
10       A. That's it.
11       Q. Did you ever have to work an all-nighter
12   as a summer analyst?
13       A. Do you mean not sleeping the entire
14   night?
15       Q. Correct.
16       A. No.
17       Q. Did you track the hours you worked as a
18   summer analyst?
19       A. Directionally, yes.
20       Q. How did you do that?
21       A. We had a staffing portal online.
22       Q. Were you trained on how to use that?
23       A. Not formally.
24           I think people just tell you how to use
25   it.

Page 14

1        T. Ernst - Confidential
2        Q. What were you told as to how to use it?
3        A. From what I recall, just put in the hours
4    you worked, but nothing more than that.
5        Q. Were you told when you should put in the
6    hours you worked?
7        A. You'd receive an e-mail on Thursday, sort
8    of prompting you to do it.
9            I believe -- that is actually the current
10   way.
11           I believe it used to be on Friday.
12       Q. Then you click on a link and it brings you
13   to the portal?
14       A. Correct.
15       Q. Would you keep track of your time during
16   the course of the week so that you could enter your
17   time accurately when prompted?
18       A. I would track sort of when I started
19   working and when I finished.
20           That was the extent.
21       Q. Were you trained on where to keep that
22   information?
23       A. No.
24       Q. How did you keep that information?
25       A. I had an Excel sheet on my desktop.

Page 15

1        T. Ernst - Confidential
2        Q. Do you still keep your time in that way?
3        A. No.
4        Q. When did you stop?
5        A. Once I finished as an analyst.
6        Q. A summer analyst or a regular analyst?
7        A. Regular.
8        Q. And that is a three-year program, correct?
9        A. Correct.
10       Q. So for three years you had an Excel sheet
11   that had your time worked that you then input into
12   the staffing portal at Centerview; is that correct?
13       A. No.
14           I had a sheet that I would delete each
15   week, so it was just -- it was not like I had a
16   running log, if that is what you are looking for.
17       Q. So once you input the hours into the
18   portal, you would delete the entry in the Excel
19   spreadsheet; is that correct?
20       A. Yes.
21       Q. Do you still have that document?
22       A. I don't believe so.
23       Q. Do you know of anyone else who you worked
24   with that kept their time in that way?
25       A. No.

Page 16

1        T. Ernst - Confidential
2        Q. Do you know who Matt Gallea is?
3        A. Do I know who he is?
4        Q. Yes.
5        A. Yes.
6        Q. He worked at Centerview, right?
7        A. Yes.
8        Q. Is he still an analyst there?
9        A. I believe he is an associate.
10       Q. Do you know if he kept his time using an
11   Excel spreadsheet?
12       A. I don't know how he keeps his time.
13       Q. Is there a program called "iStaffing"?
14       A. Yes.
15       Q. When you started as a summer analyst, and
16   when you started as an analyst at Centerview, were
17   you provided with any sort of written instructions
18   on how to document your time, both in iStaffing and
19   outside iStaffing?
20       A. Not that I recall.
21       Q. So the training -- and I am using that
22   phrase loosely -- that you may have received, was
23   just general, in that someone told you how to do it
24   at some point, and then you did it, correct?
25       A. Yes.

Page 17

T. Ernst - Confidential

1        T. Ernst - Confidential
2        Q. Did you ever input your time inaccurately
3   into iStaffing?
4        MS. SKIBITSKY:  Objection.
5        Q. You can answer.
6        MS. SKIBITSKY:  You can answer.
7        A. I am sure I did.
8        Q. I missed that answer, I'm sorry.
9        A. I'm sure I did, yes.
10       Q. Can you explain a situation where you
11  input your time inaccurately in iStaffing?
12       A. There were times when I would not use the
13  calculator, a document on my desktop, and more or
14  less guess.
15       It's just direction, provide directional
16  guidance to the staffing team.
17       Q. Did you ever intentionally input
18  inaccurate time into iStaffing?
19       A. Yes.
20       Q. Why did you do that?
21       A. If you worked so few hours in a week, you
22  would, you know, add a couple just so you would not
23  get, you know, a new project if you were going into
24  a long weekend, or something like that, but it was a
25  rare occurrence.

Page 18

1        T. Ernst - Confidential
2        MR. VALENTINO:  Can you read back the
3   answer, please?
4        (Answer read.)
5        Q. Just so I understand, one of the examples
6   you just gave is, if you don't have a lot of hours,
7   but you don't want to get staffed on a new project,
8   you would input more hours in iStaffing than you
9   actually worked, correct?
10       A. You could, yes.
11       Q. And you did that?
12       A. Yes.
13       Q. Why is that; you just did not want to get
14  work over the weekend?
15       A. Yes.
16       Q. Was there a threshold amount of hours that
17  you were told to put in at a minimum into iStaffing?
18       A. No.
19       Q. So for example, if you worked ten hours
20  in a week, you were not told to put in 40?
21       A. No.
22       Q. Did you ever intentionally put more hours
23  into iStaffing than you worked?
24       A. To clarify, I would say I worked 40, but
25  you are saying would I put in 50; is that the gist

Page 19

1        T. Ernst - Confidential
2   of your question?
3        Q. Yes.
4        A. Yes.
5        Q. How frequently would you do that?
6        A. Rarely.
7        Q. Why would you do that regularly?
8        A. I said, "rarely."
9        Q. Oh, rarely, I'm sorry.
10       Why would you do that rarely?
11       A. The same scenario, going into a weekend,
12  or something like that, but it was a rare occurrence.
13       Q. Just so that I understand, on the
14  occasions in which you did inflate the amount of
15  time you actually worked, it was because it was
16  going into a weekend and you did not want to get
17  additional work?
18       A. That is my recollection.
19       Q. Do you know of anyone else at Centerview
20  who did that?
21       A. Yes.
22       Q. Who?
23       A. I don't recall, but I know people have
24  done it.
25       Q. Did Matt Gallea do it?

Page 20

1        T. Ernst - Confidential
2        A. I don't know.
3        Q. Is doing that against Centerview's policy?
4        MS. SKIBITSKY:  Objection.
5        Q. You can answer.
6        Unless your attorney instructs you not to
7   answer --
8        MS. SKIBITSKY:  You can answer.
9        Q. -- you can answer when she objects.
10       A. Okay.
11       I'm not aware of any formal policies on
12  inputting time or things like that.
13       Q. Do you know what Centerview uses the
14  iStaffing portal for?
15       A. I have an understanding that it's to
16  manage people's time.
17       It's a general tool to see who is very
18  busy and who has capacity, but it's not a specific
19  billing tool, for example, that lawyers use.
20       Q. Do you know if your compensation -- and
21  by "compensation" I am including any sort of bonus
22  or discretionary bonus -- do you know if your
23  compensation at Centerview is in any way tied to the
24  amount of hours that you report working in
25  iStaffing?

Page 21

1        T. Ernst - Confidential
2        A. Not that I'm aware of.
3        Q. Would a result of you inaccurately
4   reporting your hours be that maybe another analyst
5   would get staffed on a matter other than you?
6        MS. SKIBITSKY:  Objection.
7        A. I'm not sure.
8        Q. Is it possible that by inaccurately
9   recording your time, that some other analyst would
10  get staffed on a deal and have to work over the
11  weekend?
12       MS. SKIBITSKY:  Objection.
13       A. I guess it is possible.
14       Q. Other than inputting the amount of hours
15  you worked, do you input any other information into
16  the iStaffing portal?
17       A. Yes.
18       Q. Can you explain what that is?
19       A. You can insert blurbs on sort of what you
20  are working on.
21       I think -- I believe this is a more recent
22  addition to the portal, and you don't always do this,
23  but it's sort of upcoming -- the day of a meeting,
24  things like that, what you're working on, and for
25  certain workstreams I can also input my best guess

Page 22

1        T. Ernst - Confidential
2   on what junior team members are -- the hours they'll
3   work in broad buckets.
4        Q. Is there a place in iStaffing where you
5   could report on your satisfaction level?
6        A. Yes.
7        Q. Can you explain what that means?
8        A. It's 1 to 5, I believe, but I could be
9   wrong in that, and it just says, "Project
10  Satisfaction."
11       Q. What does "project satisfaction" mean?
12       A. To be honest, I'm not sure.
13       Q. Did you ever ask anybody what it means?
14       A. No.
15       Q. Did anyone ever tell you what it means?
16       A. Not that I remember.
17       Q. Did you fill it out on a weekly basis?
18       A. Yes.
19       Q. Is there a place in iStaffing to report
20  on your capacity to take on additional work?
21       A. Yes.
22       Q. Can you explain what information you input
23  into that aspect of iStaffing?
24       A. Yes.
25       That is a sliding scale, 1 to 5, and

Page 23

1        T. Ernst - Confidential
2   it's -- that's all there is.
3        Q. What does "1" mean?
4        A. I believe lots of capacity.
5        Q. And "5" means no capacity?
6        A. Correct.
7        Q. And is there any sort of correlation
8   between the hours you are inputting into iStaffing
9   and the capacity level you report?
10       A. Yes.
11       Q. Is there anything specific you can tell
12  me about that; is there a certain amount of hours
13  that you'll put a 3 in there, or is there a certain
14  amount of hours that you'll put a 5 in there?
15       A. No.
16       Q. What is your general understanding of how
17  many hours you would have to work to put a 5 in the
18  capacity section?
19       A. I don't think there is a rule or a direct
20  relation to hours.
21       Q. Did you ever inaccurately report your
22  capacity in iStaffing?
23       A. I'm not sure you can.
24       It's sort of a subjective measure.
25       Q. Well, let me give you an example.

Page 24

1        T. Ernst - Confidential
2        Did you ever put a 5 in when you knew that
3   you actually could take on more work?
4        A. No.
5        Q. Did you ever put a 4 in when you knew that
6   really wasn't accurate?
7        A. I don't -- I don't know.
8        Q. But you did inaccurately state the amount
9   of hours you worked, at least on some occasions,
10  correct?
11       A. Yes.
12       Q. So wouldn't that, in effect, make the
13  reporting on capacity inaccurate in those situations?
14       A. I don't recall the capacity I put in for
15  those reports.
16       Q. Does Centerview contact employees in
17  certain situations when their hours in iStaffing are
18  high?
19       A. Yes.
20       Q. When would Centerview reach out to an
21  employee, what amount of hours would they have to
22  work for them to get contacted by Centerview?
23       A. I don't think there is a specific
24  threshold.
25       Q. Well, have you ever been contacted by

Page 25

T. Ernst - Confidential

1     T. Ernst - Confidential
2 Centerview regarding working too many hours?
3     A. Not -- I have been contacted regarding my
4 workload.
5     Q. Approximately, how many times?
6     A. Many.
7     Q. During the time that you were an analyst?
8     A. Yes.
9     Q. Can you explain what the substance was of
10 those communications when you were an analyst?
11     A. It's generally your staffer calling to
12 understand what you are working on, what is the
13 timeline, just trying to get an understanding of
14 your workload previously and going forward.
15     Q. Were you ever told that you were working
16 too much and you needed to slow down?
17     A. I don't recall.
18     Q. Did anyone ever express concern that your
19 workload was too high?
20     A. I've been told, "You are working a lot.
21 Let's manage through this, and then we'll give you a
22 break."
23     Q. Can you explain specifically what you just
24 said; who told you that, when, how much you were
25 working?

Page 26

T. Ernst - Confidential

1     T. Ernst - Confidential
2     A. No.
3      It was multiple years ago, so I don't
4 remember any specifics.
5     Q. Did you ever push back when somebody at
6 Centerview said that your workload was too high?
7     A. No, not that I recall.
8     Q. Did you ever get contacted by anyone at
9 Centerview to tell you that your workload was too
10 low?
11     A. No.
12     Q. Do you review other employees' iStaffing
13 reports?
14     A. I do not.
15     Q. Have you ever done that?
16     A. No.
17     Q. What is your current position at
18 Centerview?
19     A. Associate.
20     Q. Is associate the next level up from an
21 analyst?
22     A. Correct.
23     Q. My understanding is that an analyst is a
24 three-year program, correct?
25     A. Yes.

Page 27

T. Ernst - Confidential

1     T. Ernst - Confidential
2     Q. Did you have to do anything after the
3 analyst program ended to be accepted as an associate
4 at Centerview?
5     A. I believe I got an offer letter, but
6 beyond that, no.
7     Q. There wasn't, like, an interview where
8 you had to talk about what you did as an analyst?
9     A. No.
10     Q. Approximately, how many people were in
11 your analyst class?
12     A. Around 20.
13     Q. Approximately, how many made it through
14 to associate?
15     A. I believe nine were promoted.
16     Q. How long have you been an associate?
17     A. Around three years.
18     Q. What is the next step up in Centerview?
19     A. Principal.
20     Q. After principal, what is there?
21     A. Managing director.
22     Q. And then --
23     A. Partner.
24     Q. What is the path for an associate to get
25 to principal?

Page 28

T. Ernst - Confidential

1     T. Ernst - Confidential
2     A. Three-and-a-half years as an associate,
3 and then you are up for promotion to principal.
4     Q. Does that require interviewing or any
5 other sort of metrics that you are aware of?
6     A. Not that I am aware of.
7     Q. Do you expect to become a principal at
8 three-and-a half years?
9     A. I do.
10     Q. Is your goal to be a partner at
11 Centerview?
12     A. I'm not sure.
13     Q. Why not?
14     MS. SKIBITSKY: Objection.
15     A. It's ten years away. It's a very long
16 time frame.
17     Q. Do you have a LinkedIn profile?
18     A. Yes.
19     Q. Do you currently have one?
20     A. It's deactivated.
21     Q. Why did you deactivate it?
22     A. I was getting a lot of messages, so I
23 just deactivated it.
24     Q. Was its deactivation in any way related
25 to this case?

T. Ernst - Confidential

1
2    A. No.
3    Q. What are your duties and responsibilities
4 as an associate at Centerview?
5    A. You are responsible for checking analysts'
6 work, creating work yourself, content generation.
7       Those are the main responsibilities.
8    Q. When you are staffed on a particular
9 matter and there is an analyst on that matter, does
10 the analyst report to you as an associate?
11    A. Yes.
12    Q. So is it fair to say that there is, like,
13 a pecking order on a team at Centerview, starting
14 from the least experienced to most experienced; do
15 those people kind of report to the next person up in
16 line?
17    A. That's generally true, yes.
18    Q. So if you are on a deal and there's
19 somebody more senior to you on the deal, would you
20 consider that person your supervisor for purposes of
21 that deal?
22       MS. SKIBITSKY: Objection.
23    A. "Supervisor" feels like an awkward term
24 to me, but you do -- yes, you do report to them,
25 sort of, you -- you give your work to them, and they

T. Ernst - Confidential

1
2 would check it.
3       They would manage, sort of, what you are
4 working on.
5       So in that context, yes.
6    Q. And the opposite would be true, correct,
7 if you are working on a deal and there's an analyst
8 on the deal, you would be responsible for reviewing
9 the analyst's work, and the analyst would ultimately
10 report up to you, correct.
11    A. Correct, generally.
12    Q. Is there a reason why "supervisor" is an
13 awkward term for you?
14    A. It feels controlling.
15    Q. Don't you in some sense control the
16 schedules of the people who work on a team who are
17 junior to you?
18       MS. SKIBITSKY: Objection.
19    A. I wouldn't say I control schedules, no.
20       I think the project generally controls
21 schedules.
22       We more allocate the work that needs to
23 be done within the team.
24    Q. Do you know who Kate Shiber is?
25    A. Yes.

T. Ernst - Confidential

1
2    Q. When was the first time you met
3 Kate Shiber?
4    A. I don't recall the exact date.
5    Q. Have you ever worked on a deal with Kate
6 Shiber?
7    A. Yes.
8    Q. For purposes of the deposition, I am
9 going to refer to something called "Dragon."
10       Does that ring a bell with you at all?
11    A. Yes.
12    Q. What is "Dragon"?
13       You don't have to name the company.
14    A. Yes.
15       Dragon was a project I worked on years
16 ago that involved a company that was -- that had an
17 activist, as well as a potential M&A.
18    Q. "A potential" -- I missed the last word.
19    A. "M&A," mergers and acquisitions.
20    Q. Did you work on that in 2020?
21    A. I believe so.
22    Q. Did Kate Shiber work with you on Dragon?
23    A. Yes.
24    Q. You were her supervisor on Dragon,
25 correct?

T. Ernst - Confidential

1
2       MS. SKIBITSKY: Objection.
3    A. I was the associate on Dragon.
4    Q. And you assigned Kate work, correct?
5    A. Yes.
6    Q. And Kate's work, when completed, was to
7 be provided to you for review, correct?
8    A. Yes.
9    Q. And so, in a sense, you were in charge of
10 Kate's schedule as it related to her work on Dragon;
11 is that correct?
12    A. I was in charge of reviewing her work and
13 allocating her work.
14    Q. You are saying that that is different
15 from being in charge of her work schedule as it
16 relates to Dragon?
17    A. I did not manage her time in specifics.
18       I would just, you know, like I said,
19 allocate work to her.
20    Q. Who else was on team Dragon with you?
21    A. Matt Gallea.
22    Q. Let's go one by one.
23       So at the time, in 2020, what position
24 did Matt Gallea have?
25    A. I believe he was an analyst.

Page 33

T. Ernst - Confidential

1    T. Ernst - Confidential
2    Q. What year analyst was he?
3    A. Second or third year.
4        I don't remember which one.
5    Q. You said Kate was on Dragon, correct?
6    A. Yes.
7    Q. Was she a first-year analyst?
8    A. That's my recollection.
9    Q. Were there any other analysts on team
10   Dragon?
11   A. Another one joined, Ashwini.
12   Q. We are going to get to that.
13       She is an analyst, as well, correct?
14   A. Yes.
15   Q. What year analyst is she?
16   A. I believe she is the same year as Matt.
17   Q. Were you the only associate on team
18   Dragon?
19   A. Yes.
20   Q. Who, if anyone, else was on team Dragon
21   with you, other than the people you have already
22   named?
23   A. Matt Baron.
24   Q. Who is Matt Baron, what position did he
25   have back then?

Page 34

1    T. Ernst - Confidential
2    A. Principal.
3    Q. Were there any other principals on the
4    deal?
5    A. No.
6    Q. What is the next position, managing
7    director?
8    A. I don't believe there were any managing
9    directors on that.
10   Q. Were there any partners on team Dragon?
11   A. Yes.
12   Q. Who were the partners on team Dragon?
13   A. Blair Effron, Tony Kim, John Cogan,
14   Willem Beer.
15   Q. At the time, who was the most senior out
16   of those four partners?
17   A. Blair Effron.
18   Q. Is he the co-founder of Centerview?
19   A. Yes.
20   Q. Was he in charge of the team?
21   A. I would say he was the -- in charge of,
22   broadly, the work with the client, but he was not
23   involved in the day-to-day internal team, no.
24   Q. Were any of the partners involved in the
25   day-to-day on team Dragon?

Page 35

1    T. Ernst - Confidential
2    A. To varying extents.
3    Q. Who?
4    A. I think Willem and Tony would be aware of
5    the day-to-day.
6        Again, they are seniors, they are not
7    everything, but they are more involved in the
8    day-to-day.
9    Q. How did the distribution of work happen
10   on that team?
11   A. I don't recall specifics.
12   Q. Does somebody more senior, like a partner,
13   provide the assignments for the day, and then it
14   funnels down to everybody, or is there some other
15   way that that is done?
16   A. That is generally correct, yes.
17   Q. Would that be Tony Kim and Mr. Beer who
18   were the ones that were kind of providing
19   assignments that would then funnel down?
20   A. Yes.
21       It would generally start with Blair. The
22   partners would talk with the client.
23       That would sort of inform the work we had
24   to do, and then from there it would funnel down, as
25   you suggest.

Page 36

1    T. Ernst - Confidential
2    Q. Did you have any client contact on that
3    deal?
4    A. I would join calls.
5    Q. Did you speak to the clients at all or
6    did you just join and listen?
7    A. I don't recall any major speaking roles.
8    Q. What was your impression of the importance
9    of the Dragon deal for the firm?
10   A. It was important.
11   Q. Can you explain why it was important?
12   A. Dragon is a very large company, and that
13   just generally carries more significance.
14   Q. To your knowledge, had Dragon been a
15   client of Centerview prior to this particular deal?
16   A. I don't believe they were -- they ever
17   paid us, no, to my knowledge.
18   Q. So, to your knowledge, this was a new
19   client for Centerview?
20   A. I believe they had some introductory
21   meetings, but nothing to this level of engagement,
22   no.
23   Q. Was this the most important or near the
24   most important deal you had worked on to that point
25   at Centerview?

T. Ernst - Confidential
1
2     A.  Yes.
3     Q.  Was it the most important one?
4     A.  I don't think it's the most important.
5  It's -- I don't say anything is the most important.
6     Q.  Did anyone who was more senior to you on
7  the team express to you the importance of the deal?
8     A.  Yes.
9     Q.  Who?
10     A.  I don't recall who said it, but it would
11  have been the partners, generally.
12     Q.  Did you feel any pressure to perform well
13  on such an important deal for the company?
14     A.  Not more than any other deal.
15     Q.  Why not?
16     A.  My job doesn't necessarily change at my
17  level.  It's still very similar work.  It's just a
18  bigger company.
19     Q.  So you didn't feel any additional
20  pressure doing this deal?
21     A.  No.
22     Q.  At the time that Dragon first started,
23  there were two analysts staffed on the deal,
24  correct?
25     A.  Correct.

T. Ernst - Confidential
1
2     Q.  Did you have any input into the staffing
3  for Dragon?
4     A.  Not that I recall.
5     Q.  Do you know who had input into who was to
6  be staffed on the matter?
7     A.  No.
8     Q.  You were in charge of the work product of
9  the two analysts, Ms. Shiber and Mr. Gallea, on
10  Dragon; is that true?
11     A.  I was in charge of reviewing it, and I
12  was producing some myself.
13     Q.  So you had to make sure that those two
14  analysts were doing their job and doing good work on
15  that deal, correct?
16     A.  Yes.
17     Q.  Do you know how long Centerview's work
18  lasted on the Dragon deal?
19     A.  I don't recall the exact dates, but it
20  generally ended with a publicly filed press release.
21  That's sort of the tenor.
22     Q.  What was Centerview's role in this deal?
23     A.  We were advising the company on both the
24  inbound indication of interest from another, as well
25  as the negotiations with an activist who had taken a

T. Ernst - Confidential
1
2  position in the stock.
3     Q.  And were there specific meetings that you
4  were preparing for, or a presentation, or some sort
5  of final project that you were working towards with
6  respect to the deal?
7     A.  No.
8        I wouldn't say that is generally how it
9  works.
10     Q.  So what ultimately happened with this
11  deal; what happened?
12     A.  They rejected the offer and settled with
13  the activist.
14     Q.  You said that was made public?
15     A.  Yes.
16        The activist part, yes.
17     Q.  Did Centerview's work on Dragon end after
18  the settlement with the activist?
19     A.  I would say generally that extent of work,
20  yes.
21        There were select follow-up calls, and
22  things like that, but it wasn't the same sort of
23  involvement.
24     Q.  What do you mean by "it wasn't the same"?
25     A.  It was very -- it was much less, you know,

T. Ernst - Confidential
1
2  hours or work product we were generating once the
3  settlement happened.
4        There was a separate deal that we were
5  not really working on, but we got press release
6  credit for, so one weekly call we would join, but
7  other than that, not much.
8     Q.  How many weeks was the Dragon deal active?
9     A.  I don't recall.
10     Q.  Was it a month?
11     A.  I believe longer.
12     Q.  Was it two months?
13     A.  I don't know the exact time.
14     Q.  I am not asking for the exact time, but
15  was it between a month and two months?
16        MS. SKIBITSKY:  Objection.
17     A.  I believe it was longer.
18     Q.  You believe it was longer than two months?
19     A.  Yes.
20     Q.  I am going to use the term "live deal."
21        Do you know what that means?
22     A.  Yes.
23     Q.  What does "live deal" mean?
24     A.  You have been engaged with a company, and
25  you are actively pursuing a sale or at some point a

1          T. Ernst - Confidential
2    transaction.
3          Q.  Was Dragon a live deal?
4          A.  Yes.
5              I'd consider it live.
6          Q.  I know you don't know the exact length,
7    but you did testify generally about how long you
8    think it may have been.
9              Where is that in the spectrum of how long
10   these live deals typically last?
11         A.  There are no set parameters for a live
12   deal.  They are all very situational dependent.
13             I don't think this one was beyond the
14   scope of being reasonable or typical.
15             There's a very wide time frame depending
16   upon the mandate.
17         Q.  Approximately, how many live deals have
18   you worked on since you started at Centerview?
19         A.  Upwards of 15, I'd say.
20         Q.  How long have you been working there?
21         A.  Six -- six years, around there.
22         Q.  Have you ever worked on more than one
23   live deal at once?
24         A.  Yes.
25         Q.  What is the most amount of live deals you

1          T. Ernst - Confidential
2    have worked on at one time?
3          A.  I don't know.
4          Q.  Around 15 deals in six years, is that
5    standard for people at your level in Centerview?
6          A.  I'm not sure.
7          Q.  Is there any set amount of hours that an
8    analyst or an associate or anyone else at Centerview
9    has to work on a live deal?
10         A.  No set amount, no.
11         Q.  Is there any expectation for hours when
12   somebody is staffed on a live deal?
13         A.  There is no expectation for a set amount
14   of hours.
15             I believe there is an expectation for
16   completing work within the timeline.
17         Q.  And what was the timeline on Dragon?
18         A.  It varies day by day.  There is no
19   long-dated timeline.
20         Q.  Prior to Ms. Shiber getting staffed on
21   Dragon, had you ever interacted with her?
22         A.  Not that I recall.
23         Q.  Do you recall your first interaction with
24   her?
25         A.  No.

1          T. Ernst - Confidential
2          Q.  When she was brought onto the team, did
3    you speak to her?
4          A.  I spoke with her over the course of the
5    project, yes.
6          Q.  Do you recall, towards the beginning of
7    her involvement in the project, if you had any
8    conversations with her about what her role was going
9    to be on the project?
10         A.  I don't recall any specific conversation.
11         Q.  Did you direct anybody to speak with her
12   about her role on the project?
13         A.  I don't know.
14         Q.  Have you ever heard project Dragon
15   described as the most interesting thing anyone is
16   working on right now?
17         A.  It's possible.
18             I don't remember that specifically.
19         Q.  Well, did you ever hear anything similar
20   to that?
21         A.  As a general sentiment that it was
22   important.
23             I don't know if anyone classified it as
24   the most interesting thing anyone was working on.
25         Q.  Did anyone classify it in general as

1          T. Ernst - Confidential
2    potentially the biggest M&A deal should it go
3    through?
4          A.  It's possible, yes.
5              It would have been up there.
6          Q.  Would it have been Centerview's biggest
7    M&A deal to date if it went through?
8          MS. SKIBITSKY:  Objection.
9          A.  Possibly.
10             I don't know every deal that has been
11   worked on.
12         Q.  I want to show you a document.
13             It has been added to the chat and we are
14   going to screen share it.
15         MR. VALENTINO:  I would like to mark
16   this document as Plaintiff Exhibit 25.
17             (Plaintiff's Exhibit 25, one-page printout
18   of e-mails, the top e-mail dated 8/25/2020,
19   10:40:48 AM, to Timothy Ernst, from Kate
20   Shiber, Bates stamped No.  Centerview_002588,
21   marked for identification, as of this date.)
22             (Plaintiff's Exhibit 25 placed on shared
23   screen.)
24   BY MR. VALENTINO:
25         Q.  Mr. Ernst, which way are you going to look

Page 45

T. Ernst - Confidential
1    at it, are you going to look at it in the chat or on
2    the screen share?
3         A. I am looking at the screen share right
4    now.
5         Q. Please let me know when you have had a
6    chance to review the whole document.
7         A. Okay.
8         Q. Does this refresh your recollection as to
9    the time frame when Kate was added to the team?
10        A. It seems to be August 25th.
11        Q. I am not going to read this into the
12   record, but there is a sentence here beginning, "I
13   know Matt talked to you but let's find a time to
14   talk tomorrow...," and then there is the rest of the
15   sentence.
16            I want to focus on what I just read.
17            Do you see that?
18        A. Yes.
19        Q. That is under the August 25th e-mail from
20   you to Kate.
21            Do you know what Matt talked to her about?
22        A. I don't recall.
23        Q. Did you ask Matt to talk to her?
24        A. I don't recall.

Page 46

T. Ernst - Confidential
1         Q. When I say, "Matt," it's Matt Gallea,
2    right?
3         A. That would be my guess.
4         Q. Did you talk to her the next day?
5         A. I don't recall.
6         Q. You then write, "It's going to be a very
7    busy month but I think this is probably the most
8    interesting and dynamic accounts anyone is working
9    on so hopefully pretty exciting for one of your first
10   staffings."
11           What did you mean by "very busy month"?
12        A. There was going to be a lot of work.
13        Q. Did you have a conversation with Kate in
14   more specific terms about how much work was going to
15   be required of her on this deal?
16        A. I don't recall.
17        Q. Did you ever tell Kate the amount of hours
18   she was going to be expected to work on this deal?
19        A. I don't recall.
20        Q. Who assigned work to Kate on project
21   Dragon?
22        A. Typically, it would be me.
23        Q. To your knowledge, did anyone else assign
24   work to her?

Page 47

T. Ernst - Confidential
1         A. It's possible.
2         Q. Who would that be?
3         A. Either Matt Baron or Matt Gallea.
4         Q. Did they review Kate's work or was that
5    just you?
6         A. I think everyone would review the work,
7    but usually in steps.
8         Q. How did Kate do on the project; how was
9    her work?
10        A. Generally, pretty weak.
11        Q. Why do you say that?
12        A. It wasn't really usable in the first,
13   possibly second, instance, but -- yes.
14        Q. Can you provide any specific examples of
15   how her work was not usable?
16        A. Nothing specific, but I recall Matt Gallea
17   and I having to fix it multiple times before it could
18   be shared internally.
19        Q. How long had Kate been a first-year analyst
20   prior to her involvement on this deal?
21        A. I don't remember that now.
22        Q. She was a first-year analyst, correct?
23        A. I believe so.
24        Q. And she was added to the team in August of

Page 48

T. Ernst - Confidential
1    2020, correct?
2         A. She was earlier.
3         Q. When do first-year analysts start at
4    Centerview?
5         A. Typically, in July.
6         Q. Did Kate start in July of 2020?
7            MS. SKIBITSKY: Objection.
8         A. I don't know.
9         Q. You don't know, but Kate's class typically
10   would have started in July of 2020, right?
11        A. Yes.
12        Q. And when the analysts start, do they do
13   any training at first?
14        A. Yes.
15        Q. How long does the training typically last?
16        A. Four weeks.
17        Q. So for four weeks there's training, and
18   then they start getting assigned to projects?
19        A. Typically, yes.
20        Q. So for someone who started in July of 2020,
21   assuming that they started in July of 2020, they
22   wouldn't start to get real deal work until the next
23   month, correct?
24        A. Typically, yes.

Page 49

T. Ernst - Confidential

1      T. Ernst - Confidential
2     Q. So this was essentially Kate's first live
3  deal at Centerview, right?
4     A. I don't know.
5     Q. This was the first month of Kate's
6  employment at Centerview in which she was getting
7  actual deal work, correct?
8     A. I believe so.
9     Q. The work that you have characterized as
10  weak, wasn't that typical of someone who had just
11  started working at an investment bank in their first
12  job?
13     A. Typically, first-years' work is weak.
14     I would say this work was weak compared
15  to first-years' work.
16     Q. How was your work as a first-month,
17  first-year at Centerview; was it weak or was it
18  better than weak?
19     A. I don't know.
20     Q. Did anyone ever talk to you about your
21  work product when you were in your first month of
22  work at Centerview?
23     A. Yes.
24     Q. Did anyone ever tell you that the work
25  that you were providing in your first month at

Page 50

T. Ernst - Confidential

1      T. Ernst - Confidential
2  Centerview needed to be revised multiple times before
3  it was usable?
4     A. It would be revised, yes.
5     Q. So isn't it typical for someone like Kate
6  to not produce work that could just be immediately
7  passed on to your superiors?
8     A. Yes.
9     Q. How was Matt Gallea's work on the deal;
10  did he make mistakes?
11     A. Matt's work is generally great.
12     I'm sure he made mistakes.
13     Q. Did you tell anybody on the team about
14  your characterization of Kate's work?
15     A. It's possible.
16     Q. Well, do you remember having any
17  conversations with people on the team, or even
18  outside the team, about the quality of Kate's work?
19     A. I don't recall any specific conversation.
20     Q. Did you speak with Kate about the quality
21  of her work?
22     A. I'm sure I did, whether comments or more
23  generally.
24     Q. Did you ever sit her down and say, "Your
25  work is not as good as a typical first-year"?

Page 51

T. Ernst - Confidential

1      T. Ernst - Confidential
2     A. I don't -- I never actually met her in
3  person, so --
4     Q. Did you ever call her or be on a Zoom
5  with her or e-mail her or text her or tell her that
6  her work was not as good as a typical first-year?
7     A. I don't believe I ever used those words,
8  no.
9     Q. Wasn't a lot of Kate's work PowerPoint
10  formatting and perhaps mislinking things in Excel,
11  is that the gist of some of the issues that you were
12  having?
13     A. Those would be typical issues, yes.
14     Q. Typical of first-year analysts, correct?
15     A. Yes.
16     Q. So in what way was Kate not performing as
17  well as a typical first-year analyst on this deal?
18     A. There were more -- I would say it was
19  more of those issues, more mislinks.
20     The work was further from the finish line
21  than others when we got it.
22     There were similar errors.  There would
23  just be more and more, sort of, turns or repetitions
24  to get it to where it needed to be.
25     Q. Can you give me any specific example of

Page 52

T. Ernst - Confidential

1      T. Ernst - Confidential
2  what you just said?
3     A. I don't recall the specifics.
4     Q. Did you document it anywhere?
5     A. Beyond e-mails that I have sent, no.
6     Q. When you say, e-mails that you have sent,
7  what are you referring to?
8     A. General comments back to Kate is what I
9  was referring to.
10     Q. Did you like Kate as a person?
11     A. I don't think I liked or disliked her.
12     I, quite frankly, didn't really know her
13  that well.
14     Q. Did you ever have a conversation with her
15  about anything other than work?
16     A. Possibly, briefly, but I don't recall any
17  specific conversations.
18     MR. VALENTINO:  We have been going for
19  about an hour.
20     Do you want to take five?
21     MS. SKIBITSKY:  Yes, that would be great.
22     MR. VALENTINO:  Okay.
23     Off the record.
24     (Discussion off the record.)
25     (Short recess taken from 11:10 a.m. to

Page 53

1    T. Ernst - Confidential
2    11:20 a.m.)
3         MR. VALENTINO:  Back on the record.
4    BY MR. VALENTINO:
5         Q.  I just want to go back for a minute to
6    the interviewing process.
7         Do you have any insight as to the
8    structure of Centerview's interviews for incoming
9    analysts that did not summer there?
10        A.  Yes.
11        Q.  What is the structure?
12        A.  It's not dissimilar to the first -- to
13   the summer process that I described.
14        It's typically -- this is speaking now,
15   not -- I don't recall how it was back then -- it's
16   two -- two interviews, usually 30 minutes each.
17        You progress through that, and you go to
18   the four or five 30-minute interviews back to back
19   on a separate day.
20

Page 54

1         T. Ernst - Confidential
2

19        A.  I don't recall any of the specific
20   questions.
21        It was seven -- six years ago.
22        Q.  Is there an advantage for working at
23   Centerview as an analyst if you summered there first?
24        A.  I think it -- it can be helpful.
25        Q.  How so?

Page 55

1         T. Ernst - Confidential
2         A.  Just more familiar with the people and
3    culture, just generally more familiar with the place.
4         Q.  When you summered at Centerview, did you
5    have a mentor assigned to you?
6         A.  Yes.
7         Q.  Who was that?
8         A.  His name was Aaron Weiner.
9         Q.  What level was he?
10        A.  He was an analyst.
11        Q.  Did he talk to you about what the work
12   expectations would be if you joined Centerview as a
13   full-time analyst?
14        A.  I don't recall what we spoke about.
15        Q.  Did Kate summer at Centerview, do you
16   know?
17        A.  I don't believe she did, but I don't know.
18        Q.  Do you know approximately how many people
19   were hired by Centerview in Kate's class who were
20   not summers?
21        A.  I don't know.
22        Q.  Do you know if Kate was assigned a mentor
23   upon joining Centerview?
24        A.  I don't know.
25        Q.  Do you know if people who don't summer at

Page 56

1         T. Ernst - Confidential
2    Centerview, as a matter of course, get assigned to a
3    mentor as a first-year analyst?
4         A.  I believe -- I think everyone would get a
5    mentor is my general understanding.
6         Q.  Are you sure about that?
7         A.  I'm not sure.
8         Q.  Let's go back to project Dragon.
9         Did there come a time on the project when
10   you had an issue with Kate logging off for the night
11   without checking in with you?
12        A.  Yes.
13        Q.  Can you explain what you recall about
14   that?
15        A.  I recall they were pushing towards some
16   tight deadline, I don't recall specifically what it
17   was, and so we all -- being me, Matt Gallea, and
18   Kate -- were sort of working on separate pieces,
19   sort of just attacking different parts of it.
20        Matt and I were working, and we had not
21   heard from Kate in a while.  I believe I gave her
22   some comments, and then we had not heard from her in
23   a while.
24        I think I asked Matt to check in, or
25   possibly I did, but we just never heard back, and

Page 57

1        T. Ernst - Confidential
2   then I think we just found her work in the share
3   drive is my recollection.
4        Q. Do you recall when this was?
5        A. No.
6        Q. Do you recall how soon after Kate joined
7   the deal this was?
8        A. No.
9        MR. VALENTINO: Let's pull up Exhibit 9,
10  please.
11       (Defendant's Exhibit 9 placed on shared
12  screen.)
13       Q. This document has been previously marked
14  as Defendant's Exhibit No. 9. It is a two-page
15  document Bates stamped Centerview_000162 and 000163.
16       You can read it from the bottom to the
17  top. That would probably be the easiest way to do
18  it.
19       Let me know when you need us to scroll up
20  or down.
21       It's in the chat, as well.
22       A. Okay.
23       Q. Have you read the whole document?
24       A. Yes.
25       Q. I'm going to first talk about the bottom

Page 58

1        T. Ernst - Confidential
2   e-mail, which is an e-mail from you to Kate, cc'd to
3   Matt Gallea, dated Friday, August 28, 2020,
4   10:08 a.m.
5        You describe a communications expectation,
6   and we will get into that, but does this e-mail
7   describe the incident that you were just talking
8   about with Kate logging off without you knowing?
9        A. Yes.
10       Q. So this was roughly a week, maybe even
11  less than a week, after Kate joined the team, right?
12       A. It appears that way.
13       Q. Going through your e-mail, and focused on
14  the second sentence, it says, "We should also talk
15  today generally about expectations on communication
16  and expectations for a live project like this. Matt
17  and I shouldn't be up alone working, we are a team
18  and we will need everyone on the same page and
19  pulling their weight. Things may come up and you
20  aren't able to get to / finish stuff, but I need to
21  know that and can help out. It's not helpful to
22  think you are working on stuff and then realize it's
23  not done. Let's plan to talk in the afternoon to
24  make sure we're aligned."
25       So it's true that prior to this e-mail

Page 59

1        T. Ernst - Confidential
2   you had never had a discussion with Kate about your
3   expectations for her on communications and work
4   hours on this live project, correct?
5        A. I don't know.
6        Q. Well, would you have told her that you
7   should talk about it if you had already spoken to
8   her about it?
9        MS. SKIBITSKY: Objection.
10       A. It's possible.
11       Q. But you don't recall if you previously
12  had a discussion with Kate about your expectations
13  for her on this project?
14       A. I don't recall.
15       Q. Did you instruct Matt Gallea to have a
16  conversation with Kate prior to this e-mail about
17  your expectations for her on this project?
18       A. I don't know.
19       Q. You say, "Matt and I shouldn't be up
20  alone working..."
21       Where were the other members of the team,
22  other than Kate, when you were working?
23       A. I would assume asleep.
24       Q. Were the hours on Dragon different for
25  the members of the team depending on seniority?

Page 60

1        T. Ernst - Confidential
2        A. Yes.
3        Q. Were there any set expectations for the
4   amount of hours Kate was supposed to work on this
5   deal?
6        A. Not in terms of a specific time, no.
7        Q. So there was never a communication to
8   Kate by anyone on the team stating, "You have to
9   work 120 hours or more a week on this until it's
10  done," correct?
11       MS. SKIBITSKY: Objection.
12       A. I don't believe so.
13       Q. Other than what you just said before, do
14  you recall anything specific about what it is that
15  Kate was working on?
16       A. No.
17       Q. Did Kate, in fact, finish the work that
18  was asked of her and then logged off?
19       A. My recollection is, I think she believed
20  she was done, but the work was, in my opinion, not
21  done.
22       Q. How was it not done?
23       A. It was not -- there were mistakes. It
24  wasn't formatted correctly. It wasn't client or
25  internally ready to be shared.

Page 61

T. Ernst - Confidential
1
2      Q. What mistakes were made?
3      A. I don't recall.
4      Q. What wasn't formatted correctly?
5      A. I don't recall.
6      Q. Do you think you should have handled this
7  situation differently, by speaking to her on the
8  phone or over Zoom, rather than sending this e-mail?
9      A. I think the intention of this e-mail was
10 to speak over Zoom, which is the last sentence.
11     Q. Why did you put it in writing?
12     A. Just to make sure she knew the
13 expectations before we spoke.
14     Q. Why not call her and tell her the
15 expectations without writing this in aa e-mail?
16     A. I was possibly busy, but I don't recall.
17     Q. Then there is a response from Kate
18 shortly after your e-mail to her, and I'm not going
19 to read the whole thing, I will focus you on the
20 second sentence, where she says, "This is why I
21 asked to talk earlier in the day about the plan for
22 the day and the big picture of what is going on."
23     Did she, in fact, ask to talk to you
24 and/or Matt earlier in the day about the plan?
25     A. I don't know.

Page 62

T. Ernst - Confidential
1
2      Q. She references later in the e-mail that
3  there were several times during the day yesterday
4  when she would have been able to do more work if she
5  knew about it earlier.
6      I am paraphrasing.
7      Do you recall if she communicated to you
8  at all and stating in substance that she has the
9  capacity to take on more work, or she is free, or
10 anything of that type?
11     A. I don't recall.
12     Q. Then you respond, again, shortly after her
13 response, and I won't read the whole thing, but
14 focusing on the first paragraph, you say, "One part
15 of this job (and the worst part of this job) is many
16 times you can't 'get ahead' of things or work through
17 things early because there will always be more for
18 you to do."
19     Why is that the worst part of the job?
20     A. I think "worst part of job" might be
21 a figure of speech, but I think the reason it's a
22 negative part of the job is you just -- you are more
23 at the whims of the timeline of the deal. You can't
24 sort of work on your own timeline, sort of get ahead
25 of things, like you might be able to in other jobs.

Page 63

T. Ernst - Confidential
1
2      Q. And then you say, "Late nights are just a
3  part of the job, especially on a live deal like
4  this."
5      What do you mean by "late nights"?
6      A. I mean working later than you would at a
7  typical, more standard job.
8      Q. How late was Kate working the night that
9  you said she didn't finish her work?
10     A. I don't know.
11     Q. When Kate was on this job -- and I am
12 talking about before the restrictions were put in
13 place on her -- was she working past midnight?
14     A. I don't recall.
15     I assume so.
16     Q. Would you agree that she was working late
17 prior to the restrictions?
18     A. I think "late" can be many things, but
19 yes.
20     Q. Then you go on to tell her that "...when
21 you are finished, let me or Matt know and we will
22 take a look because we will definitely have comments
23 (just part of being a first year) and then those need
24 to be finished before signing off," and then you talk
25 about your practice when you first started.

Page 64

T. Ernst - Confidential
1
2      Prior to this e-mail, you had never told
3  Kate that when she is finished with an assignment at
4  night to let you or Matt know before signing off,
5  right?
6      A. I don't know.
7      Q. Do you think you told her that before this
8  e-mail?
9      MS. SKIBITSKY: Objection; asked and
10 answered.
11     A. I would -- I don't know if I told her that.
12 I would think it would -- it's sort of general
13 knowledge.
14     I think the point of this e-mail was, in
15 case she did not have that general knowledge, was to
16 inform it.
17     Q. How was it general knowledge?
18     A. I think it's generally known that you
19 should complete your work before signing off.
20     Q. Where do you get that general information
21 from?
22     A. I don't think there's a specific source.
23     I think it's just an understood part of
24 the job.
25     Q. Well, she was in her second month of

Page 65

1        T. Ernst - Confidential
2  employment.
3        Do you know if anyone actually told her
4  that prior to this e-mail?
5        A. I don't know.
6        Q. Does Centerview have a handbook for its
7  incoming analysts to explain these sorts of things
8  to them?
9        A. There is no handbook, no.
10       Q. So it's possible she actually didn't know
11 what the expectations were on communicating with you
12 and Mr. Gallea on a live deal, correct?
13       MS. SKIBITSKY:  Objection.
14       A. I guess it's possible.
15       Q. You mention "Jabber."
16       What is "Jabber"?
17       A. It's like an internal chat.
18       Q. Was that something that Centerview used
19 during this time period?
20       A. Some people would.
21       Q. Did you use it?
22       A. I used it over my career.
23       I don't know if I used it at this specific
24 time.
25       Q. Do you know if Kate used it to communicate

Page 66

1        T. Ernst - Confidential
2  with you or anyone else on the team?
3        A. I don't.
4        She might have.
5        Q. Does Centerview still have Jabber?
6        A. I believe so, although it's not used
7  really anymore, to my knowledge.
8        Q. You write at the end of your e-mail, "I
9  am free after 1 this afternoon."
10       Did you speak to Kate on the phone or on
11 Zoom or another platform about these e-mails?
12       A. I believe so, yes.
13       Q. When did you speak with her?
14       A. I don't know.
15       Q. Do you recall if it was the same day?
16       A. I think it was, but I don't remember
17 specifically.
18       Q. I will represent to you that this was a
19 Friday.
20       Do you recall if it was a Friday?
21       A. I don't recall the specific time of the
22 call.
23       Q. Do you recall the content of the
24 conversation you had with Kate?
25       A. I don't think it was dissimilar from this

Page 67

1        T. Ernst - Confidential
2  e-mail, just -- just making sure nothing was lost in
3  communication on the e-mail, and just aligning on
4  expectations going forward.
5        Q. Did you apologize to her for sending the
6  e-mail that you initially sent to her?
7        A. I don't recall apologizing.
8        Q. You say in this e-mail, "...we will
9  definitely have comments (just part of being a first
10 year)..."
11       What did you mean by that?
12       A. I think first-years generally need
13 comments before their work is complete.
14       Q. So in your experience at the time, her
15 work would need comments, correct?
16       A. Yes.
17       Q. But that's not atypical of a first-year
18 like Kate, correct?
19       A. No.
20       That's standard.
21       Q. Do you know if there were any tasks that
22 Kate performed on this deal for you and/or Matt or
23 anyone else that actually didn't need comments and
24 was perfect?
25       A. There could be small things, like

Page 68

1        T. Ernst - Confidential
2  administrative stuff, but I would be surprised if
3  there was substantive work product that didn't
4  require comments, but I don't remember specifics.
5        Q. At the top of the document it shows that
6  you forwarded this e-mail to a William Stewart.
7        I will represent to you that the time of
8  day -- this is from your counsel, your company's
9  counsel -- that the time of day might not be
10 accurate.  It might be earlier in the day Eastern
11 Standard Time.
12       I am not sure if that is 2:44:06 p.m.
13 Eastern Standard Time, but this does show that you
14 forwarded it to William Stewart.
15       Who is William Stewart?
16       A. He was the same year as me, the same
17 position as me, but I believe he is on the staffing
18 team.  I'm not sure if he was Kate's staffer.
19       Q. So he was the same year as you at
20 Centerview, but he was purely a staffing employee?
21       A. No.
22       Q. So I got that wrong?
23       A. Correct.
24       Q. He works on deals, too?
25       A. Yes.

Page 69

T. Ernst - Confidential

1          T. Ernst - Confidential
2      Q. And part of his other responsibilities,
3  other than deal work, is to help with the staffing?
4      A. Yes.
5      Q. How many people in your class had those
6  responsibilities?
7      A. Just one.
8      Q. Is Will still at Centerview?
9      A. I don't believe so.
10     Q. Do you have any role in staffing now?
11     A. No.
12     Q. Why did you forward this e-mail to
13 Mr. Stewart?
14     A. I don't remember.
15     Q. Was Mr. Stewart working on Dragon?
16     A. He was not.
17     Q. So what purpose would there be to e-mail
18 someone not working on the deal an e-mail between
19 you and a first-year analyst about work on the deal?
20     A. I don't remember.
21     Q. Were you trying to paper your criticisms
22 of Kate to someone in the staffing department?
23     A. I don't believe my intent was to paper
24 complaints, no.
25     Q. But you don't know why you e-mailed this

Page 70

1          T. Ernst - Confidential
2  to Mr. Stewart?
3      A. No.
4      Q. At the time, were you friends with
5  Mr. Stewart outside of work?
6      A. Yes.
7      Q. Did you summer with him?
8      A. Meaning as summer analyst?
9      Q. Sorry.
10         Were you summer analysts with him?
11     A. Yes.
12     Q. Did you know him prior to the summer
13 analyst program?
14     A. No.
15     Q. Were you forwarding this to him as a
16 friend, letting him know what happened with
17 Ms. Shiber?
18        MS. SKIBITSKY: Objection.
19     A. I don't know.
20        MR. VALENTINO: Let's pull up Exhibit 18,
21     please.
22        (Plaintiff's Exhibit 18 placed on shared
23     screen.)
24     Q. This document has previously been marked
25 as Plaintiff's Exhibit 18. It's a one-page document

Page 71

1          T. Ernst - Confidential
2  Bates stamped Centerview_001857.
3          Take a look at that and let me know when
4  you are done.
5          I will represent to you it is the same
6  e-mail -- you can read it -- it is the same e-mail
7  as the e-mail in the exhibit we just previously
8  looked at, it is the same bottom e-mail in
9  Defendant's Exhibit 9, but read it, if you want.
10     A. Okay.
11     Q. All I want to ask about this is, there is
12 a bcc on this version of the e-mail, and it's
13 "epatrick@centerview.com."
14         Who is that?
15     A. Emily Patrick.
16     Q. And who was Emily Patrick at the time?
17     A. Similar to Will, she was my year at
18 Centerview.
19     Q. Did she have any other role other than as
20 an analyst or an associate?
21     A. No.
22     Q. Was she on the staffing team?
23     A. No.
24     Q. Did she have any affiliation with Kate
25 Shiber?

Page 72

1          T. Ernst - Confidential
2      A. I believe they were in the same
3  sorority -- and I could be wrong on that -- in
4  college.
5      Q. What college did Emily go to?
6      A. Dartmouth.
7      Q. Was Emily Patrick a mentor of Ms. Shiber,
8  officially?
9      A. I don't know.
10     Q. Was Emily Patrick working on Dragon?
11     A. She was not.
12     Q. Why did you bcc her?
13     A. I don't remember.
14     Q. Were you bcc'ing her to embarrass Kate to
15 somebody who went to college with her?
16        MS. SKIBITSKY: Objection.
17     A. I don't believe so.
18     Q. Were you sending this to Emily to spread
19 gossip about Kate Shiber?
20        MS. SKIBITSKY: Objection.
21     A. I don't believe so.
22     Q. I am trying to understand what purpose it
23 serves for you as an associate on this deal to send
24 it to somebody who doesn't work on the deal and isn't
25 in staffing.

Page 73

1        T. Ernst - Confidential
2        Can you think of any purpose?
3        MS. SKIBITSKY: Objection; asked and
4    answered.
5        A. Possibly if she was her mentor, which I
6    don't know if she was, but -- I don't know, again,
7    why she was bcc'd.
8        Q. Did you ever speak to Emily about this
9    e-mail?
10       A. I don't know.
11       Q. Other than this example, the last two
12   examples we looked at of you sending e-mails where
13   you are critical of a team member to that team
14   member, are there any other examples where you have
15   done this, where you have sent your criticisms to a
16   team member to people outside of the team at
17   Centerview?
18       A. I am sure that has happened.
19       Q. Can you give me any other examples?
20       A. I don't know specifics.
21       Q. Did you do it often?
22       A. No, I don't think so.
23       Q. Are you friends with Ms. Patrick?
24       A. Yes.
25       Q. Do you socialize with her outside of work?

Page 74

1        T. Ernst - Confidential
2        A. Yes.
3        Q. Do you socialize with Mr. Stewart outside
4    of work?
5        A. Yes.
6        MR. VALENTINO: I would like to mark this
7    document as Plaintiff's Exhibit 27.
8        It is a one-page document Bates stamped
9    Centerview_000161.
10       (Plaintiff's Exhibit 27, one-page printout
11   of e-mails, the top e-mail dated 8/28/2020,
12   2:16:38 PM, to Timothy Ernst, from Emily
13   Patrick, Bates stamped No. Centerview_000161,
14   marked for identification, as of this date.)
15       (Plaintiff's Exhibit 27 placed on shared
16   screen.)
17   BY MR. VALENTINO:
18       Q. Please go ahead and review this document,
19   and let me know when you are done.
20       A. Okay.
21       Q. I am going to focus on the follow-up
22   portion, where Emily writes to you "omg."
23       Do you know what she meant by that?
24       A. "Oh My God."
25       Q. And what do you understand that to mean

Page 75

1        T. Ernst - Confidential
2    in this context?
3        A. I think she was surprised.
4        Q. Did you ever follow up with Emily about
5    this response?
6        A. I don't know.
7        Q. Did you ever talk to Emily in any
8    capacity -- whether on e-mail or text or any other
9    method of communication -- did you ever talk to her
10   about Kate?
11       A. I am sure we did.
12       Clearly, we had this e-mail exchange, but
13   I don't remember.
14       Q. Other than this.
15       A. Not recently.
16       I don't remember anything specific.
17       Q. What about generally, do you remember
18   having any discussions outside of this e-mail with
19   Emily Patrick about Kate Shiber?
20       A. I don't remember anything specific, no,
21   not really.
22       Q. What about any general recollection of a
23   discussion?
24       A. I think I remember saying that they went
25   to the same sorority, but beyond that I don't

Page 76

1        T. Ernst - Confidential
2    remember anything generally.
3        Q. Did you ever talk about the quality of
4    Kate's work with Ms. Patrick?
5        A. I don't know.
6        Q. I missed the answer.
7        A. I don't know.
8        Q. The issues in the e-mail from you to Kate
9    about communications and logging off that we have
10   just reviewed, did you ever express the issues to
11   anyone else on the team?
12       A. I'm sure I did.
13       I don't recall specifically.
14       Q. Did you speak to Tony Kim about the issues
15   identified in the e-mail that we just marked as
16   Exhibit 27?
17       A. I don't know if I spoke to him
18   specifically about that e-mail.
19       Q. What about generally any issues with Kate
20   logging off, or not checking in with you before
21   logging off, did you discuss that specific issue
22   with anyone else on the team other than Matt Gallea
23   and Kate Shiber?
24       A. I don't remember about that specific
25   issue.

Page 77

T. Ernst - Confidential

1        T. Ernst - Confidential
2        Q. Did you ever talk to Jeanne Vicari about
3    Kate Shiber?
4        A. I don't think so.
5        Q. Did you ever talk to Mr. Pruzan about
6    Kate Shiber?
7        A. I don't think so.
8        Q. Did you ever talk to Cheryl Robinson about
9    Kate Shiber?
10       A. I don't think so.
11       Q. At some point in time, were you advised
12   by anybody at Centerview that Kate couldn't work
13   certain hours of the day?
14       A. Yes.
15       Q. When were you told that?
16       A. I don't remember.
17       Q. Was it the same day that you e-mailed
18   Kate, on Friday, August 28th?
19       A. I don't remember.
20       Q. Do you recall what day of the week it
21   was?
22       A. No.
23       Q. Do you recall if it was prior to a
24   weekend?
25       MS. SKIBITSKY: Objection.

Page 78

1        T. Ernst - Confidential
2        A. No.
3        Q. Do you know who told you?
4        A. I believe it was Tony.
5        Q. What do you remember about the
6    conversation with Tony?
7        A. I remember Tony calling me, just letting
8    me know Kate couldn't work between -- I forget the
9    exact times, but, like, from 12:00 to 8:00 -- I am
10   making those numbers up, it could have been
11   different -- but he couldn't tell me why.
12       Q. Did you ask him why?
13       A. No.
14       Q. Why not?
15       A. I didn't feel a need to.
16       Q. Why not?
17       A. He just told me, so I said, "Okay."
18       Q. Did he tell you that he couldn't tell you
19   why?
20       A. Yes.
21       He said, "I can't tell you why."
22       Q. Did he provide you with any more
23   information about this other than what you have just
24   testified to?
25       A. Not that I recall.

Page 79

1        T. Ernst - Confidential
2        Q. What was your reaction to this?
3        A. I thought it was atypical, strange.
4        I think that was my main reaction.
5        Q. Why was it atypical or strange?
6        A. I don't think I had ever heard before of
7    an analyst having these times they could not work.
8        Q. Did you have any thoughts as to why you
9    were told she couldn't work during these hours?
10       A. I don't remember.
11       Q. Did you think that it was because of a
12   medical issue?
13       A. I don't remember.
14       Q. Did Kate ever ask you if she could take
15   time off to go to a medical appointment around this
16   time?
17       A. I don't remember.
18       Q. Is it fair to say that the conversation
19   with Tony about Kate's hours was close in time to
20   your e-mail to Kate about communicating with you
21   before she logs off?
22       A. I believe so.
23       Q. How did that make you feel?
24       A. I don't remember.
25       Q. Were you concerned that Kate may have gone

Page 80

1        T. Ernst - Confidential
2    to someone more senior than you about the e-mail that
3    you sent to her on August 28th?
4        A. No.
5        Q. Why?
6        A. I don't think there is anything wrong with
7    that e-mail.
8        Q. But shortly after the e-mail, within a
9    reasonable amount of time, you are being told that
10   she can't work during certain hours of the night,
11   correct?
12       A. Yes.
13       Q. Did you think that that had anything to
14   do with the issue that you raised with Kate in that
15   e-mail on August 28th of 2020?
16       A. I am sure that they're sort of connected
17   in terms of the project, but I didn't feel any
18   repercussions or anything like that.
19       Q. Were you upset with the fact that Kate
20   was going to be not working for a certain period of
21   time during the night?
22       A. I don't believe I was happy.
23       Q. Why weren't you happy?
24       A. It just means more work for Matt and I to
25   cover.

Page 81

T. Ernst - Confidential

1     Q. Did you talk to Matt about your feelings
2  on this?
3     A. I recall my conversation with Matt was
4  similar to what Tony told me, that we have these
5  guardrails that are sort of what we have to work with
6  for now.
7     Q. When you say, "guardrails," you mean
8  during certain periods of the night she couldn't
9  work, right?
10     A. Correct.
11     Q. Did Tony call Matt and tell him the same
12  thing he told you?
13     A. I don't know.
14     Q. Do you know, was there some sort of an
15  electronic communication to the team about these
16  guardrails?
17     A. I don't know if there was.
18     Q. Did you share the information you learned
19  from Tony about the guardrails with anyone else on
20  the team?
21     A. Yes.
22     Q. Who?
23     A. Definitely, Matt Gallea.
24        Possibly others.

Page 82

T. Ernst - Confidential

1     Q. You just don't know for sure who else you
2  may have told?
3     A. Correct.
4     Q. Did you express any sort of frustration
5  to anyone about the fact that she had guardrails?
6     A. I think similar to what I said before.
7        I am sure that I did in the sense that
8  now we had more work to cover.
9     Q. At that point in time, did you want Kate
10  to be removed from the team?
11     A. I don't remember.
12     Q. Would it have been easier for you if there
13  was somebody else put on the team instead of Kate?
14     A. I think it would have been -- it would
15  have been easier if there was someone who could work
16  all hours, yes.
17     Q. Ultimately, you did get all of the work
18  done that was required for this project Dragon,
19  correct?
20     A. Correct.
21     Q. Even with Kate's guardrails, you and your
22  team were able to complete the project, right?
23     A. Correct.
24     Q. How did the project end up; did you guys

Page 83

T. Ernst - Confidential

1  get any praise for your work?
2     A. Yes.
3        The partners, in general, thought we did
4  a good job.
5     Q. So despite Kate's guardrails, you were
6  able to do a good job in the eyes of the partners,
7  correct?
8     A. Yes.
9     MR. VALENTINO: Let's pull up Exhibit 7,
10  please.
11        (Plaintiff's Exhibit 7 placed on shared
12        screen.)
13     Q. This document was previously marked as
14  Plaintiff's Exhibit 7.
15        It's a one-page document, Bates stamped
16  Centerview_000249.
17        I realize, Mr. Ernst, you are not on this
18  e-mail, but would you take a look at it, I have some
19  questions for you.
20     A. Okay.
21     Q. Do you see at the top there is an e-mail
22  dated September 1st -- and I will represent to you
23  that that is a Tuesday -- from Ms. Vicari to Cheryl
24  Robinson, and it says, "FYI - Seems the team did a

Page 84

T. Ernst - Confidential

1  good job giving her space over the weekend"?
2     A. Yes.
3     Q. Does this refresh your recollection as to
4  when the guardrails were put in place?
5     A. I am sure it was shortly before this
6  e-mail.
7     Q. Do you recall if, prior to the weekend,
8  Tony Kim told you that the guardrails were going to
9  be implemented?
10     A. I believe he did.
11     Q. Were you angry with Kate that she now was
12  going to have these guardrails in place?
13     A. I wouldn't say, "angry."
14     Q. What would you say?
15     A. I was just -- like I said before, it was
16  strange, confusing.
17     Q. There was no animosity towards her because
18  she was given these guardrails?
19     A. No, not really.
20     Q. Did anyone talk bad about her, say, about
21  these guardrails, "We don't know why she is getting
22  them" and "We are upset she has them"; was anyone
23  talking negatively about her during this time period?
24     A. I am sure there was speculation as to why.

T. Ernst - Confidential

Q. What was the speculation?
A. We didn't know; hence, the speculation.
Q. Did it bother you that you didn't know the reason why she was getting these guardrails?
A. Not particularly.
Q. Did you think she was getting special treatment?
A. I guess it is unique treatment.
Q. After the guardrails were put in place, how did Kate perform?
A. I don't remember it changing much.
I think she was still relatively weak.
Q. You previously characterized her performance as -- I have forgotten what you previously said.
After the guardrails were put in place, was her performance the same or different from before the guardrails?
A. I think her general performance was no different.
I think the situation made her work product worse.
Q. Would you explain that, please.
A. Basically, she would take her work up to



T. Ernst - Confidential

the point of the deadline, log off, Matt or I or anyone else on the team would log in -- not log in -- take over her work, and then change it, modify it, to get it to where it needed to be.
Then she would pick up in the morning, but she obviously lost or didn't know the changes we had made.
It's sort of behind because it's not where she left it, which then naturally leads to more errors.
Q. You said her general performance was no different, correct?
A. In terms of her general capabilities is what I was referring to.
It was five days later, whatever.
Q. So there weren't more mistakes on her work product after the guardrails than there were before, correct?
A. I don't remember, but I don't think that is true.
Q. You think there were more mistakes?
A. Yes, I believe so.
Q. How so?
What specific examples do you have of the



T. Ernst - Confidential

statement you just made?
A. I don't have a specific example because, again, I don't remember the specifics, but it was the general cadence of what I described of picking up something you don't -- was not where she left it, and she didn't fully appreciate, sort of, the intricacies, or what's changed, what's new.
Q. Couldn't you or Matt have met with her for a brief period of time each morning to explain to her what had happened on her work during the guardrails period?
A. I don't think that would have been a realistic solution because it's not as quick as you have described it, to explain all of the changes.
Q. Well, how long would it take?
A. It depends on the work.
Q. It's possible to do that, right?
MS. SKIBITSKY: Objection.
A. It is possible to tell her what we did, yes.
Q. Did you express the issues of the guardrails and Kate to anyone on the team?
A. Could you repeat the question?
Q. Did you express the issues with Kate and



T. Ernst - Confidential

the guardrails to anyone on the team?
A. Yes, I believe I did.
Q. Who?
A. I believe I discussed it with, at that point, Matt. He was just generally aware because we were going through it together.
I believe Tony, as well.
MR. VALENTINO: Let's pull up Exhibit 12, please.
(Plaintiff's Exhibit 12 placed on shared screen.)
Q. This is a document previously marked as Plaintiff's Exhibit 12, a one-page document, Bates stamped Centerview_000280.
Let me know when you are done reviewing it.
A. Okay.
Q. I am going to focus first on your e-mail to Tony Kim on Wednesday September 2nd, at 11:22 a.m.
In the first sentence you reference "...sticking to the plan of midnight to whenever Dragon / Blair requests a call in the morning..."
Is that what Tony told you were the guardrails?

Page 89

1        T. Ernst - Confidential
2        A. I don't know.
3        Q. When you refer to a "plan," what do you
4   mean by that?
5        A. I am generally referring to the
6   guardrails.
7        Q. Was there a set time of, say, for example,
8   12:00 to 8:00, or 12:00 to 9:00, or was it 12:00 to
9   these factors that you have listed here?
10       A. I don't know.
11       Q. It seems, as least in this paragraph, you
12  are saying that you don't know if you are going to
13  need additional staffing at this point, correct?
14       A. I don't think so.
15       Q. You end with "...we may need additional
16  staffing but can figure that out when we get there."
17       That is the end of the first paragraph.
18       At that point in time, you were not
19  positive whether you were going to need additional
20  staffing or not, correct?
21       A. Yes, because I don't know whether it's
22  near term or long term.
23       Q. You say, "...if this set-up drags on
24  longer than a week or so, we may need additional
25  staffing but can figure that out when we get there."

Page 90

1        T. Ernst - Confidential
2        So even assuming that it's long term, as
3   you do here, you are still not sure whether or not
4   you will need additional staffing on this project,
5   correct?
6        A. I read this as not wanting to tell a
7   partner as an analyst or an associate, you know, we
8   need something.
9        I think that's more polite than not
10  knowing.
11       Q. We will get to it, but didn't you actually
12  do that with Mr. Kim a few days later, and ask him
13  for additional staffing?
14       A. It's possible.
15       Q. We will get to that.
16       Then you go into an explanation about how
17  this impacts her, and you refer to something called
18  the "vicious first-year cycle of not knowing what's
19  going on."
20       What do you mean by that?
21       A. I think that might be my own term, but
22  it's sort of, if you're not plugged in, you can sort
23  of get cut out because you just -- it's sort of what
24  I was referring to before, there's too many mistakes
25  and it's not efficient if you're not, you know, fully

Page 91

1        T. Ernst - Confidential
2   plugged in, so then, sort of, things move without
3   you, and then you get left -- left behind because
4   you don't have the context of what is going on.
5        Q. When you say, "the vicious first-year
6   cycle of not knowing what's going on," are you
7   referring to something that generally happens with
8   first-years?
9        A. I don't think it generally happens, no.
10       Q. So this vicious first-year cycle is
11  exclusive to Kate in this e-mail?
12       A. I think it can happen.
13       I wouldn't say it's typical.
14       Q. You say, "...she gets discouraged" at the
15  end of that sentence.
16       Did Kate express any discouragement to
17  you or anyone else on the team, to your knowledge?
18       MS. SKIBITSKY: Objection to the extent
19  it mischaracterizes the document.
20       A. I think that "she gets discouraged" is
21  within my hypothetical scenario I am laying out
22  here.
23       Q. So I want to know if this hypothetical
24  scenario actually happened.
25       Did Kate express any discouragement about

Page 92

1        T. Ernst - Confidential
2   what was happening once the guardrails were put in
3   place?
4        A. I don't recall.
5        Q. The guardrails had only been in place
6   about a week, right?
7        A. It appears that way.
8        Q. So you are offering your opinion on the
9   long-term viability of this based on a one-week
10  sample size, correct?
11       A. Correct.
12       Q. Do you think that there is anything wrong
13  with that?
14       MS. SKIBITSKY: Objection.
15       A. I think I'm relying on more than just this
16  one week, more general experience.
17       Q. What general experience are you relying
18  on?
19       A. The multiple live deals that I have worked
20  on.
21       Q. Have you ever had a situation in multiple
22  live deals that you worked on where somebody had
23  guardrails in place?
24       A. No.
25       Q. So how does your experience apply to

Page 93

1        T. Ernst - Confidential
2    Kate's situation?
3        A. I think as a first-year analyst, I know
4    what is required to be on the team, since I was one,
5    and to be a helpful team member.
6        Q. Did she do anything, in your opinion,
7    after the guardrails were put in place that was
8    helpful to the team?
9        A. It's possible.
10       Q. She still worked a lot of hours, correct?
11           MS. SKIBITSKY: Objection.
12       A. Yes.
13           She worked inside her guardrails.
14       Q. What was she doing during the
15   non-guardrail hours, from the time they were put in
16   place to the time she was terminated?
17       A. I don't remember.
18       Q. Wasn't she working on project Dragon under
19   your direction?
20       A. Yes.
21       Q. So she had to have done something on that
22   deal, correct?
23       A. Yes.
24       Q. What were her contributions to the team
25   after the guardrails were put in place?

Page 94

1        T. Ernst - Confidential
2        A. I don't remember.
3        Q. What were her duties and responsibilities
4    after the guardrails were put in place?
5        A. I believe similar to what they were before
6    except it just wasn't as efficient.
7        Q. So she was still doing similar work,
8    correct?
9        A. I don't remember, but I would assume.
10       Q. Did you know at that point in time if Kate
11   had any medical issues?
12       A. No.
13       Q. Did you suspect that she did?
14       A. I don't remember.
15       Q. If you had known that she had a
16   disability, would you have written this e-mail to
17   Tony Kim?
18           MS. SKIBITSKY: Objection.
19       A. I don't know.
20       Q. You reference -- and I am paraphrasing --
21   her not being able to own certain aspects of a
22   project to completion, aspects of her work to
23   completion.
24           Was she able to own any aspects of her
25   work to completion once the guardrails were put in

Page 95

1        T. Ernst - Confidential
2    place?
3        A. I am sure that there were some tasks she
4    could complete in, sort of, isolation, but not to
5    the extent another first-year or typical analyst
6    could contribute to the team.
7        Q. What things was she able to complete?
8        A. I don't remember.
9        Q. Moving up to the next e-mail, from Tony,
10   he says -- again, paraphrasing -- that this is going
11   to be a longer-term situation.
12           What did you understand that to mean?
13       A. That Tony understood what I said.
14       Q. What did you understand the phrase
15   "longer-term situation" to mean?
16       A. I believe I referenced longer than a week
17   in my e-mail.
18       Q. What did you think when you saw this
19   e-mail from Tony?
20       A. I don't remember.
21       Q. Then you forward the e-mail to Matt Baron,
22   and you say, "I think it's impossible for a first
23   year to become value additive on something going
24   this fast if they aren't fully plugged in."
25           First, why did you e-mail Matt Baron?

Page 96

1        T. Ernst - Confidential
2        A. So he was aware.  He was on the team.
3           He is one above me, so still involved in
4    the day-to-day.
5        Q. What does "value additive" mean?
6        A. You're net positive to the team.
7        Q. So you don't think that Kate's
8    contribution to the team after the guardrails was
9    value additive?
10       A. Not particularly.
11       Q. Didn't she bill a lot of hours on this
12   project and do things for you?
13           MS. SKIBITSKY: Objection.
14       A. I don't think we billed hours.
15       Q. Didn't she work a lot of hours after the
16   guardrails were put in place and perform work on the
17   deal?
18       A. I don't remember.
19       Q. Are you saying that everything Kate did on
20   this deal after the guardrails were put in place was
21   just unnecessary?
22       A. No.
23       Q. You did use some of the work that she did
24   perform after the guardrails were put in place,
25   right?

Page 97

T. Ernst - Confidential
1
2     A. I'm sure some aspect of her work was used.
3     Q. What percentage?
4     A. I don't know.
5     Q. You say here it's impossible to be value
6  additive in this situation, and I am paraphrasing.
7        Is it really impossible, Mr. Ernst, for
8  her to be value additive on the team with the
9  guardrails?
10     A. I don't think it's impossible.
11        I think that's a figure of speech.
12     Q. Why did you say, "impossible" here?
13     A. I think to emphasize that it is very
14  difficult.
15     Q. So why didn't you say, "very difficult"?
16     A. I don't know.
17     Q. Did you say to Mr. Kim that it was
18  impossible?
19     A. I don't believe I used that word in my
20  e-mail, no.
21     Q. Is that because he's a partner and
22  Mr. Baron isn't?
23     A. Likely.
24        I think it's more collegial between me
25  and Matt.

Page 98

T. Ernst - Confidential
1
2     Q. Did you expect Matt Baron to convey your
3  messaging to Tony Kim?
4     A. I don't know if I expected him to convey
5  it, but just be aware in case he did speak with Tony.
6     Q. Were you hoping that he would tell Tony
7  Kim that it's impossible for Kate Shiber to work on
8  the deal with the guardrails?
9     A. I don't know.
10     Q. Then Matt Baron responds to you.
11        Did you have any further conversations
12  with Matt Baron about this?
13     A. I'm not sure.
14     Q. You reported to Matt Baron on this team;
15  is that fair to say?
16     A. Yes.
17     MR. VALENTINO: Let's pull up Exhibit 13,
18        please.
19        (Plaintiff's Exhibit 13 placed on shared
20        screen.)
21     Q. Referring now to what was previously
22  marked as Plaintiff's Exhibit 13, it's a two-page
23  document, Bates stamped Centerview_000274 to 000275.
24        You can start at the bottom and let me
25  know when you are done.

Page 99

T. Ernst - Confidential
1
2        Some of this is repetitive from the last
3  exhibit.
4     A. Okay.
5     Q. Focusing on the e-mail from you to Tony,
6  Thursday, September 3, 2020 at 2:50 p.m., you write,
7  "I caught up with Matt B. this morning..."
8        Do you recall a conversation with Matt B.
9  that morning?
10     A. No.
11     Q. Do you know if that actually happened?
12     A. I'm not sure.
13     Q. Is it possible that you are actually
14  referring to the e-mail exchange between you and
15  Matt Baron that we just looked at in Plaintiff's
16  Exhibit 12?
17     A. It's possible.
18     Q. Why did you bring up Matt B. in this
19  e-mail to Tony Kim?
20     A. He's another team member.
21     Q. Were you hoping that by referencing
22  Matt B. that Tony would take it more seriously?
23     A. I think so.
24     Q. You write here at one point, you reference
25  "individual one-off tasks."

Page 100

T. Ernst - Confidential
1
2        What are "individual one-off tasks"?
3     A. They can be very wide ranging on a deal,
4  but sort of just isolated, sort of one-page things
5  are what come to mind.
6        I don't know specifically what they were
7  at this time.
8     Q. Did Kate perform individual one-off tasks
9  on this deal?
10     A. I don't remember.
11     Q. Then you write, "...it is already becoming
12  very inefficient."
13        What did you mean by "inefficient"?
14     A. Similar to what I described before, sort
15  of, you know, nothing would be completed by Kate,
16  she was picking things up that we started, so we
17  just had to -- we were much more hands-on than
18  typical in terms of getting her work product to
19  where it needed to be.
20     Q. You said nothing was completed by Kate;
21  is that what you said?
22     A. I meant to say, generally she couldn't
23  take tasks to completion.
24     Q. She could take some tasks to completion,
25  right?

Page 101

T. Ernst - Confidential

1      T. Ernst - Confidential
2      A. I am sure there were certain things she
3 could do to completion.
4      Q. Even with the guardrails in place, Kate
5 could have worked from, for example, 8:00 a.m. to
6 midnight, correct?
7      A. I believe so.
8          I'm not sure of the exact starting point.
9      Q. I am not very good at math, but is that
10 16 hours?
11      A. Eight to 12:00 would be, yes.
12      Q. Isn't it possible that Kate could actually
13 complete work in 16 hours over the course of a day
14 on this project?
15      A. I am sure she could.
16      Q. You reference "...figure out staffing
17 alternatives sooner rather than later."
18          What did you mean by that?
19      A. I think I meant another analyst.
20      Q. Did you want Kate removed from the team
21 or did you just want to add another night?
22      A. I believe I just wanted another analyst.
23      Q. So by not removing Kate you still would
24 find stuff for her to do on the deal, correct?
25      A. I am sure there were some tasks we could

Page 102

T. Ernst - Confidential

1      T. Ernst - Confidential
2 find for her to do.
3      Q. Then you reference that it would be
4 "...tough before the holiday weekend..."
5          Why is that?
6      A. I think that is just sort of being polite
7 to Tony.
8      Q. Meaning what?
9      A. I don't want to be too forceful to a
10 partner.
11      Q. And then less than two hours later you
12 e-mail Tony again.
13          "Tony - spoke with Matt B. and we think
14 that it makes sense to add another person as soon as
15 possible who is at Matt G.'s level and would be able
16 to help out right away."
17          What changed in those two hours?
18      A. My recollection is that I talked to Matt
19 Baron, and he just thought we needed more immediate
20 help.
21      Q. But hadn't you talked to him earlier that
22 morning?
23      A. The e-mail says I did.
24      Q. So did something happen on the deal that
25 changed this from "We need alternatives after the

Page 103

T. Ernst - Confidential

1      T. Ernst - Confidential
2 holidays" to "We need it as soon as possible"?
3      A. It's possible.
4      Q. But you don't know what it was?
5      A. No.
6      Q. Tony responds in this document on
7 September 6th, three days later, and says, "Tim, I'm
8 sorry for the late relay.  Did we talk after you
9 sent this e-mail?  I thought we said ok to wait
10 until Tuesday.  But if you want help today/tomorrow
11 I can try to get someone.  Let me know please."
12          Did you try and contact Tony between
13 September 3rd and his response on September 6th?
14      A. I don't remember.
15      Q. You expressed urgency on September 3rd to
16 add another team member.
17          Did you speak to anyone about the need to
18 add another team member to team Dragon in between
19 those two dates?
20      A. I don't remember.
21      Q. Did you go to staffing?
22      A. I don't remember.
23      Q. Wasn't it urgent to add another team
24 member?
25      A. The e-mail says that it was.

Page 104

T. Ernst - Confidential

1      T. Ernst - Confidential
2      Q. But it wasn't, right?
3          MS. SKIBITSKY:  Objection.
4      A. I do think it was relatively urgent.
5      Q. Mr. Ernst, you just didn't want to work
6 the hours you were working and wanted to add another
7 team member to alleviate the work on your plate;
8 isn't that true?
9          MS. SKIBITSKY:  Objection.
10      A. No.
11      Q. You like working late nights like you were
12 working on Dragon while Kate had the guardrails in
13 place?
14      A. I don't think I particularly like it, no.
15      Q. Didn't you say in an e-mail to Kate
16 earlier that you didn't want to work late nights?
17      A. That was in that e-mail.
18      Q. Then you respond to Mr. Kim on September
19 6th, and you say, "...I don't think it makes sense
20 to add someone before Tuesday at this point since I
21 am not sure how much value they would be able to add
22 given how far along we are."
23          What does that mean?
24      A. I think it means -- my recollection of it
25 is we had some deadline just on the other side of

T. Ernst - Confidential

1    the weekend, that we had progressed through the
2    weekend, and had it to a point where adding someone
3    on a weekend, they wouldn't be able to be that value
4    additive for that one day of the long -- I think it
5    was a long weekend if it's Tuesday -- they would not
6    be value additive for that one day, so we could just
7    wait until the weekend was over to not impact their
8    weekend.
9        Q. So whatever urgency that you expressed to
10   Mr. Kim in these e-mails, you somehow got the job
11   done with Kate doing the guardrails, and not adding
12   an additional team member, correct?
13       A. Yes.
14       MR. VALENTINO: I would like to mark this
15   document as Plaintiff Exhibit 29.
16       It is a one-page document Bates stamped
17   Centerview_000266.
18       (Plaintiff's Exhibit 29, one-page
19   printout of e-mails, the top e-mail dated
20   9/3/2020, 4:17:32 PM, to Timothy Ernst, from
21   Matthew Gallea, Bates stamped No.
22   Centerview_000266, marked for
23   identification, as of this date.)
24       (Plaintiff's Exhibit 29 placed on shared

T. Ernst - Confidential

1        screen.)
2    BY MR. VALENTINO:
3        Q. Please take a look at this and let me
4    know when you are ready.
5        A. Okay.
6        Q. It appears that Matt Gallea drafted an
7    e-mail to Tony Kim.
8        Did you ask him to draft this?
9        A. I don't remember.
10       Q. Do you have any reason to believe that
11   you did not ask him to draft it?
12       A. No.
13       Q. Matt says to you -- I am looking at it
14   from the top, the third sentence -- "I tried to be
15   vague but lmk if you want to be more direct. I'm
16   assuming you replied to his latest e-mail."
17       Did you tell him to be vague in his draft
18   e-mail?
19       A. I don't know.
20       Q. I want to establish what this draft e-mail
21   was in response to.
22       MR. VALENTINO: Let's pull up Plaintiff's
23   Exhibit 13, please.
24       (Plaintiff's Exhibit 13 placed on shared

T. Ernst - Confidential

1        screen.)
2        Q. If you go down to the bottom of
3    Plaintiff's Exhibit 13, this is the e-mail where
4    Tony says it's going to be a longer-term situation.
5        My question to you is, this draft e-mail,
6    was it ultimately drafted to respond to Mr. Kim's
7    e-mail at 1:04 p.m. in Plaintiff's Exhibit 13?
8        A. I don't know.
9        Q. Would you read your e-mail to Mr. Kim on
10   September 3rd at 2:50 p.m.
11       A. Okay.
12       Q. Then I want you to look at the last
13   exhibit, Plaintiff's Exhibit 29, read the draft, and
14   let me know if that refreshes your recollection that
15   this draft was ultimately edited and sent by you to
16   Tony Kim at 2:50 p.m. on Thursday, September 3rd.
17       A. They appear similar.
18       Q. Excuse me?
19       A. They appear to be similar.
20       Q. Is there any other e-mail that you wrote
21   that this would be in reference to?
22       A. What are you referring to?
23       Q. I am just trying to find out where this
24   draft e-mail manifested itself.

T. Ernst - Confidential

1        Was it sent to Tony in a slightly
2    different format by you on September 3rd at
3    2:50 p.m., or is there some other e-mail that you
4    think it was?
5        MS. SKIBITSKY: Objection.
6        A. I think it -- my e-mail to Tony at
7    2:50 p.m. appears to be an edited version of this
8    e-mail from Matt.
9        I don't know if it is, but they appear
10   similar.
11       Q. So you would agree with me that this
12   draft e-mail does not reference catching up with
13   Matt B., correct?
14       A. Matt Gallea's e-mail to me, I would
15   agree, does not reference that.
16       Q. Then you add, like in your e-mail to
17   Tony, you did say that you caught up with Matt B.,
18   correct?
19       A. Yes.
20       Q. Do you know why you added that?
21       A. No.
22       Q. This draft e-mail says, "There have
23   already been a few situations this week where we've
24   had to jump in once she signs off...," and it goes

Page 109

1     T. Ernst - Confidential
2  on from there.
3        Do you have any specific examples of those
4  situations that are referenced here?
5     A. No, not specific examples, no.
6     Q. The concerns that you raised to Tony about
7  the guardrails approach, did you raise those concerns
8  with anyone else on the team other than Matt Baron
9  and Matt Gallea?
10    A. I don't recall.
11    Q. Is it possible that you did?
12    A. It's possible.
13    Q. Why did you put these e-mails in writing
14 to Tony instead of calling him up?
15    A. I e-mail frequently.
16       I e-mail people more than I call.
17    Q. So there did come a time when somebody
18 was added to the team, correct?
19    A. Yes.
20    Q. Do you recall when?
21    A. No, not specifically.
22    MR. VALENTINO: Let's pull up Exhibit 14,
23 please.
24    (Plaintiff's Exhibit 14 placed on shared
25    screen.)

Page 110

1     T. Ernst - Confidential
2     Q. This is Plaintiff's Exhibit 14, a one-page
3  document Bates stamped Centerview_000281.
4        Go ahead and read it, and let me know when
5  you are ready.
6     A. Okay.
7     Q. Who is Anish Chakravarthi?
8     A. She was an analyst, I believe, in Matt's
9  year.
10    Q. And that is a second-year analyst?
11    A. Yes.
12       That is what "AN2" refers to.
13    Q. Did you have any say in who was selected
14 to the project?
15    A. Not that I remember.
16    Q. What was your reaction to getting this
17 e-mail?
18    A. I think I viewed it positively.
19    Q. What work assignments was Ashwini given
20 on project Dragon?
21    A. It varied day by day, but nothing
22 different than what Matt and I were already working
23 on.
24    Q. What about with respect to what Kate was
25 working on, was there a difference between what

Page 111

1     T. Ernst - Confidential
2  Ashwini was doing and what Kate was doing?
3     A. I don't recall the exact splits.
4     Q. How much longer did this project last
5  after Ashwini was added to the team?
6     A. A while.
7        Again, I don't remember.
8     Q. Weren't there meetings, very big meetings
9  with the client on September 9th and 10th?
10    A. It's possible. I don't remember.
11    Q. Isn't it true that most of the work on
12 this deal had already been done by the time that
13 Ashwini was added?
14    A. I don't believe that's true.
15    Q. So what wasn't done already?
16    A. It's a very long timeline, so -- there
17 were multiple big meetings.
18       I think the activist situation went on
19 for months, if I recall.
20       It was just ever evolving. It's not, you
21 know, one meeting and you are done.
22    Q. How often did Ashwini work between the
23 hours of midnight and 9:00 a.m. when she was added
24 to the team?
25    MS. SKIBITSKY: Objection.

Page 112

1     T. Ernst - Confidential
2     A. I don't know.
3     Q. Do you have any sense as to whether she
4  did at all?
5     A. Yes, I am sure she did.
6     Q. Was it less than ten days, more than ten
7  days?
8     A. I don't know.
9     Q. And Kate continued working on the project,
10 correct?
11    A. Yes.
12    Q. Once Ashwini came into the picture, how
13 did Kate's role change, if at all?
14    A. I don't recall.
15    Q. You continued to give Kate work to do,
16 correct?
17    A. Yes, I am sure that I did.
18    Q. Did Matt Gallea continue to give Kate
19 work to do?
20    A. Yes, I am sure he did.
21    Q. Did anyone else assign work to Kate on
22 this project?
23    A. It's possible Ash, Ashwini did.
24       It's possible Matt Baron did.
25       It would predominantly come from me,

Page 113

1        T. Ernst - Confidential
2    Matt, or Ash.
3        Q. Do you know how many hours you worked on
4    this project, roughly, during its duration?
5        A. No.
6        Q. Do you know how many times you worked a
7    week of over 100 hours during the time period of
8    project Dragon?
9        A. No.
10       Q. Would that information be in iStaffing?
11       A. I am sure my hours are in iStaffing.
12       Q. Did you accurately record the hours that
13   you performed work on project Dragon?
14       A. I don't remember.
15       Q. Is it possible you didn't because you
16   didn't want to get more work?
17       A. I don't think I was worried about that at
18   this point.
19       Q. Do you know if Ashwini worked more than
20   Kate during the period of time that they were both
21   staffed on team Dragon?
22       A. I don't.
23       Q. Is it possible she didn't work more than
24   Kate during that time period?
25       MS. SKIBITSKY: Objection; asked and

Page 114

1        T. Ernst - Confidential
2    answered.
3        A. I doubt it.
4        Q. Why do you doubt it?
5        A. Because we were all working on the same
6    timelines.
7        Just like Kate had guardrails, so if it ever
8    spilled over, then Matt, me, and Ash would be working
9    and Kate wouldn't.
10       Q. Do you know if Ash -- I am going to call
11   her "Ash," too, it's easier -- do you know if Ash was
12   staffed on any other deals at this time?
13       A. I don't.
14       Q. Were you staffed on any other deals at
15   this time?
16       A. I don't remember.
17       Q. Was Mr. Gallea staffed on any other deals
18   at this time?
19       A. I don't know.
20       Q. Is it possible that you were working on
21   other deals while project Dragon was going on?
22       A. Yes.
23       Q. Is it possible that Mr. Gallea was working
24   on other deals while project Dragon was going on?
25       A. Yes.

Page 115

1        T. Ernst - Confidential
2        Q. How was Ash's performance on the deal?
3        A. Ash was great.
4        Q. How so?
5        A. Similar to Matt, she is very strong and
6    is able to complete tasks, picked it up quickly,
7    especially joining the team when she did.
8        MR. VALENTINO: Off the record.
9        (Discussion off the record.)
10       (Plaintiff's Exhibit 32, two-page printout
11       of e-mails, the top e-mail on the first page
12       dated 9/7/2020, 7:04:13 AM, to Matt Baron,
13       from Timothy Ernst, Bates stamped Nos.
14       Centerview_000288 and Centerview_000289,
15       marked for identification, as of this date.)
16       (Plaintiff's Exhibit 32 placed on shared
17       screen.)
18       MR. VALENTINO: Back on the record.
19   BY MR. VALENTINO:
20       Q. Referring now to Plaintiff's Exhibit 32,
21   this is a two-page document, Bates stamped
22   Centerview_000288 to 289.
23       Please review this and let me know when
24   you are done.
25       A. Okay.

Page 116

1        T. Ernst - Confidential
2        Q. Please go to page 289, and I am going to
3    focus on the bottom two e-mails.
4        In Matt Baron's first e-mail the subject
5    line is "Should we let Gallea go to bed?" and then
6    in the body it says, "Or is he working on something?"
7        On this team, did you and Mr. Baron
8    decide when other team members could go to bed?
9        A. Not broadly.
10       I think we would communicate to people
11   when their work was done, similar to previous
12   statements.
13       Q. Did you ever tell a person on the team
14   directly that they could go to bed now?
15       A. I don't recall using that phrase.
16       Q. The e-mail from you to Matt says -- I'm
17   not going to read the whole thing -- "I think Kate
18   may have mislinked some stuff or something idk..."
19       Does "idk" stand for "I don't know"?
20       A. Yes.
21       Q. Then in parentheses "(there's also a
22   50% chance he's probably making things overly
23   dynamic so he can tell me how dynamic they are)."
24       What do you mean by that?
25       A. About which part?

Page 117

1    T. Ernst - Confidential
2        Q. The part in parentheses.
3        A. I think that is a joke.
4        Matt Gallea is very overachieving so he
5    is a perfectionist.
6        That was a joke about that.
7        Q. Did he have a tendency to do things that
8    were not necessary to make them dynamic?
9        A. Not that they weren't necessary.
10       He just generally followed best practices,
11   which in a time crunch you can sometimes ignore, and
12   then come back to later, but Matt liked to do it as
13   he was doing it.
14       Q. So you are not suggesting here that
15   Mr. Gallea at times could be inefficient?
16       A. No.
17       Matt is very efficient.
18       Q. What was your sleep schedule like during
19   your work on project Dragon?
20       A. I don't remember.
21       Q. Did you ever work through the night
22   without sleeping?
23       A. I don't think I ever had a sleepless
24   night, no.
25       Q. Did you have any 16-hour days or more?

Page 118

1        T. Ernst - Confidential
2        A. Yes.
3        Q. Do you think that it was necessary to
4    work the hours you did on project Dragon?
5        A. Yes.
6        Q. Do you think that your work or the work
7    of your team gets worse as you work longer hours?
8        A. I think it's easier to make mistakes.
9        I still think that the final work product
10   gets to where it needs to be.
11       Q. Doesn't it take time to fix those
12   mistakes?
13       A. Yes.
14       Q. So ultimately it could be inefficient,
15   correct?
16       MS. SKIBITSKY: Objection.
17       A. It could be.
18       Q. Did there come a time when you learned
19   that Kate was terminated?
20       A. I actually don't really know how I found
21   out, or if I really was formally told.
22       Q. You are not sure if you were ever told
23   that she was terminated?
24       A. Yes.
25       I don't recall if I was told she was

Page 119

1        T. Ernst - Confidential
2    terminated or just off the account. I don't recall.
3        I don't recall how I was told.
4        Q. Do you recall who told you any information
5    about Kate regarding her not being either with the
6    firm or on the team any longer?
7        A. No.
8        Q. When did you first find out that Kate was
9    terminated?
10       A. I don't remember.
11       Q. Did you find out that Kate was terminated
12   before project Dragon was over?
13       A. Yes.
14       I believe she was terminated before --
15   well before it was over.
16       MR. VALENTINO: Let's pull up Exhibit 16,
17   please.
18       (Plaintiff's Exhibit 16 placed on shared
19   screen.)
20       Q. Looking now at Plaintiff's Exhibit 16,
21   this is a one-page document Bates stamped
22   Centerview_ 002884.
23       Would you take a look at this and let me
24   know when you are done reviewing it.
25       A. Okay.

Page 120

1        T. Ernst - Confidential
2        Q. I realize you are not on this e-mail, but
3    the messaging about the reason for Kate's termination
4    in this e-mail, did you ever hear that?
5        A. I don't believe I did.
6        Q. Does this refresh your recollection as to
7    the timing of Kate's termination?
8        A. It appears to be September 15th.
9        Q. Is it your recollection that project
10   Dragon was still going as of that date?
11       A. Yes.
12       Q. Do you see where it says, "(FWIW, Tony
13   was involved in the decision)"?
14       A. Yes.
15       Q. Do you have any understanding as to who
16   was involved in the decision to terminate Ms. Shiber?
17       A. No.
18       I wasn't involved.
19       Q. Do you know who was involved?
20       A. No.
21       Q. Do you know if Tony was involved?
22       A. I don't know for sure.
23       Q. Were you glad that Kate was terminated?
24       A. I don't believe so.
25       Q. Did you have any thoughts or feelings

Page 121

T. Ernst - Confidential

1 about her termination when you heard about it?
2      A. Again, I don't really remember when I
3 found out she was terminated.
4      Q. Regardless of when you found out, did you
5 have any reaction to the news that she was no longer
6 with the firm?
7      A. I don't remember a strong reaction one
8 way or the other.
9      Q. Do you think she deserved to be
10 terminated?
11      MS. SKIBITSKY: Objection.
12      A. I don't know.
13      I don't have all the details.
14      Q. The guardrails that we discussed, are you
15 aware of any accommodations provided to other
16 Centerview employees related to the amount of hours
17 they can work?
18      A. I am aware of paternity leave, maternity
19 leave, various -- I know that there have been various
20 personal exceptions, a crisis in the family, stuff
21 like that.
22      I know that people have standing desks in
23 terms of an accommodation.
24      Q. Have you ever sought an accommodation at

Page 122

T. Ernst - Confidential

1 Centerview with respect to the hours that you can
2 work?
3      A. Nothing beyond scheduled holidays or --
4 we call them "protected weekends," which are just a
5 three-day holiday, but I don't believe anything
6 beyond that.
7      Q. When do you get a protected weekend?
8      A. It would just be like you're -- you are
9 just going to a wedding, so you just want to have --
10 like those two days off would be the reason for a
11 protected weekend, something like that.
12      Q. With respect to your experience working
13 on live deals, in your experience, how many analysts
14 are typically assigned to a live deal?
15      A. It varies.
16      You can have one -- one or two is
17 generally very common.
18      Some deals have three.
19      I don't think that you typically see more
20 than three, although I think there are some that are
21 currently going on at Centerview with more than
22 three.
23      Q. In the situation where there would be
24 three or more analysts, what type of deal, other

Page 123

T. Ernst - Confidential

1 than it being live, requires that amount of analysts?
2      A. I think it's typically something like
3 Dragon, where you have multiple workstreams, an
4 activist and an M&A deal selling multiple parts of
5 the business, things like that, where it's just not
6 one consolidated workstream, so you will typically
7 see more resources.
8      MR. VALENTINO: I don't have much longer.
9      I don't think we should break for lunch.
10      I think we should break for five minutes.
11      I might have some questions after the
12 break, but it is not going to be too long.
13      Is that okay?
14      MS. SKIBITSKY: Yes.
15      MR. VALENTINO: Off the record.
16      (Discussion off the record.)
17      (Short recess taken from 12:55 p.m. to
18 1:05 p.m.)
19      MR. VALENTINO: Back on the record.
20 BY MR. VALENTINO:
21      Q. Does Centerview provide a work-life
22 balance for its employees?
23      MS. SKIBITSKY: Objection.
24      A. I generally believe they try to, yes.

Page 124

T. Ernst - Confidential

1      Q. How do they try to do that?
2      A. I think with vacations and stuff, but I
3 think generally when you are busy, similar to those
4 calls, the check-in points when you are busy, your
5 staffers try to get an understanding.
6      Usually, my experience has been, when you
7 have been really busy for a while, then they try to
8 give you a break and a pause afterwards.
9      Q. Why do you think that is?
10      A. Because I think you have been very busy,
11 and they want you to have a work-life balance.
12      Q. So there is a concern from Centerview
13 that it doesn't want its employees to work really
14 long hours for long periods of time without a break?
15      A. I think, generally, yes.
16      I don't think they want people -- I think
17 your statement is correct, yes.
18      Q. Did Centerview have co-advisers on project
19 Dragon?
20      A. We did.
21      Q. Who was that?
22      A. I believe it was JPMorgan, but it could
23 have been Morgan Stanley.
24      It was one of the Morgans.

Page 125

1          T. Ernst - Confidential
2          I think it was JPMorgan.
3       Q. What was the role of whatever financial
4 institution it was?
5       A. They were doing similar things to us.
6          Both firms had to come up with a
7 valuation, their own perspectives, similar -- just
8 providing advice, general advice, but they were
9 involved on the same workstreams as we were.
10      Q. How big was the team for the co-advisers
11 as opposed to Centerview's team?
12      A. I don't remember.
13      Q. Wasn't it bigger?
14      A. Yes.
15         Generally, bulge brackets are bigger, yes.
16      Q. Do you know by how much?
17      A. I don't.
18      MR. VALENTINO:  I have nothing further.
19      MS. SKIBITSKY:  Thank you.
20      Nothing for me.
21      MR. VALENTINO:  Thank you, Mr. Ernst.
22      THE WITNESS:  Thank you.
23      MR. VALENTINO:  Off the record.
24      (Discussion off the record.)
25      (Time noted:  1:10 p.m.)

Page 126

1          T. Ernst - Confidential
2       A C K N O W L E D G E M E N T
3
4       I, TIMOTHY ERNST, hereby certify that I
5 have read the transcript of my testimony taken under
6 oath in my deposition of March 21, 2023; that the
7 transcript is a true, complete and correct record of
8 my testimony, and that the answers on the record as
9 given by me are true and correct.
10
11
12
13
14      _____
15      TIMOTHY ERNST
16
17
18 Subscribed and sworn to before me
19 on this the _____ day of _____, 2023.
20
21 _____  _____
22 Notary Public          My Commission Expires:
23
24
25

Page 127

1          T. Ernst - Confidential
2       C E R T I F I C A T E
3 STATE OF NEW YORK    )
4                      : ss.
5 COUNTY OF NEW YORK   )
6
7       I, SUSAN B. RATNER, a Shorthand Reporter
8 and a Notary Public within and for the State of
9 New York, do hereby certify that the foregoing
10 examination of TIMOTHY ERNST was taken before me on
11 the 21st day of March, 2023;
12         That the said witness was duly sworn before
13 the commencement of his testimony; that the said
14 testimony was taken stenographically by me and then
15 transcribed.
16         I further certify that I am not related
17 by blood or marriage to any of the parties to this
18 action or interested directly or indirectly in the
19 matter in controversy; nor am I in the employ of any
20 of the counsel in this action.
21         IN WITNESS WHEREOF, I have hereunto
22 set my hand this 5th day of April, 2023.
23
24         Susan B Ratner
25         SUSAN B. RATNER

Page 128

1          T. Ernst - Confidential
2 March 21, 2023
3       I N D E X
4 WITNESS    EXAMINATION BY    PAGE
5 TIMOTHY ERNST    MR. VALENTINO    5-125
6
7       E X H I B I T S
8 PLAINTIFF'S                    FOR IDENT
9 25 - One-page printout of e-mails, the top
10 e-mail dated 8/25/2020, 10:40:48 AM, to
11 Timothy Ernst, from Kate Shiber, Bates
12 stamped No. Centerview_002588.................. 44
13 26 - Number not used
14 27 - One-page printout of e-mails, the top
15 e-mail dated 8/28/2020, 2:16:38 PM, to
16 Timothy Ernst, from Emily Patrick, Bates
17 stamped No.  Centerview_000161................ 74
18 28 - Number not used
19 29 - One-page printout of e-mails, the top
20 e-mail dated 9/3/2020, 4:17:32 PM, to Timothy
21 Ernst, from Matthew Gallea, Bates stamped No.
22 Centerview_000266............................ 105
23 30 - Number not used
24 31 - Number not used
25

Page 129

1      T. Ernst - Confidential
2  March 21, 2023
3           E X H I B I T S
4  PLAINTIFF'S                    FOR IDENT
5  32 - Two-page printout of e-mails, the top
6  e-mail on the first page dated 9/7/2020,
7  7:04:13 AM, to Matt Baron, from Timothy Ernst,
8  Bates stamped Nos. Centerview_000288 and
9  Centerview_000289........................... 115
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 130

1         E R R A T A
   CASE: KATHRYN SHIBER v. CENTERVIEW PARTNERS, LLC
2  DATE: MARCH 21, 2023  DEPOSITION OF: TIMOTHY ERNST
   If there are any corrections to your deposition,
3  indicate them on this sheet of paper, give the change,
   page and line number, and reason for the change is:
4      (1) To clarify the record;
       (2) To conform to the facts; or
5      (3) To correct transcription errors.
6  Page    LINE        REASON FOR CHANGE
7  CHANGE              TO
8  page    LINE        REASON FOR CHANGE
9  CHANGE              TO
10 page    LINE        REASON FOR CHANGE
11 CHANGE              TO
12 page    LINE        REASON FOR CHANGE
13 CHANGE              TO
14 page    LINE        REASON FOR CHANGE
15 CHANGE              TO
16 page    LINE        REASON FOR CHANGE
17 CHANGE              TO
18 page    LINE        REASON FOR CHANGE
19 CHANGE              TO
20
21 TIMOTHY ERNST
22 Subscribed and sworn to before me
23 this    day of    , 2023.
24 _____
25 (Notary Public)      My Commission Expires:

## A

**aa** 61:15
**Aaron** 55:8
**ability** 8:17
**able** 58:20, 62:4, 62:25
  82:23, 83:7, 94:21, 94:24
  95:7, 102:15, 104:21, 105:4
  115:6
**accepted** 27:3
**accommodate** 6:22
**accommodation** 121:24
  121:25
**accommodations** 5:19
  121:16
**account** 119:2
**accounts** 46:9
**accurate** 24:6, 68:10
**accurately** 14:17, 113:12
**acquisitions** 31:19
**action** 1:7, 127:18, 127:20
**active** 40:8
**actively** 40:25
**activist** 31:17, 38:25, 39:13
  39:16, 39:18, 111:18, 123:5
**actual** 49:7
**add** 17:22, 101:21, 102:14
  103:16, 103:18, 103:23
  104:6, 104:20, 104:21
  108:17
**added** 44:13, 45:10, 47:25
  108:21, 109:18, 111:5
  111:13, 111:23
**adding** 105:3, 105:12
**addition** 21:22
**additional** 19:17, 22:20
  37:19, 89:13, 89:15, 89:19
  89:24, 90:4, 90:13, 105:13
**additive** 95:23, 96:5, 96:9
  97:6, 97:8, 105:5, 105:7
**address** 5:5
**administer** 4:7
**administrative** 68:2
**advantage** 54:22
**advertises** 10:4
**advice** 125:8, 125:8

**advised** 77:11
**advising** 38:23
**affiliation** 71:24
**afternoon** 58:23, 66:9
**ago** 5:17, 26:3, 31:16, 54:21
**agree** 63:16, 108:12, 108:16
**AGREED** 4:2, 4:5
**ahead** 62:16, 62:24, 74:18
  110:4
**aligned** 58:24
**aligning** 67:3
**all-nighter** 13:11
**alleviate** 104:7
**allocate** 30:22, 32:19
**allocating** 32:13
**alternatives** 101:17, 102:25
**Amanda** 3:7, 7:18
**amount** 18:16, 19:14, 20:24
  21:14, 23:12, 23:14, 24:8
  24:21, 41:25, 42:7, 42:10
  42:13, 46:18, 60:4, 80:9
  121:17, 123:2
**AN2** 110:12
**analyst** 9:13, 12:6, 12:21
  12:24, 13:12, 13:18, 15:5
  15:6, 15:6, 16:8, 16:15, 16:16
  21:4, 21:9, 25:7, 25:10, 26:21
  26:23, 27:3, 27:8, 27:11, 29:9
  29:10, 30:7, 30:9, 32:25, 33:2
  33:7, 33:13, 33:15, 42:8
  47:20, 47:23, 51:17, 54:9
  54:23, 55:10, 55:13, 56:3
  69:19, 70:8, 70:13, 71:20
  79:7, 90:7, 93:3, 95:5, 101:19
  101:22, 110:8, 110:10
**analyst's** 30:9
**analysts** 29:5, 33:9, 37:23
  38:9, 38:14, 48:4, 48:13
  51:14, 53:9, 65:7, 70:10
  122:14, 122:25, 123:2
**and/or** 61:24, 67:22
**angry** 84:12, 84:14
**animosity** 84:18
**Anish** 110:7
**answer** 6:6, 6:7, 6:19, 6:20
  6:25, 8:17, 11:21, 17:5, 17:6

  17:8, 18:3, 18:4, 20:5, 20:7
  20:8, 20:9, 76:6
**answered** 64:10, 73:4, 114:2
**answers** 126:8
**anybody** 11:8, 22:13, 43:11
  50:13, 77:12
**anymore** 66:7
**apologize** 5:17, 67:5
**apologizing** 67:7
**appear** 107:18, 107:20
  108:10
**appears** 58:12, 92:7, 106:7
  108:8, 120:8
**applied** 8:24, 9:3, 9:24
**apply** 92:25
**appointment** 79:15
**appreciate** 5:19, 87:7
**approach** 109:7
**approximately** 25:5, 27:10
  27:13, 41:17, 55:18
**April** 127:22
**Ash** 112:23, 113:2, 114:8
  114:10, 114:11, 114:11
  115:3
**Ash's** 115:2
**Ashwini** 33:11, 110:19
  111:2, 111:5, 111:13, 111:22
  112:12, 112:23, 113:19
**asked** 11:18, 56:24, 60:18
  61:21, 64:9, 73:3, 113:25
**asking** 40:14
**asleep** 59:23
**aspect** 22:23, 97:2
**aspects** 94:21, 94:22, 94:24
**assign** 46:24, 112:21
**assigned** 32:4, 46:21, 48:19
  55:5, 55:22, 56:2, 122:15
**assignment** 64:3
**assignments** 35:13, 35:19
  110:19
**associate** 12:5, 16:9, 26:19
  26:20, 27:3, 27:14, 27:16
  27:24, 28:2, 29:4, 29:10, 32:3
  33:17, 42:8, 71:20, 72:23
  90:7
**assume** 59:23, 63:15, 94:9

**assuming** 48:22, 90:2
  106:17
**attacking** 56:19
**attorney** 6:15, 20:6
**attorneys** 2:4, 2:15, 7:25
**atypical** 67:17, 79:3, 79:5
**August** 45:11, 45:20, 47:25
  58:3, 77:18, 80:3, 80:15
**authorized** 4:7
**available** 8:14
**Avenue** 2:6, 2:11, 2:17
**aware** 20:11, 21:2, 28:5, 28:6
  35:4, 54:12, 54:13, 88:6, 96:2
  98:5, 121:16, 121:19
**awkward** 29:23, 30:13

### B

**B-o-y-d** 11:3
**bachelor's** 8:24
**back** 10:11, 10:12, 13:4, 13:8
  18:2, 26:5, 33:25, 52:8, 53:3
  53:5, 53:15, 53:18, 53:18
  56:8, 56:25, 115:18, 117:12
  123:20
**background** 8:22
**bad** 84:21
**balance** 123:23, 124:12
**bank** 49:11
**banks** 12:18
**Baron** 33:23, 33:24, 47:4
  95:21, 95:25, 97:22, 98:2
  98:10, 98:12, 98:14, 99:15
  102:19, 109:8, 112:24
  115:12, 116:7, 129:7
**Baron's** 116:4
**based** 92:9
**Basically** 85:25
**basis** 22:17
**Bates** 44:20, 57:15, 71:2
  74:8, 74:13, 83:16, 88:14
  98:23, 105:17, 105:22, 110:3
  115:13, 115:21, 119:21
  128:11, 128:16, 128:21
  129:8
**bcc** 71:12, 72:12

**bcc'd** 73:7
**bcc'ing** 72:14
**becoming** 100:11
**bed** 116:5, 116:8, 116:14
**Beer** 34:14, 35:17
**beginning** 43:6, 45:13
**believe** 14:9, 14:11, 15:22
  16:9, 21:21, 22:8, 23:4, 27:5
  27:15, 31:21, 32:25, 33:16
  34:8, 36:16, 36:20, 40:11
  40:17, 40:18, 42:15, 47:24
  49:8, 51:7, 54:5, 55:17, 56:4
  56:21, 60:12, 66:6, 66:12
  68:17, 69:9, 69:23, 72:2
  72:17, 72:21, 78:4, 79:22
  80:22, 84:11, 86:23, 88:3
  88:5, 88:8, 94:5, 95:16, 97:19
  101:7, 101:22, 106:11, 110:8
  111:14, 119:14, 120:5
  120:24, 122:6, 123:25
  124:23
**believed** 60:19
**bell** 31:10
**best** 21:25, 117:10
**better** 49:18
**beyond** 27:6, 41:13, 52:5
  75:25, 122:4, 122:7
**big** 61:22, 111:8, 111:17
  125:10
**bigger** 37:18, 125:13, 125:15
**biggest** 44:2, 44:6
**bill** 96:11
**billed** 96:14
**billing** 20:19
**Blair** 34:13, 34:17, 35:21
  88:23
**blood** 127:17
**blurbs** 21:19
**body** 116:6
**bonus** 20:21, 20:22
**bother** 85:4
**bottom** 57:16, 57:25, 71:8
  98:24, 107:3, 116:3
**Boyd** 10:24, 11:2
**brackets** 125:15
**break** 6:21, 7:2, 25:22

  123:10, 123:11, 123:13
  124:9, 124:15
**Brian** 2:8, 5:13
**brief** 87:10
**briefing** 8:3
**briefly** 9:23, 52:16
**bring** 99:18
**brings** 14:12
**broad** 22:3
**broadly** 34:22, 116:9
**brought** 43:2
**Brown** 8:23, 9:12, 9:21, 10:4
**buckets** 22:3
**bulge** 125:15
**busier** 13:5, 13:9
**business** 5:5, 123:6
**busy** 12:9, 20:18, 46:8, 46:12
  61:16, 124:4, 124:5, 124:8
  124:11

### C

**cadence** 87:5
**calculator** 17:13
**call** 8:3, 40:6, 51:4, 61:14
  66:22, 81:12, 88:23, 109:16
  114:10, 122:5
**called** 5:3, 16:13, 31:9, 90:17
**calling** 25:11, 78:7, 109:14
**calls** 36:4, 39:21, 124:5
**campus** 11:8
**cancel** 5:18
**candidate's** 53:22, 54:3
**capabilities** 86:14
**capacity** 20:18, 22:20, 23:4
  23:5, 23:9, 23:18, 23:22
  24:13, 24:14, 62:9, 75:8
**career** 65:22
**carries** 36:13
**case** 5:14, 8:12, 10:18, 28:25
  64:15, 98:5, 130:1
**catching** 108:13
**caught** 99:7, 108:18
**cc'd** 58:2
**Centerview** 1:10, 3:9, 8:10
  9:13, 9:15, 10:4, 10:20, 11:5

11:8, 11:9, 11:10, 12:4, 12:16
12:17, 12:21, 12:24, 15:12
16:6, 16:16, 19:19, 20:13
20:23, 24:16, 24:20, 24:22
25:2, 26:6, 26:9, 26:18, 27:4
27:18, 28:11, 29:4, 29:13
34:18, 36:15, 36:19, 36:25
41:18, 42:5, 42:8, 48:5, 49:3
49:6, 49:17, 49:22, 50:2
54:23, 55:4, 55:12, 55:15
55:19, 55:23, 56:2, 65:6
65:18, 66:5, 68:20, 69:8
71:18, 73:17, 77:12, 119:22
121:17, 122:2, 122:22
123:22, 124:13, 124:19
130:1
**Centerview's** 10:10, 20:3
38:17, 38:22, 39:17, 44:6
53:8, 125:11
**Centerview_000161** 74:9
74:13, 128:17
**Centerview_000162** 57:15
**Centerview_000249** 83:17
**Centerview_000266** 105:18
105:23, 128:22
**Centerview_000274** 98:23
**Centerview_000280** 88:15
**Centerview_000281** 110:3
**Centerview_000288** 115:14
115:22, 129:8
**Centerview_000289** 115:14
129:9
**Centerview_001857** 71:2
**Centerview_002588** 44:20
128:12
**certain** 21:25, 23:12, 23:13
24:17, 77:13, 80:10, 80:20
81:9, 94:21, 101:2
**certifications** 9:9
**certify** 126:4, 127:9, 127:16
**Chakravarthi** 110:7
**chance** 45:7, 116:22
**change** 37:16, 86:4, 112:13
130:3, 130:3, 130:6, 130:7
130:8, 130:9, 130:10, 130:11
130:12, 130:13, 130:14

130:15, 130:16, 130:17
130:18, 130:19
**changed** 87:8, 102:17
102:25
**changes** 86:7, 87:15
**changing** 85:12
**characterization** 50:14
**characterized** 49:9, 85:14
**charge** 32:9, 32:12, 32:15
34:20, 34:21, 38:8, 38:11
**CHARLOTTE** 3:11
**chat** 7:5, 44:13, 45:2, 57:21
65:17
**check** 30:2, 56:24
**check-in** 124:5
**checking** 29:5, 56:11, 76:20
**Cheryl** 77:8, 83:24
**Chief** 3:8
**Civil** 1:7
**clarify** 18:24, 130:4
**class** 27:11, 48:10, 55:19
69:5
**classified** 43:23
**classify** 43:25
**Clayman** 2:10, 3:12
**Clearly** 75:12
**click** 14:12
**client** 34:22, 35:22, 36:2
36:15, 36:19, 60:24, 111:9
**clients** 36:5
**close** 79:19
**co-advisers** 124:19, 125:10
**co-founder** 34:18
**Cogan** 34:13
**college** 72:4, 72:5, 72:15
**collegial** 97:24
**come** 56:9, 58:19, 100:5
109:17, 112:25, 117:12
118:18, 125:6
**coming** 11:17
**commencement** 127:13
**comments** 50:22, 52:8, 56:22
63:22, 67:9, 67:13, 67:15
67:23, 68:4
**Commission** 126:22, 130:25
**common** 122:18

**communicate** 65:25, 116:10
**communicated** 65:12
**communicating** 65:11, 79:20
**communication** 58:15, 60:7
67:3, 75:9, 81:16
**communications** 25:10, 58:5
59:3, 76:9
**company** 31:13, 31:16, 36:12
37:13, 37:18, 38:23, 40:24
**company's** 68:8
**compared** 49:14
**compensation** 20:20, 20:21
20:23
**complaints** 69:24
**complete** 64:19, 67:13, 82:23
95:4, 95:7, 101:13, 115:6
126:7
**completed** 32:6, 100:15
100:20
**completing** 42:16
**completion** 94:22, 94:23
94:25, 100:23, 100:24, 101:3
**Compliance** 3:8
**concern** 25:18, 124:13
**concerned** 79:25
**concerns** 109:6, 109:7
**conducted** 10:14
**conducting** 5:14
**Confidential** 1:2, 5:1, 6:1
7:1, 8:1, 9:1, 10:1, 11:1, 12:1
13:1, 14:1, 15:1, 16:1, 17:1
18:1, 19:1, 20:1, 21:1, 22:1
23:1, 24:1, 25:1, 26:1, 27:1
28:1, 29:1, 30:1, 31:1, 32:1
33:1, 34:1, 35:1, 36:1, 37:1
38:1, 39:1, 40:1, 41:1, 42:1
43:1, 44:1, 45:1, 46:1, 47:1
48:1, 49:1, 50:1, 51:1, 52:1
53:1, 54:1, 55:1, 56:1, 57:1
58:1, 59:1, 60:1, 61:1, 62:1
63:1, 64:1, 65:1, 66:1, 67:1
68:1, 69:1, 70:1, 71:1, 72:1
73:1, 74:1, 75:1, 76:1, 77:1
78:1, 79:1, 80:1, 81:1, 82:1
83:1, 84:1, 85:1, 86:1, 87:1
88:1, 89:1, 90:1, 91:1, 92:1

93:1, 94:1, 95:1, 96:1, 97:1
98:1, 99:1, 100:1, 101:1
102:1, 103:1, 104:1, 105:1
106:1, 107:1, 108:1, 109:1
110:1, 111:1, 112:1, 113:1
114:1, 115:1, 116:1, 117:1
118:1, 119:1, 120:1, 121:1
122:1, 123:1, 124:1, 125:1
126:1, 127:1, 128:1, 129:1
**conform** 130:4
**confusing** 84:17
**connected** 80:16
**consider** 29:20, 41:5
**consolidated** 123:7
**contact** 24:16, 36:2, 103:12
**contacted** 24:22, 24:25, 25:3
  26:8
**content** 29:6, 66:23
**context** 30:5, 75:2, 91:4
**continue** 112:18
**continued** 3:2, 112:9, 112:15
**contribute** 95:6
**contribution** 96:8
**contributions** 93:24
**control** 30:15, 30:19
**controlling** 30:14
**controls** 30:20
**controversy** 127:19
**conversation** 43:10, 46:14
  50:19, 52:14, 59:16, 66:24
  78:6, 79:18, 81:4, 99:8
**conversations** 43:8, 50:17
  52:17, 98:11
**convey** 98:2, 98:4
**correct** 9:22, 13:15, 14:14
  15:8, 15:9, 15:12, 15:19
  16:24, 18:9, 23:6, 24:10
  26:22, 26:24, 30:6, 30:10
  30:11, 31:25, 32:4, 32:7
  32:11, 33:5, 33:13, 35:16
  37:24, 37:25, 38:15, 47:23
  48:2, 48:24, 49:7, 51:14, 59:4
  60:10, 65:12, 67:15, 67:18
  68:23, 80:11, 81:11, 82:4
  82:20, 82:21, 82:24, 83:8
  86:13, 86:19, 89:13, 89:20

90:5, 92:10, 92:11, 93:10
93:22, 94:8, 101:6, 101:24
105:13, 108:14, 108:19
109:18, 112:10, 112:16
118:15, 124:18, 126:7, 126:9
130:5
**corrections** 130:2
**correctly** 60:24, 61:4
**correlation** 23:7
**counsel** 5:20, 7:15, 8:11, 68:8
  68:9, 127:20
**COUNTY** 127:5
**couple** 5:17, 17:22
**course** 11:7, 14:16, 43:4
  56:2, 101:13
**court** 1:4, 6:8
**cover** 80:25, 82:9
**creating** 29:6
**credit** 40:6
**crisis** 121:21
**critical** 73:13
**criticisms** 69:21, 73:15
**crunch** 117:11
**culture** 55:3
**current** 14:9, 26:17
**currently** 28:19, 122:22
**cut** 90:23
**cycle** 90:18, 91:6, 91:10

# D

**Dartmouth** 72:6
**date** 31:4, 44:7, 44:21, 74:14
  105:24, 115:15, 120:10
  130:2
**dated** 44:18, 58:3, 74:11
  83:23, 105:20, 115:12
  128:10, 128:15, 128:20
  129:6
**dates** 38:19, 103:19
**day** 11:4, 21:23, 35:13, 42:18
  42:18, 46:5, 53:19, 61:21
  61:22, 61:24, 62:3, 66:15
  68:8, 68:9, 68:10, 77:13
  77:17, 77:20, 101:13, 105:5
  105:7, 110:21, 110:21

126:19, 127:11, 127:22
130:23
**day-to-day** 34:23, 34:25
  35:5, 35:8, 96:4
**days** 86:16, 90:12, 103:7
  112:6, 112:7, 117:25, 122:11
**deactivate** 28:21
**deactivated** 28:20, 28:23
**deactivation** 28:24
**deadline** 56:16, 86:2, 104:25
**deal** 21:10, 29:18, 29:19
  29:21, 30:7, 30:8, 31:5, 34:4
  36:3, 36:9, 36:15, 36:24, 37:7
  37:13, 37:14, 37:20, 37:23
  38:15, 38:18, 38:22, 39:6
  39:11, 40:4, 40:8, 40:20
  40:23, 41:3, 41:12, 41:23
  42:9, 42:12, 44:2, 44:7, 44:10
  46:16, 46:19, 47:21, 48:23
  49:3, 49:7, 50:9, 51:17, 57:7
  60:5, 62:23, 63:3, 65:12
  67:22, 69:3, 69:18, 69:19
  72:23, 72:24, 93:22, 96:17
  96:20, 98:8, 100:3, 100:9
  101:24, 102:24, 111:12
  115:2, 122:15, 122:25, 123:5
**deals** 41:10, 41:17, 41:25
  42:4, 68:24, 92:19, 92:22
  114:12, 114:14, 114:17
  114:21, 114:24, 122:14
  122:19
**decide** 116:8
**decision** 120:13, 120:16
**Defendant** 1:11, 2:15
**Defendant's** 57:11, 57:14
  71:9
**definitely** 11:11, 63:22, 67:9
  81:24
**degree** 8:24
**degrees** 9:6
**delete** 15:14, 15:18
**department** 69:22
**dependent** 41:12
**depending** 13:3, 41:15, 59:25
**depends** 87:17
**deposed** 5:22

Page 5

**deposition** 1:18, 4:6, 4:9
  5:15, 7:11, 7:25, 8:5, 8:7, 8:8
  8:11, 31:8, 126:6, 130:2
  130:2
**describe** 58:5, 58:7
**described** 43:15, 53:13
  53:21, 87:5, 87:15, 100:14
**deserved** 121:10
**desks** 121:23
**desktop** 14:25, 17:13
**despite** 83:6
**details** 121:14
**difference** 110:25
**different** 32:14, 56:19, 59:24
  78:11, 85:18, 85:21, 86:13
  108:3, 110:22
**differently** 61:7
**difficult** 97:14, 97:15
**direct** 23:19, 43:11, 106:16
**direction** 17:15, 93:19
**directional** 17:15
**Directionally** 13:19
**directly** 116:14, 127:18
**director** 27:21, 34:7
**directors** 34:9
**disability** 94:16
**discouraged** 91:14, 91:20
**discouragement** 91:16, 91:25
**discretionary** 20:22
**discuss** 11:9, 76:21
**discussed** 88:5, 121:15
**discussion** 52:24, 59:2, 59:12
  75:23, 115:9, 123:17, 125:24
**discussions** 75:18
**disliked** 52:11
**dissimilar** 53:12, 66:25
**distribution** 35:9
**DISTRICT** 1:4, 1:5
**document** 7:5, 15:21, 16:18
  17:13, 44:12, 44:16, 45:7
  52:4, 57:13, 57:15, 57:23
  68:5, 70:24, 70:25, 74:7, 74:8
  74:18, 83:14, 83:16, 88:13
  88:14, 91:19, 98:23, 103:6
  105:16, 105:17, 110:3
  115:21, 119:21

**documents** 7:4, 8:4
**doing** 8:13, 20:3, 37:20
  38:14, 38:14, 54:14, 93:14
  94:7, 105:12, 111:2, 111:2
  117:13, 125:5
**doubt** 114:3, 114:4
**draft** 106:9, 106:12, 106:18
  106:21, 107:6, 107:14
  107:16, 107:25, 108:13
  108:23
**drafted** 106:7, 107:7
**Dragon** 31:9, 31:12, 31:15
  31:22, 31:24, 32:3, 32:10
  32:16, 32:20, 33:5, 33:10
  33:18, 33:20, 34:10, 34:12
  34:25, 36:9, 36:12, 36:14
  37:22, 38:3, 38:10, 38:18
  39:17, 40:8, 41:3, 42:17
  42:21, 43:14, 46:22, 56:8
  59:24, 69:15, 72:10, 82:19
  88:23, 93:18, 103:18, 104:12
  110:20, 113:8, 113:13
  113:21, 114:21, 114:24
  117:19, 118:4, 119:12
  120:10, 123:4, 124:20
**drags** 89:23
**drive** 57:3
**drop** 10:5
**duly** 5:3, 127:12
**duration** 113:4
**duties** 29:3, 94:3
**dynamic** 46:9, 116:23
  116:23, 117:8

---

## E

**e-mail** 14:7, 44:18, 45:20
  51:5, 58:2, 58:2, 58:6, 58:13
  58:25, 59:16, 61:8, 61:9
  61:15, 61:18, 62:2, 64:2, 64:8
  64:14, 65:4, 66:8, 67:2, 67:3
  67:6, 67:8, 68:6, 69:12, 69:17
  69:18, 71:6, 71:6, 71:7, 71:8
  71:12, 73:9, 74:11, 75:8
  75:12, 75:18, 76:8, 76:15
  76:18, 79:20, 80:2, 80:7, 80:8

80:15, 83:19, 83:22, 84:7
  88:19, 91:11, 94:16, 95:9
  95:17, 95:19, 95:21, 95:25
  97:20, 99:5, 99:14, 99:19
  102:12, 102:23, 103:9
  103:25, 104:15, 104:17
  105:20, 106:8, 106:17
  106:19, 106:21, 107:4, 107:6
  107:8, 107:10, 107:21
  107:25, 108:4, 108:7, 108:9
  108:13, 108:15, 108:17
  108:23, 109:15, 109:16
  110:17, 115:11, 116:4
  116:16, 120:2, 120:4, 128:10
  128:15, 128:20, 129:6
**e-mailed** 69:25, 77:17
**e-mails** 44:18, 52:5, 52:6
  66:11, 73:12, 74:11, 105:11
  105:20, 109:13, 115:11
  116:3, 128:9, 128:14, 128:19
  129:5
**earlier** 48:3, 61:21, 61:24
  62:5, 68:10, 102:21, 104:16
**early** 62:17
**easier** 82:13, 82:16, 114:11
  118:8
**easiest** 57:17
**Eastern** 68:10, 68:13
**edited** 107:16, 108:8
**educational** 8:22
**effect** 4:8, 24:12
**efficient** 90:25, 94:6, 117:17
**Effron** 34:13, 34:17
**Eight** 101:11
**either** 47:4, 119:5
**electronic** 81:16
**EMANUEL** 2:16
**embarrass** 72:14
**Emily** 71:15, 71:16, 72:5
  72:7, 72:10, 72:18, 73:8
  74:12, 74:22, 75:4, 75:7
  75:19, 128:16
**Emmanuel** 7:18, 7:20
**emphasize** 97:13
**employ** 127:19
**employee** 24:21, 68:20

**employees** 7:19, 7:21, 12:17
12:17, 24:16, 26:12, 121:17
123:23, 124:14
**employment** 49:6, 65:2
**ended** 27:3, 38:20
**engaged** 40:24
**engagement** 36:21
**enter** 14:16
**entire** 13:13
**entry** 15:18
**epatrick@centerview.com**
71:13
**Ernst** 1:18, 5:1, 5:10, 5:22
6:1, 7:1, 8:1, 9:1, 10:1, 11:1
12:1, 13:1, 14:1, 15:1, 16:1
17:1, 18:1, 19:1, 20:1, 21:1
22:1, 23:1, 24:1, 25:1, 26:1
27:1, 28:1, 29:1, 30:1, 31:1
32:1, 33:1, 34:1, 35:1, 36:1
37:1, 38:1, 39:1, 40:1, 41:1
42:1, 43:1, 44:1, 44:19, 44:25
45:1, 46:1, 47:1, 48:1, 49:1
50:1, 51:1, 52:1, 53:1, 54:1
55:1, 56:1, 57:1, 58:1, 59:1
60:1, 61:1, 62:1, 63:1, 64:1
65:1, 66:1, 67:1, 68:1, 69:1
70:1, 71:1, 72:1, 73:1, 74:1
74:12, 75:1, 76:1, 77:1, 78:1
79:1, 80:1, 81:1, 82:1, 83:1
83:18, 84:1, 85:1, 86:1, 87:1
88:1, 89:1, 90:1, 91:1, 92:1
93:1, 94:1, 95:1, 96:1, 97:1
97:7, 98:1, 99:1, 100:1, 101:1
102:1, 103:1, 104:1, 104:5
105:1, 105:21, 106:1, 107:1
108:1, 109:1, 110:1, 111:1
112:1, 113:1, 114:1, 115:1
115:13, 116:1, 117:1, 118:1
119:1, 120:1, 121:1, 122:1
123:1, 124:1, 125:1, 125:21
126:1, 126:4, 126:15, 127:1
127:10, 128:1, 128:5, 128:11
128:16, 128:21, 129:1, 129:7
130:2, 130:21
**errors** 51:22, 86:11, 130:5
**especially** 63:3, 115:7

**ESQ** 2:8, 2:13, 2:19, 3:7
**essentially** 49:2
**establish** 106:21
**ethic** 53:22, 54:3, 54:10
54:17
**everybody** 35:14
**evolving** 111:20
**exact** 31:4, 38:19, 40:13
40:14, 41:6, 78:9, 101:8
111:3
**examination** 5:8, 127:10
128:4
**examined** 5:7
**example** 18:19, 20:19, 23:25
51:25, 73:11, 87:3, 89:7
101:5
**examples** 18:5, 47:15, 73:12
73:14, 73:19, 86:25, 109:3
109:5
**Excel** 14:25, 15:10, 15:18
16:11, 51:10
**exceptions** 121:21
**exchange** 75:12, 99:14
**exciting** 46:10
**exclusive** 91:11
**exclusively** 54:10
**Excuse** 107:19
**exhibit** 44:16, 44:17, 44:22
57:9, 57:11, 57:14, 70:20
70:22, 70:25, 71:7, 71:9, 74:7
74:10, 74:15, 76:16, 83:10
83:12, 83:15, 88:9, 88:11
88:14, 98:17, 98:19, 98:22
99:3, 99:16, 105:16, 105:19
105:25, 106:24, 106:25
107:4, 107:8, 107:14, 107:14
109:22, 109:24, 110:2
115:10, 115:16, 115:20
119:16, 119:18, 119:20
**expect** 28:7, 98:2
**expectation** 42:11, 42:13
42:15, 58:5
**expectations** 55:12, 58:15
58:16, 59:3, 59:12, 59:17
60:3, 61:13, 61:15, 65:11
67:4

**expected** 46:19, 98:4
**experience** 67:14, 92:16
92:17, 92:25, 122:13, 122:14
124:7
**experienced** 29:14, 29:14
**Expires** 126:22, 130:25
**explain** 9:17, 9:23, 17:10
21:18, 22:7, 22:22, 25:9
25:23, 36:11, 56:13, 65:7
85:24, 87:10, 87:15
**explanation** 90:16
**express** 25:18, 37:7, 76:10
82:5, 87:22, 87:25, 91:16
91:25
**expressed** 103:15, 105:10
**extent** 14:20, 39:19, 91:18
95:5
**extents** 35:2
**external** 7:16
**eyes** 83:7

**F**

**fact** 60:17, 61:23, 80:19, 82:6
**factors** 89:9
**facts** 130:4
**fair** 29:12, 79:18, 98:15
**familiar** 55:2, 55:3
**family** 121:21
**far** 104:22
**fast** 95:24
**feel** 37:12, 37:19, 78:15
79:23, 80:17
**feelings** 81:2, 120:25
**feels** 29:23, 30:14
**figure** 62:21, 89:16, 89:25
97:11, 101:16
**filed** 38:20
**fill** 22:17
**final** 39:5, 118:9
**Finally** 7:3
**financial** 125:3
**find** 45:14, 101:24, 102:2
107:24, 119:8, 119:11
**finish** 6:5, 51:20, 58:20
60:17, 63:9

**finished**  14:19, 15:5, 63:21
  63:24, 64:3
**firm**  36:9, 119:6, 121:7
**firms**  125:6
**first**  5:3, 9:11, 11:11, 31:2
  37:22, 42:23, 46:10, 47:13
  48:14, 49:2, 49:5, 49:11
  49:21, 49:25, 53:12, 54:23
  57:25, 62:14, 63:23, 63:25
  67:9, 88:19, 88:21, 89:17
  95:22, 95:25, 115:11, 116:4
  119:8, 129:6
**first-month**  49:16
**first-round**  10:6
**first-year**  33:7, 47:20, 47:23
  48:4, 49:17, 50:25, 51:6
  51:14, 51:17, 56:3, 67:17
  69:19, 90:18, 91:5, 91:10
  93:3, 95:5
**first-years**  49:13, 49:15
  67:12, 91:8
**five**  10:11, 11:5, 13:9, 52:20
  53:18, 86:16, 123:11
**fix**  47:18, 118:11
**Floor**  2:17, 5:6
**focus**  45:17, 53:21, 61:19
  74:21, 88:19, 116:3
**focused**  54:10, 54:17, 58:13
**focuses**  54:2
**focusing**  62:14, 99:5
**follow**  6:2, 75:4
**follow-up**  39:21, 74:21
**followed**  117:10
**follows**  5:7
**force**  4:8
**forceful**  102:9
**foregoing**  127:9
**forget**  78:8
**forgotten**  85:15
**form**  4:3
**formal**  20:11
**formally**  13:23, 118:21
**format**  108:3
**formatted**  60:24, 61:4
**formatting**  51:10
**forward**  10:8, 25:14, 67:4

69:12, 95:21
**forwarded**  68:6, 68:14
**forwarding**  70:15
**found**  57:2, 118:20, 121:4
  121:5
**four**  34:16, 48:17, 48:18
  53:18
**frame**  28:16, 41:15, 45:10
**frankly**  52:12
**free**  62:9, 66:9
**frequently**  19:5, 109:15
**Friday**  14:11, 58:3, 66:19
  66:20, 77:18
**friend**  70:16
**friends**  12:18, 70:4, 73:23
**front**  13:5
**frustration**  82:5
**full-time**  55:13
**fully**  87:7, 90:25, 95:24
**function**  7:6, 7:7
**funnel**  35:19, 35:24
**funnels**  35:14
**further**  4:5, 51:20, 98:11
  125:18, 127:16
**FWIW**  120:12
**FYI**  83:25

---

# G

**G.'s**  102:15
**Gallea**  16:2, 19:25, 32:21
  32:24, 38:9, 46:2, 47:4, 47:17
  56:17, 58:3, 59:15, 65:12
  76:22, 81:24, 105:22, 106:7
  109:9, 112:18, 114:17
  114:23, 116:5, 117:4, 117:15
  128:21
**Gallea's**  50:9, 108:15
**general**  12:8, 12:12, 12:13
  16:23, 20:17, 23:16, 43:21
  43:25, 52:8, 56:5, 64:12
  64:15, 64:17, 64:20, 75:22
  83:4, 85:20, 86:12, 86:14
  87:5, 92:16, 92:17, 125:8
**generally**  11:24, 25:11, 29:17
  30:11, 30:20, 35:16, 35:21

36:13, 37:11, 38:20, 39:8
  39:19, 41:7, 47:11, 50:11
  50:23, 55:3, 58:15, 64:18
  67:12, 75:17, 76:2, 76:19
  88:6, 89:5, 91:7, 91:9, 100:22
  117:10, 122:18, 123:25
  124:4, 124:16, 125:15
**generating**  40:2
**generation**  29:6
**gestures**  6:8, 6:9
**getting**  28:22, 42:20, 48:19
  49:6, 84:22, 85:5, 85:7
  100:18, 110:16
**gist**  18:25, 51:11
**give**  6:17, 11:13, 23:25
  25:21, 29:25, 51:25, 73:19
  112:15, 112:18, 124:9, 130:3
**given**  84:19, 104:22, 110:19
  126:9
**giving**  84:2
**glad**  120:23
**go**  5:25, 32:22, 44:2, 53:5
  53:17, 56:8, 63:20, 72:5
  74:18, 79:15, 90:16, 103:21
  107:3, 110:4, 116:2, 116:5
  116:8, 116:14
**goal**  28:10
**God**  74:24
**goes**  108:25
**going**  5:14, 6:2, 6:3, 7:3, 7:4
  7:5, 7:6, 12:3, 17:23, 19:11
  19:16, 25:14, 31:9, 33:12
  40:20, 43:8, 44:14, 44:25
  45:2, 45:12, 46:7, 46:13
  46:15, 46:19, 52:18, 57:25
  58:13, 61:18, 61:22, 67:4
  74:21, 80:20, 84:9, 84:13
  88:7, 88:19, 89:12, 89:19
  90:19, 91:4, 91:6, 95:10
  95:23, 107:5, 114:10, 114:21
  114:24, 116:2, 116:17
  120:10, 122:10, 122:22
  123:13
**good**  5:10, 5:11, 38:14, 50:25
  51:6, 83:5, 83:7, 84:2, 101:9
**gossip**  72:19

**graduate**  9:6
**graduated**  8:25, 9:11
**great**  50:11, 52:21, 115:3
**ground**  5:25
**guardrails**  81:6, 81:8, 81:17
  81:20, 82:6, 82:22, 83:6, 84:5
  84:9, 84:13, 84:19, 84:22
  85:5, 85:10, 85:17, 85:19
  86:18, 87:12, 87:23, 88:2
  88:25, 89:6, 92:2, 92:5, 92:23
  93:7, 93:13, 93:25, 94:4
  94:25, 96:8, 96:16, 96:20
  96:24, 97:9, 98:8, 101:4
  104:12, 105:12, 109:7, 114:7
  121:15
**guess**  17:14, 21:13, 21:25
  46:4, 65:14, 85:9
**guidance**  17:16
**guys**  82:25

## H

**half**  13:4, 13:5, 13:8, 28:8
**hand**  127:22
**handbook**  65:6, 65:9
**handled**  61:6
**hands-on**  100:17
**happen**  35:9, 91:12, 102:24
**happened**  5:17, 39:10, 39:11
  40:3, 70:16, 73:18, 87:11
  91:24, 99:11
**happening**  92:2
**happens**  91:7, 91:9
**happy**  6:22, 80:22, 80:23
**hear**  43:19, 120:4
**heard**  43:14, 56:21, 56:22
  56:25, 79:6, 121:2
**Heller**  2:5, 2:8, 5:13
**help**  58:21, 69:3, 102:16
  102:20, 103:10
**helpful**  54:24, 58:21, 93:5
  93:8
**hereunto**  127:21
**high**  24:18, 25:19, 26:6
**hired**  55:19
**holiday**  102:4, 122:6

**holidays**  103:2, 122:4
**honest**  22:12
**hope**  2:19, 6:15
**hopefully**  46:10
**hoping**  98:6, 99:21
**hour**  52:19
**hours**  8:21, 11:10, 12:4
  12:10, 12:21, 12:23, 13:17
  14:3, 14:6, 15:17, 17:21, 18:6
  18:8, 18:16, 18:19, 18:22
  20:24, 21:4, 21:14, 22:2, 23:8
  23:12, 23:14, 23:17, 23:20
  24:9, 24:17, 24:21, 25:2, 40:2
  42:7, 42:11, 42:14, 46:18
  59:4, 59:24, 60:4, 60:9, 77:13
  79:9, 79:19, 80:10, 82:17
  93:10, 93:15, 96:11, 96:14
  96:15, 101:10, 101:13
  102:11, 102:17, 104:6
  111:23, 113:3, 113:7, 113:11
  113:12, 118:4, 118:7, 121:17
  122:2, 124:15
**hypothetical**  91:21, 91:23

## I

**IDENT**  128:8, 129:4
**identification**  44:21, 74:14
  105:24, 115:15
**identified**  76:15
**idk**  116:18, 116:19
**ignore**  117:11
**immediate**  102:19
**immediately**  50:6
**impact**  8:17, 105:8
**impacts**  90:17
**implemented**  84:10
**importance**  36:8, 37:7
**important**  36:10, 36:11
  36:23, 36:24, 37:3, 37:4, 37:5
  37:13, 43:22
**impossible**  95:22, 97:5, 97:7
  97:10, 97:12, 97:18, 98:7
**impression**  36:8
**inaccurate**  17:18, 24:13
**inaccurately**  17:2, 17:11

  21:3, 21:8, 23:21, 24:8
**inbound**  38:24
**incident**  58:7
**including**  20:21
**incoming**  53:8, 65:7
**indicate**  130:3
**indication**  38:24
**indirectly**  127:18
**individual**  99:25, 100:2
  100:8
**inefficient**  100:12, 100:13
  117:15, 118:14
**inflate**  19:14
**inform**  35:23, 64:16
**information**  11:24, 14:22
  14:24, 21:15, 22:22, 64:20
  78:23, 81:19, 113:10, 119:4
**informational**  12:16
**initially**  67:6
**input**  15:11, 15:17, 17:2
  17:11, 17:17, 18:8, 21:15
  21:25, 22:22, 38:2, 38:5
**inputting**  20:12, 21:14, 23:8
**insert**  21:19
**inside**  93:13
**insight**  53:7
**instance**  47:14
**institution**  125:4
**instruct**  59:15
**instructed**  10:8
**instructions**  16:17
**instructs**  6:19, 20:6
**intent**  69:23
**intention**  61:9
**intentionally**  17:17, 18:22
**interacted**  42:21
**interaction**  42:23
**interest**  38:24
**interested**  127:18
**interesting**  43:15, 43:24
  46:9
**internal**  7:15, 34:23, 65:17
**internally**  47:19, 60:25
**internship**  10:5
**interview**  10:6, 10:7, 10:9
  10:15, 27:7, 54:2, 54:10

54:13, 54:15
**interviewed** 10:20, 54:8
**interviewees** 11:15
**interviewing** 28:4, 53:6
**interviews** 10:11, 10:21, 11:5
  11:7, 11:12, 12:15, 12:16
  53:8, 53:16, 53:18, 53:20
**intricacies** 87:8
**introductory** 36:20
**investment** 49:11
**involved** 31:16, 34:23, 34:24
  35:7, 96:3, 120:13, 120:16
  120:18, 120:19, 120:21
  125:9
**involvement** 39:23, 43:7
  47:21
**isolated** 100:4
**isolation** 95:4
**issue** 56:10, 76:21, 76:25
  79:12, 80:14
**issues** 51:11, 51:13, 51:19
  76:8, 76:10, 76:14, 76:19
  87:22, 87:25, 94:11
**iStaffing** 16:13, 16:18, 16:19
  17:3, 17:11, 17:18, 18:8
  18:17, 18:23, 20:14, 20:25
  21:16, 22:4, 22:19, 22:23
  23:8, 23:22, 24:17, 26:12
  113:10, 113:11

---

**J**

---

**Jabber** 65:15, 65:16, 66:5
**James** 2:13, 5:12
**Jeanne** 77:2
**job** 9:11, 11:17, 37:16, 38:14
  49:12, 62:15, 62:15, 62:19
  62:20, 62:22, 63:3, 63:7
  63:11, 64:24, 83:5, 83:7, 84:2
  105:11
**jobs** 62:25
**John** 34:13
**join** 36:4, 36:6, 40:6
**joined** 33:11, 55:12, 57:6
  58:11
**joining** 55:23, 115:7

**joke** 117:3, 117:6
**Josh** 10:24
**JPMorgan** 124:23, 125:2
**July** 48:6, 48:7, 48:11, 48:21
  48:22
**jump** 108:25
**junior** 9:20, 11:15, 22:2
  30:17

---

**K**

---

**Kate** 30:24, 31:3, 31:5, 31:22
  32:4, 33:5, 44:19, 45:10
  45:21, 46:14, 46:18, 46:21
  47:9, 47:20, 48:7, 50:5, 50:20
  51:16, 52:8, 52:10, 55:15
  55:22, 56:10, 56:18, 56:21
  57:6, 58:2, 58:8, 58:11, 59:2
  59:12, 59:16, 59:22, 60:4
  60:8, 60:15, 60:17, 61:17
  63:8, 63:11, 64:3, 65:25
  66:10, 66:24, 67:18, 67:22
  69:22, 71:24, 72:14, 72:19
  75:10, 75:19, 76:8, 76:19
  76:23, 77:3, 77:6, 77:9, 77:12
  77:18, 78:8, 79:14, 79:20
  79:25, 80:14, 80:19, 82:10
  82:14, 84:12, 85:11, 87:23
  87:25, 91:11, 91:16, 91:25
  94:10, 96:19, 98:7, 100:8
  100:15, 100:20, 101:4
  101:12, 101:20, 101:23
  104:12, 104:15, 105:12
  110:24, 111:2, 112:9, 112:15
  112:18, 112:21, 113:20
  113:24, 114:7, 114:9, 116:17
  118:19, 119:5, 119:8, 119:11
  120:23, 128:11
**Kate's** 32:6, 32:10, 47:5
  48:10, 49:2, 49:5, 50:14
  50:18, 51:9, 55:19, 68:18
  76:4, 79:19, 82:22, 83:6, 93:2
  96:7, 112:13, 120:3, 120:7
**Kathryn** 1:7, 3:5, 5:14, 130:1
**keep** 14:15, 14:21, 14:24
  15:2

**keeps** 16:12
**kept** 15:24, 16:10
**Kim** 34:13, 35:17, 76:14
  84:9, 88:20, 90:12, 94:17
  97:17, 98:3, 98:7, 99:19
  104:18, 105:11, 106:8
  107:10, 107:17
**Kim's** 107:7
**kind** 29:15, 35:18
**Kirshner** 2:10, 3:12
**knew** 24:2, 24:5, 61:12, 62:5
**know** 6:11, 6:14, 6:21, 7:20
  12:10, 15:23, 16:2, 16:3
  16:10, 16:12, 17:22, 17:23
  19:19, 19:23, 20:2, 20:13
  20:20, 20:22, 24:7, 30:24
  32:18, 38:5, 38:17, 39:25
  40:13, 40:21, 41:6, 41:6, 42:3
  43:13, 43:23, 44:10, 45:6
  45:14, 45:22, 48:9, 48:10
  49:4, 49:19, 52:12, 55:16
  55:17, 55:18, 55:21, 55:22
  55:24, 55:25, 57:19, 58:21
  59:5, 59:18, 61:25, 63:10
  63:21, 64:4, 64:6, 64:11, 65:3
  65:5, 65:10, 65:23, 65:25
  66:14, 67:21, 69:25, 70:12
  70:16, 70:19, 71:3, 72:9, 73:6
  73:6, 73:10, 73:20, 74:19
  74:23, 75:6, 76:5, 76:7, 76:17
  78:3, 78:8, 81:14, 81:15
  81:18, 82:2, 84:22, 85:3, 85:4
  86:7, 88:16, 89:2, 89:10
  89:12, 89:21, 90:7, 90:25
  91:23, 93:3, 94:10, 94:19
  97:4, 97:16, 98:4, 98:9, 98:25
  99:11, 100:6, 100:15, 103:4
  103:11, 106:5, 106:20, 107:9
  107:15, 108:10, 108:21
  110:4, 111:21, 112:2, 112:8
  113:3, 113:6, 113:19, 114:10
  114:11, 114:19, 115:23
  116:19, 118:20, 119:24
  120:19, 120:21, 120:22
  121:13, 121:20, 121:23
  125:16

**knowing** 58:8, 90:10, 90:18
  91:6
**knowledge** 36:14, 36:17
  36:18, 46:24, 64:13, 64:15
  64:17, 66:7, 91:17
**known** 64:18, 94:15
**KOSOWSKY** 3:7

## L

**large** 36:12
**lasted** 38:18
**late** 63:2, 63:5, 63:8, 63:16
  63:18, 103:8, 104:11, 104:16
**latest** 106:17
**lawyers** 20:19
**laying** 91:21
**leads** 86:10
**learned** 81:19, 118:18
**leave** 121:19, 121:20
**left** 86:10, 87:6, 91:3, 91:3
**length** 41:6
**letter** 27:5
**letting** 70:16, 78:7
**level** 22:5, 23:9, 26:20, 36:21
  37:17, 42:5, 55:9, 102:15
**light** 13:3
**liked** 52:11, 117:12
**Linder** 2:10, 3:12
**line** 29:16, 51:20, 116:5
  130:3, 130:6, 130:8, 130:10
  130:12, 130:14, 130:16
  130:18
**link** 14:12
**LinkedIn** 28:17
**listed** 89:9
**listen** 36:6
**live** 40:20, 40:23, 41:3, 41:5
  41:10, 41:11, 41:17, 41:23
  41:25, 42:9, 42:12, 49:2
  58:16, 59:4, 63:3, 65:12
  92:19, 92:22, 122:14, 122:15
  123:2
**LLC** 1:10, 3:9, 130:1
**LLP** 2:5, 2:10, 2:16, 3:12
**lmk** 106:16

**log** 15:16, 86:2, 86:3, 86:3
**logged** 60:18
**logging** 56:10, 58:8, 76:9
  76:20, 76:21
**logs** 79:21
**long** 6:22, 12:9, 13:6, 17:24
  27:16, 28:15, 38:17, 41:7
  41:9, 41:20, 47:20, 48:16
  87:16, 89:22, 90:2, 105:5
  105:6, 111:16, 123:13
  124:15, 124:15
**long-dated** 42:19
**long-term** 92:9
**longer** 40:11, 40:17, 40:18
  89:24, 95:16, 111:4, 118:7
  119:6, 121:6, 123:9
**longer-term** 95:11, 95:15
  107:5
**look** 44:25, 45:2, 63:22, 71:3
  83:19, 106:4, 107:13, 119:23
**looked** 71:8, 73:12, 99:15
**looking** 15:16, 45:4, 106:14
  119:20
**loosely** 16:22
**lost** 67:2, 86:7
**lot** 18:6, 25:20, 28:22, 46:13
  51:9, 93:10, 96:11, 96:15
**lots** 23:4
**low** 26:10
**lunch** 123:10

## M

**M&A** 31:17, 31:19, 44:2
  44:7, 123:5
**Madison** 2:11, 2:17
**main** 29:7, 79:4
**major** 9:2, 36:7
**making** 67:2, 78:10, 116:22
**manage** 11:15, 20:16, 25:21
  30:3, 32:17
**managing** 27:21, 34:6, 34:8
**mandate** 41:16
**manifested** 107:25
**March** 1:14, 126:6, 127:11
  128:2, 129:2, 130:2

**mark** 44:15, 74:6, 105:15
**marked** 44:21, 57:13, 70:24
  74:14, 76:15, 83:14, 88:13
  98:22, 105:23, 115:15
**marriage** 127:17
**maternity** 121:19
**math** 101:9
**math-econ** 8:24
**math-economics** 9:3
**Matt** 16:2, 19:25, 32:21
  32:24, 33:16, 33:23, 33:24
  45:14, 45:22, 45:24, 46:2
  46:2, 47:4, 47:4, 47:17, 50:9
  56:17, 56:20, 56:24, 58:3
  58:16, 59:15, 59:19, 61:24
  63:21, 64:4, 67:22, 76:22
  80:24, 81:2, 81:4, 81:12
  81:24, 86:2, 87:9, 88:6, 95:21
  95:25, 97:25, 98:2, 98:10
  98:12, 98:14, 99:7, 99:8
  99:15, 99:18, 99:22, 102:13
  102:15, 102:18, 106:7
  106:14, 108:9, 108:14
  108:15, 108:18, 109:8, 109:9
  110:22, 112:18, 112:24
  113:2, 114:8, 115:5, 115:12
  116:4, 116:16, 117:4, 117:12
  117:17, 129:7
**Matt's** 50:11, 110:8
**matter** 21:5, 29:9, 29:9, 38:6
  56:2, 127:19
**Matthew** 105:22, 128:21
**mean** 13:13, 22:11, 23:3
  39:24, 40:23, 46:12, 63:5
  63:6, 67:11, 74:25, 81:8, 89:4
  90:20, 95:12, 95:15, 96:5
  100:13, 101:18, 104:23
  116:24
**Meaning** 70:8, 102:8
**means** 22:7, 22:13, 22:15
  23:5, 40:21, 80:24, 104:24
**meant** 74:23, 100:22, 101:19
**measure** 23:24
**medical** 79:12, 79:15, 94:11
**medications** 8:16
**meet** 7:17, 7:24

**meeting** 21:23, 111:21
**meetings** 36:21, 39:3, 111:8
 111:8, 111:17
**member** 73:13, 73:14, 73:16
 93:5, 99:20, 103:16, 103:18
 103:24, 104:7, 105:13
**members** 22:2, 59:21, 59:25
 116:8
**mention** 65:15
**mentor** 55:5, 55:22, 56:3
 56:5, 72:7, 73:5
**mergers** 31:19
**messages** 28:22
**messaging** 98:3, 120:3
**met** 7:15, 31:2, 51:2, 87:9
**method** 75:9
**metrics** 28:5
**midnight** 63:13, 88:22, 101:6
 111:23
**mind** 100:5
**minimum** 18:17
**minute** 5:18, 53:5
**minutes** 10:12, 53:16, 123:11
**mischaracterizes** 91:19
**mislinked** 116:18
**mislinking** 51:10
**mislinks** 51:19
**missed** 17:8, 31:18, 76:6
**mistakes** 50:10, 50:12, 60:23
 61:2, 86:17, 86:22, 90:24
 118:8, 118:12
**modify** 86:4
**month** 40:10, 40:15, 46:8
 46:12, 48:24, 49:5, 49:21
 49:25, 64:25
**months** 40:12, 40:15, 40:18
 111:19
**Morgan** 124:24
**Morgans** 124:25
**morning** 5:10, 5:11, 5:15
 8:14, 86:6, 87:10, 88:23, 99:7
 99:9, 102:22
**move** 10:8, 91:2
**Moving** 95:9
**multiple** 12:15, 26:3, 47:18
 50:2, 92:19, 92:21, 111:17

123:4, 123:5

## N

**name** 5:12, 10:25, 31:13
 55:8
**named** 33:22
**names** 7:23, 54:5
**naturally** 86:10
**near** 36:23, 89:22
**necessarily** 37:16
**necessary** 117:8, 117:9
 118:3
**need** 6:10, 6:21, 57:19, 58:18
 58:20, 63:23, 67:12, 67:15
 67:23, 78:15, 89:13, 89:15
 89:19, 89:24, 90:4, 90:8
 102:25, 103:2, 103:17
**needed** 25:16, 50:2, 51:24
 86:5, 100:19, 102:19
**needs** 6:7, 30:22, 118:10
**negative** 62:22
**negatively** 84:24
**negotiations** 38:25
**net** 96:6
**never** 51:2, 56:25, 59:2, 60:7
 64:2
**new** 1:5, 1:20, 2:7, 2:7, 2:12
 2:12, 2:18, 2:18, 5:6, 5:6
 10:9, 10:9, 11:12, 17:23, 18:7
 36:18, 87:8, 127:3, 127:5
 127:9
**news** 121:6
**night** 8:20, 13:14, 56:10
 63:8, 64:4, 80:10, 80:21, 81:9
 101:21, 117:21, 117:24
**nights** 63:2, 63:5, 104:11
 104:16
**nine** 27:15
**non-guardrail** 93:15
**Nos** 115:13, 129:8
**Notary** 1:20, 5:4, 126:22
 127:8, 130:25
**noted** 125:25
**number** 128:13, 128:18
 128:23, 128:24, 130:3

**numbers** 78:10

## O

**oath** 4:7, 126:6
**object** 6:15, 6:16
**objection** 6:20, 17:4, 20:4
 21:6, 21:12, 28:14, 29:22
 30:18, 32:2, 40:16, 44:8, 48:8
 59:9, 60:11, 64:9, 65:13
 70:18, 72:16, 72:20, 73:3
 77:25, 87:19, 91:18, 92:14
 93:11, 94:18, 96:13, 104:3
 104:9, 108:6, 111:25, 113:25
 118:16, 121:12, 123:24
**objections** 4:2
**objects** 20:9
**obviously** 86:7
**occasions** 19:14, 24:9
**occurrence** 17:25, 19:12
**offer** 9:24, 10:12, 11:4, 27:5
 39:12
**offering** 92:8
**officer** 3:8, 4:7, 4:9
**offices** 10:10
**officially** 72:8
**Oh** 19:9, 74:24
**ok** 103:9
**okay** 20:10, 45:8, 52:22
 57:22, 71:10, 74:20, 78:17
 83:21, 88:18, 99:4, 106:6
 107:12, 110:6, 115:25
 119:25, 123:14
**old** 9:4
**omg** 74:22
**on-campus** 10:6, 10:7, 10:14
**once** 63:7, 8:2, 9:11, 15:5
 15:17, 40:2, 41:23, 92:2
 94:25, 108:25, 112:12
**one-off** 99:25, 100:2, 100:8
**one-page** 44:17, 70:25, 74:8
 74:10, 83:16, 88:14, 100:4
 105:17, 105:19, 110:2
 119:21, 128:9, 128:14
 128:19
**one-week** 92:9

**ones** 35:18
**online** 13:21
**opinion** 60:20, 92:8, 93:6
**opportunity** 6:18, 7:8
**opposed** 125:11
**opposite** 30:6
**order** 29:13
**outside** 16:19, 50:18, 70:5
    73:16, 73:25, 74:3, 75:18
**overachieving** 117:4
**overly** 116:22

**P**

**p.m** 68:12, 99:6, 107:8
    107:11, 107:17, 108:4, 108:8
    123:18, 123:19, 125:25
**page** 58:18, 115:11, 116:2
    128:4, 129:6, 130:3, 130:6
    130:8, 130:10, 130:12
    130:14, 130:16, 130:18
**paid** 36:17
**paper** 69:21, 69:23, 130:3
**paragraph** 62:14, 89:11
    89:17
**parameters** 41:11
**paraphrasing** 62:6, 94:20
    95:10, 97:6
**parentheses** 116:21, 117:2
**Park** 2:6
**part** 39:16, 62:14, 62:15
    62:19, 62:20, 62:22, 63:3
    63:23, 64:23, 67:9, 69:2
    116:25, 117:2
**participate** 9:14, 9:25
**participated** 9:17
**particular** 29:8, 36:15, 54:15
    54:16
**particularly** 85:6, 96:10
    104:14
**parties** 127:17
**partner** 27:23, 28:10, 35:12
    90:7, 97:21, 102:10
**partners** 1:10, 3:9, 34:10
    34:12, 34:16, 34:24, 35:22
    37:11, 83:4, 83:7, 130:1

**parts** 56:19, 123:5
**passed** 50:7
**paternity** 121:19
**path** 27:24
**Patrick** 71:15, 71:16, 72:7
    72:10, 73:23, 74:13, 75:19
    76:4, 128:16
**pause** 124:9
**pecking** 29:13
**pending** 6:23, 6:24
**people** 10:19, 12:16, 13:24
    19:23, 27:10, 29:15, 30:16
    33:21, 42:5, 50:17, 55:2
    55:18, 55:25, 65:20, 69:5
    73:16, 109:16, 116:10
    121:23, 124:17
**people's** 20:16
**percentage** 97:3
**perfect** 67:24
**perfectionist** 117:5
**perform** 37:12, 85:11, 96:16
    96:24, 100:8
**performance** 85:15, 85:18
    85:20, 86:12, 115:2
**performed** 67:22, 113:13
**performing** 51:16
**period** 65:19, 80:20, 84:24
    87:10, 87:12, 113:7, 113:20
    113:24
**periods** 81:9, 124:15
**PERRY** 2:5
**person** 8:2, 29:15, 29:20
    51:3, 52:10, 102:14, 116:13
**personal** 121:21
**perspectives** 125:7
**phone** 61:8, 66:10
**phrase** 16:22, 95:14, 116:15
**pick** 86:6
**picked** 115:6
**picking** 87:5, 100:16
**picture** 61:22, 112:12
**pieces** 56:18
**place** 22:4, 22:19, 55:3
    63:13, 84:5, 84:13, 85:10
    85:17, 92:3, 92:5, 92:23, 93:7
    93:16, 93:25, 94:4, 95:2

96:16, 96:20, 96:24, 101:4
    104:13
**placed** 44:22, 57:11, 70:22
    74:15, 83:12, 88:11, 98:19
    105:25, 106:25, 109:24
    115:16, 119:18
**plaintiff** 1:8, 1:19, 2:4, 5:13
    44:16, 74:7, 105:16
**Plaintiff's** 44:17, 44:22
    70:22, 70:25, 74:10, 74:15
    83:12, 83:15, 88:11, 88:14
    98:19, 98:22, 99:15, 105:19
    105:25, 106:23, 106:25
    107:4, 107:8, 107:14, 109:24
    110:2, 115:10, 115:16
    115:20, 119:18, 119:20
    128:8, 129:4
**plan** 58:23, 61:21, 61:24
    88:22, 89:3
**plate** 104:7
**platform** 66:11
**please** 6:10, 10:25, 18:3, 45:6
    57:10, 70:21, 74:18, 83:11
    85:24, 88:10, 98:18, 103:11
    106:4, 106:24, 109:23
    115:23, 116:2, 119:17
**plugged** 90:22, 91:2, 95:24
**PM** 74:12, 105:21, 128:15
    128:20
**point** 16:24, 36:24, 40:25
    64:14, 77:11, 82:10, 86:2
    88:6, 89:13, 89:18, 94:10
    99:24, 101:8, 104:20, 105:3
    113:18
**points** 124:5
**policies** 20:11
**policy** 20:3
**polite** 90:9, 102:6
**portal** 10:3, 13:21, 14:13
    15:12, 15:18, 20:14, 21:16
    21:22
**portion** 74:22
**position** 12:15, 26:17, 32:23
    33:24, 34:6, 39:2, 68:17
**positive** 89:19, 96:6
**positively** 110:18

**possible** 21:8, 21:13, 43:17
44:4, 47:2, 50:15, 59:10
65:10, 65:14, 87:18, 87:20
90:14, 93:9, 99:13, 99:17
101:12, 102:15, 103:2, 103:3
109:11, 109:12, 111:10
112:23, 112:24, 113:15
113:23, 114:20, 114:23
**possibly** 44:9, 47:14, 52:16
56:25, 61:16, 73:5, 81:25
**potential** 31:17, 31:18
**potentially** 44:2
**PowerPoint** 51:9
**practice** 63:25
**practices** 117:10
**praise** 83:2
**predominantly** 112:25
**preparation** 8:5, 8:8
**prepare** 7:11, 7:14, 7:25
**preparing** 39:4
**PRESENT** 3:4
**presentation** 39:4
**press** 38:20, 40:5
**pressure** 37:12, 37:20
**pretty** 13:3, 46:10, 47:11
**previous** 116:11
**previously** 25:14, 57:13
59:11, 70:24, 71:7, 83:14
85:14, 85:16, 88:13, 98:21
**principal** 27:19, 27:20, 27:25
28:3, 28:7, 34:2
**principals** 34:3
**printout** 44:17, 74:10
105:20, 115:10, 128:9
128:14, 128:19, 129:5
**prior** 36:15, 42:20, 47:21
58:25, 59:16, 63:17, 64:2
65:4, 70:12, 77:23, 84:8
**probably** 12:14, 46:8, 57:17
116:22
**process** 9:23, 53:6, 53:13
**produce** 50:6
**producing** 38:12
**product** 38:8, 40:2, 49:21
68:3, 85:23, 86:18, 100:18
118:9

**professional** 9:8
**profile** 28:17
**program** 9:14, 9:25, 12:4
13:6, 15:8, 16:13, 26:24, 27:3
54:9, 70:13
**programs** 12:19
**progress** 53:17
**progressed** 105:2
**project** 13:3, 17:23, 18:7
22:9, 22:11, 30:20, 31:15
39:5, 43:5, 43:7, 43:9, 43:12
43:14, 46:21, 47:9, 56:8, 56:9
58:16, 59:4, 59:13, 59:17
80:17, 82:19, 82:23, 82:25
90:4, 93:18, 94:22, 96:12
101:14, 110:14, 110:20
111:4, 112:9, 112:22, 113:4
113:8, 113:13, 114:21
114:24, 117:19, 118:4
119:12, 120:9, 124:19
**projects** 48:19
**promoted** 27:15
**promotion** 28:3
**prompted** 14:17
**prompting** 14:8
**protected** 122:5, 122:8
122:12
**provide** 17:15, 35:13, 47:15
78:22, 123:22
**provided** 5:20, 11:21, 11:25
16:17, 32:7, 121:16
**providing** 35:18, 49:25
125:8
**Pruzan** 77:5
**public** 1:20, 5:4, 39:14
126:22, 127:8, 130:25
**publicly** 38:20
**pull** 57:9, 70:20, 83:10, 88:9
98:17, 106:23, 109:22
119:16
**pulling** 58:19
**purely** 68:20
**purpose** 69:17, 72:22, 73:2
**purposes** 29:20, 31:8
**pursuing** 40:25
**push** 26:5

**pushing** 56:15
**put** 7:5, 14:3, 14:5, 18:17
18:20, 18:22, 18:25, 23:13
23:14, 23:17, 24:2, 24:5
24:14, 61:11, 63:12, 82:14
84:5, 85:10, 85:17, 92:2, 93:7
93:15, 93:25, 94:4, 94:25
96:16, 96:20, 96:24, 109:13

## Q

**quality** 50:18, 50:20, 76:3
**question** 4:3, 6:6, 6:10, 6:11
6:13, 6:20, 6:23, 6:24, 6:25
11:13, 11:16, 11:18, 19:2
87:24, 107:6
**questions** 6:4, 6:17, 7:9, 8:17
53:24, 54:16, 54:20, 83:20
123:12
**quick** 87:14
**quickly** 115:6
**Quinn** 2:16, 7:18, 7:20
**quite** 52:12

## R

**raise** 109:7
**raised** 80:14, 109:6
**ranging** 100:3
**rare** 17:25, 19:12
**rarely** 19:6, 19:8, 19:9, 19:10
**Ratner** 1:19, 5:4, 127:7
127:25
**reach** 24:20
**reaction** 79:2, 79:4, 110:16
121:6, 121:8
**read** 18:2, 18:4, 45:12, 45:17
57:16, 57:23, 61:19, 62:13
71:6, 71:9, 90:6, 107:10
107:14, 110:4, 116:17, 126:5
**ready** 60:25, 106:5, 110:5
**real** 48:23
**realistic** 87:14
**realize** 58:22, 83:18, 120:2
**really** 24:6, 40:5, 47:13
52:12, 66:7, 75:21, 84:20

97:7, 118:20, 118:21, 121:3
124:8, 124:14
**reason** 30:12, 62:21, 85:5
106:11, 120:3, 122:11, 130:3
130:6, 130:8, 130:10, 130:12
130:14, 130:16, 130:18
**reasonable** 41:14, 80:9
**recall** 10:14, 10:19, 11:22
11:23, 11:24, 14:3, 16:20
19:23, 24:14, 25:17, 26:7
31:4, 35:11, 36:7, 37:10, 38:4
38:19, 40:9, 42:22, 42:23
43:6, 43:10, 45:23, 45:25
46:6, 46:17, 46:20, 47:17
50:19, 52:3, 52:16, 53:15
54:11, 54:16, 54:19, 55:14
56:13, 56:15, 56:16, 57:4
57:6, 59:11, 59:14, 60:14
61:3, 61:5, 61:16, 62:7, 62:11
63:14, 66:15, 66:20, 66:21
66:23, 67:7, 76:13, 77:20
77:23, 78:25, 81:4, 84:8, 92:4
99:8, 109:10, 109:20, 111:3
111:19, 112:14, 116:15
118:25, 119:2, 119:3, 119:4
**receive** 14:7
**received** 9:24, 10:12, 16:22
**recess** 52:25, 123:18
**recollection** 19:18, 33:8, 45:9
57:3, 60:19, 75:22, 84:4
102:18, 104:24, 107:15
120:6, 120:9
**record** 45:13, 52:23, 52:24
53:3, 113:12, 115:8, 115:9
115:18, 123:16, 123:17
123:20, 125:23, 125:24
126:7, 126:8, 130:4
**recording** 21:9
**recruiting** 10:3
**refer** 31:9, 89:3, 90:17
**reference** 88:21, 94:20, 99:24
101:16, 102:3, 107:22
108:13, 108:16
**referenced** 95:16, 109:4
**references** 62:2
**referencing** 99:21

**referring** 52:7, 52:9, 86:15
89:5, 90:24, 91:7, 98:21
99:14, 107:23, 115:20
**refers** 110:12
**refresh** 45:9, 84:4, 120:6
**refreshes** 107:15
**regarding** 25:2, 25:3, 119:5
**Regardless** 121:5
**regular** 15:6, 15:7
**regularly** 19:7
**rejected** 39:12
**related** 28:24, 32:10, 121:17
127:16
**relates** 32:16
**relation** 23:20
**relatively** 85:13, 104:4
**relay** 103:8
**release** 38:20, 40:5
**relying** 92:15, 92:17
**remember** 7:23, 22:16, 26:4
33:4, 43:18, 47:22, 50:16
54:6, 66:16, 68:4, 69:14
69:20, 72:13, 75:13, 75:16
75:17, 75:20, 75:24, 76:2
76:24, 77:16, 77:19, 78:5
78:7, 79:10, 79:13, 79:17
79:24, 82:12, 85:12, 86:20
87:4, 93:17, 94:2, 94:9, 94:14
95:8, 95:20, 96:18, 100:10
103:14, 103:20, 103:22
106:10, 110:15, 111:7
111:10, 113:14, 114:16
117:20, 119:10, 121:3, 121:8
125:12
**removed** 82:11, 101:20
**removing** 101:23
**repeat** 87:24
**repeated** 6:10
**repercussions** 80:18
**repetitions** 51:23
**repetitive** 99:2
**replied** 106:17
**report** 20:24, 22:5, 22:19
23:9, 23:21, 29:10, 29:15
29:24, 30:10
**reported** 98:14

**reporter** 1:20, 6:8, 127:7
**reporting** 21:4, 24:13
**reports** 24:15, 26:13
**represent** 5:13, 66:18, 68:7
71:5, 83:23
**requests** 88:23
**require** 28:4, 68:4
**required** 46:16, 82:19, 93:4
**requirement** 12:21
**requirements** 12:11
**requires** 123:2
**reread** 6:11
**researching** 12:14
**reserved** 4:4
**resources** 123:8
**respect** 11:10, 39:6, 110:24
122:2, 122:13
**respond** 62:12, 104:18, 107:7
**responds** 98:10, 103:6
**response** 61:17, 62:13, 75:5
103:13, 106:22
**responsibilities** 29:3, 29:7
69:2, 69:6, 94:3
**responsible** 29:5, 30:8
**rest** 45:15
**restrictions** 63:12, 63:17
**result** 21:3
**resume** 10:5
**review** 8:4, 8:7, 26:12, 32:7
45:7, 47:5, 47:7, 74:18
115:23
**reviewed** 76:10
**reviewing** 30:8, 32:12, 38:11
88:16, 119:24
**revised** 50:2, 50:4
**Richard** 10:18
**right** 16:6, 43:16, 45:4, 46:3
48:11, 49:3, 58:11, 64:5
81:10, 82:23, 87:18, 92:6
96:25, 100:25, 102:16, 104:2
**ring** 31:10
**Robinson** 77:8, 83:25
**role** 38:22, 43:8, 43:12, 69:10
71:19, 112:13, 125:3
**roles** 36:7
**Rosenberg** 2:10, 3:12

**roughly** 58:10, 113:4
**round** 10:20, 11:11
**rule** 23:19
**rules** 6:2
**running** 15:16

## S

**sale** 40:25
**sample** 92:10
**satisfaction** 22:5, 22:10
  22:11
**saw** 95:18
**saying** 18:25, 32:14, 75:24
  89:12, 96:19
**says** 22:9, 58:14, 61:20
  83:25, 95:10, 102:23, 103:7
  103:25, 106:14, 107:5
  108:23, 116:6, 116:16
  120:12
**scale** 22:25
**scenario** 19:11, 91:21, 91:24
**schedule** 32:10, 32:15
  117:18
**scheduled** 122:4
**schedules** 30:16, 30:19
  30:21
**SCHWARTZ** 2:5
**scope** 41:14
**screen** 44:14, 44:23, 45:3
  45:4, 57:12, 70:23, 74:16
  83:13, 88:12, 98:20, 106:2
  107:2, 109:25, 115:17
  119:19
**screen-sharing** 7:7
**scroll** 57:19
**second** 10:20, 33:3, 47:14
  58:14, 61:20, 64:25
**second-round** 11:12
**second-year** 110:10
**section** 23:18
**see** 6:14, 20:17, 45:18, 83:22
  120:12, 122:20, 123:8
**select** 39:21
**selected** 110:13
**selling** 123:5

**send** 72:23
**sending** 61:8, 67:5, 72:18
  73:12
**senior** 29:19, 34:15, 35:12
  37:6, 80:2
**seniority** 59:25
**seniors** 35:6
**sense** 30:15, 32:9, 82:8
  102:14, 104:19, 112:3
**sent** 52:5, 52:6, 67:6, 73:15
  80:3, 103:9, 107:16, 108:2
**sentence** 45:13, 45:16, 58:14
  61:10, 61:20, 88:21, 91:15
  106:15
**sentiment** 43:21
**separate** 40:4, 53:19, 56:18
**September** 83:23, 88:20
  99:6, 103:7, 103:13, 103:13
  103:15, 104:18, 107:11
  107:17, 108:3, 111:9, 120:8
**series** 6:3
**seriously** 99:22
**serves** 72:23
**set** 41:11, 42:7, 42:10, 42:13
  60:3, 89:7, 127:22
**set-up** 89:23
**settled** 39:12
**settlement** 39:18, 40:3
**seven** 8:21, 54:21
**share** 44:14, 45:3, 45:4, 57:2
  81:19
**shared** 44:22, 47:19, 57:11
  60:25, 70:22, 74:15, 83:12
  88:11, 98:19, 105:25, 106:25
  109:24, 115:16, 119:18
**sheet** 14:25, 15:10, 15:14
  130:3
**Shiber** 1:7, 3:5, 5:14, 30:24
  31:3, 31:6, 31:22, 38:9, 42:20
  44:20, 70:17, 71:25, 72:7
  72:19, 75:19, 76:23, 77:3
  77:6, 77:9, 98:7, 120:16
  128:11, 130:1
**Short** 52:25, 123:18
**shorter** 8:2
**Shorthand** 1:19, 127:7

**shortly** 61:18, 62:12, 80:8
  84:6
**show** 44:12, 68:13
**showing** 7:3
**shows** 68:5
**side** 104:25
**signed** 4:6, 4:8
**significance** 36:13
**signing** 63:24, 64:4, 64:19
**signs** 108:25
**similar** 12:19, 37:17, 43:19
  51:22, 71:17, 81:5, 82:7, 94:5
  94:7, 100:14, 107:18, 107:20
  108:11, 115:5, 116:11, 124:4
  125:5, 125:7
**sit** 50:24
**situation** 17:10, 61:7, 85:22
  92:21, 93:2, 95:11, 95:15
  97:6, 107:5, 111:18, 122:24
**situational** 41:12
**situations** 24:13, 24:17
  108:24, 109:4
**six** 41:21, 41:21, 42:4, 54:21
**size** 92:10
**SKIBITSKY** 2:19, 17:4
  17:6, 20:4, 20:8, 21:6, 21:12
  28:14, 29:22, 30:18, 32:2
  40:16, 44:8, 48:8, 52:21, 59:9
  60:11, 64:9, 65:13, 70:18
  72:16, 72:20, 73:3, 77:25
  87:19, 91:18, 92:14, 93:11
  94:18, 96:13, 104:3, 104:9
  108:6, 111:25, 113:25
  118:16, 121:12, 123:15
  123:24, 125:19
**sleep** 8:20, 117:18
**sleeping** 13:13, 117:22
**sleepless** 117:23
**sliding** 22:25
**slightly** 108:2
**slow** 25:16
**small** 67:25
**socialize** 73:25, 74:3
**solution** 87:14
**somebody** 26:5, 29:19, 35:12
  42:12, 72:15, 72:24, 82:14

92:22, 109:17
**soon** 57:6, 102:14, 103:2
**sooner** 101:17
**sorority** 72:3, 75:25
**sorry** 17:8, 19:9, 70:9, 103:8
**sort** 10:11, 14:7, 14:18, 16:17
  20:21, 21:19, 21:23, 23:7
  23:24, 28:5, 29:25, 30:3
  35:23, 38:21, 39:4, 39:22
  51:23, 56:18, 56:19, 62:24
  62:24, 64:12, 80:16, 81:6
  81:15, 82:5, 86:9, 87:7, 90:22
  90:22, 90:23, 91:2, 95:4
  100:4, 100:4, 100:14, 102:6
**sorts** 65:7
**sought** 121:25
**source** 64:22
**SOUTHERN** 1:5
**space** 84:2
**speak** 8:10, 36:5, 43:3, 43:11
  50:20, 61:10, 66:10, 66:13
  73:8, 76:14, 98:5, 103:17
**speaking** 36:7, 53:14, 61:7
**special** 85:7
**specific** 12:10, 20:18, 23:11
  24:23, 39:3, 43:10, 46:15
  47:15, 47:17, 50:19, 51:25
  52:17, 54:2, 54:19, 60:6
  60:14, 64:22, 65:23, 66:21
  75:16, 75:20, 76:21, 76:24
  86:25, 87:3, 109:3, 109:5
**specifically** 25:23, 43:18
  54:6, 56:16, 66:17, 76:13
  76:18, 100:6, 109:21
**specifics** 26:4, 32:17, 35:11
  52:3, 68:4, 73:20, 87:4
**spectrum** 41:9
**speculation** 84:25, 85:2, 85:3
**speech** 62:21, 97:11
**spilled** 114:8
**splits** 111:3
**spoke** 43:4, 55:14, 61:13
  76:17, 102:13
**spoken** 59:7
**spread** 72:18
**spreadsheet** 15:19, 16:11

**ss** 127:4
**staffed** 18:7, 21:5, 21:10
  29:8, 37:23, 38:6, 42:12
  42:20, 113:21, 114:12
  114:14, 114:17
**staffer** 25:11, 68:18
**staffers** 124:6
**staffing** 13:21, 15:12, 17:16
  38:2, 68:17, 68:20, 69:3
  69:10, 69:22, 71:22, 72:25
  89:13, 89:16, 89:20, 89:25
  90:4, 90:13, 101:16, 103:21
**staffings** 46:11
**stamped** 44:20, 57:15, 71:2
  74:8, 74:13, 83:16, 88:15
  98:23, 105:17, 105:22, 110:3
  115:13, 115:21, 119:21
  128:12, 128:17, 128:21
  129:8
**stand** 116:19
**standard** 42:5, 63:7, 67:20
  68:11, 68:13
**standing** 121:23
**Stanley** 124:24
**start** 35:21, 48:4, 48:7, 48:13
  48:19, 48:23, 98:24
**started** 5:16, 14:18, 16:15
  16:16, 37:22, 41:18, 48:11
  48:21, 48:22, 49:11, 63:25
  100:16
**starting** 29:13, 101:8
**state** 1:20, 24:8, 127:3, 127:8
**statement** 87:2, 124:18
**statements** 116:12
**STATES** 1:4
**stating** 5:5, 60:8, 62:8
**stenographically** 127:14
**step** 27:18
**steps** 47:8
**Stewart** 68:6, 68:14, 68:15
  69:13, 69:15, 70:2, 70:5, 74:3
**sticking** 88:22
**STIPULATED** 4:2, 4:5
**stock** 39:2
**stop** 15:4
**strange** 79:3, 79:5, 84:17

**Street** 5:6
**strong** 115:5, 121:8
**structure** 53:8, 53:11
**studied** 8:23
**stuff** 58:20, 58:22, 68:2
  101:24, 116:18, 121:21
  124:3
**subject** 116:4
**subjective** 23:24
**Subscribed** 126:18, 130:22
**substance** 25:9, 62:8
**substantive** 68:3
**suggest** 35:25
**suggesting** 117:14
**Suite** 2:11
**SULLIVAN** 2:16
**summer** 9:14, 9:19, 9:20
  9:25, 10:5, 12:4, 12:5, 12:6
  12:21, 12:23, 13:4, 13:12
  13:18, 15:6, 16:15, 53:9
  53:13, 54:9, 55:15, 55:25
  70:7, 70:8, 70:10, 70:12
**summered** 54:23, 55:4
**summers** 55:20
**superiors** 50:7
**supervisor** 29:20, 29:23
  30:12, 31:24
**supposed** 60:4
**sure** 6:16, 12:7, 17:7, 17:9
  21:7, 22:12, 23:23, 28:12
  38:13, 42:6, 50:12, 50:22
  56:6, 56:7, 58:24, 61:12, 67:2
  68:12, 68:18, 73:18, 75:11
  76:12, 80:16, 82:2, 82:8, 84:6
  84:25, 90:3, 95:3, 97:2, 98:13
  99:12, 101:2, 101:8, 101:15
  101:25, 104:21, 112:5
  112:17, 112:20, 113:11
  118:22, 120:22
**surprised** 68:2, 75:3
**Susan** 1:19, 5:4, 127:7
  127:25
**suspect** 94:13
**sworn** 4:6, 4:8, 5:4, 126:18
  127:12, 130:22

## T

**take** 6:9, 6:25, 22:20, 24:3
52:20, 62:9, 63:22, 71:3
79:14, 83:19, 85:25, 86:4
87:16, 99:22, 100:23, 100:24
106:4, 118:11, 119:23
**taken** 1:18, 4:10, 38:25
52:25, 123:18, 126:5, 127:10
127:14
**talk** 27:8, 35:22, 45:15, 45:24
46:5, 49:20, 55:11, 57:25
58:14, 58:23, 59:7, 61:21
61:23, 63:24, 75:7, 75:9, 76:3
77:2, 77:5, 77:8, 81:2, 84:21
103:8
**talked** 45:14, 45:22, 102:18
102:21
**talking** 58:7, 63:12, 84:24
**tasks** 67:21, 95:3, 99:25
100:2, 100:8, 100:23, 100:24
101:25, 115:6
**team** 17:16, 22:2, 29:13
30:16, 30:23, 32:20, 33:9
33:17, 33:20, 34:10, 34:12
34:20, 34:23, 34:25, 35:10
37:7, 43:2, 45:10, 47:25
50:13, 50:17, 50:18, 58:11
58:17, 59:21, 59:25, 60:8
66:2, 68:18, 71:22, 73:13
73:13, 73:16, 73:16, 76:11
76:22, 81:16, 81:21, 82:11
82:14, 82:23, 83:25, 86:3
87:23, 88:2, 91:17, 93:4, 93:5
93:8, 93:24, 95:6, 96:2, 96:6
96:8, 97:8, 98:14, 99:20
101:20, 103:16, 103:18
103:18, 103:23, 104:7
105:13, 109:8, 109:18, 111:5
111:24, 113:21, 115:7, 116:7
116:8, 116:13, 118:7, 119:6
125:10, 125:11
**tell** 8:13, 12:20, 13:24, 22:15
23:11, 26:9, 46:18, 49:24
50:13, 51:5, 61:14, 63:20
78:11, 78:18, 78:18, 78:21

81:12, 87:20, 90:6, 98:6
106:18, 116:13, 116:23
**ten** 13:7, 18:19, 28:15, 112:6
112:6
**tendency** 117:7
**tenor** 38:21
**term** 29:23, 30:13, 40:20
89:22, 89:22, 90:2, 90:21
**terminate** 120:16
**terminated** 93:16, 118:19
118:23, 119:2, 119:9, 119:11
119:14, 120:23, 121:4
121:11
**termination** 120:3, 120:7
121:2
**terms** 46:15, 60:6, 80:17
86:14, 100:18, 121:24
**testified** 5:7, 78:24
**testify** 41:7
**testimony** 126:5, 126:8
127:13, 127:14
**text** 51:5, 75:8
**thank** 5:21, 125:19, 125:21
125:22
**thing** 43:15, 43:24, 61:19
62:13, 81:13, 116:17
**things** 20:12, 21:24, 39:22
51:10, 58:19, 62:16, 62:17
62:25, 63:18, 65:7, 67:25
91:2, 95:7, 96:12, 100:4
100:16, 101:2, 116:22, 117:7
123:6, 125:5
**think** 12:8, 12:14, 12:25
13:24, 21:21, 23:19, 24:23
30:20, 35:4, 37:4, 41:8, 41:13
46:8, 47:7, 52:11, 54:24, 56:4
56:24, 57:2, 58:22, 60:19
61:6, 61:9, 62:20, 62:21
63:18, 64:7, 64:12, 64:14
64:18, 64:22, 64:23, 66:16
66:25, 67:12, 73:2, 73:22
75:3, 75:24, 77:4, 77:7, 77:10
79:4, 79:6, 79:11, 80:6, 80:13
82:7, 82:15, 85:7, 85:13
85:20, 85:22, 86:20, 86:22
87:13, 89:14, 90:9, 90:21

91:9, 91:12, 91:20, 92:12
92:15, 93:3, 95:18, 95:22
96:7, 96:14, 97:10, 97:11
97:13, 97:24, 99:23, 101:19
102:6, 102:13, 104:4, 104:14
104:19, 104:24, 105:5, 108:5
108:7, 110:18, 111:18
113:17, 116:10, 116:17
117:3, 117:23, 118:3, 118:6
118:8, 118:9, 121:10, 122:20
122:21, 123:3, 123:10
123:11, 124:3, 124:4, 124:10
124:11, 124:16, 124:17
124:17, 125:2
**third** 33:3, 106:15
**thought** 79:3, 83:4, 102:19
103:9
**thoughts** 79:8, 120:25
**three** 15:10, 27:17, 103:7
122:19, 122:21, 122:23
122:25
**three-and-a** 28:8
**Three-and-a-half** 28:2
**three-day** 122:6
**three-year** 15:8, 26:24
**threshold** 18:16, 24:24
**Thursday** 14:7, 99:6, 107:17
**tied** 20:23
**tight** 56:16
**Tim** 103:7
**time** 11:14, 12:11, 14:15
14:17, 15:2, 15:11, 15:24
16:10, 16:12, 16:18, 17:2
17:11, 17:18, 19:15, 20:12
20:16, 21:9, 25:7, 28:16, 31:2
32:17, 32:23, 34:15, 37:22
40:13, 40:14, 41:15, 42:2
45:10, 45:14, 56:9, 60:6
65:19, 65:24, 66:21, 67:14
68:7, 68:9, 68:11, 68:13, 70:4
71:16, 77:11, 79:15, 79:16
79:19, 80:9, 80:21, 82:10
84:24, 87:10, 89:7, 89:18
93:15, 93:16, 94:10, 100:7
109:17, 111:12, 113:7
113:20, 113:24, 114:12

114:15, 114:18, 117:11
118:11, 118:18, 124:15
125:25
**timeline** 25:13, 42:16, 42:17
42:19, 62:23, 62:24, 111:16
**timelines** 114:6
**timeof** 4:4
**times** 7:24, 17:12, 25:5
47:18, 50:2, 62:3, 62:16, 78:9
79:7, 113:6, 117:15
**timing** 120:7
**Timothy** 1:18, 44:19, 74:12
105:21, 115:13, 126:4
126:15, 127:10, 128:5
128:11, 128:16, 128:20
129:7, 130:2, 130:21
**today** 6:2, 6:17, 7:4, 7:12, 8:5
8:8, 8:18, 58:15
**today/tomorrow** 103:10
**told** 14:2, 14:5, 16:23, 18:17
18:20, 25:15, 25:20, 25:24
59:6, 64:2, 64:7, 64:11, 65:3
77:15, 78:3, 78:17, 79:9, 80:9
81:5, 81:13, 82:3, 84:9, 88:24
118:21, 118:22, 118:25
119:3, 119:4
**tomorrow** 45:15
**Tony** 34:13, 35:4, 35:17
76:14, 78:4, 78:6, 78:7, 79:19
81:5, 81:12, 81:20, 84:9, 88:8
88:20, 88:24, 94:17, 95:9
95:13, 95:19, 98:3, 98:5, 98:6
99:5, 99:19, 99:22, 102:7
102:12, 102:13, 103:6
103:12, 106:8, 107:5, 107:17
108:2, 108:7, 108:18, 109:6
109:14, 120:12, 120:21
**tool** 20:17, 20:19
**top** 44:18, 57:17, 68:5, 74:11
83:22, 105:20, 106:15
115:11, 128:9, 128:14
128:19, 129:5
**topic** 11:25
**tough** 102:4
**track** 13:17, 14:15, 14:18
**trained** 13:22, 14:21

**training** 16:21, 48:14, 48:16
48:18
**transaction** 41:2
**transcribed** 127:15
**transcript** 126:5, 126:7
**transcription** 130:5
**transcripts** 8:7
**treatment** 85:8, 85:9
**trial** 4:4
**tried** 106:15
**true** 29:17, 30:6, 38:10
58:25, 86:21, 104:8, 111:11
111:14, 126:7, 126:9
**truthfully** 8:17
**try** 53:24, 103:11, 103:12
123:25, 124:2, 124:6, 124:8
**trying** 25:13, 69:21, 72:22
107:24
**Tuesday** 83:24, 103:10
104:20, 105:6
**turns** 51:23
**two** 37:23, 38:9, 38:13, 40:12
40:15, 40:18, 53:16, 53:16
73:11, 102:11, 102:17
103:19, 116:3, 122:11
122:17
**two-page** 57:14, 98:22
115:10, 115:21, 129:5
**type** 62:10, 122:25
**typical** 41:14, 49:10, 50:5
50:25, 51:6, 51:13, 51:14
51:17, 63:7, 91:13, 95:5
100:18
**typically** 41:10, 46:23, 48:6
48:10, 48:16, 48:20, 48:25
49:13, 53:14, 122:15, 122:20
123:3, 123:7

---

## U

**ultimately** 30:9, 39:10, 82:18
107:7, 107:16, 118:14
**understand** 6:13, 18:5, 19:13
25:12, 53:24, 72:22, 74:25
95:12, 95:14
**understanding** 12:3, 12:8

12:12, 12:13, 20:15, 23:16
25:13, 26:23, 54:8, 56:5
120:15, 124:6
**understood** 64:23, 95:13
**unique** 85:9
**UNITED** 1:4
**university** 8:23, 12:18
**unnecessary** 96:21
**upcoming** 21:23
**upset** 80:19, 84:23
**Upwards** 41:19
**urgency** 103:15, 105:10
**urgent** 103:23, 104:4
**URQUHART** 2:16
**usable** 47:13, 47:16, 50:3
**use** 13:22, 13:24, 14:2, 17:12
20:19, 40:20, 65:21, 96:23
**uses** 20:13
**usually** 47:8, 53:16, 124:7

---

## V

**vacations** 124:3
**vague** 106:16, 106:18
**Valentino** 2:13, 5:9, 5:12
18:2, 44:15, 44:24, 52:18
52:22, 53:3, 53:4, 57:9, 70:20
74:6, 74:17, 83:10, 88:9
98:17, 105:15, 106:3, 106:23
109:22, 115:8, 115:18
115:19, 119:16, 123:9
123:16, 123:20, 123:21
125:18, 125:21, 125:23
128:5
**valuation** 125:7
**value** 95:23, 96:5, 96:9, 97:5
97:8, 104:21, 105:4, 105:7
**Variable** 12:25
**varied** 110:21
**varies** 42:18, 122:16
**variety** 7:8
**various** 121:20, 121:20
**varying** 35:2
**verbal** 6:7
**version** 71:12, 108:8
**viability** 92:9

**Vicari** 77:2, 83:24
**vicious** 90:18, 91:5, 91:10
**view** 7:8
**viewed** 110:18

## W

**wait** 6:5, 103:9, 105:8
**WALDMAN** 3:11
**want** 5:16, 18:7, 18:13, 19:16
  44:12, 45:17, 52:20, 53:5
  71:9, 71:11, 82:10, 91:23
  101:20, 101:21, 102:9
  103:10, 104:5, 104:16
  106:16, 106:21, 107:13
  113:16, 122:10, 124:12
  124:14, 124:17
**wanted** 101:22, 104:6
**wanting** 90:6
**way** 14:10, 15:2, 15:24
  20:23, 28:24, 35:15, 44:25
  51:16, 57:17, 58:12, 92:7
  121:9
**ways** 7:8
**we've** 108:24
**weak** 47:11, 49:10, 49:13
  49:14, 49:17, 49:18, 85:13
**wedding** 122:10
**Wednesday** 88:20
**week** 14:16, 15:15, 17:21
  18:20, 58:10, 58:11, 60:9
  77:20, 89:24, 92:6, 92:16
  95:16, 108:24, 113:7
**weekend** 17:24, 18:14, 19:11
  19:16, 21:11, 77:24, 84:2
  84:8, 102:4, 105:2, 105:3
  105:4, 105:6, 105:8, 105:9
  122:8, 122:12
**weekends** 122:5
**weekly** 22:17, 40:6
**weeks** 5:17, 13:2, 13:7, 13:9
  40:8, 48:17, 48:18
**weight** 58:19
**Weiner** 55:8
**went** 8:23, 44:7, 72:15, 75:24
  111:18

**West** 5:5
**WHEREOF** 127:21
**whims** 62:23
**wide** 41:15, 100:3
**Willem** 34:14, 35:4
**William** 68:6, 68:14, 68:15
**witness** 5:3, 125:22, 127:12
  127:21, 128:4
**word** 31:18, 97:19
**words** 51:7
**work** 11:9, 11:10, 13:11
  18:14, 19:17, 21:10, 22:3
  22:20, 23:17, 24:3, 24:22
  29:6, 29:6, 29:25, 30:9, 30:16
  30:22, 31:20, 31:22, 32:4
  32:6, 32:10, 32:12, 32:13
  32:15, 32:19, 34:22, 35:9
  35:23, 37:17, 38:8, 38:14
  38:17, 39:17, 39:19, 40:2
  42:9, 42:16, 46:13, 46:15
  46:19, 46:21, 46:25, 47:5
  47:7, 47:10, 47:16, 48:23
  49:7, 49:9, 49:13, 49:14
  49:15, 49:16, 49:21, 49:22
  49:24, 50:6, 50:9, 50:11
  50:14, 50:18, 50:21, 50:25
  51:6, 51:9, 51:20, 52:15
  53:22, 54:3, 54:10, 54:17
  55:11, 57:2, 59:3, 60:4, 60:9
  60:17, 60:20, 62:4, 62:9
  62:16, 62:24, 63:9, 64:19
  67:13, 67:15, 68:3, 69:3
  69:19, 70:5, 72:24, 73:25
  74:4, 76:4, 77:12, 78:8, 79:7
  79:9, 80:10, 80:24, 81:6
  81:10, 82:9, 82:16, 82:18
  83:2, 85:22, 85:25, 86:4
  86:18, 87:11, 87:17, 94:7
  94:22, 94:25, 96:15, 96:16
  96:23, 97:2, 98:7, 100:18
  101:13, 104:5, 104:7, 104:16
  110:19, 111:11, 111:22
  112:15, 112:19, 112:21
  113:13, 113:16, 113:23
  116:11, 117:19, 117:21
  118:4, 118:6, 118:6, 118:7

  118:9, 121:18, 122:3, 124:14
**work-life** 123:22, 124:12
**worked** 13:17, 14:4, 14:6
  15:11, 15:23, 16:6, 17:21
  18:9, 18:19, 18:23, 18:24
  19:15, 21:15, 24:9, 31:5
  31:15, 36:24, 41:18, 41:22
  42:2, 44:11, 92:19, 92:22
  93:10, 93:13, 101:5, 113:3
  113:6, 113:19
**working** 14:19, 20:24, 21:20
  21:24, 25:2, 25:12, 25:15
  25:20, 25:25, 30:4, 30:7, 39:5
  40:5, 41:20, 43:16, 43:24
  46:9, 49:11, 54:22, 56:18
  56:20, 58:17, 58:22, 59:20
  59:22, 60:15, 63:6, 63:8
  63:13, 63:16, 69:15, 69:18
  72:10, 80:20, 93:18, 104:6
  104:11, 104:12, 110:22
  110:25, 112:9, 114:5, 114:8
  114:20, 114:23, 116:6
  122:13
**workload** 11:16, 11:19, 25:4
  25:14, 25:19, 26:6, 26:9
**works** 39:9, 68:24
**workstream** 123:7
**workstreams** 21:25, 123:4
  125:9
**worried** 113:17
**worse** 85:23, 118:7
**worst** 62:15, 62:19, 62:20
**write** 46:7, 66:8, 99:6, 99:24
  100:11
**writes** 74:22
**writing** 61:11, 61:15, 109:13
**written** 16:17, 94:16
**wrong** 22:9, 68:22, 72:3
  80:6, 92:12
**wrote** 107:21

## Y

**year** 9:21, 33:2, 33:3, 33:15
  33:16, 63:23, 67:10, 68:16
  68:19, 71:17, 95:23, 110:9

**years** 15:10, 26:3, 27:17
  28:2, 28:8, 28:15, 31:15
  41:21, 42:4, 54:21
**yesterday** 62:3
**York** 1:5, 1:20, 2:7, 2:7, 2:12
  2:12, 2:18, 2:18, 5:6, 5:6
  10:9, 10:9, 11:12, 127:3
  127:5, 127:9

**Z**

**Zoom** 1:13, 7:6, 51:4, 61:8
  61:10, 66:11

**0**

**000163** 57:15
**000275** 98:23
**002884** 119:22

**1**

**1** 22:8, 22:25, 23:3, 66:9
  130:4
**1:04** 107:8
**1:05** 123:19
**1:10** 125:25
**1:21-cv-03649-ER** 1:8
**10:08** 58:4
**10:10** 1:15
**10:40:48** 44:19, 128:10
**100** 113:7
**10010** 2:18
**10016** 2:7
**10019** 5:6
**10165** 2:12
**105** 128:22
**10th** 111:9
**11:10** 52:25
**11:20** 53:2
**11:22** 88:20
**115** 129:9
**12** 88:9, 88:11, 88:14, 99:16
**12:00** 78:9, 89:8, 89:8, 89:8
  101:11
**12:55** 123:18

**120** 60:9
**13** 98:17, 98:19, 98:22
  106:24, 106:25, 107:4, 107:8
**14** 109:22, 109:24, 110:2
**15** 41:19, 42:4
**15th** 120:8
**16** 101:10, 101:13, 119:16
  119:18, 119:20
**16-hour** 117:25
**18** 70:20, 70:22, 70:25
**1st** 83:23

**2**

**2** 130:4
**2:16:38** 74:12, 128:15
**2:44:06** 68:12
**2:50** 99:6, 107:11, 107:17
  108:4, 108:8
**20** 27:12
**2016** 9:19
**2017** 8:25
**2020** 31:20, 32:23, 48:2, 48:7
  48:11, 48:21, 48:22, 58:3
  80:15, 99:6
**2023** 1:14, 126:6, 126:19
  127:11, 127:22, 128:2, 129:2
  130:2, 130:23
**21** 1:14, 126:6, 128:2, 129:2
  130:2
**21st** 5:6, 127:11
**22nd** 2:17
**25** 44:16, 44:17, 44:22, 128:9
**25th** 45:11, 45:20
**26** 128:13
**27** 74:7, 74:10, 74:15, 76:16
  128:14
**28** 58:3, 128:18
**289** 115:22, 116:2
**28th** 77:18, 80:3, 80:15
**29** 9:5, 105:16, 105:19
  105:25, 107:14, 128:19
**2nd** 88:20

**3**

**3** 2:6, 23:13, 99:6, 130:5
**30** 10:12, 53:16, 128:23
**305** 2:11
**30-minute** 53:18
**31** 5:5, 128:24
**32** 115:10, 115:16, 115:20
  129:5
**3rd** 103:13, 103:15, 107:11
  107:17, 108:3

**4**

**4** 24:5
**4:17:32** 105:21, 128:20
**40** 18:20, 18:24
**44** 128:12

**5**

**5** 22:8, 22:25, 23:5, 23:14
  23:17, 24:2
**50** 18:25, 116:22
**51** 2:17
**5-125** 128:5
**52nd** 5:5
**5th** 127:22

**6**

**650** 2:11
**6th** 103:7, 103:13, 104:19

**7**

**7** 83:10, 83:12, 83:15
**7:04:13** 115:12, 129:7
**74** 128:17

**8**

**8/25/2020** 44:18, 128:10
**8/28/2020** 74:11, 128:15
**8:00** 78:9, 89:8, 101:5

## 9

**9**  57:9, 57:11, 57:14, 71:9
**9/3/2020**  105:21, 128:20
**9/7/2020**  115:12, 129:6
**9:00**  89:8, 111:23
**9th**  111:9