UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
KATHRYN SHIBER,

                                                                    **1:21-cv-03649-ER**

                          *Plaintiff*,


        -against-


CENTERVIEW PARTNERS LLC,

                          *Defendant*.
-------------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


**SCHWARTZ PERRY & HELLER, LLP**
***Attorneys for Plaintiff***
**3 Park Avenue, Suite 2700**
**New York, NY 10016**
**(212) 889-6565**


**CLAYMAN ROSENBERG KIRSHNER & LINDER LLP**
***Attorneys for Plaintiff***
**305 Madison Avenue, Suite 650**
**New York, NY 10165**
**(212) 922-1080**

## TABLE OF CONTENTS

**SUBJECT**                                                                    **PAGE**

TABLE OF AUTHORITIES                                                            iii

PRELIMINARY STATEMENT                                                           1

STATEMENT OF FACTS                                                              2

LEGAL STANDARD FOR SUMMARY JUDGMENT
IN EMPLOYMENT DISCRIMINATION CASES                                             4

ARGUMENT

POINT I        CENTERVIEW IS LIABLE FOR DISABILITY
               DISCRIMINATION UNDER THE ADA & THE NJLAD                        5

        A.     Shiber Was Qualified To Perform The
               Essential Functions Of Her Position                             5

               1.      A Jury Could Find That Shiber Was Able To Fulfill
                       The Essential Functions Of The Analyst Role             6

               2.      Permitting Shiber To Sleep Was Not
                       An Undue Burden For Centerview                          9

               3.      Centerview's Assumptions Cannot Be
                       The Basis For Summary Judgment                          12

        B.     Shiber Was Wrongfully Terminated Because Of Her Disability      13

        C.     Centerview Cannot Set Forth A
               Legitimate Reason For Terminating Shiber                        16

POINT II       SUMMARY JUDGMENT IS NOT APPROPRIATE
               UNDER THE BROADER NEW YORK LAW                                  19

        A.     Centerview's Failure To Engage In An
               Interactive Process Precludes Summary Judgment                  20

        B.     Centerview Cannot Satisfy The City Law's Affirmative Defense    21

POINT III      CENTERVIEW IS LIABLE FOR FAILING TO
               ACCOMMODATE SHIBER'S DISABILITY
               UNDER THE ADA, NEW YORK LAW & NJLAD                             22

POINT IV CENTERVIEW IS LIABLE UNDER THE
    NJLAD FOR FAILING TO ENGAGE IN
    THE INTERACTIVE PROCESS    23

POINT V SHIBER ESTALBISHES HER CLAIM FOR
    RETALIATION UNDER THE NEW YORK
    CITY HUMAN RIGHTS LAW    24

CONCLUSION    25

**TABLE OF AUTHORITIES**

<u>CASE</u>                                                                                    <u>PAGE</u>

Albunio v. City of New York,
    16 N.Y.3d 472 (2011)                                                      20

Boyce v. Lucent Techs.,
    2007 N.J. Super. Unpub. LEXIS 1680
    (Super. Ct. App. Div. May 16, 2007)                          12

Capobianco v. City of New York,
    422 F.3d 47 (2d Cir. 2005)                                          19

Carlton v. Mystic Transp., Inc.,
    202 F.3d 129 (2d Cir. 2000)                                        4

Cayetano v. Fed. Express Corp.,
    2022 U.S. Dist. LEXIS 119102 (S.D.N.Y. July 6, 2022)        15

Church v. Sears Holding Corp.,
    605 Fed. Appx. 119 (3d Cir. 2015)                              15

Clark v. Coca-Cola Beverages Northeast, Inc.,
    2022 U.S. App. LEXIS 657 (2d Cir. Jan. 10, 2022)        11

Devany v. UPS,
    2021 U.S. Dist. LEXIS 189367 (S.D.N.Y. Sept. 30, 2021)        12

Dicino v. Aetna U.S. Healthcare,
     2003 U.S. Dist. LEXIS 26487 (D.N.J. June 23, 2003)        12

Fincher v. Depository Trust and Clearing Corp.,
    604 F.3d 712 (2d Cir. 2010)                                        4-5

Gardin v. Delta Air Lines, Inc.,
    2021 U.S. Dist. LEXIS 96865 (E.D.N.Y. Mar. 31, 2021)        21

Grande v. Saint Clare's Health Sys.,
    230 N.J. 1 (2017)                                                      12

Graves v. Finch Pruyn & Co.,
    457 F.3d 181 (2d Cir. 2006)                                        11

Graziadio v. Culinary Inst. of Am.,
    817 F.3d 415 (2d Cir. 2016)                                        17

Greenbaum v. N.Y.C. Transit Auth.,
    2022 U.S. App. LEXIS 22589 (2d Cir. Aug. 15, 2022)    9-10

Hosking v. Meml. Sloan-Kettering Cancer Ctr.,
    186 A.D.3d 58, 126 N.Y.S.3d 98 (1st Dept. 2009)    22

Hunt-Watts v. Nassau Health Care Corp.,
    43 F.Supp.3d 119 (E.D.N.Y. Aug. 21, 2014)    11

Jacobsen v. New York City Health & Hospitals Corp.,
    22 N.Y.3d 824 (2014)    20, 21

Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,
    263 F.3d 208 (2d Cir. 2001)    6-7

Mathewson v. N.Y. State, Office of Mental Health,
    2021 U.S. Dist. LEXIS 209021 (N.D.N.Y. Oct. 29, 2021)    15

McMillan v. City of N.Y.,
    711 F.3d 120 (2d Cir. 2013)    6, 8-9, 11, 13, 16, 22

Melton v. Resorts Intl. Hotel, Inc.,
    2014 U.S. Dist. LEXIS 148803 (D.N.J. Oct. 20, 2014)    9

Mihalik v. Credit Agricole Cheuvreux N.A.,
    715 F.3d 102 (2d Cir. 2013)    19-20

Nixon-Tinkelman v. N.Y.C. Dept. of Health & Mental Hygiene,
    434 Fed. Appx. 17 (2d Cir. 2011)    22

Phillips v. City of N.Y.,
    66 A.D.3d 170 (1st Dept. 2009)    21-22

Photis v. Sears Holding Corp.,
    2013 U.S. Dist. LEXIS 104152 (D.N.J. July 25, 2013)    12

Pryce v. Tata Consultancy Services,
    2022 U.S. Dist. LEXIS 209411 (D.N.J. Nov. 18, 2022)    24

Raspa v. Office of Sheriff of County of Gloucester,
    191 N.J. 323 (2007)    11

Raymond v. 1199SEIU Nat. Benefit Fund,
    2023 U.S. Dist. LEXIS 125619 (S.D.N.Y. July 20, 2023)    7

Romanello v. Intesa Sanpaolo, S.p.A.,
    22 N.Y.3d 881 (2013)          22

Rosenfeld v. Canon Business Solutions, Inc.
    2011 U.S. Dist. LEXIS 115415 (D.N.J. Sept. 26, 2011)     11-12

Schlater v. Arthritis, Rheumatic & Back Disease Assocs., P.A.,
    2020 U.S. Dist. LEXIS 179024 (D.N.J. Sep. 29, 2020)    9

Schwapp v. Town of Avon,
    118 F.3d 106 (2d Cir. 1997)    5

Shannon v. N.Y. City Transit Authority,
    332 F.3d 95 (2d Cir. 2003)    11

Sheng v. M&TBank Corp.,
    848 F.3d 78 (2d Cir. 2017)    15

Sivio v. Vill. Care Max,
    436 F. Supp. 3d 778 (S.D.N.Y. 2020)    16

Sohnen v. Charter Comms., Inc.,
    2022 U.S. Dist. LEXIS 55629 (E.D.N.Y. Mar. 28, 2022)    16

Stewart v. Cty. of Salem,
    274 F. Supp. 3d 254 (D.N.J. 2017)    9

Stone v. City of Mount Vernon,
    118 F.3d 92 (2d Cir. 1997)    8

Tafolla v. Heilig,
    80 F.4th 111 (2d Cir. 2023)    6, 8, 18, 25

Tolbert v. Smith,
    790 F.3d 427 (2d. Cir. 2015)    5

Tourtellotte v. Eli Lilly & Co.,
    636 Fed. Appx. 831 (3d Cir. 2016)    24

Turner v. Delta Airlines, Inc.,
    2023 U.S. Dist. LEXIS 34110 (E.D.N.Y. Mar. 1, 2023)    12

Velez v. Girraphic LLC, 2021 U.S. Dist. LEXIS 88908
    (S.D.N.Y. May 10, 2021)    25

Williams v. New York City Hous. Auth.,
    61 A.D.3d 62 (1st Dept. 2009)                      20

Williams v. N.Y.C. Dept. of Heath & Mental Hygiene,
    299 F.Supp.3d 418 (S.D.N.Y. 2018)       12, 19

**STATUTE**                      **PAGE**

N.Y.C. Administrative Code §8-107(15)(b)        22

N.Y.C. Administrative Code §8-107(7)         24-25

N.Y.C. Administrative Code §8-130(c)         20

Americans with Disabilities Act, 42 U.S.C. §12111(8)      6

Americans with Disabilities Act, 42 U.S.C. §12112(10)(A)    9

New Jersey Law Against Discrimination, N.J. Stat. §10:5-12(a)    23

New Jersey Administrative Code §13:13-2.8(a)(3)      12

## PRELIMINARY STATEMENT

Plaintiff Kathryn Shiber ("Shiber") was terminated just 18 days after she informed Defendant Centerview Partners LLC ("Centerview") about her disability and requested a reasonable accommodation. Specifically, Shiber, who was then a recent college graduate, had just started working in Centerview's prestigious first-year Analyst program when she learned from her colleagues that she was expected to work multiple 24-hour days in a row without sleeping. While Shiber expected to work long and unpredictable hours, Centerview's requirements were far beyond what she reasonably expected, and consecutive sleepless nights would have exacerbated the symptoms of her disability.

Shiber first spoke with Centerview's Human Resources representative Cheryl Robinson ("Robinson") on August 28, 2020, who then brought in Partner Tony Kim ("Kim"). Shiber repeatedly stated that she did not want her disability to impact her opportunities at Centerview. Robinson and Kim assured Shiber that she had "done the right thing" by raising her concerns and decided that Shiber would not work between midnight and 9:00 am, which Centerview called "guardrails." Shiber continued working without incident and received positive feedback.

Shiber was terminated on September 15, 2020, just eighteen days later. During the termination meeting, Centerview's Chief Operating Officer Jeanne Vicari ("Vicari") explicitly referenced Shiber's disability and request for reasonable accommodation. Vicari told Shiber that she "should have known" her disability precluded her from working as an Analyst and that Shiber "made a mistake" and "took a coveted spot" by accepting the role. Shiber immediately retracted the accommodation request, but Vicari told Shiber that her termination was "unequivocal." The law required Centerview to engage in an interactive process to explore a solution that could permit Shiber to continue in her role, but Centerview terminated her without even a conversation about

its concerns. Shiber's termination had life-changing consequences, as her humiliating removal from Centerview's first-year Analyst-class effectively ended her career in investment banking.

This case is replete with questions of fact. For example, a jury could reasonably reject Centerview's claim that Shiber was unable to fulfill the "essential functions" of the Analyst role, or that permitting Shiber to sleep each night for some amount of time would be an "undue burden." The record confirms that Centerview's employees were already permitted to sleep each night and that the need to be on call at *all* hours of the day was, at most, a marginal function.

Revealingly, Centerview does not present any data or job description to support its claim that the ability to work overnight was an essential function of the position. Instead, Centerview relies solely on tropes and stereotypes of "Wall Street," which is insufficient to warrant the relief it seeks. A jury could find that Shiber was fired because Centerview perceived her as broken, not because of the feasibility of any accommodation. That Vicari decided to terminate Shiber *the same day* that she learned about Shiber's history of concussions, without ever speaking to her, further heightens the inference of discrimination.

The impact of Centerview's argument is that, as a matter of law, any individual with a medical condition that requires consistent sleep would be precluded from working at an investment bank or large law firm. Such an argument cannot be accepted as a matter of law, particularly under New York Law. Accordingly, Centerview's motion for summary judgment should be denied.

## STATEMENT OF FACTS

Shiber was accepted into Centerview's prestigious three-year Analyst program and began working on July 6, 2020. (Siber Decl. ¶2). Shiber was selected from tens of thousands of applicants for one of the coveted 30 openings in September 2019. (Siber Decl. ¶3).

Shiber was assigned to a project on August 24, 2020, known as a "live deal." (Siber Decl. ¶¶6-7). Shiber soon learned that, as part of this project, she was expected to work 24 hours a day over multiple days, when she was reprimanded by an Associate for having logged off at 1:00 am after completing her assignments. (Siber Decl. ¶¶9-11, Ex. 3[1]). Shiber was apologetic and said she did not want any question about her commitment to Centerview. (Siber Decl. ¶¶12-13, Ex. 4).

The need to work 24-hours in a row over multiple days without sleep was particularly concerning for Shiber, since she has been diagnosed with and received medical treatment for "Unspecified Anxiety Disorder" and "Unspecified Mood Disorder" and requires consistent sleep to avoid exacerbating the effects of her diagnosis. (Siber Decl. ¶¶15-17).

Shiber reached out to Cheryl Robinson ("Robinson") of Human Resources the same day about her and advised her that, due to her medical disability, she required eight to nine hours of sleep per night, ideally on a somewhat consistent schedule. (Siber Decl. ¶¶18-19, Ex. 5). Robinson told Shiber that she had done the right thing by contacting Human Resources and that she would "see what [she] could do." (Siber Decl. ¶20). Shiber said she did not want her need for an accommodation to impact her opportunities and experiences at the firm. (Siber Decl. ¶20).

Later that day, Shiber spoke with both Robinson and Partner Tony Kim ("Kim"), where Shiber reiterated that she did not want her need for an accommodation to limit her professional career. (Siber Decl. ¶¶19-20). Shiber was advised that Centerview would tell Shiber's co-workers that she had a "hard stop" each night between midnight and 9:00 am, an accommodation Centerview referred to as "guardrails." (Siber Decl. ¶¶21-30). At Centerview's request, Shiber

---

[1] All Exhibits are attached to the Declaration of Plaintiff Kathryn Shiber and all deposition transcripts are attached to the Declaration of Brian Heller, Esq. References to Shiber's Declaration are designated as "Shiber Decl. ¶__" and references to the depositions of witnesses are indicated by the witnesses' name and page number, i.e., "Shiber __."

provided a letter from her college medical provider, Marylee Verdi, FNP-C, PMHNP-BC ("Verdi"), to support the guardrails accommodation that Centerview implemented. (Siber Decl. ¶¶31-34, Ex. 7). Shiber continued to work and received positive feedback. (Siber Decl. ¶¶36-38).

Shiber was terminated on Tuesday, September 15, 2020, in a meeting with Centerview's Chief Operating Officer Jeanne Vicari ("Vicari") and Robinson. (Siber Decl. ¶¶39-42). Vicari told Shiber that her termination was directly related to her disability and accommodation, saying, "Due to these accommodations you cannot perform the essential functions of the job," "You made a mistake in accepting this job knowing you couldn't complete the job" and that Shiber "should have known" she would be unable to do the job. (Siber Decl. ¶¶43; Vicari 112; Robinson 143).

Shiber was shocked. (Siber Decl. ¶44; Vicari 109; Robinson 142-143). No one had spoken with her about any concerns with the guardrails accommodation. (Siber Decl. ¶¶64-66, 71-72). Shiber asked to rescind the accommodation entirely, but Vicari and Robinson rejected any interactive process, telling Shiber, "Your employment at the firm is terminated and that is irrevocable" and, "We can't ignore the evidence you've presented to us that the requirements of this job will have a negative impact on your health." (Siber Decl. ¶¶45-46).

Vicari had made the decision to terminate Shiber on Friday, September 11, 2020, the same day she learned that Shiber had a history of concussions. (Siber Decl. ¶¶50-52; Vicari 77, 83-84).

## LEGAL STANDARD FOR SUMMARY JUDGMENT
## IN EMPLOYMENT DISCRIMINATION CASES

Courts have recognized that "an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000); Fincher v.

Depository Trust and Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) (noting that in discrimination cases, "the defendant will rarely admit to having said or done what is alleged, and third-party witnesses are by no means always available."); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."). Shiber is not required to persuade the Court that she would win at trial. See Tolbert v. Smith, 790 F.3d 427, 434 (2d. Cir. 2015) ("In determining whether summary judgment is appropriate, we must resolve all ambiguities and draw all reasonable inferences against the moving party.").

## ARGUMENT

### POINT I

### CENTERVIEW IS LIABLE FOR DISABILITY DISCRIMINATION UNDER THE ADA & THE NJLAD

Construing the facts in the light most favorable to Shiber, a jury could find that (a) Shiber was qualified to fulfill the essential elements of her role and (b) the accommodation she requested, namely to sleep, would not cause an undue burden on Centerview. The record further confirms that Shiber was really terminated due to Centerview's discriminatory perception of her disability.

**A.    Shiber Was Qualified To Perform The Essential Functions Of Her Position**

Centerview's only argument opposing Shiber's prima facie case is that Shiber's need for sleep made her unqualified to perform the essential functions of being an Analyst. Construing the facts in the light most favorable to Shiber, a jury could find that Shiber's need for sleep did not

impact her ability to perform the *essential* functions of her role, and that such an accommodation was not an undue burden.

    *1.    A Jury Could Find That Shiber Was Able To Fulfill*
        *<u>The Essential Functions Of The Analyst Role</u>*

The determination of a what constitutes an "essential function" requires "a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice," and mandates the Court to "draw all inferences in favor of the non-moving party." <u>Tafolla v. Heilig</u>, 80 F.4th 111, 119 (2d Cir. 2023). The term "essential function" is generally defined as "duties to be performed in the position in question, but not functions that are merely marginal." <u>Id</u>. While some deference is granted to an employer, "[u]ltimately, however, the question whether a task constitutes an essential function depends on the totality of the circumstances." <u>Id</u>. As the Second Circuit noted in <u>McMillan v. City of N.Y.</u>, 711 F.3d 120, 126 (2d Cir. 2013), "A court must avoid deciding cases based on unthinking reliance on intuition about the methods by which jobs are to be performed" and instead "must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice."

Here, a fact-specific inquiry confirms that Centerview cannot identify an *essential* function that Shiber was unable to fulfill because of her need to have a somewhat consistent sleep schedule. Centerview cites the "ability to work unpredictable long hours and be available all hours of the day." (Centerview Brief pg. 11). However, Centerview fails to cite to any job description or policy confirming that working without sleep is an essential requirement. <u>See</u> 42 U.S.C. §12111(8); <u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 222 (2d Cir. 2001) (finding a question of fact as to whether an essential function of plaintiff's job required a driver's license where

"[n]owhere in the three-page job description does it say that managers and assistant managers must possess a valid driver's license."); <u>Raymond v. 1199SEIU Nat. Benefit Fund</u>, 2023 U.S. Dist. LEXIS 125619, at *15 (S.D.N.Y. July 20, 2023) (denying summary judgment where the plaintiff could perform the essential function of "travel" as identified in the job description, even though he could not drive).

Centerview notes that it ███████████████████████████████ ████████████████████████ (Centerview Brief pg. 11, SOF ¶6). However, when Kim interviewed Shiber, he did not speak with her about the hours she would be working, which he would have done if such work was essential. (Shiber 167; Kim 21). The fact that Centerview hired Shiber after such ████████ demonstrates that working days on end without sleep was not essential.

The testimony of Centerview's witnesses confirms that forgoing sleep is not "essential" to the Analyst role. Kim specifically disagreed with the claim that anyone who is incapable of working for 24 hours straight is disqualified from being considered at Centerview. (Kim 96). Kim further stated that 80 hours per week was "a lot of hours," which was far less than the 120 hours per week that Shiber was working with the guardrails. (Kim 34). Robinson confirmed, "All of our analysts sleep. All of our employees sleep." (Robinson 154:18-19).

Centerview argues that Shiber would not be able to sleep while working on "live deals." However, the record shows that most employees do not work on live deals consistently, nor do live deals prevent employees from sleeping. For example, Associate Timothy Ernst ("Ernst") testified that in six years, he had worked on just 15 live deals. (Ernst 41-42). Even when working on live deals or on multiple deals at once, he never went a night without sleep. (Ernst 117). Kim noted that employees working more than 120 hours a week happens "rarely, if ever." (Kim 32).The

fact that Centerview offered to take Shiber off project Dragon and live deals in general shows that Centerview does not believe that working on live deals is an essential function of the Analyst role. See Tafolla, 80 F.4th at 120 (reversing summary judgment on whether "archiving" was an essential duty, when the testimony of defendant's witnesses downplayed that function).

Centerview's reputation for maintaining "work-life balance" further refutes its claim that forgoing sleep is an essential function of the Analyst role. All of Centerview's witnesses testified that the firm encourages a work-life balance, which includes sleep. (Vicari 62, 64; Kim 21-22; Robinson 19-20, 161-162). Centerview's reviews on the website "the Vault," upon which it relies, describe the firm's "[g]reat culture and work/life balance," "flexible hours" and "the best quality of life and respect of people's free time compared to any other bank I have experienced directly or indirectly." (Ex. 10: "On balance of workload/quality of life/compensation and especially business outlook, I do not think there is a better place to work in the Investment banking industry.").

Based on this record, a jury could find that the ability for Analysts to stay awake for days at a time is not an "essential" function, but is at most a "marginal" function. In Stone v. City of Mount Vernon, 118 F.3d 92, 99 (2d Cir. 1997), the Second Circuit denied summary judgment where the plaintiff, an injured firefighter, was no longer able to engage in "fire suppression" duties. The court noted that the plaintiff had requested a desk position and that "it would be entirely permissible for a factfinder to infer that the ability to engage in fire-suppression activities is marginal to the positions" plaintiff sought. Id. at 100; cited by Tafolla, 80 F.4th at 119.

In McMillan v. City of N.Y., 711 F.3d at 122, similarly, the Second Circuit reversed summary judgment where the plaintiff was terminated because his mental disability prevented him from arriving to work on time. The court recognized "the importance of a penetrating factual

analysis" and held that, drawing all inferences in the plaintiff's favor, the court could not find as a matter of law that the plaintiff's request to arrive late was an undue burden. Id. at 126, 129.

Here, as in Stone and McMillan, a "penetrating factual analysis" demonstrates that the ability to work without sleep for days on end is "marginal" to the responsibilities of an Analyst, rather than an essential function. See also Stewart v. Cty. of Salem, 274 F. Supp. 3d 254, 263 (D.N.J. 2017) ("Whether the County was incapable of accommodating Plaintiff's disability of being unable to climb stairs for more than 1/3 of a 12-hour shift is a dispute that a jury must resolve."); Schlater v. Arthritis, Rheumatic & Back Disease Assocs., P.A., 2020 U.S. Dist. LEXIS 179024, at *23 (D.N.J. Sep. 29, 2020) (finding a question of fact as to whether it was an "essential function" for the plaintiff to be present during standard office hours where her job description did not list her essential functions "in ways that would imply they could not be done by an individual working from home at times."); Melton v. Resorts Intl. Hotel, Inc., 2014 U.S. Dist. LEXIS 148803, at *17-18 (D.N.J. Oct. 20, 2014) (denying summary judgment where the plaintiff, a doorman, was terminated because he was unable to work the graveyard shift, finding an issue of fact as to whether "schedule flexibility" was an essential function).

### 2.    Permitting Shiber To Sleep Was Not An Undue Burden For Centerview

It is Centerview's burden to prove that Shiber's requested accommodation of sleeping presents an undue burden. See McMillan, 711 F.3d at 128. An "undue hardship" is "an action requiring significant difficulty or expense." Id. (quoting 42 U.S.C. §12111(10)(A)). An employer must "show special (typically case-specific) circumstances demonstrating undue hardship in the particular circumstances." Greenbaum v. N.Y.C. Transit Auth., 2022 U.S. App. LEXIS 22589, at

*10-11 (2d Cir. Aug. 15, 2022) (holding that plaintiff "has met his modest burden of proposing 'the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'").

Here, Centerview cannot show special circumstances that permitting Shiber to sleep presented an undue burden. It was Centerview who proposed the guardrails accommodation for Shiber, which it would not have done had it been an undue burden. Shiber was not even in favor of the guardrails, since she was concerned that she would be viewed differently by her colleagues. (Shiber Decl. ¶22). Robinson and Kim assured Shiber that the guardrails would not be detrimental to her. (Shiber Decl. ¶¶24-30). Centerview cannot credibly explain why the guardrails were reasonable when first proposed, but were suddenly unreasonable 18 days later.

Additionally, Centerview cannot claim that permitting Shiber to sleep each night was an undue burden since Vicari specifically acknowledged at her deposition, **"Employees sleeping is not an undue burden for Centerview."** (Vicari 89). Sleep is essential for everyone and was only more pressing for Shiber because of her disability.

Furthermore, the work on Dragon was completed successfully notwithstanding the guardrails. Centerview makes much of Ernst's expressed concerns with Shiber's ability to adequately perform her duties with the guardrails in place. (Centerview Brief, pgs. 7-8, 12, 16). However, Kim did not receive any contemporaneous complaints that Shiber's work was deficient in any manner. (Shiber Decl. ¶62; Kim 140). Kim said the meetings the team was working towards went "perfectly" and Ernst, who worked on the deal and assigned Shiber work, testified that the Partners were pleased. (Shiber Decl. ¶¶38, 76). Centerview has not cited one instance of Shiber failing to complete an assignment or provide inadequate work during her brief tenure.

Centerview distorts Shiber's need for sleep as a request for "light duty." Shiber made no such request. She only requested a conversation on how to manage her disability and made it clear that she did not want to limit her opportunities at Centerview. (Shiber Decl. ¶22, 24). Even with the guardrails, she was working 9:00 am to midnight, seven days a week, working 105 hours out of 168-hour week, which cannot reasonably be considered "light duty." Centerview's speculation that others would have to assume Shiber's work does not satisfy its burden to obtain judgment as a matter of law. See McMillan, 711 F.3d at 127 (distinguishing defendant's cases "because the plaintiffs' positions in those cases required their presence during specific hours.").

Centerview does not present one single case where a plaintiff's need for sleep was deemed an undue burden. Instead, Centerview cites cases where the plaintiff's disability prevented them from performing a job that required physical exertion, unlike the Analyst position. See, e.g. Clark v. Coca-Cola Beverages Northeast, Inc., 2022 U.S. App. LEXIS 657, at *7 (2d Cir. Jan. 10, 2022) (plaintiff was unable to work a physically strenuous warehouse position); Raspa v. Office of Sheriff of County of Gloucester, 191 N.J. 323, 338 (2007) (plaintiff with a disability affecting his vision was unable to work around inmates); Shannon v. N.Y. City Transit Authority, 332 F.3d 95, 103 (2d Cir. 2003) (plaintiff's colorblindness precluded him from working as a bus operator); Hunt-Watts v. Nassau Health Care Corp., 43 F.Supp.3d 119, 131 (E.D.N.Y. Aug. 21, 2014) (plaintiff was unable to perform surgeries as contemplated by her job description).

Centerview also cites cases where the plaintiff asked the employer to create an entirely new position, which is not the case here. See Graves v. Finch Pruyn & Co., 457 F.3d 181, 187 (2d Cir. 2006) (employer not required to create a sedentary position after plaintiff was no longer able to work as a laborer at a paper company); Rosenfeld v. Canon Business Solutions, Inc., 2011 U.S.

Dist. LEXIS 115415, at *41-42 (D.N.J. Sept. 26, 2011) (plaintiff not entitled to be moved off of the overnight shift because of his insomnia); Dicino v. Aetna U.S. Healthcare, 2003 U.S. Dist. LEXIS 26487, at *48 (D.N.J. June 23, 2003) (employer was not required to accommodate plaintiff's request to drive no more than 30 when the employer had no closer offices).

Centerview also cites inapplicable cases where the plaintiff asserted a disability as an excuse for misconduct. See Devany v. UPS, 2021 U.S. Dist. LEXIS 189367, at *36-37 (S.D.N.Y. Sept. 30, 2021) (plaintiff fired for violating "last chance" agreement and blamed his alcoholism); Turner v. Delta Airlines, Inc., 2023 U.S. Dist. LEXIS 34110, at *15 (E.D.N.Y. Mar. 1, 2023) (plaintiff terminated for failing to complete paperwork while on a final corrective action notice); Photis v. Sears Holding Corp., 2013 U.S. Dist. LEXIS 104152, at *25 (D.N.J. July 25, 2013) (plaintiff fired for making false statements during an investigation).

Centerview also relies on cases where the requested accommodation was plainly unreasonable. See Williams v. N.Y.C. Dept. of Heath & Mental Hygiene, 299 F.Supp.3d 418, 426 (S.D.N.Y. 2018) (plaintiff demanded a transfer in response to allegations of discrimination against her); Boyce v. Lucent Techs., 2007 N.J. Super. Unpub. LEXIS 1680, at *17 (Super. Ct. App. Div. May 16, 2007) (plaintiff's request for a promotion as an "accommodation" was not reasonable).

3.    *Centerview's Assumptions Cannot Be*
      *The Basis For Summary Judgment*

Under the NJLAD, Centerview must "produce evidence that its decision was based on 'an objective standard supported by factual evidence' and not on general assumptions about the employee's disability." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 27 (2017) (quoting N.J. Admin. Code §13:13-2.8(a)(3)).

Here, Centerview does not provide any support for its claim that Shiber was unable to meet an essential function. Centerview does not provide any analysis of hours that its Analysts actually work, nor does it provide any substantive testimony about the hours that other entry-level employees work at comparable firms. Instead, Centerview relies on tall tales and tropes about employees on "Wall Street" working without sleep. Centerview's brief is replete with assumptions about what is "widely known and understood both within and outside the investment banking industry" and vague claims about "the experience of junior investment bankers across Wall Street." (Centerview Brief pgs. 1, 12). Centerview's stereotypes and generalities do not meet its burden to show "an objective standard."

Centerview's assumptions are similarly unavailing under the ADA and New York Law. In McMillan, the Second Circuit reversed summary judgment where the lower court "appears to have relied heavily on its assumption" that the plaintiff's on-time arrival was an essential function. 711 F.3d at 126. The court noted "several relevant factors" that created a question of fact about the employer's representation and concluded that "whether [plaintiff's] late and varied arrival times substantially interfered with his ability to fulfill his responsibilities is a subject of reasonable dispute." Id. Here, as in McMillan, Centerview's reliance on assumptions, rather than a fact-specific inquiry, do not support judgment as a matter of law.

**B.    Shiber Was Wrongfully Terminated Because Of Her Disability**

Vicari, who Centerview identifies as the sole decisionmaker for Shiber's termination, held a discriminatory animus towards Shiber because of her disability. Vicari's malice was on full display when terminating Shiber on September 15, 2020, when she said to Shiber:

13

- **"Due to these accommodations you cannot perform the essential functions of the job."** (Vicari 112; Robinson 143).

- **"You made a mistake in accepting this job knowing you couldn't complete the job."** (Vicari 112; Robinson 143)

- Shiber **"should have known"** she would be unable to do the job. (Vicari 113; Robinson 143-144, 145-146).

- **"You took a coveted spot in a program where you agreed to fulfill the requirements for three years and given this accommodation you can't fulfill them."** (Vicari 117-118; Robinson 144-145).

Shiber told Vicari and Robinson that she wanted to rescind the accommodation and would work whatever hours were needed. (Shiber Decl. ¶¶45-46; Vicari 110-111; Robinson 142, 166). Vicari rejected any discussion saying, **"We can't ignore the evidence you've presented to us that the requirements of this job will have a negative impact on your health."** (Shiber Decl. ¶46; Vicari 110-111, 120; Robinson 151-152, 165:19-166:2). This undisputed evidence permits a jury to find that it was Vicari's *perception* of Shiber's disability that caused her termination, not the burden caused by the accommodation.

The inference of discrimination is heighted by the fact that *Vicari made the decision to terminate Shiber the very same day she learned that Shiber had a history of concussions*. On Friday, September 11, 2020, Vicari and other senior employees emailed about a website that Shiber had created in high school where she wrote about the concussions she had experienced and how she was recognizable by the black helmet she wore while sailing. (Ex. 8; Shiber 29-30, 34, 214; Vicari 76-77; Robinson 129). Both Vicari and Robinson recognized that Shiber's prior concussions might be the cause of her need to have a consistent sleep schedule. (Vicari 77; Robinson 131).

14

Vicari admits that she made the decision to terminate Shiber the very same day she connected Shiber's concussions to her need for consistent sleep. (Vicari 83:18-84:2). A jury could find that once Vicari learned Shiber had a history of concussions, she perceived her as disabled, broken and not fit to work at Centerview.

Centerview's failure to engage in an interactive process with Shiber is proof of its discriminatory intent. In <u>Sheng v. M&TBank Corp.</u>, 848 F.3d 78, 87 (2d Cir. 2017), the Second Circuit held that "an employer's failure to engage in a good faith interactive process can be introduced as evidence tending to show disability discrimination and that the employer has refused to make a reasonable accommodation." <u>See also</u> <u>Cayetano v. Fed. Express Corp.</u>, 2022 U.S. Dist. LEXIS 119102, at *19 (S.D.N.Y. July 6, 2022) (noting that a failure to engage in an interactive proves "further supports an inference of discrimination."); <u>Mathewson v. N.Y. State, Office of Mental Health</u>, 2021 U.S. Dist. LEXIS 209021, at *7 (N.D.N.Y. Oct. 29, 2021) ("If a plaintiff alleges that his employer failed to make an accommodation and failed to engage in a sufficient interactive process, the plaintiff has adequately pled out his claim of disability discrimination.").

In this case, Centerview did not engage in any interactive process with Shiber about its supposed concern that the guardrails accommodation would not work long term. (Robinson 111-112, 114). The only conversations anyone from Centerview had with Shiber was when (a) she was told the guardrails would be implemented on August 28 and (b) she was terminated on September 15. (Shiber Decl. ¶64). There was nothing "interactive" about that process.

Centerview's paternalistic claim that Shiber would suffer "consequences" if she continued working at Centerview, or that she would not have "the same experience" as other Analysts (Centerview Brief pg. 14-15), does not relieve it of the need to engage in an interactive process.

15

Centerview's belief that Shiber would be better off working somewhere else because of her disability is not compassionate, but rather is the exact type of discrimination that the human rights laws are designed to prevent. See Church v. Sears Holding Corp., 605 Fed. Appx. 119, 121-122 (3d Cir. 2015) (denying summary judgment where the plaintiff's new supervisor terminated her because "we didn't want [the plaintiff] to hurt herself or the company to at be fault" for an injury).

**C.    Centerview Cannot Set Forth A<br>Legitimate Reason For Terminating Shiber**

Given that Centerview acknowledges that it terminated Shiber because of her disability and need for accommodation, there is no need to analyze whether Centerview's reasons are a pretext. As the Second Circuit recognized in McMillan, "When the parties agree that the employer complains of conduct that is the direct result of the employee's disability…, there is no need to evaluate whether the employer's adverse employment action made in response to that conduct is pretextual." 711 F.3d at 129; Sivio v. Vill. Care Max, 436 F. Supp. 3d 778, 798 (S.D.N.Y. 2020) (finding that defendant failed to establish a non-discriminatory reason where the plaintiff was told "she was being terminated because her disability prevented her from performing the essential functions of her job."); Sohnen v. Charter Comms., Inc., 2022 U.S. Dist. LEXIS 55629, at *24 (E.D.N.Y. Mar. 28, 2022) (holding that where the plaintiff was fired because the defendant claimed he was unable to perform essential functions, "summary judgment can be, and is, denied without deciding whether a reasonable jury could find pretext existed for Plaintiff's termination.").

Nevertheless, Centerview cannot provide a legitimate explanation for why it terminated Shiber. Centerview does not identify an event that required Shiber's termination. In fact, Vicari could not identify what caused her to decide to terminate Shiber on Friday, September 11, 2020,

which was the same day she learned that Shiber had a history of concussions. (Vicari 87). Vicari did not speak with Ernst or Gallea or see their emails about Shiber. (Vicari 52-53). Nor did Vicari consult with Kim, who developed the guardrails accommodation for Shiber, about the decision to terminate Shiber. (Vicari 81, 104). Vicari did not compare the hours that Shiber worked in the short time between her request for an accommodation and her termination, nor did Vicari compare Shiber's with those of other first-year Analysts. (Vicari 69, 73; Robinson 104).

Vicari acknowledged that terminating Shiber soon after her requested accommodation might create the appearance of discrimination. (Vicari 86). A jury could come to a similar conclusion. See Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 431 (2d Cir. 2016) ("The weakness of the evidence supporting the defendant's explanation, considered in conjunction with the very close temporal proximity between Graziadio's leave and her termination, would then permit the conclusion that defendants' decision to fire" the plaintiff was her request for leave).

Centerview exaggerates that Shiber's sleep caused "severe inefficiencies." (Centerview Brief pg. 16). Shiber had only been employed for a few weeks and was mostly re-formatting PowerPoint slides. (Shiber Decl. ¶62; Vicari 104-105). While Centerview brought on another individual to work on the Dragon deal, that individual was a second-year Analyst with more experience, and Ernst did not feel that this addition changed how the work was completed. (Shiber Decl. ¶76; Ernst 105). While Centerview claims that the addition of this Analyst to the deal team is evidence of "severe inefficiencies" with the guardrails approach, it offers no proof that such addition had any negative impact on its work or anything else. (Centerview Brief pg. 17).

Ernst and Gallea's complaints about Shiber's work were also exaggerated, as she only worked with them for a handful of days. Their expectation that a first-year Analyst do the grunt

work overnight should not have controlled how Centerview responded to Shiber's request for an accommodation. In any event, Vicari did not speak to either of them or see their emails about Shiber (Vicari 52-53), so her decision to terminate could not have been based on their input.

Centerview goes so far as to blame Shiber for her own termination, twisting her statement that she did not want to be treated differently as a directive that she not be removed from "live deals." This is a disputed fact, as Centerview only asked Shiber if she wanted to be removed from Dragon, not whether she wanted to stop working on live deals altogether. (Shiber Decl. ¶79).

Centerview makes the straw man argument that it had no choice but to terminate Shiber because she did not want her co-workers to learn about her disability. This is not true, as Shiber understood that her co-workers would have to be told that she required an accommodation. (Shiber Decl. ¶78; Vicari 39). Kim acknowledged that even if Centerview had told Shiber's co-workers that she had a medical issue, that would not have resolved the problem. (Kim 119).

The letter from Shiber's college medical provider, Marylee Verdi, FNP-C, PMHNP-BC ("Verdi"), stating that Shiber needed to sleep each night, did not compel Shiber's termination. The purpose of the letter was to justify the guardrails accommodation that Centerview had already implemented and had no impact on the guardrails accommodation that had already been put in place. (Shiber Decl. ¶34; Robinson 72, 88, 93). No one from Centerview ever asked to speak with Shiber or with Verdi about her letter. (Robinson 93). See Tafolla, 80 F.4th 111, 123 (2d Cir. 2023), (vacating summary judgment where the employer did not "seek clarification from [plaintiff] or her doctor regarding the nature of the accommodation she requested.").

Furthermore, Centerview was aware that Shiber could have more flexibility than Verdi proposed. Kim recalled Shiber saying that she did not need to have consistent sleep every night,

18

just that she needed it frequently. (Kim 88). Verdi, at her deposition, confirmed that there was flexibility in Shiber's sleep schedule, noting a "consistent routine" of sleep was important, though "it may not necessarily be hours of sleep…" (Verdi 30). Centerview's refusal to explore options, but rather to use Verid's letter to bolster the discriminatory result it desired, is proof of its animus.

This case is like <u>Capobianco v. City of New York</u>, 422 F.3d 47, 60 (2d Cir. 2005), where the plaintiff, a sanitation worker, was unable to work at night due to night blindness, but the sanitation department made the decision that the plaintiff was not able to work at *any* time and fired him. The Second Circuit reversed summary judgment, citing the defendant's refusal to "consider[] whether Capobianco's condition could be accommodated." <u>Id</u>. at 61. In this case, as in <u>Capobianco</u>, Shiber's refusal to consider accommodating Shiber precludes summary judgment.

Centerview claims that it "routinely" provides reasonable accommodations. However, the requests for "accommodation" that Centerview received, of which there were only a few (Robinson 15), dealt either with employees taking time off or requiring special equipment, not sleep. (Vicari 23-24, 30-31; Kim 128-129; Robinson 16-17). A jury could find that Centerview felt it was easier to simply terminate Shiber rather than engage with her.

**POINT II**

**SUMMARY JUDGMENT IS NOT APPROPRIATE
UNDER THE BROADER NEW YORK LAW**

Shiber's claims under New York Law must receive special consideration, separate from her claims under federal and New Jersey law. <u>See</u> <u>Williams</u>, 61 F.4th at 69-70 (noting, "we must analyze the federal-and state-law claims separately from the city-law claims") (citing <u>Mihalik v. Credit Agricole Cheuvreux N.A.</u>, 715 F.3d 102, 109 (2d Cir. 2013) (directing courts to "analyze

NYCHRL claims separately and independently from any federal and state law claims."). The text of the City Law mandates that it be construed "in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Albunio v. City of New York, 16 N.Y.3d 472, 477-78 (2011) (cited by Administrative Code §8-130(c)). Shiber must only show that she was treated "less well," at least in part, because of her disability. See Williams v. New York City Hous. Auth., 61 A.D.3d 62, 78 (1st Dept. 2009).

### A.    Centerview's Failure To Engage In An Interactive Process Precludes Summary Judgment

Centerview's refusal to engage in an interactive process renders summary judgment unavailable under New York Law. In Jacobsen v. New York City Health & Hospitals Corp., 22 N.Y.3d 824, 842 (2014), the Court of Appeals vacated summary judgment where the defendant terminated the plaintiff because his respiratory disability prevented him from visiting construction sites. The Court noted that the majority of the plaintiff's role did not require him to go to construction sites and that the defendant denied his request for a respirator "without considering it." Id. The Court emphasized the need for an interactive process on a fundamental level, holding:

> In light of the importance of the employer's consideration of the employee's proposed accommodation, the employer normally cannot obtain summary judgment on a State HRL claim unless the record demonstrates that there is no triable issue of fact as to whether the employer duly considered the requested accommodation. And, the employer cannot present such a record if the employer has not engaged in interactions with the employee revealing at least some deliberation upon the viability of the employee's request. **Consequently, to prevail on a summary judgment motion with respect to a State HRL claim, the employer must show that it engaged in a good faith interactive process that assessed the needs of the disabled individual and the reasonableness of the accommodation requested.** (Emphasis added).

The Court noted that, "in all but the most extreme cases, the lack of a good faith interactive process forecloses summary judgment in favor of the employer…" <u>Id</u>. at 838; <u>see also</u> <u>Phillips v. City of N.Y.</u>, 66 A.D.3d 170, 176 (1st Dept. 2009) (recognizing that under the State Law, "summary judgment is not available where there is a genuine dispute as to whether the employer has engaged in a good faith interactive process.").

The <u>Jacobsen</u> Court noted an even stricter analysis under the City Law, holding that "the City HRL unquestionably forecloses summary judgment where the employer has not engaged in a good faith interactive process regarding a specifically requested accommodation." 22 N.Y.3d at 837-38; <u>Gardin v. Delta Air Lines, Inc.</u>, 2021 U.S. Dist. LEXIS 96865, at *78 (E.D.N.Y. Mar. 31, 2021) (denying summary judgment on a City Law failure to accommodate claim because of defendant "declining to engage Plaintiff in an interactive process when faced with Plaintiff's informal request for accommodation").

The facts of this case highlight why an interactive process is necessary. From the first time that Shiber addressed her disability, her primary concern was about not being treated differently at work. (Shiber Decl. ¶¶19, 22, 24). The responses that Shiber received from Human Resources and Kim were supportive, telling her she "did the right thing" in coming forward. (Shiber Decl. ¶¶20-21, 25). Centerview's subsequent refusal to discuss its concerns with Shiber led to the exact result she feared – being fired because of her disability. (Shiber Decl. ¶44). Centerview's failure to engage interactively with Shiber precludes summary judgment under <u>Jacobsen</u>.

**B.    <u>Centerview Cannot Satisfy The City Law's Affirmative Defense</u>**

Under the City Law, Centerview has the burden of meeting the affirmative defense, that Shiber "could not, with reasonable accommodation, satisfy the essential requisites of the job."

Hosking v. Meml. Sloan-Kettering Cancer Ctr., 186 A.D.3d 58, 126 N.Y.S.3d 98, 102 (1st Dept. 2009) (citing Administrative Code §8-107(15)(b)); Romanello v. Intesa Sanpaolo, S.p.A., 22 N.Y.3d 881, 885 (2013) ("Contrary to the State HRL, it is the employer's burden to prove undue hardship" under the City Law); Phillips, 66 A.D.3d at 182-83 ("The City Council dealt explicitly with the question of whether an employee, with reasonable accommodation, would be able to perform the essential requisites of the job by placing the burden of proof not on the plaintiff, but squarely on the defendant."). As set forth in Point I, Centerview cannot meet this burden.

**POINT III**

**CENTERVIEW IS LIABLE FOR FAILING TO ACCOMMODATE
SHIBER'S DISABILITY UNDER THE ADA, NEW YORK LAW & NJLAD**

A jury could reasonably find Centerview liable for failing to accommodate Shiber's disability. This claim is distinct from her discrimination claim and must be viewed separately. See McMillan, 711 F.3d at 125 ("An employer may also violate the ADA by failing to provide a reasonable accommodation."); Nixon-Tinkelman v. N.Y.C. Dept. of Health & Mental Hygiene, 434 Fed. Appx. 17, at *18-19 (2d Cir. 2011) ("A plaintiff can base a discrimination claim on an employer's failure to make a reasonable accommodation.").

Under the New York City Human Rights Law, "there is no accommodation (whether it be indefinite leave time or any other need created by a disability) that is categorically excluded from the universe of reasonable accommodation." Phillips., 66 A.D.3d at 182; see also Hosking, 126 N.Y.S.3d at 103 (noting that the City Council amended the City Law in 2018 to codify Phillips). Centerview's only argument on this claim is that Shiber could not have fulfilled the essential

22

functions of her job because of her disability. As set forth above, a jury could find that Shiber was capable of performing the essential duties of an Analyst.

## POINT IV

### CENTERVIEW IS LIABLE UNDER THE NJLAD FOR FAILING TO ENGAGE IN THE INTERACTIVE PROCESS[2]

To establish a claim for failure to engage in the interactive process under NJLAD §10:5-12(a), Shiber must show: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Schlater, 2020 U.S. Dist. LEXIS 179024, at *26.

Shiber meets these elements. Centerview glosses over the "interactive" part of the process by noting that "[s]ome combination" of individuals discussed how to handle Shiber's request." (Centerview Brief pg. 22). However, the only time that anyone at Centerview discussed the accommodation with Shiber was when the guardrails were implemented on August 28 and when she was terminated on September 15. (Shiber Decl. ¶64). Vicari acknowledged that there was no interactive process regarding Shiber's termination. (Vicari 91).

Centerview argues that "Shiber never offered Centerview alternative solutions" (Centerview Brief pg. 2), but omits that Centerview never asked Shiber for alternatives to the guardrails. In fact, Shiber was initially not in favor of the guardrails and offered that she sleep a set number of hours prior to the start of the next day's morning meeting, but Robinson rejected

---

[2] Centerview does not seek summary judgment on Shiber's claim under §8-107(28) of the New York City Human Rights Law for failure to engage in the cooperative dialogue.

23

that suggestion. (Shiber Decl. ¶66). Furthermore, Centerview never told her that the guardrails created any concerns. (Shiber Decl. ¶¶64-65). Shiber believed that everything was going smoothly right up until the moment she was terminated. (Shiber Decl. ¶44). Centerview cannot blame Shiber for not offering solutions when no one told her there was a problem.

There were alternatives that could have permitted Shiber to continue working without the guardrails. For example, Centerview could have assigned her to deals that did not require her to stay awake for multiple nights in a row. (Shiber Decl. ¶71). Centerview could have offered her a temporary leave to explore how she could balance her work with her need for sleep. (Shiber Decl. ¶72). Significantly, Centerview could have permitted Shiber to work without any accommodation whatsoever, as Shiber requested, to explore what the realities of working without the guardrails would actually look like. (Shiber Decl. ¶45). Centerview foreclosed those possibilities by summarily terminating Shiber, based on a discriminatory assumption about her capabilities.

This case is not like <u>Tourtellotte v. Eli Lilly & Co.</u>, 636 Fed. Appx. 831, at *45 (3d Cir. 2016), which Centerview cites, where the plaintiff's "outright refusal to engage in the interactive process at all" precluded her claim. Centerview unsuitably relies on <u>Pryce v. Tata Consultancy Services</u>, 2022 U.S. Dist. LEXIS 209411, at *19 (D.N.J. Nov. 18, 2022), where it was undisputed "that Defendant granted Plaintiff's exact accommodation request" to work remotely.

## POINT V

### SHIBER ESTALBISHES HER CLAIM FOR RETALIATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

Section §8-107(7) of the City Law makes it unlawful "to retaliate or discriminate in any manner against any person because such person has … requested a reasonable accommodation

24

under this chapter…" See, e.g. Velez v. Girraphic LLC, 2021 U.S. Dist. LEXIS 88908, at *18 (S.D.N.Y. May 10, 2021); ("The NYCHRL further provides that failing to provide a reasonable accommodation for a person with a disability and retaliating against a person for requesting a reasonable accommodation are discriminatory practices.").

Here, there can be no dispute that Shiber's was fired because of her request for accommodation, since that was what Vicari told her. The hostility that Vicari showed to Shiber while firing her demonstrates the retaliatory animus, including Vicari saying that Shiber "should have known" she would be unable to do the job and that she "made a mistake in accepting this job." (Vicari 112-113; Robinson 143-144, 145-146). See Tafolla, 80 F.4th at 126 ("The close temporal proximity between Tafolla's requests for the accommodation and the instruction that she would need to go on medical leave is sufficient to support on inference of retaliation.").

## **CONCLUSION**

For the foregoing reasons, Shiber respectfully requests that Centerview's motion for summary judgment be denied, and for such further relief as this Court deems just and proper.

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*

By:_____
    BRIAN HELLER
    3 Park Avenue, Suite 2700
    New York, NY 10016
    (212) 889-6565
    bheller@sphlegal.com

**CLAYMAN ROSENBERG KIRSHNER & LINDER LLP**
*Attorneys for Plaintiff*

By:_____
    JAMES F. VALENTINO
    305 Madison Avenue, Suite 650
    New York, NY 10165
    (212) 922-1080
    valentino@clayro.com

25