UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHRYN SHIBER,

                             Plaintiff,

          – *against* –

CENTERVIEW PARTNERS LLC,

                          Defendant.

**<u>OPINION & ORDER</u>**

21-cv-3649 (ER)

<u>Ramos, D.J.</u>:

      Kathryn Shiber brought this action against her former employer, Centerview Partners LLC, asserting claims of disability discrimination, failure to accommodate and engage in an interactive dialogue, and retaliation pursuant to the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and the New Jersey Law Against Discrimination ("NJLAD"). Doc. 110. Before the Court is Centerview's partial motion for summary judgment. Doc. 115. For the reasons set forth, the motion is DENIED.

## I.    BACKGROUND

### A.  Factual Background[1]

      After graduating from Dartmouth College with a degree in quantitative social science and studio art, Shiber started working at Centerview as analyst on July 6, 2020. Doc. 110 (Third Amended Complaint) ¶¶ 7–8. Approximately ten weeks later, on September 15, 2020, she was terminated. Doc. 126 ¶ 61.

     *1.  Analysts at Centerview & Wall Street*

      Centerview is an investment banking advisory firm that advises companies on corporate transactions such as mergers and acquisitions. *Id.* ¶ 1.

---

[1] The following facts are drawn from the parties' Rule 56.1 statements, Docs. 116, 126, supporting exhibits, and pleadings, and are undisputed unless otherwise noted.

Centerview has a prestigious three-year analyst program (the "Program"), wherein analysts, who are primarily recent college graduates, are trained in investment banking and general business transactions.  Doc. 126 ¶ 2; *see* Doc. 125-4 (transcript of the deposition of Tony Kim[2]) at 4–5.  Due to the nature of the analyst position, Centerview alleges that work hours are "very unpredictable" and expects its analysts to be available at all hours, sometimes "working 24 hours a day."  Doc. 125-4 at 24–25, 30; *see also* Doc. 125-5 (transcript of the deposition of Timothy Ernst[3]) at 12–14, 28.  Centerview alleges that it is common in the investment banking industry to require analysts to carry a heavy workload and work long and unpredictable hours.  *See* Doc. 125-4 at 25 (Kim:  "Q. The ability to work 24 hours in a row, is that based upon Centerview's culture, or do you think that is across Wall street?  A.  That is across Wall Street"); *see also* Doc. 118-11 at 2–3, 10, 21 (Centerview reviews on Vault.com[4] referencing the similarity of the long hours worked at Centerview to those of the financial industry generally; illustrative reviews include:  "You will face the *typical investment banking hours here as well*"; "[s]ometimes all the work piles up at once, and those days are less fun…"; "*[l]ike any investment bank*, no way to anticipate the hours/when tasks will come up"; "[u]npredictability, but I think that's pretty universal across firms") (emphases added).[5]

Kim testified that Centerview is part of an industry where employees work "a lot of hours," which he defined as "80 hours or more per week."  Doc. 125-4 at 10.  Kim

---

[2] Tony Kim is a senior partner at Centerview.  Doc. 126 ¶ 35.

[3] Timothy Ernst is an associate at Centerview.  Doc. 126 ¶ 14.

[4] Of the 81 reviews provided on Vault.com, 33 reviews include a comment regarding the long, unpredictable hours.  *See* Doc. 118-11.

[5] Shiber notes that the Vault.com entries also include reviews noting Centerview's work-life balance and flexible hours.  *See* Doc. 118-11 at 3, 7, 13.  The Court notes that 3 of the 81 reviews positively reference Centerview's work-life balance.  *Id.*  For example, one review wrote that an "upper" for working at Centerview was "work-life balance" and that:  "You will … have a life outside the office."  *Id.* at 7.

further testified that Centerview employees "rarely, if ever" work more than 120 hours. *Id.* at 9.

### 2. *Shiber's Medical Condition*

In high school, Shiber was diagnosed with post-concussive syndrome from multiple concussions she suffered. Doc. 124 (Shiber's declaration) ¶ 16. In October 2018, while still in college, she was diagnosed with "Unspecified Mood Disorder" and "Unspecified Anxiety Disorder." Doc. 118-6 (October 30, 2018 evaluation note by Dr. Da-Shih Hu, Staff Psychiatrist, Dartmouth Health Services) at 2.

### 3. *Interview Process*

Shiber interviewed for an analyst position in the Program during her senior year of college in September 2019. Doc. 118-2; *see* Doc. 110 ¶ 9. As part of that process, she had at least three separate rounds of interviews. Doc. 126 ¶ 9.

Centerview alleges that the interview process ██████████████████████ ██████████████████████████████████████████ ████████████████████████ Doc. 125-4 at 6. ██████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████ *Id.* at 7. However, there is nothing in the record before the Court concerning the information provided to Shiber ████████████████████████ about the hours analysts would be expected to work. Shiber, in response, alleges that no one discussed with her the exact hours she would be expected to work during the interview process. *See* Doc. 124 ¶ 85; Doc. 118-20 at 3.

On September 20, 2019, Centerview extended Shiber an offer to join the Program, which she accepted. Doc. 124 ¶ 4; *see* Doc. 126 ¶ 10.

### 4. *Shiber's Tenure at Centerview*

Shiber started working at Centerview on July 6, 2020. Doc. 126 ¶ 11. Like all other Centerview employees, Shiber worked remotely due to the COVID-19 pandemic.

Doc. 110 ¶¶ 13–16; *see also* Doc. 124 ¶ 5.  During her first three weeks, she participated in group training sessions and was not assigned to any client matters.  Doc. 126 ¶ 12.

Shiber was assigned to her first live deal[6], Project Dragon, on Monday, August 24, 2020, which involved a potential merger for a large, new client.  *Id.* ¶ 13.  When Shiber joined Project Dragon, the team included Tony Kim, a senior partner, Matthew Baron, a principal, Timothy Ernst, an associate, and Matthew Gallea, a third-year analyst.  *Id.* ¶¶ 14, 35.

During her first week on Project Dragon, Shiber worked until about 2:00 a.m. for two or three days in a row and then worked until about 1:00 a.m. on another night.  Doc. 124 ¶¶ 9–10.

On August 28, 2020, the Friday of her first week on Project Dragon, Shiber logged off at approximately 1:00 a.m. without communicating to the rest of the team that she would be doing so.  *Id.* ¶¶ 10–12.  Shiber logged off because she had completed her assignments and not been assigned any additional work.  *Id.*

Later that morning, at 10:08 a.m., Ernst emailed Shiber, cc'ing Gallea:

> We should [] talk today generally about expectations on communication and expectations for a live project like this. [Gallea][7] and I shouldn't be up alone working, we are a team and will need everyone on the same page and pulling their weight. Things may come up and you aren't able to get to/finish stuff, but I need to know that and can help out.  It's not helpful to think you are working on stuff and then realize it's not done.  Let's plan to talk in the afternoon to make sure we're aligned.

Doc. 118-1 at 2–3.[8]

Shiber responded 23 minutes later, at 10:31 a.m.:

---

[6] "A live deal is one where Centerview is engaged on behalf of a company that is actively pursuing a sale or other transaction."  Doc. 126 ¶ 13.

[7] Ernst refers to "Matt," but there are two Matts in the Project Dragon team:  Matthew Gallea and Matthew Baron.  Doc. 126 ¶ 14.  The Court assumes that Ernst is referring to Gallea because he is cc'ed in this email. Doc. 118-1.

[8] At her deposition, Shiber testified that after she received this email, she started crying and having a panic attack.  Doc. 125-1 at 53.

> I'm really sorry about that. This is why I asked to talk earlier in the day about the plan for the day and the big picture of what is going on. I thought I had finished completing the comments and my tasks for the night were done. I really don't want to let the team down. As far as I could tell yesterday we weren't sent a significant amount of tasks adding to this presentation, so there were several times throughout the day yesterday when I would have been able to do more work on it if had known about it earlier. I would really appreciate if we could strategize how we/I can be more efficient earlier in the day.

*Id.* at 2.

> Ernst responded 8 minutes later, at 10:39 a.m.:

> Sure, and I know you are just starting so it'll be helpful to talk. One part of this job (and the worst part of this job) is many times you can't "get ahead" of things or work through things early because there will always be more for you to do. Late nights are just part of the job, especially on a live deal like this. In general when you are finished, let me or [Gallea] know and we will take a look because we will definitely have comments (just part of being a first year) and then those need to be finished before signing off. When I was first starting and wasn't sure if I was done or not, I would always email/jabber my associate/analyst to make sure there was nothing else for me to be doing or if I was done for the night. I think you'll get the hang of it, but in general the finish line is always going to be moving so we can't just wake up with a clear task of 3 things we need to do, it'll change hour by hour. Trust me, we don't want to be working late either and if we don't need to be we won't but there will be many late nights on this.

*Id.*

That morning, at 10:33 a.m., after she responded to Ernst's first email, Shiber emailed Cheryl Robinson, the director of human resources, requesting to speak with her. Doc. 118-23. Shiber wrote:

> I am very concerned with learning how to communicate with my team and manage expectations. I may need accommodations and do not feel comfortable advocating for myself so I would really appreciate your help on this.

*Id.* at 2; Doc. 126 ¶ 25.

In response to that email, Shiber, Robinson, and other Centerview administrators, as discussed below, had a series of meetings throughout that day to address Shiber's

concerns.  During that first meeting, Shiber told Robinson that she has a medical condition for which she needed an accommodation because she required eight-to-nine hours of sleep per night on a consistent basis.  *See* Doc. 125-3 (transcript of the deposition of Robinson) at 10–11, 30.

Robinson told Shiber that she did the right thing by contacting Robinson and that she did not need to disclose the specifics of her medical condition to her.  *See id.* at 10 (Robinson:  "I wasn't concerned with the diagnosis … If her medical doctor is … writing a letter stating what the needed accommodation is, for me that is information I needed.").  Robinson also told Shiber that her health was the firm's top priority.  Doc. 126 ¶ 28.  The two then discussed whether Shiber would be able to catch up on sleep the coming weekend.  *See* Doc. 125-3 at 10; Doc. 125-1 (transcript of the deposition of Shiber) at 75.  Robinson recalls that Shiber said that she thought the weekend "was going to be okay in regard[s] to being able to get the time off that she needed for her sleep."  Doc. 125-3 at 10.  Shiber recalls that Robinson told her that Centerview had "put something in place for over that weekend" so that she could get the sleep she needed.  Doc. 125-1 at 75.

In accordance with Centerview's standard procedure, Robinson then asked Shiber to provide a note from her medical provider explaining what she needed by way of an accommodation.  Doc. 125-3 at 24; *see* Doc. 125-2 (transcript of the deposition of Jeanne Vicari) at 6–7, 9.

Later on August 28, Robinson contacted Vicari, Centerview's chief operating officer, regarding Shiber's request.  Doc. 126 ¶ 33; *see* Doc. 125-2 at 5–6; *see also* Doc. 125-3 at 22–23.  While on the call, Vicari told Robinson that Shiber was currently staffed on Project Dragon and explained that it was a "very active" live deal.  Doc. 125-2 at 6.

Robinson and Vicari decided to speak with Kim, who was a senior partner on Project Dragon, that day to ensure that Shiber would be able to a get a sufficient amount of sleep over the upcoming weekend.  Doc. 126 ¶ 35.

Later that same day, on August 28, Robinson proposed a "guardrails accommodation" (the "accommodation") to Shiber.  *Id.* ¶ 37.  The accommodation would allow Shiber to not work between midnight and 9:00 a.m. each day.  *Id.*

Shiber responded that she was concerned that the accommodation would need to be communicated to her team because she believed "that every team member … would know that there was something different about [her]" and "would treat [her] differently or look down upon [her]."  Doc. 125-1 at 63.  Robinson explained that in order for the accommodation to be followed, the Project Dragon team would need to be made aware of it.  Doc. 118-20 at 5.

Later that same day, after proposing the accommodation, Robinson, Kim, and Shiber spoke on the phone.  Doc. 126 ¶ 39.

The parties dispute what was specifically discussed in this call.  Centerview alleges they discussed the different alternatives that could work for Shiber.  *See* Doc. 125-4 at 23.  In addition, they discussed the possibility of removing Shiber from Project Dragon, but Shiber said that she did not want to be removed.  *See* Doc. 125-1 at 75 (Shiber:  "A.  I recall that [Kim] stated that he could take me off of the deal that I was currently working on.  Q.  And what was your response to … that?  A.  That I did not want [Kim] to do that.").  Shiber, however, alleges that while Kim and Robinson made it clear that Centerview was willing and able to provide the accommodation, they did not ask Shiber to provide an alternative accommodation.  Doc. 124 ¶¶ 26, 28.

Shiber reiterated that she did not want anyone to know about the accommodation.  Doc. 126 ¶ 42.  In response, Kim explained to Shiber that it would be difficult to manage a team without communicating any information about her offline hours.  *Id.*  Centerview alleges that Shiber understood that to put in place the accommodation and "have [her] team respect those boundaries, [] the team would need to be made aware of them."  Doc. 125-1 at 78.

After his phone call with Shiber and Robinson, Kim told the Project Dragon team that Shiber would be offline from midnight to 9:00 a.m. each day.  Doc. 126 ¶ 43.  Kim did not tell the team why Shiber would be offline during that period.  *Id.*  The accommodation was instituted immediately.  *Id.* ¶ 44.

The parties dispute whether at the time the accommodation was implemented Robinson and Kim viewed it as a viable long-term solution.  Centerview alleges that Robinson and Kim had not determined whether the accommodation was a permanent solution.  *See* Doc. 125-4 at 22; *see also* Doc. 125-3 at 17.  While Shiber alleges that Robinson and Kim never stated that the accommodation was "a short-term accommodation" and that Centerview never asked for any alternatives.  Doc. 124 ¶¶ 27–28.

The following Monday morning, August 31, 2020, Shiber emailed to Marylee Verdi, a nurse practitioner at Dartmouth who had been Shiber's primary care provider for the prior two years, to request a medical note:

> I think the [medical] letter just needs to say I have significant medical conditions which require:  9 hours of sleep per night [and] [c]onsistent times off for a stable sleep schedule in order to function properly and maintain my health.

Doc. 124-6 at 2.

The next day, on September 1, 2020, Shiber gave Robinson a letter from Verdi.

Doc. 118-5 at 2; *see* Doc. 126 ¶ 47.  In that letter, Verdi wrote:

> I am writing on behalf of [] Shiber, as I have been her primary care provider for the last 2 years.  Because of [Shiber's] underlying medical diagnosis, she requires consistent sleep 8–9 hours.  If she is not able to maintain a regular sleep schedule she is a[t] a significant risk for exacerbation of her illness.

Doc. 118-5 at 2.[9]

---

[9] Later, at her deposition on February 14, 2023, Verdi stated that there could be flexibility in Shiber's sleep schedule.  Doc. 125-6 (transcript of the deposition of Verdi) at 5 ("[I]t may not necessarily be hours of

Also on September 1, 2020, Shiber emailed Robinson with subject line, "Logistics":

> I really appreciate all your help sorting out this medical stuff. Could you please let me know what you relayed to the team? Just so I have a sense of what everyone knows/expects. What I should say when I need to sign off? I am concerned about how to manage that. For example - right now I just submitted something for comments and it's unlikely I'll be able to turn them in time since they want to send it up tonight. How should I say that? Also, in terms of actual timing, what do you think is the best/most productive/straight-forward way to manage/set the expectation? For example, I'm usually expected to be "in" by 9:30. But, we frequently have calls at 8, which is a pretty significant bump forward in schedule.

Doc. 118-17 at 2.

That same day, Vicari emailed Robinson and stated, "Fyi – Seems the teams did a good job giving her space over the weekend." Doc. 118-14 at 2.

The next day, on September 2, 2020, Shiber and Robinson spoke regarding the accommodation. Doc. 126 ¶ 52. Robinson explained that the Project Dragon team was told that Shiber had a hard stop from midnight to 9:00 a.m. and that no reason was given to the team for that accommodation. *Id.* Robinson also explained that there was no expectation that Shiber join 8:00 a.m. calls. *Id.*

That same day, Kim emailed Ernst and Gallea, with subject line "Kate" (in reference to Shiber): "Are you guys managing ok? Do we need to get additional staffing? Let me know what you think." Doc. 118-3 at 2. Ernst responded:

> Thanks … we've been sticking to the plan of midnight to whenever Dragon [] requests a call in the morning is off limits. We are

---

sleep, but has to be consistent. You know, 12 midnight to 5 in morning – you know, consistently – even on weekends, within an hour or so.").

Shiber disputes that she needed 8 to 9 hours of sleep consistently and instead alleges that she just needed it frequently. *See* Doc. 124 ¶¶ 68–69 (Shiber: "Although Kim had very little recollection of conversations with me, he recalled my saying that I did not need to have consistent sleep every night, just that I needed it frequently."); Doc. 125-4 at 23 (Kim: "I have a recollection of exploring the boundaries of what eight to nine hours meant … I recall her saying that she didn't need to have it every night, but she needed to have it very frequently.); *see also* Doc. 125-6. However, it is undisputed, at the time that the accommodation was implemented, that the medical documentation provided by her healthcare provider specified that Shiber required 8 to 9 hours of sleep consistently. *See* Doc. 118-5 at 2.

certainly busy but can manage through the near-term. Our only question is whether this is a near-term or long-term set-up. We don't have context on the situation, and understand we aren't supposed to, but if this set-up drags on longer than a week or so, we may need additional staffing but can figure that out when we get there.

I also think it is not really effective from her perspective over the long-term because things take a while for her (as expected) but we end up having to jump in to turn our own comments because she has to stop before she is able to get to it so it is difficult for her to own things to completion. Since she has to jump in and out of workstreams, and this will keep moving so fast, I think it will get increasingly confusing for her as [Gallea][10] and I keep building things out without her. Then she can get stuck in what I would call the vicious first-year cycle of not knowing what's going on, so her work is wrong, we don't have time or its midnight so [Gallea] and I fix it, and then it repeats and she gets discouraged. Again, not an issue if this is a near-term situation but figured I'd flag as well.

*Id.*

Kim responded, "Thanks, Tim - this is going to be a longer term situation, so let's discuss solutions next week. Definitely appreciate the nuances of what you have pointed out []." *Id.*

Ernst forwarded this email exchange to Baron, the principal working on Project Dragon, and wrote: "FYI - let me know if you disagree but it just won't be helpful if this thing keeps going fast. I think it's impossible for a first year to become value additive on something going this fast if they aren't fully plugged in." *Id.* Baron responded: "Completely agree. It's not helpful for anyone if she can't get up to speed and own things as there is too much to do, and we need a full person to help with everything that needs to get done. Sorry you guys aren't getting the leverage we hoped for here." *Id.*

After the accommodation was implemented, Ernst observed, as he anticipated in the above-referenced emails, that Shiber had difficulties keeping up with the changes that

---

[10] Ernst refers to "Matt," but as previously mentioned, there are two Matts in the team. Doc. 126 ¶ 14. The Court assumes that Ernst is referring to Gallea because he is cc'ed in this email. Doc. 118-3.

had been made to her work from the night prior.  Doc. 125-5 at 23.[11]  Ernst discussed his

concerns regarding Shiber and the accommodation with Gallea and Kim.  *Id.* at 22–23.

The next day, on September 3, 2020, Ernst wrote to Kim:

> I caught up with [Baron] this morning and he wanted to get a sense
> for how we can better manage the time on this account (to the extent
> we can) given the really late nights.  As this pace continues to pick
> up, it's going to become more and more difficult to give [Shiber]
> responsibility for different workstreams (as opposed to just
> individual one-off tasks) and it is already becoming very inefficient.
> We discussed and think it may make sense to figure out staffing
> alternatives sooner rather than later.

Doc. 118-15 at 2.

Later that day, Ernst followed up and wrote:  "[S]poke with [Baron] and we think

that it makes sense to add another person as soon as possible who is around [Gallea's]

level and would be able to help out right away."  *Id.*

A few days later, on September 8, 2020, Centerview added another analyst to

Project Dragon.  Doc. 126 ¶ 58; *see* Doc. 118-16.  Centerview alleges that the additional

team member was added due to the concerns Ernst raised regarding staffing.  Doc. 125-4

at 29 (Kim:  "I … was [trying] to figure out whether they needed to have additional

staffing, which we actually did end up doing, adding someone to the team, at least in part

because of Tim's very thoughtful e-mail here about the issues that this [accommodation]

was creating"); *see* Doc. 125-5 at 22, 27–28.

A few days later, on September 11, 2020, Vicari sent a link entitled "black

helmet" to Robinson and Amanda Kosowsky, Centerview's chief compliance officer, and

wrote:  "Read about the black helmet."  Doc. 124-8; *see* Doc. 124 ¶ 50.  This link led to a

profile of Shiber in a sailing team website that referenced that she was "recognizable

---

[11] Shiber alleges that after the accommodation was implemented, she received "largely positive feedback" from Ernst and Gallea, and that no one on the Project Dragon team expressed to her that "they were dissatisfied with [her] performance or the quality of [her] work."  Doc. 124 ¶¶ 36–37.  Shiber, however, does not cite to any evidence corroborating the positive feedback.  In fact, there is evidence to the contrary, specifically, Ernst testified that after the accommodation was implemented, Shiber made "more mistakes."  Doc. 125-5 at 23.

because of the black helmet that [she] wore on the water due to the concussions that [she] had suffered in high school." Doc. 124 ¶ 50. Later the day, Kosowsky responded with a link to www.katsails.com/concussion, which was a blog that Shiber created when she was in high school regarding her sailing experiences. Doc. 124-8; *id.* ¶ 50. Vicari testified that she decided to terminate Shiber the same day that she sent the black helmet email. *See* Doc. 125-2 at 22.

A few days later, on September 15, 2020, Shiber was terminated during a WebEx video call with Vicari and Robinson. Doc. 126 ¶ 61.[12] Vicari informed Shiber that she could not "perform the essential functions of this job, which require[d] [] [her] to [] be available 24/7 … given the unpredictable workload" and that the decision to terminate her was "irrevocable." Doc. 125-2 at 29.[13] Vicari explained that Centerview's ability to protect the "blackout period" was not going to be sustainable with the Program. *Id.* Vicari also told Shiber that she took "a coveted spot" in the Program "where [she] agreed to fulfill the requirements for three years [that] given the accommodation she [could not] fulfill" and that Centerview could have given the spot to someone else. *Id.* at 31.[14] Shiber responded to Vicari and Robinson that, rather than be terminated, she would prefer "to rescind the accommodation and that [she] would work whatever hours were needed." Doc. 124 ¶ 45; *see id.* at 29.[15] Vicari responded that Centerview could not "ignore [the]

---

[12] Shiber had not spoken with Robinson between September 2 and September 15, 2020. Doc. 124 ¶ 35.

[13] Vicari did not discuss the decision to terminate Shiber's employment with Kim, Ernst, Baron, or Gallea. *See* Doc. 125-2 at 14–15, 22.

[14] At her deposition, in response to being asked whether she told Shiber that she "made a mistake in accepting the job knowing [she] couldn't complete the job," Vicari responded: "I do believe she made a mistake in accepting the job with respect to her own health situation, and what a job at Centerview as an analysts entails." Doc. 125-2 at 29.

At her deposition, in response to being asked if she told Shiber that "she should have known that she would have been unable to do the job and that the [analyst] position would require many 120-hour weeks over the three years, which she should have known," Vicari responded: "I did not say that as such." *Id.* at 30.

[15] Shiber notes that she was already working 105 hours per week with the accommodation in place and was willing to work more to keep her job. Doc. 124 ¶ 45.

doctor's note," referencing Verdi's letter that there was a "significant risk" that her illness could be exacerbated if Shiber did not get 8–9 hours of consistent sleep  Doc. 125-2 at 29.

Centerview determined that given the demands of the analyst position, the accommodation was unsustainable and could not be maintained long term.  *Id.* at 21; Doc. 125-3 at 27, 29.  Centerview further determined that Shiber was unable to perform the duties of an analyst with the accommodation.  Doc. 126 ¶ 60; *see* Doc. 125-2 at 27 (Vicari:  "all that unpredictability, I decided, was unsustainable to protect her in the long run, to protect that blackout period over a long, three year period.").

Prior to Shiber's request for an accommodation, Centerview had not received any request from any of its investment bankers for an accommodation for "consistent" time-off over a prolonged period, or a request from any employee for an accommodation relating to that employee's sleep schedule.  Doc. 126 ¶ 66.

**B.  Procedural History**

Shiber initiated this action against Centerview, asserting claims only under the NYCHRL and seeking over $5 million in damages on April 23, 2021.  Doc. 1 Centerview moved to dismiss the complaint on July 9, 2021.  Doc. 16.  In response, Shiber amended her complaint on July 23, 2021, adding claims under the NYSHRL and the NJLAD.  Doc. 18.  Shiber again amended her complaint on August 23, 2021, adding claims under the ADA.  Doc. 23.  Centerview moved to dismiss the NYSHRL and NYCHRL claims for lack of subject matter jurisdiction on September 27, 2021, which the Court granted on April 20, 2022.  Docs. 24, 30.

On March 20, 2024, Shiber sought leave to amend her complaint based on the change in law following the New York Court of Appeals' decision in *Syeed v. Bloomberg*, 235 N.E.3d 351 (Mar. 14, 2024).  Doc. 100.  The Court granted Shiber's request to file an amended complaint reviving her NYSHRL and NYCHRL claims on July 2, 2024.  Doc. 108.  In the third amended complaint, Shiber brings the following claims:

- disability discrimination under NYCHRL §8-107(1)(a) (Count 1),
- failure to engage in a cooperative dialogue in violation of NYCHRL §8-107(28) (Count 2),
- failure to provide a reasonable accommodation in violation of NYCHRL §8-107(15)(a) (Count 3),
- retaliation in violation of NYCHRL §8-107(7) (Count 4),
- disability discrimination under NYSHRL §296(1)(a) (Count 5),
- failure to provide a reasonable accommodation in violation of NYSHRL §296(3)(a) (Count 6),
- disability discrimination under the NJLAD, § 10:5-12(a) (Count 7),
- failure to accommodate her disability in violation of the NJLAD § 10:5-12(a) and NJ Admin. Code § 13:13-2.5 (Count 8),
- failure to engage in an interactive process in violation of the NJLAD § 10:5-12(a) and NJ Admin. Code § 13:13-2.5 (Count 9),
- disability discrimination in violation of the ADA (Count 10), and
- failure to grant a reasonable accommodation in violation of the ADA (Count 11).

Doc. 110.

Centerview moves for summary judgment as to all counts except Count 2. Doc. 115.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* (citing *SCR Joint Venture*, 559 F.3d at 137). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence

sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue. *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (citations omitted); *see also Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (stating courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions") (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials— apply no less to discrimination cases." *Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137. Courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

### III.    DISCUSSION

### A.  Counts 1, 5, 7, & 10 – Disability Discrimination Claims under ADA, NYSHRL, NYCHRL, and NJLAD

Centerview contends that Shiber fails to establish a prima facie case of discrimination, and that even if she did, Centerview offers a legitimate, non-pretextual reason for her termination.

Disability discrimination claims under ADA, NYSHRL, NYCHRL, and NJLAD are properly analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *DeSantis v. New Jersey Transit*, 756 Fed. Appx. 197, 202 (3d Cir. 2019) (applying *McDonnell Douglas* framework to ADA and NJLAD claims); *Asiedu v. Broadreach Medical Resources*, No. 19-cv-11825 (ER), 2022 WL 4237077, at *9 (S.D.N.Y Sept. 13, 2022) (applying *McDonnell Douglas* framework to NYSHRL claim); *Balgley v. N.Y.C. Health & Hospitals Corp.*, No. 14-cv-9041 (KBF), 2017 WL 95114, at *4 (S.D.N.Y. Jan. 10, 2017) (applying *McDonnell Douglas* framework to ADA and NYCHRL claims).  A plaintiff's first step under *McDonnell Douglas* is to establish a prima facie case of discrimination.  *Banks v. General Motors, LLC*, 81 F.4th 242, 270 (2d Cir. 2023) (quoting *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000)).

The burden at this stage "is not onerous."  *Id.* (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  Once the plaintiff has established a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse action.  *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *McDonnell Douglas*, 411 U.S. at 802).  Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination.  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804); *Banks*, 81 F.4th at 270–71 (citing *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)).

In order to establish a prima facie case of disability discrimination, Shiber must show that:  (1) her employer is subject to the ADA; (2) she is disabled within the meaning of the ADA; (3) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability.  *Beaton v. Metropolitan Transportation Authority New York City Transit*, No. 15-cv-8056 (ER), 2018 WL 1276863, at *4 (S.D.N.Y Mar. 2, 2018) (citing *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)); *see also Penberg v. HealthBridge Management*, 823 F. Supp. 2d 166, 181 (E.D.N.Y. 2011) (NYSHRL).

For purposes of this motion, Centerview contests only the third and fourth elements of Shiber's prima facie case for disability discrimination.

Evidence of whether a particular function is essential under the ADA includes, but is not limited to:  (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past incumbents in the job; and/or (7) the current work experience of incumbents in similar jobs.  *Jones v. New York City Transit Authority*, 838 F. App'x 642, 645 (2d Cir. 2021) (summary order) (citing 29 C.F.R. § 1630.2(n)(3)); *see Fatcheric v. Bartech Grp., Inc.*, No. 15-cv-9702 (WHP), 2017 WL 3084418, at *5 (S.D.N.Y. July 19, 2017) (noting that the NYSHRL and NYCHRL have very similar requirements with respect to the ADA's "essential functions" test); *Van de Pol v. Caesars Hotel Casino*, 979 F. Supp. 308, 312 (D.N.J. 1997) ("all conclusions reached by this court regarding plaintiff's ADA claim apply equally to plaintiff's NJLAD claim").  The inquiry into whether a particular function is essential for any given position is a fact intensive one.  *Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 569 (S.D.N.Y. 2023) (citation omitted).  "[A] court must give substantial deference to an

employer's judgment as to whether a function is essential to the proper performance of a job." *McBride v. BIC Consumer Products Management Co.*, 583 F.3d 92, 98 (2d Cir. 2009) (citation omitted).

Centerview argues that the above factors support a "finding that the ability to be available at all hours of the day and to work long, unpredictable hours is an essential function of the analyst role." Doc. 117 at 18. Specifically, Centerview's judgment of what is essential, the amount of time spent by a junior analyst performing the function, the consequences of waiving an analyst's ability to work unpredictable hours, and the actual work experience of other junior analysts at Centerview and in the investment banking industry generally. *Id.* at 18–20. Shiber counters that Centerview did not identify an essential function that she was unable to fulfill. Doc. 127 at 13. Shiber further notes that Centerview fails to cite to any internal job description or firm policy corroborating that the ability to available at all hours of the day and work long, unpredictable hours is an essential function of the analyst position. *Id.*[16]

Here, Centerview does not provide sufficient evidence for the Court to conclude that a reasonable jury could not find in favor of Shiber that the ability to be available at all hours of the day and to work long, unpredictable hours is not an essential function of the analyst role. In the first place, Centerview does not provide a job description or firm policy that supports its position. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 222 (2d Cir. 2001) (finding that summary judgment should have not have been granted because there is a genuine issue of material fact as to whether possessing a driver's license was an essential function of plaintiff's job where "[n]owhere in the three-

---

[16] The Court notes that Shiber mischaracterizes what Centerview describes as the essential function at issue here. Centerview argues that the essential function is the ability to be *available* at all hours of the day and to work long, unpredictable hours. Doc. 117 at 18. While Shiber argues that Centerview requires that analysts be able to work without sleep. Doc. 127 at 13–14. However, Centerview never argues that the ability to work without sleep is an essential function of the job. For purposes of this motion, the Court assumes that the essential function is the ability to be available at all hours of the day and to work long, unpredictable hours.

page job description does it say that managers and assistant managers must possess a valid driver's license.").

As Shiber aptly notes, Centerview also does not provide any analysis of the hours that its analysts actually work, nor does it provide any substantive testimony about the hours that other entry-level employees work at comparable firms. Doc. 127 at 20. Indeed, Centerview does not provide any comprehensive data on hours actually worked on the Project Dragon deal. Centerview instead relies on 33 Vault.com reviews and the depositions of four Centerview employees (Ernst, Kim, Robinson, and Vicari) regarding the hours of junior investment bankers in Centerview and the investment banking industry generally are expected to work, which clearly does not meet an objective standard. *See McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) ("A court must avoid deciding cases based on 'unthinking reliance on intuition about the methods by which jobs are to be performed … Instead, a court must conduct 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.'") (citations omitted). In addition, there is no evidence in the record that Shiber reviewed the Vault.com entries prior to starting at Centerview, and at her deposition, Centerview did not ask Shiber about the Vault.com entries.

Centerview also relies on evidence that Centerview has a ███████████████ ████████████████████████████████████████████████ ██████ Doc. 125-4 at 6. However, Centerview does not provide any information about what Shiber was specifically asked or what was discussed in this interview. Centerview only cites to Kim's deposition testimony, which briefly discusses ████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████ *See id.* at 6–7; Doc. 118-2. In her deposition, Shiber testified that at the interview, she was not told how many hours analysts at Centerview were expected or required to work. Doc. 125-1 at 44.

Accordingly, the Court denies summary judgment on Counts 1, 5, 7, and 10, the disability counts, because there is a genuine dispute of fact whether the ability to be available at all hours of the day and to work long, unpredictable hours is an essential function of the analyst role.[17]

### B.  Counts 3, 6, 8, & 11 – Failure to Provide Reasonable Accommodation Claims under ADA, NYSHRL, NYCHRL, and NJLAD

NYSHRL, NYCHRL, and NJLAD failure to accommodate claims are analyzed in the same way as ADA claims.  *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 76 (2d Cir. 2019); *see also McKenna v. Santander Investment Securities Inc.*, No. 21-cv-941 (DLC), 2022 WL 2986588, *7 (S.D.N.Y. July 28, 2022) ("Claims under the NYSHRL for a failure to accommodate are governed by the same legal standards as federal ADA claims." (citing *Fox*, 918 F.3d at 76); *Campbell v. IPsoft Inc.*, No. 18-cv-10684 (DF), 2021 WL 4248861, at *21 (S.D.N.Y. Sept. 17, 2021); *Rich v. Verizon New Jersey Inc.*, No. 16-cv-1895 (FLW) (DEA), 2017 WL 6314110, at *21 n. 16 (D.N.J. Dec. 11, 2017). Disability discrimination under the ADA "includes a failure to provide an employee with a reasonable accommodation for [her] disability."  *Nieblas-Love v. N.Y.C. Housing Authority*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016) (citing G*raves v. Finch Pruyn & Co.*, 457 F. 3d 181, 184 (2d Cir. 2006)); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (quoting 42 U.S.C. § 12112(b)(5)(A)).  Accordingly, such a claim for failure to accommodate is also examined under the *McDonnell Douglas* burden-shifting framework.  *Berger v. N.Y.C. Police Department*, 304 F. Supp. 3d 360, 368–69 (S.D.N.Y. 2018).

To establish a prima facie claim under the ADA for failure to accommodate, an employee must show that:  (1) she is disabled within the meaning of the ADA, (2) her

---

[17] Because the Court has determined that there is a genuine dispute of fact as to the essential function of the analyst role, the Court will not analyze whether (1) Shiber could not perform the essential function with or without any reasonable accommodation, (2) Centerview presented a legitimate, non-discriminatory reasons for Shiber's termination, or (3) Shiber cannot show that Centerview's offered reason for termination is pretextual.

employer is covered by the ADA and had notice of her disability, (3) she could perform the essential functions of her job with reasonable accommodation, and (4) her employer refused to provide such an accommodation despite being on notice. *Fox*, 918 F.3d at 73 (citation omitted); *see Nieblas-Love*, 165 F. Supp. 3d at 73 (citing, *inter alia*, *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)); *see also Noll v. International Business Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). "Under the burden-shifting framework applied in these cases, after the plaintiff satisfies [her] burden of 'production and persuasion as to the existence of an accommodation that is facially reasonable,' the burden 'shifts to the defendant to rebut the reasonableness of the proposed accommodation,' which 'is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship.'" *Berger*, 304 F. Supp. 3d at 369 (quoting *Wright v. N.Y. State Department of Corrections*, 831 F.3d 64, 76 (2d Cir. 2016)).

"[G]enerally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Costabile v. N.Y.C. Health & Hospitals Corp.*, 951 F.3d 77, 81 (2d Cir. 2020) (per curiam) (quotation omitted). "An employer is required to engage in an interactive process upon notice of the need for an accommodation." *Gaughan v. Rubenstein*, 261 F. Supp. 3d 390, 419 (S.D.N.Y. 2017) (citation omitted); *see Goonan v. Federal Reserve Bank of New York*, No. 12-cv-3859 (JPO), 2014 WL 3610990, at *4–*5 (S.D.N.Y. July 22, 2014). "To trigger the duty to engage the interactive accommodations process, the employer must have known, or have had sufficient notice such that the employer reasonably should have known, that the employee has a disability within the meaning of the Act, as opposed to a mere impairment." *Costabile,* 951 F.3d at 81. Even still, "[t]he employer's failure to engage in such an interactive process … does not relieve a plaintiff of her burden of demonstrating, following discovery, that some accommodation of her disability was possible." *McBride*, 583 F.3d at 101; *see also McElwee v. County of Orange*, 700 F.3d 635, 642 (2d Cir.

2012).  To meet that burden, a plaintiff must show that the costs of the accommodation, at least facially, do not clearly exceed its benefits.  *See McElwee*, 700 F.3d at 642.

For purposes of the instant motion, Centerview does not dispute that Shiber has met the first two elements of a prima facie case of discrimination for failure to accommodate.  Accordingly, the only questions before the Court are whether there is a genuine dispute over whether Shiber could perform the essential functions of her job with an accommodation, and whether Centerview refused to provide her with a reasonable accommodation.

Centerview argues that because Shiber could not perform an essential function of her analyst position, the ability to work indeterminate hours on a daily basis, there was no reasonable accommodation it could have provided to ensure Shiber received eight to nine hours of sleep per night.  Doc. 117 at 21–22, 27–28.  Shiber argues that that a jury could find that she was could perform the essential duties of an analyst.  Doc. 127 at 29–30.

Here, the Court denies summary judgment because, as already discussed, there is a genuine dispute whether the ability to be available at all hours of the day and to work long, unpredictable hours is an essential function of the analyst role.  There is also a factual dispute as to whether there was an alternate reasonable accommodation that Centerview could have provided.  Specifically, Shiber alleges that she could have performed her job so long as she could get 8–9 hours of sleep "frequently," and not necessarily every day.  This position was supported by Verdi, Shiber's healthcare provider, who testified at her deposition that:  "[I]t may not necessarily be hours of sleep, but has to be consistent.  You know, 12 midnight to 5 in morning – you know, consistently – even on weekends, within an hour or so."  Doc. 125-6 at 5.  There is also no dispute that when she was terminated, Centerview stated plainly that the decision was "irrevocable' and allowed no further conversation, despite Shiber's efforts to continue to engage.  Accordingly, a genuine issue of fact exists as to whether Shiber could perform the job with a reasonable accommodation.

### C. Count 9 – Failure to Engage in an Interactive Process Pursuant to the NJLAD[18]

To show under NJLAD that an employer failed to participate in the interactive process, a disabled employee must demonstrate:  (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.  *Boles v. Wal-Mart Stores, Inc.*, No. 12-cv-1762 (JLL), 2014 WL 1266216, at *12 (D.N.J. Mar. 26, 2014) (citation omitted); *see also Bravo v. Union County*, No. 12-cv-2848 (DRD), 2013 WL 2285780, at *12 (D.N.J. May 23, 2013).  "The burden is first upon the employee to request assistance, and then upon the employer to come up with potential accommodations."  *Boles*, 2014 WL 1266216, at *12 (citation omitted).  "While there are no magic words to seek an accommodation, the employee, however, must make clear that ... assistance [is desired] for [] her disability."  *Id.* (citation omitted).

An employer is required to initiate a good faith interactive process regarding accommodations before reasonably determining whether an employee's disability reasonably precludes performance of her essential job functions.  *Whalen v. New Jersey Manufactures Insurance Co.*, No. A-3155-09T4, 2012 WL 3166601, at *14 (N.J. Super. Ct. App. Div. Aug. 6, 2012) (citations omitted); *see also Williams v. Philadelphia Housing Authority Police Department*, 380 F.3d 751, 772 (3d Cir.2004), *cert. denied*, 544 U.S. 961 (2005).  For example, an employer's good faith attempt may be shown by meeting with the employee, requesting information about the condition and what limitations the employee has, asking the employee what she specifically wants, and offering and discussing available alternatives when the request is too burdensome.  *Taylor*

---

[18] Centerview does not seek summary judgment on the failure to engage in the cooperative dialogue claim pursuant to the NYCHRL.

*v. Phoenixville School District*, 184 F.3d 296, 317 (3d. Cir. 1999); *see also Jones v. Aluminum Shapes, Inc.*, 339 N.J. Super. 412, 423–26 (App. Div. 2001) (applying *Taylor* to an NJLAD claim). Participation in the interactive process "is the obligation of both parties," and the "employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals." *Taylor*, 184 F.3d at 317.

Here, Centerview does not dispute that Shiber requested an accommodation. Doc. 117 at 28 n.4. Centerview argues that it fulfilled its obligations in participating in the interactive process because its employees and Shiber "had multiple conversations regarding possible accommodations and the feasibility thereof." *Id.* at 30. Centerview further argues that the fact that "no solution was viable, does not negate [its] good faith engagement in the interactive process." *Id.; see Victor v. State*, 203 N.J. 383, 424 (2010) ("Engaging in the interactive accommodation process 'does not dictate that any particular concession must be made by the employer ... [but instead what it] requires is that employers make a good-faith effort to seek accommodations.") (citation omitted). Shiber counters that Centerview "glosses over" the interactive process and that "the only time that anyone at Centerview discussed the accommodation with Shiber was when [it was] implemented on August 28 and when she was terminated on September 15." Doc. 127 at 30.

The Court denies summary judgment because there is a genuine dispute of fact whether Shiber has established a prima facie case of discrimination. Specifically, as already discussed, there is a factual dispute as whether the ability to be available at all hours of the day and to work long, unpredictable hours is an essential function of the analyst role. In addition, Centerview *did not* offer or discuss alternatives with Shiber when it determined that the accommodation was too burdensome and instead terminated Shiber from her position, stating that its decision was "irrevocable" without further

negotiation.  *See Taylor*, 184 F.3d at 317 (explaining that an employer's good faith attempt can be shown, among other things, by offering and discussing available alternatives when the accommodation request is too burdensome).

### D.  Count 4 – Retaliation Claim under the NYCHRL

To establish a prima facie case of retaliation under the NYCHRL, a plaintiff must show that:  (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) she suffered an action that would be reasonably likely to deter a person from engaging in a protected activity; and (4) a causal connection exists between the protected activity and the action.  *Pilgrim v. McGraw–Hill Companies, Inc.*, 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009).  The NYCHRL's retaliation provision is broader than that under federal and state law, in that it protects "plaintiffs who 'oppos[e] any practice forbidden under' the law from conduct 'reasonably likely to deter a person engaging in such action.'"  *Ya-Chen Chen v. City University of New York*, 805 F.3d 59, 76 (2d Cir. 2015) (quoting *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) and citing N.Y.C. Admin. Code § 8–107(7)).  Under NYCHRL, "there is no [] requirement that the employee suffer a materially adverse action" and "it is illegal for an employer to retaliate in 'any manner.'"  *Pilgrim,* 599 F. Supp. 2d at 469.  If relevant, the *McDonnell Douglas* burden-shifting analysis also applies.  *Id.*

Centerview contests only the fourth element, the causal connection of the request for an accommodation and termination, of Shiber's prima facie case under the NYCHRL. Centerview argues that the evidence presented substantiates that Shiber was terminated "because she was not qualified to perform the analyst role without accommodation, and that [it] could not sustain the accommodation she had requested."  Doc. 117 at 31. Centerview further argues that even assuming that the Court found that there was a causal connection, it had a legitimate, non-discriminatory reason for her termination, specifically terminating Shiber "because no reasonable accommodation existed that would enable her to perform the essential functions of her job."  *Id.*; Doc. 133 at 10 n.4.  Shiber instead

argues that she was indisputably fired because of her accommodation request because, as Vicari told her, her accommodation was unsustainable with the Program.   Doc. 127 at 32; *see* Doc. 125-2 at 29.[19]  Specifically, Vicari informed Shiber that she could not "perform the essential functions of this job, which require[d] [] [her] to [] be available 24/7 … given the unpredictable workload" and that the decision to terminate her was "irrevocable."  Doc. 125-2 at 29.[20]  Vicari also told Shiber that she took "a coveted spot" in the Program "where [she] agreed to fulfill the requirements for three years [that] given the accommodation she [could not] fulfill."  *Id.* at 31.  Shiber further argues that the "hostility that Vicari showed to Shiber while firing her demonstrates the retaliatory animus" and notes that there was temporal proximity between Shiber's request for accommodation and termination, which supports the retaliation claim.  Doc. 127 at 32.

Here, the Court denies summary judgment because Centerview has not proven as matter of law that Shiber could not perform the analyst role without the accommodation. There is also factual dispute whether Centerview retaliated against Shiber by firing her for requesting an accommodation.  *Velez v. Girraphic LLC*, No. 20-cv-5644 (JPC), 2021 WL 1873233, at *6 (S.D.N.Y. May 10, 2021) ("The NYCHRL further provides that failing to provide a reasonable accommodation for a person with a disability and retaliating against a person for requesting a reasonable accommodation are discriminatory practices.").  In addition, the temporal proximity between Shiber's request for accommodation and termination, a total of 18 days, supports an inference of retaliation.  *See Tafolla v. Heilig*, 80 F.4th 111, 126 (2d Cir. 2023).

---

[19] At her deposition, in response to being asked whether she told Shiber that she "made a mistake in accepting the job knowing [she] couldn't complete the job," Vicari responded:  "I do believe she made a mistake in accepting the job with respect to her own health situation, and what a job at Centerview as an analysts entails."  Doc. 125-2 at 29.

[20] Vicari did not discuss the decision to terminate Shiber's employment with Kim, Ernst, Baron, or Gallea. *See* Doc. 125-2 at 14–15, 22.

## IV.    CONCLUSION

For the foregoing reasons, the motion for partial summary judgment is DENIED. The parties are directed to appear for a conference on October 21, 2025 at 11:00 a.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 115.

It is SO ORDERED.

Dated:    September 29, 2025
          New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.